## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------------x

In re

CARIBBEAN PETROLEUM CORP., et al.,[1]

                  Debtors.

:    Chapter 11

:    Case No. 10-_____ ( )

:

:    Joint Administration Requested

-------------------------------------------------------------------------x

## DECLARATION OF NICOLÁS LÓPEZ PEÑA IN SUPPORT
## OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

        I, Nicolás López Peña, under penalty of perjury, hereby declare that the following is true to the best of my knowledge, information, and belief:

        1.    I am the Chief Financial Officer of Caribbean Petroleum Corporation ("CPC") and Caribbean Petroleum Refining, L.P. ("CPR"), two of the three affiliated Debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Cases"). I have held the position of Chief Financial Officer of CPC and CPR from June 2006 to the present. From June 2008 to June 2010, I also held the positions of interim Chief Executive Officer of CPC and CPR.

        2.    I am admitted to the Puerto Rico Bar, and prior to joining CPC and CPR in June 2006, I was a partner with the Puerto Rico-based general practice law firm of Correa, Collazo, Herrero & Fortuño P.S.C.

        3.    On the date hereof (the "Petition Date"), CPC, CPR and Gulf Petroleum Refining (Puerto Rico) Corporation ("GPC") each filed a voluntary petition for relief under

---

[1] The debtors in these chapter 11 cases (along with the last four digits of each Debtor's federal tax identification number) are: Caribbean Petroleum Corporation (7836), Caribbean Petroleum Refining, L.P. (1421), and Gulf Petroleum Refining (Puerto Rico) Corporation (1417) (collectively, the "Debtors"). The service address for all of the Debtors is: PO Box 361988, San Juan, Puerto Rico 00936.

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.    In my capacity as Chief Financial Officer of CPC and CPR, I am generally familiar with the day-to-day operations, business and financial affairs, and books and records of the Debtors.[2] I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of the Cases, and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and (ii) the relief, in the form of motions, that the Debtors have requested of the Court on the Petition Date (the "First Day Pleadings").

5.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration and I am authorized to submit this Declaration on behalf of the Debtors.

6.    As discussed in more detail herein, the commencement of the Cases was precipitated by catastrophic accidental explosions that occurred in October 2009 at the Debtors' facilities located in Bayamón, Puerto Rico. Prior to these devastating incidents, the Debtors were one of the primary importers and distributors of petroleum products in Puerto Rico. However, the explosions, ensuing fires, and substantial related damage have effectively halted

---

[2] Although I am not an officer of GPC, I am generally familiar with the business and financial affairs of GPC through my role as Chief Financial Officer of CPC and CPR. GPC is the general partner of CPR which, as discussed herein, is a Delaware limited partnership. GPC has no operations and holds no assets other than a 1% interest in CPR. Accordingly, in describing the Debtors' operations and financial affairs herein, unless otherwise noted, I am referring generally to CPC and CPR.

-2-

the Debtors' operations and resulted in severe liquidity constraints impacting the Debtors' ability to service their outstanding debt obligations.

7.      Accordingly, prior to the commencement of the Cases, the Debtors engaged in extensive, good-faith negotiations with their prepetition senior secured lender, Banco Popular de Puerto Rico ("Banco Popular"), which holds a lien on substantially all of the Debtors' assets, and a claim against the Debtors in the approximate principal amount of $137 million.[3] Through these discussions, the Debtors determined that an expedited sale of substantially all of the Debtors' assets is the best available means by which to maximize the value of the Debtors' estates for the benefit of creditors. The Debtors, with the support of Banco Popular, commenced the Cases to implement the aforementioned sale process, and to achieve a comprehensive restructuring under chapter 11 of the Bankruptcy Code.

8.      Part I of this Declaration provides a brief description of the Debtors' businesses, organizational structure, and significant indebtedness. Part II provides additional detail regarding the circumstances giving rise to the commencement of the Cases. Part III summarizes the First Day Pleadings and the relief sought therein, which the Debtors believe are critical to the administration of the Cases and the Debtors' restructuring efforts.

---

[3] As noted herein, certain other lenders also hold liens on certain assets of the Debtors, which, in some cases, are senior to the liens of Banco Popular pursuant to existing intercreditor arrangements.

# I. DESCRIPTION OF THE DEBTORS

## A. The Debtors' Businesses and Organizational Structure[4]

9. The Debtors' business model is premised upon the import, offloading, storage, and distribution of petroleum products in Puerto Rico. Although legally separate entities, the Debtors' operations are integrated and interdependent. Specifically, CPC purchases and imports petroleum products, CPR offloads and stores CPC's and third party petroleum products, and CPC distributes such petroleum products to retailers located in Puerto Rico.

10. The Debtors are part of a privately-held corporate structure. The Debtors are indirect subsidiaries of the GTRIMG Foundation Vaduz, a trust organized under the laws of Lichtenstein (the "Trust"), the beneficiaries of which are the wife and children of Mr. Gad Zeevi, the Debtors' President, and Chairman of the Debtors' respective Boards of Directors. Three British Virgin Island entities reside between the Trust and the Debtors, including GTRIMG LTD, First Oil International, Ltd. ("FOI") and Oil Resources International ("ORI"). ORI owns direct 100% interests in CPC and GPC, respectively. As described below, CPC and GPC are the limited and general partner, respectively, of CPR. Below is a chart depicting the organizational structure of the Debtors as of the Petition Date:

---

[4] Unless otherwise noted herein, the discussion of the Debtors' operations describes such operations immediately prior to the October 2009 explosions.

RLF1 3599382v. 1



**Caribbean Petroleum Corporation**

11. CPC is a Delaware corporation and the only limited partner of CPR, owning 99% of the partnership interests of CPR. CPC performs management, treasury, and accounting services for CPR, as well as for itself, but maintains separate books and records from CPR.

12. CPC holds (i) a tax grant from the Puerto Rico government and (ii) a permit issued by the United States Customs and Borders Protection that enable CPC to import and distribute petroleum products in Puerto Rico.

13. CPC is a leading distributor of gasoline and other petroleum products through a network of Gulf-branded retail service stations in Puerto Rico (the "Service Stations"),

competing with other distributors such as Texaco, Shell and Total Petroleum.[5] CPC's network of Service Stations consists of 184 Service Stations located throughout Puerto Rico, primarily in the San Juan area. 116 of the Service Stations are located on real property owned by CPC. The other 68 Service Stations are located on property which CPC leases from certain third parties. Each of the Service Stations is leased by CPC to an independent operator (collectively, the "Dealers"). CPC is a party to both short-term and long-term supply contracts with the Dealers, pursuant to which CPC delivers Gulf-branded gasoline and diesel to the Dealers, and the Dealers are obligated to purchase all of their petroleum products from CPC. CPC, in some instances, also sells petroleum products to independent retail and wholesale marketers, as well as industrial, governmental, and marine petroleum end-users.

14. CPC estimates that the Service Stations employ or generate jobs for approximately 1,500 people in Puerto Rico. Prior to the October 2009 explosions, CPC's distribution operations accounted for approximately 13% of the retail gasoline and diesel market in Puerto Rico, and employed, in the aggregate, approximately 39 of the Debtors' employees.

