# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------x

In re                                          :   Chapter 11

CARIBBEAN PETROLEUM CORP., et al.,[1]          :   Case No. 10-_____ (   )

    Debtors.                                   :   Joint Administration Requested

------------------------------------------------------------------------x

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED FINANCING, (B) USE CASH COLLATERAL, (C) GRANT LIMITED PRIMING LIENS AND SUPERPRIORITY CLAIMS TO THE POSTPETITION LENDER, AND (D) PROVIDE ADEQUATE PROTECTION TO THE PREPETITION LENDER, (II) SCHEDULING A FINAL HEARING, AND (III) GRANTING RELATED RELIEF

Caribbean Petroleum Corporation ("CPC"), Caribbean Petroleum Refining, L.P. ("CPR"), and Gulf Petroleum Refining (Puerto Rico) Corporation ("GPC"), as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), respectfully represent:

### Fed. R. Bankr. P. 4001 Concise Statement[2]

1.      By this motion and for the reasons set forth below, pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Fed. R. Bankr. P. 2002, 4001, and 9014, and Del. Bankr. L.R. 4001-2, the Debtors respectfully request entry of (a) an interim order substantially in the form attached hereto as Exhibit A (the

---

[1] The Debtors in these chapter 11 cases (along with the last four digits of each Debtor's federal tax identification number) are: Caribbean Petroleum Corporation (7836), Caribbean Petroleum Refining, L.P. (1421), and Gulf Petroleum Refining (Puerto Rico) Corporation (1417). The service address for all Debtors is: PO Box 361988, San Juan, Puerto Rico 00936.

[2] Unless otherwise indicated, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the DIP Term Sheet (as defined below).

"Interim Order") (i) authorizing the Debtors to (A) obtain postpetition senior secured financing, (B) use cash collateral, (C) grant limited priming liens and superpriority claims to the Postpetition Lender (as defined below), and (D) provide adequate protection to the Prepetition Lender (as defined below), (ii) scheduling a hearing to consider the relief requested herein on a final basis (the "Final Hearing"), and (iii) granting related relief; and (b) an order granting the relief requested herein on a final basis (the "Final Order," and together with the Interim Order, the "DIP Orders").[3]

2.　　Pending the Final Hearing and entry of the Final Order, the Debtors respectfully request that the DIP Facility (as defined below) be approved on an interim basis pursuant to the terms of the Summary of Principal Terms and Conditions, dated August 12, 2010, attached to the Interim Order as Exhibit 1 (the "DIP Term Sheet").[4] The proposed DIP Facility primes only the liens of the Prepetition Lender (as defined below), who has consented to such priming and the relief requested herein, and is junior only to the Permitted Prepetition Liens (as defined below).

---

[3] The Debtors will provide a proposed Final Order to the Court, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), and all parties in interest upon appropriate notice in advance of the Final Hearing.

[4] In the interest of time, the Postpetition Lender (as defined below) agreed to provide interim postpetition financing to the Debtors solely on the basis of the DIP Term Sheet and the Interim Order. Prior to the Final Hearing, the Debtors and the Postpetition Lender shall agree on the form of the final documentation of the Amendment (as defined in the DIP Term Sheet, and together with the DIP Term Sheet, the Note (as defined in the DIP Term Sheet), and any other documents related to the DIP Facility (as defined below), the "DIP Documents") evidencing the DIP Facility consistent with the DIP Term Sheet. The Debtors will provide a copy of the form of the final documentation of the Amendment to the Court, the U.S. Trustee, and all parties in interest upon appropriate notice in advance of the Final Hearing. For the avoidance of doubt, failure by the DIP Borrowers and the Postpetition Lender to execute the Amendment shall not release the DIP Borrowers from any of their obligations under the DIP Term Sheet, the Note or the Interim Order.

RLF1 3599370v. 1

3.    Pursuant to Fed. R. Bankr. P. 4001 and Del. Bankr. L.R. 4001-2, the

following are the material provisions of the DIP Term Sheet and/or the Interim Order:[5]

| **Borrower**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | CPC, CPR, and GPC (the "DIP Borrowers"). |
|---|---|
| **Postpetition Lender**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | Banco Popular de Puerto Rico (in its capacity as lender under the DIP Facility (as defined below), the "Postpetition Lender") |
| **Commitment**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | $10,000,000 non-revolving, multi-draw credit sub-facility (the "DIP Facility") to be made available to the DIP Borrowers until the Maturity Date (as defined below) and the balance of which sub-facility shall never exceed the $10,000,000 maximum aggregate principal amount provided above together with the outstanding balance of the other Revolving Loans (as defined in the Prepetition Loan Agreement (as defined below)) shall never exceed, in aggregate principal amount, the $18,000,000 Revolving Loan Limit (as defined in the Prepetition Loan Agreement) and which DIP Facility shall be available to the DIP Borrowers in accordance with and be governed by the terms of the DIP Term Sheet and the other DIP Documents and shall not be subject to any Borrowing Base (as defined in the Prepetition Loan Agreement) or any other applicable lending formulas or any representations, warranties, covenants, or events of default contained in the Prepetition Loan Agreement that are not contained in the DIP Term Sheet. (Interim Order at pp. 1-2; DIP Term Sheet § 5) |
| **Term**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | Unless accelerated by an Event of Default (as defined below), the earliest to occur (the "Maturity Date") of: (a) twenty-five (25) days after entry of the Interim Order if the Final Order shall not have been entered by the Court and the Amendment shall not have been executed and delivered by the DIP Borrowers to the Postpetition Lender, (b) consummation of any consensual or nonconsensual (including under section 1129(b)(2)(A)(i), (ii) and/or (iii) of the Bankruptcy Code) chapter 11 plan of reorganization or liquidation of or for the DIP Borrowers, whether proposed by the DIP Borrowers, the |

---

[5] The summaries and descriptions of the terms and conditions of the DIP Term Sheet and the Interim Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Term Sheet and the Interim Order. In the event that there is a conflict between this motion and the DIP Term Sheet or the Interim Order, the DIP Term Sheet or the Interim Order, as applicable, shall control in all respects.

RLF1 3599370v. 1

| | Creditors' Committee or any other party, and (c) one hundred eighty (180) days after the DIP Closing Date. The Maturity Date shall be accelerated upon the occurrence of an Event of Default, subject to the Remedies Notice Period. (Interim Order ¶ 24; DIP Term Sheet § 11). |
|---|---|
| **Use of DIP Facility**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | Subject to the DIP Budget (as defined below), the DIP Facility shall be used to fund: (a) the marketing for a sale of all or substantially all assets of the DIP Borrowers (the "363 Sale") and effectuation of the 363 Sale, (b) the Rehabilitation (subject to certain conditions as set forth in the DIP Term Sheet), (c) the Postpetition Lender's monthly interest, out-of-pocket costs, fees, and expenses related to the DIP Facility, (d) employee wages and general corporate purposes, (e) payment of professional fees of counsel and financial advisors to the DIP Borrowers, and the statutory committee of unsecured creditors appointed in the chapter 11 cases (the "Creditors' Committee"), incurred in connection with the administration and prosecution of the chapter 11 cases (the "Budgeted Professional Fees"), (f) Adequate Protection Payments (as defined below), (g) the adequate assurance deposit for the DIP Borrowers' utility providers, as ordered by the Court (the "Adequate Assurance Deposit"); and (h) payment of quarterly fees to the U.S. Trustee, in each case subject to the Limitations (as defined below). (Interim Order ¶ 10(b); DIP Term Sheet § 12) |
| **Entities with Interests in Cash Collateral**<br>*Fed. R. Bankr. P.*<br>*4001(b)(1)(B)(i)* | The Prepetition Lender (as defined below). (Interim Order ¶ 24) |
| **Use of Cash Collateral; Material Terms**<br>*Fed. R. Bankr. P.*<br>*4001(b)(1)(B)(ii) and (iii)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | The Debtors are authorized to use Cash Collateral (as defined below) of the Prepetition Lender (as defined below) subject to the provisions for adequate protection discussed in ¶ 35 below. The Debtors' right to use Cash Collateral shall terminate automatically on the Maturity Date or upon the occurrence (subject to the Remedies Notice Period) of an Event of Default; provided, that during the Remedies Notice Period, the DIP Borrowers may use Cash Collateral solely to satisfy payroll obligations in a manner consistent with the DIP Budget and fund the Carve-Out (as defined below). (Interim Order ¶ 24) |
| **Interim Financing**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | Up to $3,663,500. (Interim Order ¶ 11(a)) |
| **Amortization** | None. |

