# Exhibit 1

ASSET PURCHASE AGREEMENT

BY AND AMONG

CARIBBEAN PETROLEUM CORPORATION,

CARIBBEAN PETROLEUM REFINING L.P.,

GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION,

(SELLERS)

[BUYER/ACQUISITION VEHICLE]

AND

[PARENT GUARANTOR]

(BUYER)

NOVEMBER __, 2010

# TABLE OF CONTENTS

**Page**

1. Definitions .................................................................................................................1

2. Purchase and Sale. ....................................................................................................12
   (a) Purchase and Sale of Acquired Assets; Retention of Excluded Assets ...............12
   (b) Assumption of Assumed Liabilities; Retention of Excluded Liabilities ...............12
   (c) Assumption and Rejection of Contracts ................................................................12
   (d) Consideration. ......................................................................................................13
   (e) Closing ..................................................................................................................13
   (f) Deliveries at Closing. ............................................................................................14
   (g) Non-Assignment of Assumed Contracts ................................................................15

3. Sellers' Representations and Warranties ...................................................................15
   (a) Organization of Sellers; Good Standing ................................................................15
   (b) Authorization of Transaction ................................................................................16
   (c) Noncontravention ..................................................................................................16
   (d) Title to Acquired Assets ........................................................................................16
   (e) Litigation ...............................................................................................................17
   (f) Brokers' Fees. ........................................................................................................17
   (g) Disclosure. ............................................................................................................17

4. Buyer's and Guarantor's Representations and Warranties .......................................18
   (a) Organization of Buyer and Guarantor ..................................................................18
   (b) Authorization of Transaction ................................................................................18
   (c) Noncontravention ..................................................................................................18
   (d) Litigation ...............................................................................................................19
   (e) Brokers' Fees .........................................................................................................19
   (f) Financial Capacity .................................................................................................19
   (g) Adequate Assurances Regarding Executory Contracts ..........................................19

5. Pre-Closing Covenants ..............................................................................................19
   (a) Commercially Reasonable Efforts; Cooperation ...................................................19
   (b) Notices and Consents ............................................................................................20
   (c) Conduct of the Business Pending the Closing .......................................................20
   (d) Notice of Developments ........................................................................................21
   (e) Access ...................................................................................................................21
   (f) Press Releases and Public Announcements ...........................................................21
   (g) Bankruptcy Court Matters .....................................................................................22
   (h) Bulk Transfer Laws ...............................................................................................22
   (i) Cure Amounts .......................................................................................................22
   (j) Supplementation and Amendment of Disclosure Schedule ...................................23
   (k) Regulatory Filings .................................................................................................23
   (l) Allocation of the Purchase Price ...........................................................................24

i

6.     Other Covenants................................................................................................24
     (a)    Cooperation; Further Assurances................................................................24
     (b)    Litigation Support........................................................................................24
     (c)    Availability of Records ...............................................................................25
     (d)    Satisfaction of Excluded and Assumed Liabilities .................................26
     (e)    Employee Matters........................................................................................26
     (f)    Transfer Taxes.............................................................................................28
     (g)    Recording of Intellectual Property Assignments .....................................28
     (h)    Property and Other Taxes ...........................................................................28
     (i)    Wage Reporting ..........................................................................................29
     (j)    Use of Name ...............................................................................................29

7.     Conditions to Obligation to Close ....................................................................29
     (a)    Conditions to Buyer's and Guarantor's Obligations.................................29
     (b)    Conditions to Sellers' Obligations.............................................................30
     (c)    No Frustration of Closing Conditions ........................................................30

8.     Termination........................................................................................................31
     (a)    Termination of Agreement..........................................................................31
     (b)    Procedure Upon Termination......................................................................32
     (c)    Effect of Termination..................................................................................32

9.     Miscellaneous....................................................................................................32
     (a)    Expenses .....................................................................................................32
     (b)    Entire Agreement........................................................................................33
     (c)    Incorporation of Schedules and Exhibits ..................................................33
     (d)    Amendments and Waivers ..........................................................................33
     (e)    Succession and Assignment........................................................................33
     (f)    Notices ........................................................................................................33
     (g)    Governing Law; Jurisdiction......................................................................34
     (h)    Consent to Service of Process.....................................................................35
     (i)    WAIVERS OF JURY TRIAL .....................................................................35
     (j)    Specific Performance ..................................................................................35
     (k)    Severability .................................................................................................35
     (l)    No Survival of Representations and Warranties.........................................35
     (m)    Survival of Covenants and Agreements.....................................................35
     (n)    No Third Party Beneficiaries .....................................................................35
     (o)    Construction................................................................................................35
     (p)    Computation of Time ..................................................................................36
     (q)    Mutual Drafting ..........................................................................................36
     (r)    Headings; Table of Contents.......................................................................36
     (s)    Counterparts; Facsimile or Email Signatures ...........................................36
     (t)    Time of Essence..........................................................................................36
     (u)    Guaranty......................................................................................................36

RLF1 3631767v. 1

| Exhibit A | - | Bidding Procedures Order |
| Exhibit B | - | Form of Sale Order |
| Exhibit C | - | Form of Escrow Agreement |
| Exhibit D | - | Form of Bill of Sale |
| Exhibit E | - | Form of Assignment and Assumption Agreement |
| Exhibit F | - | Form of Trademark Assignment |
| Exhibit G | - | Form of Intellectual Property Assignment |

| Annex A | - | Assumed Contracts |

# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>") is entered into as of November __, 2010, by and among Caribbean Petroleum Corporation, a corporation formed under the laws of the State of Delaware ("<u>CPC</u>"), Caribbean Petroleum Refining L.P., a limited partnership formed under the laws of the State of Delaware ("<u>CPRLP</u>") and Gulf Petroleum Refining (Puerto Rico) Corporation, a corporation formed under the laws of the State of Delaware ("<u>Gulf</u>", together with CPC and CPRLP, the "<u>Sellers</u>" and each, individually, a "<u>Seller</u>"), [   ] (the "<u>Buyer</u>"), and [ ] (the "<u>Guarantor</u>"). Sellers, Buyer and Guarantor are referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in <u>Section 1</u>.

**WHEREAS**, Sellers have historically engaged in the business of importing, offloading, storing and distributing petroleum-based products in Puerto Rico (the "<u>Business</u>");

**WHEREAS**, on August 12, 2010 (the "<u>Commencement Date</u>") Sellers commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which cases are currently pending before the Honorable Kevin Gross and jointly administered under Case No. 10-12553 (KG) (the "<u>Chapter 11 Cases</u>");

**WHEREAS**, Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Business as of the Closing on the terms and subject to the conditions set forth herein, and, in furtherance of the foregoing, (i) Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Acquired Assets, and (ii) Buyer wishes to assume from Sellers the Assumed Liabilities, in the case of clause (i) and (ii) above, on the terms and subject to the conditions set forth herein; and

[**WHEREAS**, Buyer is a wholly-owned Subsidiary of Guarantor, and Guarantor wishes to irrevocably and unconditionally guarantee to Sellers the due and punctual payment and performance of all obligations of Buyer under this Agreement on the terms and subject to the conditions set forth herein.]

**NOW, THEREFORE**, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

1.      <u>Definitions</u>.

"<u>Acquired Assets</u>" means all of Sellers' right, title and interest in and to all of Sellers' properties, assets and rights of every nature, kind and description, tangible and intangible (including goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, existing as of the Closing Date, other than the Excluded Assets, in each case that are used in the Business, including the following: (a) all Inventory; (b) all Furnishings and Equipment, petroleum terminaling, pipeline and storage facilities, ship dock facilities in San Juan Harbor, and physical facilities of every type used in the Business; (c) all Records used in the Business, including all Tax Returns and Records relating to Property Taxes (and, for avoidance of doubt, excluding any Tax Returns and Records relating to income or similar Taxes) imposed on the

Acquired Assets or with respect to the Business; provided that Sellers shall have the right to make copies of any such Tax Returns and Records; (d) all Intellectual Property used in the Business (collectively, "Acquired Intellectual Property"); (e) all Contracts used in the Business as set forth on Annex A and designated by Buyer pursuant to Section 2(c) hereof, which will be assigned to Buyer pursuant to Section 365 of the Bankruptcy Code in connection with the transactions contemplated in this Agreement (all Contracts contemplated by this clause (e), collectively, the "Assumed Contracts"); (f) all of Sellers' interest in real property consisting of (i) Sellers' fee interests in all owned real properties, and (ii) Sellers' interests in vacant real property and other real property owned or leased by Sellers, and such interests shall be deemed to include all interests of Sellers in and to any improvements and fixtures on such real property, and also any easements, covenants and other rights appurtenant to such real property; (g) all claims of Sellers against third parties relating to the Acquired Assets and Assumed Liabilities, whether choate or inchoate, known or unknown, contingent or noncontingent; (h) all Permits relating to the Business (all Permits contemplated by this clause (h), collectively, the "Assumed Permits") in each case, only to the extent such Assumed Permits are assignable; and (i) all insurance policies and binders set forth on Schedule 1.1 of the Disclosure Schedule and all claims, refunds and credits from such policies or binders due or to become due with respect to such policies.

"Acquired Intellectual Property" has the meaning set forth in the definition of Acquired Assets.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"Agreement" has the meaning set forth in the preamble.

"Antitrust Laws" means, collectively, the HSR Act, the Sherman Antitrust Act of 1890, as amended, the Clayton Antitrust Act of 1914, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2(f)(i)(B).

"Assisting Party" has the meaning set forth in Section 6(b).

"Assumed Contracts" has the meaning set forth in the definition of Acquired Assets.

