# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Caribbean Petroleum Corp., et al., | ) | Case No. 10-12553(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re Dkt Nos. 288 & 399** |

## MEMORANDUM OPINION

### Introduction

Caribbean Petroleum Corporation ("CPC"), Caribbean Petroleum Refining L.P., and Gulf Petroleum Refining (Puerto Rico) (collectively, "Debtors") have moved (the "Rejection Motion") pursuant to 11 U.S.C. § 365 to reject any or all of its agreements with franchisees (the "Franchise Agreements") upon the contemplated sale of substantially all of Debtors' assets. The parties objecting to the Rejection Motion are franchisees (the "Franchisees") who operate 184 service stations throughout Puerto Rico, of which 116 are located on real property owned by CPC and 68 are located on properties which CPC leases and then subleased to the operators. The Rejection Motion raises principally the impact, if any, of the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C. S 2801, *et seq.,* in a bankruptcy case. For the reasons which follow, the Court has entered an Order granting the Rejection Motion (D.I. 399)[1].

---

[1] The exigencies of the situation required the Court to enter the Order with the Opinion to follow.

### Jurisdiction

The Court has jurisdiction over the pending matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

The Debtors filed their petitions for relief under chapter 11 of the Bankruptcy Code on August 12, 2010. Until October 23, 2009, when explosions destroyed some of their essential facilities in Puerto Rico, the Debtors operated integrated and interdependent businesses consisting of import, offloading, storage and distribution of petroleum products in Puerto Rico. CPC was a leading distributor in Puerto Rico of gasoline and other petroleum products through a network of Gulf-branded retail service stations (the "Service Stations"). The Franchisees operate the Service Stations.

The Debtors are seeking an early sale of substantially all of their assets, and filed a motion (the "Sale Motion") (D.I. 9) at the outset of the case to accomplish such a sale (the "Sale"). The Court approved the Debtors' proposed bidding procedures by Order, dated September 10, 2010 (the "Bidding Procedures Order") (D.I. 149), which provided for a stalking horse agreement, procedures for Debtors' assumption and assignment of executory contracts and unexpired leases in connection with the sale (the "Sale") and set dates for the Sale process. The dates are: December 10, 2010, for the submission of bids; December 13, 2010 (subsequently adjourned to December 16, 2010, by Notice of Adjournment of Auction, D.I. 400), for the auction; December 22, 2010, for the hearing on the Sale; and February 8,

2010, for the closing on the Sale.

In response to the Rejection Motion, the Franchisees promptly took action. They moved to withdraw the reference to the District Court, which motion remains pending, and sought a motion to stay the Court's consideration of the Rejection Motion. The Court denied the stay and thereafter conducted a hearing on the Rejection Motion on December 1, 2010.

The Debtors have filed the Rejection Motion in what they view as a necessity to improve the prospects of the Sale. Debtors have concluded that potential bidders may be discouraged from bidding, or will lower their bids because of unfavorable Franchise Agreements. In that event, Debtors will not be able to maximize their return in the Sale. The Franchisees have raised numerous objections which the Court will now address.

### Due Process

Certain of the Franchisees have argued that the Rejection Motion deprived them of due process because of the brevity of notice. They also claim that the Rejection Motion and notice was in English only, without a version in Spanish, and that many of the Franchisees are Spanish speaking.

The Court does not find merit in the due process objection. First, the notice complied with the Court's Local Rules. Del. Bankr. L.R. 9006-1(c)(i) and (ii). *See In re Old Carco LLC*, 406 B.R. 180, 207 (Bankr. S.D.N.Y. 2009) (notice which complies with procedural rules adequate).

Second, Puerto Rican law provides that Spanish and English are official languages of Puerto Rico. 1 LPRA § 59. *See also Storage Tech. Corp. v. Comite Pro Rescate de la Salud*

(*In re Storage Tech Corp.*), 117 B.R. 610, 621 (Bankr. D. Colo. 1990) (English and Spanish can be used indiscriminately and there was no evidence that the defendants did not comprehend English). Here, too, the Franchisees provided no evidence that the Franchisees do not speak English or were prejudiced by the English-only documents.

