**<u>Exhibit 1</u>**

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**CARIBBEAN PETROLEUM CORPORATION,**

**CARIBBEAN PETROLEUM REFINING L.P.,**

**GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION,**

**(SELLERS)**

**AND**

**PUMA ENERGY INTERNATIONAL B.V.,**

**(BUYER)**

**DECEMBER 17, 2010**

# TABLE OF CONTENTS

**Page**

1.    Definitions ................................................................................................................. 1

2.    Purchase and Sale. ................................................................................................... 15
    (a)    Purchase and Sale of Acquired Assets; Retention of Excluded Assets ............... 15
    (b)    Assumption of Assumed Liabilities; Retention of Excluded Liabilities ............. 15
    (c)    Assumption and Rejection of Contracts ............................................................. 15
    (d)    Consideration. ..................................................................................................... 16
    (e)    Closing ................................................................................................................ 17
    (f)    Deliveries at Closing. ......................................................................................... 17
    (g)    Non-Assignment of Assumed Contracts ............................................................ 18

3.    Sellers' Representations and Warranties .................................................................. 19
    (a)    Organization of Sellers; Good Standing ............................................................ 19
    (b)    Authorization of Transaction .............................................................................. 19
    (c)    Noncontravention ............................................................................................... 19
    (d)    Title to Acquired Assets. .................................................................................... 20
    (e)    Litigation. ........................................................................................................... 20
    (f)    Absence of Certain Changes .............................................................................. 20
    (g)    Environmental Matters ....................................................................................... 21
    (h)    Board Approval and Recommendation. .............................................................. 21
    (i)    Brokers' Fees. ..................................................................................................... 21
    (j)    Disclosure. .......................................................................................................... 21

4.    Buyer's Representations and Warranties .................................................................. 22
    (a)    Organization of Buyer ........................................................................................ 22
    (b)    Authorization of Transaction .............................................................................. 22
    (c)    Noncontravention ............................................................................................... 22
    (d)    Litigation. ........................................................................................................... 23
    (e)    Brokers' Fees ...................................................................................................... 23
    (f)    Financial Capacity .............................................................................................. 23
    (g)    Adequate Assurances Regarding Executory Contracts ...................................... 23

5.    Pre-Closing Covenants ............................................................................................. 23
    (a)    Commercially Reasonable Efforts; Cooperation ............................................... 23
    (b)    Notices and Consents ......................................................................................... 23
    (c)    Conduct of the Business Pending the Closing .................................................... 24
    (d)    Notice of Developments ..................................................................................... 25
    (e)    Access ................................................................................................................. 25
    (f)    Press Releases and Public Announcements ........................................................ 26
    (g)    Bankruptcy Court Matters .................................................................................. 26
    (h)    Bulk Transfer Laws ............................................................................................ 27
    (i)    Cure Amounts ..................................................................................................... 27
    (j)    Supplementation and Amendment of Disclosure Schedule ................................ 27
    (k)    Regulatory Filings .............................................................................................. 27

|  | (l) | Allocation of the Purchase Price | 28 |
|  | (m) | Schedules and Exhibits | 28 |
|  | (n) | Certain Filings | 28 |

| 6. | | Other Covenants | 28 |
|  | (a) | Cooperation; Further Assurances | 28 |
|  | (b) | Litigation Support | 29 |
|  | (c) | Availability of Records | 29 |
|  | (d) | Satisfaction of Excluded and Assumed Liabilities | 30 |
|  | (e) | Employee Matters | 30 |
|  | (f) | Transfer Taxes | 31 |
|  | (g) | Recording of Intellectual Property Assignments | 31 |
|  | (h) | Property and Other Taxes | 31 |
|  | (i) | Wage Reporting | 32 |
|  | (j) | Use of Name | 32 |

| 7. | | Conditions to Obligation to Close | 33 |
|  | (a) | Conditions to Buyer's Obligations | 33 |
|  | (b) | Conditions to Sellers' Obligations | 34 |
|  | (c) | No Frustration of Closing Conditions | 35 |

| 8. | | Termination | 35 |
|  | (a) | Termination of Agreement | 35 |
|  | (b) | Procedure Upon Termination | 36 |
|  | (c) | Effect of Termination | 36 |

| 9. | | Miscellaneous | 37 |
|  | (a) | Expenses | 37 |
|  | (b) | Entire Agreement | 37 |
|  | (c) | Incorporation of Schedules and Exhibits | 37 |
|  | (d) | Amendments and Waivers | 37 |
|  | (e) | Succession and Assignment | 38 |
|  | (f) | Notices | 38 |
|  | (g) | Governing Law; Jurisdiction | 39 |
|  | (h) | Consent to Service of Process | 40 |
|  | (i) | WAIVERS OF JURY TRIAL | 40 |
|  | (j) | Specific Performance | 40 |
|  | (k) | Severability | 40 |
|  | (l) | No Survival of Representations and Warranties | 40 |
|  | (m) | Survival of Covenants and Agreements | 41 |
|  | (n) | No Third Party Beneficiaries | 41 |
|  | (o) | Construction | 41 |
|  | (p) | Computation of Time | 41 |
|  | (q) | Mutual Drafting | 41 |
|  | (r) | Headings; Table of Contents | 42 |
|  | (s) | Counterparts; Facsimile or Email Signatures | 42 |
|  | (t) | Time of Essence | 42 |

Exhibit A   -   Bidding Procedures Order
Exhibit B   -   Form of Sale Order
Exhibit C   -   Form of Escrow Agreement
Exhibit D   -   Form of Bill of Sale
Exhibit E   -   Form of Deed
Exhibit F   -   Form of Assignment and Assumption Agreement
Exhibit G   -   Form of Trademark Assignment
Exhibit H       Form of Intellectual Property Assignment


Annex A   -   Assumed Contracts
Annex B       Owned Real Property

# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is entered into as of December 17, 2010, by and among Caribbean Petroleum Corporation, a corporation formed under the laws of the State of Delaware ("CPC"), Caribbean Petroleum Refining L.P., a limited partnership formed under the laws of the State of Delaware ("CPRLP") and Gulf Petroleum Refining (Puerto Rico) Corporation, a corporation formed under the laws of the State of Delaware ("Gulf", together with CPC and CPRLP, the "Sellers" and each, individually, a "Seller") and Puma Energy International  B.V., a corporation formed under the laws of the Netherlands (the "Buyer"). Sellers and Buyer are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Section 1.

**WHEREAS**, Sellers have historically engaged in the business of refining, importing, offloading, storing and distributing gasoline and other petroleum-based products in the Commonwealth of Puerto Rico (the "Business");

**WHEREAS**, on August 12, 2010 (the "Commencement Date"), Sellers commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are currently pending before the Honorable Kevin Gross and jointly administered under Case No. 10-12553 (KG) (collectively, the "Chapter 11 Cases"); and

**WHEREAS**, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Business and certain other assets, as of the Closing, on the terms and subject to the conditions set forth herein, and, in furtherance of the foregoing, (i) Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Acquired Assets, and (ii) Buyer wishes to assume from Sellers the Assumed Liabilities, in the case of clause (i) and (ii) above, on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter contained, the receipt and sufficiency of which are acknowledged, and intending to be bound hereby, the parties hereto hereby agree as follows:

1.      Definitions.

"Acquired Assets" means all of Sellers' right, title and interest in and to all of Sellers' properties, assets and rights of every nature, kind and description, tangible and intangible (including goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, existing as of the Closing Date, other than the Excluded Assets, in each case that are used in or related to the Business, including, but not limited to, the following: (a) all Inventory; (b) all Furnishings and Equipment, refinery equipment, petroleum terminaling, pipeline and storage facilities, ship dock facilities in San Juan Harbor, and physical facilities of every type used in or related to the Business; (c) all Records used in or related to the Business or used in connection with the Acquired Assets, including all Tax Returns and Records relating to Taxes imposed on the Acquired Assets or with respect to the Business, other than Tax Returns and Records relating

to income or similar Taxes; <u>provided</u> that Sellers shall have access to and the right to make copies of any such Tax Returns and Records in accordance with <u>Section 6(c)</u> hereof; (d) all Intellectual Property used in or related to the Business (collectively, "<u>Acquired Intellectual Property</u>"); (e) all Contracts used in or related to the Business as set forth on <u>Annex A</u> and designated by Buyer pursuant to <u>Section 2(c)</u> hereof, which will be assigned to Buyer pursuant to Section 365 of the Bankruptcy Code in connection with the transactions contemplated in this Agreement (all Contracts contemplated by this clause (e), collectively, the "<u>Assumed Contracts</u>") and any and all deposits, claims, causes of action, settlements, retroactive adjustments, setoff rights, recoupment rights and rights of refund in respect of any Assumed Contract (other than the Excluded Litigation Claims and Excluded Insurance Policies, each of which, for the avoidance of doubt, shall be Excluded Assets), whether related to periods ending before, on, or after the Closing Date; (f) all of the Owned Real Property together with all interests of Sellers in and to any subsurface rights, mineral rights, hereditaments, water rights, water courses, alleys, passages, privileges, covenants and reciprocal easement agreements relating to any such Owned Real Property; (g) all claims of Sellers against third parties relating to the Acquired Assets (other than the Excluded Litigation Claims and Excluded Insurance Policies, each of which, for the avoidance of doubt, shall be Excluded Assets) or the Assumed Liabilities, whether choate or inchoate, known or unknown, contingent or noncontingent, together with all rights, title and interest in and to any award made or to be made in relation thereto; (h) all Permits relating to the Business (the Permits contemplated by this clause (h), collectively, the "Assumed Permits") in each case, only to the extent such Assumed Permits are assignable; (i) all insurance policies and binders set forth on <u>Schedule 1.1 of the Disclosure Schedule</u> and all claims, refunds and credits from such policies or binders due or to become due with respect to such policies; (j) all credits, warranties, representations and guarantees provided to or otherwise received by Sellers from any suppliers, manufacturers, contractors or sellers that relate or pertain to any Acquired Asset, only to the extent such are assignable; (k) all telephone and facsimile numbers, domain names and e-mail addresses used in or related to the Business, only to the extent such are transferrable; (l) all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with current or former employees and/or agents of Sellers or with third parties, to the extent relating to the Business (or any portion thereof), only to the extent such are transferable; and (m) all goodwill associated with the Business, including customer and supplier lists, and all goodwill associated with all Intellectual Property.

"<u>Acquired Intellectual Property</u>" has the meaning set forth in the definition of Acquired Assets.

"<u>Administrative Expenses</u>" means "administrative expenses" as defined in Section 503(b) of the Bankruptcy Code.

"<u>Affiliate</u>" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Antitrust Division</u>" has the meaning set forth in <u>Section 5(k)</u>.

"Antitrust Laws" means, collectively, the HSR Act, the Sherman Antitrust Act of 1890, as amended, the Clayton Antitrust Act of 1914, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2(f)(i)(C).

"Assisting Party" has the meaning set forth in Section 6(b).

"Assumed Contracts" has the meaning set forth in the definition of Acquired Assets.

"Assumed Liabilities" means only the following: Liabilities (a) with respect to the Acquired Assets that arise after the Closing; (b) to the extent incurred after the Closing with respect to the Assumed Contracts or the Assumed Permits and for the Cure Amounts (subject to the Buyer Cure Amounts Cap); (c) for Property Taxes to the extent that such Taxes relate to the ownership of the Acquired Assets after the Closing; (d) for Transfer Taxes as provided in Section 6(f); (e) for Taxes with respect to the Acquired Assets, only to the extent allocated to Buyer pursuant to Section 6(h) of this Agreement; (f) all Liabilities associated with the environmental condition of the Acquired Assets as of the Closing Date; provided, that the Assumed Liabilities shall not, with respect to (i) Governmental Entities, include Liabilities that have been or will be asserted (or, in the case of monetary claims for funds actually expended by any Governmental Entity, could have been lawfully asserted for such funds), and (ii) with respect to any Person other than a Governmental Entity, include Liabilities that have been, will be or could have been lawfully asserted, in case of sub-clause (i) or (ii), by such Person as Administrative Expenses, general unsecured claims or any other "claims" as defined in Section 101(5) of the Bankruptcy Code for purposes of the Chapter 11 Cases (such exception to the Assumed Liabilities set forth in this clause (f), which for the avoidance of doubt shall be Excluded Liabilities, the "Specified Environmental Claims")); and (g) related to the Acquired Assets required to be paid by Buyer under this Agreement or under any Related Agreement; provided, however, notwithstanding the above, Assumed Liabilities shall not include any Excluded Liabilities.  Notwithstanding any language to the contrary set forth in clauses (a) through (g) above (except as expressly provided in clauses (b) and (f)), Buyer shall not assume any Liabilities of Sellers that arise from events, facts or circumstances that occur prior to the Closing.  Furthermore, Sellers shall not have any obligation for any Liabilities related to the Acquired Assets for events, facts or circumstances that occur after the Closing.

"Assumed Permits" has the meaning set forth in the definition of Acquired Assets.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"Bidding Procedures Order" means the Final Order entered by the Bankruptcy Court on September 10, 2010, attached hereto as Exhibit A, approving, among other things, the Bidding Procedures.

"Bill of Sale" has the meaning set forth in Section 2(f)(i)(A).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York or San Juan, Puerto Rico shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Cure Amounts Cap" means, subject to Section 5(i) and as adjusted in accordance with Section 2(c)(i), the aggregate amount of Cure Amounts set forth on Annex A hereto.

"Cash" means all cash (including checks received prior to the close of business on the Closing Date, whether or not deposited or cleared prior to the close of business on the Closing Date), certificates of deposit and other bank deposits, treasury bills and other cash equivalents and marketable securities.

"Chancery Court" has the meaning set forth in Section 9(g).

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means any and all claims, demands, actions, choses in action, suits, complaints, causes of action, charges, suits, rights of recovery, rights of recoupment, proceedings and other litigation assets of the Sellers of any kind or nature, whether choate or inchoate, known or unknown, contingent or noncontingent, together with all rights, title and interest in and to any award made or to be made in relation thereto.

"Closing" has the meaning set forth in Section 2(e).

"Closing Date" has the meaning set forth in Section 2(e).

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state law.

"COBRA Liabilities" means all Liabilities arising on or prior to the Closing Date under COBRA with respect to any current or former employee of any Seller (including the Covered Employees) and/or any beneficiaries or dependents thereof.

"Commencement Date" has the meaning set forth in the recitals.

"Commercial Tort Claims" has the meaning set forth in Section 9-102 of the Uniform Commercial Code as in effect in the State of Delaware.

"Competing Transaction" means any direct or indirect acquisition or purchase, by a Person other than Buyer, of the Business or all or substantially all of the Acquired Assets, or any merger, consolidation, recapitalization or other business combination or other transaction (including a plan of reorganization or liquidation) affecting the Acquired Assets or the Business such that the Acquired Assets or the Business are no longer owned and controlled by Sellers (or a wholly-owned Subsidiary thereof) or any Affiliates thereof.

"Confidentiality Agreement" means the letter agreement, dated August 3, 2010, by and among Sellers and Buyer's Affiliate, Puma Energy Puerto Rico, Inc., regarding the terms and conditions on which Sellers would make available certain information to Buyer.

"Contract" means any written or oral agreement, commercial fuel agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, franchise, dealer and distributorship agreement, supply agreement, service agreement, software license agreement, software maintenance agreement, development agreement, joint venture agreement, promotion agreement, customer contract or purchase order, partnership agreement or other arrangement, understanding, permission or commitment, including any amendments, modifications or supplements to the foregoing.

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to, or in connection with, any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Covered Employee" means any officer or employee of any Seller or any of their respective Affiliates whose duties relate primarily to the operation of the Business and who is actively employed as of the date immediately prior to the Closing Date.

"Cure Amounts" has the meaning set forth in Section 5(i).

"D&O Insurance Policies" means all of Sellers' insurance policies providing coverage for current and former directors and officers of Sellers.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order or any other order of any Governmental Entity.

"Deed" has the meaning set forth in Section 2(f)(i)(B).

"Deposit" has the meaning set forth in Section 2(d)(ii).

"DIP Facility" means that certain $10,000,000 Debtor in Possession Senior Secured Superpriority Priming Financing Facility dated as of August 11, 2010, among Sellers and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced from time to time in accordance with its terms.

"DIP Lenders" means Banco Popular de Puerto Rico and the banks, financial institutions and other lender parties to the DIP Facility from time to time.

"Drop Dead Date" means April 14, 2011, or such later date as Buyer and Sellers may mutually agree in writing.

"Employee Benefit Plan" means each "employee benefit plan" as defined in Section 3(3) of ERISA, any "multi-employer plan" as defined in Section 3(37) of ERISA, each medical, surgical, hospitalization, life insurance and other "welfare" plan, fund, or program (within the meaning of Section 3(1) of ERISA), each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA), and each other plan, policy, program, agreement, understanding and arrangement (whether written or oral) providing compensation or other benefits to any current or former director, officer, employee or consultant (or to any dependent or beneficiary thereof) of any Seller or their Affiliates which is now or has been maintained, sponsored or contributed to by Sellers or their Affiliates or under the terms of which Sellers or their Affiliates have or are reasonably likely to have any obligation or liability, whether actual or contingent, including all employment, consulting, severance, termination, incentive, bonus, fund, deferred compensation, retirement, pension, savings, profit sharing, retention, change in control, vacation, holiday, cafeteria, medical, disability, life, accident, fringe benefit, health, welfare, stock-based and other compensation (including stock purchase and stock option plans) and benefit plans, policies, programs, agreements, understandings or arrangements.

"Environmental Claims" means a written notice, claim, demand, action, suit, complaint or proceeding by any Person alleging liability or potential liability with respect to the release, threatened release, discharge, emission, spill, leak, use, or the presence of or exposure to, any Hazardous Substances.

"Environmental Law" means each federal, state, or local Law (including those of the Commonwealth of Puerto Rico) relating to (a) the protection, preservation or restoration of the environment (including air, water, vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or to human health or safety, or (b) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Substances.    The term Environmental Law includes (a) the federal Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act, the federal Water Pollution Control Act of 1972, the federal Clean Air Act, the federal Clean Water Act, the federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the federal Solid Waste Disposal Act and the federal Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Atomic Energy Act, the Nuclear Waste Policy Act of 1982, the federal Occupational Safety and Health Act of 1970, the Puerto Rico Public Policy Environmental Act, and regulations promulgated thereunder, each as amended and as now in effect, and (b) any common law or equitable doctrine (including injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to, or threatened as a result of, the presence of or exposure to any Hazardous Substances.

"EPA" means the United States Environmental Protection Agency, and any successor thereto.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that with Sellers is: (a) a member of a controlled group of corporations within the meaning of Section 414(b) of the IRC; (b) a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the IRC; (c) a member of an affiliated service group within the meaning of Section 414(m) of the IRC; or (d) a member of a group of organizations required to be aggregated under Section 414(o) of the IRC.

"Escrow Agent" has the meaning set forth in Section 2(d)(ii).

"Escrow Agreement" has the meaning set forth in Section 2(d)(i).

"Excluded Assets" means any and all assets of Sellers that are not Acquired Assets. Without limiting the generality of the foregoing sentence, each of the following shall be Excluded Assets for purposes of this Agreement: (a) all of Sellers' or any of their respective Affiliates' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller or any of its Affiliates as a corporation, limited partnership or other entity; (b) all Tax Returns and Records related to Taxes paid or payable by any Seller or any of its Affiliates (other than Tax Returns and Records specifically included in clause (c) of the definition of Acquired Assets); (c) all Records that Sellers are not permitted under applicable Law to transfer; provided that Buyer shall have the right to make copies of any such Records to the extent such Records are exclusively related to the Business; (d) all assets with respect to any income Taxes of any Seller or any of its Affiliates for periods prior to the Closing, including any rights to income Tax refunds, overpayments or income Tax credits; (e) all equity securities of any Seller; (f) all Cash (including, for the avoidance of doubt, the Purchase Price) and accounts receivable, prepaid expenses, refunds, rights of setoff, notes receivable, trade accounts and other debts due or accruing to Sellers from (i) all of the Contracts other than the Assumed Contracts, (ii) the Assumed Contracts prior to the Closing, (iii) ownership of the Acquired Assets prior to the Closing and (iv) any other source; (g) all rights under any Contract that is not an Assumed Contract; (h) all of Sellers' or any of their respective Affiliates' current assets that are not related to or used in the Business; (i) all rights (including rights of set-off and rights of recoupment (including any such item relating to the payment of Taxes)), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of any Seller or any of its Affiliates against third parties with respect to Excluded Assets and Excluded Liabilities; (j) all avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law (including all rights and avoidance claims of Sellers arising under Chapter 5 of the Bankruptcy Code) except with respect to any of the Assumed Contracts; (k) any Records related to the Chapter 11 Cases other than the Records which are contained in clause (c) of the definition of Acquired Assets; (l) any (i) confidential personnel and medical records pertaining to any Covered

Employee and (ii) other Records that Sellers are required by law to retain; <u>provided</u> that Buyer shall have the right to make copies of any portions of such Records pursuant to sub-clause (ii) above to the extent that such portions relate either to the Business or any Acquired Asset and are necessary for Buyer to comply with applicable law; (m) all Employee Benefit Plans, including all assets maintained pursuant to, or in connection with, any Employee Benefit Plan, currently or previously sponsored or maintained by Sellers or any of Sellers' ERISA Affiliates or their respective predecessors or with respect to which such, or their respective predecessors, has made or is required to make payments, transfers or contributions in respect of any present or former employees, directors, officers, shareholders, consultants or independent contractors of Sellers or any of Sellers' ERISA Affiliates or their respective predecessors, and all insurance policies, fiduciary liability policies, benefit administration contracts, actuarial contracts, trusts, escrows, surety bonds, letters of credit and other contracts primarily relating thereto; (n) all of Sellers' rights under this Agreement and any Related Agreement; (o) all of Sellers' rights under or pursuant to all warranties (expressed or implied), representations and guarantees made by third parties to the extent relating to (i) any Excluded Assets or (ii) any Excluded Liabilities; (p) all of Sellers' rights to the Acquired Assets and Assumed Permits to the extent such rights are not assignable; (q) all Records relating to the Property and Casualty Insurance Policies and D&O Insurance Policies; (r) all Property and Casualty Insurance Policies and D&O Insurance Policies (including those set forth on <u>Schedule 1.2 of the Disclosure Schedule</u>) and all claims, refunds and credits from such policies due or to become due with respect to such policies (such policies referenced in this clause (r), the "<u>Excluded Insurance Policies</u>"); (s) all Excluded Litigation Claims; (t) all vehicles not used in the Business or related to the Acquired Assets; (u) all billboard signs and artwork not owned by Sellers; and (v) any other assets not owned by Sellers; and (w) each of those assets set forth on <u>Schedule 1.3 of the Disclosure Schedule</u>.

"<u>Excluded Insurance Policies</u>" has the meaning set forth in the definition of Excluded Assets.

"<u>Excluded Liabilities</u>" means any and all Liabilities of any of the Sellers that are not Assumed Liabilities.  In furtherance, and not in any way a limitation of the foregoing, the Excluded Liabilities include the following Liabilities of any of the Sellers: (a) indebtedness for borrowed money, including, but not limited to, all amounts owed under the DIP Facility; (b) all Liabilities at any time relating to or arising under or in connection with any collective bargaining agreement, Employee Benefit Plan or any other severance, retention, employment, change-of-control, pension, incentive, retirement, equity or other compensation or benefit plan, program, policy, obligation or agreement of or with any Seller; (c) all Liabilities relating to wages, remuneration, compensation, benefits, severance, vacation or other paid-time-off for any Covered Employees or any former directors, officers, employees, contractors or other service providers engaged in connection with the Business; (d) all Liabilities arising out of the Excluded Assets, including Contracts that are not Assumed Contracts; (e) except for Taxes specifically allocated to Buyer pursuant to <u>Section 6(h)</u>, any Liability of Sellers, or otherwise imposed on any of the Acquired Assets or with respect to the Business for any Pre-Closing Tax Period, in respect of any Tax, including any Liability of Sellers for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise; (f) Liabilities existing prior to the Closing Date that are subject to compromise under the Bankruptcy Code; (g) all Liabilities associated with brokers, finders or other consultants or advisors to Sellers entitled to a fee or reimbursement of

expenses with respect to this transaction; (h) any Liability relating to any Litigation arising out of or related to any occurrence or event that happened prior to the Closing, except to the extent expressly identified as an Assumed Liability; (i) any Liability for Cure Amounts in excess of the Buyer Cure Amounts Cap; (j) all Liabilities relating to long term deferred revenue of the Business as of the Closing; (k) all Liabilities with respect to the Specified Environmental Claims; (l) any Liability for product liabilities, employee liabilities, workers' compensation claims, personal injury or property damage claims arising prior to the Closing, except to the extent expressly identified as an Assumed Liability; (m) any liability, claim or obligation in connection with, or arising out of, any claim or dispute for services rendered or products, systems or goods manufactured, distributed, designed, configured, engineered, assembled, compiled or sold by Sellers prior to the Closing, including product liability claims; (n) all Liabilities arising from any claim relating exclusively to Sellers' conduct of the Business or ownership of the Acquired Assets prior to the Closing, except to the extent expressly identified as an Assumed Liability; and (o) all Liabilities and/or obligations of any Seller to Buyer under this Agreement, any Related Agreement or with respect to or arising out of the transactions contemplated hereby.

"Excluded Litigation Claims" means all Claims including, without limitation: (a) Commercial Tort Claims, (b) Claims set forth on the Schedules of Assets and Liabilities and Statements of Financial Affairs as filed by Sellers with the Bankruptcy Court, as supplemented, amended or modified from time to time, (c) Claims against or adverse to Sellers' current or former officers, directors, managers, employees, professionals, advisors, accountants, attorneys, lenders or agents and relate to acts, omissions, facts or events occurring on or prior to the Closing Date or (d) Claims against or adverse to other Persons and relate to acts, omissions, facts or events occurring on or prior to the Closing Date (other than Claims arising under any Assumed Contract, which shall constitute Acquired Assets).

"Final Order" means an Order of the Bankruptcy Court or other court of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect.

"Franchise Agreements" means those Contracts set forth in the Rejection Order.

"FTC" has the meaning set forth in Section 5(k).

"Fuel Inventory" means the fuel products, including gasoline, diesel, jet fuel, crude oil, kerosene and propane owned by Sellers as of the Closing Date.

"Furnishings and Equipment" means all tangible personal property (other than Inventory and Intellectual Property), wherever located, including machinery, equipment, computers, furniture, automobiles, trucks, railcars, tools, tractors and trailers, dock loaders, cranes, forklifts, spare parts, and leased personal property (to the extent assigned hereunder), in each case that is used in the Business.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

"Governmental Entity" means any United States federal, state, municipal or local or non-United States governmental or regulatory authority, agency, commission, court, body, board,

department or other governmental entity, including the Bankruptcy Court and the Commonwealth of Puerto Rico.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Hazardous Substances" means any substances, elements, mixtures, chemicals, constituents or materials, whether solid, liquid or gas, that are defined, listed or otherwise classified or regulated as pollutants, contaminants, hazardous wastes, hazardous substances, chemical substances, substances of very high concern, toxic substances, toxic materials, hazardous materials, extremely hazardous wastes under any present Environmental Laws (including petroleum and petroleum related substances, products, by products and wastes).

"Intellectual Property" means all (i) trademarks, copyrights, patents, service marks, trade names, logos and other designations used by Sellers in the Business and (ii) all computer programs and other computer software (other than off-the-shelf shrink wrapped software), software licenses, trade secrets, plans and specifications, inventions, know-how, technology, proprietary processes and formulae used by the Sellers, in each case, in the Business.

"Intellectual Property Assignment" has the meaning set forth in Section 2(f)(i)(E).

"Inventory" means the Fuel Inventory and all other goods held for sale or furnished under Contracts of service, and all raw materials and supplies, and all manufactured, spare and purchased parts, in each case that are used in the Business.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means all laws, statutes, rules, regulations, ordinances, codes, permits, consents, approvals, licenses, judgments, orders, writs, judicial decisions, decrees, policies, injunctions and other authorizations, requirements and pronouncements having the effect of law of any Governmental Entity.

"Leased Real Property" means the real property leased or subleased by the Sellers as tenant or subtenant, as applicable, together with, to the extent leased or subleased by the Sellers, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Sellers attached or appurtenant thereto and all easements, rights of way, servitudes, licenses, tenements, privileges and appurtenances relating to the foregoing.

"Liability" means any debt, liability, loss, penalty, adverse claim, recoupment, offset or obligation of whatever kind or nature (whether direct or indirect, known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due), including any liability for Taxes and any claim (as such term is defined in Section 101 of the Bankruptcy Code).

"Lien" means any mortgage, pledge, lien, encumbrance, charge, security interest, option, right of first refusal, easement, deed of trust, security agreement or other encumbrance or restriction on the use or transfer of any property.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity, by or before any Governmental Entity.

"Local Bankruptcy Rules" means the Local Bankruptcy Rules for the District of Delaware applicable to all cases in such district governed by the Bankruptcy Code.

