IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re                                  : Chapter 11
                                       :
CARIBBEAN PETROLEUM CORP., et al.,[1]  : Case No. 10-12553 (KG)
                                       :
         Debtors.                      : Jointly Administered
                                       :
                                       : Re: Docket Nos. 9, 53, 54, 127, 149, 152,
                                         155, 161, 165, 205, 243, 256, 293, 304, 312,
---------------------------------------------------------------x  317

### DECLARATION OF ROBERT L. ROSE IN SUPPORT OF OBJECTION TO APPROVAL OF AUCTION SALE

ROBERT L. ROSE declares and affirms as follows:

1. I am the President and Chief Executive Officer of Allied Aviation, LLC, a Florida limited liability company ("Allied").

2. Allied is the parent company of approximately 80 entities which operate in locations around the United States, Puerto Rico, Canada and Central America. Allied Aviation and its subsidiaries are in the transportation services industry, and provide transportation, fueling, tank farm management, infrastructure development, fixed base operations, baggage handling and maintenance services to a number of major airports and pipelines located in North and Central America.

3. I have personal knowledge of the facts set forth in this Declaration, except for those statements made on information and belief, which I am informed and believe to be true.

---

[1] The Debtors in these chapter 11 cases (along with the last four digits of each Debtor's federal tax identification number) are: Caribbean Petroleum Corporation (7836), Caribbean Petroleum Refining L.P. (1421), and Gulf Petroleum Refining (Puerto Rico) Corporation (1417). The service address for all Debtors is: PO Box 361988, San Juan, Puerto Rico 00936.

4. This Declaration is submitted in support of Allied's objection to the Debtor's application to Approve the Auction Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims and Encumbrances to Puma Energy International B.V. ("Puma") and for related relief (the "Sale Motion").

## Introduction

5. As is discussed in detail below, Allied submitted a higher and better offer to acquire certain assets and assume certain liabilities of the Debtor. Notwithstanding this offer, the Auction was improperly and arbitrarily concluded. Allied's increased offer was not given proper consideration -- nor were Allied or any other bidders given the opportunity to submit additional bids.

6. In addition, the "winning" bid made by Puma did not conform to the bidding procedures established by counsel to the Debtor, i.e., Puma's $82 million bid was not $1 million more than the combined $81.9 million bid of Allied ($41.5 million) and the bidders for the Debtors' Service Stations ($40.4 million), even though the Debtors had established $1 million minimum bidding increments.

7. Furthermore, bidders for the Debtors' Service Station assets were not given the chance to increase their bids, despite their expressed desire to do so. Had these bidders been given the opportunity to increase their bids, I have been advised that an additional $5 to $10 million -- or possibly even more -- could have been raised at the Auction for the benefit of the Debtor's estate.

8. In short, consideration of additional bids by Allied and the Service Station bidders had the potential to significantly increase the estate's recovery. However, no one was given the opportunity to submit further bids after Puma's non-conforming bid of $82 million. For these

reasons, and those described in more detail below, Allied submits that the Auction should be reopened to consider these additional bids, as well as any bids Puma and other parties may have.

**Background**

9. On December 10, 2010, Allied submitted a bid to acquire the following assets and assume certain liabilities of Caribbean Petroleum Corporation: (i) approximately 184 gasoline service stations (the "Service Stations"); (ii) 2.8 million barrel tank farm (the "Tank Farm"); (iii) related gasoline pipelines (the "Pipelines"); (iv) the dock and terminal facility located in the harbor of San Juan Puerto Rico (the "Dock"); and (v) certain related assets.

10. Allied's bid was for a total of $31 million, with an estimated escrow of $8 to $10 million for environmental liabilities (the "Initial Bid"). Unlike other bid proposals, Allied proposed to assume certain pension plan liabilities of the Debtor in connection with both current and retired employees.[2] In connection with its Initial Bid and as required by the Bid Procedures established by the Debtor, Allied submitted a deposit check in the amount of $1,550,000.