15. For the twelve month period ending September 2009, CPC generated sales revenue of approximately $259 million.

**Caribbean Petroleum Refining, L.P.**

16. CPR is a Delaware limited partnership that owns certain facilities used in connection with the offloading and storage of petroleum products. Specifically, CPR owns, among other things, (i) the only privately-owned deepwater dock in San Juan Harbor (the

---

[5] CPC holds a license from Cumberland Gulf Group of Companies ("Gulf"), the current owner of the GULF brand and related trademarks, to distribute petroleum products in Puerto Rico under the GULF brand. Gulf has disputed the Debtors' right to use the GULF name pursuant to such license, due to certain outstanding license fees owed to Gulf. The Debtors have engaged in negotiations with Gulf in an effort to resolve the dispute between the parties.

RLF1 3599382v. 1

"Dock"), advantageously located in a free trade zone near the major population center of San Juan, (ii) a tank farm (the "Tank Farm") consisting of forty-eight (48) multi-purpose tanks with an aggregate storage capacity of 2.8 million barrels, and twenty-eight (28) liquid petroleum gas tanks that have been out of use since 2006,[6] and (iii) six pipelines (the "Pipelines") that connect the Dock to the Tank Farm.

17.    The Dock allows CPR to load and unload a variety of petroleum products, including fuel oil, crude oil, gasoline, diesel and jet fuel.  It is capable of servicing vessels up to 850 feet long and with 38 feet of draft, and has capacity for up to a 75,000 ton vessel.  The Dock is the only facility in the San Juan Harbor that can handle vessels of this size, and can handle two smaller barges simultaneously, or one large vessel.  The Pipelines, which are 13,000 feet in length, connect the Dock to the Tank Farm and are capable of transporting the range of petroleum products discharged at the Dock.

18.    In addition to servicing the Tank Farm, the Pipelines can also service certain third-parties, including the Puerto Rico Electric Power Authority ("PREPA") and the San Juan Airport.  From January 2009 through September 2009, CPR provided approximately 71% of the jet fuel consumed at the San Juan Airport.

19.    The Tank Farm is capable of storing an array of petroleum products, including fuel oil, crude oil, gasoline, diesel, jet fuel and liquefied petroleum gas.  Prior to the October 2009 explosions, CPR generated revenues through the provision of storage services to

---

[6] As a result of the October 2009 explosions, twenty (20) tanks were destroyed and twelve (12) tanks were damaged.

-7-

PREPA and other customers. CPR also owns 64 acres of undeveloped land located adjacent to the Tank Farm, and a non-operational refinery.[7]

20. Prior to the October 2009 explosions, CPR's operations employed approximately 27 individuals, and either directly or indirectly generated jobs for approximately 100 individuals in the aggregate.

21. For the twelve month period ending September 2009, CPR generated revenues of approximately $13.7 million.

### Gulf Petroleum Refining (Puerto Rico) Corporation

22. GPC is a Delaware corporation. As stated, GPC is the general partner of CPR, owning 1% of the partnership interests of CPR. Aside from performing its duties as the general partner of CPR and its ownership of a 1% partnership interest in CPR, GPC has no other operations or assets.

### B. Significant Indebtedness

### Westernbank Credit Facility

23. On December 17, 2001, predecessors in interest to the Debtors commenced voluntary chapter 11 cases before this Court (the "2001 Bankruptcy Cases"). On March 13, 2003, the Court confirmed a plan of reorganization in the 2001 Bankruptcy Cases proposed by the debtors therein (the "2001 Plan").[8] On March 24, 2003, the 2001 Plan became effective (the "2001 Plan Effective Date"). In accordance therewith, CPC and CPR, as borrowers, entered into an exit loan facility with Westernbank Puerto Rico ("Westernbank"), as

---

[7] CPR's refinery has been non-operational since year 2000.

[8] The 2001 Bankruptcy Cases have been substantially consummated, but remain open. See In re Caribbean Petroleum LP, et al., Case Nos. 01-11657 (KG) through 01-11661 (KG) (Bankr. D. Del. Dec. 17, 2001).

RLF1 3599382v. 1

lender, pursuant to a Loan and Security Agreement, dated as of March 22, 2003 (as amended from time to time, the "Westernbank Credit Facility"). On April 30, 2010, the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico closed Westernbank, and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. The FDIC subsequently entered into a Purchase and Assumption Agreement (the "Purchase and Assumption Agreement") with Banco Popular, dated as of April 30, 2010, pursuant to which Banco Popular assumed certain of Westernbank's deposits and liabilities and purchased certain of Westernbank's assets, including the Westernbank Credit Facility.[9] Accordingly, Banco Popular is the current lender under the Westernbank Credit Facility.

24. The Westernbank Credit Facility is comprised of (i) an $18 million revolving credit facility, of which approximately $1.74 million was outstanding as of July 30, 2010,[10] and (ii) seven term loans with an aggregate outstanding principal balance of approximately $135 million as of July 30, 2010.

25. To secure the Debtors' obligations under the Westernbank Credit Facility, pursuant to certain collateral documents executed in connection therewith, CPC and CPR granted Westernbank (i) second priority liens and mortgages on the Dock and the Pipelines, and (ii) first

---

[9] Pursuant to the Purchase and Assumption Agreement, Banco Popular purchased certain Shared-Loss Assets (as defined in the Purchase and Assumption Agreement), and accordingly, the FDIC and Banco Popular also entered into that certain Commercial Shared Loss Agreement, attached as Exhibit 4.15B to the Purchase and Assumption Agreement (the "Loss Sharing Agreement"). It is my understanding that, pursuant to the Loss Sharing Agreement, under certain circumstances and pursuant to certain conditions, the FDIC guarantees certain losses that may be incurred by Banco Popular in connection with its purchase and assumption of the Westernbank Credit Facility.

[10] Pursuant to the Westernbank Credit Facility, the revolving credit facility is no longer available.

priority liens and mortgages on substantially all of CPC's and CPR's other real and personal property (collectively, the "Westernbank Collateral").[11]

### FirstBank Puerto Rico Credit Facility

26. CPR is party to a Loan Agreement, dated as of December 2, 1998 (as amended from time to time, the "FirstBank Credit Facility"), by and between CPR, as borrower, and FirstBank Puerto Rico ("FirstBank"), as lender. Pursuant to the 2001 Plan and on the 2001 Plan Effective Date, the FirstBank Credit Facility was amended, and the balance of the FirstBank Credit Facility was fixed at approximately $16.7 million. The FirstBank Credit Facility presently consists of a term loan that matures on February 1, 2013, and which has an aggregate outstanding principal balance of approximately $12.5 million as of July 30, 2010. As of the Petition Date, CPR is current with respect to its payment obligations under the FirstBank Credit Facility.

27. Pursuant to certain collateral documents executed in connection with the FirstBank Credit Facility, the FirstBank Credit Facility is secured by a security interest in, and a first priority mortgage on, the Dock and the Pipelines. On the 2001 Plan Effective Date, FirstBank and Westernbank entered into an Intercreditor Agreement, dated as of March 24, 2003 (the "Intercreditor Agreement"), to confirm and acknowledge the relative priorities of such parties' respective interests in certain of the Debtors' assets. Pursuant to the terms of the Intercreditor Agreement, among other things, FirstBank's interest in the Dock and the Pipelines

---

[11] In connection with the Debtors' entry into the Westernbank Credit Facility, certain non-Debtors executed guarantees and other credit support in favor of Westernbank. Specifically, the following documents were executed: (i) that certain Guarantee of Gad Zeevi, dated March 22, 2003; (ii) that certain Guarantee of Talia Zeevi, dated March 22, 2003; (iii) that certain Pledge and Security Agreement of FOI, dated March 22, 2003; and (iv) that certain Guarantee, and Pledge and Security Agreement, of ORI, dated March 22, 2003.