| | |
|---|---|
| **Interest Rates**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | Outstanding amounts under the DIP Facility shall accrue interest at a rate of 8.00% per annum (the "<u>Non-Default Rate</u>"). Accrued interest shall be payable monthly in arrears not later than the first day of each calendar month and shall be calculated on the basis of a 360-day year and actual days elapsed. Default interest shall be equal to the Non-Default Rate plus 2% per annum, shall automatically accrue on and after occurrence and during the continuance of an Event of Default (as defined below) under the DIP Term Sheet and shall be payable on demand. (DIP Term Sheet § 8). |
| **DIP Budget**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | A weekly six-month budget in form and substance satisfactory and agreeable to the DIP Borrowers, the Postpetition Lender, and the Prepetition Lender (as defined below). (DIP Term Sheet § 12) |
| **Milestones**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(vi)* | The DIP Borrowers shall (a) pursue and effectuate the 363 Sale and (b) file and receive Court approval of a plan of liquidation for the DIP Borrowers that is satisfactory and agreeable to the DIP Borrowers, the Postpetition Lender, and the Prepetition Lender (the "<u>Plan</u>") and the Disclosure Statement (as defined below) in accordance with the milestones set forth in the DIP Term Sheet and comply with the Sales Process Protocol, as described in more detail in ¶ 27 below. (DIP Term Sheet § 21) |
| **Other Covenants** | Compliance with affirmative and negative covenants as are customary for debtor in possession financing, including delivery of weekly cash reports, and limitation on liens, indebtedness, investments, sales, and affiliate transactions. (DIP Term Sheet § 25, 26) |
| **Liens and Priorities**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(i)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(i)(D) and (G),*<br>*4001-2(a)(ii)* | The DIP Facility shall be afforded certain liens and claims, including limited priming liens and superpriority claims on property of the estate, as described in more detail in ¶ 24 below. (Interim Order ¶¶ 12, 13, 14, 15, 16; DIP Term Sheet § 17) |
| **Carve-Out** | Subject to the terms, conditions, and Carve-Out Prospective Fee Caps (as defined in the DIP Term Sheet) set forth in § 20 of the DIP Term Sheet, an amount sufficient to satisfy (collectively, the "<u>Carve-Out</u>"): (a) all fees required to be paid pursuant to 28 U.S.C. §§ 156(c) and 1930(a)(6), (b) all unpaid allowed professional fees, expenses, and disbursements of the professionals of the Debtors and the Creditors' Committee (the "<u>Case Professionals</u>") incurred prior to receipt of a Carve-Out Trigger Notice (as defined in the DIP Term Sheet), (c) all unpaid allowed fees, expenses, and disbursements of the Case |

| | Professionals incurred subsequent to the earlier of (i) the DIP Borrowers' receipt of a Carve-Out Trigger Notice and (ii) consummation of the 363 Sale. (Interim Order ¶ 17; DIP Term Sheet § 20) |
|---|---|
| **Waiver of Rights**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(viii) and (x)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(i)(B) and (C)* | The Debtors waive certain rights and causes of actions against the Prepetition Lender (as defined below), and the time within which a non-Debtor party in interest or the Creditors' Committee may challenge (each, a "Challenge") the obligations to, or liens of, the Prepetition Lender will be limited to the latest of (a) seventy-five (75) days from the date of entry of the Interim Order, if brought by any non-Debtor party other than the Creditors' Committee, (b) sixty (60) days from the date of appointment of the Creditors' Committee, if brought by the Creditors' Committee, or (c) such later date as has been agreed to, in writing, by the Prepetition Lender in respect of Challenges that may be initiated against the Prepetition Lender, in the sole discretion of the Prepetition Lender, and has been ordered by the Court. The Final Order also will prohibit the assertion of all other claims under section 506(c) of the Bankruptcy Code against the Postpetition Lender and the Prepetition Lender. (Interim Order ¶¶ 32) |
| **Determination of Validity, Enforceability, Priority, or Amount of a Prepetition Claim or Any Lien Securing the Claim**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(iii)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(i)(B)* | The Debtors stipulate to the enforceability of the Prepetition Obligations (as defined in the Interim Order) and the validity of the Prepetition Loan Agreement Liens (as defined below). Except to the extent that a Challenge is timely commenced and results in a final order of the Court disallowing the Prepetition Obligations or invalidating the Prepetition Loan Agreement Liens in whole or in part, the Prepetition Obligations shall constitute allowed, secured claims for all purposes in the cases and any subsequent proceedings under the Bankruptcy Code, and the Prepetition Loan Agreement Liens shall be deemed legal, valid, and binding. (Interim Order ¶ 7) |
| **Adequate Protection for Prepetition Lender**<br>*Fed. R. Bankr. P.*<br>*4001(b)(1)(B)(iv),*<br>*4001(c)(1)(B)(ii)* | Adequate protection for the Prepetition Lender (as defined below) includes, additional and replacement liens, superpriority claims, repayment from unencumbered assets, payment of all reasonable professional fees and expenses incurred by the Prepetition Lender in connection with the administration of the chapter 11 cases, the right to credit bid, payment of insurance proceeds, loss payee and additional insured status on the Debtors' insurance policies, reporting and inspection rights, and certain other protections. See discussion in ¶ 34 herein. (Interim Order ¶ 25; DIP Term Sheet § 19) |
| **Events of Default**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.* | The DIP Term Sheet contains certain Events of Default, as described in ¶ 29 below. (Interim Order ¶ 18; DIP Term Sheet § 22, Exhibit A) |

| 4001-2(a)(ii) | |
|---|---|
| **Waiver or Modification of the Automatic Stay** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | Subject to five (5) business days' prior written notice of an Event of Default by the Postpetition Lender to the DIP Borrowers, the automatic stay shall be terminated (solely with respect to the DIP Facility) to permit the exercise of remedies by the Postpetition Lender, with a full waiver by the DIP Borrowers of all rights to contest such termination except with respect to the existence and/or continuance of an Event of Default. (Interim Order ¶ 19; DIP Term Sheet Exhibit B, ¶ 2) |
| **Waiver or Modification of Applicability of Nonbankruptcy Law Relating to the Perfection or Enforceability of a Lien** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(vii)* | All liens granted under the Interim Order for the benefit of the Postpetition Lender and the Prepetition Lender, other than liens on Avoidance Actions (as defined below), shall be enforceable, non-avoidable, and automatically perfected, effective as of the date of entry of the Interim Order, and no further action shall be required to effect such perfection. (Interim Order ¶ 30) |
| **Indemnification** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The DIP Borrowers agree to certain indemnities as described in ¶ 31 below. (DIP Term Sheet § 30) |
| **Conditions to Borrowing** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* <br> *Del. Bankr. L.R. 4001-2(a)(ii)* | Customary borrowing conditions, including: (a) delivery of a Borrowing Request, (b) accuracy of all representations and warranties contained in the DIP Documents, (c) absence of any continuing Event of Default or any event or condition which, with notice or the passage of time or both, would constitute an Event of Default, (d) entry of the Interim Order or Final Order, as the case may be, (e) payment of the Postpetition Lender's due and payable fees and expenses, (f) certification of accounting for and disclosure of Insurance Proceeds, (g) delivery of insurance-related documents, (h) compliance with the Milestone Schedule and the Sale Process Protocol, and (i) financing-related motions being in form and substance satisfactory and agreeable. (DIP Term Sheet § 23) |
| **Liens on Causes of Action Under Chapter 5 and Proceeds Thereof** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(xi)* <br> *Del. Bankr. L.R. 4001-2(a)(i)(D)* | Subject to entry of the Final Order, the Postpetition Lender and the Prepetition Lender shall be granted liens on all Avoidance Actions (as defined below). (Interim Order ¶ 13, 25; DIP Term Sheet § 17, 19) |

## Background

4. On the date hereof (the "Petition Date"), each of the Debtors filed with the Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code ("the

RLF1 3599370v. 1

"Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. Contemporaneously with the filing of this motion, the Debtors have filed a motion requesting the joint administration of their chapter 11 cases for procedural purposes only pursuant to Fed. R. Bankr. P. 1015(b).