"Assumed Liabilities" means, with respect to the Business: (a) all Liabilities relating to Buyer's ownership or operation of the Business or Acquired Assets that arise from events, facts or circumstances that occur after the Closing, including all liabilities for breaches of Environmental Laws accruing after the Closing; (b) all Current Liabilities; (c) all Liabilities to the extent incurred after the Closing under the Assumed Contracts or the Assumed Permits; (d) all Liabilities relating to or arising out of the use and occupation of real property used in the Business, to the extent such Liabilities arise from Buyer's occupation of the real property or ownership or operation of the Business after the Closing; (e) all Liabilities of the Business for

2

Taxes to the extent such Liabilities arise from Buyer's ownership or operation of the Business after the Closing; (f) all Liabilities for Transfer Taxes; (g) all Liabilities of the Business for payroll, vacation and sick leave, accrued in respect of the Transferred Employees (the Liabilities described in this clause (g), the "Accrued Employee Obligations"); (h) all Liabilities relating to or arising out of any claim or threatened claim against any Seller relating to the Business or the Acquired Assets, but only to the extent such Liabilities arise from any action or omission of the Business under the ownership or operation of the Business by the Buyer or any of its Affiliates after the Closing; (i) Taxes with respect to the Business or the Acquired Assets to the extent specifically allocated to Buyer pursuant to Section 6(h); (j) all Liabilities associated with suppliers and customers of the Business, but only to the extent such Liabilities arise from Buyer's ownership or operation of the Business after the Closing; (k) all Liabilities relating to long term deferred revenue of the Business as of the Closing; (l) all Liabilities for Cure Amounts, subject to the Buyer Cure Amounts Cap; (m) all Liabilities for breaches of Environmental Laws arising out of or relating to the operation of the Business on or before the Closing or Sellers' leasing, owning or operation of real property in an aggregate amount not to exceed $_____, but only to the extent such Liabilities constitute administrative claims for purposes of the Chapter 11 Cases; (n) all other Liabilities with respect to the Acquired Assets arising after the Closing; and (o) all Liabilities of the Business relating to amounts required to be paid by Buyer hereunder or under any Related Agreement; provided, however, that, notwithstanding the above, the Assumed Liabilities shall not include any Excluded Liabilities.

"Assumed Permits" has the meaning set forth in the definition of Acquired Assets.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"Bidding Procedures Order" means the Final Order entered by the Bankruptcy Court on September 10, 2010, attached hereto as Exhibit A, approving, among other things, the Bidding Procedures.

"Bill of Sale" has the meaning set forth in Section 2(f)(i)(A).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York or San Juan, Puerto Rico shall be authorized or required by law to close.

"Buyer" has the meaning set forth in the preamble.

3

"Buyer Cure Amounts Cap" means, subject to Section 5(i) and as adjusted in accordance with Section 2(c)(ii), the aggregate amount of Cure Amounts set forth on Annex A hereto.

"Buyer Plan" means each Employee Benefit Plan of Buyer or an Affiliate of Buyer in which any Transferred Employee becomes eligible to participate.

"Cash" means all cash (including checks received prior to the close of business on the Closing Date, whether or not deposited or cleared prior to the close of business on the Closing Date), certificates of deposit and other bank deposits, treasury bills and other cash equivalents and marketable securities.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Closing" has the meaning set forth in Section 2(e).

"Closing Date" has the meaning set forth in Section 2(e).

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state law.

"COBRA Liabilities" means all Liabilities arising on or prior to the Closing Date under COBRA with respect to any current or former employee of any Seller (including the Covered Employees) and/or any beneficiaries or dependents thereof.

"Commencement Date" has the meaning set forth in the recitals.

"Commercial Tort Claims" has the meaning set forth in Section 9-102 of the Uniform Commercial Code as in effect in the State of Delaware.

"Competing Transaction" means any direct or indirect acquisition or purchase of the Business or all or substantially all of the Acquired Assets, or any merger, consolidation, recapitalization or other business combination or other transaction (including a plan of reorganization or liquidation) affecting the Acquired Assets or the Business such that the Acquired Assets or the Business are no longer owned and controlled by the Sellers (or a wholly-owned Subsidiary thereof) or any Affiliates thereof.

"Confidentiality Agreement" means the letter agreement, dated [      ], 2010, by and among Sellers and the Guarantor regarding the terms and conditions on which Sellers would make available certain information.

"Contract" means any written or oral agreement, commercial fuel agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, franchise, dealer and distributorship agreement, supply agreement, service agreement, software license agreement, software maintenance agreement, development agreement, joint venture agreement, promotion agreement, customer contract or purchase order, partnership agreement or other arrangement, understanding, permission or commitment.

4

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to, or in connection with, any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Covered Employee" means any officer or employee of any Seller or any of their respective Affiliates whose duties relate primarily to the operation of the Business and who is actively employed as of the date immediately prior to the Closing Date.

"Cure Amounts" has the meaning set forth in Section 5(i).

"Current Liabilities" means the Liabilities of Sellers, accrued and unpaid as of the Closing Date, arising from and including the Commencement Date through and including the Closing Date, in each case solely to the extent: (a) related to the Business or the ownership of the Acquired Assets by Sellers; or (b) listed on Schedule 1.2 of the Disclosure Schedule.

"D&O Insurance Policies" means all of Sellers' insurance policies providing coverage for current and former directors and officers of Sellers.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order or any other order of any Governmental Entity.

"Deposit" has the meaning set forth in Section 2(d)(ii).

"DIP Facility" means that certain $10,000,000 Debtor in Possession Senior Secured Superpriority Priming Financing Facility dated as of August 11, 2010, among the Sellers and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced from time to time in accordance with its terms.

"DIP Lenders" means Banco Popular de Puerto Rico and the banks, financial institutions and other lender parties to the DIP Facility from time to time.

"Drop Dead Date" means July 31, 2011, or such later date as Buyer and Sellers may mutually agree in writing.

"Employee Benefit Plan" means each "employee benefit plan" as defined in Section 3(3) of ERISA and each other plan, policy, program, agreement, understanding and arrangement (whether written or oral) providing compensation or other benefits to any current or former director, officer, employee or consultant (or to any dependent or beneficiary thereof) of any Seller or their Affiliates which is now or has been maintained, sponsored or contributed to by Sellers or their Affiliates or under the terms of which Sellers or their Affiliates have or are reasonably likely to have any obligation or liability, whether actual or contingent, including all employment, consulting, severance, termination, incentive, bonus, deferred compensation, retirement, pension, savings, profit sharing, retention, change in control, vacation, holiday, cafeteria, medical, disability, life, accident, fringe benefit, health, welfare, stock-based and other compensation and benefit plans, policies, programs, agreements, understandings or arrangements.

5

"Environmental Law" means any federal, state or local Law that relates to, or otherwise imposes liability or standards of conduct concerning, pollution, protection of the environment, or protection of human or occupational health from environmental hazards, including those concerning discharges, releases or threatened releases of, petroleum or Hazardous Substances.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning set forth in Section 2(d)(ii).

"Escrow Agreement" has the meaning set forth in Section 2(d)(ii).

"Excluded Assets" means any and all assets of Sellers that are not Acquired Assets. Without limiting the generality of the foregoing sentence, each of the following shall be Excluded Assets for purposes of this Agreement: (a) all of Sellers' or any of their respective Affiliates' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller or any of its Affiliates as a corporation, limited partnership or other entity; (b) all Tax Returns and Records related to Taxes paid or payable by any Seller or any of its Affiliates (other than Tax Returns and Records specifically included in item (c) of the definition of Acquired Assets); (c) all Records related to any Subsidiary of Sellers; provided that Buyer shall have the right to make copies of any such Records to the extent such Records are exclusively related to the Business; (d) all assets with respect to any income Taxes of any Seller or any of its Affiliates for periods prior to the Closing, including any rights to income Tax refunds, overpayments or income Tax credits; (e) all equity securities of any Seller; (f) all Cash (including, for the avoidance of doubt, the Purchase Price) and accounts receivable of the Business; (g) all rights under any Contract that is not an Assumed Contract; (h) all of Sellers' or any of their respective Affiliates' current assets not related to or used in the Business; (i) all rights (including rights of set-off and rights of recoupment (including any such item relating to the payment of Taxes)), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of any Seller or any of its Affiliates against third parties with respect to Excluded Assets and Excluded Liabilities; (j) all avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law (including all rights and avoidance claims of Sellers arising under Chapter 5 of the Bankruptcy Code); (k) any Records and agreements related to the Chapter 11 Cases other than Records and agreements contained in subsection (c) of the definition of Acquired Assets; (l) any (i) confidential personnel and medical records pertaining to any Covered Employee and (ii) other Records that Sellers are required by law to retain; provided that Buyer shall have the right to make copies of any portions of such Records pursuant to clause (ii) above to the extent that such portions relate either to the Business or any Acquired Asset and are necessary for the Buyer to comply with applicable law; (m) all assets maintained pursuant to, or in connection with, any Employee Benefit Plan; (n) all of Sellers' rights under this Agreement and any Related Agreement; (o) all of Sellers' rights under or pursuant to all warranties (expressed or implied), representations and guarantees made by third parties to the extent relating to (i) any Excluded Assets or (ii) any Excluded Liabilities; (p) all of Sellers' rights to the Acquired Assets and Assumed Permits to the extent such rights are not assignable; (q) all

6

Records relating to the Property and Casualty Insurance Policies and D&O Insurance Policies; (r) all Property and Casualty Insurance Policies and D&O Insurance Policies (including those set forth on <u>Schedule 1.3 of the Disclosure Schedule</u>) and all claims, refunds and credits from such policies due or to become due with respect to such policies; and (s) all Commercial Tort Claims.[1]

"<u>Excluded Liabilities</u>" means any and all Liabilities of any of the Sellers that are not Assumed Liabilities. In furtherance, and not in limitation of the foregoing, the Excluded Liabilities include the following Liabilities of any of the Sellers: (a) indebtedness for borrowed money; (b) all Liabilities, other than Accrued Employee Obligations, at any time relating to or arising under or in connection with any Employee Benefit Plan or any other severance, retention, employment, change-of-control, pension, incentive, retirement, equity or other compensation or benefit plan, program, policy or agreement of or with any Seller; (c) all Liabilities relating to wages, remuneration, compensation, benefits, severance, vacation or other paid-time-off that are not Accrued Employee Obligations; (d) all Liabilities arising out of the Excluded Assets, including Contracts that are not Assumed Contracts; (e) except for Taxes with respect to the Business or the Acquired Assets specifically allocated to Buyer pursuant to <u>Section 6(h)</u>, any Liability of Sellers, or otherwise imposed on any of the Acquired Assets or with respect to the Business for any Pre-Closing Tax Period, in respect of any Tax, including any Liability of Sellers for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise; (f) Liabilities existing prior to the Commencement Date that are subject to compromise under the Bankruptcy Code; (g) all Liabilities associated with brokers, finders or other consultants or advisors to Sellers entitled to a fee or reimbursement of expenses with respect to this transaction; (h) any Liability relating to any Litigation arising out of or related to any occurrence or event that happened prior to the Closing Date; (i) any Liability for Cure Amounts in excess of the Buyer Cure Amounts Cap; and (j) all Liabilities arising from any claim relating exclusively to Sellers' conduct of the Business or ownership of the Acquired Assets prior to the Closing Date, except to the extent expressly identified as an Assumed Liability.