### Ripeness

The Franchisees complain that the Rejection Motion is premature and will not be justiciable until a successful bidder emerges and designates the Franchise Agreements it wants Debtors to assume and assign, and those the Debtors will then reject. The Franchisees take exception to the "conditional" rejection concept.

The Third Circuit has addressed ripeness as a two factor test: (1) fitness of the issues for judicial determination, and (2) hardship to the parties of withholding the court's consideration. *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 307 (3d Cir. 2000). *See also Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 (3d Cir. 1996).

The first prong of the test, fitness for judicial decision, focuses on such factors as:

- are the issues legal versus factual,
- are events uncertain,
- is factual development necessary, and
- are the parties sufficiently adverse.

*In re Powermate Holding Corp.*, 394 B.R. 765, 769 (Bankr, D. Del. 2008). The Rejection Motion satisfies all of these factors. The applicability of the PMPA and the question of the nature of the Franchise Agreements are legal questions. The events are in the future but are not uncertain. The Sale is forthcoming and bidders will be influenced by the status of the Franchise Agreements. As the Court stated in *Midway Games* and applicable here:

4

> Without the Court's determination of whether the automatic stay applies to the Officers, the Debtors' efforts to proceed further with their bankruptcy, with a plan of liquidation, as well as with negotiations with creditors, would be severely hindered. . . . Until the Debtors know if the stay applies to the Officers, the case will stall and further exhaust the assets of the estate. Most notably, any continued investigation, including the filing of IDOL's complaint against the Officers, would deplete the Debtors' most significant asset, the remaining proceeds from the Court approved asset sales.

*In re Midway Games*, *Inc.*, 428 B.R. 327, 333 (Bankr. D. Del. 2010).

### B. The PMPA

Franchisees' most substantive argument is that the PMPA extinguishes Debtors' rights under the Bankruptcy Code to bring the Rejection Motion. The Court does not agree, and the case law is to the contrary and establishes that Bankruptcy Code Section 365 trumps the PMPA. *In re Harrell Oil Co., Inc.*, 38 B.R. 280, 282. (Bankr. E.D.N.C. 1984) and *In re Deppe*, 116 B.R. 898, 905 (Bankr. D. Minn. 1990). Particularly instructive is *Carco*, 406 B.R. at 205-06, in which the bankruptcy court held that Section 365 preempts state law (which the PMPA applies), which in *Carco* was designed to protect auto dealers from losing their franchises. The situation in *Carco* was very close to the scenario the Court faces here. Bankrupt Chrysler was seeking to reject dealer franchises pursuant to Section 365 and in opposition the car dealers invoked the protective provisions of the Automobile Dealers Day in Court Act (the "ADDCA"). Like the PMPA, the ADDCA was designed to protect the franchisees. The ADDCA protects car dealership franchisees while the PMPA protects service station franchisees. The court in *Carco* made the following salient rulings:

> More generally, a bankruptcy court recently held that "Congress enacted [§] 365 to provide debtors the authority to reject executory contracts. This authority preempts state law by virtue of the Supremacy Clause [and] the Bankruptcy Clause." *In re City of Vallejo*, 403 B.R. 72, 77 (Bankr.E.D.Cal. 2009). "Where a state law 'unduly impede[s] the operation of federal bankruptcy policy, the state law [will] have to yield.'" *Id.* (quoting *Perez*, 402 U.S. at 649, 91 S.Ct. 1704). Specifically and by no means exclusively, statutory notice or waiting periods of, *e.g.*, 60 or 90 days before termination clearly frustrate § 365's purpose to allow a debtor to reject a contract as soon as the debtor has the court's permission (and there is no waiting period under the Bankruptcy Rules). Buy-back requirements also frustrate § 365's purpose to free a debtor of obligations once the debtor has rejected the contract. Good cause hearings frustrate § 365's purpose of giving a bankruptcy court the authority to determine whether a contract may be assumed or rejected. Strict limitations on grounds for nonperformance frustrate § 365's purpose of allowing a debtor to exercise its business judgment and reject contracts when the debtor determines rejection benefits the estate. So-called "blocking rights" which impose limitations on the power of automobile manufactures to relocate dealers or establish new dealerships or modify existing dealerships over a dealer's objection, frustrate § 365's purpose of giving a debtor the power to decide which contracts it will assume and assign or reject by allowing other dealers to restrict that power.