"Material Adverse Effect" means, when used with respect to the Business, any effect or change that is materially adverse to the Business or the Acquired Assets; provided, however, that no effects or changes arising or related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) general business or economic conditions either in the United States of America or otherwise; (ii) conditions generally affecting the petroleum import, storage, and distribution industry; (iii) national or international political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iv) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) changes in Law or in GAAP; (vi) the taking of any action contemplated by this Agreement or any other Related Agreement; (vii) the announcement or pendency of this Agreement or the transactions contemplated hereby; or (viii) exigencies arising as a result of or in connection with Sellers' financial condition or status as a filer or filers under Chapter 11 of the Bankruptcy Code.

"Necessary Consent" has the meaning set forth in Section 2(g).

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice, subject, in the case of Sellers or the Business, to changes in the business or operations of any Seller resulting from business exigencies arising as a result of, or in connection with, Sellers' financial condition or status as a filer under Chapter 11 of the Bankruptcy Code.

"Owned Real Property" means the real property in which Sellers have fee title (or equivalent) interest including, but not limited to, the parcels of real property listed on Annex B, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of Sellers attached or appurtenant thereto and all easements, rights of way, servitudes, licenses, tenements, privileges and appurtenances relating to the foregoing.

"Party" or "Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, authorizations or similar right obtained from any Governmental Entity.

"Permitted Liens" means: (i) Liens relating to Taxes which are not due and payable as of the Closing Date; (ii) as to Owned Real Property, (a) leases and subleases to third party tenants, to the extent such leases or subleases are Assumed Contracts, (b) zoning requirements and other

governmental land use limitations arising under applicable Law with respect to the use, occupancy, subdivision or improvement of such real property, (c) all rights or easements, if any, of any Governmental Entity or any public or private utility company, to maintain telephone wires, pipes, conduits or other facilities which enter or cross such real property, (d) the state of facts that a current accurate survey would show as of the Closing, (e) variations between tax lot lines and the record lines and (f) utility easements, passages, easements (including reciprocal easement agreements, if any), rights of way, water liens, privileges, licenses, hereditaments, appurtenances, covenants and restrictions with respect to the Owned Real Property, in each case in this clause (ii), that do not prevent the operation of the Business as is presently conducted; and (iii) any Liens disclosed on <u>Schedule 1.4 of the Disclosure Schedule</u>.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group of any of the foregoing.

"<u>Post-Closing Tax Period</u>" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"<u>Property and Casualty Insurance Policies</u>" means all property, casualty and liability policies where a Seller is an insured.

"<u>Property Taxes</u>" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"<u>Purchase Price</u>" means, subject to <u>Section 5(i)</u>, an amount equal to Eighty-Two Million Dollars ($82,000,000).

"<u>Records</u>" means all of the books, files, documents and records owned by or in the control of Sellers (in whatever format they exist, whether in hard copy or electronic format), including all records, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists and supplier lists), plans, drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data, training materials, printed manuals, programmers' notes, engineering data, designs, maintenance records and procedures, operating manuals and procedures, safety manuals, current and historical operating information, production records, inventory records, safety and environmental reports, spill prevention and storm water runoff plans, if any, equipment manufacturer's warranties, if any, specifications of equipment, plans, blueprints, engineering studies, job descriptions, technical and shop drawings and other printed materials.

"<u>Rejection Order</u>" means the Order Authorizing Conditional Rejection of Certain Franchise Agreements entered by the Bankruptcy Court on December 2, 2010.

"<u>Related Agreements</u>" means this Agreement, the Bill of Sale, the Deeds, the Assignment and Assumption Agreement, the Trademark Assignment, the Escrow Agreement, and all other

Contracts, schedules, certificates or other documents being delivered pursuant to or in connection with this Agreement (other than the Assumed Contracts).

"Representative" of a Person means the Person's Controlled Affiliates and the officers, directors, managers, employees, advisors (including its financial advisors), representatives (including its legal counsel and its accountants) and agents of the Person and/or its Controlled Affiliates.

"Sale Motion" means the motion filed by Sellers on August 13, 2010, seeking entry of an order approving, among other things, this Agreement.

"Sale Order" means an order or orders of the Bankruptcy Court, substantially in the form attached hereto as Exhibit B, which approves this Agreement and all of the terms and conditions hereof and authorizes Sellers to consummate the transactions contemplated hereby pursuant to Sections 105, 363, 365 and 1146(c) of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006. Without limiting the generality of the foregoing, such order shall find, hold and provide, among other things, that: (a) the Acquired Assets sold to Buyer pursuant to this Agreement (including the Owned Real Property as specifically described in the Sale Order) shall be transferred to Buyer free and clear of all Liabilities, Liens and interests (other than Permitted Liens and Liens created by Buyer); (b) Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (c) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions; (d) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the breach hereof as provided herein; (e) not selling the Acquired Assets free and clear of Liabilities, Liens and interests (other than Permitted Liens and Liens created by Buyer) would impact adversely on Sellers' efforts to maximize the value of their respective estates; (f) a sale of the Acquired Assets other than one free and clear of Liabilities, Liens and interests (other than Permitted Liens and Liens created by Buyer) would be of substantially less benefit to the estates of Sellers; (g) Buyer has provided adequate assurance of future performance with respect to the Assumed Contracts and that the Assumed Contracts may be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code; (h) the transactions contemplated by this Agreement are in the best interests of Sellers' estates, their creditors, and all other parties-in-interest; (i) due and adequate notice and an opportunity to be heard in accordance with all applicable laws were given to all necessary parties in the Chapter 11 Cases, including all Governmental Entities; (j) Buyer and Sellers are authorized to close the transactions immediately upon entry of the Sale Order; (k) the requirements of Bankruptcy Rule 6004(h) shall be waived; (l) Buyer is not a successor to any Sellers or any of their respective estates and the transactions contemplated by this Agreement shall not amount to a consolidation, merger or de facto merger of Buyer with or into any Seller; and (m) the sale of the Acquired Assets to Buyer is not being undertaken for the purpose of escaping liability for any of Sellers' debts or hindering, delaying or defrauding creditors under the Bankruptcy Code or under any applicable Laws.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Specified Environmental Claims" has the meaning set forth in the definition of Assumed Liabilities.

"<u>Straddle Period</u>" means any Tax period beginning before or on and ending after the Closing Date.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or Controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or Control any managing director or general partner of such business entity (other than a corporation).  The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"<u>Tax</u>" or "<u>Taxes</u>" means any United States federal, state or local or non United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, asset, transfer, registration, value added, alternative or add on minimum, estimated or other tax of any kind whatsoever, or other governmental taxes, charges, fees, levies or other assessments imposed by and payable to the United States, or any state, county, local or foreign government or subdivision or agency thereof, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"<u>Tax Records</u>"  has the meaning set forth in Section 6(c).

"<u>Tax Return</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Trademark Assignment</u>"  has the meaning set forth in <u>Section 2(f)(i)(D)</u>.

"<u>Transfer Tax</u>" has the meaning set forth in <u>Section 6(f)</u>.

2.    <u>Purchase and Sale</u>.

(a)    <u>Purchase and Sale of Acquired Assets; Retention of Excluded Assets</u>.  On the terms and subject to the conditions of this Agreement, at the Closing, Buyer agrees to purchase, acquire and accept from Sellers, and Sellers agree to sell, transfer, assign, convey and deliver to Buyer, all of the Acquired Assets free and clear of any and all Liens (other than Liens created by Buyer and the Permitted Liens), claims and other interests as of the Closing for the consideration specified in <u>Section 2(d)(i)</u>.  Nothing contained herein shall be deemed to sell, transfer, assign or

convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in, and under the Excluded Assets.

(b)       Assumption of Assumed Liabilities; Retention of Excluded Liabilities.  On the terms and subject to the conditions of this Agreement at the Closing, Buyer agrees to assume and become responsible for only the Assumed Liabilities and to timely pay, honor and discharge, or cause to be timely paid, honored and discharged, all of the Assumed Liabilities in accordance with the terms thereof.  Notwithstanding anything in this Agreement to the contrary, Buyer will not assume, and shall be deemed not to have assumed, any of the Excluded Liabilities.  On the terms and subject to the conditions of this Agreement (including Section 7(a)(xii)), at the Closing, Buyer agrees to assume responsibility for the administrative orders described in paragraph 10 of the Sale Order and nothing in this Agreement shall release, nullify, or enjoin the enforcement of any Liability of Buyer to any Governmental Entity under any applicable Law that any Person would be subject to as the owner or operator of the Acquired Assets after the date of entry of the Sale Order.

(c)       Assumption and Rejection of Contracts.

(i)       Annex A sets forth a list of the Contracts that Buyer desires to be assumed by Sellers and assigned to Buyer at the Closing.  Notwithstanding the foregoing, at any time prior to the date that is ten (10) Business Days prior to the Closing Date (A) Buyer may, by written notice to Sellers, designate any Contract (other than any Contract related to the Foreign Trade Zone subgrant) that has not been (i) previously designated as an Assumed Contract or (ii) rejected, as an Assumed Contract, and upon receipt of any such notice Sellers shall use reasonable efforts to effect the assumption of such Contract by Sellers in accordance with the Bankruptcy Code, and, if such Contract is assumed prior to the Closing, such Contract shall become an Assumed Contract and (B) Buyer may, by written notice to Sellers, designate any Assumed Contract that has not been assumed by Sellers as one that Buyer no longer desires to have assumed and assigned and such Contract shall be deemed not to be an Assumed Contract and, in each case, the Buyer Cure Amounts Cap shall be adjusted accordingly by an amount equal to the Cure Amount, if any, associated with such Contract.  To the extent not already undertaken by Sellers, as promptly as reasonably practicable following the designation by Buyer of any additional Contract as an Assumed Contract in accordance with the foregoing sentence, Sellers shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all necessary actions in order to determine and fix the Cure Amounts with respect to such Contract and to effect the assumption of such Contract by Sellers in accordance with the Bankruptcy Code at the Closing, such assumption to be effective as of the Closing Date.  Buyer shall use its reasonable best efforts to cooperate in the foregoing.

(ii)       Buyer agrees that it will provide adequate assurance of future performance of all of the Assumed Contracts so that all Assumed Contracts can be assumed by Sellers at or prior to the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.  In furtherance of the foregoing, Buyer acknowledges and agrees that Buyer will provide all necessary information regarding Buyer, as well as a financial commitment of performance by Buyer with respect to the

Assumed Contracts from and after the Closing, to demonstrate adequate assurance of the performance of the Assumed Contracts.

(d)    Consideration.

(i)    The aggregate consideration for the sale and transfer of the Acquired Assets shall be (A) the Purchase Price payable in cash at the Closing pursuant to Section 2(f)(ii)(G) and (B) the assumption by Buyer of the Assumed Liabilities.

(ii)    On or before the date hereof, Buyer shall have deposited with JPMorgan Chase Bank, National Association, in its capacity as escrow agent (the "Escrow Agent"), pursuant to the terms of an escrow agreement, dated as of the date hereof, in the form of Exhibit C attached hereto (the "Escrow Agreement"), an amount in cash equal to Four Million, One Hundred Thousand Dollars ($4,100,000) (the "Deposit") by wire transfer of immediately available funds.  The Escrow Agent shall hold, invest and disburse the Deposit strictly in accordance with the terms and provisions of this Agreement, the Escrow Agreement and any Final Order of the Bankruptcy Court.  All interest and investment income earned on the Deposit shall be payable to Buyer and shall be reported to any taxing authority with jurisdiction (if any), as income of Buyer, except in the event that Sellers are entitled to the Deposit as set forth in this Agreement, in which case the interest and investment income earned thereon shall belong to Sellers and shall, to the extent applicable, be credited against the Purchase Price.  Sellers and Buyer, as appropriate, shall promptly execute all forms reasonably requested by any escrow agent, including IRS Form W-9, or any substitute form, and any necessary investment direction letters.  The Deposit (together with all accrued investment income or interest thereon) shall be held by the Escrow Agent in trust and distributed to Buyer or Sellers as follows:

(A)    if the Closing shall occur, then the Deposit, together with all accrued investment income or interest thereon, shall be applied towards the Purchase Price payable by Buyer to Sellers under Section 2(f)(ii)(G);

(B)    if Sellers terminate this Agreement pursuant to Section 8(a)(iii) (solely with respect to Sections 7(b)(i), (ii), (iv) and (vi)), Section 8(a)(v) or 8(a)(ix), or if Buyer terminates this Agreement pursuant to Section 8(a)(ii) (solely with respect to Section 7(a)(xi)), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Sellers; and

(C)    if this Agreement is terminated (1) by Buyer pursuant to Sections 8(a)(ii) (other than with respect to Section 7(a)(xi)), 8(a)(iv), 8(a)(vi), 8(a)(vii), 8(a)(viii) or 8(a)(ix), (2) by Sellers pursuant to Sections 8(a)(iii) (solely with respect to Sections 7(b)(iii) and 7(b)(v)), 8(a)(vi) or 8(a)(vii) or (3) by both Parties pursuant to Section 8(a)(i), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Buyer.

(e)    Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Cadwalader, Wickersham & Taft LLP, located at One World Financial Center, New York, New York 10281, (i) commencing at 11:00 a.m. local

time on the Business Day (the "<u>Closing Date</u>") immediately following the date on which all conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated in this Agreement, as set forth in <u>Section 7</u> (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions), have been satisfied or waived, or (ii) such other Business Day that is otherwise mutually agreed to by Sellers and Buyer.

(f)        <u>Deliveries at Closing</u>.

(i)        At the Closing, Sellers will deliver to Buyer the following duly executed documents and other items:

(A)        Bill of Sale substantially in the form of <u>Exhibit D</u> attached hereto (the "<u>Bill of Sale</u>");

(B)        a deed for each of the Owned Real Properties included in the Acquired Assets substantially in the form of <u>Exhibit E</u> attached hereto (the "<u>Deeds</u>");

(C)        an Assignment and Assumption Agreement substantially in the form of <u>Exhibit F</u> attached hereto (the "<u>Assignment and Assumption Agreement</u>");

(D)        an instrument of assignment substantially in the form of <u>Exhibit G</u> (the "<u>Trademark Assignment</u>") attached hereto for each registered trademark (or pending application therefor) transferred or assigned hereby,

(E)        an instrument of assignment in the form of <u>Exhibit H</u> (the "<u>Intellectual Property Assignment</u>") attached hereto for any patent, copyright, or other Intellectual Property;

(F)        a certified copy of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement, including the Bidding Procedures Order and the Sale Order; and

(G)        a certificate to the effect that each of the conditions specified in <u>Section 7(a)(iv)</u> and <u>Section 7(a)(v)</u> is satisfied in all material respects.

(ii)        At the Closing, Buyer will deliver, and in the case of <u>Section 2(f)(ii)(F)</u> will cause the Escrow Agent to deliver, to Sellers the following duly executed documents, cash amounts and other items:

(A)        the Bill of Sale;

(B)        the Assignment and Assumption Agreement;

(C)        the Trademark Assignment;

(D)     the Intellectual Property Assignment;

(E)     a certificate to the effect that each of the conditions specified in Section 7(b)(i) and Section 7(b)(ii) is satisfied in all respects;

(F)     the Deposit, in accordance with the terms of the Escrow Agreement, by wire transfer of immediately available funds to one or more bank accounts designated in writing by Sellers to Buyer and the Escrow Agent prior to the Closing Date;

(G)     the Purchase Price, less an amount equal to the Deposit (together with all accrued investment income and interest thereon through the date immediately preceding the Closing Date), by wire transfer of immediately available funds to one or more bank accounts designated in writing by Sellers to Buyer prior to the Closing Date;

(H)     such other documents, instruments and certificates as Sellers may reasonably request; and

(I)     such additional documents as may be necessary or customary to consummate the Agreement, including any Transfer Tax or statement of value forms which may be required.

(g)     Non-Assignment of Assumed Contracts.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Acquired Asset if (i) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto would constitute a breach thereof or in any way adversely affect the rights of Buyer thereunder and (ii) the Bankruptcy Court shall not have entered a Final Order providing that such consent is not required (each such action, a "Necessary Consent").  In such event, Sellers and Buyer will use their commercially reasonable efforts to obtain, as promptly as reasonably practicable, any Necessary Consent with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that, notwithstanding anything to the contrary contained herein, Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Litigation or legal proceedings to obtain any such consent or approval or otherwise incur any expenses in connection with obtaining such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective, would adversely affect the rights of any Seller thereunder or Buyer would not in fact receive all such rights, such Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no expense to such Seller, under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Buyer, or under which such Seller would enforce for the benefit of Buyer with Buyer assuming such Seller's obligations and any and all rights of such Seller against a third party thereto.

3.      Sellers' Representations and Warranties.  Subject to Bankruptcy Court approval of this Agreement, entry of the Sale Order and such Sale Order being a Final Order at the time of the Closing, obtaining any of the consents required by this Agreement or the Sale Order, each Seller represents and warrants, as of itself, to Buyer that, except as set forth in the Disclosure Schedule delivered by Sellers to Buyer on the date hereof (collectively, the "Disclosure Schedule"), the statements contained in this Section 3 are true and correct as of the date of this Agreement, and shall be true and correct as of the Closing Date.

(a)      Organization of Sellers; Good Standing.  Each Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware and, pursuant to Sections 1107 and 1108 of the Bankruptcy Code and the orders of the Bankruptcy Court, each Seller has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on the Business as a debtor in possession.

(b)      Authorization of Transaction.  Subject to Bankruptcy Court approval pursuant to the Sale Order, such Sale Order being a Final Order and any other authorization as may be required by the Bankruptcy Court:

(i)      each Seller has full corporate or similar power and authority to execute and deliver this Agreement and the Related Agreements to which it is a party and to perform its obligations hereunder and thereunder;

(ii)      the execution, delivery, consummation and performance of this Agreement and the Related Agreements to which a Seller is a party have been duly authorized by such Seller;

(iii)      this Agreement has been, and each Related Agreement to which a Seller is a party will be, at the Closing, duly and validly executed and delivered by each Seller party thereto; and

(iv)      this Agreement, and the Related Agreements to which a Seller is a party will, when executed, assuming, in each case, the due authorization, execution, and delivery thereof by the other parties thereto, constitute the valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(c)      Noncontravention.  Subject to (i) Bankruptcy Court approval pursuant to the Sale Order and such Sale Order being a Final Order and (ii) receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, neither the execution and delivery of this Agreement or the Related Agreements, nor the consummation of the transactions contemplated in this Agreement or the Related Agreements, will (i) conflict with or result in a breach of the certificate of incorporation or bylaws or other organizational documents of any Seller, (ii) violate any Law or Decree that is material to the conduct of the Business and to which the Business or the Acquired Assets are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Assumed

Contract.  Subject to (i) Bankruptcy Court approval pursuant to the Sale Order and such Sale Order being a Final Order and (ii) receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity or third party in order for the Parties to consummate the transactions contemplated by this Agreement, the failure of which to give, make or obtain would result in a Material Adverse Effect.

(d)    <u>Title to Acquired Assets</u>.

(i)    Sellers have (i) good and valid title to, or a valid leasehold interest in, all tangible assets that are included in the Acquired Assets and (ii) good and valid title to the Owned Real Property, in each case free of all Liens other than Permitted Liens or such other Liens which shall be discharged on or before the Closing Date in connection with the Sale Order or any other action of the Bankruptcy Court.

(ii)    <u>Annex B</u> hereto sets forth a true and complete list of all Owned Real Property.

(iii)    Subject to Bankruptcy Court approval of the Sale Order, Sellers have the power and the right to sell, assign and transfer and, at the Closing, Sellers shall sell and deliver to Buyer and Buyer will acquire from Sellers, (i) good title to, or an adequate leasehold interest in, all tangible assets that are included in the Acquired Assets and (ii) good and valid title to the Owned Real Property, free and clear of all Liens, other than Liens created by Buyer and Permitted Liens.

(e)    <u>Litigation</u>.  As of the date hereof, there is no Litigation pending or, to the knowledge of Sellers, threatened against any Seller before any Governmental Entity, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business or would reasonably be expected to prevent, restrict or delay the consummation of the transactions contemplated in this Agreement or any Related Agreement.

(f)    <u>Absence of Certain Changes</u>.  Except for the commencement of the Chapter 11 Cases, the orders, writs, injunctions, decrees, statutes, rules or regulations of general applicability to the Acquired Assets, since the Commencement Date, there have been no events or conditions that could constitute a Material Adverse Effect.

(g)    <u>Environmental Matters</u>. Sellers have delivered to Buyer a true and correct copy of the Evaluation of Environmental Liabilities Report prepared by SCS Engineers for Sellers dated December 6, 2010.

(h)    <u>Board Approval and Recommendation</u>.  The board of directors of each Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court, a sale, assumption and assignment of the Acquired Assets and the Assumed Contracts pursuant to this Agreement under Sections 105, 363 and 365 of the Bankruptcy Code is in the best interests of each Seller.

(i)  <u>Brokers' Fees</u>.  Sellers have no obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the transactions contemplated by this Agreement, except as set forth on <u>Schedule 3(f) of the Disclosure Schedule</u>.  Buyer shall not have any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person hired or retained by Sellers in connection with this Agreement or the transactions contemplated by this Agreement.

(j)  <u>Disclosure</u>.  Except for the representations and warranties contained in this <u>Section 3</u>, no Seller nor any other Person makes (and Buyer is not relying upon) any other express or implied representation or warranty with respect to Sellers, the Business, the Acquired Assets (including the value, condition or use of any Acquired Asset), the Assumed Liabilities or the transactions contemplated by this Agreement, in the Related Agreements or in any other agreement, document or instrument to be delivered in connection herewith or therewith, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of any Seller or any of their respective officers, directors, employees, agents or Representatives. Without in any way limiting the foregoing and except for the representations and warranties contained in this <u>Section 3</u>, each Seller (i) expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of title, merchantability or fitness for a particular purpose, the physical condition of any personal or real property comprising a part of the Acquired Assets or which is the subject of any Contract to be assigned to Buyer at the Closing, the environmental condition or any other matter relating to the physical condition of any real property or improvements, the zoning of any such real property or improvements, the value of the Acquired Assets (or any portion thereof), the transferability of the Acquired Assets, the terms, amount, validity or enforceability of any Assumed Liabilities, the title of the Acquired Assets (or any portion thereof), the probable success or profitability of the ownership, the use or operation of the Business and the Acquired Assets by Buyer after the Closing, or any other matter or thing relating to the Acquired Assets or any portion thereof), and (ii) expressly disclaims all liability and responsibility for any projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant or Representative of any Seller or any of their Affiliates). Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of the physical condition of the Acquired Assets and all such other matters relating to or affecting the Acquired Assets as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Acquired Assets, Buyer is doing so based solely upon such independent inspections and investigations. Accordingly, upon the Closing Date, Buyer will accept the Acquired Assets at the Closing "as is," "where is," and "with all faults."

4.     Buyer's Representations and Warranties.

Buyer represents and warrants to Sellers that the statements contained in this Section 4 are true and correct as of the date of this Agreement and will be true and correct on the Closing Date:

(a)     Organization of Buyer.  Buyer is a corporation duly incorporated or formed (as applicable), validly existing and in good standing under the laws of the Netherlands and has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

(b)     Authorization of Transaction.

(i)     Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement, the Related Agreements and all other agreements contemplated in this Agreement to which it is a party and to perform its obligations hereunder and thereunder;

(ii)     the execution, delivery, consummation and performance of this Agreement, the Related Agreements and all other agreements contemplated in this Agreement to which Buyer is a party have been duly authorized by Buyer;

(iii)     this Agreement has been, and each Related Agreement to which Buyer is a party will be, at the Closing, duly and validly executed and delivered by Buyer; and

(iv)     this Agreement, and the Related Agreements to which Buyer is a party will, when executed, assuming, in each case, the due authorization, execution, and delivery thereof by the other parties thereto, constitute the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(c)     Noncontravention.  Subject to receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, neither the execution and delivery of this Agreement or the Related Agreements, nor the consummation of the transactions contemplated in this Agreement or the Related Agreements will (i) conflict with or result in a breach of the certificate of incorporation or bylaws or other organizational documents of Buyer, (ii) violate any Law or Decree to which Buyer is, or its respective assets or properties are, subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which Buyer is a party or by which it is bound. Subject to receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity or third party in order for the Parties to consummate the transactions contemplated by this Agreement.

(d)    <u>Litigation</u>.    As of the date hereof, there is no Litigation pending or, to the knowledge of the Buyer, threatened against Buyer before any Governmental Entity, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a material adverse effect or would reasonably be expected to prevent, restrict or delay the consummation of the transactions contemplated in this Agreement or any Related Agreement.

(e)    <u>Brokers' Fees</u>. Buyer does not have any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the transactions contemplated by this Agreement.

(f)    <u>Financial Capacity</u>.    Buyer (i) has, or at the Closing will have, sufficient funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price and any expenses incurred by Buyer and its Affiliates in connection with the transactions contemplated by the Related Agreements, including Cure Amounts; (ii) has, or at the Closing will have, the resources and capabilities (financial or otherwise) to perform their respective obligations hereunder; and (iii) has not, and at the Closing will not have, incurred any obligation, commitment, restriction or Liability of any kind, that would impair or adversely affect such resources and capabilities.

(g)    <u>Adequate Assurances Regarding Executory Contracts</u>.    Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

5.    <u>Pre-Closing Covenants</u>.  The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

(a)    <u>Commercially Reasonable Efforts; Cooperation</u>.    Except as otherwise set forth herein, each of the Parties will use its commercially reasonable efforts to take all action and to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement at the earliest practicable date (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the transactions contemplated in this Agreement set forth in <u>Section 7</u>).

(b)    <u>Notices and Consents</u>.

(i)    Sellers and Buyer shall use their commercially reasonable efforts to obtain all material authorizations, consents, orders and approvals of all Governmental Entities and officials that may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement (including obtaining any Permits) and will cooperate with each Party in seeking to obtain all such authorizations, consents, orders and approvals.

(ii)    Sellers shall give such notices to third parties and use their commercially reasonable efforts to obtain all Necessary Consents.

(iii)    Buyer shall cooperate and use all commercially reasonable efforts to assist Sellers in giving such notices and obtaining such consents.

(c)    Conduct of the Business Pending the Closing.  From the date hereof until the Closing Date, except as otherwise expressly provided for in this Agreement, or with the prior written consent of Buyer (which consent shall not be unreasonably withheld, delayed or conditioned), and subject to any applicable orders of the Bankruptcy Court, Sellers shall:

(i)    use commercially reasonable efforts to maintain the Acquired Assets, pay expenses and payables, collect receivables, repair and continue normal maintenance (normal wear and tear excepted) to the extent payable pursuant to the budget approved by the Bankruptcy Court in connection with the approval of the DIP Facility;

(ii)    (A) comply in all material respects with all Laws and Assumed Contracts, (B) maintain all Assumed Permits, and (C) pay all applicable Taxes that Sellers are required to pay (taking into account any relief afforded pursuant to the Chapter 11 Cases) to the extent payable pursuant to the budget approved by the Bankruptcy Court in connection with the approval of the DIP Facility;

(iii)    use commercially reasonable efforts to pursue sale processes pursuant to Section 363 of the Bankruptcy Code and to comply at all times with the Bidding Procedures Order;

(iv)    not enter into or make any material amendment to any Contract or transaction relating to the purchase of assets for use in the Business in excess of one hundred thousand dollars ($100,000) that will constitute Acquired Assets or Assumed Liabilities;

(v)    not modify, extend, renew or cancel in writing (except as a result of a default by the other party thereunder) any Assumed Contracts or enter into any new Contract related to the Acquired Assets, except in the Ordinary Course of Business;

(vi)    not enter into any new employment agreements, collective bargaining agreements, union contracts or similar Contracts, written or oral;

(vii)    use commercially reasonable efforts to cooperate with the EPA on the remedial procedures currently being undertaken with respect to the Acquired Assets;

(viii)    not alter the Acquired Assets, or consent to such alteration, except to complete any improvements or non-structural changes or installations which may be required by Law or are undertaken in the Ordinary Course of Business;

(ix)    use commercially reasonable efforts to perform all material obligations that are required to be performed by Sellers under the DIP Facility, and promptly as reasonably practicable deliver to Buyer a copy of any notice of default received by Sellers under the DIP Facility or any other material agreement or instrument affecting the Acquired Assets;

(x)    not sell, lease, transfer, mortgage, encumber, alienate or dispose of any Acquired Asset except for Fuel Inventory in the Ordinary Course of Business;

(xi)    use commercially reasonable efforts to transfer, assign, record or perfect in its name good title to any Acquired Assets that is not presently held or recorded in its name;

(xii)    not merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence;

(xiii)    not subject any of the Acquired Assets to any Lien (other than Permitted Liens); and

(xiv)    not enter into a legally enforceable contract or agreement requiring it to do anything prohibited by this Section 5(c).

(d)    Notice of Developments.  From the date hereof until the Closing, each of Sellers and Buyer will give prompt written notice to the other Party of (i) the existence of any fact or circumstance, or the occurrence of any event, which could be reasonably likely to cause a condition to a Party's obligations to consummate the transactions contemplated in this Agreement as set forth in Section 7, not to be satisfied as promptly as practicable, and (ii) the receipt of any notice or other communication from any Governmental Entity in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5(d) shall not be deemed to amend or supplement this Agreement, and the failure to deliver any such notice shall not constitute a waiver by any Party of any right or condition to the consummation of the transactions contemplated in this Agreement.

(e)    Access.