**The Auction: Part 1**

11. The Auction began on December 16, 2010 and continued until December 17, 2010, at the offices of Debtor's Counsel, Cadwalader, Wickersham & Taft, LLP. Vincent Papalia, Esq. and Seth Zuckerman, Esq., counsel to Allied, and Stan Czaplicki, Vice President of Allied, attended the Auction in person. I participated telephonically on both days, although Mr. Czaplicki was not present on the second day.

12. The Auction was conducted in multiple stages, with multiple lengthy adjournments. The first stage involved bidders interested in individual Service Stations owned by Debtors. Although the Bid Procedures stated that the Auction would begin at 10 a.m., the

---

[2] It is my understanding that there is a significant underfunding liability associated with the Debtors' Pension Plan. By agreeing to assume this liability as to employees retained by Allied and retirees, the total amount of Allied's bid is enhanced.

3

Auction did not commence until approximately 4:30 p.m. Many of these bidders participated in the Auction by conference call from Puerto Rico. After a lengthy and competitive process, bids from qualified bidders totaled approximately $40,400,000 for the Service Stations alone.

13. After the conclusion of this stage, there was another lengthy break in the Auction process. Counsel to the Debtor stated that the next stage of the process would involve "platform" bids (i.e., bids for substantially all of the assets of Debtors). Counsel for the Debtors stated that prior to this phase of the Auction, Debtors' counsel and other representatives would meet with each individual bidding group to review the advantages and disadvantages of each group's offer.

14. At approximately 11:45 p.m., after a lengthy break during which neither the Debtor nor any other party met with Allied, the platform auction began, with the Debtor announcing that there were three participants for this phase of the Auction: (i) Allied; (ii) Puma; and (iii) Astra Energy ("Astra Energy"). At the beginning of this phase, Debtor's counsel announced that it had solicited and received an increased bid of $62 million from Puma to acquire substantially all of the assets of the Debtors (up from an initial bid of $35 million). Another lengthy break in the auction process then ensued.

15. During this break, Allied met with Debtors' counsel, as well as the Debtors' financial advisor, FTI Consulting, Inc. During this meeting, Allied proposed to revise its bid to exclude the Service Stations and inquired whether it would receive a credit for the assets it was not interested in purchasing; i.e., the Refinery and Undeveloped Land (which the Debtors could sell separately). Allied was advised that it would receive a credit for these excluded assets, although no definitive credit amount was established.

16. At approximately 2:10 a.m. on December 17, 2010, the Auction resumed. At the beginning of this process, it was announced that Puma had submitted a revised bid in the total amount of $80 million. At this time, the Debtors announced that future bids for the Terminal Assets (as defined below) had to be in minimum increments of $1 million.[3]

17. Because Allied and Astra were interested in bidding for less than all of the assets of the Debtor at this time, the next stage of the Auction involved only the so called "Terminal Assets" of the Debtor, i.e., the Refinery, the Tank Farm, the Pipelines, the Undeveloped Land and the Dock (collectively, the "Terminal Assets"). Astra started with a bid in the range of $14 million. After Puma's revised bid was submitted, and before Allied was given the opportunity to submit another bid, Puma suggested that the next bid for the Terminal Assets be increased to a minimum of $24 million in order to accelerate the process. At that point, it was announced that there would be another brief adjournment of the Auction. During that break, both Astra and Allied requested that Debtor's counsel advise as to the credit being assigned to the Terminal Assets not being bid on.

18. At about 3:00 a.m. on December 17th, the Auction again resumed. Other than with respect to the Service Stations, Debtors' counsel announced that the Debtors and other interested parties were unwilling to assign a liquidated value (or credit) for the Terminal Assets excluded from Allied's bid (i.e., the Refinery and Undeveloped Land), and unilaterally set the minimum bid at $41.5 million for all assets other than the Service Stations, i.e., the Terminal Assets. The Debtors further advised that Puma would be requested to submit an additional bid only if this "minimum" was achieved. After this amount was announced, Astra withdrew from the bidding process.

---

[3] By contrast, the Bidding Procedures established minimum bid increments of $100,000.