RLF1 3599382v. 1

is senior to Westernbank's interest in such assets, to the extent of the debt owed by CPR to FirstBank under the FirstBank Credit Facility.

### Puerto Rico Treasury Department

28.    In the 2001 Bankruptcy Cases, the Debtors and the Department of Treasury for the Commonwealth of Puerto Rico ("Hacienda") entered into a Payment Compromise Agreement, dated as of March 10, 2003 (the "Hacienda Settlement"), to settle a contested proof of claim filed by Hacienda. Pursuant to the Hacienda Settlement, among other things, the Debtors agreed to remit certain periodic cash payments to Hacienda, in the aggregate amount of $32,000,000. To secure the Debtors' obligations under the Hacienda Settlement, Hacienda was entitled to record mortgages on the real property against which it had filed valid tax liens as of the commencement of the 2001 Bankruptcy Cases, subordinate to the security interests in such assets held by FirstBank and Banco Popular, respectively.[12] As of the Petition Date, the Debtors owe Hacienda approximately $13.5 million pursuant to the Hacienda Settlement, excluding interest.[13]

### Non-Debtor Affiliates

29.    Inpecos. Prior to the commencement of the 2001 Bankruptcy Cases, Inpecos, A.G. ("Inpecos"), a Swiss company and affiliate of the Debtors, routinely procured letters of credit from certain banks, including Credit Suisse First Boston ("Credit Suisse"), to finance purchases of petroleum products by the Debtors' predecessors in interest. During the 2001 Bankruptcy Cases, Inpecos filed a proof of claim against then-CPC in the aggregate amount of $95.6 million, including a secured claim in the amount of $20 million. The 2001 Plan

---

[12] The Debtors' obligations to Hacienda are partially guaranteed by certain non-Debtors.

[13] The Debtors have accrued additional obligations to Hacienda since the 2001 Plan Effective Date.

RLF1 3599382v. 1

provided for the distribution to Inpecos of (i) 3,000 shares of convertible preferred stock in CPC,[14] (ii) a 30% limited partnership interest in CPR,[15] and (iii) on account of Inpecos' allowed secured claim against CPC, deferred cash payments in an amount equal to $15 million, payable directly to Credit Suisse, as secured creditor of Inpecos.[16]

30.     Pursuant to a subsequent agreement between CPC and Inpecos, dated March 24, 2003 (the "Inpecos Agreement"), in lieu of issuing (i) the 3,000 shares of convertible preferred stock in CPC and (ii) the 30% limited partnership interest in CPR, CPC agreed to provide Inpecos with 3% Subordinated Certificated Notes (the "Notes") in the aggregate amount of $80.6 million. Specifically, pursuant to the Inpecos Agreement, CPC issued Inpecos the Notes in three series: (a) $26,866,666.66 of Notes due 2018, (b) $26,866,666.66 of Notes due 2023, and (c) $26,866,666.66 of Notes due 2028. Due to CPC's liquidity constraints, CPC has been unable to make any payment to Inpecos under the Notes since October 2006.

31.     Lexel. Prior to the Petition Date, and with the consent of Westernbank, CPC and CPR obtained various secured and unsecured loans from Lexel Establishment ("Lexel"), a Lichtenstein entity affiliated with the Debtors. As of July 30, 2010, CPC and CPR collectively owed approximately $11.2 million to Lexel on account of these loans. The Debtors

---

[14] Pursuant to the 2001 Plan, the preferred stock granted to Inpecos entitles the holder of each share to receive a dividend of $500 payable in equal quarterly installments commencing the first calendar quarter after the 2001 Plan Effective Date, and to be paid only if all other holders of allowed claims are paid in full at such time under the 2001 Plan.

[15] Pursuant to the 2001 Plan, the limited partnership interest granted to Inpecos entitles the holder to receive an annual distribution thereon in the amount of $750,000, payable in equal quarterly installments commencing on the first day of the first full calendar quarter after the 2001 Plan Effective Date, and to be paid only if all other holders of allowed claims are paid in full at such time under the 2001 Plan.

[16] Specifically, pursuant to the 2001 Plan, Credit Suisse is entitled to receive: (i) an initial $5.25 million cash payment, (ii) an additional $750,000 in cash payments shortly after the 2001 Plan Effective Date, and (iii) $9 million, to be paid in $250,000 installments every 90 days thereafter. As of July 30, 2010, Credit Suisse is owed approximately $2.6 million arising from this arrangement.

RLF1 3599382v. 1

used these advances provided by Lexel to, among other things, construct a large tank capable of holding up to 500,000 barrels of gasoline, and another tank for diesel, so that CPR would have additional capacity to service PREPA and other third parties.

32. In addition to the foregoing, pursuant to a Funding Agreement, dated as of June 6, 2008 (the "Lexel Funding Agreement"), by and between CPC and Lexel, Lexel agreed to fund CPC's purchase of petroleum to sell to unbranded retailers, and Lexel was to receive a percentage of the proceeds from the sale of such products. Pursuant to a letter agreement dated as of June 6, 2008, by and among Westernbank, CPC, CPR and Lexel (the "Funding Intercreditor Agreement"), CPC opened a stand-alone bank account at Westernbank into which Lexel deposited approximately $2.75 million, for use by the Debtors in accordance with the Lexel Funding Agreement. As of July 30, 2010, a principal amount of $1.6 million remained outstanding pursuant to the Lexel Funding Agreement.

## II. KEY EVENTS LEADING TO COMMENCEMENT OF THE CASES

### A. The Explosions

33. As stated above, on and about October 23, 2009, massive explosions and ensuing fires engulfed various of the Debtors' facilities, including significant portions of the Tank Farm (the "Explosions"). The concussive effect of the Explosions measured 2.8 on the Richter scale, and the resulting pressure wave rippled through San Juan and surrounding areas.

34. The Explosions had a devastating impact upon the Debtors' operations and liquidity in that they damaged or destroyed a significant number of the Debtors' storage tanks located at the Tank Farm, surrounding infrastructure, and portions of the Pipelines. Due to the Explosions, CPR lost approximately 50% of its Tank Farm storage capacity, as well as a considerable amount of the Debtors' petroleum products stored therein. Furthermore, the EPA has prohibited the Debtors from using any remaining tanks until complete inspections of the

-13-

remaining tanks have been conducted. As a result, the Debtors' terminal operations are at a standstill.

35. Operations remain halted due to the clean-up and repair that must still be conducted on the Debtors' property. Following the Explosions, the Debtors initially hired contractors and worked with the National Response Corporation (the "NRC") to conduct emergency response and clean-up at the impacted areas, but have since faced extreme difficulties related to these efforts, due in large part to the Debtors' lack of liquidity to pay for the remediation measures themselves.