6. Historically, the Debtors operated integrated and interdependent businesses consisting of the import, offloading, storage, and distribution of petroleum products in Puerto Rico. In 2009, the Debtors' distribution operations accounted for approximately 13% of the retail gasoline and diesel market in Puerto Rico. During the past nine months, however, the Debtors' operations and liquidity have been severely constrained due to catastrophic explosions, fires, and resulting damage that occurred at the Debtors' facilities on and about October 23, 2009. The explosions, which measured 2.8 on the Richter scale, (i) damaged and destroyed more than half of the Debtors' storage tanks, (ii) crippled surrounding infrastructure essential to the normal operation of the Debtors' businesses, (iii) resulted in substantial emergency and environmental clean-up costs, and (iv) exposed the Debtors to significant environmental tort and commercial claims.

7. Additional information regarding the Debtors' businesses and capital structure, as well as the circumstances leading to these chapter 11 cases, is contained in the Declaration of Nicolás López Peña in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, sworn to on August 12, 2010 (the "López Declaration").

RLF1 3599370v. 1

## Jurisdiction

8.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Prepetition Secured Indebtedness

### Prepetition Loan Agreement

9.    On December 17, 2001, predecessors in interest to the Debtors

commenced voluntary chapter 11 cases before this Court (the "2001 Bankruptcy Cases").  On

March 13, 2003, the Court confirmed a plan of reorganization in the 2001 Bankruptcy Cases

proposed by the debtors therein (the "2001 Plan").[6]  On March 24, 2003, the 2001 Plan became

effective (the "2001 Plan Effective Date").   In accordance therewith, CPC and CPR, as

borrowers, entered into an exit loan facility with Westernbank Puerto Rico ("Westernbank"), as

lender, pursuant to a Loan and Security Agreement, dated as of March 22, 2003 (as amended

from time to time, the "Prepetition Loan Agreement," together with other related documents, the

"Prepetition Loan Documents").   On April 30, 2010, the Office of the Commissioner of

Financial Institutions of the Commonwealth of Puerto Rico closed Westernbank, and appointed

the Federal Deposit Insurance Corporation ("FDIC") as receiver.   The FDIC subsequently

entered into a Purchase and Assumption Agreement with Banco Popular de Puerto Rico (in its

capacity as assignee of Westernbank, the "Prepetition Lender"), dated as of April 30, 2010,

pursuant to which the Prepetition Lender assumed certain of Westernbank's deposits and

liabilities and purchased certain of Westernbank's assets, including the Prepetition Loan

---

[6] The 2001 Bankruptcy Cases have been substantially consummated, but remain open.  See In re Caribbean Petroleum LP, et al., Case Nos. 01-11657 (KG) through 01-11661 (KG) (Bankr. D. Del. Dec. 17, 2001).

Agreement. Accordingly, the Prepetition Lender is the current lender under the Prepetition Loan Agreement.

10. The Prepetition Loan Agreement is comprised of (i) an $18 million revolving credit facility, of which approximately $1.74 million was outstanding as of July 30, 2010,[7] and (ii) seven term loans with an aggregate outstanding principal balance of approximately $135 million as of July 30, 2010.

11. To secure the Debtors' obligations under the Prepetition Loan Agreement, pursuant to certain collateral documents executed in connection therewith, CPC and CPR granted Westernbank (i) second priority liens and mortgages on the Dock and the Pipelines (each as defined in the López Declaration) and (ii) first priority liens and mortgages on substantially all of CPC's and CPR's other real and personal property and the proceeds thereof, as more fully described in the Prepetition Loan Documents (the "Prepetition Collateral").[8]

**Firstbank Loan Agreement**

12. CPR is party to a Loan Agreement, dated as of December 2, 1998 (as amended from time to time, the "Firstbank Credit Facility," together with other related documents, the "Firstbank Loan Documents"), by and between CPR, as borrower, and Firstbank Puerto Rico ("Firstbank"), as lender. Pursuant to the 2001 Plan and on the 2001 Plan Effective Date, the Firstbank Credit Facility was amended, and the balance of the Firstbank Credit Facility

---

[7] Pursuant to the Prepetition Loan Agreement, the revolving credit facility is no longer available.

[8] In connection with the Debtors' entry into the Prepetition Loan Agreement, certain non-Debtors executed guarantees and other credit support in favor of the Prepetition Lender (as successor in interest to Westernbank Puerto Rico). Specifically, the following documents were executed: (i) that certain Guarantee of Gad Zeevi, dated March 22, 2003; (ii) that certain Guarantee of Talia Zeevi, dated March 22, 2003; (iii) that certain Pledge and Security Agreement of First Oil International, Ltd., dated March 22, 2003; and (iv) that certain Guarantee, and Pledge and Security Agreement of Oil Resources International, dated March 22, 2003.

was fixed at approximately $16.7 million. The Firstbank Credit Facility presently consists of a term loan that matures on February 1, 2013, and which has an aggregate outstanding principal balance of approximately $12.5 million as of July 30, 2010. As of the Petition Date, CPR is current with respect to its payment obligations under the Firstbank Credit Facility.

13.     Pursuant to certain collateral documents executed in connection with the Firstbank Credit Facility, the Firstbank Credit Facility is secured by a security interest in, and a first priority mortgage on, the Dock and the Pipelines (each as defined in the López Declaration). On the 2001 Plan Effective Date, Firstbank and Westernbank entered into an Intercreditor Agreement, dated as of March 24, 2003 (the "Intercreditor Agreement"), to confirm and acknowledge the relative priorities of such parties' respective interests in certain of the Debtors' assets. Pursuant to the terms of the Intercreditor Agreement, among other things, Firstbank's interest in the Dock and the Pipelines is senior to the Prepetition Lender's (as successor in interest to Westernbank) interest in such assets, to the extent of the debt owed by CPR to Firstbank under the Firstbank Credit Facility.

**Puerto Rico Treasury Department**

14.     In the 2001 Bankruptcy Cases, the Debtors and the Department of Treasury for the Commonwealth of Puerto Rico ("Hacienda") entered into a Payment Compromise Agreement, dated as of March 10, 2003 (the "Hacienda Settlement") to settle a contested proof of claim filed by Hacienda. Pursuant to the Hacienda Settlement, among other things, the Debtors agreed to remit certain periodic cash payments to Hacienda, in the aggregate amount of $32,000,000. To secure the Debtors' obligations under the Hacienda Settlement, Hacienda was entitled to record mortgages on the real property against which it had filed valid tax liens as of the commencement of the 2001 Bankruptcy Cases, subordinate to the security

RLF1 3599370v. 1

interests in such assets held by Firstbank and the Prepetition Lender, respectively. As of the Petition Date, the Debtors owe Hacienda approximately $13.5 million pursuant to the Hacienda Settlement, excluding interest.

**Relief Requested**

15.     By this motion and for the reasons set forth below, pursuant to sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Fed. R. Bankr. P. 2002, 4001, and 9014, and Del. Bankr. L.R. 4001-2, the Debtors respectfully request that the Court (a) authorize the Debtors, on an interim basis pending the Final Hearing and entry of the Final Order, to (i) obtain postpetition senior secured financing up to an aggregate principal amount of $3,663,500, (ii) use cash collateral, (iii) grant priming liens and superpriority claims to the Postpetition Lender, and (iv) provide adequate protection to the Prepetition Lender, (b) authorize the Debtors, on a final basis, to (i) obtain postpetition senior secured financing up to an aggregate principal amount of $10,000,000 pursuant to the DIP Facility, (ii) use cash collateral, (iii) grant limited priming liens and superpriority claims to the Postpetition Lender, and (iv) provide adequate protection to the Prepetition Lender, (c) schedule the Final Hearing, and (d) grant related relief, in each case, on the terms and subject to the conditions described herein and set forth in the DIP Orders, the DIP Term Sheet and the other DIP Documents.

**Debtors' Proposed DIP Facility**

**A.      The Debtors' Efforts to Obtain Postpetition Financing**

16.     As set forth in the López Declaration, in the months leading up to the Petition Date, the Debtors faced acute liquidity and operational crises. Cash generated from the Debtors' limited operations was insufficient to satisfy the Debtors' immediate and anticipated cash requirements, and the Prepetition Lender made clear that it would not fund the Debtors indefinitely outside of a chapter 11 case. Accordingly, in anticipation of the commencement of

-12-

chapter 11 cases, the Debtors determined to seek postpetition financing, as the Debtors lacked the liquidity necessary to fund even their most basic operating expenses.