"<u>Final Order</u>" means an Order of the Bankruptcy Court or other court of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect.

"<u>Fuel Inventory</u>" means the inventory of fuel products, including gasoline, diesel, kerosene and propane owned by Sellers as of the Closing Date.

"<u>Furnishings and Equipment</u>" means all tangible personal property (other than Inventory and Intellectual Property), including machinery, equipment, computers, furniture, automobiles, trucks, railcars, tractors and trailers, in each case that is used in the Business.

"<u>GAAP</u>" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

---

[1] Buyer may identify any Excluded Assets it may wish to acquire (and the value it assigns thereto) in addition to those assets that have been designated as Acquired Assets.

"Governmental Entity" means any United States federal, state, or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity, including the Bankruptcy Court and the Commonwealth of Puerto Rico.

"Guarantied Obligations" has the meaning set forth in Section 9(u)(i).

"Guarantor" has the meaning set forth in the preamble.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Hazardous Substances" means any substances, including any and all substances, (whether solid, liquid or gas) defined, listed or otherwise classified as pollutants, contaminants, hazardous wastes, hazardous substances, chemical substances, substances of very high concern, toxic substances, toxic materials, hazardous materials, extremely hazardous wastes or under any present Environmental Laws (including petroleum and petroleum related substances, products, by products and wastes).

"Intellectual Property" means all (i) trademarks, copyrights, patents, service marks, trade names, logos and other designations used by Sellers in the Business and (ii) all computer programs and other computer software (other than off-the-shelf shrink wrapped software), trade secrets, plans and specifications, inventions, know-how, technology, proprietary processes and formulae used by the Sellers, in each case, in the Business.

"Intellectual Property Assignment" has the meaning set forth in Section 2(f)(i)(C).

"Inventory" means Fuel Inventory and all other goods held for sale or furnished under Contracts of service, and all raw materials and supplies, and all manufactured, spare and purchased parts, in each case that are used in the Business.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Knowledge" of a Person (and other words of similar import) means the actual knowledge of (a) with respect to Sellers, [            ] and (b) with respect to Buyer, [            ].

"Law" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of any Governmental Entity.

"Liability" means any debt, liability, adverse claim, offset or obligation of whatever kind or nature (whether direct or indirect, known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due), including any liability for Taxes and any claim (as such term is defined in Section 101 of the Bankruptcy Code).

"Lien" means any mortgage, pledge, lien, encumbrance, charge, security interest, option, right of first refusal, easement, mortgage, security agreement or other encumbrance or restriction on the use or transfer of any property.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity, by or before any Governmental Entity.

"Local Bankruptcy Rules" means the Local Bankruptcy Rules for the District of Delaware applicable to all cases in such district governed by the Bankruptcy Code.

"Material Adverse Effect" means, when used with respect to the Business, any effect or change that is materially adverse to the Business or the Acquired Assets; provided, however, that no effects or changes arising or related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) general business or economic conditions either in the United States of America or otherwise; (ii) conditions generally affecting the petroleum import, storage, and distribution industry; (iii) national or international political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iv) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) changes in Law or in GAAP; (vi) the taking of any action contemplated by this Agreement or any other Related Agreement; (vii) the announcement or pendency of this Agreement or the transactions contemplated hereby; or (viii) exigencies arising as a result of or in connection with Sellers' financial condition or status as a filer or filers under Chapter 11 of the Bankruptcy Code.

"Necessary Consent" has the meaning set forth in Section 2(g).

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice, subject, in the case of Sellers or the Business, to changes in the business or operations of any Seller resulting from business exigencies arising as a result of, or in connection with, Sellers' financial condition or status as a filer under Chapter 11 of the Bankruptcy Code.

"Party" or "Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Entity.

"Permitted Liens" means: (i) Liens relating to Taxes which are not due and payable as of the Closing Date or the amount or validity of which is being contested in good faith by appropriate proceedings; (ii) mechanics', carriers', workers', repairers', materialmen's and similar Liens arising or incurred in the Ordinary Course of Business, for amounts which are not due and payable as of the Closing Date or the amount or validity of which is being contested in good faith by appropriate proceedings; (iii) any Liens disclosed on Schedule 1.4 of the Disclosure Schedule; and (iv) any other Liens which will be discharged on or before the Closing Date in connection with the Sale Order or any other actions of the Bankruptcy Court.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group of any of the foregoing.

"Post-Closing Tax Period" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"Property and Casualty Insurance Policies" means all property, casualty and liability policies where a Seller is an insured.

"Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Purchase Price" means, subject to Section 5(i), an amount equal to [        ] Dollars ($[        ]).

"Records" means the books, records, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists and supplier lists), plans, drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data, training materials, printed manuals, programmers' notes and other printed materials.

"Related Agreements" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Trademark Assignment, the Escrow Agreement, and all other Contracts, schedules, certificates or other documents being delivered pursuant to or in connection with this Agreement (other than the Assumed Contracts).

"Representative" of a Person means the Person's Controlled Affiliates and the officers, directors, managers, employees, advisors (including its financial advisors), representatives (including its legal counsel and its accountants) and agents of the Person and/or its Controlled Affiliates.

"Sale Motion" means the motion filed by the Sellers on August 13, 2010, seeking entry of an order approving, among other things, this Agreement.

"Sale Order" means an order or orders of the Bankruptcy Court, substantially in the form attached hereto as Exhibit B, which approves, without limitation, this Agreement and all of the terms and conditions hereof and authorizing Sellers to consummate the transactions contemplated hereby pursuant to Sections 105, 363, 365 and 1146(c) of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that: (a) the Acquired Assets sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens (other than Permitted Liens and Liens created by the Buyer); (b) Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (c) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length

bargaining positions; (d) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the breach hereof as provided herein; (e) not selling the Acquired Assets free and clear of Liens and claims (other than Permitted Liens and Liens created by the Buyer) would impact adversely on Sellers' efforts to maximize the value of their respective estates; (f) a sale of the Acquired Assets other than one free and clear of Liens and claims (other than Permitted Liens and Liens created by the Buyer) would be of substantially less benefit to the estates of Sellers; and (g) the Buyer has provided adequate assurance of future performance with respect to the Assumed Contracts and that the Assumed Contracts may be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Straddle Period" means any Tax period beginning before or on and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or Controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or Control any managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, asset, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, or other governmental taxes, charges, fees, levies or other assessments imposed by and payable to the United States, or any state, county, local or foreign government or subdivision or agency thereof, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Records" has the meaning set forth in Section 6(c)(ii)

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6(f).

"Transferred Employee" has the meaning set forth in Section 6(e)(i).

2.  Purchase and Sale.

(a)  Purchase and Sale of Acquired Assets; Retention of Excluded Assets.  On the terms and subject to the conditions of this Agreement, at the Closing, Buyer agrees to purchase, acquire and accept from Sellers, and Sellers agree to sell, transfer, assign, convey and deliver to Buyer, all of the Acquired Assets free and clear of any and all Liens (other than Liens created by Buyer and the Permitted Liens), claims and other interests as of the Closing for the consideration specified in Section 2(d)(i). Nothing contained herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in, and under the Excluded Assets.

(b)  Assumption of Assumed Liabilities; Retention of Excluded Liabilities.  On the terms and subject to the conditions of this Agreement at the Closing, Buyer agrees to assume and become responsible for the Assumed Liabilities and to timely pay, honor and discharge, or cause to be timely paid, honored and discharged, all of the Assumed Liabilities in accordance with the terms thereof.  Notwithstanding anything in this Agreement to the contrary, Buyer will not assume, and shall be deemed not to have assumed, any of the Excluded Liabilities.

(c)  Assumption and Rejection of Contracts.

(i)  Annex A sets forth a list of the Contracts that Buyer desires to be assumed by the Sellers and assigned to Buyer at the Closing.  Notwithstanding the foregoing, at any time prior to the date that is five (5) Business Days prior to the hearing before the Bankruptcy Court to obtain entry of the Sale Order (A) Buyer may, by written notice to Sellers, designate any Contract that has not been (i) previously designated as an Assumed Contract or (ii) rejected as an Assumed Contract, and upon receipt of any such notice Sellers shall use reasonable efforts to effect the assumption of such Contract by Sellers in accordance with the Bankruptcy Code, and, if such Contract is assumed prior to the Closing, such Contract shall become an Assumed Contract and (B) Buyer may, by written notice to the Sellers, designate any Assumed Contract that has not been assumed by Sellers as one that Buyer no longer desires to have assumed and such Contract shall be deemed not to be an Assumed Contract and, in each case, the Buyer Cure Amounts Cap shall be adjusted accordingly by an amount equal to the Cure Amount, if any, associated with such Contract.  To the extent not already undertaken by Sellers, as promptly as reasonably practicable following the designation by Buyer of any additional Contract as an Assumed Contract in accordance with the foregoing sentence, Sellers shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all necessary actions in order to determine and fix the Cure Amounts with respect to such Contract and to effect the assumption of such Contract by Sellers in accordance with the Bankruptcy Code at the Closing, such assumption to be effective as of the Closing Date.  Buyer shall use its reasonable best efforts to cooperate in the foregoing.