*Carco*, 406 B.R. at 205-206 (footnotes omitted). The Franchisees seek to impose similar provisions of the PMPA. The Court agrees with the *Carco* analysis, and holds that the rights afforded by Section 365 take precedence over the PMPA.

## **Business Judgment**

The Franchisees challenge the standard of review applicable to the Rejection Motion. Debtors argue that their business judgment is the standard. Franchisees want the Court to employ the heightened standard apropos to matters involving the public interest.

6

Courts normally leave the decision to reject a contract to the debtor's sound business judgment. As Judge Walsh wrote in *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001), "A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of bad faith, or whim or caprice." *See also Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 849-50 (Bankr. W.D. Pa. 1987). However, in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 528 (1984), the Supreme Court found that certain contracts are in the "public interest" and therefore require heightened scrutiny. Courts interpreting *Bildisco* have consistently limited the heightened scrutiny to the protection of national public interest such as public safety, health or welfare. *Carco*, 406 B.R. at 189.

The PMPA does not express as its purpose a concern for any public policy interest. Its stated purpose is to protect franchisees from arbitrary or capricious termination of franchise agreements. In *Carco*, the court rejected the franchisees' insistence that the heightened standard should control the debtors' effort to reject auto dealership franchise agreements. The court found, as the Court does here with respect to the PMPA, that the ADDCA was not a Congressional effort to protect the national public interest. The *Carco* court found that "the public safety issues raised by the closing of dealerships do not create an imminent threat to health or safety." *Carco*, 406 B.R. at 190. The court further explained that:

> This observation is consistent with the *Pilgrim's Pride* court's observation that it was "unwilling to hold that a higher standard for rejection must be met any time another federal law is implicated by the contract to be rejected. Not every act of

7

> Congress that may touch a debtor's contract will require the court to consider public policy or other extraneous requirements of federal law in determining whether that contract may be rejected." *Pilgrim's Pride*, 403 B.R. at 424-25. Indeed, the Affected Dealers point to no language in the ADDCA requiring such considerations. Similarly, the *Pilgrim's Pride* court declined to apply the "public interest standard" in a case involving potential violations of the federal Packers and Stockyards Act ("PSA") in the contract rejection context because the court could not find language in the PSA requiring such public policy considerations. *See Pilgrim's Pride*, 403 B.R. at 424-25.
>
> The *Pilgrim's Pride* court identified an additional scenario beyond inconsistency with a federal statute or encroachment on the turf of a federal regulator where it may be appropriate to apply a higher standard than business judgment to contract rejection: local laws designed to protect public health or safety. *See Pilgrim's Pride*, 403 B.R. at 424 & fn. 26 (citing *Midatlantic*, 474 U.S. 494, 106 S. Ct. 755, 88 L.Ed.2d 859). Many Affected Dealers raised this very issue in the context of federal preemption, arguing that § 365 did not preempt the Dealer Statutes because they were enacted to protect public safety. While the Court continues discussion of this issue in its discussion of federal preemption *infra*, the Court notes that local laws designed to protect public health or safety, without imminent harm present, do not give rise to application of a heightened standard for contract rejection. Further, because the ADDCA does not give rise to such application of a "public interest standard", the Court applies a business judgment standard rather than a "public interest standard" here.

*Id.* at 190-191.

Applying the business judgment standard, the Court is convinced that Debtors have met their burden of showing that the Rejection Motion represents an informed decision, in good faith and in the honest belief that it is in the best interest of the Debtors. *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).

The unrefuted evidence before the Court supports the conclusion that the Debtors properly exercised their business judgment in pursuing the Rejection Motion. FTI Consulting, Inc. ("FTI"), Debtors' crisis manager, and Roy Messing ("R. Messing"), Debtors' Restructuring Officer, found that potential bidders would be encouraged to make bids for the Sale were the Rejection Motion granted. *See* Declaration of Roy Messing, dated November 26, 2010 (D.I. 370) ("Messing Dec.") at ¶¶ 5-7. The Debtors' professionals have therefore advised Debtors that:

> 6. . . . Potential bidders have expressed that if the Rejection Motion is approved, and they receive greater clarity regarding their rights related to the treatment of the Franchise Agreements, they will be more likely to seriously consider submitting a bid that would include the real property at the Service Stations.
>
> 7. To that end, potential bidders are waiting for the adjudication of the Rejection Motion before submitting any bids. . . . These bidders, therefore, are looking for assurance that the Debtors will be able to reject these Franchise Agreements. The potential bidders have been watching the docket closely, and have seen the motion to withdraw the reference with respect to the Rejection Motion (see D.I. 322) and objections to the Rejection Motion (see D.I. 321, 335 and 337). Potential bidders have expressed concern that the Rejection Motion will not be decided before the deadline to submit bids, currently set for December 10, 2010. These bidders are worried that if an order approving the Rejection Motion is not entered before this deadline, they will not have certainty as to what their rights are related to the Franchise Agreements. Without certainty on this significant issue, potential bidders are hesitant to submit bids.
>
> 8. Accordingly, based on these recent conversations with potential bidders, we believe it would be extremely detrimental to the sale process if the Rejection Motion was not decided in the next week - in advance of the bid deadline set for December 10, 2010 - providing potential bidders with sufficient

> time to finalize their bids and decide how they would like to treat the Service Stations and Franchise Agreements. . . .

The Debtors have acted on FTI's and R. Messing's advice in bringing the Rejection Motion and such action clearly represents the sound exercise of business judgment. The Court therefore finds that the Rejection Motion is in the best interests of the Debtors' estates.

### The Integrated Franchise Agreements

The Franchisees have also objected to the Rejection Motion on the ground that Section 365(h) provides them with the right to continue to use the Service Stations after rejection.

Section 365(h)(ii) provides that if a debtor rejects a lease of real property and the debtor is the lessor, then:

> (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

The Court agrees with Debtors that Section 365(h)(ii) does not apply to the Rejection Motion because the Franchise Agreements are not leases, but are licenses. Section 365(h) applies only to leases.

The difference between a lease and license is subtle but significant. A lease is a contract that provides exclusive possession of premises. A license, on the other hand, confers a privilege to occupy a premises. *Jetz Service Co., Inc. v. Ags Meadow Lakes Assoc.*,

1993 WL 17201, *2 (S.D.N.Y. Jan. 14, 1993).[2]  The Franchise Agreements expressly provide Debtors with the right to repossess the Service Stations.  Debtors also reserve the right to operate the Service Stations except for fuel sales.  Debtors therefore have not granted exclusive use to Franchisees.  The Franchise Agreements are thus licenses, not leases.

Furthermore, to adopt the Franchisees' argument, the Court would have to find that the single document comprising the Franchise Agreements contains two independent agreements, a "use" agreement and petroleum products "supply" agreement.  The Court has no basis for segregating the Franchise Agreements into two, independent undertakings.  The Franchise Agreements are integrated and nonseverable.  The case law plainly establishes that agreements such as the Franchise Agreements constitute a single agreement with an interrelated purpose.  The Franchise Agreements are one agreement with mutually dependent purposes.  *See*, *e.g.*, *Ashland Oil, Inc. v. Donahue*, 223 S.E.2d 433 (W.Va. 1976) (two agreements, one containing a lease and the other a sale and delivery agreement for gasoline, comprise a single agreement); *In re Kafarkis*, 162 B.R. 710, 725 (Bankr. E.D. Pa. 1993) (franchise agreement and lease agreement construed as a single agreement).  The reasoning behind the Court's decision here and in the cited cases should be apparent.  The lease and the supply provisions exist as one and would be economically unfeasible if separate.  The Franchisees therefore do not retain any Section 365(h) rights in the Franchise Agreements.[3]

---

[2] Puerto Rican law is in accord.  Civil Code of Puerto Rico, Art. 1433, 31 L.P.R.A. 4012.

[3] The Court has not ruled on the objection of San German Gulf, Inc. and Mark Terzikhan. At the hearing on the Rejection Motion, they raised potential factual issues relating to the Applicability of Section 365(h) to the Franchise Agreement for their Service Station.  The Court will consider their objection at the later date.

## CONCLUSION

The Court has granted the Rejection Motion for the foregoing reasons.

Dated: December 8, 2010

_____
KEVIN GROSS, U.S.B.J.