(i)    Prior to the Closing, Sellers shall, upon reasonable advance written request by Buyer, permit Buyer and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere with normal business operations, to all premises, properties, personnel, Records, Tax Records, and Contracts of the Business for the purpose of evaluating and reviewing the Business, the Acquired Assets and Assumed Liabilities, and obtaining, at Buyer's election (and in any event, at Buyer's sole cost and expense), policies from a title company insuring Buyer's fee interest in the Owned Real Property (provided, that the Parties expressly acknowledge that obtaining such title insurance policy shall not be a condition to the Closing); provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the affect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable law.  Except in response to a request contemplated by the first sentence of this Section 5(e)(i), during the period from the date hereof and ending on the Closing Date, Buyer shall not, and shall cause its Representatives not to, contact any customers, suppliers or licensors of the Business in connection with, or pertaining to, the Business or any subject matter of this Agreement, except with the prior written consent of Sellers, which consent shall not be unreasonably withheld.

(ii)    All information obtained pursuant to this <u>Section 5(e)</u> shall be subject to the terms and conditions of the Confidentiality Agreement.

(f)    <u>Press Releases and Public Announcements</u>.  Prior to the Closing, no Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties; <u>provided</u>, <u>however</u>, that any Party may make any public disclosure it believes in good faith is required by applicable law (including the Bankruptcy Code) (<u>provided</u>, that the disclosing Party shall use all reasonable best efforts to consult with the non-disclosing Party with respect to the text thereto prior to making the disclosure).

(g)    <u>Bankruptcy Court Matters</u>.

(i)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing bids with respect to any transaction (or series of transactions) involving a Competing Transaction, prior to the entry of the Sale Order (but not thereafter).  Nothing contained herein shall be construed to prohibit Sellers and any of its representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Transaction, prior to the entry of the Sale Order (but not thereafter).

(ii)    Sellers shall use commercially reasonable efforts to pursue the entry of the Sale Order.  Sellers shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules in connection with obtaining approval of the Sale Order.

(iii)    Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, in no event shall Buyer or any Seller be required to agree to any amendment of this Agreement.

(iv)    Sellers shall use their commercially reasonable best efforts to obtain entry by the Bankruptcy Court of the Sale Order no later than February 8, 2011.

(v)    Sellers further covenant and agree that, after the entry of the Sale Order, the terms of any liquidation plan it submits to the Bankruptcy Court, or any other court for confirmation or sanction, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

(h)    <u>Bulk Transfer Laws</u>.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions

contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith.

(i)    <u>Cure Amounts</u>.  As promptly as practicable following the date hereof, Buyer and Sellers shall use commercially reasonable efforts to cooperate and determine the amounts required to cure all defaults under each Assumed Contract so as to permit the assumption and assignment of each such Assumed Contract pursuant to Section 365 of the Bankruptcy Code in connection with the transactions contemplated by this Agreement (as ultimately determined by the Bankruptcy Court, the "<u>Cure Amounts</u>").  Buyer shall be responsible for paying all Cure Amounts subject to the Buyer Cure Amounts Cap.  Sellers shall be responsible for paying all Cure Amounts in excess of the Buyer Cure Amounts Cap.  Sellers hereby agree that Buyer, with the consent of Sellers, and as approved by the Bankruptcy Court, may pay any such Cure Amounts in excess of the Buyer Cure Amounts Cap and deduct such amount from the Purchase Price otherwise payable to Sellers at the Closing.  Sellers will, pursuant to the Sale Motion, move to assume and assign to Buyer the Assumed Contracts and will provide notices thereof to the Assumed Contract counterparties and all other parties in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court.

(j)    <u>Supplementation and Amendment of Disclosure Schedule</u>.  Sellers may, at their option, include in the Disclosure Schedule items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information provided in one Disclosure Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Disclosure Schedule to which its relevance is reasonably apparent on its face.  At any time prior to the date that is five (5) Business Days prior to the Closing Date, Sellers shall have the right to supplement or amend the Disclosure Schedule with respect to any matter hereafter arising or discovered after the delivery of the Disclosure Schedule pursuant to this Agreement.  No such supplement or amendment shall have any effect on the satisfaction of the conditions to closing set forth in <u>Section 7(a)</u>, unless the matter or issue so disclosed on the Disclosure Schedule is an event, occurrence, fact, condition, change, development or effect that, individually or in the aggregate, has had or resulted in or would reasonably be expected to have or result in a Material Adverse Effect on the Business or the Acquired Assets.

(k)    <u>Regulatory Filings</u>.

(i)    If necessary, Buyer and Sellers shall (i) use commercially reasonable efforts to make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated herein as promptly as practicable, (ii) comply, to the extent practicable, at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective subsidiaries from Federal Trade Commission (the "<u>FTC</u>"), the Antitrust Division of the United States Department of Justice (the "<u>Antitrust Division</u>") or any other Governmental Entity in respect of such filings, and (iii) cooperate with each other in connection with any such filing or request (including, to the extent

permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Entity under any Antitrust Laws with respect to any such filing.  Each Party shall use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any Antitrust Law in connection with the transactions contemplated herein.  Each Party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Entity regarding any such filings.  Each of Buyer and Sellers shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to the transactions contemplated herein as promptly as possible after the execution of this Agreement.

(l)    <u>Allocation of the Purchase Price</u>.  Prior to the Closing, the Parties shall use their best efforts to agree to a written schedule allocating the Purchase Price and the Assumed Liabilities among the Acquired Assets.  Each of the Parties hereto shall report the federal, state, local and other tax consequences of the purchase and sale contemplated hereby (including the filing of Internal Revenue Service Form 8594 or any supplements or amendments thereto) in a manner consistent with such Purchase Price allocation schedule.  None of the Parties hereto shall, and shall not permit any of its Affiliates to, take a position (except as required by applicable Law) on any Tax Return, before any taxing authority, or in any judicial proceeding, that is inconsistent with such Purchase Price allocation schedule.

(m)    <u>Schedules and Exhibits</u>.  Sellers and Buyer shall cooperate and work in good faith to complete any Exhibits, Annexes and other documents to be attached to this Agreement.

(n)    <u>Certain Filings</u>.  Sellers and Buyer shall use commercially reasonable efforts to cooperate with one another to (i) determine whether any action by or in respect of, or filing with, any Governmental Entity is required in connection with the consummation of the transactions contemplated by this Agreement and (ii) take such actions or make any such filings, furnishing information as required by any Governmental Entity in order to consummate the transactions contemplated by this Agreement.

6.    <u>Other Covenants</u>.  The Parties agree as follows with respect to the period from and after the Closing:

(a)    <u>Cooperation; Further Assurances</u>.  The Parties shall cooperate with each other, and shall use commercially reasonable efforts to cause their respective Controlled Affiliates and Representatives to cooperate with each other, to provide an orderly transition of the Business and the Acquired Assets from Sellers to Buyer.  On and after the Closing, Buyer will afford promptly to Sellers and its counsel, financial advisers and other agents reasonable access during normal business hours to its properties, books and records, employees, auditors and counsel to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax Returns, reports or forms, the defense of any Tax audit, claim or assessment, the reconciliation of Claims in the Chapter 11 Cases, the preparation and

confirmation of a plan in the Chapter 11 Cases, other matters relating to the winding-up of a Seller's estate and/or the closing of any of the Chapter 11 Cases, or to permit Sellers to determine any matter relating to its rights and obligations hereunder or any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities. Sellers will hold, and will use commercially reasonable efforts to cause their officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning Buyer or the Business provided to them pursuant to this Section 6(a). Without limiting the provisions of this Section 6(a), to the extent that Buyer or any Seller discovers any additional assets or properties which should have been transferred or assigned to Buyer as Acquired Assets but were not so transferred or assigned at Closing, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer without any adjustment to the Purchase Price and shall cooperate and execute and deliver all conveyances, assumptions, notices, releases, and other instruments as may be necessary to make effective the transactions contemplated by this Agreement. Without limiting the provisions of this Section 6(a), to the extent that Buyer or any Seller discovers any assets or properties which are an Excluded Asset that were inadvertently or otherwise mistakenly transferred or assigned to Buyer, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property back to Sellers.

(b)    Litigation Support. In the event and for so long as any Party actively is contesting or defending against any Litigation commenced with respect to (i) any transaction contemplated by this Agreement or any other Related Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act or transaction on or prior to the Closing Date involving the Business, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, make available its personnel and provide such testimony and access to its books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the affect of waiving, its attorney-client privilege with respect thereto. As a condition to the cooperation required pursuant to this Section 6(b), the Party to provide such cooperation or assistance (the "Assisting Party") may require the Party receiving such cooperation or assistance to enter into a non-disclosure agreement reasonably satisfactory in form and substance to the Assisting Party.

(c)    Availability of Records.

(i)    After the Closing Date, Buyer shall provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Acquired Assets for periods prior to the Closing and shall preserve such Records until the later of (A) six (6) years after the Closing Date, (B) the required retention period required by any United States Law, (C) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (D) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have

the right to retain originals or copies of all Records included in the Acquired Assets for periods prior to the Closing.  Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer will permit Sellers to retain such Records.  With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all commercially reasonable assistance that Sellers may request in connection with such Litigation or claim and shall make available to Sellers' personnel most knowledgeable about the matter in question.

(ii)    After the Closing Date until the latest of (A) six (6) years after the Closing Date, (B) the required retention period required by any United States Law, (C) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (D) the expiration of the applicable statute of limitations, Sellers shall (x) provide to Buyer and its Representatives (after reasonable notice and during normal business hours and without charge to Buyer) access to all Records relating to Taxes incurred by Sellers in connection with the Business, or otherwise relating to or affecting the Business (collectively, "Tax Records"), and (y) prior to destroying any Tax Records, notify Buyer thirty (30) days in advance of any such proposed destruction of their intent to destroy such Records, and Sellers will permit Buyer to retain a copy of such Tax Records.  Access contemplated in clause (x) in the immediately preceding sentence shall include access to any information in electronic form to the extent reasonably available.  With respect to any claims that are Assumed Liabilities, Sellers shall render all commercially reasonable assistance that Buyer may request in defending such claims.

(d)    Satisfaction of Excluded and Assumed Liabilities.  Buyer agrees to pay, perform and discharge the Assumed Liabilities as they become due and shall indemnify and hold Sellers harmless with respect to the Assumed Liabilities. Sellers agree to satisfy and hold Buyer harmless with respect to the Excluded Liabilities as required by the Bankruptcy Code.

(e)    Employee Matters.

(i)    Covered Employees.  Sellers and Buyer acknowledge and agree that Buyer is not obligated to hire any of the Covered Employees.  Nothing contained in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels, or prevent any change in the employee benefits provided to any individual employee of any Seller.  No provision of this Agreement shall create any third-party beneficiary rights in any employee of any Seller or former employee of any Seller or any other persons or entities (including any beneficiary or dependent thereof), in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.

(ii)    COBRA Liabilities. Sellers agree and acknowledge that Sellers will retain and will be solely liable for, to the extent required under COBRA, and that Buyer will not assume, any of the COBRA Liabilities.  Without limiting the foregoing, Sellers agree that Sellers will provide all benefits required under COBRA to any employees of any Seller, and that Sellers will continue after Closing to maintain a "group health plan" (within the meaning of Treasury Regulation 54.5980B-2) under which to provide such benefits.

(iii)     Limitations.  Buyer shall not have any obligation to extend offers of employment to any Covered Employee, or other service provider or employee of any Seller or any of its Affiliates or to enter or continue any employment or other service relationship with any such Covered Employee, service provider or employee.   Any employment opportunity offered by Buyer hereunder shall be subject to the terms so offered by Buyer in its sole discretion, and Buyer may reserve the right to terminate such employment in accordance with applicable Law.

(iv)     Seller Obligations.

(A)     Sellers shall be and remain solely liable for all wages, remuneration and other obligations and Liabilities, whether actual or contingent: (1) associated with any employee, officer or other service provider of any Seller or any Seller Affiliate (or any dependent thereof), including in connection with any termination of any such service relationship; and (2) that arise under or in connection with any Employee Benefit Plan at any time. Without limiting the generality of the foregoing, Buyer shall not, at any time, have any obligation or liability with regard to any severance, retention, employment, change-of-control, pension, retirement, equity or other plan, program, policy, obligation or agreement of or with any Seller or any of its Affiliates.

(B)     Sellers shall retain responsibility for and continue to pay all medical, life insurance, disability and other welfare plan expenses and benefits for each Covered Employee with respect to claims incurred by such Covered Employee or their covered dependents through the end of the month in which the Closing Date occurs.

(f)     Transfer Taxes.  Buyer shall pay (and shall indemnify and hold harmless Sellers and their directors, officers, employees, Affiliates, agents, partners, successors and permitted assigns against) any stamp, documentary, registration, transfer, added-value or similar tax (each a "Transfer Tax") imposed under applicable Law in connection with the transactions contemplated by this Agreement and the Related Agreements that are not eliminated through the application of Section 1146(a) of the Bankruptcy Code.  Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence. Buyer shall be responsible for filing such Tax Returns and remitting the Tax to the applicable taxing authority, including bearing any costs associated with preparing said returns.

(g)     Recording of Intellectual Property Assignments.  Buyer shall file and record all assignments of Acquired Intellectual Property with the appropriate Governmental Entities as promptly as practicable following the Closing.

(h)     Property and Other Taxes.   Subject to Section 6(f) hereof, Sellers shall be responsible for and shall promptly pay, in accordance with the Bankruptcy Code, all Taxes due and payable with respect to the Business or the Acquired Assets, including all Property Taxes, attributable to any Pre-Closing Tax Period.  Buyer shall be responsible for and shall promptly pay when due all such Taxes due and payable with respect to the Acquired Assets, including all

Property Taxes, attributable to any Post-Closing Tax Period.  All such Taxes, imposed (i) in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), or (ii) measured by income or receipts, and due and payable with respect to the Business or the Acquired Assets, as applicable, for the Straddle Period shall be apportioned between Buyer and Sellers based on an interim closing of the books method on the Closing Date, to the extent permitted by applicable Law.  All such Taxes, other than those described in the prior sentence, that are due and payable with respect to the Business or the Acquired Assets, as applicable, for the Straddle Period shall be apportioned between Buyer and Sellers based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period.  Sellers shall be liable for the proportionate amount of any applicable Taxes that are attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of any applicable Taxes that are attributable to the Post-Closing Tax Period.  Upon receipt of any bill for such Taxes, Buyer or Sellers, as applicable, shall present a statement to the other Party setting forth the amount of reimbursement to which each is entitled under this <u>Section 6(h)</u> together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by the Party owing it to the other Party within ten (10) days after delivery of such statement.  In the event that Buyer or Sellers make any payment for which it is entitled to reimbursement under this <u>Section 6(h)</u>, the applicable Party shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement to which the presenting Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.  Buyer and Sellers shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of all Tax Returns pursuant to this Agreement and any action, audit or other proceeding with respect to Taxes relating to the Business or the Acquired Assets, as applicable.  Such cooperation shall include the retention and provision of Records and information pursuant to <u>Section 6(a)</u> and <u>Section 6(c)</u> hereof and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Sellers shall use commercially reasonable efforts to cooperate with Buyer in connection with Buyer's efforts to obtain any Tax credits or Tax benefits that may be reasonably available to Buyer in connection with the transactions contemplated by this Agreement.

(i)    <u>Wage Reporting</u>.  Sellers agree to utilize, or cause their respective Affiliates to utilize, the alternate procedure set forth in Internal Revenue Service Revenue Procedure 2004-53, or any comparable procedure applicable in the Commonwealth of Puerto Rico, with respect to Covered Employee wage reporting for the year in which the Closing Date occurs.

(j)    <u>Use of Name</u>.  Sellers agree that, as of Closing, Sellers and their respective Affiliates shall cease any and all use, including in connection with the publication, copying, production, sale, distribution or other exploitation of any assets, of the "Caribbean Petroleum Corporation" name and any similar names which may give rise to a likelihood of confusion with "Caribbean Petroleum Corporation," together with the logo used by Sellers in connection therewith prior to Closing.  Sellers further agree that CPC will, within ten (10) Business Days of Closing, legally change its name with the Secretary of State of the State of Delaware and cease to be named "Caribbean Petroleum Corporation."  For the avoidance of doubt, nothing in this <u>Section 6(j)</u> shall be deemed to limit Sellers' and their respective Affiliates' right to use the name

"Caribbean Petroleum Corporation" in connection with filing Tax Returns or to describe the historical relationship between Sellers and CPC without suggesting a continuing affiliation with CPC.

      7.    <u>Conditions to Obligation to Close</u>.

      (a)    <u>Conditions to Buyer's Obligations</u>.  Buyer's obligation to consummate the transactions contemplated in this Agreement in connection with the Closing is subject to satisfaction or waiver of the following conditions:

      (i)    no order staying, reversing, modifying or amending the Bidding Procedures Order shall be in effect on the Closing Date;

      (ii)    the Bankruptcy Court shall have entered the Sale Order, such order shall be a Final Order and reasonably satisfactory to Buyer and Sellers and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

      (iii)    the Bankruptcy Court shall have entered the Rejection Order, such order shall be a Final Order, and no order staying, reversing, modifying or amending the Rejection Order shall be in effect on the Closing Date which has the effect of preventing Sellers from rejecting substantially all of the Franchise Agreements;

      (iv)    the representations and warranties set forth in <u>Section 3</u> shall be true and correct in all material respects (except where such representation or warranty is already qualified by materiality or similar standard, in which case such representation and warranty shall be true and correct in all respects) when made and at and as of the Closing Date as if made at and as of such time (in either case, except to the extent expressly made as of an earlier date, in which case as of such date as if made at, and as of, such date);

      (v)    Sellers shall have performed and complied with their covenants and agreements hereunder through the Closing in all material respects;

      (vi)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

      (vii)    the Acquired Assets shall be transferred, assigned, conveyed and delivered to Buyer free and clear of any and all Liens (other than Liens created by Buyer and the Permitted Liens);

      (viii)    Sellers shall have obtained any consent, approval, waiver, or order of, and made each filing or registration with, any Governmental Entity required in connection with the consummation by Sellers of the transactions contemplated by this Agreement, other than those the failure to have been obtained or made would not cause a Material Adverse Effect;

(ix)    each delivery contemplated by <u>Section 2(f)(i)</u> to be delivered to Buyer shall have been delivered;

(x)    since the date hereof, no event, occurrence, fact, condition, change, development or effect shall have occurred that, individually or in the aggregate, has had or resulted in or would reasonably be expected to have or result in a Material Adverse Effect on the Business or the Acquired Assets;

(xi)    the waiting period applicable to the transactions contemplated hereby under the HSR Act, if any, shall have expired, or early termination of the waiting period shall have been granted;

(xii)    Buyer shall have entered into an agreement with the United States government, reasonably acceptable to Buyer, with respect to Buyer's obligations in connection with any Environmental Claims related to the Acquired Assets following the Closing.  As one of the factors in the determination of what is reasonably acceptable, Buyer acknowledges and agrees that it accepts, and that any such agreement shall conform with, the cooperative owner expectations outlined in the letter from the United States Department of Justice to All Potential Buyers, dated December 9, 2010, and that such agreement shall be subject to the approval of the appropriate officials of the United States government; and

(xiii)    no Governmental Entity shall have filed any objection with the Bankruptcy Court with respect to the consummation of the transactions on the terms set forth in this Agreement that has not been withdrawn, resolved or otherwise disposed of and which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business or would reasonably be expected to prevent, restrict or delay the consummation of the transactions contemplated in this Agreement.

(b)    <u>Conditions to Sellers' Obligations</u>.    Sellers' obligation to consummate the transactions contemplated in this Agreement in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)    the representations and warranties set forth in <u>Section 4</u> shall be true and correct in all material respects (except where such representation or warranty is already qualified by materiality or similar standard, in which case such representation and warranty shall be true and correct in all respects) when made and at and as of the Closing Date as if made at and as of such time (in either case, except to the extent expressly made as of an earlier date, in which case as of such date as if made at, and as of, such date);

(ii)    Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(iii)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(iv)     each delivery contemplated by <u>Section 2(f)(ii)</u> to be delivered to Sellers shall have been delivered;

(v)     the Bankruptcy Court shall have entered the Sale Order, such order shall be a Final Order and reasonably satisfactory to Buyer and Sellers and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date; and

(vi)     the waiting period applicable to the transactions contemplated hereby under the HSR Act, if any, shall have expired, or early termination of the waiting period shall have been granted.

(c)     <u>No Frustration of Closing Conditions</u>.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the transactions contemplated in this Agreement set forth in <u>Section 7(a)</u> or <u>Section 7(b)</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts (or, where applicable, commercially reasonable efforts) to satisfy the conditions to the consummation of the transactions contemplated in this Agreement or other breach of a representation, warranty or covenant hereunder.

8.     <u>Termination</u>.

(a)     <u>Termination of Agreement</u>.   This Agreement may be terminated and the transactions contemplated in this Agreement abandoned at any time prior to the Closing:

(i)     by mutual written consent of Sellers and Buyer;

(ii)     by Buyer, if any of the conditions to the obligations of Buyer set forth in <u>Section 7(a)</u> shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(iii)     by Sellers, if any condition to the obligations of Sellers set forth in <u>Section 7(b)</u> shall have become incapable of fulfillment other than as a result of a breach by any Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(iv)     by Buyer, if there shall be a breach by any Seller of any representation, warranty, covenant or agreement of such Seller contained in this Agreement which would result in a failure of a condition set forth in <u>Section 7(a)</u>, and which breach has not been cured within seven (7) Business Days after the giving of written notice by Buyer to Sellers of such breach;

(v)     by Sellers, if there shall be a breach by Buyer of any representation, warranty, covenant or agreement of Buyer contained in this Agreement which would result in a failure of a condition set forth in <u>Section 7(b)</u>, and which breach has not been cured within seven (7) Business Days after the giving of written notice by Sellers to Buyer of such breach;

(vi)     by Buyer or Sellers, upon the entry by Sellers into a definitive agreement (prior to the entry of the Sale Order) with respect to a Competing Transaction;

(vii)    by Buyer or Sellers, if there shall be in effect a nonappealable Decree of a Governmental Entity of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, or the Bankruptcy Court or another court of competent jurisdiction shall stay the Sale Order;

(viii)   by Buyer, if the Sale Order is not entered by March 31, 2011; or

(ix)     by Buyer or Sellers, as applicable, on any date that is after the Drop Dead Date if the Closing shall not have occurred on or before such Drop Dead Date; provided, however, that Buyer or Sellers, as applicable, shall not have the right to terminate this Agreement under this Section 8(a)(ix) if the Closing has not occurred on or before the Drop Dead Date because of such Party's material failure to fulfill any of its obligations under this Agreement.

For the avoidance of doubt, any conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code and/or the appointment of a trustee under Chapter 11 or Chapter 7 of the Bankruptcy Code shall not effect a termination of this Agreement by Buyer, Sellers, or any such trustee so appointed or diminish Buyer's obligations hereunder, and this Agreement shall remain enforceable against Buyer by any such Chapter 11 or Chapter 7 trustee and binding upon any such Chapter 11 or Chapter 7 Trustee.

(b)     Procedure Upon Termination.  In the event of termination by Buyer or Sellers, or both, pursuant to Section 8(a), written notice thereof shall forthwith be given to the other Party, and this Agreement shall terminate and the purchase of the Acquired Assets hereunder shall be abandoned, without further action by Buyer or Sellers.  If this Agreement is terminated as provided herein, then each Party shall redeliver all documents, work papers and other material of any other Party relating to the transactions contemplated in this Agreement, whether so obtained before or after the execution hereof, to the Party furnishing the same.

(c)     Effect of Termination.

(i)      If any Party terminates this Agreement pursuant to Section 8(a), then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Section 1 (Definitions), Section 2(d)(ii) (Consideration), Section 9 (Miscellaneous), and this Section 8 (Termination) shall survive any such termination in accordance with their terms), and no Party shall have any liability to any other Party hereunder except as expressly set forth in this Section 8 or Section 2(d)(ii); provided, that no such termination shall relieve any of the Parties of any liability for an intentional breach of this Agreement or be deemed to constitute a waiver of any available remedy (including specific performance if available) for any such breach.

(ii)     If Sellers terminate this Agreement pursuant to Section 8(a)(iii) (solely with respect to Sections 7(b)(i), (ii), (iv) and (vi)) or Sections 8(a)(v) or 8(a)(ix), or if

Buyer terminates this Agreement pursuant to Section 8(a)(ii) (solely with respect to Section 7(a)(xi)), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Sellers.

(iii)    If this Agreement is terminated (1) by Buyer pursuant to Sections 8(a)(ii) (other than with respect to Section 7(a)(xi)), 8(a)(iv), 8(a)(vi), 8(a)(vii), 8(a)(viii) or 8(a)(ix), (2) by Sellers pursuant to Sections 8(a)(iii) (solely with respect to Sections 7(b)(iii) and 7(b)(v)), 8(a)(vi) or 8(a)(vii) or (3) by both Parties pursuant to Section 8(a)(i), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Buyer.

(iv)    If this Agreement is terminated in accordance with Section 8(a), (A) the Confidentiality Agreement shall survive such termination, and nothing in Section 8(b) or in this Section 8(c) shall relieve Buyer or Sellers of their respective obligations under the Confidentiality Agreement, and (B) Buyer agrees that all prohibitions in the Confidentiality Agreement shall be extended to a period of three (3) years from the date of such termination.

9.    Miscellaneous.

(a)    Expenses.  Except as otherwise provided in this Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.  Buyer shall be responsible for any HSR Act filing fees.

(b)    Entire Agreement.  This Agreement, the other Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(c)    Incorporation of Schedules and Exhibits.  The Schedules, Annexes and Exhibits to this Agreement are incorporated herein by reference and made a part hereof.

(d)    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any

rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9(d). Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

(e)    Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns, including any trustee appointed in the Chapter 11 Cases or any subsequent Chapter 7 case. For the avoidance of doubt, Buyer is not a successor to any Seller or any of their respective bankruptcy estates and the sale of the Acquired Assets shall not amount to a consolidation, merger or de facto merger of Buyer with or into any Seller. The sale of the Acquired Assets to Buyer is not being undertaken for the purpose of escaping liability for any of Sellers' debts or hindering, delaying or defrauding creditors under the Bankruptcy Code or under any applicable Laws. No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other Parties, provided, however, that Sellers' consent shall not be unreasonably withheld in connection with any assignment by Buyer of all or any part of its rights, interests or obligations hereunder to one or more wholly owned Subsidiaries or Affiliates of Buyer, provided, that (i) Buyer shall remain fully liable for any and all for its obligations hereunder notwithstanding such assignment, and (ii) with respect to any assignments to any Affiliate of Buyer, such assignment would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by this Agreement or any Related Agreement.

(f)    Notices.    All notices, requests, demands, claims and other communications hereunder will be in writing (including electronic and facsimile transmission) and shall be given,

If to Sellers:

>
> Caribbean Petroleum Corporation
> c/o FTI Consulting, Inc.
> 3 Times Square
> 11th Floor
> New York, NY 10036
> Attn: Roy Messing
> Telephone:    212.499.3677
> Facsimile:    212. 499.3636

with a copy (which shall not constitute notice) to:

>
> Cadwalader, Wickersham & Taft LLP
> One World Financial Center

New York, New York  10281
Attention:      George A. Davis / Zachary H. Smith
Telephone: 212.504.6000
Facsimile:      212.504.6666

If to Buyer:

Puma Energy Puerto Rico
P.O. Box 11929
San Juan, Puerto Rico  00922
Attention:  Victor M. Dominguez
Telephone:      787.679.7350
Facsimile:      787.679-7385

with a copy (which shall not constitute notice) to:

Fuentes Law Offices
P.O. Box 9022726
San Juan, Puerto Rico  00902-2726
Attention:  Alex Fuentes
Telephone:      787.919.7788
Facsimile:      787.722.5206

and

Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas  75201
Attention:  Clifton R. Jessup, Jr.
Telephone:      214.665.3638
Facsimile:      214.665.5938

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m., local time, in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9(f).

(g)      Governing Law; Jurisdiction.  This Agreement shall in all aspects be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, the other Related Agreements or

the transactions contemplated hereby or thereby, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court or if the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Agreement, the other Related Agreements or the transactions contemplated hereby or thereby, such matter shall be brought in the courts in the Court of Chancery for the State of Delaware in and for New Castle County (the "Chancery Court"), and in the event that the Chancery Court does not have subject matter jurisdiction as to a matter arising out of or relating to this Agreement, in any state or federal court of the State of Delaware located in New Castle County.  Each of the Parties hereto agrees that any action instituted by it arising out of or relating to this Agreement will be instituted exclusively in one of the above specified courts.  Each Party waives any defense of inconvenient forum to the maintenance of any dispute or action so brought, consents to service of process by mail and waives any objection to venue in any such court.  Each party agrees that a final judgment in any dispute or action so brought will be conclusive and may be enforced by dispute or action on the judgment or in any other manner provided at law (common, statutory or other) or in equity.

(h)    Consent to Service of Process.  Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9(f).

(i)    WAIVERS OF JURY TRIAL.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.

(j)    Specific Performance.  Each Party acknowledges that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party hereto shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 9(j) shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(k)    Severability.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

(l)    No Survival of Representations and Warranties.  None of Sellers' or Buyer's respective representations or warranties in this Agreement shall survive the Closing.