19. Allied then submitted a cash bid in the amount of $37 million for the Tank Farm, the Pipelines and the Dock. When coupled with the $40.4 million in bids for the Service Stations and a modest credit for the Refinery and Undeveloped Land in the amount of $3.5 million,[4] Allied's total package was equivalent to an "enterprise" value of $80.9 million. After this bid was submitted, the Auction again adjourned and Debtors' counsel announced that it would consider all of the bids and announce the results of the auction later Friday morning.

**Higher Offers for the Service Stations**

20. On Friday, I had multiple conversations with parties who participated in the auction of the Service Stations. In particular, I spoke to representatives of Peerless Energy, which had submitted multiple bids for certain Service Stations as part of the first phase of the Auction Process. Based on these conversations, it is my understanding and belief that both Peerless and certain other the individual bidders, if given the chance to rebid on the Service Station assets, would be willing to increase their initial bids on a combined basis by at least an additional $5-$10 million or possible even more.

21. However, neither Peerless nor any of the other individual Service Station bidders were afforded the opportunity to increase their bids.

22. Attached as Exhibit A is a letter from Peerless regarding its interest in continuing the auction for the Service Stations. Given that these bidders did not have the benefit of knowing the amount of the bids submitted for the enterprise as a whole, I believe it was intrinsically unfair -- and contrary to the estate's interests -- to deny them the ability to increase their offers. Similarly, while Puma was given the opportunity to increase its bid based upon the other bids

---

[4] The appraised value for the Undeveloped Land alone as supplied by the Debtor was over 5 times the amount of the proposed credit.

6

received for the Service Stations and Terminal Assets, neither Allied nor the Service Station bidders were given that same opportunity.

**The Auction: Part 2**

23. On Friday morning, Allied advised the Debtors that (i) we would be willing to increase our bid for the Terminal Assets and (ii) we had received information from various sources indicating that a re-bid of the individual Service Stations would likely result in a substantial increase in the overall bids for the Service Stations. Accordingly, we urged the Debtors to consider revised bids.

24. On Friday evening, once the Auction proceedings were finally re-commenced, Allied submitted a revised bid as follows: (i) it increased the cash consideration by $1 million to $38 million; (ii) included the Refinery as a purchased asset; and (iii) offered a two year, $3.5 million "put" with respect to the Undeveloped Land. The put contemplated that the Debtors would be required to use their best efforts to market the Undeveloped Land for a two year period. If at the end of the two year period the Debtors were unsuccessful in finding a successful buyer, Allied would agree to purchase the Undeveloped Land at a price of $3.5 million. This revised bid, together with the floor established for the Service Stations of $40.4 million, increased the "enterprise" value of Allied's bid to $81.9 million.

25. After still another adjournment in the Auction, it was announced that Puma had agreed to increase its bid to $82 million -- an amount just $100,000 in excess of Allied's bid when combined with the bids for the Service Stations. Despite this very small difference, and the fact that the Debtors had required $1 million bid increments, counsel to the Debtor also announced at the same time that the Auction was being closed and that Puma had been declared the successful party and that no further bids would be considered.

7

### Flaws in the Auction Process

26. Counsel to Allied objected to the closing of the Auction and the conformity of Puma's bid to the bid requirements established by Debtors' counsel. Specifically, Puma's final bid only exceeded Allied's bid by approximately $100,000. However, as noted above, Debtors' counsel previously declared that bid increments needed to be at least $1 million. Further, notwithstanding the non-conforming nature of Puma's bid, Allied advised that it was prepared to submit a higher offer by increasing the "put" with respect to the Undeveloped Land, but was never given an opportunity to do so. Additionally, despite waiting for hours over a two day period and, on information and belief, indicating a willingness to the Debtors to submit additional bids, the Service Station bidders were not permitted to submit any further bids.

27. Allied respectfully submits that the bid process was flawed in that potentially higher and better offers were not given proper consideration and the auction was prematurely closed when Puma agreed to increase its bid to $82 million. In addition, the successful bid did not conform to the bid requirements established during the Auction.

28. For these reasons, Allied objects to the Sale Motion and requests that the Auction be reinstated so that the highest and best offer(s) may be obtained for the Debtors' assets for the benefit of the Debtors' estate and their creditors.

Pursuant to 28 U.S.C. §1746, I hereby declare under penalty of perjury that the foregoing statements made by me are true and correct to the best of my knowledge, information and belief.