36. Idled operations have resulted in negligible cash flow to the Debtors, and CPC lacks sufficient liquidity to purchase the gasoline necessary to supply its Dealer network and other customers. Following the Explosions, CPC used its remaining working capital and $2 million of funding of the Westernbank Credit Facility to purchase gasoline from four different suppliers in Puerto Rico to deliver to the Service Stations. However, the Debtors exhausted their working capital by early 2010, and have been unable to supply the Dealers since that time. The Debtors understand that certain of the Dealers, although contractually obligated to purchase all of their petroleum products from CPC, have purchased petroleum products from other sources, claiming this is necessary due to CPC's inability to supply product.

37. Collectively, the effects of the Explosions have caused the virtual shut-down of the Debtors' operations.

B.     **Substantial Liabilities Arising from the Explosions**

38. As a result of the Explosions, the Debtors have become subject to substantial emergency and environmental clean-up costs, as well as tort and other related litigation claims.

RLF1 3599382v. 1

**Emergency Response and Clean-Up Actions**

39.     Immediately following the Explosions, the NRC, along with other third party emergency responders (the "Other Emergency Responders"), provided emergency response and clean-up assistance at CPR's facilities. The NRC and the Other Emergency Responders have sought reimbursement from CPR for costs incurred related to the emergency response services provided to CPR. CPR has contested certain of the amounts invoiced by the NRC and Other Emergency Responders, but in any event, as a result of its severe liquidity constraints, CPR has been unable to repay the cost for these services. As of the Petition Date, approximately $6 million of invoices from the NRC are outstanding (including approximately $70,000 in respect of spills that occurred prior to the Explosions) and approximately $380,000 of invoices are outstanding to the Other Emergency Responders.

40.     In late November 2009, the Debtors began negotiations with the EPA in an effort to reach a consensual plan for the clean-up of CPR's facilities. However, the Debtors could not reach agreement with the EPA, and pursuant to a Unilateral Administrative Order for Removal Activities, dated as of February 19, 2010 (the "EPA Order"), the EPA directed CPR to commence clean-up and removal actions with respect to CPR's facilities. CPR was unable to complete such efforts, and accordingly, the EPA assumed responsibility for the remediation of CPR's facilities. The EPA has sought reimbursement from CPR for oversight and clean-up expenses, and as of the Petition Date, approximately $2.1 million in EPA invoices remain outstanding. CPR anticipates that the EPA will seek reimbursement of an additional $4 million to $8 million in respect of oversight and clean-up expenses.

RLF1 3599382v. 1

### Tort Litigation

41.    The Debtors are facing significant tort litigation on account of alleged property damage and personal injuries purportedly arising from the Explosions.  As of the Petition Date, nine cases stemming from the Explosions had been filed with the United States District Court for the District of Puerto Rico, five of which were filed as class actions.  All nine of the federal cases have been consolidated before the Honorable Francisco A. Besosa, and all such proceedings are presently in the early stages of litigation.  In addition, as of the Petition Date, seventeen cases, including one class action, have been filed with the Court of First Instance, Superior Part of Bayamón.  It is my understanding that this litigation also is in an early stage.

42.    As of the Petition Date, the aggregate amount of tort-related claims asserted against the Debtors, calculated based upon the damages sought by the plaintiffs in the aforementioned actions, exceeds $455 million.

### AOT Arbitration Award

43.    Prior to the Petition Date, CPC frequently entered into contracts with AOT Limited ("AOT"),[17] pursuant to which AOT supplied petroleum products to CPC.  Under the terms of a typical contract between AOT and CPC, AOT would deliver petroleum products by vessel to the Dock; CPC would then offload the products, and transport them through the Pipelines to the Tank Farm.  However, pursuant to an arrangement between the parties, CPC would not pay AOT for the delivered product until such time as CPC withdrew the product from the applicable tank(s) for its own use.  Thus, at any given time, by arrangement between the parties, CPR had AOT-delivered product in its storage tanks for which AOT had yet to be paid.

---

[17] AOT is a purchaser and distributor of a variety of petroleum products.

RLF1 3599382v. 1

44.     When the Explosions occurred, a vessel was discharging AOT petroleum products at the Dock, and certain of such products were being transferred through the Pipelines to tanks located at the Tank Farm. The Explosions destroyed the AOT product being discharged from the vessel, and further destroyed several storage tanks containing petroleum products previously delivered by AOT to CPC.

45.     After making demand on CPC for payment in respect of the product destroyed in the Explosions, AOT instituted arbitration proceedings before the Society of Maritime Arbitrators, Inc. of New York City (the "Arbitration Panel") seeking to recover such payment from CPC. On July 20, 2010, the Arbitration Panel awarded AOT a final award of $63.6 million (the "AOT Award") for the destruction of the AOT product, demurrage, certain expenses and attorney fees. On August 10, 2010, AOT commenced an action in the United States District Court for the Southern District of New York, seeking a judgment confirming the AOT Award.

C.     **Efforts to Rehabilitate and Resume Operations**

46.     Following the Explosions, the Debtors continued to use the Dock and the undamaged portion of the Pipelines to unload and store fuel oil delivered by PREPA vessels and deliver such products to PREPA upon request.[18] In order to use the Dock, the Debtors are required by the United States Coast Guard to have an Oil Spill Removal Organization ("OSRO") onsite during the discharge of any vessel. In 2005, the Debtors engaged the NRC as the OSRO to oversee the unloading and discharge processes at the Dock, pursuant to a contract between the

---

[18] The Debtors, on a consensual basis with PREPA, setoff the amounts owed by PREPA for these services against the amounts owed by the Debtors in respect of electric utility services provided by PREPA. This arrangement is discussed in more detail in the Debtors' motion seeking authorization to provide adequate assurance of payment to utility companies, filed contemporaneously herewith.

RLF1 3599382v. 1

Debtors and the NRC (the "NRC Contract"). On or about July 19, 2010, however, the NRC sent a letter to the Debtors notifying them of the NRC's purported termination of the NRC Contract due to outstanding amounts allegedly due thereunder. Without the services of the NRC, the Debtors are currently unable to discharge any vessels at the Dock; accordingly, the Debtors are not currently providing any discharge services to PREPA. Additionally, because the surviving storage tanks located at the Tank Farm cannot be used for storage at this time due to restrictions imposed by the EPA, CPR presently is unable to store new product from PREPA (or other sources) and realize the revenue streams associated therewith.

47. In an effort to restore partial operations, shortly after the Explosions, the Debtors repaired certain pipeline systems within the Tank Farm on an emergency basis so that they could continue terminal services for PREPA. By letters to the EPA on November 24, 2009 and April 20, 2010, CPR requested authorization to resume partial operations of certain terminal services. On May 20, 2010, the EPA denied CPR's request to resume partial terminal operations, pending a complete inspection of all surviving tanks. The EPA has ordered that all tanks be emptied so that the EPA may complete its inspections. However, as the Debtors have lacked the liquidity needed to repair the pipeline systems within the Tank Farm and remove remaining product from certain standing storage tanks, the timeframe for the completion of the EPA's inspections is unclear.