17.     Based on the Prepetition Lender's lien position and history with the Debtors, the Debtors identified the Prepetition Lender as the most likely source of postpetition financing. Thus, the Debtors and the Postpetition Lender engaged in extensive, good faith, arm's length negotiations with respect to the terms and conditions of the postpetition financing. The result of these negotiations is the proposed DIP Facility, which primes only the liens of the Prepetition Lender, who has consented to such priming and the relief requested herein, and is subject only to (A) valid, perfected and unavoidable liens permitted under the Prepetition Loan Documents to the extent that such permitted liens are senior to the liens of the Prepetition Lender on the Prepetition Collateral in existence on or as of the Petition Date, and (B) subject to the Intercreditor Agreement and to the extent valid, perfected, and unavoidable, the liens granted to and for the benefit of Firstbank as lender under the Firstbank Credit Agreement held as of the Petition Date on the Dock and the Pipelines (as each defined in the López Declaration), in each instance, only for so long as and to the extent that such liens set forth in clause (A) and (B) are and remain outstanding (clauses (A) and (B) together, the "Permitted Prepetition Liens").

18.     The Debtors do not believe that they would have been able to obtain postpetition financing from a source other than the Postpetition Lender on terms more favorable than those set forth in the DIP Documents. The Prepetition Lender will not consent to the priming of its liens other than pursuant to the proposed DIP Facility. Because the Debtors' obligations to the Prepetition Lender are secured by all of the Debtors' assets, the Debtors had only two potential options with respect to the prospect of obtaining postpetition financing from a lender other than the Postpetition Lender:   (a) find a lender willing to extend postpetition

-13-

financing with priority junior to that of the Prepetition Lender or (b) obtain postpetition financing that primed the liens of the Prepetition Lender without its consent.

19.     Given the status of the capital markets and the Debtors' imminent liquidity needs, the Debtors, on the advice of their advisors, concluded that any proposal for postpetition financing (other than the proposal of the Postpetition Lender) in all likelihood would have required a non-consensual priming lien on substantially all of the Debtors' assets, and thus would not have contemplated unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, credit secured by liens junior to the Prepetition Lender liens, or credit secured by liens equal to the Prepetition Lender's liens.

20.     Accordingly, the Debtors believe than any effort to attract third party postpetition financing would have caused insurmountable difficulties with the Prepetition Lender, a party whose support is essential to maximizing the value of the Debtors' estates, and ultimately, the success of the chapter 11 cases.  In light of these concerns and the realities of existing market conditions, the Debtors, in the sound exercise of their business judgment, concluded that the DIP Facility proposed by the Postpetition Lender, which is premised upon a consensual priming of only the Prepetition Lender's liens and thus avoids the need for a lengthy and uncertain priming dispute, is the best postpetition financing option available to the Debtors.

**B.     The Debtors' Liquidity Needs**

21.     Upon reaching the conclusion that financing a "traditional" chapter 11 operational restructuring was not feasible or realistic, the Debtors, with the assistance of their financial advisor, FTI Consulting, Inc. ("FTI"), analyzed the amount of cash necessary for the Debtors to facilitate an expeditious, robust marketing process for a sale of substantially all of their assets, to consummate a sale transaction and confirm a chapter 11 plan within approximately six months of the Petition Date, and to fund the Debtors' limited operations and

-14-

preserve the value of their assets during such time. In determining the amount of liquidity needed for this purpose, the Debtors and FTI conferred with certain of the Debtors' operations and management personnel with respect to the Debtors' anticipated cash receipts and disbursements. Ultimately, the Debtors, in consultation with FTI, determined that they will need $10,000,000 in postpetition financing during the chapter 11 cases. As evidenced by the DIP Budget (as defined below), the DIP Facility is appropriately sized given the Debtors' projected liquidity needs for the next six months.

22.     The Debtors have provided a budget to the Postpetition Lender and the Prepetition Lender, which forecasts projected cash flow for the six-month period following the Petition Date, and which budget has been approved in form and substance by the Postpetition Lender and the Prepetition Lender (as subsequently amended, modified, and updated from time to time in accordance with the DIP Documents, the "DIP Budget").[9] The Debtors believe that the DIP Budget is feasible and will provide the Debtors with sufficient liquidity to fund the contemplated sale process, propose and confirm a chapter 11 plan, and satisfy essential financial obligations during such time, in order to preserve and maximize the value of the Debtors' estates for the benefit of all parties in interest.

23.     As reflected in the DIP Budget, the total amount of DIP Facility proceeds potentially required by the DIP Borrowers prior to the anticipated entry of the Final Order on or about September 7, 2010 is approximately $3,663,500 (the "Interim Amount").[10] Absent the ability to use the Interim Amount pending entry of the Final Order, the Debtors will not have

---

[9] The DIP Budget is annexed as Annex A to the DIP Term Sheet. The DIP Term Sheet is annexed as Exhibit 1 to the Interim Order.

[10] Pursuant to the DIP Term Sheet, the DIP Borrowers' actual cash disbursements may, on a cumulative basis, vary from the DIP Budget by up to 15% (the "Permitted Variance"). See DIP Term Sheet § 12.

sufficient cash on hand to enable them to commence the marketing process for a sale of substantially all of their assets or to satisfy essential postpetition obligations as they come due. Time is of the essence with respect to the sale process and the chapter 11 cases, as delay increases the Debtors' exposure to the vagaries of the chapter 11 process, and results in higher costs of administration and professional fees to the detriment of the Debtors' estates and creditors. Accordingly, access to these funds on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors' estates during the period prior to entry of the Final Order by ensuring that the Debtors do not suffer a delay in commencing the sale process, and that the Debtors have sufficient liquidity to continue their limited business operations, to preserve the value of their assets, to fund the administration of these cases, and to satisfy the proposed Adequate Protection Payments to the Prepetition Lender.

## C.   Liens and Claims

24.     Pursuant to the DIP Orders, all loans and obligations under the DIP Facility shall:

a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, constitute superpriority claims against each of the Debtors, with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (the "Superpriority DIP Claims");

b)    Pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by perfected first priority security interests and liens, not subject to subordination, on all prepetition and postpetition properties and assets of the Debtors, whether owned on the DIP Closing Date or at any time thereafter acquired or created by any Debtor or in which such Debtor now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"), including but not limited to: (a) all the equity interests held by such Debtor, (b) all intercompany notes, accounts receivable, any other liabilities or payment or repayment obligations, or other obligations owed to such Debtor by any of its affiliates, (c) all of such Debtor's interest in or right to insurance proceeds and payments of any kind under insurance policies, or otherwise, (d) the Debtors' rights under section 506(c) of the Bankruptcy Code, and (e) all tangible and intangible real (owned and leased) and personal property of such Debtor

-16-

(including but not limited to accounts, chattel paper, contracts, deposit accounts, goods, documents, inventory, equipment, general intangibles, investment property, intellectual property and intellectual property licenses, investment property, real property, cash, securities accounts, commercial tort claims, other claims, choses in action, causes of action, letter of credit rights, intercompany notes, leases, leasehold improvements, and all proceeds and supporting obligations, all books and records pertaining to the Collateral, and products and proceeds of any and all of the foregoing and all collateral security and guarantees given with respect to any of the foregoing); provided, that the Postpetition Lender shall receive a perfected security interest in and lien upon causes of action arising under chapter 5 of the Bankruptcy Code and any proceeds thereof (the "Avoidance Actions") only upon entry of the Final Order; provided, further, that the Postpetition Lender shall receive a perfected security interest and lien upon all of the DIP Borrowers' cash except for the Adequate Assurance Deposit;

c) Pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by perfected security interests liens not subject to subordination, in and on all Collateral that is subject to the Permitted Prepetition Liens, junior to such Permitted Prepetition Liens; and

d) Pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by perfected first priority, senior priming security interests liens in and on all Collateral, not subject to subordination or any other liens, including without limitation, the prepetition liens (the "Prepetition Loan Agreement Liens") granted to or for the benefit of the Prepetition Lender under the Prepetition Loan Documents, which liens in each case shall be primed and made subject to and subordinate to the perfected first priority priming liens (the "Priming DIP Liens") to be granted to the Postpetition Lender; provided, that the Priming DIP Liens shall be junior to the Permitted Prepetition Liens;

e) in each case subject only in the event of the occurrence and during the continuance of an Event of Default to the Carve-Out and any exceptions for which the Postpetition Lender has provided its prior written consent.