(ii)     Buyer agrees that it will provide adequate assurance of future performance of all of the Assumed Contracts so that all Assumed Contracts can be assumed by Sellers at or prior to the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.    In furtherance of the foregoing, Buyer acknowledges and agrees that Buyer will provide all necessary information regarding Buyer, as well as a financial commitment of performance by Buyer with respect to the Assumed Contracts from and after the Closing, to demonstrate adequate assurance of the performance of the Assumed Contracts.

(d)     Consideration.

(i)     The aggregate consideration for the sale and transfer of the Acquired Assets shall be (A) the Purchase Price payable in cash at the Closing pursuant to Section 2(f) and (B) the assumption by Buyer of the Assumed Liabilities.

(ii)     On or before the date hereof, Buyer or Guarantor, on behalf of Buyer, shall have deposited with [          ], in its capacity as escrow agent (the "Escrow Agent"), pursuant to the terms of an escrow agreement, dated as of the date hereof, in the form of Exhibit C attached hereto (the "Escrow Agreement"), an amount in cash equal to [                    ] (the "Deposit") by wire transfer of immediately available funds, which Deposit (together with all accrued investment income or interest thereon) shall be held by the Escrow Agent in trust and distributed to Buyer or Sellers as follows.

(A)     if the Closing shall occur, then the Deposit, together with all accrued investment income or interest thereon, shall be applied towards the Purchase Price payable by Buyer to Sellers under Section 2(f)(ii)(G);

(B)     if Sellers terminate this Agreement pursuant to Section 8(a)(iii) (solely with respect to Sections 7(b)(i), (ii), (iv) and (vi)), Section 8(a)(v), or Section 8(a)(ix), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to the Sellers as liquidated damages (and not as a penalty); and

(C)     if this Agreement is terminated (1) by Buyer pursuant to Sections 8(a)(ii), 8(a)(iv), 8(a)(vi), 8(a)(vii), or 8(a)(viii), (2) by Sellers pursuant to Section 8(a)(iii) (solely with respect to Sections 7(b)(iii)) or (3) by both Parties pursuant to Section 8(a)(i), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Buyer.

(e)     Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Cadwalader, Wickersham & Taft LLP, located at One World Financial Center, New York, New York 10281, commencing at 11:00 a.m. local time on the Business Day (the "Closing Date") immediately following the date on which all conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated in this Agreement, as set forth in Section 7 (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions), have been satisfied or waived.

13

(f)     Deliveries at Closing.

        (i)     At the Closing, Sellers will deliver to Buyer the following duly executed documents and other items:

                (A)     Bill of Sale substantially in the form of Exhibit D attached hereto (the "Bill of Sale");

                (B)     an Assignment and Assumption Agreement substantially in the form of Exhibit E attached hereto (the "Assignment and Assumption Agreement");

                (C)     an instrument of assignment substantially in the form of Exhibit F (the "Trademark Assignment") attached hereto for each registered trademark (or pending application therefor) transferred or assigned hereby, and an instrument of assignment in the form of Exhibit G (the "Intellectual Property Assignment") attached hereto for any patent, copyright, or other Intellectual Property;

                (D)     a certified copy of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement, including the Bidding Procedures Order and the Sale Order; and

                (E)     a certificate to the effect that each of the conditions specified in Section 7(a)(iii) and Section 7(a)(iv) is satisfied in all material respects.

        (ii)    At the Closing, Buyer will deliver, and in the case of Section 2(f)(ii)(F) will cause the Escrow Agent to deliver, to Sellers the following duly executed documents, cash amounts and other items:

                (A)     the Bill of Sale;

                (B)     the Assignment and Assumption Agreement;

                (C)     the Trademark Assignment;

                (D)     the Intellectual Property Assignment;

                (E)     a certificate to the effect that each of the conditions specified in Section 7(b)(i) and Section 7(b)(ii) is satisfied in all respects;

                (F)     the Deposit, in accordance with the terms of the Escrow Agreement, by wire transfer of immediately available funds to one or more bank accounts designated in writing by Sellers to Buyer and the Escrow Agent prior to the Closing Date;

                (G)     the Purchase Price, less an amount equal to the Deposit (together with all accrued investment income and interest thereon through the date immediately preceding the Closing Date), by wire transfer of immediately

14

available funds to one or more bank accounts designated in writing by Sellers to Buyer prior to the Closing Date;

(H)     such other documents, instruments and certificates as Sellers may reasonably request; and

(I)     such additional documents as may be necessary or customary to consummate the Agreement, including any Transfer Tax or statement of value forms which may be required.

(g)     Non-Assignment of Assumed Contracts.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Acquired Asset if (i) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto would constitute a breach thereof or in any way adversely affect the rights of Buyer thereunder and (ii) the Bankruptcy Court shall not have entered a Final Order providing that such consent is not required (each such action, a "Necessary Consent").  In such event, Sellers and Buyer will use their commercially reasonable efforts to obtain, as promptly as reasonably practicable, any Necessary Consent with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that, notwithstanding anything to the contrary contained herein, Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Litigation or legal proceedings to obtain any such consent or approval or otherwise incur any expenses in connection with obtaining such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective, would adversely affect the rights of any Seller thereunder or Buyer would not in fact receive all such rights, such Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no expense to such Seller, under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Buyer, or under which such Seller would enforce for the benefit of Buyer with Buyer assuming such Seller's obligations and any and all rights of such Seller against a third party thereto.

3.     Sellers' Representations and Warranties.  Subject to Bankruptcy Court approval of this Agreement, entry of the Sale Order and such Sale Order being a Final Order at the time of the Closing, obtaining any of the consents required by this Agreement or the Sale Order, each Seller represents and warrants, as of itself, to Buyer that, except as set forth in the Disclosure Schedule delivered by Sellers to Buyer on the date hereof (collectively, the "Disclosure Schedule"), the statements contained in this Section 3 are true and correct as of the date of this Agreement, and shall be true and correct as of the Closing Date.

(a)     Organization of Sellers; Good Standing.  Each Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware and, pursuant to Sections 1107 and 1108 of the Bankruptcy Code and the orders of the Bankruptcy Court, has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on the Business as a debtor in possession.

15

(b)  _Authorization of Transaction_.  Subject to Bankruptcy Court approval pursuant to the Sale Order, such Sale Order being a Final Order and any other authorization as may be required by the Bankruptcy Court:

(i)  each Seller has full corporate or similar power and authority to execute and deliver this Agreement and the Related Agreements to which it is a party and to perform its obligations hereunder and thereunder;

(ii)  the execution, delivery, consummation and performance of this Agreement and the Related Agreements to which a Seller is a party have been duly authorized by such Seller;

(iii)  this Agreement has been, and each Related Agreement to which a Seller is a party will be, at the Closing, duly and validly executed and delivered by each Seller party thereto; and

(iv)  this Agreement, and the Related Agreements to which a Seller is a party will, when executed, assuming, in each case, the due authorization, execution, and delivery thereof by the other parties thereto, constitute the valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(c)  _Noncontravention_.  Subject to (i) Bankruptcy Court approval pursuant to the Sale Order and such Sale Order being a Final Order and (ii) receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, neither the execution and delivery of this Agreement or the Related Agreements, nor the consummation of the transactions contemplated in this Agreement or the Related Agreements, will (i) conflict with or result in a breach of the certificate of incorporation or bylaws or other organizational documents of any Seller, (ii) violate any Law or Decree that is material to the conduct of the Business and to which the Business or the Acquired Assets are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Assumed Contract.  Subject to (i) Bankruptcy Court approval pursuant to the Sale Order and such Sale Order being a Final Order and (ii) receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity or third party in order for the Parties to consummate the transactions contemplated by this Agreement, the failure of which to give, make or obtain would result in a Material Adverse Effect.

(d)  _Title to Acquired Assets_.

(i)  The Sellers have good and valid title to, and own and possess all rights and interests in, including the right to use, each of the Acquired Assets.

(ii)  Subject to Bankruptcy Court approval of the Sale Order, the Sellers have the power and the right to sell, assign and transfer and, at the Closing, the Sellers will sell

16

and deliver to Buyer and Buyer will acquire from Sellers, good and valid title to the Acquired Assets, free and clear of all Liens (other than Liens created by Buyer and Permitted Liens).

(e) <u>Litigation</u>. As of the date hereof, there is no Litigation pending or, to the Knowledge of Sellers, threatened against any Seller before any Governmental Entity, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business or would reasonably be expected to prevent, restrict or delay the consummation of the transactions contemplated in this Agreement or any Related Agreement.

(f) <u>Brokers' Fees</u>. Sellers have no obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the transactions contemplated by this Agreement, except as set forth on <u>Schedule 3(f) of the Disclosure Schedule</u>.

(g) <u>Disclosure</u>. Except for the representations and warranties contained in this <u>Section 3</u>, no Sellers nor any other Person makes (and Buyer is not relying upon) any other express or implied representation or warranty with respect to Sellers, the Business, the Acquired Assets (including the value, condition or use of any Acquired Asset), the Assumed Liabilities or the transactions contemplated by this Agreement, in the Related Agreements or in any other agreement, document or instrument to be delivered in connection herewith or therewith, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of any Seller or any of their respective officers, directors, employees, agents or Representatives. Without in any way limiting the foregoing and except for the representations and warranties contained in this <u>Section 3</u>, each Seller (i) expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of title, merchantability or fitness for a particular purpose, the physical condition of any personal or real property comprising a part of the Acquired Assets or which is the subject of any Contract to be assigned to Buyer at the Closing, the environmental condition or any other matter relating to the physical condition of any real property or improvements, the zoning of any such real property or improvements, the value of the Acquired Assets (or any portion thereof), the transferability of the Acquired Assets, the terms, amount, validity or enforceability of any Assumed Liabilities, the title of the Acquired Assets (or any portion thereof), the probable success or profitability of the ownership, the use or operation of the Business and the Acquired Assets by Buyer after the Closing, or any other matter or thing relating to the Acquired Assets or any portion thereof), and (ii) expressly disclaims all liability and responsibility for any projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant or Representative of any Seller or any of their Affiliates). Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of the physical condition of the Acquired Assets and all such other matters relating to or affecting the Acquired Assets as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Acquired Assets, Buyer is doing so based solely upon such independent inspections and investigations. Accordingly, upon the

Closing Date, Buyer will accept the Acquired Assets at the Closing "as is," "where is," and "with all faults."