(m)    Survival of Covenants and Agreements.  All covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided,

that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

(n)     <u>No Third Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns. For avoidance of doubt, and without limitation, the Parties acknowledge and agree that all provisions contained in <u>Section 6(e)</u> of this Agreement with respect to employees are included for the sole benefit of the respective Parties and shall not create any right (i) in any other Person, including any employees, former employees, any participant in any Employee Benefit Plan or any beneficiary thereof or (ii) to continued employment with Sellers or Buyer.

(o)     <u>Construction</u>.

(i)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.  The words "<u>including</u>" and "<u>include</u>" and other words of similar import will be deemed to be followed by the phrase "without limitation."  The words "<u>herein</u>," "<u>hereto</u>" and "<u>hereby</u>," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement.  References to Articles, Sections, clauses, subclauses, subparagraphs, Annexes and Exhibits herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Annexes and Exhibits of this Agreement.  The word "if" and other words of similar import will be deemed to be followed by the phrase "and only if."  Any reference herein to law or to a law, statute, rule or regulation of any Governmental Entity (or any provision thereof) shall include all laws and such law, statute, rule or regulation promulgated thereunder (or provision thereof), including any successor thereto, as it may be amended from time to time.  Any reference herein to "<u>dollars</u>" or "<u>$</u>" shall mean United States dollars.

(ii)     The Disclosure Schedules are hereby incorporated by reference.

(p)     <u>Computation of Time</u>.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.  If the final date of any period which is set out in any provision of this Agreement or the Closing Date falls on a day which is not a Business Day, then the time of such period or the Closing Date, as the case may be, shall be extended to the next Business Day.

(q)     <u>Mutual Drafting</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

(r)    <u>Headings; Table of Contents</u>.    The Section headings and the table of contents contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(s)    <u>Counterparts; Facsimile or Email Signatures</u>.    This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.    This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies or pdf, each of which shall be deemed an original.

(t)    <u>Time of Essence</u>.    Time is of the essence of this Agreement.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**CARIBBEAN PETROLEUM CORPORATION**

By: _____
Name: Roy Messing
Title: Restructuring Officer

**CARIBBEAN PETROLEUM REFINING L.P.**

By: _____

Name: Roy Messing
Title: Restructuring Officer

**GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION**

By: _____

Name: Roy Messing
Title: Restructuring Officer

*Signature page to Asset Purchase Agreement*

**PUMA ENERGY INTERNATIONAL B.V.**

By: _____

    Name: ROBERT JONES

    Title: HEAD OF STRATEGY + INVESTMENTS

**Exhibit A**

Bidding Procedures

<u>EXHIBIT A</u>

<b><u>BIDDING PROCEDURES</u></b>

Set forth below are the bidding procedures (the "<u>Bidding Procedures</u>") to be employed in connection with the sale of the Assets (as defined below) of Caribbean Petroleum Corporation ("<u>CPC</u>") and certain of its affiliates that are debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the jointly administered cases (the "<u>Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") pending in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") (Case No. 10-12553 (KG)). Pursuant to the Bidding Procedures, the Debtors shall solicit bids for the purchase of the Assets, conduct an auction for the Assets (the "<u>Auction</u>") if the Debtors receive two or more Qualified Bids (as defined below), and thereafter, seek entry of an order (the "<u>Sale Order</u>"), after notice and a hearing (the "<u>Sale Approval Hearing</u>"), authorizing and approving the sale of the Assets to the Successful Bidder(s) (as defined below).

On August 12, 2010, the Debtors filed with the Bankruptcy Court the "Motion of Debtors for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Authorizing Entry into Stalking Horse Agreements and Approving Stalking Horse Protections, (C) Approving Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Scheduling Auction and Sale Approval Hearing, (E) Approving the Form and Manner of the Sale Notice, and (F) Granting Certain Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief" (the "<u>Sale Motion</u>"). On [•], the Bankruptcy Court entered an order approving the Bidding Procedures and scheduling **December 22, 2010 at 9:30 a.m. (prevailing Eastern Time)** as the date and time that the Sale Approval Hearing will be held.

**A.**     **<u>Assets to be Sold</u>**

The Debtors seek to sell substantially all of their assets, including, without limitation, all equipment, machinery, inventory, supplies, real property, software, intellectual property, cash and accounts receivable (such assets, the "<u>Assets</u>"). Except as otherwise provided in definitive documentation with respect to any sale of the Assets, all of the Debtors' rights, title and interest in and to the Assets shall be sold free and clear of all liens, claims, encumbrances, rights, remedies, restrictions, pledges, interests, liabilities, charges, options and contractual commitments of any kind or nature whatsoever, whether arising before or after the date that the Debtors filed the Cases in the Bankruptcy Court, whether at law or in equity, in accordance with section 363 of the Bankruptcy Code.

**B.**     **<u>Bid Deadline</u>**

Any entity wanting to participate in the Auction (a "<u>Potential Bidder</u>") must submit a Qualified Bid (as defined below) in writing to (i) Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281, Attention: George A. Davis and Zachary H. Smith, counsel for the Debtors, (ii) Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899, Attention: Mark Chehi,

counsel for Banco Popular de Puerto Rico (the "<u>Prepetition Secured Lender</u>"), (iii) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attention: Lorenzo Marinuzzi, proposed counsel for the statutory committee of unsecured creditors appointed in the Cases (the "<u>Creditors' Committee</u>"), and (iv) Pension Benefit Guaranty Corporation, 1200 K Street, NW, Washington, D.C. 20005, Attention: C. Wayne Owen, Jr., **so as to be actually received on or before December 10, 2010 at 5:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>"), which deadline may be extended by the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee. No bids submitted after the Bid Deadline shall be considered by the Debtors.

### C.    <u>Bid Requirements</u>

Only bids for the Assets that constitute "Qualified Bids" will be considered by the Debtors. A "<u>Qualified Bid</u>" is an offer to purchase the Assets that: (i) identifies the Assets to be purchased and the consideration to be paid for such Assets, (ii) identifies any proposed revisions to the Stalking Horse Agreement (as defined below), if any, or the form of asset purchase agreement provided by the Debtors (the "<u>Form APA</u>"), (iii) identifies the Potential Bidder and the officer(s) or authorized agent(s) who will appear on behalf of such Potential Bidder, (iv) provides evidence, satisfactory to the Debtors in their reasonable discretion, in consultation with the Prepetition Secured Lender and the Creditors' Committee, of the Potential Bidder's financial wherewithal and operational ability to consummate the proposed transaction, (v) provides that such offer is not subject to any due diligence or financing contingency or further board or similar approval, (vi) provides for a good faith deposit (a "<u>Good Faith Deposit</u>") to be submitted to the Debtors on or before the Bid Deadline in an amount equal to not less than five percent (5%) of the proposed purchase price, (vii) identifies any executory contracts ("<u>Contracts</u>") or unexpired leases ("<u>Leases</u>") to be assumed and assigned in connection with the proposed purchase of the Assets and provides evidence of the Potential Bidder's ability to provide adequate assurance of future performance under such Contracts and Leases, (viii) provides that such offer is irrevocable until the later of (a) consummation of a transaction involving any other Potential Bidder for the same Assets and (b) the first business day that is thirty (30) days after the conclusion of the Sale Approval Hearing, (ix) includes a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to submit an offer to purchase the Assets on the terms proposed by such Potential Bidder, (x) contains the form of order approving the proposed transaction that the Potential Bidder would request the Debtors to submit to the Bankruptcy Court, and (xi) states whether or not the Potential Bidder intends to assume all or any part of the CAPECO Puerto Rican Pension Plan sponsored by CPC (the "<u>Pension Plan</u>").

In order to facilitate the preparation and submission of bids for the Assets, the Debtors will file the Stalking Horse Agreement (as defined below) (or the Form APA, if no Stalking Horse Bidder (as defined below) is selected), and a form Sale Order, with the Bankruptcy Court on or before November 10, 2010. Upon request, the Debtors will provide copies of such documents to any Potential Bidder. The Debtors may, in their business judgment, communicate with any Potential Bidder and may request any additional information reasonably required in connection with the evaluation of any such Potential Bidder or bid submitted by such Potential Bidder.

As soon as practicable after a Potential Bidder submits a bid, the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee, will determine whether such bid is a Qualified Bid and will notify such Potential Bidder of such determination. The Debtors reserve the right to consider bids for the Assets that do not conform to one or more of the requirements specified in this "Bid Requirements" section, and, in consultation with the Prepetition Secured Lender and the Creditors' Committee, may deem such bids to be Qualified Bids notwithstanding such requirements.  The Debtors may aggregate separate bids from unaffiliated Potential Bidders to create one Qualified Bid, provided, however, that all such Potential Bidders shall remain subject to the provisions of section 363(n) of the Bankruptcy Code regarding collusive bidding.

**D.      Stalking Horse Bid**

On or before **November 10, 2010**, the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee, intend to enter into a "stalking horse" agreement (a "Stalking Horse Agreement") with one or more Potential Bidders (the "Stalking Horse Bidder(s)") for the purpose of establishing a minimum acceptable bid (the "Stalking Horse Bid").  Any Stalking Horse Bid shall be deemed a Qualified Bid for purposes of these Bidding Procedures.

**E.      Stalking Horse Protections**

1.      Break-Up Fee

The Debtors may, with the consent of the Prepetition Secured Lender and the Creditors' Committee and subject to Section E.3 below, provide the Stalking Horse Bidder(s) with a break-up fee in the event that such Stalking Horse Bidder(s) is not determined to be the Successful Bidder (the "Break-Up Fee") of up to two percent (2%) of the guaranteed cash purchase price proposed in the Stalking Horse Bid without further approval of the Bankruptcy Court, provided, however, that such Stalking Horse Bidder is not in default, has not previously terminated its bid, and is not an "insider" of the Debtors, as such term is defined in section 101(31) of the Bankruptcy Code.

2.      Expense Reimbursement

The Debtors may, with the consent of the Prepetition Secured Lender and the Creditors' Committee and subject to Section E.3 below, reimburse the Stalking Horse Bidder(s) for all reasonable and actual costs and expenses incurred by such Stalking Horse Bidder(s) in connection with its bid (the "Expense Reimbursement", and together with the Break-Up Fee, the "Stalking Horse Protections") up to an amount equal to $300,000 without further approval of the Bankruptcy Court, provided, however, that such Stalking Horse Bidder is not in default, has not previously terminated its bid, is not determined to be the Successful Bidder, and is not an "insider" of the Debtors, as such term is defined in section 101(31) of the Bankruptcy Code.

3.      Further Bankruptcy Court Approval Required

In the event that the Debtors enter into a Stalking Horse Agreement with the consent of the Prepetition Secured Lender and the Creditors' Committee, the Debtors shall

(i) promptly file with the Bankruptcy Court (a) a notice that includes a copy of such Stalking Horse Agreement and (b) such documentation in support of such Stalking Horse Agreement and the Stalking Horse Protections provided thereunder, as may be necessary and appropriate, and (ii) provide a copy of such Stalking Horse Agreement to any Potential Bidder and the Office of the United States Trustee for the District of Delaware (the "<u>United States Trustee</u>") upon request. If no objection or response to the provision of the Stalking Horse Protections to the Stalking Horse Bidder(s) is received by the Debtors on or before the 10th day following the filing of the Stalking Horse Agreement with the Bankruptcy Court, the proposed Stalking Horse Protections to be provided to such Stalking Horse Bidder(s) (which amounts may not exceed the Break-Up Fee or Expense Reimbursement set forth above) shall be deemed approved by the Bankruptcy Court and the Debtors shall be authorized to provide such Stalking Horse Bidder(s) with the Stalking Horse Protections without further order of the Bankruptcy Court.

Absent the consent of the Prepetition Secured Lender and the Creditors' Committee, the Debtors will be required by expedited notice and motion to seek approval by the Bankruptcy Court of the selection of the Stalking Horse Bidder(s) and/or the provision of the Stalking Horse Protections to such Stalking Horse Bidder(s).

**F.    Due Diligence**

Through and including the Bid Deadline, the Debtors will afford Potential Bidders the opportunity to conduct a due diligence investigation regarding the Assets in the manner determined by the Debtors, in their business judgment, to be reasonable and appropriate.  The Debtors shall not be obligated to furnish access to any information of any kind whatsoever regarding the Assets after the Bid Deadline.

Upon request, the Debtors will provide each Potential Bidder with a copy of these Bidding Procedures and a form Sale Order, together with a copy of the Stalking Horse Agreement (or the Form APA, if no Stalking Horse Bidder is selected).  Should any Potential Bidder desire additional or further information, such Potential Bidder will be required to execute a confidentiality agreement in form and substance satisfactory to the Debtors and the Prepetition Secured Lender in their business judgment and on terms that are not more favorable to such Potential Bidder than the confidentiality agreement executed by the Stalking Horse Bidder, if any.  Upon execution of such confidentiality agreement, the respective Potential Bidder will be given access (through a virtual data room, site inspections or otherwise) to various financial data and other relevant and confidential information.  The Debtors will designate an employee or other representative to coordinate all requests for additional information or access from Potential Bidders.  The Debtors may, in their discretion, coordinate due diligence investigations such that multiple Potential Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.  The Debtors shall not be obligated to furnish access to any such information to any entity that does not execute a confidentiality agreement in form and substance satisfactory to the Debtors and the Prepetition Secured Lender in their business judgment.  In any event, the Stalking Horse Bidder shall be provided prompt access to all due diligence materials, management presentations, site inspections and other information provided to Potential Bidders that were not previously made available to the Stalking Horse Bidder.

G.     **Credit Bid**

On or before the Bid Deadline, the Prepetition Secured Lender may submit a credit bid for some or all of the Assets to the fullest extent permitted under section 363(k) of the Bankruptcy Code.

H.     **The Auction**

If two or more Qualified Bids are received on or before the Bid Deadline, the Debtors shall conduct the Auction commencing on **December 13, 2010 at 10:00 a.m. (prevailing Eastern Time),** at the offices of Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281, to determine the highest or otherwise best bid for the Assets (the "<u>Successful Bid</u>").  The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction.  The Debtors reserve the right to cancel the Auction if two or more Qualified Bids are not received as of the Bid Deadline.

I.     **Auction Procedures**

Only an entity that has submitted a Qualified Bid (a "<u>Qualified Bidder</u>"), the Prepetition Secured Lender, the United States Trustee, the Creditors' Committee, and such entities' respective advisors are eligible to participate in the Auction.  All participants shall appear in person, by telephone, or through a duly authorized representative.  Prior to the Auction, the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee, shall select one or more Qualified Bids that, in their business judgment, reflects the highest or otherwise best value for the Debtors' estates as the starting bid(s) (the "<u>Starting Auction Bid(s)</u>") and advise all participants in the Auction of the terms of the Starting Auction Bid(s).  Qualified Bidders may then submit bids that are better and higher than the Starting Auction Bid in an initial increment amount equal to the amount of the Stalking Horse Protections plus $250,000 and subsequent increments of at least $100,000 (collectively, the "<u>Overbid Increments</u>").  The Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee, shall determine whether any Qualified Bid, or any combination of Qualified Bids, is the Successful Bid pursuant to the "Determination of Successful Bid" section below.

As soon as practicable following the determination of the Successful Bid, the Debtors shall file a notice with the Bankruptcy Court identifying the Qualified Bidder(s) that submitted the Successful Bid (the "<u>Successful Bidder</u>") and serve such notice by telecopy, electronic mail transmission, or overnight delivery, upon the following entities:  (i) the United States Trustee, (ii) counsel to the Prepetition Secured Lender, (iii) counsel to the Creditors' Committee, (iv) the United States Environmental Protection Agency, (v) all other parties that have filed notices of appearance in the Cases, (vi) all Qualified Bidders; and (vii) all non-Debtor counterparties to the Contracts and Leases proposed to be assumed and assigned under the Successful Bid.

The Debtors may adjourn, continue, re-open or terminate the Auction, subject to any required approval of the Bankruptcy Court, and reserve the right to adopt other and further rules and procedures for the Auction that, in their business judgment, in consultation with the

Prepetition Secured Lender and the Creditors' Committee, will better promote the goals of the Auction.

### J.  Determination of Successful Bid

As soon as practicable following the Bid Deadline (if only one Qualified Bid is submitted) or the Auction (if two or more Qualified Bids are submitted), the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee, shall review each Qualified Bid that has been submitted and determine, in the Debtors' reasonable discretion and in consultation with the Prepetition Secured Lender and the Creditors' Committee, whether any Qualified Bid, or any combination of Qualified Bids, is the Successful Bid.  In making such determination, the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee, shall consider any factor that they deem relevant, including, without limitation, the purchase price, whether the Qualified Bid proposes to purchase less than all of the Assets, the payment of any Break-Up Fee or Expense Reimbursement, any benefit to the Debtors' estates from any proposal to assume liabilities of the Debtors, including any liabilities under the Pension Plan, and those factors affecting the speed and certainty of consummating the sale of the Assets.  The Debtors may, in consultation with the Prepetition Secured Lender and the Creditors' Committee, determine in their reasonable discretion that the Successful Bid consist of one or more Qualified Bids that do not propose to purchase all or substantially all of the Assets.

As soon as practicable following notification of the determination of the Successful Bid, but in no event later than the first business day after the 3rd day following such notification, the Successful Bidder(s) must execute a definitive agreement to purchase the Assets (an "Asset Purchase Agreement"), to the extent not previously executed, in all respects acceptable to the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee, and consistent with such Successful Bidder's proposed revisions to the Stalking Horse Agreement, if any, or the Form APA, unless otherwise agreed to by the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee.

The presentation of the Successful Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of such bid.  The Debtors will be deemed to have accepted the Successful Bid only when such bid has been approved by the Bankruptcy Court pursuant to the Sale Order and the sale of the Assets proposed in such bid has been consummated.

### K.  Back-Up Bid

The Successful Bidder(s) shall be required to consummate the purchase of the Assets by **11:59 p.m. (prevailing Eastern Time) on February 8, 2011**, subject to extension by the Debtors, with the express consent of the Prepetition Secured Lender and the Creditors' Committee.  If the Successful Bidder(s) fails to timely consummate the purchase of the Assets, or any part thereof, then the next highest or otherwise best Qualified Bid (if any) (the "Back-up Bid") may be designated by the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee, as the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale of the Assets to the Qualified Bidder that submitted the Back-Up Bid pursuant to the terms of such Back-Up Bid as soon as is commercially reasonable.  If the Successful Bidder(s) fails to consummate the purchase of the Assets because of a breach, default

or failure to perform on the part of such Successful Bidder(s), the Debtors reserve the right to seek all available damages from such Successful Bidder(s).

### L.    Reservation of Rights

1.    Determination of Successful Bid

The Debtors reserve the right to (i) determine in their reasonable discretion, in consultation with the Prepetition Secured Lender and the Creditors' Committee, whether any Qualified Bid(s) is a Successful Bid and (ii) reject, at any time prior to entry of the Sale Order by the Bankruptcy Court, without liability, any bid that the Debtors, in their reasonable discretion, in consultation with the Prepetition Secured Lender and the Creditors' Committee, determine to be (a) inadequate or insufficient, (b) not in conformity with the Bidding Procedures, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, or (c) contrary to the best interests of the Debtors and their estates.

At or before the Sale Approval Hearing, the Debtors may impose such other terms and conditions on the sale of the Assets as the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee, may determine to be in the best interests of the Debtors and their estates.

2.    Modification of Bidding Procedures

The Debtors reserve the right to modify the Bidding Procedures, in consultation with the Prepetition Secured Lender and the Creditors' Committee, without the need for any further order of the Bankruptcy Court, including, without limitation, (i) extending the deadlines set forth in the Bidding Procedures, (ii) adjourning the Auction and the Sale Approval Hearing, and (iii) withdrawing any Assets from the sale process at any time prior to or during the Auction.

### M.    Disposition of Good Faith Deposits

All Good Faith Deposits shall be held in a separate interest-bearing escrow account for the benefit of the Debtors. As soon as practicable following the consummation of the sale of the Assets, any Good Faith Deposit received from a Qualified Bidder who is not determined to be the Successful Bidder shall be released from escrow and returned to such Qualified Bidder. If the Successful Bidder fails to consummate the purchase of the Assets, or any part thereof, because of a breach, default or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of the Debtors without affecting or reducing any of the Debtors' other rights or claims against such Successful Bidder. If a Successful Bidder fails to consummate the purchase of the Assets, or any part thereof, because of a breach, default or failure to perform on the part of the Debtors, the Good Faith Deposit deposited by such Successful Bidder shall be returned to such Successful Bidder. If a Successful Bidder consummates the purchase of the Assets, the Good Faith Deposit deposited by such Successful Bidder shall be applied as a credit toward the purchase price for the Assets.

**N.**     **As Is, Where Is**

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their estates, or their agents or representatives.  Except as otherwise expressly provided in these Bidding Procedures, any applicable Stalking Horse Agreement, or any applicable Asset Purchase Agreement, by submitting a bid, each Potential Bidder that submits a bid shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Assets prior to making its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith.

**O.**     **Sale Approval Hearing**

The sale of the Assets and applicable Asset Purchase Agreement shall be presented for authorization and approval by the Bankruptcy Court at the Sale Approval Hearing, which is scheduled to be held on **December 22, 2010 at 9:30 a.m. (prevailing Eastern Time)** at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801, before the Honorable Kevin Gross, United States Bankruptcy Judge.  The Sale Approval Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Approval Hearing.

**P.**     **Jurisdiction**

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the sale of the Assets, the Bidding Procedures, Stalking Horse Agreements, any applicable Asset Purchase Agreement, and any other matter that in any way relates to the foregoing.  All entities that submit a bid for the purchase of the Assets shall be deemed to have consented to the core jurisdiction of, and venue in, the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes relating to the sale of the Assets, the Bidding Procedures, Stalking Horse Agreements, any applicable Asset Purchase Agreement, and any other matter that in any way relates to the foregoing.

**Exhibit B**

Form of Sale Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------------x

In re                        :    Chapter 11

                               :

CARIBBEAN PETROLEUM CORP., et al.,[1]   :    Case No. 10-12553 (KG)

                               :

           Debtors.            :    Jointly Administered

                               :    Re: Docket Nos. 9, 53, 54, 127, 149, 152,

                                   155, 161, 165, 205, 243, 256, 288, 293, 304,

                               :    312, 317, 326, 331, 343, 350, 360, 399, 400,

-------------------------------------------------------------------------x    406, 411, 416, 417, 419, 425, 453

## ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; AND (III) GRANTING CERTAIN RELATED RELIEF

Upon the motion, dated August 12, 2010 [D.I. 9] (the "Motion"), of Caribbean

Petroleum Corporation, Caribbean Petroleum Refining L.P., and Gulf Petroleum Refining

(Puerto Rico) Corporation, as debtors and debtors in possession in the above-captioned chapter

11 cases (collectively, the "Debtors"), pursuant to sections 105, 363 and 365 of chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 6006 and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and

6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "Local Rules"), seeking entry of an order, among other

things, (i) authorizing the Debtors to sell substantially all of their assets free and clear of all liens,

---

[1] The Debtors in these chapter 11 cases (along with the last four digits of each Debtor's federal tax identification number) are: Caribbean Petroleum Corporation (7836), Caribbean Petroleum Refining L.P. (1421), and Gulf Petroleum Refining (Puerto Rico) Corporation (1417). The service address for all Debtors is: PO Box 361988, San Juan, Puerto Rico 00936.

claims, encumbrances and other interests to Puma Energy International B.V. (the "Buyer")
pursuant to the terms and conditions of that certain Asset Purchase Agreement, dated December
17, 2010, attached hereto as Exhibit 1 (the "Agreement");[2] (ii) authorizing the assumption and
assignment of certain executory contracts and unexpired leases in connection therewith; and
(iii) granting certain related relief, all as more fully described in the Motion and the Agreement;
and the Court having entered an order on September 10, 2010 [D.I. 149] (the "Bidding
Procedures Order") (i) approving procedures (the "Bidding Procedures") for (a) submitting bids
for the purchase of substantially all of the Debtors' assets, and (b) conducting an auction for the
Debtors' assets (the "Auction"); (ii) authorizing the Debtors to (a) enter into a stalking horse
agreement for the purpose of establishing a minimum acceptable bid for the Debtors' assets, and
(b) provide any stalking horse bidder with a break-up fee and expense reimbursement; and
(iii) approving procedures for the assumption and assignment of certain executory contracts and
unexpired leases in connection with the sale of the Debtors' assets; and the Court having entered
an order on December 2, 2010 [D.I. 399] and a related Memorandum Opinion on December 8,
2010 [D.I. 416] (collectively, the "Rejection Order") approving the conditional rejection of
certain executory contracts; and a hearing having been held to consider the relief requested in the
Motion (the "Sale Approval Hearing"); and upon the record of the Sale Approval Hearing and all
of the proceedings had before the Court; and the Court having found and determined that the
relief requested in the Motion is in the best interests of the Debtors, their estates and creditors,
and all parties in interest and that the legal and factual bases set forth in the Motion and at the
Sale Approval Hearing establish just cause for the relief granted herein; and after due
deliberation and sufficient cause appearing therefor:

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the
Agreement.

2

**THE COURT HEREBY FINDS THAT:**[3]

### Jurisdiction and Venue

A.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district and this Court under 28 U.S.C. §§ 1408 and 1409.

### Statutory Predicates

B.     The statutory predicates for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.

### Final Order

C.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order and that waiver of any applicable waiting period is appropriate, and expressly directs entry of judgment as set forth herein.

### Compliance with Bidding Procedures Order

D.     As demonstrated by (i) the testimony and other evidence proffered or introduced at the Sale Approval Hearing and (ii) the representations of counsel made on the record at the Sale Approval Hearing, the Debtors have thoroughly and fairly marketed the Acquired Assets and conducted the related sale process in good faith and in compliance in all

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

respects with the Bidding Procedures and the Bidding Procedures Order.  All interested persons and entities have been afforded a full, fair and reasonable opportunity to (i) conduct due diligence investigations, (ii) submit bids and to submit higher or otherwise better bids to purchase the Acquired Assets, and (iii) object or be heard with respect to the Motion and the relief granted by this Order.  The Bidding Procedures were non-collusive, in good faith, substantially and procedurally fair to all parties, and obtained the highest value for the Acquired Assets for the Debtors, their creditors and their estates.

       E.     The Auction was held on December 16, 2010 and December 17, 2010. The Debtors did not select a Stalking Horse Bidder (as defined in the Bidding Procedures) for the Acquired Assets.  Prior to the Auction, and in accordance with the Bidding Procedures, the Debtors determined that the initial bid submitted by the Buyer was a Qualified Bid (as defined in the Bidding Procedures), and that a revised bid submitted by the Buyer, as reflected on the record of the Auction, was the Starting Auction Bid (as defined in the Bidding Procedures).  In accordance with the Bidding Procedures, the Debtors, in consultation with Banco Popular de Puerto Rico ("Banco Popular") and the Official Committee of Unsecured Creditors (the "Creditors' Committee"), determined that a further revised bid submitted by the Buyer, reflected on the record of the Auction and memorialized by the Agreement, is the Successful Bid (as defined in the Bidding Procedures).

**Notice**

       F.     As evidenced by the affidavits of service and publication previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Approval Hearing, the sale of the Acquired Assets (the "Sale"), and the assumption and assignment of the Assumed Contracts has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, all applicable

Local Rules, and in compliance with the Bidding Procedures Order.  Such notice was good, sufficient and appropriate under the particular circumstances, and no other or further notice of the Motion, the Auction, Sale Approval Hearing, the Sale, assumption and assignment of the Assumed Contracts or entry of this Order is required.

G.    Actual written notice of the Motion, the Auction, the Sale Approval Hearing, the Sale, and the assumption and assignment of the Assumed Contracts, and a fair and reasonable opportunity to object or be heard with respect to the Motion, the Sale and the relief granted by this Order has been afforded to all interested persons and entities, including, without limitation, (i) the Office of the United States Trustee (the "United States Trustee"), (ii) counsel for the Official Committee of Unsecured Creditors (the "Creditors' Committee"), (iii) all known creditors of the Debtors, (iv) any entity known or reasonably believed to have asserted an interest in or lien, charge or encumbrance against any of the Acquired Assets, (v) all counterparties to the Assumed Contracts, (vi) any entity that has expressed a bona fide interest in acquiring the Acquired Assets, (vii) all taxing authorities having jurisdiction over any of the Acquired Assets, including the Internal Revenue Service, (viii) the Securities and Exchange Commission, (ix) the United States Environmental Protection Agency, (x) any applicable state environmental agency, (xi) the United States Department of Justice, (xii) the United States Attorney's office, (xiii) the Attorneys General in any State or Commonwealth where the Acquired Assets are located, and (xiv) all parties that have requested notice pursuant to Bankruptcy Rule 2002.

H.    The Debtors published notice of the Sale, the deadline to submit bids for the Acquired Assets, the time and place of the Auction, the time and place of the Sale Approval Hearing, and the time for filing an objection to the Sale or the Motion, in the *New York Times* in English on September 15, 2010, and in *El Nuevo Dia* in Spanish on September 30, 2010.  Such

publication notice was good, sufficient and proper notice to any interested parties whose identities are unknown to the Debtors.