*Robert L. Rose*
ROBERT L. ROSE

Dated: Tampa, Florida
December 21, 2010

# EXHIBIT A



**PEERLESS**
*OIL & CHEMICALS, INC.*

"*Quality Gasoline and Fuels for Puerto Rico and the Caribbean*"
ADDRESS: 671 ROAD 337, FIRM DELIVERY, PEÑUELAS, PR 00624-7513
Telephone: 787-836-1280 / Fax: 787-836-1283 / E-mail: luis.vazquez@peerlessoil.com

December 21, 2010

United States Bankruptcy Court
For the District of Delaware

In re: Caribbean Petroleum Corporation, and others; Debtors
Jointly Administered, Case No. 10-12553 (KG)

TO WHOM IT MAY CONCERN:

Peerless Oil & Chemicals, Inc. participated as a qualified bidder in the CAPECO auction held on December 16 and 17, 2010. At the end of the first day, Peerless was the highest bidder on 12 stations, for a total amount of $3,950,000. On the second day, we were notified by personnel of the firm of Cadwalader, Wickersham & Taft LLP, that we would have the opportunity to increase the existing bid only for the stations in which we were the highest bidder, not for any other station. When we requested to them the provision of the bid order or regulation where said condition was stated, none was provided. In any event, we were never allowed to make any additional bid to that made the first day. Upon being informed that the bid was going to be adjudicated to Puma, and since we were not allowed to increase our bid, not even for the stations for which we were the highest bidder, our attorney Luis Sánchez Betances stated for the record our objection to the closing of the bid and its adjudication to Puma. The grounds for the objection were the unfairness of the bidding process; that we were not allowed to increase our bid for those stations we were the highest and for other stations which we were interested but were not the highest bidder or did not participate in the bid originally.

Peerless was never provided with any order, regulation or writing containing any restriction related to additional biddings. In addition, we in good faith rested on representations at all pertinent times that all the bids would remain open until a winner was announced.

Had Peerless had the opportunity to increase the bids as described before, the combined bids for station and terminal would have resulted in additional substantial moneys to the estate, above and beyond to what Puma offered. We believe the refusal to accept further offers from willing bidders was not in the best interests of the debtor and the creditors.

Regards,

Luis R. Vázquez, P.E.
General Manager

# CERTIFICATE OF SERVICE

I, William A. Hazeltine, do hereby certify I am not less than 18 years of age and that on this 20th day of December 2010, I caused a copy of the within *Declaration of Robert L. Rose in Support of Objection to Approval of Auction Sale* to be served upon the parties on the attached service list in the manner indicated.

**FIRST CLASS MAIL & FACSIMILE**
George A. Davis, Esq.
Zachary H. Smith, Esq.
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
(212) 504-6666

**FIRST CLASS MAIL & FACSIMILE**
Internal Revenue Service
Insolvency Section
31 Hopkins Plaza, Room 1150
Baltimore, MD 21201
(410) 962-9955

**FIRST CLASS MAIL & FACSIMILE**
David L. Gordon
Ruben Gomez
United States Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460
(202) 616-2427

**FIRST CLASS MAIL & FACSIMILE**
David L. Gordon
Ruben Gomez
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 616-2427

**HAND DELIVERY**
Mark D. Collins, Esq.
Jason M. Madron, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801

**HAND DELIVERY**
David M. Klauder, Esq.
Office of the United States Trustee
844 King Street, Suite 2313
Lockbox #35
Wilmington, DE 19801-3519

**HAND DELIVERY**
Mark Chehi, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE 19899

**FIRST CLASS MAIL & FACSIMILE**
Juan A. Aquino, Esq.
O'Neill & Borges
American International Plaza, Suite 800
250 Munoz Rivera Avenue
San Juan, Puerto Rico 00918-1813
(787) 753-8944

**FIRST CLASS MAIL & FACSIMILE**
Securities & Exchange Commission
233 Broadway
New York, NY 10279
(212) 336-1319

Under penalty of perjury, I declare the foregoing to be true and correct.

December 21, 2010
Date

*/s/ William A. Hazeltine*
William A. Hazeltine