48. Although CPC lacks the capital necessary to purchase petroleum products for purposes of distributing product to its customers, in an effort to begin to restore its supply relationships with the Dealers, on June 15, 2010, CPC entered into a short-term agreement with a competitor, Peerless Oil & Chemical ("Peerless"). Pursuant to this arrangement, Peerless supplies petroleum products to the Dealers and pays CPC a commission that equals the

RLF1 3599382v. 1

differential between the agreed purchase price between CPC and Peerless, and the price charged by CPC to the Dealers. To date, this arrangement has generated minimal revenue for the Debtors.

49. Since the Explosions and the subsequent refusal by EPA to authorize CPR to begin partial terminal services, the Debtors have been virtually non-operational, and the Debtors have realized little income. Currently, the Debtors' only sources of income from operations are: (i) lease payments for the leased Service Stations, which average approximately $220,000 per month; (ii) rent payments for billboard space owned by CPC, which average approximately $25,000 per month; and (iii) commissions on sales of petroleum products by Peerless to the Dealers, which are expected to be approximately $54,000 for July 2010.

### D.   Insurance Proceeds and Liquidity Constraints

50. The Debtors are covered under six different insurance polices for damages and liabilities related to the Explosions: (i) Primary General Liability, (ii) Umbrella Liability, (iii) Property All Risk, (iv) Premises Pollution Liability, (v) Marine Terminal Operations Liability, and (vi) Storage Tank Third Party Liability Corrective Action and Clean-Up Policy. The Debtors have submitted claims related to the Explosions under each of the aforementioned policies and, to date, the Debtors have received $34.75 million in insurance proceeds: $30 million (the "Chartis Proceeds") from their Property All Risk policy (the "Chartis Policy"), and $4.75 million (the "Navigators Proceeds") from their Marine Terminal Operation Liability policy (the "Navigators Policy"), which amounts constitute the coverage limit for one "occurrence" under the respective policies.[19]

---

[19] On July 7, 2010, CPC submitted an additional Proof of Loss claim under the Chartis Policy in connection with the Explosions. Chartis subsequently filed a Complaint for Declaratory Judgment on

51.     Pursuant to the Westernbank Credit Facility, Banco Popular holds a first priority lien on any insurance proceeds received by the Debtors, and thus controls the use of such funds.  Additionally, under the Intercreditor Agreement, FirstBank is entitled to a portion of any insurance proceeds received by CPR.   Accordingly, Banco Popular (and Westernbank prior thereto) received approximately $11.8 million of the Chartis Proceeds, and FirstBank received approximately $1.4 of the Chartis Proceeds.[20]  To access the remaining Chartis Proceeds for use in operations, the Debtors were required to provide Banco Popular with individualized funding requests before Banco Popular would transfer any proceeds into the Debtors' operating accounts. With the consent of Banco Popular, the Debtors have used a majority of the Chartis Proceeds, for, among other things, debt service, operating expenses, vendor obligations, employee wages and benefits, taxes, tank rehabilitation, and professional fees.

52.     It is my understanding that on July 9, 2010, the Debtors received the Navigators Proceeds.  At that time, given their liquidity crisis, the Debtors lacked funds to make even basic payments such as payroll.  In addition, the Debtors faced an upcoming insurance premium payment due on July 16 in the amount of $3.5 million, which payment was necessary to obtain insurance coverage for the Debtors' assets, and thereby preserve the value of the Debtors' estates.  It is my understanding that the Debtors promptly requested Banco Popular's consent to use the Navigators Proceeds to satisfy impending obligations, and Banco Popular consented to the use of such proceeds to satisfy certain expenditures, including the aforementioned insurance

---

July 8, 2010 in the Superior Court of the State of Delaware, New Castle County, alleging that the Proof of Loss includes claims that are not covered by the Chartis Policy.

[20] As a result of such payment to FirstBank, the Debtors' obligations under the Firstbank Credit Facility are fully paid through December 2010.

RLF1 3599382v. 1

premium payment obligations and wage obligations through July 30.[21]  Ultimately, however, other than with respect to the payment of employee wages on a day by day basis from July 30, 2010 to the Petition Date, Banco Popular refused to provide additional funding to the Debtors outside of chapter 11.

53.    Cash generated from the Debtors' minimal operating activities is insufficient to meet the Debtors' immediate and anticipated cash requirements and, absent additional financing under a postpetition facility, the Debtors lack the liquidity necessary to fund even the most basic operating expenses, such as employee payroll, medical and pension plan contributions, utilities, and security guard expenses.

E.    **Prepetition Negotiations with Banco Popular**

54.    Pursuant to the Westernbank Credit Facility, the Debtors were obligated to remit an interest payment to Banco Popular on July 1, 2010 in the amount of approximately $680,000 plus $11,500 in fees.  Considering their dire liquidity position, the Debtors recognized that they would be unable to make this payment.  Accordingly, on June 21, 2010, the Debtors sought to initiate restructuring discussions with Banco Popular, and in the context thereof, requested a forbearance from Banco Popular with respect to the June 2010 debt service payment, as well as certain additional funding through the end of July.[22]  Although Banco Popular declined

---

[21]  Additionally, pursuant to the Intercreditor Agreement, Banco Popular has set aside $531,250 from the Navigators Proceeds for amounts that may be owed to FirstBank.

[22]  Prior to the closing of Westernbank and the assignment of the Westernbank Credit Facility to Banco Popular in April 2010, the Debtors from time to time engaged in discussions with Westernbank concerning a consensual restructuring of some or all of the debt under the Westernbank Credit Facility, approached certain third parties potentially interested in acquiring some or all of the Debtors' assets, and engaged in preliminary discussions with Westernbank regarding same.  In addition, following the Explosions, the Debtors developed and presented rehabilitation proposals to Westernbank, which were designed to mitigate the substantial rehabilitation costs attendant to the Explosions, improve operations, and position the Debtors for potential profitability.  Unfortunately, however, the Debtors were unable to reach consensus with Westernbank regarding these matters.

RLF1 3599382v. 1

to grant a forbearance, on June 29, 2010, Banco Popular advised the Debtors of its willingness to consent to the Debtors' use of $400,000 of remaining insurance proceeds to satisfy certain immediate financial obligations. Such funding ultimately was provided by Banco Popular and was used by the Debtors to satisfy certain wages and utility obligations, as well as certain fees of the Debtors' restructuring professionals.

55.     On or about July 1, 2010, the Debtors raised with Banco Popular the possibility of exploring a potential senior secured postpetition financing arrangement with an affiliate of AOT, Astra Oil Trading, N.V. ("Astra"), and, in connection therewith, pursuing an orderly marketing and sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code with such entity possibly serving as a stalking horse. In response, Banco Popular advised the Debtors of its interest in possibly providing senior secured postpetition financing to the Debtors, and the parties subsequently commenced discussions with respect to such potential financing, as well as the contours of a possible consensual chapter 11 process premised on the sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

56.     On July 11, 2010, the Debtors submitted a proposal to Banco Popular which outlined, among other things, the benefits of postponing the Debtors' chapter 11 filing until July 30, at the earliest, in order to permit the Debtors, Banco Popular, and Astra to vet the mechanics of an orderly sale process prior to commencement of the Cases. The next week, on July 16, principals of the Debtors, Banco Popular, Astra, and their respective advisors met in New York to discuss the possibility of a mutually agreeable arrangement whereby Astra would potentially serve as the stalking horse bidder in connection with the sale of the Debtors' assets. At this meeting, Astra affirmed its interest in conducting due diligence and considering a

RLF1 3599382v. 1

possible stalking horse arrangement, and stated its intention to commence due diligence in earnest. As such, Banco Popular consented to the Debtors' use of the Navigators Proceeds to fund operations through the end of July for certain specified purposes, including certain restructuring advisory fees, subject to a budget agreed upon by the Debtors and Banco Popular.