25. Except with respect to liens on Avoidance Actions, the liens securing the DIP Facility shall be valid, perfected, enforceable, and effective as of the date of entry of the Interim Order without any further action by the DIP Borrowers or the Postpetition Lender and without necessity of the execution by the DIP Borrowers of mortgages, security agreements, pledge agreements, financing statements, or other agreements; provided, that the Postpetition

-17-

Lender shall receive a perfected lien upon all of the DIP Borrowers' cash except for the Adequate Assurance Deposit.

### D. Provisions to be Highlighted Pursuant to Del. Bankr. L.R. 4001-2

26.     The Debtors believe that the following provisions of the DIP Term Sheet and/or the Interim Order must be highlighted pursuant to Del. Bankr. L.R. 4001-2:[11]

a)     **Binding the Estate to Validity, Perfection, or Amount of Secured Debt; Waiver of Claims Against the Prepetition Lender.** Although Interim Order includes certain stipulations by the DIP Borrowers with respect to the enforceability of the Prepetition Obligations (as defined in the Interim Order) and the validity of the Prepetition Loan Agreement Liens, and certain waivers by the DIP Borrowers of rights and causes of action against the Prepetition Lender, the Interim Order reserves the rights of non-Debtor parties in interest, including the Creditors' Committee, to initiate a Challenge with respect thereto by the earlier of (i) seventy-five (75) days from the date of entry of the Interim Order, if brought by any non-Debtor party other than the Creditors' Committee and (ii) sixty (60) days from the date of appointment of the Creditors' Committee, if brought by the Creditors' Committee. (Interim Order ¶ 32)

b)     **Granting Liens on DIP Borrowers' Claims and Causes of Action Under Chapter 5 of the Bankruptcy Code.** Effective as of entry of the Final Order, the DIP Borrowers shall grant the Postpetition Lender and the Prepetition Lender liens on the Avoidance Actions. (Interim Order ¶ 13, 25); DIP Term Sheet § 17, 19)

c)     **Waiver of Section 506(c) Surcharge.** Effective as of entry of the Final Order, the Debtors waive the ability to surcharge against the Collateral and the Prepetition Collateral without the prior written consent of the Postpetition Lender and the Prepetition Lender (as applicable). (Interim Order ¶ 20, 21, 25(k), 45); DIP Term Sheet § 19, 23, 27, Exhibit B at ¶ 2)

### E. Milestone Schedule and Sale Process Protocol

27.     The DIP Term Sheet contains the following milestones for the 363 Sale and the Plan (the "Milestone Schedule"):

---

[11] Additional provisions not specifically covered by Del. Bankr. L.R. 4001-2 are highlighted in the Concise Statement provided at the outset of the motion.

a)    The Milestone Schedule with respect to the 363 Sale includes the following milestones: (i) within thirty (30) days following the Petition Date, the Court shall have entered an order (the "<u>Bidding Procedures Order</u>") approving bidding procedures attached to the DIP Term Sheet as Annex C (the "<u>Bidding Procedures</u>") with respect to the 363 Sale, which Bidding Procedures and Bidding Procedures Order shall be acceptable to and approved by the Postpetition Lender, the Prepetition Lender and the DIP Borrowers; (ii) within ninety (90) days following the Petition Date, (A) the Postpetition Lender, the Prepetition Lender and the DIP Borrowers shall have identified a stalking horse bidder acceptable to and approved by the Postpetition Lender, the Prepetition Lender and the DIP Borrowers, if any, to purchase substantially all of the assets of the DIP Borrowers pursuant to the 363 Sale (the "<u>Stalking Horse</u>") and (B) the DIP Borrowers shall have entered into definitive documentation with the Stalking Horse, if any, acceptable to and approved by the Postpetition Lender and the Prepetition Lender; (iii) within one hundred twenty (120) days following the Petition Date, the marketing process with respect to the 363 Sale shall be concluded; and (iv) within one hundred eighty (180) days following the Petition Date, (A) the Court shall have entered an order approving the 363 Sale (the "<u>Sale Order</u>"), which Sale Order shall be acceptable to the Postpetition Lender, the Prepetition Lender and the DIP Borrowers and (B) the 363 Sale shall be consummated.

b)    The Milestone Schedule with respect to the Plan includes the following milestones: (i) within one hundred twenty (120) days following the Petition Date, the DIP Borrowers shall have filed a proposed Plan acceptable to the Postpetition Lender and the Prepetition Lender and a corresponding disclosure statement (a "<u>Disclosure Statement</u>") with the Court; (ii) within one hundred sixty-five (165) days following the Petition Date, the Court shall have approved the Disclosure Statement with respect to a proposed Plan acceptable to the Prepetition Lender and the Postpetition Lender; and (iii) within one hundred eighty (180) days of the Petition Date, the Court shall have confirmed the Plan.

28.    The DIP Term Sheet contains the following protocol for conducting the marketing and bidding process for the sale of the Debtors' assets:

It shall be a condition of the making of any DIP Loan and an affirmative covenant of the DIP Borrowers to conduct the marketing and bidding process in connection with the 363 Sale in accordance with the bidding procedures attached to the DIP Term Sheet as Annex C (the "<u>Bidding Procedures</u>") and the DIP Borrowers shall provide the Postpetition Lender and the Prepetition Lender, on a weekly basis (or more frequently if circumstances warrant it and the Postpetition Lender requests it), status updates in the form of a standing weekly conference call, information and

-19-

access in connection with the Sale Process Protocol (as defined below) including but not limited to (as available): (i) confidentiality agreements executed with potentially interested parties; (ii) status and access to the dataroom used for due diligence in connection with the 363 Sale (the "Dataroom"); (iii) a listing of any party or parties engaged in due diligence in connection with the 363 Sale; (iv) contact information for any potentially interested party in connection with the 363 Sale; (v) the status of negotiations with interest parties and the potential Stalking Horse(s), if any; (vi) status of any due diligence being conducted by interested parties and the Stalking Horse; (vii) status of any issues related to the EPA or any other governmental authority that may impact the due diligence process or APA; (viii) quantification and support for any APA adjustments proposed by interested parties and the Stalking Horse; (ix) list of contracts to be assumed or rejected and quantification of cure costs/rejection claims associated therewith as available; (x) copies of any documentation received from an interested party that (a) qualifies them as a Qualified Bidder (as defined in the Bidding Procedures) and (b) verifies that they have the financial ability to close the transaction; (xi) drafts of any documentation being negotiated with such potential Stalking Horse(s), including but not limited to asset purchase agreement(s) and exhibits and schedules thereto; and (xii) copies of all bids submitted in connection with the 363 Sale (collectively, the "363 Sale Reporting Obligations" and, together with the Bidding Procedures, the "Sale Process Protocol"). The due diligence process for prospective bidders shall have commenced no later than the date of the Interim DIP Order, subject to each prospective bidder's execution of a non-disclosure agreement satisfactory and agreeable to the DIP Borrowers.

F.  **Events of Default**

29.     The DIP Term Sheet contains customary events of default for debtor in

possession financing. Such events of default include, but are not limited to, the following:

a)      The Final Order shall not have been entered by the Court, and the Amendment shall not have been executed and delivered by the DIP Borrowers and the Postpetition Lender, within 25 days after the date on which the Interim Order has been entered; or

b)      The DIP Borrowers shall fail to pay any of the obligations under the DIP Facility on the due date thereof, subject to a five (5) business day grace period with respect to the payment of interest and fees; or

c)      Any representation, warranty or other written statement to the Postpetition Lender by any DIP Borrower or by an authorized representative on behalf of any DIP Borrower proves to have been false or misleading in any material respect when made (except that such materiality qualifier shall