4.  Buyer's and Guarantor's Representations and Warranties.

Each of Buyer and Guarantor represents and warrants jointly and severally to Sellers that the statements contained in this Section 4 are true and correct as of the date of this Agreement and will be true and correct on the Closing Date:

(a)  Organization of Buyer and Guarantor. Each of Buyer and Guarantor is a [corporation or limited liability company] duly incorporated or formed (as applicable), validly existing and in good standing under the laws of the State of [_____] and has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

(b)  Authorization of Transaction.

(i)  each of Buyer and Guarantor has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement, the Related Agreements and all other agreements contemplated in this Agreement to which it is a party and to perform its obligations hereunder and thereunder;

(ii)  the execution, delivery, consummation and performance of this Agreement, the Related Agreements and all other agreements contemplated in this Agreement to which Buyer or Guarantor, as applicable, is a party have been duly authorized by Buyer and Guarantor;

(iii)  this Agreement has been, and each Related Agreement to which Buyer or Guarantor is a party will be, at the Closing, duly and validly executed and delivered by Buyer or Guarantor, as applicable; and

(iv)  this Agreement, and the Related Agreements to which Buyer or Guarantor is a party will, when executed, assuming, in each case, the due authorization, execution, and delivery thereof by the other parties thereto, constitute the valid and binding obligation of Buyer and Guarantor, enforceable against Buyer and Guarantor in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(c)  Noncontravention. Subject to receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, neither the execution and delivery of this Agreement or the Related Agreements, nor the consummation of the transactions contemplated in this Agreement or the Related Agreements will (i) conflict with or result in a breach of the certificate of incorporation or bylaws or other organizational documents of Buyer or Guarantor, (ii) violate any Law or Decree to which Buyer or Guarantor is, or its respective assets or properties are, subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which Buyer or Guarantor

18

is a party or by which it is bound. Subject to receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, neither Buyer nor Guarantor is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity or third party in order for the Parties to consummate the transactions contemplated by this Agreement.

(d) Litigation. As of the date hereof, there is no Litigation pending or, to the Knowledge of the Buyer of Guarantor, threatened against the Buyer or Guarantor before any Governmental Entity, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a material adverse effect or would reasonably be expected to prevent, restrict or delay the consummation of the transactions contemplated in this Agreement or any Related Agreement.

(e) Brokers' Fees. Neither Buyer nor Guarantor have any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the transactions contemplated by this Agreement.

(f) Financial Capacity. Buyer and Guarantor (i) have, or at the Closing will have, sufficient funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price and any expenses incurred by Buyer and Guarantor in connection with the transactions contemplated by the Related Agreements, including Cure Amounts; (ii) have, or at the Closing will have, the resources and capabilities (financial or otherwise) to perform their respective obligations hereunder; and (iii) have not, and at the Closing will not have, incurred any obligation, commitment, restriction or Liability of any kind, that would impair or adversely affect such resources and capabilities.

(g) Adequate Assurances Regarding Executory Contracts. Each of Buyer and Guarantor is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

5. Pre-Closing Covenants. The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

(a) Commercially Reasonable Efforts; Cooperation. Except as otherwise set forth herein, each of the Parties will use its commercially reasonable efforts to take all action and to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement at the earliest practicable date (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the transactions contemplated in this Agreement set forth in Section 7).

RLF1 3631767v. 1

(b)     Notices and Consents.

(i)     Sellers and Buyer shall use their commercially reasonable efforts to obtain all material authorizations, consents, orders and approvals of all Governmental Entities and officials that may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement and will cooperate with each Party in seeking to obtain all such authorizations, consents, orders and approvals.

(ii)     Sellers shall give such notices to third parties and use their commercially reasonable efforts to obtain all Necessary Consents.

(iii)     Buyer shall cooperate and use all commercially reasonable efforts to assist Sellers in giving such notices and obtaining such consents.

(c)     Conduct of the Business Pending the Closing.   From the date hereof until the Closing Date, except as otherwise expressly provided for in this Agreement, or with the prior written consent of Buyer (which consent shall not be unreasonably withheld, delayed or conditioned), and subject to any applicable orders of the Bankruptcy Court, Sellers shall:

(i)     use commercially reasonable efforts to maintain the Acquired Assets, pay expenses and payables, collect receivables, repair and continue normal maintenance (normal wear and tear excepted) to the extent payable pursuant to the budget approved by the Bankruptcy Court in connection with the approval of the DIP Facility;

(ii)     (A) comply in all material respects with all Laws and Assumed Contracts, (B) maintain all Assumed Permits, and (C) pay all applicable Taxes that Sellers are required to pay (taking into account any relief afforded pursuant to the Chapter 11 Cases) to the extent payable pursuant to the budget approved by the Bankruptcy Court in connection with the approval of the DIP Facility;

(iii)     use commercially reasonable efforts to pursue sale processes pursuant to Section 363 of the Bankruptcy Code and to comply at all times with the Bidding Procedures Order;

(iv)     not enter into or make any material amendment to any Contract or transaction relating to the purchase of assets for use in the Business in excess of one hundred thousand dollars ($100,000) that will constitute Acquired Assets or Assumed Liabilities except as set forth on Schedule 5(c)(v);

(v)     sell, lease, transfer, mortgage, encumber, alienate or dispose of any Acquired Asset for an aggregate purchase price in excess of one hundred thousand dollars ($100,000) except for in the Ordinary Course of Business or as set forth on Schedule 5(c)(vi);

(vi)     use commercially reasonable efforts to transfer, assign, record or perfect in its name good title to any Acquired Assets (other than as noted on Schedule 5(c)(vii) to the Disclosure Schedule) that is not presently held or recorded in its name;

20

(vii) not merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence;

(viii) not subject any of the Acquired Assets to any Lien (other than Permitted Liens); and

(ix) not enter into a legally enforceable contract or agreement requiring it to do anything prohibited by this Section 5(c).

(d) Notice of Developments. From the date hereof until the Closing, each of Sellers and Buyer will give prompt written notice to the other Party of (i) the existence of any fact or circumstance, or the occurrence of any event, which could be reasonably likely to cause a condition to a Party's obligations to consummate the transactions contemplated in this Agreement as set forth in Section 7, not to be satisfied as promptly as practicable, and (ii) the receipt of any notice or other communication from any Governmental Entity in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5(d) shall not be deemed to amend or supplement this Agreement, and the failure to deliver any such notice shall not constitute a waiver by any Party of any right or condition to the consummation of the transactions contemplated in this Agreement.

(e) Access.

(i) Prior to the Closing, Sellers shall, upon reasonable advance written request by Buyer, permit Buyer and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere with normal business operations, to all premises, properties, personnel, Records and Contracts of the Business for the purpose of evaluating and reviewing the Business, the Acquired Assets and Assumed Liabilities; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the affect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable law. Except in response to a request contemplated by the first sentence of this Section 5(e)(i), during the period from the date hereof and ending on the Closing Date, Buyer shall not, and shall cause its Representatives not to, contact any customers, suppliers or licensors of the Business in connection with, or pertaining to, the Business or any subject matter of this Agreement, except with the prior written consent of Sellers, which consent shall not be unreasonably withheld.

(ii) All information obtained pursuant to this Section 5(e) shall be subject to the terms and conditions of the Confidentiality Agreement.

(f) Press Releases and Public Announcements. Prior to the Closing, no Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable law (including the Bankruptcy Code) (provided, that the disclosing Party shall use all

21

reasonable best efforts to consult with the non-disclosing Party with respect to the text thereto prior to making the disclosure).

(g)     <u>Bankruptcy Court Matters</u>.

(i)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing bids with respect to any transaction (or series of transactions) involving a Competing Transaction. Nothing contained herein shall be construed to prohibit Sellers and any of its representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Transaction.

(ii)     Sellers shall use commercially reasonable efforts to pursue the entry of the Sale Order. Sellers shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules in connection with obtaining approval of the Sale Order.

(iii)     Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, in no event shall Buyer or any Seller be required to agree to any amendment of this Agreement.

(iv)     Sellers shall use their commercially reasonable best efforts to obtain entry by the Bankruptcy Court of the Sale Order no later than February 8, 2011.

(v)     Sellers further covenant and agree that, after the entry of the Sale Order, the terms of any liquidation plan it submits to the Bankruptcy Court, or any other court for confirmation or sanction, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

(h)     <u>Bulk Transfer Laws</u>. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith.

(i)     <u>Cure Amounts</u>. As promptly as practicable following the date hereof, Buyer and Sellers shall use commercially reasonable efforts to cooperate and determine the amounts required to cure all defaults under each Assumed Contract so as to permit the assumption and assignment of each such Assumed Contract pursuant to Section 365 of the Bankruptcy Code in connection with the transactions contemplated by this Agreement (as ultimately determined by the Bankruptcy Court, the "<u>Cure Amounts</u>"). Buyer shall be responsible for paying all Cure Amounts subject to the Buyer Cure Amounts Cap. Sellers shall be responsible for paying all

22

Cure Amounts in excess of the Buyer Cure Amounts Cap. Sellers hereby agree that Buyer, with the consent of Sellers, and as approved by the Bankruptcy Court, may pay any such Cure Amounts in excess of the Buyer Cure Amounts Cap and deduct such amount from the Purchase Price otherwise payable to Sellers at the Closing. Sellers will, pursuant to the Sale Motion, move to assume and assign to Buyer the Assumed Contracts and will provide notices thereof to the Assumed Contract counterparties and all other parties in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court.