      I.     The Debtors served notice of the assumption and assignment of the Assumed Contracts on the non-Debtor counterparties to the Assumed Contracts, which notice included (i) the title of each Assumed Contract, (ii) the name of the counterparties to each Assumed Contract, (iii) the amounts, if any, determined by the Debtors to be necessary to be paid upon assumption of the Assumed Contracts (the "Cure Amounts"), and (iv) the deadline by which any counterparty to the Assumed Contracts must object to the assumption and assignment of the Assumed Contracts.  The service of such notice was good, sufficient and appropriate under the particular circumstances and no other or further notice of the assumption and assignment of the Assumed Contracts or the Cure Amounts is required.  Each counterparty to the Assumed Contracts has had an opportunity to object to the assumption by the Debtors and the assignment to the Buyer of the Assumed Contracts and to the Cure Amounts set forth in the aforementioned notice.

      J.     On December 19, 2010, the Debtors served notice of the selection of the Buyer as the successful bidder for the Acquired Assets on (i) the United States Trustee, (ii) counsel for the Creditors' Committee, (iii) all known creditors of the Debtors, (iv) any entity known or reasonably believed to have asserted an interest in or lien, charge or encumbrance against any of the Acquired Assets, (v) all counterparties to the Assumed Contracts, (vi) any entity that has expressed a bona fide interest in acquiring the Acquired Assets, (vii) all taxing authorities having jurisdiction over any of the Acquired Assets, including the Internal Revenue Service, (viii) the Securities and Exchange Commission, (ix) the United States Environmental Protection Agency, (x) any applicable state environmental agency, (xi) the United States Department of Justice, (xii) the United States Attorney's office, (xiii) the Attorneys General in

any State or Commonwealth where the Acquired Assets are located, (xiv) all parties that have requested notice pursuant to Bankruptcy Rule 2002, and (xv) all Qualified Bidders (as defined in the Bidding Procedures).

        K.    On November 9, 2010 and November 10, 2010, the Debtors served notice of the filing of the "Motion of Debtors Pursuant to Sections 105 and 365 of the Bankruptcy Code and Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure for Entry of an Order Authorizing Conditional Rejection of Certain Franchise Agreement" [D.I. 288] (the "Rejection Motion") and the deadline to submit objections thereto on the non-Debtor parties to the agreements identified on Exhibit 2 attached hereto (the "Rejected Contracts").  On December 2, 2010 and December 14, 2010, the Debtors served notice of entry of the Rejection Order on the non-Debtor counterparties to the Rejected Contracts.  Such notice was good, sufficient and appropriate under the particular circumstances, and no other or further notice of the rejection of the Rejected Contracts or entry of the Rejection Order is required under bankruptcy or non-bankruptcy law.

## Corporate Authority

        L.    The Debtors have full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, and the Sale has been duly and validly authorized by all necessary corporate action of each of the Debtors.  No further consents or approvals are required for the Debtors to consummate the transactions contemplated by the Agreement, except as otherwise set forth in the Agreement.

## Good Faith Purchaser

        M.    The Buyer is purchasing the Acquired Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision and any other applicable or similar bankruptcy and

non-bankruptcy law.  The Buyer has at all times acted in good faith and will continue to act in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Sale. The Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

## Arm's-Length Sale

N.      The Agreement was negotiated, proposed and entered into by the Debtors and the Buyer without collusion, in good faith and from arm's-length bargaining positions. Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the avoidance of the Sale or the Agreement or the imposition of costs or damages under section 363(n) of the Bankruptcy Code.

## Business Justification

O.      The Debtors have demonstrated good, sufficient and sound business reasons and compelling circumstances to enter into the Agreement, sell the Acquired Assets, assume and assign the Assumed Contracts and reject the Rejected Contracts under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate and reasonable exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and creditors, and other parties in interest.  Such business reasons include, but are not limited to, the facts that (i) there is substantial risk of deterioration of the value of the Acquired Assets if the Sale is not consummated quickly, (ii) the Agreement and the terms thereof constitute the highest and/or best offer for the Acquired Assets, (iii) no other person or entity or group of persons or entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer, (iv) the Sale pursuant to the terms of the Agreement will present the best opportunity to realize the value of the Debtors on a going concern basis and avoid decline and devaluation of the Debtors' businesses, and (v) unless the Sale is concluded expeditiously as

8

provided for in the Motion and pursuant to the Agreement, recoveries to creditors may be diminished. The Debtors' determination that the Agreement constitutes the highest and/or best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

P.      The terms and conditions of the Agreement, including the consideration to be realized by the Debtors pursuant to the Agreement, are fair and reasonable, and the transactions contemplated by the Agreement are in the best interests of the Debtors' estates. Approval of the Motion, the Agreement, the Sale, the assumption and assignment of the Assumed Contracts and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

## No Fraudulent Transfer

Q.      The consideration provided by the Buyer for the Acquired Assets pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest and/or best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors and estates than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, the Commonwealth of Puerto Rico, any state, territory, possession or the District of Columbia.

R.      The Buyer is not a mere continuation of the Debtors or their estates, there is no continuity or common identity between the Buyer and any of the Debtors, and there is no continuity of enterprise between the Buyer and any of the Debtors. The Buyer is not holding itself out to the public as a continuation of any of the Debtors. The Buyer is not a successor to any of the Debtors or their estates and the Sale does not amount to a consolidation, merger or de facto merger of the Buyer with or into any of the Debtors. The Sale of the Acquired Assets to the Buyer is not being undertaken for the purpose of escaping liability for any of the Debtors'

debts or hindering, delaying or defrauding creditors under the Bankruptcy Code or under the

laws of the United States, the Commonwealth of Puerto Rico, any state, territory, possession or

the District of Columbia.

### Free and Clear

S.      Except as otherwise expressly provided in the Agreement or this Order,

the Acquired Assets shall be sold free and clear of all interests, obligations, rights,

encumbrances, pledges, liens (including, without limitation, mechanics', materialmens' and other

consensual and non-consensual liens and statutory liens), mortgages, deeds of trust, security

interests, claims (including, any "claim" as defined in section 101(5) of the Bankruptcy Code),

liabilities, debt obligations, losses, penalties, leases, charges, offsets, contracts, options, rights of

first refusal, rights of first offer, rights of first sale, rights of notice, easements, servitudes,

proxies, voting trusts or agreements, transfer restrictions under any agreement, conditional sale

or other title retention agreements, judgments, hypothecations, demands, licenses, sublicenses,

assignments, indentures, loan agreements, instruments, debts, rights of recovery, guaranties,

contractual commitments, restrictions, recoupment, employee benefit agreements and

obligations, collective bargaining agreements and obligations, claims based on reimbursement,

contribution, indemnity, exoneration, products liability, tortious conduct, property damage,

personal injury, alter-ego or taxes, claims based on pension plan contributions and related

liabilities, environmental liabilities, claims and obligations under the PMPA, options to purchase,

and Excluded Liabilities, in each case of whatever kind, nature, or description in, against or with

respect to any of the Acquired Assets, the Debtors or the Business having arisen, existed or

accrued prior to and through the date of the closing of the Sale (the "Closing Date"), whether

direct or indirect, absolute or contingent, choate or inchoate, known or unknown, matured or

unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law,

10

equity, statute or otherwise and whether arising prior to, on or after the Petition Date, including claims or liabilities otherwise arising under doctrines of successor liability, de facto merger or substantial continuity or liabilities or obligations arising under any Law or Decree (collectively, "Interests").

T.      Notwithstanding any provision to the contrary in the Agreement or this Order, the setoff and recoupment rights of the United States under applicable non-bankruptcy law shall be preserved and are unaffected.

U.      The transfer of the Acquired Assets to the Buyer free and clear of all Interests (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities) will not result in any undue burden or prejudice to any holders of any Interests as such Interests shall attach to the net proceeds of the Sale of the Acquired Assets received by the Debtors in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets and subject to any claims and defenses the Debtors, their estates or other parties may possess with respect thereto.

V.      The Debtors may sell the Acquired Assets free and clear of all Interests (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities) because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Holders of Interests against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code.  Holders of Interests, including those who did object, fall within one or more of the other subsections of section 363(f), including without limitation section 363(f)(5) of the Bankruptcy Code because the holders of any such Interest could be compelled in a legal or equitable proceeding to accept a money satisfaction on account of such Interest, and are adequately

11

protected by having their Interests, if any, attach to the proceeds of the Sale ultimately attributable to the Acquired Assets in which such creditor alleges an Interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors, their estates or other parties may possess with respect thereto.

W.    The Buyer would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors' estates and respective creditors, if the Sale, and the assumption, assignment and sale of the Assumed Contracts, were not free and clear of all Interests (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities), or if the Buyer would, or in the future could, be liable for any such Interests.

X.    Not selling the Acquired Assets free and clear of all Interests (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities) would adversely impact the Debtors' efforts to maximize the value of their estates, and the Sale of the Acquired Assets other than one free and clear of all Interests (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities) would be of substantially less benefit to the Debtors' estates.

**Validity of Transfer**

Y.    The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Agreement.

Z.      The Acquired Assets constitute property of the Debtors' estates and good title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

## Assumed Contracts

AA.     The assumption and assignment of the Assumed Contracts, free and clear of Interests, pursuant to the terms of this Order is integral to the Agreement and is in the best interests of the Debtors, their estates and creditors, and other parties in interest, and represents a reasonable exercise of the Debtors' sound and prudent business judgment.

BB.     Pursuant to the terms of the Agreement, on or before the Closing Date, the Buyer and the Debtors, as applicable, shall have:  (i) cured, or provided adequate assurance of cure of, any monetary default existing as of and including the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, (ii) provided compensation, or adequate assurance of compensation, to any party for actual pecuniary loss to such party resulting from a monetary default existing as of and including the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and (iii) provided adequate assurance of its future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

## Rejected Contracts

CC.     The rejection of the Rejected Contracts pursuant to the terms of the Rejection Order and this Order is integral to the Agreement and is in the best interests of the Debtors, their estates and creditors, and other parties in interest, and represents a reasonable exercise of the Debtors' sound and prudent business judgment.

## Compelling Circumstances for an Immediate Sale

DD.    To maximize the value of the Acquired Assets and preserve the viability of the business to which the Acquired Assets relate, it is essential that the Sale of the Acquired Assets occur within the time constraints set forth in the Motion, the Bidding Procedures Order, and the Agreement.  Time is of the essence in consummating the Sale.  Accordingly, there is cause to waive the stay contemplated by Bankruptcy Rules 6004 and 6006.

EE.    The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the approval and consummation of the Sale prior to, and outside of, a chapter 11 plan.  The Sale pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating chapter 11 plan for the Debtors and therefore, does not constitute a sub rosa plan.

FF.    Given all of the circumstances of these cases and the adequacy and fair value of the Purchase Price under the Agreement, the Sale of the Acquired Assets to the Buyer constitutes a reasonable and sound exercise of the Debtors' business judgment.

## IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

## General Provisions

1.    The Motion is granted and approved as provided herein.  The Motion complies with all provisions of Local Rule 6004-1 other than those previously waived by the Court.

2.    All objections and responses to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections and responses, are overruled on the merits and denied with prejudice.

14

3.      This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order and the Rejection Order are incorporated herein by reference.

## Approval of the Agreement

4.      The Agreement and all other ancillary documents, and all of the terms and conditions thereof, are approved.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and directed to take any and all actions necessary or appropriate to execute and deliver, perform under, consummate, implement and effectuate the Agreement together with any and all instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Agreement, this Order and the Sale, and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, the Acquired Assets and Assumed Liabilities, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Agreement, without any further corporate action or order of this Court.

## Transfer of the Acquired Assets

6.      Except as otherwise expressly provided in the Agreement or this Order, pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets to the Buyer on the Closing Date pursuant to the terms of the Agreement and this Order "as is where is" and free and clear of all Interests of any kind whatsoever with all such Interests to attach to the net proceeds of the Sale of the Acquired Assets received by the Debtors in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets and subject to any claims and defenses the Debtors, their estates or other parties may possess with respect thereto.

15

7.    The transfer of the Acquired Assets to the Buyer will be, as of the Closing Date, a legal, valid, binding and effective transfer of the Acquired Assets, and, except as otherwise expressly provided in the Agreement or this Order, shall vest the Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Interests accruing, arising or relating thereto any time prior to and through the Closing Date.  Except as otherwise expressly provided in the Agreement or this Order, the Buyer shall not assume or become liable for any Interests relating to the Acquired Assets, provided, however, that the Buyer shall not be relieved of liability with respect to Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities.

8.    Nothing in the Agreement or this Order releases, nullifies, or enjoins the enforcement of any liability to a Governmental Entity under police or regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order (except with respect to the Specified Environmental Claims).

9.    To the fullest extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, Permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Assets or the Business, and all such licenses, Permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date, provided, however, that the Buyer complies with all applicable legal requirements under non-bankruptcy law governing such transfers, and provided, further, however, that nothing in the Agreement or this Order releases the Buyer from complying with all applicable non-bankruptcy laws governing such transfers.

10.    Notwithstanding any provision of the Agreement or this Order to the contrary, other than with respect to the Specified Environmental Claims, it shall be a condition

16

precedent to the Buyer's obligation to close the Sale that the Buyer shall have entered into an agreement with the United States government, reasonably acceptable to the Buyer, with respect to the Buyer's obligations in connection with any Environmental Claims related to the Acquired Assets following the Closing, and which agreement shall set forth the framework by which the Buyer shall assume certain obligations of the Debtors under the following administrative orders issued with respect to the Debtors' facility in Bayamón, Puerto Rico: (i) the Unilateral Administrative Order for Removal Activities, Docket No. CWA-02-2010-3801, issued by the EPA, Region 2, on February 19, 2010, and (ii) Administrative Order on Consent, Docket No. II RCRA-95-3008(h)-0303, issued by the EPA, Region 2, on October 12, 1995. Assumption of the administrative orders referenced in this Paragraph 10 shall not relieve the Buyer of any other liability pursuant to Paragraph 8 of this Order.

11.    Notwithstanding any provision in the Motion, this Order or any documents implementing the Sale (collectively, "Documents"), any sale of the Bayamon refinery, to the extent the Buyer wishes to take advantage of the Foreign Trade Zone subgrant, will be accomplished in the ordinary course of business as if the Debtors' bankruptcy cases were never commenced and the Debtors and the Buyer shall comply with all applicable non-bankruptcy law, federal regulations and statutes, including but not limited to (i) 15 C.F.R. Part 400, specifically, section 400.28, (ii) 19 C.F.R. Part 146, specifically section 146.7, and (iii) the Foreign Trade Zone manual. Moreover, without limiting the foregoing, nothing in the Documents shall be interpreted to set cure amounts for the Foreign Trade Zone subgrant or to require any governmental unit to consent to Buyer's use of the Foreign Trade Zone subgrant.

12.    Except as expressly permitted or otherwise specifically provided by the Agreement or this Order, all persons and entities holding Interests in all or any portion of the Acquired Assets arising under or out of, in connection with, or in any way relating to the

17

Debtors, the Acquired Assets, the operation of the Business prior to and including the Closing Date or the transfer of the Acquired Assets to the Buyer, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer or its successors or assigns, their property or the Acquired Assets, such persons' or entities' Interests in and to the Acquired Assets.

13.     On the Closing Date, each holder of an Interest in the Acquired Assets (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities) is authorized and directed to execute such documents and take all other actions as may be necessary to release such Interest, if any, as provided for herein, as such Interests may have been recorded or may otherwise exist.

14.     The transactions authorized herein shall be of full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

15.     Upon consummation of the transactions contemplated in the Agreement, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Order under section 363 and the related provisions of the Bankruptcy Code.

16.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to the Buyer in accordance with the terms of the Agreement and this Order.

17.     All persons and entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the Buyer or its assignee on the Closing Date.

18.     A certified copy of this Order may be filed with any appropriate clerk and/or recorded with any appropriate recorder to act to cancel any of the Interests of record in the Acquired Assets (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities) and to resolve any title issues with respect to the Acquired Assets.

19.     If any person or entity which has filed statements or other documents or agreements evidencing Interests with respect to all or any portion of the Acquired Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all Interests that the person or entity has or may assert with respect to all or any portion of the Acquired Assets (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities), the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

20.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

## **Assumption, Assignment and Sale of Assumed Contracts**

21.     Except as otherwise expressly provided in the Agreement or this Order, upon the Closing Date, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, the Debtors are authorized to (a) assume each of the Assumed Contracts and assign the Assumed Contracts to the Buyer free and clear of all Interests of any kind or nature whatsoever and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer.

22.     The Cure Amounts set forth on Exhibit 3 attached hereto are the sole amounts necessary to be paid upon assumption of the Assumed Contracts under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code and the payment of the applicable Cure Amounts (if any) by the Buyer and, to the extent the Cure Amounts exceed the Buyer Cure Amounts Cap, the Debtors, shall (a) effect a cure of all defaults existing under the Assumed Contracts as of and including the Closing Date and (b) compensate counterparties to the Assumed Contracts for any actual pecuniary loss resulting from all defaults existing under the Assumed Contracts as of and including the Closing Date.  Upon the payment of the Cure Amounts, if any, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.  The Cure Amounts shall not be subject to further dispute or audit, including any based on performance prior to the Closing Date, irrespective of whether such Assumed Contract contains an audit clause.  After the payment of the Cure Amounts by the Buyer and the Debtors, as applicable pursuant to the Buyer Cure Amounts Cap, neither the Debtors nor the Buyer shall have any further liabilities to the counterparties to the Assumed Contracts other than the Buyer's obligations under the Assumed Contracts that accrue and become due and payable on or after the Closing Date.

23.     Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.

24.     Each Assumed Contract constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code and all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Contracts have been satisfied.   Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, (i) the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts, (ii) the Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts, and (iii) the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contracts.

25.     The Buyer has provided adequate assurance of future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

26.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption, assignment and sale of the Assumed Contracts.   The validity of the assumption, assignment and sale to the Buyer shall not be affected by any dispute between any of the Debtors or their affiliates and another party to an Assumed Contract regarding the payment of any amount, including any Cure Amount under the Bankruptcy Code.   Upon assignment to the Buyer, the Assumed Contracts shall be

21

valid and binding, in full force and effect and enforceable by the Buyer in accordance with their respective terms.

        27.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all counterparties to the Assumed Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Buyer any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of and including the Closing Date under the Agreement or arising by reason of the closing of the Sale.  Any party that may have had the right to consent to the assignment of a Assumed Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise if such party failed to object to the assumption and assignment of such Assumed Contract.

**Rejection of the Rejected Contracts**

        28.    The Rejected Contracts constitute executory contracts for purposes of section 365 of the Bankruptcy Code and upon the Closing Date, shall be deemed rejected pursuant to section 365 of the Bankruptcy Code notwithstanding any provisions of the PMPA without any other or further notification of such rejection to the non-Debtor parties to the Rejected Contracts and without implicating any rights that the non-Debtor parties to the Rejected Contracts may assert under section 365(h) of the Bankruptcy Code.  The non-Debtor parties to the Rejected Contracts shall not retain any rights under section 365(h) of the Bankruptcy Code in the Rejected Contracts, including any right of possession or quiet enjoyment.  The Buyer shall take title and possession of any Acquired Assets previously subject to any Rejected Contract free and clear of any Interests, including any rights and interests held by, or obligations owed to, the non-Debtor parties to such Rejected Contracts under the PMPA and section 365(h) of the Bankruptcy Code.

22

29.    The Buyer's obligation to consummate the transactions contemplated in the Agreement in connection with the Closing is subject to satisfaction or waiver of the conditions set forth in Section 7 of the Agreement including, without limitation, that the Bankruptcy Court shall have entered the Rejection Order, such order shall be a Final Order, and no order staying, reversing, modifying or amending the Rejection Order shall be in effect on the Closing Date which has the effect of preventing the Debtors from rejecting substantially all of the Franchise Agreements.

## Related Relief

30.    Upon the Closing Date and except as otherwise expressly provided in the Agreement, this Order or by stipulations filed with or announced to this Court with respect to a specific matter, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its successors and assigns, or the Acquired Assets, with respect to any (a) Interest (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities) arising under, out of, in connection with or in any way relating to the Debtors, the Buyer, the Acquired Assets, the Business or the operation of the Acquired Assets or the Business prior to and including the Closing Date, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors or assigns, assets or properties, (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Buyer, its successors or assigns, assets or properties, (iii) creating, perfecting or enforcing any Interest (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities) against the Buyer, its successors or assigns, assets or properties, (iv) asserting any setoff, right of subrogation or recoupment of

23

any kind against any obligation due the Buyer or its successors or assigns, or (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof.

     31.  Except as otherwise expressly provided in the Agreement or this Order, the Buyer shall not have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets or the Business except with respect to Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Agreement or this Order, the Buyer shall not be liable for any claims or Liabilities against the Debtors or any of its predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of and including the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to and including the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Business or any of the Acquired Assets prior to and including the Closing Date.  The Buyer has given substantial consideration under the Agreement for the benefit of the holders of any Interest in the Debtors or any of the Acquired Assets.  The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer, which releases shall be deemed to have been given in favor of the Buyer by all holders of Interests in

the Debtors or any of the Acquired Assets (other than Liens created by the Buyer, the Permitted Liens and the Assumed Liabilities).

32.    The transactions contemplated by the Agreement are undertaken by the Buyer and the Debtors without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of such Sale are duly stayed pending such appeal.

33.    Upon the Closing Date, the proceeds of the Sale shall be deposited in an escrow account as cash collateral of the Prepetition Lender and the Postpetition Lender (both as defined in this Court's "Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Senior Secured Financing, (B) Use Cash Collateral, (C) Grant Liens and Superpriority Claims to the Postpetition Lender, and (D) Provide Adequate Protection to the Prepetition Lender and (II) Granting Related Relief" [D.I. 148] (the "Final DIP Order")), and be subject to (i) the Final DIP Order and (ii) all Interests in such proceeds in the order of their priority, with the same validity, force and effect which they now have as against the respective Acquired Assets sold and subject to any claims and defenses the Debtors, their estates or other parties may possess with respect thereto.  Such escrowed proceeds of the Sale shall only be disbursed in accordance with any further order(s) of the Court, including, without limitation, an order confirming a chapter 11 plan of liquidation.

34.    Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these chapter 11 cases, (b) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (c) any related proceeding subsequent to

entry of this Order, shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

35.    Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.  The Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and may, in their discretion and without further delay, close the transactions contemplated under the Agreement and take any action and perform any act authorized under this Order.

36.    Nothing in this Order or the Agreement approves or provides for the transfer to the Buyer of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Debtors' estates.

37.    No bulk sales law or any similar law of any state or other jurisdiction, including the Commonwealth of Puerto Rico, applies in any way to the Sale.

38.    There are no brokers involved in consummating the Sale and no brokers' commissions are due.

39.    The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be authorized and approved in its entirety.

40.    The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof, without further order of this Court; provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates; and provided further that the Prepetition Lender and the Postpetition Lender have provided express written consent to such modification, amendment or supplement.

26

41.    The terms and provisions of the Agreement and this Order shall be binding in all respects upon the Debtors, their respective estates and creditors, all holders of equity interests in any of the Debtors, all holders of any Interest in the Acquired Assets, the Buyer and all successors and assigns of the Buyer, and any trustees, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases.  This Order and the Agreement shall inure to the benefit of the Debtors, their estates and creditors, the Buyer and their respective successors and assigns.

42.    This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Agreement, the Sale or this Order.

43.    Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

44.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

45.    To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.

46.    To the extent there are any inconsistencies between the terms of this Order and the Agreement (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

47.     The provisions of this Order are nonseverable and mutually dependent.


Dated:  December __, 2010
        Wilmington, Delaware


_____
        THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT 1**

**Asset Purchase Agreement**

# EXHIBIT 2

**List of Rejected Contracts**

# EXHIBIT 3

**Cure Schedule**

**Exhibit C**

Form of Escrow Agreement

# ESCROW AGREEMENT

This ESCROW AGREEMENT (this "<u>Agreement</u>") is executed and effective on December 10, 2010 (the "<u>Effective Date</u>"), by and among Caribbean Petroleum Corporation, a corporation formed under the laws of the State of Delaware, (the "<u>Seller</u>"), Puma Energy International, B.V., as buyer, or its designee (the "<u>Buyer</u>" and, together with the Seller, collectively, the "<u>Escrow Parties</u>"), and JPMorgan Chase Bank, National Association as escrow agent (the "<u>Escrow Agent</u>").

WHEREAS, the Escrow Parties and Caribbean Petroleum Refining L.P., a limited partnership formed under the laws of the State of Delaware, and Gulf Petroleum Refining (Puerto Rico) Corporation, a corporation formed under the laws of the State of Delaware may enter into an Asset Purchase Agreement, to be dated on or around the date hereof (as such agreement may be amended, restated or otherwise modified from time to time, the "<u>Purchase Agreement</u>").

WHEREAS, on or before December 10, 2010 (the "<u>Deposit Date</u>"), Buyer will deposit into an interest bearing account (the "<u>Escrow Account</u>") an amount of up to two million United States Dollars (up to $2,000,000) pursuant to the terms and conditions of the bidding procedures filed with the Untied States Bankruptcy Court for the District of Delaware on September 10, 2010 in connection with the cases that are currently pending before the Honorable Kevin Gross and jointly administered under Case No. 10-12553 (KG) (the "<u>Bidding Procedures</u>"). The funds held by the Escrow Agent pursuant to this Agreement are referred to as the "<u>Escrow Amount</u>".

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency whereof is hereby acknowledged, the parties agree as follows:

1.    <u>Appointment of and Acceptance by Escrow Agent</u>.  The Buyer and the Seller hereby appoint and designate the Escrow Agent to acquire and maintain possession of the Escrow Account and to act as escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and designation under the terms and conditions set forth herein.

2.    <u>Receipt of Deposit; Establishment of Escrow; Interest</u>.

(a) Buyer will deliver to the Escrow Agent and the Escrow Agent will acknowledge to the Buyer and the Seller in accordance with <u>Section 10</u> hereof its receipt of the Escrow Amount.  The Escrow Agent shall hold, invest and disburse the Escrow Amount in accordance with the terms of this Agreement.  Except with respect to amounts otherwise released pursuant to this Agreement, until the termination of this Agreement and the distribution of the Escrow Amount in full, the Buyer and the Seller agree that they shall not transfer or attempt to transfer the Escrow Amount or any beneficial interest they may have in any of the Escrow Account, Escrow Amount or this Agreement.  Any attempt to make any such transfer shall be null and void *ab initio*.

(b) All income interest, dividends, distributions, increments, gains or other earnings on or, in respect of the Escrow Account (collectively, the "Escrow Income") shall become part of the Escrow Account and shall be held in the Escrow Account and reinvested from time to time by the Escrow Agent as provided in this Agreement.

3.     Investment of the Escrow Amount.  During the term of this Escrow Agreement, the Escrow Amount shall be invested in a JPMorgan Chase Bank, N.A. money market deposit account ("MMDA") or a successor or similar investment offered by the Escrow Agent, unless otherwise instructed in writing by the Escrow Parties in accordance with the Permitted Investments listed below.  The Escrow Agent will provide interest on the Escrow Amount held in a MMDA account (or a successor or similar investment) at a rate determined by the Escrow Agent.  MMDA accounts have rates of return that are based upon market conditions.  At the written direction of the Seller and the Buyer, the Escrow Agent will invest the Escrow Amount in one or more of: (a) direct obligations of the United States of America, (b) obligations for which the full faith and credit of the United States of America is pledged to provide for the payment of principal and interest and/or (c) money market funds authorized to invest in short-term securities issued or guaranteed as to principal and interest by the U.S. Government and repurchase agreements with respect to such securities (collectively, any such investments made at the written direction of the Seller and the Buyer, the "Permitted Investments"), with the Escrow Parties expressly assuming the risk of any such Permitted Investment.  The Escrow Agent is hereby authorized to execute the purchase and sale of Permitted Investments through the facilities of its own trading or capital markets operations.  The Escrow Agent can liquidate any Permitted Investment in order to comply with disbursement instructions without any liability for any resulting loss.  Any loss incurred from a Permitted Investment will be borne by the Escrow Amount.  The Escrow Agent will provide a written statement to the Buyer and the Seller at the end of each month prior to the termination of this Agreement pursuant to Section 18 hereof listing the balance of the Escrow Account and detailing any transactions or disbursements during the immediately preceding month.  The Escrow Agent shall not have any liability for any loss sustained as a result of making any Permitted Investment pursuant to the terms of this Escrow Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Escrow Parties to give the Escrow Agent instructions to invest or reinvest the Escrow Amount.

4.     Taxes.

(a) The Seller is required to prepare and file any and all income or other tax returns applicable to the Escrow Account with the Internal Revenue Service and all required state and local departments of revenue as and to the extent required under the provisions of the Internal Revenue Code of 1986, as amended and its regulations (the "Code").

(b) All Escrow Income shall be allocated to Buyer and reported, as and to the extent required by law, by the Escrow Agent to the Internal Revenue Service (the "IRS"), or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned from the Escrow Amount by the Buyer whether or not such Escrow Income has been distributed during such year.  Any other tax returns required to be filed will be prepared and filed by the Seller with the IRS and any other taxing authority as required by law.  The Escrow Parties

acknowledge and agree that Escrow Agent shall have no responsibility for the preparation and/or filing of any income, franchise or any other tax return with respect to the Escrow Account or any Escrow Income.  The Escrow Parties further acknowledge and agree that any taxes payable with respect to the Escrow Income shall be paid by the Buyer.  The Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c) The Escrow Agent shall have no responsibility for the preparation and/or filing of any tax or information return with respect to any transaction, whether or not related to this Agreement (or a related agreement), that occurs outside the Escrow Account.