57.     Over the course of the following four week period, the Debtors and Banco Popular engaged in negotiations regarding the Debtors' proposed postpetition financing, as well as the framework of the contemplated sale process. During that time, the Debtors determined, in consultation with Banco Popular, to appoint a Chief Restructuring Officer ("CRO") for the purpose of overseeing the Debtors' restructuring efforts and sale process. The Debtors have engaged Kevin Lavin of FTI Consulting, Inc. as CRO, effective as of the Petition Date.

**F.      Intent of the Chapter 11 Cases**

58.     Through these Cases, the Debtors intend to effect an orderly and efficient sale of all or substantially all of their assets pursuant to section 363 of the Bankruptcy Code, comprehensively resolve creditor claims, and make distributions in accordance with the priority scheme of the Bankruptcy Code. The Debtors, with the support of Banco Popular, believe that the proposed sale of their integrated businesses through a consensual 363 sale process will maximize the value of the Debtors' estates and is in the best interests of their estates and creditors. The circumstances warrant an expedited, but thorough, marketing and sale process as the Debtors lack the income or financing to fund protracted chapter 11 cases. The Debtors do not have sufficient working capital or access to financing or the support of their secured creditors to rebuild and rehabilitate their assets and operations during the chapter 11 cases. Thus, the expedited 363 sale process provides the best mechanism to maximize value under the circumstances.

RLF1 3599382v. 1

## III. SUMMARY OF THE FIRST DAY PLEADINGS

59.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Pleadings, which the Debtors believe are necessary to enable them to achieve a soft landing in chapter 11.  The Debtors respectfully request that the Court grant the relief requested in the First Day Pleadings.  A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.  Any capitalized term not expressly defined in this Part III shall have the meaning ascribed to that term in the relevant First Day Pleading.

### A. Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")

60.     By the Joint Administration Motion, the Debtors seek joint administration of their chapter 11 cases for procedural purposes only.  Most, if not all, of the motions, applications and other pleadings that will be filed in the Debtors' cases will relate to relief sought jointly by all of the Debtors.  Joint administration will allow the Debtors' cases to be administered as a single case, rather than multiple independent cases.  Joint administration will also obviate the need for duplicative notices, motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and their estates, as well as creditors and other parties in interest.  The Court will also be relieved of the administrative burden of entering duplicative orders and maintaining duplicative files and dockets.  Moreover, supervision of the administrative aspects of these chapter 11 cases by the U.S. Trustee will be simplified.

61.     Joint administration will not adversely affect the rights of the Debtors' respective creditors because the Joint Administration Motion requests only the administrative consolidation of the Debtors' estates and as such, each creditor may still assert a claim against a

-24-

particular estate. In fact, creditors' rights will be enhanced by the reduction in costs resulting from joint administration.

62.     Accordingly, I believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**B.     Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, (B) Continue Intercompany Transfers and (C) Maintain Existing Bank Accounts and Business Forms, (II) Extending Time to Comply With 11 U.S.C. § 345(b), and (III) Scheduling a Final Hearing (the "Cash Management Motion")**

63.     By the Cash Management Motion, the Debtors seek (a) authorization to (1) continue to operate the cash management system (the "Cash Management System"), (2) continue intercompany transfers ("Intercompany Transfers") in the ordinary course of the Debtors' businesses, consistent with their prepetition practices, (3) maintain their existing bank accounts ("Bank Accounts") and business forms and (b) an extension of the time to comply with section 345(b) of the Bankruptcy Code.

64.     To maximize the efficiencies and value of their businesses, the Debtors employ the Cash Management System to collect, transfer, and disburse the funds generated by their businesses. Through the use of the Cash Management System, the Debtors are able to collect and transfer cash efficiently and effectively. The Debtors contemplate that any order(s) approving the Debtors' proposed postpetition financing facility will provide for the opening of a new DIP Account at Banco Popular, which will receive and disburse the proceeds of the postpetition financing facility in accordance with the order(s) approving the postpetition financing facility. Accordingly, the Debtors request to continue the Cash Management System, including the incorporation of the DIP Account.

RLF1 3599382v. 1

65.     Further, the Debtors believe that "cause" exists pursuant to section 345(b) of the Bankruptcy Code to extend the time to comply with the requirements of the statute because it is unclear whether compliance with section 345(b) is necessary in the case at hand. The Debtors therefore respectfully request a sixty-day extension of their time to comply with the requirements of section 345(b) of the Bankruptcy Code. During that time, the Debtors will engage the U.S. Trustee in discussions to determine if further compliance with section 345(b) is necessary.

66.     The Debtors also engage in limited Intercompany Transfers. CPR relies on the Intercompany Transfers from CPC in order to make disbursements and fulfill its business obligations. If the Intercompany Transfers were to be discontinued, the Debtors' Cash Management System would be disrupted to the detriment of the Debtors and their estates. Accordingly, the Debtors request that the Court authorize them to continue to engage in Intercompany Transfers in the ordinary course of their businesses, consistent with their prepetition practices.

67.     The Debtors also believe that their transition to chapter 11 will be more orderly and less costly if all Bank Accounts are continued following the Petition Date with the same account numbers; provided, however, the account numbers and depository Bank name(s) for the Westernbank Bank Accounts will change on or about August 28, 2010 pursuant to a process in which all Westernbank bank accounts and loan accounts will be converted to the systems used by Banco Popular; provided further, however that upon such conversion, the Debtors shall file a notice with the Court including an updated schedule with the Converted Bank Accounts and request that any order(s) approving the Cash Management Motion apply to the Converted Bank Accounts in all respects and with the same force and effect as the Bank

-26-

Accounts. Further, to minimize expenses and disruption to the Debtors' ordinary financial affairs, the Debtors respectfully request they be authorized to continue to use their existing check stock and business forms. To the extent that the Debtors do resort to new check stock, any new check stock ordered will reflect their status as debtors in possession and list the case number under which these cases are being jointly administered.

68. Without the relief requested, I believe the Debtors' will be forced to (i) take on unnecessary expense and administrative problems and (ii) divert resources that could better be served by the estates elsewhere, which will negatively impact the Debtors' rehabilitation efforts and cause significant harm to the Debtors' estates. Accordingly, I believe that the relief requested is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

C. **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Employee Compensation and Benefits and (B) Maintain and Continue Such Benefits and Other Employee-Related Programs, (II) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations and (III) Scheduling a Final Hearing (the "Employee Wages and Benefits Motion")**

69. By the Employee Wages and Benefits Motion, the Debtors seek, among other things, (i) authorization, in their sole discretion and in the exercise of their business judgment, as deemed necessary to continue to operate and preserve value, to (a) pay all wages, salaries, other compensation and other costs incident to the foregoing (collectively, the "Compensation Obligations") and employee benefits, which include, among other things, healthcare, insurance, vacation and other welfare benefits, reimbursable business expenses, and other costs incident to the foregoing (collectively, the "Employee Benefit Obligations"), earned or incurred prior to the Petition Date, (b) withhold all federal, state and local taxes relating to the Compensation Obligations and Employee Benefit Obligations as required by applicable law,

-27-

(c) pay all employment, unemployment, social security, and similar federal, state and local taxes including, without limitation, taxes relating to the Federal Insurance Contributions Act and the Federal Unemployment Tax Act relating to the Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "Payroll Taxes"), and make other payroll deductions, including but not limited to, employee benefit plan contributions, union dues and retirement, garnishments, and voluntary deductions (collectively with the Payroll Taxes, the "Payroll Deduction Obligations," and collectively with the Compensation Obligations and Employee Benefit Obligations, the "Prepetition Employee Obligations"), and (d) continue and honor their prepetition programs, policies, and practices with respect to the Prepetition Employee Obligations in the ordinary course of business; and (ii) direction to all financial institutions to receive, honor, process, and pay any and all checks and wire transfers drawn on the Debtors' applicable payroll accounts in satisfaction of the Prepetition Employee Obligations.