RLF1 3599370v. 1

not be applicable to any representation, warranty or other written statement that already is qualified or modified by materiality in the text thereof); or

d) Any DIP Borrower shall breach any covenant or obligation contained in the DIP Documents (subject to any applicable grace periods set forth in the DIP Term Sheet including Exhibit A thereto) or fail to comply with or fail to perform any of the terms, conditions or covenants or their obligations set forth in the Interim Order or the Final Order; or

e) The occurrence of any condition or event which permits the Postpetition Lender to exercise any of the remedies set forth in the Interim Order or the Final Order, including any "Event of Default" (as defined in the Interim Order or the Final Order); or

f) The occurrence of any event since the Petition Date that has or would reasonably be expected to have a material adverse effect on (a) the condition (financial or otherwise), businesses, operations or property of the DIP Borrowers, taken as a whole, (b) the ability of any DIP Borrower to fully and timely perform its respective obligations under the DIP Documents, the Interim Order or the Final Order, or (c) the legality, validity, binding effect or enforceability of any of the DIP Documents or the rights and remedies of the Postpetition Lender under any of the DIP Documents, the Interim Order or the Final Order; provided, that (x) the filing of the Bankruptcy Cases and (y) any events of default occurring under the Prepetition Loan Agreement shall not be taken into consideration (a "Material Adverse Change"); or

g) Prior to consummation of a 363 Sale, the ownership of any DIP Borrower shall change from that set forth on the Organizational Chart; or

h) Any DIP Borrower or any of its affiliates shall challenge in any action the validity or enforceability of any of the DIP Documents, the enforceability of the obligations thereunder, or the perfection or priority of any lien granted to the Postpetition Lender or any of the DIP Documents ceases to be in full force or effect; or

i) Any DIP Borrower or officer of any DIP Borrower shall be convicted under any criminal law that could reasonably be expected to result in a forfeiture of any property of such DIP Borrower; or

j) A trustee or an examiner with enlarged powers relating to the operation of the business of any DIP Borrower (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), shall be appointed in any of the Bankruptcy Cases; or

k) Any lien on any of the Collateral or superpriority claim which is pari passu with or senior to the DIP Liens or Superpriority DIP Claims of the

Postpetition Lender shall be granted (other than the Carve-Out) or any DIP Borrower shall file a motion seeking approval of any such lien or superpriority claim; or

l) Other than payments authorized by the Court in respect of one or more "first day" or other orders reasonably satisfactory to the Postpetition Lender and the DIP Borrowers, the DIP Borrowers shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables; or

m) The Court shall enter an order granting relief from the automatic stay (i) to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any DIP Borrower which have an aggregate value in excess of $50,000, or (ii) to permit other actions that would reasonably be expected to result in a Material Adverse Change; or

n) Any material provision of any DIP Documents shall cease to be valid or binding on any DIP Borrower, or any DIP Borrower shall so assert in any pleading filed in any court; or

o) Any order shall be entered reversing, amending, supplementing, staying for a period in excess of 5 days, vacating or otherwise modifying in any material respect the Interim Order or the Final Order without the prior written consent of the Postpetition Lender (and no such consent shall be implied from any other authorization by the Postpetition Lender); or

p) The DIP Borrowers shall effect a material change in the executive management of the DIP Borrowers (other than any changes agreed to in writing by the Postpetition Lender), unless such default is cured to the reasonable satisfaction of the Postpetition Lender within 5 business days following such material change; or

q) A plan shall be confirmed in any of the Bankruptcy Cases that does not provide for the termination of the commitments under the DIP Facility and the indefeasible payment in full in cash of the DIP Obligations on the effective date of such plan in a manner acceptable to the Postpetition Lender; or

r) The (a) filing by the DIP Borrowers of any plan of reorganization or liquidation without the prior written approval of the Postpetition Lender and the Prepetition Lender, or (b) the termination of any of the DIP Borrowers' exclusive rights under section 1121 of the Bankruptcy Code; or

s) (a) On a cumulative basis, the DIP Borrowers' actual cash disbursements shall vary from the DIP Budget in excess of the Permitted Variance, which

cumulative variance shall be measured on a weekly basis and subject to a five (5) business day grace period, or (b) the DIP Borrowers shall fail to deliver the DIP Budget, any Variance Report, any 13-week cash flows or any related reports or certificate with respect to the DIP Budget, in form and substance satisfactory to the Postpetition Lender, within two (2) business days of the date when due; or

t) Failure of the DIP Borrowers to meet any of the milestones in the Milestone Schedule, or failure to seek and obtain any approval of the Prepetition Lender or the Postpetition Lender required under Section 21 of the DIP Term Sheet, or failure to implement or adhere to the Sale Process Protocol, subject to a grace period of five (5) business days; provided, that no Event of Default under the DIP Facility and no termination of the DIP Borrowers' authorization to use Cash Collateral shall occur if the failure to satisfy any milestone in the Milestone Schedule is due solely to unreasonable delay caused by the Postpetition Lender or the Prepetition Lender or the Court's schedule of hearing dates; or

u) The filing of any motion to approve a sale of all or a substantial portion of any DIP Borrower's assets without the prior written approval of the Postpetition Lender; or

v) Any DIP Borrower seeking, or the filing of any motion by any DIP Borrower or any other party to obtain, additional or replacement postpetition financing for the DIP Borrowers; or

w) Failure of the DIP Borrowers to comply with any of their adequate protection obligations to the Prepetition Lender under the Interim Order and the Final Order; or

x) Failure of the DIP Borrowers to employ upon and following the Petition Date (subject to Court approval) at all times a chief restructuring officer satisfactory to the Postpetition Lender and the DIP Borrowers and that has full and final executive authority over all employees and other officers of the DIP Borrowers; or

y) Any of the Bankruptcy Cases shall be dismissed or converted into a chapter 7 case; or

z) The commencement or continuation of any judicial action or proceeding in law or equity, by or with the support of the DIP Borrowers, against the Postpetition Lender or the Prepetition Lender.

-23-

### G.  Remedies

30.     Following the provision by the Postpetition Lender to the Debtors of five (5) business days' prior written notice (such five (5) business day period, the "Remedies Notice Period") of an Event of Default under the DIP Facility (with a copy of such written notice to be provided to counsel to the Debtors, the Creditors' Committee, counsel to the Creditors' Committee, and the U.S. Trustee, and filed with the Court), the stay otherwise applicable to the Postpetition Lender with respect to the Collateral shall terminate to permit the enforcement of the rights and remedies provided in the DIP Documents, the Interim Order, and the Final Order (as applicable).  Pursuant to the DIP Term Sheet, the DIP Borrowers waive the right to contest the exercise of remedies by the Postpetition Lender; however, the DIP Borrowers may contest the assertion of the existence and/or continuation of an Event of Default.

### H.  Indemnification

31.     The DIP Borrowers agree to indemnify the Postpetition Lender, its affiliates, successors and assigns, and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and hold them harmless from and against any and all liabilities, obligations, losses, damages, claims, costs, expenses and disbursements (including reasonable fees and disbursements of counsel and financial advisors, and any funding of or payment of Carve-Out amounts) of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by any DIP Borrower or any of its affiliates) that relates to the DIP Documents, the Interim Order or the Final Order, as applicable, the transactions contemplated by the DIP Facility, the use or proposed use of proceeds of the DIP Loans, or any enforcements of the DIP Documents.  No Indemnified Person shall be indemnified for any liability, obligation,

-24-

loss, damage, claim, cost, expense, or disbursement to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from its gross negligence or willful misconduct.

32.     Notwithstanding anything to the contrary in the DIP Term Sheet, the obligation of the DIP Borrowers to pay all out-of-pocket costs and expenses, including fees, disbursements and other charges of counsel, of the Postpetition Lender in connection with the DIP Facility is not subject to any limitation in the DIP Budget on the amount of fees, costs or expenses payable to the Postpetition Lender; provided, however for the avoidance of doubt, the non-payment of the Postpetition Lender's professional fees and expenses in excess of the amounts budgeted in the DIP Budget shall not constitute an Event of Default. Payment of the full amount of all such fees, costs and expenses  shall constitute DIP Obligations whether or not the DIP Budget provides for payment of such amounts.

### Use of Cash Collateral and Adequate Protection

33.     Most, if not all, of the cash, cash equivalents, and other amounts on deposit or maintained in the Debtors' bank accounts constitute proceeds that are the cash collateral of the Prepetition Lender[12] in accordance with section 552(b) of the Bankruptcy Code (collectively, the "Cash Collateral").

34.     The Prepetition Lender has consented to the Debtors' use of Cash Collateral in the ordinary course of business, subject to the grant of adequate protection, including the proposed Adequate Protection Liens (as defined below), the Adequate Protection

---

[12] Pursuant to the Intercreditor Agreement, Firstbank does not maintain a lien on the Debtors' Cash Collateral. See Intercreditor Agreement § 2.2 (stating that the Prepetition Lender's (as successor in interest to Westernbank) lien on all assets other than those limited assets subject to Firstbank's senior lien is exclusive); Intercreditor Agreement § 3.4 (certification of a release by Firstbank of its security interest in the Debtors' accounts, inventory, and proceeds). Copies of the Intercreditor Agreement are available upon request to counsel for the Debtors.