(j)     Supplementation and Amendment of Disclosure Schedule. Sellers may, at their option, include in the Disclosure Schedule items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information provided in one Disclosure Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Disclosure Schedule to which its relevance is reasonably apparent on its face. From time to time prior to the Closing, Sellers shall have the right to supplement or amend the Disclosure Schedule with respect to any matter hereafter arising or discovered after the delivery of the Disclosure Schedule pursuant to this Agreement. No such supplement or amendment shall have any effect on the satisfaction of the conditions to closing set forth in Section 7(a).

(k)     Regulatory Filings.

(i)     If necessary, Buyer and Sellers shall (i) use commercially reasonable efforts to make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated herein as promptly as practicable, (ii) comply, to the extent practicable, at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective subsidiaries from Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division") or any other Governmental Entity in respect of such filings, and (iii) cooperate with each other in connection with any such filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Entity under any Antitrust Laws with respect to any such filing. Each Party shall use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any Antitrust Law in connection with the transactions contemplated herein. Each Party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Entity regarding any such filings. Each of Buyer and Sellers shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to the transactions contemplated herein as promptly as possible after the execution of this Agreement.

23

(l)     Allocation of the Purchase Price. Prior to the Closing, the Parties shall use their best efforts to agree to a written schedule allocating the Purchase Price and the Assumed Liabilities among the Acquired Assets. Each of the Parties hereto shall report the federal, state, local and other tax consequences of the purchase and sale contemplated hereby (including the filing of Internal Revenue Serve Form 8594) in a manner consistent with such Purchase Price allocation schedule. Neither of the Parties hereto shall, nor shall it permit any of its Affiliates to, take a position (except as required by applicable law) on any Tax Return, before any taxing authority, or in any judicial proceeding, that is inconsistent with such Purchase Price allocation schedule.

6.     Other Covenants. The Parties agree as follows with respect to the period from and after the Closing:

(a)     Cooperation; Further Assurances. The Parties shall cooperate with each other, and shall use commercially reasonable efforts to cause their respective Controlled Affiliates and Representatives to cooperate with each other, to provide an orderly transition of the Business from Sellers to Buyer. On and after the Closing, Buyer will afford promptly to Sellers and its counsel, financial advisers and other agents reasonable access during normal business hours to its properties, books and records, employees, auditors and counsel to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax Returns, reports or forms, the defense of any Tax audit, claim or assessment, the reconciliation of Claims in the Chapter 11 Case, the preparation and confirmation of a plan in the Chapter 11 Case, other matters relating to the winding-up of the Seller's estate and/or the closing of the Chapter 11 Case, or to permit Sellers to determine any matter relating to its rights and obligations hereunder or any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities. Sellers will hold, and will use commercially reasonable efforts to cause their officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning Buyer or the Business provided to them pursuant to this Section 6(a). Without limiting the provisions of this Section 6(a), to the extent that the Buyer or any Seller discovers any additional assets or properties which should have been transferred or assigned to Buyer as Acquired Assets but were not so transferred or assigned at Closing, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer without any adjustment to the Purchase Price and shall cooperate and execute and deliver all conveyances, assumptions, notices, releases, and other instruments as may be necessary to make effective the transactions contemplated by this Agreement. Without limiting the provisions of this Section 6(a), to the extent that the Buyer or any Seller discovers any assets or properties which are an Excluded Asset that were inadvertently or otherwise mistakenly transferred or assigned to Buyer, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property back to Sellers.

(b)     Litigation Support. In the event and for so long as any Party actively is contesting or defending against any Litigation commenced with respect to (i) any transaction contemplated by this Agreement or any other Related Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act or

24

transaction on or prior to the Closing Date involving the Business, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, make available its personnel and provide such testimony and access to its books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the affect of waiving, its attorney-client privilege with respect thereto. As a condition to the cooperation required pursuant to this Section 6(b), the Party to provide such cooperation or assistance (the "Assisting Party") may require the Party receiving such cooperation or assistance to enter into a non-disclosure agreement reasonably satisfactory in form and substance to the Assisting Party.

(c)     Availability of Records.

(i)     After the Closing Date, Buyer shall provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Acquired Assets for periods prior to the Closing and shall preserve such Records until the later of (A) six (6) years after the Closing Date, (B) the required retention period required by any United States Law, (C) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (D) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all Records included in the Acquired Assets for periods prior to the Closing. Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer will permit Sellers to retain such Records. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in connection with such Litigation or claim and shall make available to Sellers' personnel most knowledgeable about the matter in question.

(ii)     After the Closing Date until the latest of (A) six (6) years after the Closing Date, (B) the required retention period required by any United States Law, (C) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (D) the expiration of the applicable statute of limitations, Sellers shall (x) provide to Buyer and its Representatives (after reasonable notice and during normal business hours and without charge to Buyer) access to all Records relating to Taxes incurred by the Sellers in connection with the Business, or otherwise relating to or affecting the Business (collectively, "Tax Records"), and (y) prior to destroying any Tax Records, notify Buyer thirty (30) days in advance of any such proposed destruction of their intent to destroy such Records, and Sellers will permit Buyer to retain a copy of such Tax Records. Access contemplated in clause (x) in the immediately preceding sentence shall include access to any information in electronic form to the extent reasonably available. With respect to any claims that are Assumed Liabilities, Sellers shall render all commercially reasonable assistance that Buyer may request in defending such claims.

25

(d) <u>Satisfaction of Excluded and Assumed Liabilities</u>. Buyer agrees to pay, perform and discharge the Assumed Liabilities as they become due and shall indemnify and hold Sellers harmless with respect to the Assumed Liabilities. Sellers agree to satisfy the Excluded Liabilities as required by the Bankruptcy Code and hold Buyer harmless with respect to the Excluded Liabilities.

(e) <u>Employee Matters</u>.

(i) <u>Transferred Employees</u>. Prior to the Closing, but effective as of the Closing, Buyer shall make offers of employment to each of the Covered Employees other than those Covered Employees whom Buyer notifies Sellers in writing on or before [_____], 2010, that it does not intend to hire, the total compensation and benefits of which offers shall be on terms and conditions that are in the aggregate no less favorable than the terms and conditions upon which each such Covered Employee is employed immediately prior to the Closing Date (excluding any severance policies, defined benefit pension, equity compensation programs and annual incentive opportunity), <u>provided, however</u>, that such eligibility to participate in Buyer Plans shall begin on the first day of the calendar month immediately following the Closing Date. Sellers will use commercially reasonable efforts to inform Covered Employees about the possibility of employment with Buyer, including assisting Buyer with interviewing Covered Employees and providing Buyer with information regarding Covered Employees to the fullest extent permitted by applicable Law. Any Covered Employee employed by a Seller immediately before the Closing and who accepts such offer of employment with Buyer (or any Affiliate of Buyer) and becomes an employee of Buyer (or any Affiliate of Buyer) is referred to herein as a "<u>Transferred Employee</u>." Sellers and their Affiliates shall terminate for all purposes (including under all Employee Benefit Plans) the employment of all Covered Employees who agree to become Transferred Employees, effective immediately prior to the Closing. Notwithstanding any other provision in this Agreement to the contrary, Buyer shall have no obligations with respect to Covered Employees other than Transferred Employees.

(ii) <u>Service</u>. Buyer shall grant all Transferred Employees credit after the Closing for continuous service with Sellers or any of their respective Affiliates and their respective predecessors prior to the Closing (to the extent such service was recognized by Sellers and their respective Affiliates) for purposes of participation and vesting and, in the case of any Buyer severance plan or program (if any), benefit accruals under any Buyer Plan. Buyer will cause to be waived any waiting period and preexisting condition limitations applicable to Transferred Employees under any group health plan maintained by Buyer or any of its Affiliates in which such Transferred Employees are otherwise permitted to participate, other than limitations or waiting periods that are already in effect with respect to such Transferred Employees and that have not been satisfied as of the Closing Date under any welfare plan maintained for the Transferred Employees immediately prior to the Closing Date. Buyer will take all action necessary to ensure that, to the extent permitted under applicable Buyer Plans, such Transferred Employees are given full credit for all expenses and deductibles incurred under any group health plan sponsored by Sellers or any of their respective Affiliates for the plan year that includes the Closing Date for the purposes of satisfying the maximum out-of-pocket expense

26

limitations and deductibles under any group health plan sponsored by Buyer or any of its Affiliates in which Transferred Employees participate after the Closing Date.

(iii)    COBRA Liabilities. Sellers agree and acknowledge that Sellers will retain and will be solely liable for, to the extent required under COBRA, and that Buyer will not assume, all COBRA Liabilities. Without limiting the foregoing, Sellers agree that Sellers will provide any benefits required under COBRA to any employees of any Seller who do not become Transferred Employees for any reason, and that Sellers will continue after Closing to maintain a "group health plan" (within the meaning of Treasury Regulation 54.5980B-2) under which to provide such benefits.

(iv)    Limitations. Except as expressly provided in Section 6(e)(i), Buyer shall have no obligation to extend offers of employment to any employee or other service provider of any Seller or any of its Affiliates or to enter or continue any employment or other service relationship with any such employee or service provider. Any employment opportunity offered by Buyer hereunder shall be "at will" and may be terminated by Buyer or any of its affiliates at any time for any reason. Nothing in this Agreement shall: (i) be deemed to prevent or restrict in any way the right of Buyer to terminate, reassign, promote or demote any of the Transferred Employees after the Closing or to change the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such Transferred Employees; (ii) create any third-party rights in any Transferred Employees or any current or former employees or other service providers of any Seller or any of its Affiliates (or any beneficiaries or dependents of the foregoing); or (iii) obligate Buyer or its affiliates to adopt or maintain any Buyer Plan or other Employee Benefit Plan or other compensatory arrangement at any time.