(d) The Escrow Parties have provided the Escrow Agent with their respective fully executed IRS Form W-8, or W-9 and/or other required documentation.  The Escrow Parties each represent that its correct TIN assigned by the IRS, or any other taxing authority, is set forth in the delivered forms.

5.     <u>Disbursement upon Joint Written Instructions</u>.

(a) The Escrow Agent shall disburse the Escrow Amount, or any portion thereof, in accordance with the joint written instructions of the Buyer and the Seller.  Each of the Buyer and the Seller agree to prepare and sign joint written instructions that direct the Escrow Agent to distribute the Escrow Amount, or a portion thereof, as promptly as practicable after payments from the Escrow Amount are due and payable pursuant to and in accordance with the terms of the Bidding Procedures and the Asset Purchase Agreement submitted by Buyer.  Each of the Buyer and the Seller agree that any such joint written instructions shall set forth sufficient payment instructions for each portion of the Escrow Amount to be distributed from the Escrow Account and that the Escrow Agent shall act solely upon the instructions that it receives and shall not be responsible for determining whether the instructions are in accordance with the terms of the Bidding Procedures.

(b) Notwithstanding <u>Section 5(a)</u>, within two (2) Business Days following the closing contemplated by the Purchase Agreement, the Escrow Agent shall distribute to the Seller an amount equal to the balance of the Escrow Amount upon written instruction of the Seller to so release.  The Escrow Agent shall act solely upon the instructions that it receives from the Seller and shall not be responsible for determining whether the instructions are in accordance with the Bidding Procedures.

6.     <u>Liability and Duties of the Escrow Agent</u>.  The Escrow Agent's duties and obligations under this Agreement shall be determined solely by the express provisions of this Agreement.  The Escrow Agent shall be under no obligation to refer to any documents other than this Agreement and the instructions and requests delivered to the Escrow Agent hereunder.  The Escrow Agent shall not be obligated to recognize, and shall not have any liability or responsibility arising under, any agreement to which the Escrow Agent is not a party, even though reference thereto may be made herein.  With respect to the Escrow Agent's responsibility, the Escrow Parties further agree that:

(a) The Escrow Agent, including its officers, directors, employees and agents, shall not be liable to anyone whomsoever by reason of any error of judgment or for any act done or step taken or omitted by the Escrow Agent in good faith, or for any mistake of fact or law or anything which the Escrow Agent may do or refrain from doing in connection herewith, unless caused by or arising out of the Escrow Agent's gross negligence or willful misconduct. The Escrow Agent may consult with counsel of its own choice and shall have full and complete authorization and protection for any action taken or suffered by the Escrow Agent hereunder in accordance with the opinion of such counsel. The Escrow Parties shall jointly and severally indemnify and hold the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, managers, attorneys, accountants, experts, agents and employees (the "Indemnitees") harmless from and against any and all liability losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including, without limitation, the fees and expenses of in house or outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Losses") which may arise out of or in connection with (a) the Escrow Agent's execution and performance of this Escrow Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Escrow Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except in the case of any Indemnitee to the extent that such Losses are finally adjudicated by a court of competent jurisdiction to have been primarily caused by the gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions, whether joint or singular, from the Parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. Such indemnification shall survive the Escrow Agent's resignation or removal, or the termination of this Agreement.

(b) Each of the Buyer and the Seller may examine the Escrow Account and the records pertaining thereto at any time during normal business hours at the Escrow Agent's office upon 24 hours prior notice and pursuant to the reasonable regulations of the Escrow Agent. The Escrow Agent shall provide the Seller and the Buyer with monthly statements showing Escrow Income and disbursements, if any, of the Escrow Account.

(c) This Agreement is a personal one, the Escrow Agent's duties hereunder being only to the Escrow Parties, their successors, permitted assigns, heirs and legal representatives, and to no other Person whomsoever.

(d) No succession to, or assignment of, the interest of the Escrow Parties shall be binding upon the Escrow Agent unless and until written notice of such succession or assignment has been given to the Escrow Agent in accordance with Section 10 hereof.

(e) The Escrow Agent may rely or act upon joint written instructions bearing a signature or signatures properly believed by the Escrow Agent to be genuine of the Buyer and the Seller.

(f) In case any property held by the Escrow Agent shall be attached, garnished or levied upon under a court order, or the delivery thereof shall be stayed or enjoined by a court order, or any writ, order, judgment or decree shall be made or entered by any court affecting the

property deposited under this Agreement or any part thereof, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders, judgments or decrees so entered or issued, and in case the Escrow Agent obeys or complies with any such writ, order, judgment or decree, the Escrow Agent shall not be liable to the Escrow Parties or to any other Person by reason of such compliance in connection with such litigation.

(g) The Escrow Agent reserves the right to resign at any time by giving at least 30 days prior written notice of resignation to the Escrow Parties specifying the effective date thereof.  Within 30 days after receiving such notice, the Buyer and the Seller jointly shall appoint a successor escrow agent to which the Escrow Agent shall distribute the property then held under this Agreement, whereupon the Escrow Agent shall upon such distribution to a successor escrow agent, be discharged of and from any and all further obligations arising in connection with this Agreement, except for such liability and expenses which results from the Escrow Agent's gross negligence or willful misconduct.  If a successor escrow agent has not been appointed or has not accepted such appointment by the end of such 30-day period, the Escrow Agent may apply to a court of competent jurisdiction for the appointment of a successor escrow agent, and the costs, expenses and reasonable attorney's fees which are incurred in connection with such proceeding shall be paid one-half by the Buyer and one-half by the Seller.  Until a successor escrow agent has accepted such appointment and the Escrow Agent has transferred the Escrow Account to such successor escrow agent, the Escrow Agent shall continue to retain and safeguard the Escrow Account until receipt of (A) a joint written instruction by the Seller and the Buyer, or (B) a final non-appealable order of a court of competent jurisdiction.

(h)  In the event of any disagreement between the Seller and the Buyer resulting in adverse claims or demands being made in connection with the Escrow Account or in the event that the Escrow Agent is in doubt as to what action it should take hereunder, the Escrow Agent shall be entitled to refrain from taking any action until such time as the Escrow Agent shall have received (A) a final non-appealable order of a court of competent jurisdiction or the Neutral Arbitrator that is accompanied by an opinion of the Escrow Parties' respective counsel that such order is final and non-appealable, or (B) a joint written instruction executed by the Seller and the Buyer directing delivery of the Escrow Account, at which time the Escrow Agent shall disburse the Escrow Account in accordance with such determination or joint written instruction.

(i)  The Escrow Agent does not have any interest in the Escrow Account but is serving as escrow holder only and has only possession thereof.  If any payments of income from the Escrow Account shall be subject to withholding regulations then in force with respect to United States taxes, the Buyer and the Seller agree to provide the Escrow Agent with appropriate forms for or with respect to such withholding.  This Section 6(i) and Section 6(a), Section 7 and Section 18 hereof shall survive notwithstanding any termination of this Agreement or the Escrow Agent's resignation.

(j)  The Buyer and the Seller may, upon at least 30 days prior written notice to the Escrow Agent, dismiss the Escrow Agent and appoint a successor.  In such event, the Escrow Agent will promptly account for and deliver to the successor escrow agent named in such notice all of the remaining Escrow Amount then held by the Escrow Agent hereunder.  Upon acceptance thereof and of such accounting by such successor escrow agent, and upon

reimbursement to the Escrow Agent of all expenses due to it hereunder through the date of such accounting and delivery in accordance with the terms hereof, the Escrow Agent will be discharged of and from any and all further obligations arising in connection with this Agreement, except for such liability and expenses which results from the Escrow Agent's gross negligence, or willful misconduct.

7.      Compensation of Escrow Agent.  The Escrow Agent shall be entitled to fees and reimbursement for expenses including, but not by way of limitation, the fees and costs of attorneys or agents which it may find necessary to engage in performance of its duties hereunder, in accordance with the fee schedule attached hereto as Exhibit A.  Such fees and expenses shall be paid, at the Deposit Date, by the Buyer and are not pro ratable for partial years.

8.      Certificate of Incumbency.  The Escrow Agent may assume that any Person purporting to give any notice in accordance with the provisions hereof has been duly authorized to do so.

9.      Funds Transfer Agreement.  In the event funds transfer instructions are given (other than in writing at the time of the execution of this Agreement), whether in writing or by facsimile, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the Person or Persons designated in such transfer instructions, and the Escrow Agent may rely upon the confirmations of anyone purporting to be the Person or Persons so designated. Each funds transfer instruction shall be executed by an authorized signatory, a list of such signatories is set forth on Schedule 1.  The Escrow Parties acknowledge that such security procedure is commercially reasonable.  It is understood that the Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying number provided by any party hereto to identify (i) the beneficiary, (ii) the beneficiary's bank or (iii) an intermediary bank.  The Escrow Agent may apply funds for any payment order it executes using any such identifying number, even where its use may result in a Person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank, or an intermediary bank, designated.

10.     Notices.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when delivered personally, faxed (receipt confirmed), sent via a nationally recognized overnight courier.  Notice will be effective when dispatched if delivered personally or by fax or on receipt of delivery by overnight courier service.  Such notices, demands and other communications will be sent to the address indicated below:

Notices to the Seller:

Caribbean Petroleum Corporation
c/o FTI
3 Times Square
11th Floor
New York, NY 10036
Attn: Roy Messing

Telephone:    (212) 499-3677
Facsimile:     (212) 499-3636

with a copy (which shall not constitute notice to the Seller) to:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York  10281
Attn:   George Davis / Zachary Smith
Fax:    (212) 504-6666
Phone: (212) 504-6000

Notices to the Buyer:

Puma Energy Puerto Rico
Attn: Victor M. Dominguez
P. O. Box 11929
San Juan, PR 00922
Fax:  787-679-7385
Phone:  (787) 679-7351

with a copy (which shall not constitute notice to the Buyer) to:

c/o Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Attn:   Clifton R. Jessup, Jr.
Fax:    (214) 665-3638
Phone: (214) 665-5938

Notices to the Escrow Agent:

JPMorgan Chase Bank N.A.
Escrow Services
4 New York Plaza, 21st Floor
New York, New York 10004
Attn:   Florence Hanley/Debbie DeMarco
Fax:    (212) 623-6168
Phone: (212) 623-6811/6742

Any party may change the address to which notices are to be delivered by giving the other parties notice in the manner provided in this Section 10.  Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to this Section 10, such communications shall be deemed to have been given on the date received by those representatives of the Escrow Agent listed in Section 10 or any employee of the Escrow Agent who reports directly to such above-referenced Escrow Agent representative listed in Section 10. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency

exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate. "Business Day" shall mean any day other than Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth above is authorized or required by law or executive order to remain closed.

11. <u>Binding Effect; Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned, in whole or in part, by operation of law or otherwise, by the Escrow Agent, the Buyer, or the Seller, without the prior written consent of the other parties; <u>provided</u>, that Buyer may assign its rights and interests under this Agreement to any future purchaser of the stock or assets of the Company, to any of its Affiliates or to any of its financing sources.  Any assignment in violation of this <u>Section 11</u> will be void and of no effect. Subject to the preceding two sentences, this Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12. <u>Severability</u>.  If any term or provision of this Agreement is held to be illegal, invalid, or incapable of being enforced by any rule of law or public policy, such provision shall be fully severable and all other terms and provisions of this Agreement will remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, this Agreement will be modified so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable law in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

13. <u>No Strict Construction</u>.  Each of the parties hereto acknowledges that this Agreement has been prepared jointly by the parties hereto, and will not be strictly construed against any other party.

14. <u>Headings</u>.  The headings used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and will not be deemed to limit, define, extend or describe the scope of this Agreement or otherwise affect the meaning or interpretation of this Agreement.

15. <u>Counterparts</u>.  This Agreement may be executed and delivered (including by facsimile transmission) in two or more counterparts, each of which will be deemed an original, and all of which together will constitute one and the same agreement and will become effective when such counterparts have been signed by each of the parties and delivered to the other parties.  Facsimile or emailed signatures to this Agreement will have the same legal effect as manual signatures.

16. <u>Governing Law</u>.  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York regardless of the laws that might otherwise govern under applicable principles of conflict of laws thereof.

17. <u>Amendment</u>.  This Agreement may not be amended or modified, except by an instrument in writing executed by the Escrow Parties and the Escrow Agent.

USActive 21277225.3

18.     Termination.   This Agreement shall remain in effect unless and until (i) the Escrow Account is distributed in full, or (ii) it is terminated in a written instrument executed by the Escrow Parties, in which event, termination shall take effect no later than 20 days after notice to the Escrow Agent of such termination.   Termination of this Agreement shall not impair the obligations of the Escrow Parties set forth in Sections 6(a), 6(i) and 7 hereof, which obligations shall survive the termination of this Agreement.

19.     Merger or Consolidation.   Any banking association or corporation into which the Escrow Agent (or substantially all of its escrow business) may be merged, converted or with which the Escrow Agent may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent shall be a party, or any banking association or corporation to which all or substantially all of the escrow business of the Escrow Agent shall be sold or otherwise transferred, shall succeed to all the Escrow Agent's rights, obligations and immunities hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

20.     Entire Agreement.   This Agreement and, in regards to the parties other than the Escrow Agent, the Purchase Agreement and the terms of the Bidding Procedures relating to the return of the Escrow Amount constitute the entire agreement and understanding among the Escrow Parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the Escrow Parties with respect to the subject matter of this Agreement.   In regards to the Escrow Agent, this Agreement contains the entire agreement and understanding among the parties hereto.

21.     No Third-Party Beneficiaries.   This Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns and nothing herein expressed or implied shall give or be construed to give any Person, other than the parties hereto and such permitted successors and assigns, any legal or equitable rights or remedies hereunder.

22.     Waiver of Jury Trial.   Each of the parties hereto waives any right it may have to trial by jury in respect of any litigation based on, arising out of, under or in connection with this Agreement or any course of conduct, course of dealing, verbal or written statement or action of any party hereto.

23.     Jurisdiction.   Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of the state and federal courts of the State of New York in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any other court action relating to this Agreement or any of the transactions contemplated by this Agreement in which the Escrow Agent is named as a party in any other court.

24.     Limited Liability.   IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL LOSSES OR DAMAGES OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN

ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

25.    <u>Force Majeure</u>.    Notwithstanding any other provision of this Agreement, the Escrow Agent shall not be obligated to perform any obligation hereunder and shall not incur any liability for the nonperformance or breach of any obligation hereunder to the extent that the Escrow Agent is delayed in performing, unable to perform or breaches such obligation because of acts of god, war, terrorism, fire, floods, strikes, electrical outages, equipment or transmission failures, or other causes beyond its control.

26.    <u>Identification</u>.    The Escrow Parties acknowledge that the Escrow Agent, pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Patriot Act</u>"), is required to obtain, verify and record information that identifies each Person who opens an account and, upon request, the Escrow Parties agree to provide the Escrow Agent with information sufficient to establish their identity in accordance with the Patriot Act.