70.     As of the Petition Date, the Debtors employ approximately 46 individuals. The success of the Debtors' rehabilitation efforts depends on the retention and cooperation of the Debtors' employees. Any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the employees' morale, dedication, confidence, and cooperation and would adversely impact the Debtors' relationship with their employees at a time when the employees' support is critical to the success of the Debtors' chapter 11 cases. At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably follow as a result of any trained and knowledgeable employee seeking employment elsewhere. Consequently, it is critical that the Debtors be authorized to satisfy their Prepetition Employee Obligations and continue their ordinary course Employee Benefits Obligations in effect as of the

Petition Date. The Debtors propose a cap of $150,000 on the payment of Prepetition Employee Obligations during the first twenty-one days following the Petition Date, which amount excludes payments with respect to the Debtors' obligations to the Pension Plan as the Debtors are requesting authority pursuant to the Final Order to pay these amounts, and estimate that all such amounts are within the statutory priority caps set forth in sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

71.     Moreover, if the checks issued and fund transfers requested in payment of the Prepetition Employee Obligations are dishonored, or if such Prepetition Employee Obligations are not timely paid during the postpetition period, the Debtors' employees could suffer extreme personal hardship, including, in some instances, being unable to pay their daily living expenses. It would also be inequitable to require the Debtors' employees to bear personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that they would be reimbursed.

72.     Accordingly, I believe that payment of all Prepetition Employee Obligations in accordance with the Debtors' prepetition business practices will enable the Debtors to retain qualified employees and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**D.      Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Scheduling a Final Hearing (the "Utilities Motion")**

73.     By the Utilities Motion, the Debtors seek (i) entry of an interim order (a) prohibiting utility companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts outstanding for utility services or on account of any perceived inadequacy of the Debtors' proposed adequate assurance

-29-

of payment, pending entry of a Final Order, (b) approving the Debtors' proposed adequate assurance of payment to utility companies, (c) approving procedures for resolving any requests for alternative assurance of payment, and (d) scheduling a Final Hearing to consider the relief requested in the Utilities Motion on a final basis; and (ii) entry of a Final Order granting the relief requested therein on a final basis.

74. In connection with the operation of their businesses, the Debtors obtain various Utility Services, including electricity, water, sewer, telephone, trash collection, cable and data, and other similar services from the Utility Companies or their brokers. Should any Utility Company refuse or discontinue service, even for a brief period, it would be disruptive and distracting to the Debtors and their employees during this critical time.

75. Within 20 days of the Petition Date, the Debtors propose to place a cash deposit equal to two weeks of Utility Services, calculated based on the two-week historical average over the past 12 months, into a newly-created, segregated account for the benefit of any Utility Company, unless such Utility Company agrees in writing to a lesser amount, or already holds a deposit equal to, or greater than, two weeks of Utility Services. The Debtors estimate that the Adequate Assurance Deposit will be approximately $6,500. The creditors of the Debtors shall have no interest in, or lien on, the Adequate Assurance Deposit or the Utility Deposit Account.

76. I believe that the Adequate Assurance Deposit, together with the Debtors' ability to pay for future Utility Services in the ordinary course of business with funds available from their postpetition financing, should provide the Utility Companies with the assurance they need. I further believe that the procedures for requesting additional assurance of payment as set forth in the Utilities Motion provide the Utility Companies with a fair and orderly process for

seeking modification of the Proposed Adequate Assurance while protecting the Debtors from being forced to address additional adequate assurance requests in a disorganized manner and at a time when the Debtors' efforts could be more productively focused on their chapter 11 cases.

77.     Accordingly, I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

### E.     Motion of Debtors For Entry of an Order Extending Time Within Which to File Schedules and Statements (the "Schedules Motion")

78.     By the Schedules Motion, the Debtors seek entry of an order extending through the date that is the sixtieth (60th) day after the Petition Date the date by which the Debtors must file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs pursuant to section 521 of the Bankruptcy Code and Fed. R. Bankr. P. 1007 (collectively, the "Schedules").

79.     Completing the Debtors' Schedules will require the Debtors and their advisors to collect, review, and assemble copious amounts of information. I believe that given the urgency with which the Debtors sought chapter 11 relief and the numerous critical operational matters that the Debtors' limited staff must address in the early days of these cases, the Debtors are not in a position to properly and accurately complete the Schedules within the required 30-day period.

80.     Accordingly, I believe that the relief requested in the Schedules Motion is in the best interests of the Debtors, their estates and creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

RLF1 3599382v. 1

**F.** **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Senior Secured Financing, (B) Utilize Cash Collateral, (C) Grant Priming Liens, Priority Liens, and Superpriority Claims to DIP Lenders, and (D) Provide Adequate Protection to Prepetition Secured Parties, (II) Scheduling a Final Hearing, and (III) Granting Related Relief ("<u>DIP Motion</u>")**

81.     By the DIP Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to, among other things, (a) obtain postpetition senior secured financing in the aggregate amount of $10 million, (b) use cash collateral, (c) grant priming liens and superpriority claims to the Debtors' proposed postpetition lender, Banco Popular, and (d) provide adequate protection to Banco Popular, as a prepetition secured lender of the Debtors; and (ii) scheduling a final hearing on the DIP Motion.

82.     In anticipation of the commencement of chapter 11 cases, the Debtors determined to seek postpetition financing, as the Debtors lacked the liquidity necessary to fund even their most basic operating expenses. Based on Banco Popular's lien position and history with the Debtors, the Debtors identified Banco Popular as the most likely source of postpetition financing. Thus, the Debtors and Banco Popular engaged in extensive, good faith, arm's length negotiations with respect to the terms and conditions of the postpetition financing. The result of these negotiations is the proposed DIP Facility, which primes only the liens of Banco Popular, who has consented to such priming and the relief requested in the DIP Motion, and is junior only to the Permitted Prepetition Liens.