Payments (as defined below), and the other terms and conditions set forth herein and in the Interim Order.

   35. As adequate protection of, and protection against any diminution in, the value as of the Petition Date of the Prepetition Lender's liens on, security interests in, and any other interests in property of the Debtors as of the Petition Date, the Prepetition Lender is entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Prepetition Collateral for any such diminution in value. The Prepetition Lender shall be entitled to, subject to the Carve-Out:

a) Additional and replacement liens in all prepetition and postpetition property of the DIP Borrowers (the "Adequate Protection Liens"), which Adequate Protection Liens shall be junior in priority only to the Priming DIP Liens and the Permitted Prepetition Liens and shall be subject to the Carve-Out; provided, that the Prepetition Lender shall receive a perfected security interest and lien upon the Avoidance Actions only upon entry of the Final DIP Order; provided, further, that the Prepetition Lender shall receive a perfected lien upon all of the DIP Borrowers' cash except for the Adequate Assurance Deposit;

b) Superpriority claims, having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, junior to the Superpriority DIP Claims and shall be subject to the Carve-Out;

c) Repayment of the obligations to the Postpetition Lender under the DIP Facility and payment of the Adequate Protection Payments (as defined below) to the Prepetition Lender, and any other adequate protection payments made in the Bankruptcy Cases, shall be made or deemed to be made with the proceeds of property of the DIP Borrowers that are not encumbered by perfected, valid, enforceable and unavoidable liens of the Prepetition Lender;

d) The escrow of all proceeds of the 363 Sale pending distribution to creditors, including the Prepetition Lender on account of its allowed claims, upon consummation the Plan or upon such other distribution of such proceeds as otherwise ordered by the Court;

e) Shall have the right to credit bid the indebtedness owed to the Prepetition Lender under the Prepetition Loan Agreement, in whole or in part, in

connection with any sale or disposition of assets of the Debtors (whether or not such asset sale or disposition is undertaken or proposed under or pursuant to the terms of any consensual or nonconsensual (including under section 1129(b)(2)(A)(i), (ii) and/or (iii) of the Bankruptcy Code) chapter 11 plan of reorganization or liquidation of or for the Debtors, whether proposed by the Debtors, the Creditor's Committee or any other party, by motion under section 363 of the Bankruptcy Code, or otherwise under applicable law) and the Debtors hereby waive all rights to oppose such credit bid rights of the Prepetition Lender;

f)   Shall be named as a loss payee (in respect of property/casualty insurance policies maintained by the DIP Borrowers) and additional insured (in respect of liability insurance policies maintained by the DIP Borrowers), and the DIP Borrowers shall deliver to the Prepetition Lender copies of any and all insurance claims (including past, pending or future claims), whether or not funded, of all non-privileged documents and correspondence related to such insurance claims and any claims that the DIP Borrowers are contemplating, and the Prepetition Lender shall be provided with thirty (30) days' advance notice of all non-renewal/cancellation/amendment riders in respect of such policies;

g)   Shall be entitled to payment, promptly and in any event no later than three (3) business days after receipt thereof, of any proceeds and any other payments payable to any of the Debtors under any of the Debtors' insurance policies and which proceeds and/or payments are received by the Debtors during the pendency of the Bankruptcy Cases (which payments of any such Insurance Proceeds the Prepetition Lender is hereby authorized by the DIP Borrowers to pay to Firstbank in accordance with the Intercreditor Agreement);

h)   Provide to the Postpetition Lender, as soon as possible and in any event within three (3) business days after an officer of any DIP Borrower obtains actual knowledge, or after due inquiry, would have obtained such knowledge by acting in good faith and in a prudent manner in the performance of his or her duties, notice of the occurrence of (x) any material adverse development with respect to any loss, damage, investigation, claim, litigation, action, proceeding or controversy involving the DIP Borrowers, notice thereof and as soon as practicable thereafter, to the extent the Prepetition Lender requests, copies of all documentation relating thereto and (y) any material adverse change in the business, properties, assets or condition (financial or otherwise) of any DIP Borrower;

i)   Shall be permitted to visit and inspect the properties, books and records of the DIP Borrowers upon reasonable notice at the Debtors' expense;

j)   Upon entry of Final Order, the Prepetition Lender and its collateral shall not be subject to or liable for any claims under section 506(c) of the Bankruptcy Code, and the assertion of any such claims against the Prepetition Lender or its collateral shall be prohibited by the Final Order;

k)   Provision of such budgets and other information respecting the Prepetition Collateral, the sale or disposition of the Debtors' assets, and any draft proposed plan of reorganization or liquidation (or plan term sheet) of or for the Debtors as the Prepetition Lender, from time to time, may request, and the DIP Borrowers hereby irrevocably authorize and direct each of their accountants and advisors to deliver to the Prepetition Lender, at the Debtors' expense, copies of all financial statements of the Debtors and such other information respecting the Debtors' assets and business as the Prepetition Lender may request;

l)   Shall have the approval rights provided for in the Milestone Schedule (as defined in the DIP Term Sheet) set forth in Section 21 of the DIP Term Sheet;

m)  Shall provide the Prepetition Lender with the status updates required by the Sale Process Protocol (as defined in the DIP Term Sheet) set forth in Section 21 of the DIP Term Sheet; and

n)   Payment of all reasonable professional fees and expenses incurred by the Prepetition Lender in connection with the administration of the Bankruptcy Cases in accordance with the DIP Budget (the "Adequate Protection Payments").[13]

36.   The Adequate Protection Liens shall be valid, perfected, enforceable, and

effective as of the date of entry of the Interim Order without any further action by the DIP

---

[13] Notwithstanding anything to the contrary in the DIP Term Sheet, the Prepetition Lender and Postpetition Lender shall have claims and administrative expenses (as the case may be) for payment of the full amount of all professional fees and expenses of the Prepetition Lender and Postpetition Lender incurred in connection with the Bankruptcy Cases, and such claims and administrative expenses (as the case may be) are not subject to any limitation in the DIP Budget on the amount of professional fees or expenses payable as Adequate Protection Payments, and payment of the full amount of all professional fees and expenses of the Prepetition Lender and Postpetition Lender incurred in connection with the Bankruptcy Cases shall constitute obligations of the DIP Borrowers whether or not the DIP Budget and the other DIP Documents provide for limited Adequate Protection Payments during the period covered by the DIP Budget. For the avoidance of doubt, the non-payment of the Prepetition Lender's and the Postpetition Lender's professional fees and expenses in excess of the amounts budgeted in the DIP Budget shall not constitute an Event of Default.

Borrowers or the Prepetition Lender and without the need for execution by the DIP Borrowers of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

## The DIP Facility Should Be Authorized

37.     Approval of the DIP Facility and the use of Cash Collateral will enable the Debtors to fund an orderly and efficient sale process and confirm a chapter 11 plan, while satisfying their minimal operating expenses and preserving the value of their assets in anticipation of a sale transaction and plan confirmation. Because the Debtors' available and projected Cash Collateral is insufficient to fund these cases, the credit provided under the DIP Facility is essential to the Debtors' successful completion of the restructuring process described in the López Declaration. Absent the requisite financing, the Debtors would not be able to pursue a sale of substantially all of their assets – a course of action that the Debtors and their primary prepetition secured lender, the Prepetition Lender, believe to be the most expeditious means of maximizing the value of the Debtors' estates. Simply stated, if the Debtors are precluded from timely pursuit of a sale transaction, the Debtors' ability to generate the highest and best recovery for their estates and creditors would be frustrated, and the Debtors' estates would suffer irreparable harm. Further, the availability of Cash Collateral and credit under the DIP Facility will instill confidence in potential bidders for the Debtors' assets and assure such bidders of the Debtors' ability to maintain stability and preserve the value of the assets throughout the sale process, thereby greatly enhancing the opportunity for a robust, competitive sale process that will yield the greatest recovery for the Debtors' estates and creditors. Accordingly, the timely approval of the relief requested herein is imperative.

38.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit (a)

with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c). Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (x) the debtor is unable to obtain such credit otherwise and (y) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

39. Due to the exigent circumstances of the chapter 11 cases, the fully encumbered nature of the Debtors' assets, and the current condition of the capital markets, the Debtors likely would be unable to obtain sufficient financing without granting priming liens pursuant to section 364(d) of the Bankruptcy Code. Furthermore, the Debtors do not believe that they could procure postpetition financing or other financial accommodations from any other prospective lender on terms and conditions more favorable than the proposed DIP Facility, which is premised upon a consensual priming of only the Prepetition Lender's liens. Accordingly, the Debtors propose to obtain the financing set forth in the DIP Term Sheet by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3), and (d) of the Bankruptcy Code.