(v)    Seller Obligations.

(A)    Sellers shall be and remain solely liable for all wages, remuneration and other obligations and Liabilities, whether actual or contingent: (1) associated with any employee or other service provider of any Seller or any Seller Affiliate (or any dependent thereof) who does not become a Transferred Employee, including in connection with any termination of any such service relationship; (2) that arise in connection with any Transferred Employee (or any dependent thereof) on or prior to the Closing Date and which do not constitute Accrued Employee Obligations; and (3) that arise under or in connection with any Employee Benefit Plan at any time and which do not constitute Accrued Employee Obligations. Without limiting the generality of the foregoing, except with respect to the Accrued Employee Obligations, which Buyer hereby expressly assumes, Buyer shall not, at any time, have any obligation or liability with regard to any severance, retention, employment, change-of-control, pension, retirement, equity or other plan, program, policy or agreement of or with any Seller or any of its Affiliates.

(B)    Sellers shall retain responsibility for and continue to pay all medical, life insurance, disability and other welfare plan expenses and benefits for each Transferred Employee with respect to claims incurred by such Transferred

Employees or their covered dependents through the end of the month in which the Closing Date occurs. Expenses and benefits with respect to claims incurred by Transferred Employees or their covered dependents on or after the end of the month in which the Closing Date occurs, shall be the responsibility of Buyer. For purposes of this paragraph, a claim is deemed incurred: in the case of medical or dental benefits, when the services that are the subject of the claim are performed; in the case of life insurance, when the death occurs; in the case of long-term disability benefits, when the disability occurs; in the case of workers compensation benefits, when the event giving rise to the benefits occurs; and otherwise, at the time the Transferred Employee or covered dependent becomes entitled to payment of a benefit (assuming that all procedural requirements are satisfied and claims applications properly and timely completed and submitted).

(f)     Transfer Taxes. Buyer shall pay (and shall indemnify and hold harmless Sellers and their directors, officers, employees, Affiliates, agents, partners, successors and permitted assigns against) any stamp, documentary, registration, transfer, added-value or similar tax (each a "Transfer Tax") imposed under applicable Law in connection with the transactions contemplated by this Agreement and the Related Agreements that are not eliminated through the application of Section 1146(a) of the Bankruptcy Code. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence. Buyer shall be responsible for filing such Tax Returns and remitting the Tax to the applicable taxing authority, including bearing any costs associated with preparing said returns.

(g)     Recording of Intellectual Property Assignments. Buyer shall file and record all assignments of Acquired Intellectual Property with the appropriate Governmental Entities as promptly as practicable following the Closing.

(h)     Property and Other Taxes. Subject to Section 6(f) hereof, Sellers shall be responsible for and shall promptly pay, in accordance with the Bankruptcy Code, all Taxes due and payable with respect to the Business or the Acquired Assets, including all Property Taxes, attributable to any Pre-Closing Tax Period. Buyer shall be responsible for and shall promptly pay when due all such Taxes due and payable with respect to the Business or the Acquired Assets, including all Property Taxes, attributable to any Post-Closing Tax Period. All such Taxes due and payable with respect to the Business or the Acquired Assets for the Straddle Period shall be apportioned between Buyer and Sellers based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. Sellers shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for such Taxes, Buyer or Sellers, as applicable, shall present a statement to the other Party setting forth the amount of reimbursement to which each is entitled under this Section 6(h) together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the Party owing it to the other Party within ten (10) days after delivery of such statement. In the event that Buyer or Sellers make any payment for which it is entitled to reimbursement under this Section 6(h), the applicable Party shall make such reimbursement promptly but in no event later than ten (10) days after the

28

presentation of a statement setting forth the amount of reimbursement to which the presenting Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. Buyer and Sellers shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of all Tax Returns pursuant to this Agreement and any action, audit or other proceeding with respect to Taxes relating to the Business or the Acquired Assets. Such cooperation shall include the retention and provision of Records and information pursuant to Section 6(a) and Section 6(c) hereof and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(i)     Wage Reporting.  Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the alternate procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to Covered Employee wage reporting for the year in which the Closing Date occurs.

(j)     Use of Name.  Sellers agree that, as of Closing, Sellers and their respective Affiliates shall cease any and all use, including in connection with the publication, copying, production, sale, distribution or other exploitation of any assets, of the "Caribbean Petroleum Corporation" name and any similar names which may give rise to a likelihood of confusion with "Caribbean Petroleum Corporation," together with the logo used by Sellers in connection therewith prior to Closing. Sellers further agree that CPC will, within ten (10) Business Days of Closing, legally change its name with the Secretary of State of the State of Delaware and cease to be named "Caribbean Petroleum Corporation." For the avoidance of doubt, nothing in this Section 6(j) shall be deemed to limit Sellers' and their respective Affiliates' right to use the name "Caribbean Petroleum Corporation" in connection with filing Tax Returns or to describe the historical relationship between Sellers and CPC without suggesting a continuing affiliation with CPC.

7.     Conditions to Obligation to Close.

(a)     Conditions to Buyer's and Guarantor's Obligations.  Buyer's and Guarantor's obligation to consummate the transactions contemplated in this Agreement in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)     no order staying, reversing, modifying or amending the Bidding Procedures Order shall be in effect on the Closing Date;

(ii)     the Bankruptcy Court shall have entered the Sale Order and such order shall be a Final Order and reasonably satisfactory to Buyer and Sellers and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(iii)     the representations and warranties set forth in Section 3 shall be true and correct in all material respects (except where such representation or warranty is already qualified by materiality or similar standard, in which case such representation and warranty shall be true and correct in all respects) when made and at and as of the Closing

Date as if made at and as of such time (in either case, except to the extent expressly made as of an earlier date, in which case as of such date as if made at, and as of, such date);

(iv)     Sellers shall have performed and complied with their covenants and agreements hereunder through the Closing in all material respects;

(v)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(vi)     each delivery contemplated by Section 2(f)(i) to be delivered to Buyer shall have been delivered; and

(vii)     the waiting period applicable to the transactions contemplated hereby under the HSR Act, if any, shall have expired, or early termination of the waiting period shall have been granted.

(b)     Conditions to Sellers' Obligations.     Sellers' obligation to consummate the transactions contemplated in this Agreement in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)     the representations and warranties set forth in Section 4 shall be true and correct in all material respects (except where such representation or warranty is already qualified by materiality or similar standard, in which case such representation and warranty shall be true and correct in all respects) when made and at and as of the Closing Date as if made at and as of such time (in either case, except to the extent expressly made as of an earlier date, in which case as of such date as if made at, and as of, such date);

(ii)     Buyer and Guarantor shall have performed and complied with their respective covenants and agreements hereunder through the Closing in all material respects;

(iii)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(iv)     each delivery contemplated by Section 2(f)(ii) to be delivered to Sellers shall have been delivered;

(v)     the Bankruptcy Court shall have entered the Sale Order and such order shall be a Final Order and reasonably satisfactory to Buyer and Sellers and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date; and

RLF1 3631767v. 1

(vi)    the waiting period applicable to the transactions contemplated hereby under the HSR Act, if any, shall have expired, or early termination of the waiting period shall have been granted.

(c)    No Frustration of Closing Conditions.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the transactions contemplated in this Agreement set forth in Section 7(a) or Section 7(b), as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts (or, where applicable, commercially reasonable efforts) to satisfy the conditions to the consummation of the transactions contemplated in this Agreement or other breach of a representation, warranty or covenant hereunder.

8.    Termination.

(a)    Termination of Agreement.    This Agreement may be terminated and the transactions contemplated in this Agreement abandoned at any time prior to the Closing:

(i)    by mutual written consent of Sellers and Buyer;

(ii)    by Buyer, if any of the conditions to the obligations of Buyer and Guarantor set forth in Section 7(a) shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer and Guarantor;

(iii)    by Sellers, if any condition to the obligations of Sellers set forth in Section 7(b) shall have become incapable of fulfillment other than as a result of a breach by any Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(iv)    by Buyer, if there shall be a breach by any Seller of any representation, warranty, covenant or agreement of such Seller contained in this Agreement which would result in a failure of a condition set forth in Section 7(a), and which breach has not been cured within seven (7) Business Days after the giving of written notice by Buyer to Sellers of such breach;

(v)    by Sellers, if there shall be a breach by Buyer or Guarantor of any representation, warranty, covenant or agreement of Buyer or Guarantor, as applicable, contained in this Agreement which would result in a failure of a condition set forth in Section 7(b), and which breach has not been cured within seven (7) Business Days after the giving of written notice by Sellers to Buyer of such breach;

(vi)    by Buyer or Sellers, upon the consummation of a Competing Transaction;

(vii)    by Buyer or Sellers, if there shall be in effect a nonappealable Decree of a Governmental Entity of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, or the Bankruptcy Court or another court of competent jurisdiction shall stay the Sale Order;

31

(viii)  by Buyer, if the Sale Order is not entered by March 31, 2011; or

(ix)  by Buyer or Sellers, as applicable, on any date that is after the Drop Dead Date if the Closing shall not have occurred on or before such Drop Dead Date; provided, however, that Buyer or Sellers, as applicable, shall not have the right to terminate this Agreement under this Section 8(a)(ix) if the Closing has not occurred on or before the Drop Dead Date because of such Party's material failure to fulfill any of its obligations under this Agreement.

For the avoidance of doubt, any conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code and/or the appointment of a trustee under Chapter 11 or Chapter 7 of the Bankruptcy Code shall not effect a termination of this Agreement by the Buyer, the Sellers, or any such trustee so appointed or diminish Buyer's obligations hereunder, and this Agreement shall remain enforceable against Buyer by any such Chapter 11 or Chapter 7 trustee.