*    *    *    *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

**CARIBBEAN PETROLEUM CORPORATION**

By:_____

    Name:  Roy Messing
    Title:  Restructuring Officer

**PUMA ENERGY INTERNATIONAL, B.V.**

By:_____

    Name: Pierre Lorinet
    Title:  Director

**PUMA ENERGY INTERNATIONAL, B.V.**

By:_____

    Name: Pierre Eladari
    Title:  Director

*Signature Page to Escrow Agreement*

**JPMORGAN CHASE BANK, N.A.**
(as Escrow Agent)

By: _____

    Name:  Debra A. DeMarco
    Title:  Vice President

**EXHIBIT A**

SCHEDULE OF ESCROW AGENT FEES

~~~~

**Escrow Agent Services**

**Account Acceptance Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Waived**

Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation.

**Annual Administration Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$500**

The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction. Payable by Seller at the Deposit Date and, if applicable, annually in advance thereafter, without pro-ration for partial years.

**Extraordinary Services and Out-of Pocket Expenses**

Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at the Bank's then standard rate. Disbursements, receipts, investments or tax reporting exceeding 25 items per year may be treated as extraordinary services thereby incurring additional charges.

**Disclosure & Assumptions**

- Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review. JPMorgan reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or conditions or other factors change from those used to set our fees.

- The escrow deposit shall be continuously invested in a JPMorgan Chase Bank money market deposit account ("MMDA") or a JPMorgan Chase Bank Cash Compensation account. MMDA and Cash Compensation Accounts have rates of compensation that may vary from time to time based upon market conditions.

- The Parties acknowledge and agree that they are permitted by U.S. law to make up to six (6) pre-authorized withdrawals or telephonic transfers from an MMDA per calendar month or statement cycle or similar period. If the MMDA can be accessed by checks, drafts, bills of exchange, notes and other financial instruments ("Items"), then no more than three (3) of these six (6) transfers may be made by an Item. The Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days notice prior to a withdrawal from a money market deposit account.

- Payment of the invoice is due upon receipt.

**Compliance**

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account.  We may ask for information that will enable us to meet the requirements of the Act.

## Schedule A

### Telephone Number(s) for Call-backs and
### Person(s) Designated to Give and Confirm Funds Transfer Instructions

If to the Seller:

Caribbean Petroleum Corporation
TIN#: 25-1407836
Address:
Rd. 28, Km. 2
Luchetti Industrial Park
Bayamon, PR 00961


Wire Instructions:        Caribbean Petroleum Corporation
                          Banco Popular de Puerto Rico
                          ABA #:  021502011
                          Acct #:   13 1390384
                           Ref:  363 Escrow


| Name | Telephone Number | Signature |
|------|------------------|-----------|
| Roy Messing | (212) 499-3677 | Restructuring Officer |

Sch. A-1

**Schedule A**

**Telephone Number(s) for Call-backs and**
**Person(s) Designated to Give and Confirm Funds Transfer Instructions**

If to the Sellers:

[        ]
TIN#:         [      ]
Address:      [      ]

Wire Instructions:    JP Morgan Chase Bank - New York, New York
                      ABA #:        021000021
                      Acct Name:    [      ]
                      Acct #:       [      ]
                      Ref:          [      ]

Name                  Telephone Number           Signature

1. [      ]           [      ]            _____

2. [      ]           [      ]            _____


If to Buyer:

Puma Energy International B.V.
Branch Office Geneva
2, Quai de La Poste
CH-1203 Geneva
Switzerland


Wire Instructions:

Credit Suisse SA Geneva
1 Quai des Bergues
CH-1211 Geneva
Switzerland

Currency: USD
Acc. Nr: CH68 0483 5143 0870 9200 0
SWIFT: CRESCHZZ80A

Name                  Telephone Number           Signature

1. Muriel Noblet      +41 22 594 6160

2. Laurent Symolon    +41 22 594 6160

Sch. A-1

Telephone call backs shall be made to both Escrow Parties if joint instructions are required pursuant to the agreement.  All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer.

Wire Instructions for Escrow Account:

ABA:  021000021
SWIFT:  CHASUS33
Name of Bank:  JPMorgan Chase Bank
Account Number:  507953312
Account Name:  Escrow Incoming Wire Account
Ref:  further credit to 899569289; Puma/Caribbean Petroleum
Attn:  Florence Hanley

Sch. A-3

**Exhibit D**

Form of Bill of Sale

EXHIBIT D

## **FORM OF BILL OF SALE**

1.      Sale and Transfer of Assets.  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and as contemplated by that certain Asset Purchase Agreement dated as of December 17, 2010 (the "Agreement") by and among PUMA ENERGY INTERNATIONAL B.V. ("Buyer") and Debtors and Debtors-In-Possession CARIBBEAN PETROLEUM CORPORATION, CARIBBEAN PETROLEUM REFINING L.P. and GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION (each individually, a "Seller" and, collectively, the "Sellers"), Sellers hereby sell, assign, transfer, convey and deliver to Buyer and Buyer's successors and assigns all of Sellers' right, title and interest in and to all of the Acquired Assets.  For the avoidance of doubt Sellers are not selling, assigning, transferring, conveying or delivering to Buyer any of the Excluded Assets.  Capitalized terms used but not defined herein shall have the meanings given to such terms in the Agreement.

2.      Terms of the Agreement.  This Bill of Sale is in accordance with and is subject to all of the terms and conditions of the Agreement.  Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of the Sellers, Buyer or the Buyer's designee contained in the Agreement.

3.      Governing Law.  This Bill of Sale shall in all aspects be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

[Signature Pages Follow]

* * * * * *

IN WITNESS WHEREOF, each Seller has executed this Bill of Sale as of _____, 20__.

**CARIBBEAN PETROLEUM CORPORATION**

By: _____
     Name:
     Title:

**CARIBBEAN PETROLEUM REFINING L.P.**

By: _____
     Name:
     Title:

**GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION**

By: _____
     Name:
     Title:

**Exhibit E**

Form of Deed

EXHIBIT E

NUMBER

## DEED OF PURCHASE-SALE

In the City of San Juan, Commonwealth of Puerto Rico, this _____ (___) day of _____, two thousand eleven (2011).

### BEFORE ME

_____, Attorney-at-Law and Notary Public in and for the Commonwealth of Puerto Rico, with offices in building number two hundred seventy (270), Muñoz Rivera Avenue, Hato Rey, San Juan, Puerto Rico and residence in Guaynabo, Puerto Rico.

### APPEAR

AS PARTY OF THE FIRST PART: [CARIBBEAN PETROLEUM CORPORATION] (hereinafter referred to as "Seller"), a corporation organized and existing under the laws of the State of Delaware and duly authorized to do business in the Commonwealth of Puerto Rico, represented in this act by its [_____], _____, of legal age, corporate executive and resident of San Juan, Puerto Rico, duly authorized to appear on its behalf pursuant to (describe authority).

AS PARTY OF THE SECOND PART: PUMA ENERGY INTERNATIONAL B.V. (hereinafter referred to as the "Buyer"), a Corporation organized under the laws of the Netherlands, represented by its _____, represented by _____, of legal age, corporate executive and a resident of San Juan, Puerto Rico, who is authorized to appear on behalf and in representation of said party pursuant to (describe authority).

I, the Notary, hereby certify that I personally know the persons appearing herein (or certify the means by which they have been identified) and I further certify through their statements as to their age, professions and residence. They assure me that they have and in my judgment they do have the necessary legal capacity to execute this instrument, and therefore they freely and voluntarily.

### STATE

FIRST: That on _____, _____ (___), two thousand and ten (2010), the United States Bankruptcy Court for the District of Delaware, in the case of Caribbean Petroleum Corp., et al, case number 10-12553(KG), entered an Order (hereinafter, the "Order") approving the sale of substantially all of the Assets of Seller, including the real property identified below (hereinafter, the "Property"), free and clear of all liens other than Permitted Liens (as such term

is defined in the Asset Purchase Agreement by and among the Seller, the Buyer and the other parties thereto dated as of December 17, 2010 (the "Purchase Agreement"). A certified copy of the Order will be attached to the first certified copy of this Deed.

SECOND: That on December 16, 2010, an auction took place in the City of New York, State of New York, pursuant to which Buyer agreed to purchase the Property in the terms and conditions indicated in the Purchase Agreement.

THIRD: Seller is the owner in fee simple of the real property described as follows (hereinafter, the "Property"):

## "DESCRIPTION"

The Property was acquired by Seller pursuant to _____. The Property is recorded in _____ Section of the Registry of the Property of Puerto Rico at page _____ (____), volume _____ (____) at page _____ (____), Property Number _____ (____).

FOURTH: Seller has agreed to sell to Buyer and Buyer has agreed to purchase from Seller the Property, and in consideration of the premises and of the mutual agreements herein contained, Seller hereby sells to Buyer, who in return purchases from Seller the Property, under the following:

## TERMS AND CONDITIONS

One:    Purchase and Sale: Seller herein sells, transfers and conveys and Buyer herein buys, acquires and receives, upon the terms and conditions hereinafter set forth and set forth in the Purchase Agreement, together with all its rights, titles, improvements and any and all things appertaining thereto and/or forming part thereof, the Property described in Paragraph THIRD of the present deed.

Two:

(a)    Purchase Price and Method of Payment: The purchase price for the Property is _____ ($____ ) (the "Purchase Price"), which Purchase Price is paid by Buyer to Seller in this act as follows:

(b)    Surface Area: The Property is sold for the Purchase Price and any expression concerning the surface area of the Property appearing in the description of the same is merely of an informative nature and consequently there will be no reduction or increase in the Purchase Price nor any type of claim among the parties for any increase or decrease in the surface area that may be reflected in a future land survey of the Property.

Three:  <u>Cost and Expenses</u>: The cost and expenses related to the formalization of the purchase sale effected pursuant to the terms hereof shall be as follows:

> Buyer will pay the notarial tariff, stamps and transfer taxes, if any, attorneys fees and any other fees due in connection with this deed and other instruments of transfer of the Property, if any.

Four:  <u>Brokers</u>: The parties hereby warrant and represent to each other that they have not contracted with or retained the services of any broker in connection with the purchase and sale effected herein.

Five:  <u>Warranties and Representations</u>: Seller warrants and represents that it is the sole owner in fee simple of the Property, that it has sufficient capacity in law to enter into this agreement and transfer the title of the Property to the Buyer and that it hereby transfers to Buyer fee simple title to the Property sold, free and clear of any mortgage liens to the extent described in the Order (other than Permitted Liens), Seller sells the Property without any further warranties and representations in an "as is", "where is" condition without any representation or warranty whatsoever concerning the physical condition, including its surface area, geometric configuration or topography, quality and quantity of any improvements, access, zoning, construction or use permits, approvals or permits from governmental agencies, easements, encumbrances or any other matter or thing affecting or related to the Property.

Six:  <u>No Representations;</u>.  Seller has made no representations concerning the Property or any part of the same,  including any environmental condition, that might be affecting the Property, or as to its fitness for future development or use.

Seven: <u>Delivery of Possession</u>: Actual possession of the Property shall be delivered by Seller to Buyer upon the execution and delivery of this Deed.

Eight:  <u>Additional Documentation</u>: The parties hereby affirm that they have the required corporate power to enter into this Agreement and execute the  present deed and agree to execute any additional document or instrument, notarial or otherwise, necessary for the recording and transfer of the fee simple title to the Property in the name of Buyer in the Registry of Property of Puerto Rico.

<u>ACCEPTANCE</u>

I, the Notary, do hereby certify that I advised the appearing parties of the legal effect of the present deed, who waived their right to have attesting witnesses in this instrument, after having duly advised them of such right.

I, the Notary, also certify and attest that this document was read by the parties and having found it in accordance with their wishes and instructions they approve and ratify the content thereof and sign before me placing their initials on each and every page of the original of this deed.

I, the Notary, further certify and attest that the appearing parties and I know and fully understand the English language and I attest as to my personal acquaintance to the appearing parties and to their personal qualifications.

-3-

TO ALL OF WHICH, under my signature and seal, signing and sealing the same according to law, I the undersigned Notary, ATTEST.

**Exhibit F**

Form of Assignment and Assumption Agreement

EXHIBIT F

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

   This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made this __ day of _____, 20__, by and among PUMA ENERGY INTERNATIONAL B.V. ("Assignee") and Debtors and Debtors in Possession CARIBBEAN PETROLEUM CORPORATION, CARIBBEAN PETROLEUM REFINING L.P. and GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION (each individually, an "Assignor" and, collectively, the "Assignors").  Assignor and Assignee are referred to herein individually as a "Party" and collectively as the "Parties."

## W I T N E S S E T H:

   WHEREAS, the Assignors and the Assignee have entered into that certain Asset Purchase Agreement dated as of December 17, 2010 (the "APA"); and

   WHEREAS, all capitalized terms used herein and not defined herein are used as defined in the APA; and

   WHEREAS, pursuant to, and in accordance with the terms of, the APA, the Assignors have agreed to transfer and assign to the Assignee all of Assignors' right, title and interest in and to, as the same shall exist on the date hereof, the Assumed Contracts, and the Assignee (i) has agreed and desires to accept from the Assignors all of the Assignors' right, title and interest in and to the Assumed Contracts and (ii) has agreed and desires to assume the Assumed Liabilities from the Assignors.

   NOW THEREFORE, in consideration of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

   1.  Assignment.  Each Assignor does hereby convey, assign, transfer and deliver to the Assignee (i) all of such Assignor's right, title and interest in and to the Assumed Contracts and (ii) the Assumed Liabilities and all of such Assignor's obligations to pay the Assumed Liabilities.

   2.  Acceptance and Assumption.  The Assignee hereby (i) accepts the conveyance, assignment, transfer and delivery of the Assumed Contracts and (ii) assumes and agrees to pay, perform and discharge when due the Assumed Liabilities in accordance with the terms thereof.

   3.  Terms of the APA.  This Agreement is in accordance with and is subject to all of the terms and conditions of the APA.  Nothing contained in this Agreement shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of the Assignors, or the Assignee contained in the APA.

4.        <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5.        <u>Further Assurances</u>.  The Assignors and the Assignee shall execute and deliver, or cause to be executed and delivered, from time to time hereafter, upon request and without further consideration, all such further documents and instruments and shall do and perform all such acts as may be reasonably necessary to give full effect to the intent of this Agreement.

6.        <u>Governing Law</u>.  This Agreement shall in all aspects be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.  For so long as Assignors are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Assignors are no longer subject to the jurisdiction of the Bankruptcy Court or if the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Agreement, such matter shall be brought in the courts in the Court of Chancery for the State of Delaware in and for New Castle County (the "<u>Chancery Court</u>"), and in the event that the Chancery Court does not have subject matter jurisdiction as to a matter arising out of or relating to this Agreement, in any state or federal court of the State of Delaware located in New Castle County.  Each of the Parties hereto agrees that any action instituted by it arising out of or relating to this Agreement will be instituted exclusively in one of the above specified courts.  Each Party waives any defense of inconvenient forum to the maintenance of any dispute or action so brought, consents to service of process by mail and waives any objection to venue in any such court.  Each party agrees that a final judgment in any dispute or action so brought will be conclusive and may be enforced by dispute or action on the judgment or in any other manner provided at law (common, statutory or other) or in equity.

7.        <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to constitute an original, but all of which together shall constitute one and the same instrument.

8.        <u>Miscellaneous</u>.  The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not affect in any way the meaning or interpretation of this Agreement.

*[Signature Page Follows]*

USActive 21231064.4

IN WITNESS WHEREOF, the Assignors and the Assignee have executed this Assignment and Assumption Agreement as of the date first written above.

**CARIBBEAN PETROLEUM CORPORATION**

By: _____
     Name:
     Title:

**CARIBBEAN PETROLEUM REFINING L.P.**

By: _____
     Name:
     Title:

**GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION**

By: _____
     Name:
     Title:

**PUMA ENERGY INTERNATIONAL
B.V.**


By: _____
     Name:
     Title:

**Exhibit G**

Form of Trademark Assignment

Exhibit G

## **FORM OF TRADEMARK ASSIGNMENT**

This TRADEMARK ASSIGNMENT is effective as of this __ day of [        ], 20[        ].

WHEREAS, Debtors and Debtors-In-Possession CARIBBEAN PETROLEUM CORPORATION, CARIBBEAN PETROLEUM REFINING L.P. and GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION (each individually, an "Assignor" and, collectively, the "Assignors"), are the owners of all right, title and interest in and to each of the trademarks, service marks and trade names listed on Schedule A annexed hereto, registered and unregistered, throughout the world, as well as all applications for registration and licenses or other rights in respect thereof and all goodwill associated therewith (collectively, the "Marks"); and

WHEREAS, PUMA ENERGY INTERNATIONAL, B.V. ("Assignee"), desires to acquire all right, title and interest in and to each of the Marks; and

WHEREAS, Assignors and Assignee entered into that certain Asset Purchase Agreement dated as of December 17, 2010 (the "Asset Purchase Agreement"), pursuant to which Assignors have agreed to sell to Assignee and Assignee has agreed to purchase from Assignors certain Acquired Assets as defined therein, including all of the Assignors' right, title and interest in and to the Marks, in accordance with the terms, conditions and provisions of the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.    Assignment.  Each Assignor does hereby convey, assign, transfer and deliver to Assignee all of such Assignor's right, title and interest in and to each of the Marks, together with the goodwill symbolized by such Marks, and with the right to sue and collect damages and/or profits for past infringements of said Marks, the intent hereof being to substitute Assignee in the place of Assignors.

2.    Acceptance and Assumption.  The Assignee hereby accepts the conveyance, assignment, transfer and delivery of the Marks, together with all goodwill and other intangible assets associated therewith.

3.    Terms of the Asset Purchase Agreement.  This Trademark Assignment is in accordance with and is subject to all of the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Trademark Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of the Assignors or the Assignee contained in the Asset Purchase Agreement.

4.      <u>Successors and Assigns</u>.  This Trademark Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5.      <u>Further Assurances</u>.  The Assignors and the Assignee shall execute and deliver, or cause to be executed and delivered, from time to time hereafter, upon request and without further consideration, all such further documents and instruments and shall do and perform all such acts as may be reasonably necessary to give full effect to the intent of this Trademark Assignment.

6.      <u>Governing Law</u>.  This Trademark Assignment shall in all aspects be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.  For so long as Assignors are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Trademark Assignment, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Assignors are no longer subject to the jurisdiction of the Bankruptcy Court or if the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Trademark Assignment, such matter shall be brought in the courts in the Court of Chancery for the State of Delaware in and for New Castle County (the "<u>Chancery Court</u>"), and in the event that the Chancery Court does not have subject matter jurisdiction as to a matter arising out of or relating to this Assignment, in any state or federal court of the State of Delaware located in New Castle County.  Each of the Parties hereto agrees that any action instituted by it arising out of or relating to this Trademark Assignment will be instituted exclusively in one of the above specified courts.  Each Party waives any defense of inconvenient forum to the maintenance of any dispute or action so brought, consents to service of process by mail and waives any objection to venue in any such court.  Each party agrees that a final judgment in any dispute or action so brought will be conclusive and may be enforced by dispute or action on the judgment or in any other manner provided at law (common, statutory or other) or in equity.

7.      <u>Counterparts</u>.  This Trademark Assignment may be executed in two or more counterparts, each of which shall be deemed to constitute an original, but all of which together shall constitute one and the same instrument.

8.      <u>Miscellaneous</u>.  The section headings contained in this Trademark Assignment are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not affect in any way the meaning or interpretation of this Trademark Assignment.

[Remainder of page left intentionally blank]

IN WITNESS WHEREOF, the Assignors and the Assignee have executed this Trademark Assignment as of the date first written above.

**CARIBBEAN PETROLEUM CORPORATION**

By: _____
    Name:
    Title:

**CARIBBEAN PETROLEUM REFINING L.P.**

By: _____
    Name:
    Title:

**GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION**

By: _____
    Name:
    Title:

**PUMA ENERGY INTERNATIONAL B.V.**


By: _____
     Name:
     Title:

**Schedule A**

**Exhibit H**

Form of Intellectual Property Assignment

EXHIBIT H

## FORM OF INTELLECTUAL PROPERTY ASSIGNMENT

This INTELLECTUAL PROPERTY ASSIGNMENT (this "Assignment") is made this __ day of [            ], 20[   ], by and among PUMA ENERGY INTERNATIONAL B.V. ("Assignee") and Debtors and Debtors-In-Possession CARIBBEAN PETROLEUM CORPORATION, CARIBBEAN PETROLEUM REFINING L.P. and GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION (each individually, an "Assignor" and, collectively, the "Assignors").  Each Assignor and Assignee are referred to herein individually as a "Party" and collectively as the "Parties."

## W I T N E S S E T H:

WHEREAS, the Assignors and the Assignee have entered into that certain Asset Purchase Agreement dated as of December 17, 2010 (the "APA"); and

WHEREAS, all capitalized terms used herein and not defined herein are used as defined in the APA; and

WHEREAS, pursuant to, and in accordance with the terms of, the APA, the Assignors have agreed to transfer and assign to the Assignee all of Assignors' right, title and interest in and to, as the same shall exist on the date hereof, the Acquired Intellectual Property, and the Assignee has agreed and desires to accept from the Assignors all of the Assignors' right, title and interest in and to the Acquired Intellectual Property; and

WHEREAS, the Acquired Intellectual Property includes, without limitation, the trademarks, service marks and trade names listed on Schedule A attached hereto (the "Marks"), which Marks have been separately conveyed to Assignee pursuant to that certain Trademark Assignment among the Assignors and Assignee dated the date hereof.

NOW THEREFORE, in consideration of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.      Assignment.  Each Assignor does hereby convey, assign, transfer and deliver to the Assignee (i) all of such Assignor's right, title and interest in and to the Acquired Intellectual Property (other than the Marks), together with all goodwill and other intangible assets associated therewith.

2.      Acceptance and Assumption.  The Assignee hereby accepts the conveyance, assignment, transfer and delivery of the Acquired Intellectual Property (other than the Marks), together with all goodwill and other intangible assets associated therewith.

3.      Terms of the APA.  This Assignment is in accordance with and is subject to all of the terms and conditions of the APA.  Nothing contained in this Assignment shall be

deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of the Assignors or Assignee contained in the APA.

4.    <u>Successors and Assigns</u>.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5.    <u>Further Assurances</u>.  The Assignors and the Assignee shall execute and deliver, or cause to be executed and delivered, from time to time hereafter, upon request and without further consideration, all such further documents and instruments and shall do and perform all such acts as may be reasonably necessary to give full effect to the intent of this Assignment.

6.    <u>Governing Law</u>.  This Assignment shall in all aspects be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.  For so long as Assignors are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Assignment, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Assignors are no longer subject to the jurisdiction of the Bankruptcy Court or if the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Assignment, such matter shall be brought in the courts in the Court of Chancery for the State of Delaware in and for New Castle County (the "<u>Chancery Court</u>"), and in the event that the Chancery Court does not have subject matter jurisdiction as to a matter arising out of or relating to this Assignment, in any state or federal court of the State of Delaware located in New Castle County.  Each of the Parties hereto agrees that any action instituted by it arising out of or relating to this Assignment will be instituted exclusively in one of the above specified courts.  Each Party waives any defense of inconvenient forum to the maintenance of any dispute or action so brought, consents to service of process by mail and waives any objection to venue in any such court.  Each party agrees that a final judgment in any dispute or action so brought will be conclusive and may be enforced by dispute or action on the judgment or in any other manner provided at law (common, statutory or other) or in equity.

7.    <u>Counterparts</u>.  This Assignment may be executed in two or more counterparts, each of which shall be deemed to constitute an original, but all of which together shall constitute one and the same instrument.

8.    <u>Miscellaneous</u>.  The section headings contained in this Assignment are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not affect in any way the meaning or interpretation of this Assignment.

*[Signature Page Follows]*

2

IN WITNESS WHEREOF, the Assignors and the Assignee have executed this Assignment and Assumption Agreement as of the date first written above.

**CARIBBEAN PETROLEUM CORPORATION**

By: _____
    Name:
    Title:

**CARIBBEAN PETROLEUM REFINING L.P.**

By: _____
    Name:
    Title:

**GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION**

By: _____
    Name:
    Title:

**PUMA ENERGY INTERNATIONAL B.V.**


By: _____
    Name:
    Title:

## **Schedule A**

**Annex A**

Assumed Contracts

**Annex A**
Assumed Contracts

| Executory Contracts to be Assumed | | |
|---|---|---|
| **Name and Address** | **Concept** | **Cure Amount** |
| Compañía de Comercio y Exportación de Puerto Rico PO Box 195009    San Juan, PR 00919-5009 | Pipelines Right of Way Contract | $1,846.42 |
| Puerto Rico Industrial Development Company (PRIDCO) PO Box 362350 SAN JUAN, PR 00936-2350 | L-057-3-66-08-A Mooring Bollards Contract. Project No. (Parcel of Land) L-057-3-66-08-A | $0.00 |
| Puerto Rico Industrial Development Company (PRIDCO) PO Box 362350 SAN JUAN, PR 00936-2350 | Tax Exemption Grant | $0.00 |
| Marina Puerto Chico P.O. Box 488 Puerto Real Fajardo, PR 00740-0488 | Station 459 Supply | $0.00 |
| ADJA Corp. c/o Garage Bonin Corp. P.O. Box 242 Barceloneta, PR 00617- | Station 300 Lease | $0.00 |
| Iván Sierra Cintrón Laderas de Palma Real Cervantes W-7-32 San Juan, PR 00926 | Station 304 Lease | $1,548.39 |
| Arturo R. Umpierre P.O. Box 10518 Caparra Heights Station San Juan, PR 00922-10518 | Station 304 Lease | $6,625.00 |
| Miguel Cotto - Caguas HC 7 Box 34328 Caguas, PR 00725-9420 | Station 321 Lease | $18,125.00 |
| Abraham Petroleum 335 Calle Tiburon Paseo Las Olas Dorado, PR 00646- | Station 327 Lease | $0.00 |
| Russe, Pedro R. - Morovis HC-02 Box 6035 Sector La Línea Morovis, PR 00717-9722 | Station 342 Lease | $0.00 |
| Armando Santiago Urb. Los Flamboyanes # 24 Aguada, PR 00602 | Station 345 Lease | $0.00 |
| Rubén Ruíz CH-01 Box 6621 Carr. 132 Km.3.7 Guayanilla, PR 00656 | Station 345 Lease | $1,856.19 |
| Arturo Reyes Nieves P.O. Box 669 Manatí, PR 00701- | Station 361 Lease | $2,048.84 |

**Annex A**
Assumed Contracts

| Name and Address | Concept | Cure Amount |
|---|---|---|
| Alomac Properties And Realty, Inc. HC 7 Box 34328 Caguas, PR 00725-9420 | Station 366 Lease | $0.00 |
| Cuevas González, Noel P.O. Box 763 Camuy, PR 00627- | Station 371 Lease | $0.00 |
| Rullán Bayron, Alberto Garza No. 5 Adjuntas, PR 00610- | Station 376 Lease | $1,122.50 |
| Coop. Gasolinera De Hato Tejas P.O. Box 282 Bayamón, PR 00960- | Station 402 Lease | $0.00 |
| Mark Ter Horst P.O. Box 8490 Humcao, PR 00792 | Station 404 Lease | $1,432.50 |
| Iván Bird Díaz P.O. Box 946 Fajardo, PR 00738 | Station 404 Lease | $4,354.84 |
| Yacoub Husni P.O. Box 1813 Utuado, PR 00641- | Station 406 Lease | $0.00 |
| Hamad Corporation Calle Dr. Cueto 19 Utuado, PR 00641- | Station 407 Lease | $0.00 |
| Francisco Ortiz Roura P.O. Box 1502 Orocovis, PR 00720- | Station 414 Lease | $44,020.00 |
| Caribbean Airport Facilities P.O. Box 1903 Carolina, PR 00628- | Station 415 Lease | $0.00 |
| No Dealer | Station 424 Lease | $1,354.84 |
| Antonio Torres P.O. Box 1497 Rio Grande, PR 00745- | Station 425 Lease | $0.00 |
| Villa Turabo Service Station, Inc. HC 7 Box 34328 Caguas, PR 00727-9420 | Station 427 Lease | $5,700.00 |

**Annex A**
Assumed Contracts

| Name and Address | Concept | Cure Amount |
|---|---|---|
| Hato Gas Service Station, Inc. HC 7 Box 34328 Caguas, PR 00725-9420 | Station 428 Lease | $0.00 |
| Wifki Awadallah Ave. Central Esq. San Patricio # 1625 Las Lomas Río Piedras, PR 00921- | Station 431 Lease | $0.00 |
| Johnny Hernandez Rosado P.O. Box 634 Las Croabas Fajardo, PR 00648 | Station 432 Lease | $658.06 |
| Nieves Ocasio, Juan Ramon - Quebradillas HC-02 Box 10094 Quebradillas, PR 00678- | Station 435 Lease | $7,715.00 |
| Vega Baja Gulf, Inc. P.O. Box 2131 Vega Baja, PR 00694-2131 | Station 440 Lease | $0.00 |
| Agustin Colon Dueño P.O. Box 8962 Fernandez Juncos Station San Juan, PR 00910 | Station 441 Lease | $1,161.29 |
| Torres Droz, David - Las Marías P.O. Box 373 Las Marías, PR 00670- | Station 445 Lease | $0.00 |
| Jose Rivera Torres HC-03 Box 15623 Bo. Jacaguas Juana Díaz, PR 00795-9523 | Station 446 Lease | $0.00 |
| Genaro Gonzalez P.O. Box 373182 Cavey, PR 00673 | Station 449 Lease | $2,322.58 |
| Mahmoud Ali Shehadeh P.O. Box 3313 Vega Alta, PR 00692- | Station 453 Lease | $0.00 |
| Cruz Rivera, Jose A. - Caguas Urb. Villanueva Calle 4 Esq. 5 Q-9 Caguas, PR 00725- | Station 463 Lease | $0.00 |
| Coop. Gasolinera De Dorado - Dorado P.O. Box 407 Dorado, PR 00646-0407 | Station 464 Lease | $0.00 |
| William Calo Arroyo #43 Paseo de la Flores Primavera Encantata Trujilloo Alto, PR 00976 | Station 467 Lease | $4,401.29 |

**Annex A**
Assumed Contracts

| Name and Address | Concept | Cure Amount |
|---|---|---|
| Santa Paula Oil P.O. Box 8618 Bayamón, PR 00960-8035 | Station 469 Lease | $800.00 |
| Abraham Petroleum 335 Calle Tiburon Paseo Las Olas Dorado, PR 00646- | Station 472 Lease | $0.00 |
| King Oil Corp. P.O. Box 69001 Suite 118 Hatillo, PR 00659-6901 | Station 473 Lease | $400.00 |
| A.Y.N. Investment P.O. Box 69001 Suite 118 Hatillo, PR 00659-6901 | Station 474 Lease | $0.00 |
| Al Amana Corp, Bayamon P.O. Box 3313 Vega Alta, PR 00692- | Station 479 Lease | $400.00 |
| Ríos Ruiz, Luis Angel HC-02 Box 6026 Adjuntas, PR 00601-9601 | Station 483 Lease | $0.00 |
| Abraham Petroleum 335 Calle Tiburon Paseo Las Olas Dorado, PR 00646- | Station 485 Lease | $0.00 |
| Ramón L. Nieves, Corozal HC-01 Box 3721 Corozal, PR 00643- | Station 487 Lease | $0.00 |
| Gama Group, Inc. P.O. Box 8631 Bayamón, PR 00960-8631 | Station 489 Lease | $3,741.06 |
| Luis R. Coss Rivera HC-70 Box 25999 San Lorenzo, PR 00754- | Station 497 Lease | $39,827.12 |
| Deleon Bello, Pedro J. - Manatí P.O. Box 1608 Vega Baja, PR 00694-1608 | Station 499 Lease | $1,292.89 |
| Glorisan, Inc. - Ponce Urb. Caminos del Sur Calle Pelicano # 407 Ponce, PR 00731- | Station 600 Lease | $5,575.94 |
| Abraham Petroleum 335 Calle Tiburon Paseo Las Olas Dorado, PR 00646- | Station 732 Lease | $0.00 |

**Annex A**
Assumed Contracts

| Name and Address | Concept | Cure Amount |
|---|---|---|
| Abraham Petroleum 335 Calle Tiburon Paseo Las Olas Dorado, PR 00646- | Station 736 Lease | $0.00 |
| Morales, William - Guanica Box 595 Guanica, PR 00653- | Station 801 Lease | $0.00 |
| Wifki Awadallah Ave. Central Esq. San Patricio # 1625 Las Lomas Río Piedras, PR 00921- | Station 802 Lease | $0.00 |
| Víctor M. González Calle Oviero Bloque 7 # 3 Urb. Torrimar Guaynabo, PR 00966 | Station 803 Lease | $483.87 |
| V & F Administration Group, Inc. 68 Palmeras Reales Humacao, PR 00791 | Station 804 Lease | $5,960.00 |
| Terrenos del Este, Inc. P.O. Box 946 Fajardo, PR 00738 | Station 804 Lease | $10,816.19 |
| Reynaldo Delgado Lebron P.O. Box 717 Punta Santiago Humacao, PR 00741 | Station 900 Lease | $2,969.60 |
| Caez Rodríguez, Carlos Villa Carolina Calle 603 Bloque 222 # 23 Carolina, PR 00985- | Station 905 Lease | $20,385.00 |
| **Total Cure Amount:** | **$198,944.41** | |

**Annex B**

Owned Real Property

**Annex B**

Owned Real Property

USActive 21336229.2

**Annex B**

Owned Real Property[1]

1. **San Juan Harbor Deepwater Dock and Inland Real Property**

**Deepwater Dock:**

A.    LOCATION:

The dock is located in Pueblo Viejo Ward, Municipality of Guaynabo, Puerto Rico and approximately four hundred (400) feet West of the United States Army Terminal dock.

B.    STRUCTURES:

(i)  The dock  work area consists of a twenty feet by creosoted timber structure fourteen feet above MLW supported by steel framing on the thirteen sixteen inch O.D. steel pipe piles filled with concrete.

(ii)  Pipe lines to dock work area are supported on sixteen two pile bents spaced twenty feet O.C. The two piles in each bent are sixteen inch O.D. pipe spaced twelve feet O.C., they are filled with concrete and tied together by a concrete cap twenty four inches deep by twenty inches wide timber walk way runs from the shore to the dock and supported on these bents.