RLF1 3599382v. 1

83.     Banco Popular has consented to the Debtors' use of Cash Collateral in the ordinary course of business, subject to the grant of adequate protection and the other terms and conditions set forth in the Interim Order.[23]

84.     Approval of the DIP Facility and the use of Cash Collateral will enable the Debtors to fund an orderly and efficient sale process and confirm a chapter 11 plan, while satisfying their minimal operating expenses and preserving the value of their assets in anticipation of a sale transaction and plan confirmation. Because the Debtors' available and projected Cash Collateral is insufficient to fund these cases, the credit provided under the DIP Facility is essential to the Debtors' successful completion of the restructuring process described above. Absent the requisite financing, the Debtors would not be able to pursue a sale of substantially all of their assets -- a course of action that the Debtors and their primary prepetition secured lender, Banco Popular, believe to be the most expeditious means of maximizing the value of the Debtors' estates. Simply stated, if the Debtors are precluded from timely pursuit of a sale transaction, the Debtors' ability to generate the highest and best recovery for their estates and creditors would be frustrated, and the Debtors' estates would suffer irreparable harm. Further, the availability of Cash Collateral and credit under the DIP Facility will instill confidence in potential bidders for the Debtors' assets and assure such bidders of the Debtors' ability to maintain stability and preserve the value of the assets throughout the sale process, thereby enhancing the opportunity for a robust, competitive sale process that will yield the greatest possible recovery for the Debtors' estates and creditors.

---

[23] Pursuant to the Intercreditor Agreement, Firstbank does not maintain a lien on the Debtors' Cash Collateral. See Intercreditor Agreement § 2.2 (stating that the Prepetition Lender's (as successor in interest to Westernbank) lien on all assets other than those limited assets subject to Firstbank's senior lien is exclusive); Intercreditor Agreement § 3.4 (certification of a release by Firstbank of its security interest in the Debtors' accounts, inventory, and proceeds). Copies of the Intercreditor Agreement are available upon request to counsel for the Debtors.

RLF1 3599382v. 1

85. Absent authorization to use Cash Collateral and obtain credit under the DIP Facility, on an interim basis pending the Final Hearing, the Debtors will suffer immediate and irreparable harm, as the Debtors lack the funds necessary to commence a sale process and to fund even their minimal operations, including employee wages. Any delay in commencing the sale process poses grave risk to the Debtors and their ability to implement a strategy and confirm a chapter 11 plan that will yield the highest recovery for their estates and creditors. Accordingly, the interim relief requested herein is vital to the Debtors, and to the success of the chapter 11 cases.

86. For these reasons, I believe that the DIP Facility is the best financing option available to the Debtors under the present circumstances. Furthermore, because the proposed financing will enable the Debtors' to maximize the value of their estates for the benefit of all stakeholders, I believe that entering into the DIP Facility is a sound exercise of the Debtors' business judgment.

G. **Motion of Debtors for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Authorizing Entry Into Stalking Horse Agreements and Approving Stalking Horse Protections, (C) Approving Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Scheduling Auction and Sale Approval Hearing, (E) Approving the Form and Manner of the Sale Notice, and (F) Granting Certain Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief ("Sale Motion")**

87. By the Sale Motion, the Debtors seek entry of two orders. First, the Debtors request entry of an order (the "Bidding Procedures Order"):

(i)     approving procedures (the "Bidding Procedures) for (a) submitting bids for the purchase of all or substantially all of the Debtors' assets (the "Assets"), and (b) conducting an auction for the Assets (the "Auction"), in the event that the Debtors receive two or more Qualified Bids for the Assets;

-34-

(ii)    authorizing, but not requiring, the Debtors to (a) enter into a "stalking horse" agreement (a "Stalking Horse Agreement"), on or before November 10, 2010, with one or more bidders (the "Stalking Horse Bidder(s)") for the purpose of establishing a minimum acceptable bid for the Assets (the "Stalking Horse Bid"), (b) provide any Stalking Horse Bidder(s) with a break-up fee (the "Break-Up Fee") of up to two percent (2%) of the guaranteed cash purchase price proposed in the Stalking Horse Bid, and (c) reimburse any Stalking Horse Bidder(s) for all reasonable and actual costs and expenses up to an amount equal to $300,000 incurred by such Stalking Horse Bidder(s) in connection with its bid (the "Expense Reimbursement", and together with the Break-Up Fee, the "Stalking Horse Protections");

(iii)    approving procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases (the "Leases") in connection with the sale of the Assets and resolution of any objections thereto;

(iv)    scheduling (a) a deadline to submit bids for the Assets of December 10, 2010, (b) the date of the Auction for December 13, 2010, (c) the date of the hearing to consider approval of the proposed sale of the Assets (the "Sale Approval Hearing") for January 10, 2011, and (d) a deadline to consummate the sale of the Assets of February 8, 2011;

(v)    approving the form and manner of notice of the deadline to submit bids for the Assets, the date and time of the Auction and the date and time of the Sale Approval Hearing; and

(vi)    granting certain related relief.

88.    Second, upon conclusion of the Sale Approval Hearing, the Debtors request entry of an order (the "Sale Order") (i) authorizing and approving the sale of the Assets to the Successful Bidder, (ii) authorizing the assumption and assignment of certain Contracts and Leases to be assumed and assigned in connection with the proposed sale of the Assets to the Successful Bidder, and (iii) granting certain related relief.

89.    The Debtors have considered all alternatives, with the assistance of their advisors and support of Banco Popular, and determined that the sale of their integrated businesses through a consensual 363 sale process governed by the Bidding Procedures will maximize the value of the Debtors' estates and is in the best interests of their estates and

-35-

creditors. The circumstances warrant an expedited, but thorough, marketing and sale process as the Debtors lack the income or financing to fund protracted chapter 11 cases. The Debtors do not have sufficient working capital or access to financing or the support of their secured creditors to rebuild and rehabilitate their assets and operations during the chapter 11 cases. Thus, the expedited sale provides the best mechanism to maximize value under the circumstances and is a valid exercise of the Debtors' business judgment.

90.    The sale of the Assets, pursuant to the Bidding Procedures and by public auction, will ensure that the bidding process with respect to the Assets is fair and reasonable and will yield the maximum value for their estates and creditors.

91.    Further, the Stalking Horse Protections and Overbid Increments will provide a clear benefit to the Debtors' estates as they will enable the Debtors to secure an adequate floor and, thus, insist that competing bids be materially higher or otherwise better than any agreement that might be entered into with the Stalking Horse Bidder. Thus, the Debtors' ability to offer the Stalking Horse Protections enables them to ensure the sale of substantially all of the Assets to a contractually-committed bidder at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to their estates.

92.    Lastly, the assumption and assignment of Contracts and Leases are necessary for any Successful Bidder to conduct business going forward, and since no purchaser would take the Assets without certain Contracts and Leases, the assumption and assignment of such Contracts and Leases is essential to inducing the highest and best offer for the Assets. Further, upon consummation of the proposed sale of the Assets, the Debtors will no longer continue to operate their businesses and will therefore have no use for any of the Contracts and Leases utilized in their businesses. The proposed Assumption and Assignment Procedures

ensure that all counterparties to Contracts and Leases to be assumed and assigned by the Debtors will have ample notice of such relief and an opportunity to contest any asserted Cure Amount, as well as the ability of the Successful Bidder to provide adequate assurance of future performance.

93.     Accordingly, I believe that the relief requested in the Sale Motion is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

RLF1 3599382v. 1

## CONCLUSION

For the reasons stated herein and in each of the First Day Pleadings, the Debtors respectfully request that the Court enter orders approving the First Day Pleadings.

Dated: August 12, 2010

_____
Nicolás López Peña