40. Having determined that postpetition financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the Postpetition Lender and the Prepetition Lender regarding the DIP Facility, the use of Cash Collateral, and the adequate protection obligations extensively and at arm's length. So long as a debtor's business judgment does not run afoul of the letter and spirit of the Bankruptcy Code, courts grant a debtor

RLF1 3599370v. 1

considerable discretion with respect to postpetition financing. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also In Farmland Industries, Inc., 294 B.R. 855, 881-84 (Bankr. W.D. Mo. 2003); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

41.     A debtor is not required to seek alternative financing from every possible lender in order to satisfy the requirements of section 364(d) of the Bankruptcy Code. In re 495 Central Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992). Rather, a debtor need only demonstrate sufficient efforts to obtain financing from other sources without the granting of senior liens. Snowshoe, 789 F.2d at 1088 (the debtor demonstrated that credit could not be obtained without the granting of a senior lien, in part by providing evidence that efforts to obtain financing from other financial institutions in the geographic area had proven unsuccessful).

42.     All of the Debtors' assets are encumbered, and given these limitations, the Debtors have successfully negotiated postpetition financing on the best terms available. The circumstances of these chapter 11 cases necessitate postpetition financing under sections 364(c) and (d) of the Bankruptcy Code. In light of the foregoing reasons, the DIP Facility reflects the exercise of the Debtors' sound business judgment.

43.     The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's

length. Accordingly, the Postpetition Lender and all obligations incurred under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.[14]

### The Use of Cash Collateral Should Be Approved and the Proposed Adequate Protection Should Be Authorized

44.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral if "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). In addition to the DIP Facility, the Debtors require the use of Cash Collateral in order to ensure that they have the liquidity necessary to fund the contemplated sale process, confirmation of a chapter 11 plan, and their limited business operations during these cases. Absent authority to use Cash Collateral, the Debtors' liquidity needs will not be satisfied, jeopardizing the Debtors' ability to conduct an efficient and effective sale process, and, ultimately, their ability to maximize value for the benefit of all parties in interest. Thus, the use of Cash Collateral is imperative to the success of the chapter 11 cases.

45.     The Prepetition Lender has consented to the use of Cash Collateral on the terms set forth herein, in the Interim Order, and in the DIP Term Sheet, and its interests in the Cash Collateral are adequately protected as described herein. Accordingly, the Debtors' request to use Cash Collateral should be approved. [15]

---

[14] The provisions highlighted pursuant to Del. Bankr. L.R. 4001-2 were negotiated thoroughly and were required both by the Postpetition Lender for the availability of the DIP Facility and the Prepetition Lender for its consent to use Cash Collateral. Therefore, the inclusion of such provisions is justified by the facts and circumstances of these cases.

[15]     Notwithstanding any other provision hereof, the proposed adequate protection to the Prepetition Lender sought pursuant hereto is without prejudice to the right of the Prepetition Lender to seek modification of the grant of adequate protection set forth herein so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification. The consent of the Prepetition Lender to the priming of its liens on the Prepetition Collateral by the Priming DIP Liens (a) is limited to the DIP Facility authorized

46.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by the trustee, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).   Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of the relief.   11 U.S.C. § 361.   Adequate protection is an elastic concept, and accordingly, what constitutes adequate protection must be decided on a case-by-case basis.   <u>See</u> <u>MBank Dallas v. O'Connor (In re O'Connor)</u>, 808 F.2d 1393, 1396-97 (10th Cir. 1987); <u>Martin</u> <u>v. U.S. (In re Martin)</u>, 761 F.2d 472, 474 (8th Cir. 1985).   The focus of the inquiry is whether a secured creditor is protected from diminution in the value of its interest in the collateral during the period of use.   <u>See</u> <u>In re Swedeland Dev. Group, Inc.</u>, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy") (internal citations omitted).

47.     In consideration for the adequate protection proposed herein, the Prepetition Lender has consented to the Debtors' use of Cash Collateral and entry into the DIP Facility.   The Adequate Protection Liens, Adequate Protection Payments, superpriority claims, and other protections afforded the Prepetition Lender provide ample protection against any diminution in the value of its interests in the Collateral.   Accordingly, the adequate protection proposed herein is fair, reasonable, and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

---

pursuant to the Interim Order and/or the Final Order, as applicable, and shall not extend to any other postpetition financing or to any modified version or replacement of the DIP Facility and (b) does not constitute, and shall not be construed as constituting, an acknowledgement or stipulation by the Prepetition Lender that, absent such consent, its interests in the Prepetition Collateral would be adequately protected.

## The Automatic Stay Should Be Modified on a Limited Basis

48.     The relief requested herein contemplates a modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to (a) permit the DIP Borrowers to grant the security interests, liens, and superpriority claims described above with respect to the Postpetition Lender and the Prepetition Lender, as the case may be, and to perform such acts as may be reasonably requested to assure the perfection and priority of such security interests and liens, (b) permit the Postpetition Lender to exercise (solely with respect to the DIP Facility), upon the occurrence and continuance of an Event of Default and after five (5) business days' written notice thereof, the rights and remedies provided in the DIP Documents, the Interim Order, and the Final Order, as applicable, and (c) implement the terms of the proposed DIP Orders.  In the Debtors' business judgment, the stay modification requested herein is fair and reasonable under the circumstances.

## Interim Approval Should Be Granted

49.     Fed. R. Bankr. P. 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen days after service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a hearing to consider the relief requested on a final basis.

50.     Pursuant to Fed. R. Bankr. P. 4001(b) and (c), the Debtors respectfully request that the Court conduct an expedited preliminary hearing on this motion and (a) approve the DIP Facility on an interim basis, (b) authorize the Debtors to use Cash Collateral and, consistent with the DIP Budget and the DIP Agreement, use up to $3,663,500 of the DIP Facility on an interim basis, pending the Final Hearing and entry of the Final Order, in order to

-34-

commence the marketing process for the sale of substantially all of the Debtors' assets, finance the Debtors' limited business operations, preserve the value of the Debtors' assets, and avoid immediate and irreparable harm to the Debtors, their estates and creditors, and all parties in interest, and (c) schedule the Final Hearing.

51.     The Debtors lack the funds necessary to commence a sale process – a process that is critical to maximizing the value of the Debtors' estates for the benefit of all stakeholders – and to fund their limited operating expenses and maintain the value of their assets while they pursue a sale transaction. Thus, the Debtors have an urgent and immediate need for liquidity. Absent authorization to use Cash Collateral and obtain credit under the DIP Facility, on an interim basis pending the Final Hearing, the Debtors will suffer immediate and irreparable harm, as the Debtors would be unable to continue to fund even their minimal operations, including employee wages. Further, any delay in commencing the sale process poses grave risk to the Debtors and their ability to implement a strategy and confirm a chapter 11 plan that will yield highest recover for their estates and creditors. Accordingly, the interim relief requested herein is vital to the Debtors, and to the success of the chapter 11 cases.

### Waiver of Fed. R. Bankr. P. 6004(a) and (h)

52.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Fed. R. Bankr. P. 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Fed. R. Bankr. P. 6004(h).

### Notice

53.     No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases. Pursuant to Del. Bankr. L.R. 9013-1(m), notice of the "first-day" hearing to consider this motion is being provided to (i) the U.S. Trustee, (ii) the holders of the thirty largest unsecured claims against the Debtors on a consolidated basis, (iii) each of the

Debtors' prepetition secured lenders, (iv) the Securities and Exchange Commission, (v) the Internal Revenue Service, (vi) the United States Environmental Protection Agency, and (vii) the United States Department of Justice. Following the hearing, a copy of this motion and any order entered with respect hereto will be served on (a) the foregoing parties and (b) all parties having filed requests for notices in these chapter 11 cases. Due to the urgency of the circumstances and the nature of the relief requested herein, the Debtors submit that no other or further notice need be given.

RLF1 3599370v. 1

**No Prior Motion**

54.    No prior motion for the relief requested herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:    August 12, 2010
          Wilmington, Delaware

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 498-7531

-and-

John J. Rapisardi
George A. Davis
Zachary H. Smith
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

Proposed Co-Attorneys for Debtors
and Debtors in Possession

RLF1 3599370v. 1