(b)  Procedure Upon Termination.  In the event of termination by Buyer or Sellers, or both, pursuant to Section 8(a), written notice thereof shall forthwith be given to the other Party, and this Agreement shall terminate and the purchase of the Acquired Assets hereunder shall be abandoned, without further action by Buyer or Sellers.  If this Agreement is terminated as provided herein, then each Party shall redeliver all documents, work papers and other material of any other Party relating to the transactions contemplated in this Agreement, whether so obtained before or after the execution hereof, to the Party furnishing the same.

(c)  Effect of Termination.

(i)  If any Party terminates this Agreement pursuant to Section 8(a), then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Section 1 (Definitions), Section 2(d)(ii) (Consideration), Section 9 (Miscellaneous), and this Section 8 (Termination) shall survive any such termination in accordance with their terms), and no Party shall have any liability to any other Party hereunder except as expressly set forth in this Section 8 or Section 2(d)(ii).

(ii)  If Sellers terminate this Agreement pursuant to Section 8(a)(iii) (solely with respect to Sections 7(b)(i), (ii), (iv) and (vi)), Section 8(a)(v), or Section 8(a)(ix), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Sellers.

(iii)  If this Agreement is terminated (1) by Buyer pursuant to Sections 8(a)(ii), 8(a)(iv), 8(a)(vi), 8(a)(vii), or 8(a)(viii), (2) by Sellers pursuant to Section 8(a)(iii) (solely with respect to Sections 7(b)(iii)), or (3) by both Parties pursuant to Section 8(a)(i), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Buyer.

(iv)  If this Agreement is terminated in accordance with Section 8(a), (A) the Confidentiality Agreement shall survive such termination, and nothing in Section 8(b) or in this Section 8(c) shall relieve Buyer or Sellers of their respective obligations under the

32

Confidentiality Agreement, and (B) Buyer agrees that all prohibitions in the Confidentiality Agreement shall be extended to a period of three (3) years from the date of such termination.

9.  Miscellaneous.

(a)  Expenses.  Except as otherwise provided in this Agreement, Sellers and Buyer shall bear their own expenses, including attorney's fees, incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.  Buyer shall be responsible for any HSR Act filing fees.

(b)  Entire Agreement.  This Agreement, the other Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(c)  Incorporation of Schedules and Exhibits.  The Schedules, Annexes and Exhibits to this Agreement are incorporated herein by reference and made a part hereof.

(d)  Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9(d).  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

(e)  Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Parties.

33

(f)  Notices.  All notices, requests, demands, claims and other communications hereunder will be in writing (including electronic and facsimile transmission) and shall be given,

If to Sellers:

> c/o Caribbean Petroleum Corporation
> [    ]

with a copy (which shall not constitute notice) to:

> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, New York 10281
> Attention: [    ]

If to Buyer:

> [    ]

[If to Guarantor:]

> [    ]

with a copy (which shall not constitute notice) to:

> [    ]

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m., local time, in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9(f).

(g)  Governing Law; Jurisdiction.  This Agreement shall in all aspects be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, the other Related Agreements or the transactions contemplated hereby or thereby, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court or if the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Agreement, the other Related Agreements or the transactions contemplated hereby or thereby, such matter shall be brought in the courts in the Court of Chancery for the

34

State of Delaware in and for New Castle County (the "Chancery Court"), and in the event that the Chancery Court does not have subject matter jurisdiction as to a matter arising out of or relating to this Agreement, in any state or federal court of the State of Delaware located in New Castle County. Each of the Parties hereto agrees that any action instituted by it arising out of or relating to this Agreement will be instituted exclusively in one of the above specified courts. Each Party waives any defense of inconvenient forum to the maintenance of any dispute or action so brought, consents to service of process by mail and waives any objection to venue in any such court. Each party agrees that a final judgment in any dispute or action so brought will be conclusive and may be enforced by dispute or action on the judgment or in any other manner provided at law (common, statutory or other) or in equity.

(h)     Consent to Service of Process. Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9(f).

(i)     WAIVERS OF JURY TRIAL.     EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.

(j)     Specific Performance. Each Party acknowledges that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party hereto shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 9(j) shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(k)     Severability.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

(l)     No Survival of Representations and Warranties. None of Sellers', Buyer's or Guarantor's respective representations or warranties in this Agreement shall survive the Closing.

(m)     Survival of Covenants and Agreements. All covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided, that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

(n)     No Third Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted

assigns. For avoidance of doubt, and without limitation, the Parties acknowledge and agree that all provisions contained in Section 6(e) of this Agreement with respect to employees are included for the sole benefit of the respective Parties and shall not create any right (i) in any other Person, including any employees, former employees, any participant in any Employee Benefit Plan or any beneficiary thereof or (ii) to continued employment with Sellers or Buyer.

(o) Construction.

(i) The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The words "including" and "include" and other words of similar import will be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. References to Articles, Sections, clauses, subclauses, subparagraphs, Annexes and Exhibits herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Annexes and Exhibits of this Agreement. The word "if" and other words of similar import will be deemed to be followed by the phrase "and only if." Any reference herein to law or to a law, statute, rule or regulation of any Governmental Entity (or any provision thereof) shall include all laws and such law, statute, rule or regulation promulgated thereunder (or provision thereof), including any successor thereto, as it may be amended from time to time. Any reference herein to "dollars" or "$" shall mean United States dollars.

(ii) The Disclosure Schedules are hereby incorporated by reference.

(p) Computation of Time. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

(q) Mutual Drafting. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

(r) Headings; Table of Contents. The Section headings and the table of contents contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(s) Counterparts; Facsimile or Email Signatures. This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies or pdf, each of which shall be deemed an original.

(t) Time of Essence. Time is of the essence of this Agreement.

36

(u)     Guaranty.

(i)     Subject to the conditions and limitations as set forth below, Guarantor hereby absolutely, irrevocably and unconditionally guarantees, as principal and not as surety, to Sellers the due and punctual payment and performance of all obligations of Buyer under this Agreement (the guaranty obligations under this Section 9(u)(i), collectively, the "Guaranteed Obligations").

(ii)    Guarantor guarantees that the Guaranteed Obligations will be duly and punctually paid and fully and completely performed (in the case of performance, as if Guarantor were the primary obligor) in accordance with the terms of this Agreement. If for any reason Buyer shall fail or be unable duly and punctually to pay or fully and completely to perform any Guaranteed Obligation as and when the same shall become due or otherwise required, then Guarantor shall, subject to the terms and conditions of this Agreement, forthwith duly and punctually pay or fully and completely perform such Guaranteed Obligation (in the case of performance, as if Guarantor was the primary obligor). Guarantor further agrees that this Agreement, to the extent it requires the payment of money, constitutes a guaranty of payment when due and not of collection and is in no way conditioned or contingent upon any attempt to collect from Buyer.

(iii)   Guarantor hereby unconditionally waives (A) any and all notices, including promptness, diligence, notice of acceptance of this Agreement and any other notice with respect to any of the Guaranteed Obligations and this Agreement, (B) any presentment, demand, performance, protest, notice of nonpayment as the same pertains to Buyer, suit or the taking of other action by either Seller against, and any other notice to, Buyer, Guarantor or others with respect to any of the Guaranteed Obligations, (C) any right to require either Seller to proceed against Buyer or to exhaust any security held by either Seller or to pursue any other remedy with respect to any of the Guaranteed Obligations, (D) any defense based upon an election of remedies by Sellers, unless the same would excuse performance by Buyer under this Agreement with respect to any of the Guaranteed Obligations and (E) any duty of Sellers to advise Guarantor of any information known to Sellers regarding Buyer or its ability to perform under this Agreement with respect to any of the Guaranteed Obligations. Each Seller may at any time, and from time to time, without notice to, or consent of, Guarantor and without impairing or releasing the obligations of Guarantor hereunder, with respect to any of the Guaranteed Obligations, (1) agree with Buyer or Guarantor to make any change in the terms of the Guaranteed Obligations, (2) take or fail to take any action of any kind in respect of any security for the Guaranteed Obligations, (3) exercise or refrain from exercising any rights against Buyer or Guarantor, or (4) compromise or subordinate the Guaranteed Obligations, including any security therefor. Any other suretyship defenses are hereby waived by Guarantor with respect to any of the Guaranteed Obligations.

(iv)    The provisions of this Section 9(u) shall continue to be effective or be reinstated, as the case may be, if (A) at any time and to the extent that any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the payee thereof upon the insolvency, bankruptcy, reorganization or similar event of Buyer or Guarantor, all as though such payment had not been made, or (B) the obligations of

37

Guarantor under this Section 9(u), with respect to any of the Guarantied Obligations, are released in consideration of a payment of money or transfer of property by Buyer or any other Person and to the extent that such payment, transfer or grant is rescinded or must otherwise be returned by the recipient thereof upon the insolvency, bankruptcy, reorganization or similar event of Buyer, Guarantor or such other Person, all as though such payment, transfer or grant had not been made. Notwithstanding anything to the contrary contained herein, nothing in this Section 9(u) shall be deemed to constitute a waiver of, or prevent Guarantor from asserting, any valid defense that may be assertable by Buyer.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

RLF1 3631767v. 1

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**CARIBBEAN PETROLEUM CORPORATION**

By: _____
     Name: [       ]
     Title: [    ]

**CARIBBEAN PETROLEUM REFINING L.P.**

By: _____
    Name: [       ]
    Title: [    ]

**GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION**

By: _____
    Name: [        ]
    Title: [      ]

**[BUYER]:**


By: _____
    Name:
    Title:



**[GUARANTOR]:**


**By:_____**

**Name:**

**Title**

**Exhibit A**

Bidding Procedures

[To Come]

**Exhibit B**

Form of Sale Order

[To Come]

**Exhibit C**

Form of Escrow Agreement

[To Come]

**Exhibit D**

Form of Bill of Sale

[To Come]

# Exhibit E

Form of Assignment and Assumption Agreement

[To Come]

**Exhibit F**

Form of Trademark Assignment

[To Come]

**Exhibit G**

Form of Intellectual Property Assignment

[To Come]

**Annex A**

Assumed Contracts

[To Come]