Purchased from the Puerto Rico Industrial Development Company pursuant to Deed No. 13 of April 14, 1965, before Notary Julio Martinez Julia.

2. **Bayamon Property; Location of Tank Farm and Refinery**

3. **The Pipeline**

The Compañía de Comercio y Exportación de Puerto Rico (CEC) is the owner of a parcel of land located in Guaynabo, Puerto Rico.  From this Property, CEC granted an easement for the location of certain pipelines pursuant to a Personal Easement Contract dated September 1, 2005.  According to this contract, the easement is described as follows:

Predio de terreno de nueve mil cien (9,100) pies de largo por treinta y cinco (35) de ancho, equivalente a siete punto tres uno dos (7.312) acres, equivalente a siete punto cuatro siete cuatro (7.474) cuerdas, colindante con la parte Este de la propiedad de "Capeco" en Bayamon hasta la carretera 165, Km. 2, donde ubica el proyecto conocido como Centro Mercantil Internacional en el área de Pueblo Viejo, Guaynabo, Puerto Rico.

---

[1] The property descriptions set forth herein are subject to confirmation with local counsel and such descriptions may accordingly be updated by Sellers.

4.      **The Undeveloped Land**

Description: Parcel of land located in the Juan Sánchez ward of the Municipality of Bayamón, having an area of sixty seven point eight seven nine four (67.8794) cuerdas, equivalent to two hundred sixty six thousand seven hundred ninety two point eight three three five (266,792.8335) square meters and bounded on the North, by the De Diego Expressway, by the South, with the remnant of the property from which this parcel was segregated and by property of PROGASCO, on the East, with land of the United States of America and the Commonwealth of Puerto Rico and on the West, with lands of Radio Station WIAC and with lands of PROGASCO.

5.      **Service Station No. 1**

Description of Property
Property Number 14,390
Station 1
Address: Marginal & Paz Forest Hills, Bayamón

6.      **Service Station No. 4**

Description of Property
Property Number 37,477
Station 4
Address: Ave. Las Rosas, Urb. Los Angeles, Carolina

7.      **Service Station No. 6**

Description of Property
Property Number 17478
Station 6
Address: San Patricio & Central, Las Lomas R. Piedras

8.      **Service Station No. 7**

Description of Property
Property Number 20737
Station Number 7
Address: Ave. De Diego & Carr. 21 Rep. Metropolitano

9.      **Service Station No. 10**

Description of Property
Property Number 23898
Station 10
Address: Calle 52 & 54 Urb. La Riviera, Río Piedras

10.    **Service Station No. 11**

Description of Property
Property Number 13139
Station 11
Address: Calle Betances # 90 Caguas

11.    **Service Station No. 12**

Description of Property
Property Number 3203
Station 12
Address: Carr. 3 26 Km. 8 Vistamar, Carolina

12.    **Service Station No. 13**

Description of Property
Property Number 16,642
Station 13
Address: Ave. Comerio Norte, esq. Sabana Seca, Levittown

13.    **Service Station No. 17**

Description of Property
Property Number 15406
Station Number 17
Address: Carr. 1 Km. 35, Caguas

14.    **Service Station No. 18**

Description of Property
Property Number 5702
Station 18
Address: Carr. 181 & 183 San Lorenzo

15.    **Service Station No. 19**

Description of Property
Property Number 5854
Station 19
Address: Ave. 65 Infanteria  Km. 9.7 Carolina

16.    **Service Station No. 23**

Description of Property
Property Number 19806
Station 23

Address: Carr. # 2 Km. 184.3 Mayaguez

17.    **Service Station No. 24**

Description of Property
Property Number 21731
Station 24
Address: Ave. Muñoz Rivera # 1007, Rio Piedras

18.    **Service Station No. 27**

Description of the Property
Property Number 2434
Station 27
Address: Carr. 176 Km. 1.5 Cupey Bajo Rio Piedras

19.    **Service Station No. 28**

Description of the Property
Property Number
Station 28
Address: Ave. 65 Inf. Km. 19.8, Canovanas

20.    **Service Station No. 33**

Description of Property
Property Number 12983
Station 33.
Address: Carr. # 2 Km. 49.6 Manati

21.    **Service Station No. 34**

Description of Property
Property Number 15066
Station 34
Address: Boundary & 174 Santa Rosa Bayamon

22.    **Service Station No. 36**

Description of Property
Property Number 14878
Station 36
Address: Padre Noel & Los Meros, Ponce

23.    **Service Station No. 37**

Description of Property

Property Number 6844
Station 37
Address: Paraná Esq. Wesser, Rio Piedras Heights

24.    **Service Station No. 38**

Description of Property
Property Number 14098
Station Number 38
Address: Calle Georgetti # 3, Caguas

25.    **Service Station No. 39**

Description of Property
Property Number 5654
Station 39
Address: Carr. 901 Km. 0.5 Yabucoa

26.    **Service Station No. 40**

Description of Property
Property Number 3257
Station 40
Address:  Carr. # 2 Km. 3.5 Bechara, Puerto Nuevo

27.    **Service Station No. 41**

Description of Property
Property Number 8666
Sation Number 41
Address: Ave. De Diego, Rio Piedras

28.    **Service Station No. 43**

Description of Property
Property Number 13937
Station 43
Address: Esmeralda & Venus, Ponce de Leon Guaynabo

29.    **Service Station No. 45**

Description of Property
Property Number 32610
Station 45
Address: Carr. # 190 Km. 10.7 Valle Arriba, Carolina

30. **Service Station No. 47**

   <u>Description of Property</u>
   Property Number 10581
   Station 47
   Address: Carr. # 10 Km. 50.0 Utuado

31. **Service Station No. 49**

   <u>Description of Property</u>
   Property Number 1295
   Station 49
   Address: Carr. # 3 Km. 64.5 Bo. Daguao,  Naguabo

32. **Service Station No. 50**

   <u>Description of Property</u>
   Property Number 32193
   Station 50
   Address:  1908 Ave. Mcleary , Santurce

33. **Service Station No. 52**

   <u>Description of Property</u>
   Property Number 8559
   Station 52
   Address: Carr. 181 Km. 6.1 Bo. Jagual, San Lorenzo

34. **Service Station No. 55**

   <u>Description of Property</u>
   Property Number 11959
   Station 55
   Address: Mckinley # 111, Mayaguez

35. **Service Station No. 56**

   <u>Description of Property</u>
   Property Number 6501
   Station 56
   Address: Carr. 119 Int. 362 Ave. A. Castro San German

36. **Service Station No. 58**

   <u>Description of Property</u>
   Property Number 28390
   Station 58

Address: Calle 4 & 5 Caparra Hills, Guaynabo

**37.**    **Service Station No. 59**

Description of Property
Property Number 12633
Station 59
Address: Carr. 108 Km. 3.5 Miradero, Mayaguez

**38.**    **Service Station No. 62**

Description of Property
Property Number 5500
Station 62
Address: Carr. 112  Km. 1.2 Mora Ward, Isabela

**39.**    **Service Station No. 68**

Description of Property
Property Number 1076
Station 68
Address: Carr. 2 Km. 162.2 Hormigueros

**40.**    **Service Station No. 69**

Description of Property
Property Number 645.
Station 69
Address: Carr. 844 km. 2.1 Cupey Bajo Rio Piedras

**41.**    **Service Station No. 70**

Description of Property
Property Number 6,721
Station 70
Address: Carr. 156 & 569 Orocovis

**42.**    **Service Station No. 71**

Description of Property
Property Number 14934
Station 71
Address: Alcazar & Madrid, Guaynabo

**43.**    **Service Station No. 73**

Description of Property

Property Number 3875
Station 73
Address: Carr. # 3 Km. 43.5 Fajardo

**44.    <u>Service Station No. 76</u>**

<u>Description of Property</u>
Property Number
Station 76
Address: Carr. # 1 Km. 59.3 Cayey

**45.    <u>Service Station No. 77</u>**

<u>Description of Property</u>
Property Number 1546
Station 77
Address:  Carr. # 1 Urb. Monserrate, Salinas

**46.    <u>Service Station No. 78</u>**

<u>Description of Property</u>
Property Number
Station 78
Address:  Calle D-D Marginal Valle Verde, Ponce

**47.    <u>Service Station No. 82</u>**

<u>Description of Property</u>
Property Number 3131
Station 82
Address: Carr. 3 Km. 33.3 Luquillo

**48.    <u>Service Station No. 84</u>**

<u>Description of Property</u>
Property Number 6344
Station 84
Address: Carr. 2 Km. 15.5 Corujo, Bayamon

**49.    <u>Service Station No. 88</u>**

<u>Description of Property</u>
Property Number
Station 88
Address: Ave. Victoria 565 Aguadilla

**50.    <u>Service Station No. 89</u>**

Description of Property
Property Number 4012
Station 89
Address: Carr. 721 Km. 74.0 Bo. Los Robles Aibonito

**51.     Service Station No. 93**

Description of Property
Property Number 15527
Station 93
Address: Carr. # 2 Km. 79.6 Radio Ville, Arecibo

**52.     Service Station No. 94**

Description of Property
Property Number 1392
Station 94
Address: Carr. 176 Km. 3.8 Cupey Alto Rio Piedras

**53.     Service Station No. 96**

Description of Property
Property Number 4692
Station 96
Address: Carr. # 3 km. 134.2 Bo. Algarrobo Guayama

**54.     Service Station No. 97**

Description of Property
Property Number
Station 97
Address: Calle 8 Esq. 19 Caguas Norte, Caguas

**55.     Service Station No. 98**

Description of Property
Property Number 26510
Station 98
Address: Glenview Shopping Center, Ponce

**56.     Service Station No. 101**

Description of Property
Property Number 1004
Station 101
Address: Carr. # 1 Km. 103, Santa Isabel

**57.**  **Service Station No. 102**

Description of Property
Property Number 2764
Station 102
Address: Carr. # 140 Km. 5.3 Florida

**58.**  **Service Station No. 103**

Description of Property
Property Number 255
Station 103
Address: Hwy. 165 Km. 1.8 Toa Alta

**59.**  **Service Station No. 104**

Description of Property
Property Number 2772
Station 104
Address: Carr. 2 & 140 Km. 57.8 C. Davila, Barceloneta

**60.**  **Service Station No. 105**

Description of Property
Property Number 5743
Station 105
Address: Cent. Comercial La Quinta, Yauco

**61.**  **Service Station No. 106**

Description of Property
Property Number
Station 106
Address: Carr. 2 Km. 120.7 Caimital Alto, Aguadilla

**62.**  **Service Station No. 111**

Description of Property
Property Number 15886
Station 111
Address: Carr. # 2 Km. 68.1 Santana, Arecibo

**63.**  **Service Station No. 112**

Description of Property
Property Number 6398
Station 112

Address: North & West Main, Sierra Bayamon, Bayamon

**64.**    **Service Station No. 113**

Description of Property
Property Number 15086
Station 113
Address: Ave. Betances Hermanas Davilas, Bayamon

**65.**    **Service Station No. 116**

Description of Property
Property Number 3095
Station 116
Address: Santa Rosa Esq. Poll, La Cumbre, Rio Piedras

**66.**    **Service Station No. 118**

Description of Property
Property Number 16359
Station 118
Address: Carr. 20 & Baldorioty  Km. 6.0 La Cumbre Guaynabo

**67.**    **Service Station No. 119**

Description of Property
Property Number 21641
Station 119
Address: Ave. Central & 1039 Puerto Nuevo

**68.**    **Service Station No. 120**

Description of Property
Property Number 16907
Station 120
Address: Carr. 10 Km. 85.9 Bo. Tamana, Arecibo

**69.**    **Service Station No. 122**

Description of Property
Property Number 4781
Station 122
Address: Carr. 699 & 854 Dorado

**70.**    **Service Station No. 123**

Description of Property

Property Number 1938
Station 123
Address: Carr. 343 Km. 0.3 Valle Hermoso, Hormigueros

**71.**    **Service Station No. 127**

Description of Property
Property Number
Station 127
Address: Calle 1 & 2 Fajardo Gardens, Fajardo

**72.**    **Service Station No. 129**

Description of Property
Property Number 16909
Station 129
Address: Carr. 129 Km. 39.4 Arecibo

**73.**    **Service Station No. 131**

Description of Property
Property Number 5541
Station 131
Address: Carr. 371 Km. 2.3 Bo. Almacigo, Yauco

**74.**    **Service Station No. 132**

Description of Property
Property Number 7316
Station 132
Address: Carr. 987 Km. 0.2  Fajardo

**75.**    **Service Station No. 133**

Description of Property
Property Number 16926
Station 133
Address: Ave. Jesus M. Fragoso & Ave. Fidalgo Diaz Carolina

**76.**    **Service Station No. 135**

Description of Property
Property Number 18999
Station 135
Address: Carr. 838 Main St. Santa Paula, Guaynabo

**77.**    **Service Station No. 138**

Description of Property
Property Number 38689
Station 138
Address: Calle Acasia # 1184  Highland Park, Rio Piedras

**78.**     **Service Station No. 139**

Description of Property
Property Number 43424
Station 139
Address: Carr. 2 Km. 8.3 Bayamon

**79.**     **Service Station No. 140**

Description of Property
Property Number 1842
Station 140
Address: Ave. 65 Infa. & Calle Martell, Rio Piedras

**80.**     **Service Station No. 141**

Description of Property
Property Number 3721
Station 141
Address: Carr. 152 Km. 12.3 Bo. Cedro Arriba, Naranjito

**81.**     **Service Station No. 143**

Description of Property
Property Number 3021
Station 143
Address:  Carr. 845 Km. 0.2  Cupey, Rio Piedras

**82.**     **Service Station No. 145**

Description of Property
Property Number 1834
Station 145
Address: Bo. Cuevas, Trujillo Alto

**83.**     **Service Station No. 146**

Description of Property
Property Number 17765
Station 146
Address: Univercity Gardens Bo. Hato Abajo, Arecibo

84.  **Service Station No. 147**

Description of Property
Property Number 16686
Station 147
Address: Carr. 156 Km. 57.7, Caguas

85.  **Service Station No. 148**

Description of Property
Property Number 20540
Station 148
Address: Ave. Domenech 403 & Calle Nueva, Rio Piedras

86.  **Service Station No. 150**

Description of Property
Property Number
Station 150
Address: Carr. 109 Km. 0.6, Añasco

87.  **Service Station No. 152**

Description of Property
Property Number 4,004
Station 152.
Address: 65 Inf. # 100 Sur, Lajas

88.  **Service Station No. 154**

Description of Property
Property Number 2,037
Station 154
Address: Carr. 144 Km. 16.8 Bo. Collores, Jayuya

89.  **Service Station No. 155**

Description of Property
Property Number 10,015
Station 155
Address: Ave. Jose Garrdo Esq. Aqua Marina Urb. Villa Blanca, Caguas

90.  **Service Station No. 156**

Description of Property
Property Number 3,744

Station 156
Address: Carr. # 3 Km. 45.2, Fajardo

**91.    Service Station No. 157**

Description of Property
Property Number 7111
Station 157
Address: Carr. # 149 Km. 66.2 Salida Villalba, Juana Diaz

**92.    Service Station No. 159**

Description of Property
Property Number 527
Station 159
Address: Calle Luchetti & Marginal St. Condado

**93.    Service Station No. 160**

Description of Property
Property Number19,394
Station 160
Address: Bo. Guanajibo, Urb. Sultana, Mayaguez

**94.    Service Station No. 161**

Description of Property
Property Number 4,993
Station 161
Address: Carr. 119 Km. 0.7, Camuy

**95.    Service Station No. 162**

Description of Property
Property Number 13,782
Station 162
Address: Calle 1 y Avenida Caguax, Caguas

**96.    Service Station No. 163**

Description of Property
Property Number 18,501
Station 163
Address: Las Lomas, Rio Piedras

**97.    Service Station No. 165**

Description of Property
Property Number 17,078
Station 165
Address: Carr. 3 2 Km. 129.2 Bo. Victoria, Aguadilla

**98.    Service Station No. 167**

Description of Property
Property Number 5,385
Station 167
Address: Carr. 14 Km. 10.8 Bo. Collores, Juana Díaz

**99.    Service Station No. 168**

Description of Property
Property Number 20,935
Station 168
Address: Carr. 3 Km. 80.1, Humacao

**100.    Service Station No. 169**

Description of Property
Property Number 5,000
Station 169
Address:  Carr. 2 Km. 49.4 Manati

**101.    Service Station No. 170**

Description of Property
Property Number 2,861
Station 170
Address: Carr. # 14 Km. 35.3 Coamo

**102.    Service Station No. 172**

Description of Property
Property Number 3,295
Station   172
Address: Carr. 125 Km. 4.0 Moca

**103.    Service Station No. 173**

Description of Property
Property Number 3204
Station 173
Address: Pontezuela & Marginal, Vistamar, Carolina

**104.** **Service Station No. 174**

Description of Property
Property Number 82
Station 174-1
Address: Ave. Ponce de Leon # 38 Esq. Sta. Rosa de Lima Bo. Sabana, Cataño

Description of Property
Property Number 716
Station 174-2
Address:

Description of Property
Property Number 1759
Station 174-3
Address:

**105.** **Service Station No. 176**

Description of Property
Property Number 13,706
Station 176
Address: Carr. # 1 Amatista Street Urb. Bucare, Rio Piedras

**106.** **Service Station No. 177**

Description of Property
Property Number 3,707
Station 177
Address: Carr. 189 Frente Colegio Turabo, Gurabo

**107.** **Service Station No. 178**

Description of Property
Property Number 4,015
Station 178
Address: Ave. Hostos # 80, Ponce

**108.** **Service Station No. 179**

Description of Property
Property Number 6,950
Station 179
Address: Calles 32 & 8 Jard. Metropolitanos, Rio Piedras

**109.** **Service Station No. 180**

Description of Property
Property Number
Station 180
Address: Carr. # 2 Salida Carr. 155, Vega Baja

**110.   Service Station No. 184**

Description of Property
Property Number 10760
Station 184
Address: Carr. # 2 Los Negritos, Ponce

**111.   Service Station No. 185**

Description of Property
Property Number 1,568
Station 185
Address: Carr. 151 Km. 0.5 Salida Orocovis Urb. Las Vegas, Villalba

**112.   Service Station No. 188**

Description of Property
Property Number 39,301
Station 188
Address: Marginal E urb. Los Angeles, Carolina

**113.   Service Station No. 191**

Description of Property
Property Number 1,049
Station 191
Address: Carr. 693 km. 8.2 Sardinera Beach, Hoteles Hyatt, Dorado

**114.   Service Station No. 192**

Description of Property
Property Number 4,396
Station 192
Address: Calle Palmer Final, Canóvanas

115. **Service Station No. 193**

Description of Property
Property Number 24,292
Station 193
Address: Las Américas & Dr. Biaggi Avenue, Ponce

116. **Service Station No. 194**

Description of Property
Property Number 13456
Station 194
Address: Carr. 2 Km. 77.4 Ave. Miranar, Arecibo

117. **Service Station No. 195**

Description of Property
Property Number 4057
Station 195
Address: Carr. # 3 Km. 135.2, Guayama

118. **Service Station No. 196**

Description of Property
Property Number 9,750
Station 196
Address: Carr. 1 Km. 40.6 Bo. Turabo, Caguas

119. **Service Station No. 198**

Description of Property
Property Number 38,459
Station 198
Address: Ave. Campo Rico Final, Sabana Gardens, Carolina

120. **Service Station No. 199**

Description of Property
Property Number 6372
Station 199
Address: Carr. 2 Km. 14.2 Hato Tejas, Bayamon

**DISCLOSURE SCHEDULE**

**In connection with the**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**CARIBBEAN PETROLEUM CORPORATION,**

**CARIBBEAN PETROLEUM REFINING L.P.,**

**GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION,**

**(SELLERS)**

**AND**

**PUMA ENERGY INTERNATIONAL B.V.**

**(BUYER)**

**DECEMBER 17, 2010**

## Schedule 1.1
## Insurance Policies and Binders

| Insured | Coverage | Lead Underwriter | Policy Number | Policy Period |
|---------|----------|------------------|---------------|---------------|
| Caribbean Petroleum Corporation | Coverage Binder: Storage Tank Third Party Liability, Corrective Action and Cleanup Policy Claims-made<br><br>• Third Party Bodily Injury and Property Damage<br>• Corrective Action Due to Underground Storage Tank Releases<br>• Cleanup of Pollutants Due to Aboveground Storage Tank Releases<br>• Defense | Liberty International Underwriters | TXM-PR-101957-110 | 5/31/2010 – 5/31/2011 |
| Caribbean Petroleum Corporation | Public Liability, Products and Completed Operations, Pollution Liability, Employers Liability | CV Starr Underwriting Agents Limited | WD1000241 | 5/31/2010 – 5/31/2011 |
| Caribbean Petroleum Corporation | Excess Liability<br><br>Tankfarm, refinery (mothballed), loading and unloading of vessels | CV Starr Underwriting Agents Limited | WD1000242 | 5/31/2010 – 5/31/2011 |
| Caribbean Petroleum Corporation, Caribbean Petroleum Refining L.P., First Oil International Ltd., Oil Resources International, Gulf Chemical Corporation, Gulf Petroleum Refining (Puerto Rico) Corporation, Puerto Rico Electric Power Authority<br><br>Additional Insured: First Bank of Puerto Rico, Banco Popular de Puerto Rico, American Finance Group, Inpecos A.G. | Excess Automobile Liability and Marine Terminal Operators Liability | Navigator Management Company | 10L0739/01 | 5/31/2010 – 5/31/2011 |
| Caribbean Petroleum Refining L.P., First Oil International, Oil Resources International, Gulf Chemical Corporation, Gulf Petroleum Refining (Puerto Rico) Corporation | Premises Pollution Liability Policy | Westchester Surplus Lines Insurance Company | PPL G22087861-003 | 5/31/2009 – 5/31/2011 |

| Insured | Coverage | Lead Underwriter | Policy Number | Policy Period |
|---------|----------|------------------|---------------|---------------|
| Additional Insured: First Bank of Puerto Rico, Westernbank Puerto Rico, American Finance Group, Inpecos A.G., Compania de Comercio y Exportacion de Puerto Rico, Puerto Rico Electric Power Authority | | | | |

## Schedule 1.2
## Property, Casualty Insurance, and D&O Insurance Policies

| Insured | Coverage | Lead Underwriter | Policy Number | Policy Period |
|---|---|---|---|---|
| Caribbean Petroleum Corporation, Inc. | Directors & Officers; Employment Practices Liability; Fiduciary Liability | Liberty Mutual Insurance Company<br><br>Broker: BHR Risk Services Inc. | VKU-1000444-10 | 3/8/2010 – 3/8/2011 |
| Caribbean Petroleum Corporation, First Oil International Ltd, Oil Resources International, Gulf Chemical Corporation, Gulf Petroleum Refining (Puerto Rico) Corporation, Caribbean Petroleum Refining Limited Partnership, and any subsidiary, affiliated, associated, owned or controlled entity or joint venture<br><br>Additional Insureds: First Bank of Puerto Rico, Westernbank Puerto Rico, American Finance Group, Inpecos A.G. | All Risks of Direct Physical Loss and/or Damage, and Business Interruption Insurance, excluding Marine and/or Vessel Impact | Lloyd's of London Syndicates Underwriters | EL1000281 | 5/31/2010 – 5/31/2011 |
| Caribbean Petroleum Corporation, First Oil International Ltd, Oil Resources International, Gulf Chemical Corporation, Gulf Petroleum Refining (Puerto Rico) Corporation, Caribbean Petroleum Refining Limited Partnership, and any subsidiary, affiliated, associated, owned or controlled entity or joint venture<br><br>Additional Insureds: First Bank of Puerto Rico, Westernbank Puerto Rico, American Finance Group, Inpecos A.G. | Excess All Risks of Direct Physical Loss and/or Damage, excluding Marine and/or Vessel Impact | Lloyd's of London Syndicates Underwriters | EL1000294 | 5/31/2010 – 5/31/2011 |

| Insured | Coverage | Lead Underwriter | Policy Number | Policy Period |
|---------|----------|------------------|---------------|---------------|
| Caribbean Petroleum Corporation, First Oil International Ltd, Oil Resources International, Gulf Petroleum Refining (Puerto Rico) Corporation, Caribbean Petroleum Refining Limited Partnership, and any subsidiary, affiliated, associated, owned or controlled entity or joint venture<br><br>Additional Insureds: First Bank of Puerto Rico, Westernbank Puerto Rico, American Finance Group, Inpecos A.G., BNP Paribas New York, First Bank Puerto Rico | Primary Marine Property<br><br>All Risks of Direct Physical Loss and/or Damage, and Business Interruption Insurance | Lloyd's of London Syndicates Underwriters | PP1008092 | 5/31/2010 – 5/31/2011 |
| Caribbean Petroleum Corporation, First Oil International Ltd, Gulf Petroleum Refining (Puerto Rico) Corporation, Caribbean Petroleum Refining Limited Partnership, and any subsidiary, affiliated, associated, owned or controlled entity or joint venture<br><br>Additional Insureds: First Bank of Puerto Rico, Westernbank Puerto Rico, American Finance Group, Inpecos A.G., BNP Paribas New York, First Bank Puerto Rico | Excess Marine Property<br><br>All Risks of Direct Physical Loss and/or Damage, and Business Interruption Insurance | Lloyd's of London Syndicates Underwriters | PP1008094 | 5/31/2010 – 5/31/2011 |
| Caribbean Petroleum Corporation | All Risks of Direct Physical Loss and/or Damage, and Business Interruption Insurance for all Real Property Relating to Scheduled Gas Stations | Integrand Assurance Company | CP-028040420-1 | 7/31/2010 – 7/31/2011 |

**Schedule 1.3**
**Excluded Assets**

None

**Schedule 1.4**
**Permitted Liens**

None

## Schedule 3(e)
## Litigation

## Caribbean Petroleum Corporation

| Case Caption | Case number | Nature of proceeding | Court | Location of court | Status or disposition |
|---|---|---|---|---|---|
| (Luis D. Rojas Rodriguez) Aponte v. CPC | 10-01030 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Advantage Business Consulting Inc. v. CPC | D CD2009-2523 | Collection action | Puerto Rico Superior Court | Bayamon | Stayed |
| Angel L. Garcia Ortiz v. CPC | D DP2010-0152 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Angel L. Perez Ocasio et al. v. CPC | D DP2009-0989 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Antilles Insurance Co. CPC | D CD2010-1162 | Subrogation | Puerto Rico Superior Court | Bayamon | Stayed |
| Antonia Rivera Casiano et al. v. CPC | D DP2010-0046 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| AOT Limited v. CPC (Astra Arbitration) | 10-05927 | Arbitration | U.S. District Court for the Southern District of N.Y. | New York | Appealing ruling |
| Autoridad de Carreteras y Transporte de P.R. v. CPC | K EF2002-0437 | Expropriation | Puerto Rico Superior Court | San Juan | Stayed |
| Barroso-Amezquita v. CPC | 09-02215 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Carlos X. Perez Molina v. CPC | D DP2010-0003 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Carmen I. Garcia Delgado v. Nelson Capote Ferrer | NSCI200200917 | Tort | Puerto Rico Superior Court | Fajardo | Stayed |
| Chartis Insurance Company vs. CPC | N10C-07-062FSS | Request for declaratory judgment | Superior Court of the State of Delaware | New Castle County | Stayed |
| CPC v. Abraham Petroleum | K AC2008-1452 | Breach of Contract | Puerto Rico Superior Court | San Juan | Stayed |
| CPC v. Antonio Torres | K AC2010-0555 | Eviction and breach of contract | Puerto Rico Superior Court | San Juan | Pending |
| CPC v. Arturo Rivera Marin | NSCI200300230 | Breach of contract | Puerto Rico Superior Court | Fajardo | Pending |
| CPC v. Carlos Caez | 05-10128 | Breach of Contract | U.S. Bankruptcy Court for the District of Puerto Rico | San Juan | Filed proof of claim in |

| Case Caption | Case number | Nature of proceeding | Court | Location of court | Status or disposition |
|---|---|---|---|---|---|
| | | | | | bankruptcy court. |
| CPC v. Daniel Rodriguez Triff | K AC2005-4861 | Breach of contract | Puerto Rico Superior Court | San Juan | Pending |
| CPC v. International Industries | 09-1458 | Damages | U.S. District Court for the District of Puerto Rico | San Juan | Pending |
| CPC v. Maria Socorro Lopez Delgado | E AC2003-0437 | Collection action | Puerto Rico Superior Court | Caguas | Pending |
| CPC v. Maria Socorro Lopez Delgado | 06-00703 | Bankruptcy | U.S. Bankruptcy Court for the District of Puerto Rico | San Juan | Proof of Claim Filed |
| CPC v. Plaza Guaynabo "Gulf" Car Wash and Service Center, Inc. | K AC2006-7831 | Breach of Contract | Puerto Rico Superior Court | San Juan | Settled - May 2010 |
| CPC v. Rafael Rodriguez Diaz | D CD2003-0820 | Eviction and collection action | Puerto Rico Superior Court | Bayamon | Pending |
| CPC v. VBI Investment | K PE2001-1209 | Breach of contract and collection action | Puerto Rico Superior Court | San Juan | Pending |
| Cruz Andino v. CPC | 09-02096 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Cruzada Evangelica Cristiana, Inc. v. CPC | FCC 120 08061 | Property dispute | Puerto Rico Superior Court | Loiza | Stayed |
| Cruz-Aponte v. CPC | 09-02092 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| David Salaberry Hernandez et al.v. CPC | D DP2010-0037 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Department of Natural Resources - Environmental Damages | 10-02-VS | Administrative Procedure | Dept. of Natural and Environmental Resources | San Juan | Answer filed. |
| Domenech-Guzman v. CPC | 10-02036 | Tort | U.S. District Court for the District of Puerto Rico | Puerto Rico | New Case - Filed in Oct. |
| Eduardo Ruiz Valentin v. Agustin Rodriguez | J PE2008-0261 | Property dispute | Puerto Rico Court of Appeals | Ponce | Stayed |
| Efrain Santana Rosario v. CPC | HSCI2006001 86 | Breach of contract | Puerto Rico Superior Court | Humacao | Stayed |
| Elizabeth Sanchez Guzman et al. v. CPC | D DP2009-1043 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Environmental Quality Board - Order | OA-10-AG-82 | Administrative Procedure | Environmental Quality Board | San Juan | Information request |

| Case Caption | Case number | Nature of proceeding | Court | Location of court | Status or disposition |
|---|---|---|---|---|---|
| requesting information | | | | | |
| Esther Rivera Garcia v. Carlos Lopez Segarra | F DP2009-0223 | Tort | Puerto Rico Superior Court | Carolina | Stayed |
| Fioldaliza Santiago Nieves v. CPC-Damages | K DP2009-0691 | Tort | Puerto Rico Superior Court | San Juan | Stayed |
| Henry Figueroa Ramos v. CPC | D DP2010-0286 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Heriberto Garcia-Parra v. CPC | 09-02148 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Hipolito Gomez Rivera v. Gulf Petroleum Inc. | HSCI200601132 | Tort | Puerto Rico Superior Court | Humacao | Stayed |
| In re Abraham Petroleum Corp. | 09-05928 | Chapter 11 Bankruptcy | U.S. Bankruptcy Court for the District of Puerto Rico | San Juan | Proof of claim filed - Litigation ongoing regarding debtor's objection to claim |
| In re Cape Bruny Tankschiffarts Gmbh and Co. KG, et al. | 10-01337 | Complaint for exoneration from or limitation of liability | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| In re Yacoub Husin | 10-04213 | Chapter 13 bankruptcy | U.S. Bankruptcy Court for the District of Puerto Rico | San Juan | Proof of claim filed |
| Irma I. Santiago Rodriguez et al. v. CPC | D DP2009-0998 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Ivan Bird Diaz v. CPC | D AC2007-2047 | Collection action | Puerto Rico Superior Court | Bayamon | Stayed |
| Jaime Casiano Torres v. CPC | J AC2008-0048 | Breach of contract | Puerto Rico Superior Court | Ponce | Stayed |
| Jaime Casiano Torres v. CPC | J AC2008-0048 | Tort | Puerto Rico Superior Court | Ponce | Stayed |
| Jesus F. Trilla Pinero v. Alejandro Garcia Padilla | K AC2000-1096 | Class Action | Puerto Rico Superior Court | San Juan | Stayed |
| Jose A. Baranda Suarez v. CPC | KLCE 200800582 | Breach of contract | Puerto Rico Court of Appeals | San Juan | Stayed |
| Juan J. Carrasquillo Salgueiro v. CPC | K AC2010-0929 | Breach of contract | Puerto Rico Superior Court | San Juan | New Case - Filed in Oct. |
| Juan Rodriguez Irizarry v CPC | D DP2010-0001 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |

| Case Caption | Case number | Nature of proceeding | Court | Location of court | Status or disposition |
|---|---|---|---|---|---|
| Luis A. Caraballo Torres v. Gulf Petroleum Inc. | J4CI200600303 | Tort | Puerto Rico Superior Court | Ponce | Stayed |
| Lymaris Ortiz Erazo et al. v. CPC | D DP2010-0043 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Manuel A. Arroyo Flores v. CPC | K CD2009-0444 | Breach of contract | Puerto Rico Superior Court | San Juan | Stayed |
| Manuel A. Colon Cabrera v. CPC | D PE2001-0782 | Breach of contract | Puerto Rico Superior Court | Bayamon | Stayed |
| Margarita Malave Rodriguez v. Autoridad de Carreteras | G DP2008-0128 | Tort | Puerto Rico Superior Court | Guayama | Stayed |
| Maria del Rosario Torrens Morales v. CPC | K DP2009-0141 | Tort | Puerto Rico Superior Court | Bayamon | Dismissed without prejudice |
| Maria del Rosario Torrens Morales v. CPC | D DP2007-0367 | Tort | Puerto Rico Superior Court | Bayamon | Dismissed without prejudice |
| Mercedes Rodriguez et al. v. CPC | D DP2010-0040 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Miguel A. Marquez v. CPC (Cruz-Aponte) | 10-01207 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Monica Maldonado Gonzalez et al. v. CPC | D DP2010-0050 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Natividad Santiago Casiano et al. v. CPC | D DP2009-1092 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Nayda G. Suarez Reyes et al. v. CPC | D DP2009-1063 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Porfiria Cruz Martinez et al. v. CPC | D DP2009-1125 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Puerto Nuevo Development Corp. v. CPC | D PE2007-1113 | Property dispute | Puerto Rico Superior Court | Bayamon | Stayed |
| Rafael Cruz d/b/a Garage Ralph v. CPC | 09-02118 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| RG Premier Bank Puerto Rico v. Enrique Jose Prieto Rodriguez (3d Party) | K CD2007-1263 | Collection action | Puerto Rico Superior Court | San Juan | Stayed |
| Ricardo Ortiz Santiago v. CPC | J AC2010-0307 | Breach of contract | Puerto Rico Superior Court | Ponce | Stayed |
| Ricardo S. Resto | K DP2006- | Tort | Puerto Rico Superior Court | San Juan | Stayed |

| Case Caption | Case number | Nature of proceeding | Court | Location of court | Status or disposition |
|---|---|---|---|---|---|
| Garcia v. Hernan Batista (3d Party) | 0986 | | | | |
| Santa Paula Oil Corp. v. CPC | D AC2004-3862 | Breach of contract | Puerto Rico Superior Court | Bayamon | Stayed |
| Suarez Nieves P.S.C. v. CPC | D CD2010-0739 | Collection action | Puerto Rico Superior Court | Bayamon | Stayed |
| Suarez v. CPC | 09-02095 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Victor M. Reyes Ortiz et al. v. CPC | D DP2009-1045 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| William Morales Martinez v. CPC | 04-01964 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Yamil Abdel Raman v. CPC | D AC2006-0018 | Breach of contract | Puerto Rico Superior Court | Bayamon | Stayed |

## Caribbean Petroleum Refining L.P.

| Case Caption | Case number | Nature of proceeding | Court | Location of court | Status or disposition |
|---|---|---|---|---|---|
| (Luis D. Rojas Rodriguez) Aponte v. CPC | 10-01030 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Angel L. Garcia Ortiz v. CPC | D DP2010-0152 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Angel L. Perez Ocasio et al. v. CPC | D DP2009-0989 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Antonia Rivera Casiano et al. v. CPC | D DP2010-0046 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Barroso-Amezquita v. CPC | 09-02215 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Chartis Insurance Company vs. CPC | N10C-07-062FSS | Request for declaratory judgment | Superior Court of the State of Delaware | New Castle County | Stayed |
| Citation & Notification of Penalty - Claim for damages to personnel | OSHE: 2010-095 | Administrative Procedure | Occupational Safety and Health Administration | San Juan | Answer filed. |
| Coto Malley & Tamargo LLP v. CPC | K CD2010-2676 | Collection action | Puerto Rico Superior Court | San Juan | Stayed |
| Cruz Andino v. CPC | 09-02096 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Cruz-Aponte v. CPC | 09-02092 | Tort | U.S. District Court for the | San Juan | Stayed |

| Case Caption | Case number | Nature of proceeding | Court | Location of court | Status or disposition |
|---|---|---|---|---|---|
| | | | District of Puerto Rico | | |
| David Salaberry Hernandez et al.v. CPC | D DP2010-0037 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Domenech-Guzman v. CPC | 10-02036 | Tort | U.S. District Court for the District of Puerto Rico | Puerto Rico | Filed on 10/22/2010 |
| Environmental Quality Board  - Order requesting information | OA-10-AG-82 | Administrative Procedure | Environmental Quality Board | San Juan | Information request |
| In re Cape Bruny Tankschiffarts Gmbh and Co. KG, et al. | 10-01337 | Complaint for exoneration from or limitation of liability | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Irma I. Santiago Rodriguez et al. v. CPC | D DP2009-0998 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Lymaris Ortiz Erazo et al. v. CPC | D DP2010-0043 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Mercedes Rodriguez et al. v. CPC | D DP2010-0040 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Miguel A. Marquez v. CPC(Cruz-Aponte) | 10-01207 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Monica Maldonado Gonzalez et al. v. CPC | D DP2010-0050 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Porfiria Cruz Martinez et al. v. CPC | D DP2009-1125 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |
| Suarez v. CPC | 09-02095 | Tort | U.S. District Court for the District of Puerto Rico | San Juan | Stayed |
| Victor M. Reyes Ortiz et al. v. CPC | D DP2009-1045 | Tort | Puerto Rico Superior Court | Bayamon | Stayed |

## Gulf Petroleum Refining (Puerto Rico) Corporation

None

**Schedule 3(f)**
**Brokers' Fees**

FTI Consulting, Inc.

Jeffries & Company, Inc.