IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re                                              : Chapter 11
                                                   :
CARIBBEAN PETROLEUM CORP., et al.,[1]              : Case No. 10-12553 (KG)
                                                   :
                    Debtors.                       : Jointly Administered
                                                   :
                                                   : Related Docket Nos.: 9, 269, 390, 392, 394, 492 and 495
                                                   : Hearing Date: December 22, 2010 at 9:30 a.m. (EST)
---------------------------------------------------------------x

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING CERTAIN RELATED RELIEF

Caribbean Petroleum Corporation, Caribbean Petroleum Refining L.P., and Gulf Petroleum Refining (Puerto Rico) Corporation (collectively, the "Debtors") submit this reply to the responses (the "Responses", see D.I. 269, 390, 392, 394, 492 and 495) to the Debtors' motion (the "Sale Motion", see D.I. 9)[2] seeking, among other things, entry of an order (the "Sale Order"): (i) authorizing the sale (the "Sale") of substantially all of the Debtors' assets (the "Assets") free and clear of all liens, claims, encumbrances and other interests to Puma Energy International B.V. ("Puma") pursuant to the terms and conditions of that certain asset purchase agreement dated December 17, 2010 (the "Agreement"), (ii) authorizing the assumption by the Debtors and assignment to Puma of certain executory contracts and unexpired leases (the

---

[1] The Debtors in these chapter 11 cases (along with the last four digits of each Debtor's federal tax identification number) are: Caribbean Petroleum Corporation (7836), Caribbean Petroleum Refining L.P. (1421), and Gulf Petroleum Refining (Puerto Rico) Corporation (1417). The service address for all Debtors is: PO Box 361988, San Juan, Puerto Rico 00936.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Motion.

"Assumed Contracts") in connection therewith, and (iii) granting certain related relief. The Debtors respectfully represent that the Responses should be overruled for the reasons set out below:

## PRELIMINARY STATEMENT

In just five months, the Debtors have successfully marketed their Assets and completed an auction, resulting in an $82 million all cash bid by Puma for substantially all of the Assets. This is a phenomenal achievement under the circumstances. Indeed, the outcome of the sale process and the auction has fully achieved the Debtors' and other parties in interest's expectations as to the value that could be obtained through a sale of the Assets.

This success is a major milestone in these cases. A sale has been contemplated since even before these cases were filed. Prior to commencement, the Debtors determined that the best way to maximize value to the estate and its creditors would be through a sale of the Assets pursuant to section 363 of the Bankruptcy Code. Accordingly, pursuant to the Bidding Procedures approved at the outset of these cases, the Debtors began a robust marketing process for the Assets, which culminated in the submission of a substantial number of bids for the Assets. A competitive auction was held on December 16-17, 2010 in which Puma was determined to be the successful bidder. The auction process was non-collusive and all parties acted in good faith. As described more fully below and in the accompanying declaration of Roy Messing, Puma's bid is the highest and best bid that the Debtors received pursuant to a fair and thorough auction, and accordingly, the Sale to Puma should be approved, and the assumption by the Debtors and assignment to Puma of the Assumed Contracts should be authorized.

Allied Aviation LLC objects to the Sale and argues that Puma's bid is not the highest and best bid and that bidding should be reopened. Allied's objection to the Sale should be overruled for the following reasons:

- as disgruntled bidders, Allied lacks standing to object to the Sale;
- Allied is wrong that its bid is better than Puma's bid; and
- the Debtors' termination of the auction was a fully justified exercise of their business judgment.

## BACKGROUND

### A. The Bidding Procedures

1. On August 13, 2010, the Debtors filed the Sale Motion. On September 10, 2010, the Court entered an order [D.I. 149] (the "Bidding Procedures Order") (i) approving procedures (the "Bidding Procedures") for (a) submitting bids for the purchase of substantially all of the Assets, and (b) conducting an auction for the Assets (the "Auction"); (ii) authorizing the Debtors to enter into a stalking horse agreement for the purpose of establishing a minimum acceptable bid for the Assets; and (iii) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale.

2. The Bidding Procedures Order established (i) December 10, 2010 as the deadline for the submission of bids for the Assets, (ii) December 13, 2010 as the date of the Auction,[3] (iii) December 22, 2010 as the hearing date to consider the proposed Sale to the Successful Bidder, and (iv) February 8, 2011 as the deadline to consummate the Sale to the Successful Bidder.

---

[3] Pursuant to the Bidding Procedures, the Debtors moved the date for the Auction to December 16, 2010.

**B. The Marketing and Sale Process**

3. Since the entry of the Bidding Procedures Order, the Debtors, along with FTI Consulting, Inc. ("FTI"), and in consultation with the respective financial advisors to the Debtors' senior secured lender, Banco Popular de Puerto Rico ("BPPR"), and the Statutory Committee of Unsecured Creditors (the "Committee"), commenced a robust marketing of the Assets. The Debtors received 56 bids for the Assets: (i) three bids for substantially all of the Assets, (ii) one bid for the Debtors' tank farm, dock and pipelines, (iii) two bids for the Debtors' scrap metal, including all of the scrap metal from the Debtors' dormant oil refinery, and (iv) 50 bids for one or more of the Debtors' owned service stations. Of the 56 bids received, 35 were deemed Qualified Bids by the Debtors, in consultation with BPPR and the Committee. Pursuant to the Bidding Procedures, all Qualified Bidders were invited to participate in the Auction for the Assets commencing on December 16, 2010.[4] The Auction was held over two days and many hours. A copy of the Auction transcript is attached as Exhibit A.

4. The Auction was structured in three stages. During the first stage, the Debtors opened bidding for individual service stations from 33 separate bidders on a station by station basis. The bidding for individual owned service stations yielded an aggregate of $40.4 million for such assets (the "Service Station Aggregate Bid"). The second stage of bidding invited bids for the purchase of substantially all of the Assets, or "platform bids." The highest bid received during this stage of bidding was $80 million from Puma for the Debtors' service stations, tank farm, dock, pipelines, refinery and undeveloped land. The third stage of bidding requested bids for the Debtors' tank farm, dock, pipelines, refinery and undeveloped land. The

---

[4] Consistent with the Bidding Procedures, the Debtors, in consultation with BPPR and the Committee, permitted certain parties whose bids did not conform to one or more of the "Qualified Bid" requirements to participate in the Auction. See Bidding Procedures ¶ C.

highest and best bid for this subset of Assets would then be paired with the Service Station Aggregate Bid and placed in competition with the highest platform bid. After several rounds of bidding and negotiations, the highest bid during the third stage of the auction was submitted by Allied Aviation LLC and Allied Aviation Services, Inc. (collectively, "Allied") in the amount of $38 million, plus a $3.5 million put right with respect to the undeveloped land. Under the put right, the Debtors would use their best efforts to the sell the land within two years and if the land was not sold in that timeframe, Allied would have the obligation to purchase such land for $3.5 million. After a brief recess from the third stage of bidding, Puma increased its platform bid to $82 million payable in cash on closing. Allied countered by increasing its proposed put right obligation with respect to the undeveloped land to $5 million, for what it believed to be a total platform bid of $83.4 million together with the Service Station Aggregate Bid. Of course, Allied's bid was not payable in cash in full on closing. The put right is not exercisable for two years, during which time the Debtors would own the undeveloped land, pay taxes, maintain insurance and be liable for environmental costs.

5. After another recess and further discussions with the advisors for Banco Popular, the Committee and the United States Environmental Protection Agency (the "EPA"), the Debtors determined that the $82 million all cash bid submitted by Puma for the Assets was the highest and best bid for the Assets, and thus concluded that Puma was the Successful Bidder. The advisors for each of BPPR, the Committee and FirstBank Puerto Rico (holder of a first priority security interest in the Debtors' dock and pipelines) confirmed on the record their support for the Debtors' determination that Puma's bid was the highest and best bid for the Assets. On December 19, the Debtors filed a notice of the selection of Puma as the Successful Bidder for the Assets (the "Successful Bid Notice") [D.I. 472]. Included in the Successful Bid

Notice is a copy of the Agreement with a schedule of the Assumed Contracts (the "Puma Assumption Schedule").

6. On November 1, 2010, certain employees of the Debtors filed an objection to the Sale Motion (the "Employee Objection") [D.I. 269]. On December 21, the following parties filed additional objections to the Sale Motion: (i) Puerto Nuevo Development Corp./Jupiter Property Management, LLC (the "Puerto Nuevo Sale Objection") [D.I. 492] and (ii) Allied (the "Allied Objection") [D.I. 495].

7. Prior to the filing of this Reply, the Debtors filed a declaration of their Restructuring Officer, Roy Messing of FTI in support of the Sale Motion (the "Messing Declaration") [D.I. 491]. The Messing Declaration describes the marketing process undertaken by the Debtors, how the auction was conducted, how the bids were evaluated and why the Debtors – in consultation with BPPR and the Committee – chose the Puma bid over all other bids, including the Allied bid.

## C. The Cure Notice

8. Pursuant to the Bidding Procedures Order, on November 9, 2010, the Debtors filed the Notice of Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale of Substantially all of the Assets (the "Cure Notice") [D.I. 293] setting forth the amount, if any, determined by the Debtors to be necessary to be paid upon assumption of the Assumed Contracts in connection with the Sale (the "Cure Schedule").

9. On December 1, 2010, the Debtors received objections to the Cure Schedule from the following parties: (i) Puerto Rico Electric Power Authority ("PREPA") (the

"PREPA Objection") [D.I. 392];[5] (ii) Daniel Rodriguez Triff and his spouse Zaida Beatriz Perez (the "Rodriguez Objection") [D.I. 394] and (iii) Puerto Nuevo (the "Puerto Nuevo Cure Objection") [D.I. 390].

## REPLY

### I. THE SALE MOTION SHOULD BE APPROVED

10. After an extensive marketing process and a vigorous, fairly conducted auction, the Debtors have exercised their sound business judgment and selected Puma's $82 million bid as the Successful Bid. This decision – made in consultation with BPPR and the Committee – is appropriate under the facts, the terms of the Bidding Procedures, and applicable law.

11. As noted in the Debtors' first day papers, a "traditional" chapter 11 operational restructuring simply was not feasible. In light of this reality, the Debtors, after extensive, good faith discussions with BPPR, determined that an expedited sale of all or substantially all of the Assets was the most effective means for maximizing the value of the Debtors' estates. To that end, BPPR agreed to fund the Debtors' chapter 11 cases for six months. Accordingly, the Debtors have a limited period of time within which to consummate the Sale. Indeed, the Debtors have already missed certain milestones in these cases, and a failure to have an approved sale now may have extremely negative consequences.

12. Earlier in the cases, the Court approved certain Bidding Procedures to govern the marketing and auction process. Throughout, the Debtors acted in compliance with the Bidding Procedures during the bidding and auction process, and in concluding that Puma's

---

[5] On December 14, 2010, PREPA filed a motion for relief from the Bidding Procedures Order to file an amendment to the previously filed PREPA Objection (the "PREPA Amendment Motion") [D.I. 442].

bid was the highest and best offer for the Assets. The Bidding Procedures afford the Debtors, in consultation with BPPR and the Committee, considerable discretion in determining whether (a) any bid is a Qualified Bid (see Bidding Procedures ¶ C), (b) any Qualified Bid(s) is a Successful Bid (see id. at ¶ J), (c) to reject any bid that is inadequate or contrary to the best interests of the Debtors and their estates (see id. at ¶ L(1)), (d) to terminate the auction (see id. at ¶ I), and (e) to modify the Bidding Procedures (see id. at ¶ L(2)). As described in more detail in the Messing Declaration, the Debtors consulted with BPPR and the Committee throughout the sale process, and within the broad discretion granted under the Bidding Procedures conducted the bidding and auction process. Ultimately, the Debtors determined that the $82 million bid submitted by Puma was the highest and best bid for the Assets. See Messing Declaration at ¶ 20. The Puma bid provides $82 million of all cash consideration from an experienced petroleum wholesaler and is supported by Puma's substantial financial wherewithal and the high likelihood of a timely closing. Specifically, because the Puma bid is submitted by a single, sophisticated purchaser, it presents low execution risk, lower transactions costs than any other bid and a greater ability to efficiently and conclusively resolve all remaining environmental issues with the EPA. See id.

### A. The Allied Objection is Meritless and Should Be Overruled

13. Notwithstanding the clear evidence that the Sale should be approved, Allied – a disgruntled bidder – has filed an objection. For the reasons set out below, the Allied Objection should be overruled.

#### 1. Allied Lacks Standing to Object to the Sale

14. As an initial matter, Allied lacks standing to object to the Sale. Allied is not a creditor, and therefore it is not a party in interest in this case pursuant to 11 U.S.C. § 1109. In fact, this Court has expressly held that a "disgruntled bidder" lacks standing to object to a sale absent fraud or impropriety that infects the intrinsic fairness of the sale process. This Court's

language in In re Nortel Networks denying standing to a disgruntled bidder could not be any clearer:

> A leading case addressing the standing of a losing bidder to object to a sale is Kabro Assoc. of West Islip, LLC v. Colony Hill Associates (In re Colony Hill Assoc.), 111 F.3d 269 (2d Cir. 1997). There, the court ruled that in the absence of fraud, collusion, or bad faith, an objector does not having standing to contest the results of an auction. The courts addressing the standing issue are uniform in the Colony Hill statement of the law. See, e.g., In re Karpe, 84 B.R. 926, 929 (Bankr. M.D. Pa. 1988); and In re Planned Sys., Inc., 82 B.R. 919, 922 (Bankr. S.D. Ohio 1988). Indeed, the failure of a court to confirm a sale in the absence of unfairness, fraud, unstable or gross inadequacy of price constitutes an abuse of discretion. In re Stanley Engineering Corp., 164 F.2d 316 (3d Cir. 1948).

See In re Nortel Networks Inc., (Bankr. D. Del. Dec. 4, 2009) Case No. 09-10138 (KG). A copy of the Nortel order is attached as Exhibit B. As the Court's order in Nortel makes clear, because Allied has failed to make out any case of fraud, collusion or bad faith, Allied lacks standing to pursue its objection and its objection must be denied.

### 2. Puma's Bid Is the Best Bid

15. Assuming the Court chooses to address the merits of Allied's objection, the objection should be overruled. Allied contends that the proposed sale does not maximize value to the estate and that its bid is better than Puma's. See Allied Objection ¶ 8. These propositions are demonstrably false. As set forth in the Messing Declaration, Puma's bid is superior to Allied's bid because:

- Puma's $82 million bid is all cash payable upon closing. Allied's bid contains a "put right" by which millions of dollars of its bid allocable to the undeveloped land would not be payable to the Debtors for two years after closing. Allied's objection does not discount for the time value of this money, nor does it acknowledge that the Debtors would be forced to expend cash administering the land (including having to remediate any environmental issues), paying property taxes and would potentially have to pay marketing and transaction costs if they seek to sell the land.

> Moreover, the Debtors have no assurance that Allied will actually pay on the put right. All of these decrease the value of Allie's bid compared to Puma's bid.

- By sheer numbers alone, Allied's bid presents significantly more execution risk than Puma's bid. Only one transaction must be closed to consummate Puma's bid. However, thirty-four transactions must close to consummate Allied's bid.

- By sheer numbers alone, Allied's bid presents significantly greater transaction costs than Puma's bid. Closing thirty-four separate transactions is substantially more time and resource-intensive than closing only one transaction.

- Any potential delay in closing will be extremely expensive to the Debtors. Each additional month in bankruptcy costs $4 million in postpetition borrowing costs, professional fees and administrative expenses.

- By sheer numbers alone, Allied's bid presents significantly more hassle for the EPA, whose support of the sale is paramount. Negotiating future remediation efforts with thirty-four new owners is considerably more complex than negotiating with one new owner.

- The higher execution risk presented by Allied's bid results in a significantly higher risk that the Debtors' liquidating estates will bear the costs and liabilities of unsold assets, because if service station owners cannot close, properties will revert to the Debtors.

See Messing Declaration ¶¶ 20-26. Against all of these facts, Allied cannot seriously contend its bid was superior to Puma's bid.

16. The Debtors' selection of Puma's bid as the highest and best offer is entitled to the broad protection provided by the business judgment rule and the considerable discretion provided by the Bidding Procedures. Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. In re Dura Automotive, 2007 Bankr. LEXIS 2764 at * 258, citing Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722

F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); In re Delaware and Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (same). Accordingly, a debtor's determination as to which bid is the best is to be afforded great deference. In re Castre, Inc., 312 B.R. 426, 430-31 (Bankr. D. Colo. 2004) (finding that a debtor's judgment on the sale of estate assets is "entitled to respect and deference from the Court, as long as the burden of giving sound business reasons is met," and that a debtor is "entitled to great judicial deference in deciding which bid to accept as the best and highest bid on the sale of the Debtors' assets."); In re Gulf States Steel, Inc. of Alabama, 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002) (deferring to the business judgment of the debtor in approving a sale to the debtor's chosen successful bidder).

17. The rationale for selecting the Puma bid set forth above – along with the support for that decision from every major constituency in these cases – is the essence of a proper exercise of business judgment. That decision should not be subjected to second guessing by a disgruntled bidder.

18. Moreover, the Bidding Procedures approved by this Court provide the Debtors with broad discretion to conduct the bidding and sale process in whatever manner the Debtors, in consultation with BPPR and the Committee, determine is most likely to maximize the value of the Debtors' estates. And, particularly relevant here, the Bidding Procedures make clear that the selection of a Successful Bidder is within the Debtors' reasonable discretion, and that in making such selection, the Debtors may consider any factor they deem relevant, including, without limitation, those factors affecting the need for speed and certainty of consummating the

sale of the assets. See Bidding Procedures ¶ J. Thus, the Debtors' conclusion that Puma's bid is the highest and best bid is well within the substantial latitude provided to them under the Bidding Procedures.

19. To counter, Allied states that "the Bankruptcy Court should not approve a proposed sale where the price brought at the sale was grossly inadequate as to shock the conscience of the court and raise a presumption of fraud, unfairness or mistake." See Allied Objection ¶ 5. However, Puma's bid is the opposite of grossly inadequate. It represents a full and fair price. Accordingly, Allied's contention that its bid is better than Puma's or that the sale should not be approved is spurious.

### 3. The Debtors Properly Terminated the Auction

20. Allied also challenges the sale by asserting that the Debtors closed bidding prematurely. See Allied Objection ¶ 9-10. This argument fails.[6] The Debtors conducted a multi-day auction, with bidding on the service stations alone lasting for six hours, with careful attention paid to the bids for each individual station. See Messing Declaration at ¶ 14. During phases two and three of the Auction, Allied submitted five bids and had repeated opportunities to submit a higher and better apples to apples competing bid to counter Puma's bid. See Dec. 16, 2010 Tr. at 161:11-16, 168:2-8, 169:11-170:8, 184:23-185:14, 188:22-189:6. But Allied never

---

[6] Allied's complaints about the bidding increments established by the Debtors are equally meritless. In the first instance, bidding increments, along with other decisions regarding bidding and auction procedures, are left in the sound business judgment of the Debtors pursuant to the Bidding Procedures. In any event, Allied can show no harm to the Debtors' estates, which is of critical importance to successfully opposing a motion to approve a sale. To the contrary, the Debtors' decision to lower bidding increments benefited their estates because in response, Puma increased its bid.

took this opportunity and the last offer it made was clearly inferior to Puma's bid.[7] Thus, terminating the Auction on December 17 was an appropriate decision.

21. The Debtors did not make the decision to terminate in a vacuum. Rather, the decision was made by the Debtors' independent professionals, in consultation with the other real economic parties in interest in these cases: BPPR and the Committee. All of these parties determined together that further bidding would not yield enough additional value to render the Allied bid, combined with the Service Station Aggregate Bid, higher and better than the final bid submitted by Puma. This determination by the Debtors was informed by a continuous dialogue with BPPR and the Committee and supported by ample justifications.[8] Thus, it lies comfortably within the broad protection of the business judgment rule described above and the Bidding Procedures – which explicitly permit the Debtors to terminate the Auction in their discretion (Bidding Procedures § I) – and the finality of the Debtors' decision must stand.

22. As the court in Capmark recognized in rejecting a motion to reopen bidding earlier this year, reopening bidding after an auction is closed is an extraordinary step. In re Capmark Financial Group Inc., Tr. 163: 20; 165: 5, Case No. 09-13684 (CSS) (Bankr. D. Del. June 29, 2010). Finality is essential because "[i]f people know that they can bid up to a certain point, leave the auction and come back to the hearing and start all over, ultimately [the debtor

---

[7] Allied's contention that service station bidding should have been reopened is based on the assertion in the Declaration of Robert L. Rose in Support of Objection to Approval of Auction Sale, see D.I. 496 at ¶ 7, 20, that service station bidders purportedly told Allied they would increase their bids. This is hearsay under Federal Rules of Evidence 801 and any reference to these alleged conversations should be stricken from the record and deemed impermissible.

[8] The Debtors also believe that reopening the service station bids would not yield enough additional value to render the Allied bid, combined with the Service Station Aggregate Bid, higher and better than the final bid submitted by Puma. Indeed, given FTI's concerns regarding the individual service station bidders' financial wherewithal to close, allowing them to continue bidding up their proposed purchase price would have only exacerbated that problem, to the detriment of the Debtors' estates. See Messing Declaration at ¶ 28.

is] going to be in a position where it doesn't get maximum value at the actual auction." Capmark Tr. at 163: 13-16; see also In re Finlay Enterprises, Inc., Tr. 44: 45, No. 09-14873 (Bankr. S.D.N.Y. Nov. 12, 2009) (finding that the only reason the court should consider whether to reopen bidding is if there is a legitimate concern that there has been a violation of a court order).[9] For these reasons, the finality of the Debtors' decision to terminate bidding should be respected here.

23. In support of its argument that bidding should be re-opened, Allied ignores these well-founded concerns about finality. Instead, Allied cites Farmland, which affirmed a bankruptcy court's decision to reopen a closed auction. In re Farmland Industries, Inc., 239 B.R. 122, 126 (8th Cir. B.A.P. 2003). The factual circumstances in Farmland are so far removed from this case that Farmland undermines Allied's argument. There, the court re-opened bidding because of an egregious violation of a prior court order: the debtors had failed to provide a party that was entitled to exercise a right of first refusal with any notice of sale. Id. Of course, nothing of the sort occurred here. Accordingly, the Debtors' determination to conclude bidding was appropriate and should remain undisturbed.

B. **Puerto Nuevo Objection**

24. In its Sale Objection, Puerto Nuevo asserts that the Debtors do not have proper title to an approximate 5 acre parcel of land located at KM 3.8 Palmas Ward, Catano, Puerto Rico that lies just south of Interstate PR-22 (the "South Property") and the Debtors cannot sell this property. Puerto Nuevo asserts that it is the rightful owner of the South Property and that the Debtors do not own or otherwise have any interest in the South Property. The Debtors reject Puerto Neuvo's claim, and assert that they hold proper legal title to the South Property.

---

[9] Transcripts of these decisions are attached as Exhibit C.

Litigation over the South Property is pending in the Court of First Instance of Puerto Rico, Bayamón. That litigation has been stayed with the filing of these chapter 11 cases.

25. The objection to the Sale should be overruled. The Debtors intend to sell only the rights and interests they have in the South Property to Puma. Thus, the Sale will not impact Puerto Nuevo's rights and interests, if any, in the South Property. The Debtors believe that the Sale Hearing is not the proper time or place to determine the proper forum to resolve this dispute.

## II. OBJECTIONS TO THE CURE SCHEDULE ARE MOOT

### A. Rodriguez Objection

26. In the Rodriguez Objection, Mr. Rodriguez asserts that the alleged Lease-Sub-Lease agreement between himself and the Debtors, related to a Service Station #64 located in Miramar, San Juan, Puerto Rico (the "Rodriguez Agreement"), as identified on the Cure Schedule, does not exist, and that he no longer owns or operates this service station. Accordingly, Mr. Rodriguez requests that the Rodriguez Agreement be removed from the Cure Schedule and objects to any potential assumption and assignment of the Agreement. The Debtors agree that they are not currently leasing this service station or providing gasoline to the current operator of the station. Accordingly, the Debtors confirm that the Rodriguez Agreement no longer exists and cannot be assumed, and the Rodriguez Agreement is not included on the Puma Assumption Schedule. See Successful Bidder Notice, Exhibit 1. To that end, the Rodriguez Objection is moot.

### B. PREPA Objection

27. In the PREPA Objection, PREPA asserts that amounts listed on the Cure Schedule related to the assumption and assignment of that certain fuel-oil terminalling agreement and that certain light-distillate terminalling agreement (the "Terminalling Agreements") are

incorrect. PREPA asserts that to the extent the Debtors assume any executory contract relating to PREPA's provision of electricity to the Debtors, the correct cure amount related to this assumption is $152,565.38, plus any additional postpetition amounts owed to PREPA for the provision of electricity at the time of the Terminalling Agreements. See PREPA Objection at 5. Additionally, PREPA alleges that the Debtors owe a total of $931,570.65 from the Debtors' alleged breach of the Terminalling Agreements after the October 2009 explosions. See id. at 6. Further, in the PREPA Amendment Motion, PREPA argues that the Bankruptcy Court should grant it relief from the objection deadline to the Cure Notice, originally set for December 1, and allow PREPA to file an amendment to the PREPA Objection. PREPA alleges that the Debtors owe an additional $8,389,028.26 as a result of the costs associated with contracting for emergency shipments of fuel after the October 2009 explosions, and would like to amend the PREPA Objection to include these amounts.

28. Pursuant to the Bidding Procedures, Puma has decided not to assume any of the Debtors' executory contracts with PREPA, including the Terminalling Agreements. See Successful Bidder Notice, Exhibit 1. Thus, the PREPA Objection and Amendement Motion are moot.

C. **Puerto Nuevo**

29. While the Puerto Nuevo Cure Objection is filed as an objection to the assumption and assignment of any executory contracts related to the South Property, no executory contracts related to the South Property were included on the Cure Schedule, nor have any been included in the Puma Assumption Schedule. Accordingly, the Puerto Nuevo Cure Objection is moot.

## III. THE EMPLOYEE OBJECTION HAS NO MERIT

30. In the Employee Objection, the employees allege that they were not provided with information regarding the impact of the bankruptcy and the Sale on their employee benefits and other rights. The Employee Objection is without merit and fails to assert a valid objection to the Sale Motion. Throughout these chapter 11 cases, the Debtors have provided the employees with all the available information regarding the bankruptcy cases and the Sale, and the impact of both on the Debtors' pension plan and other employee benefits. The Debtors have explained that the Successful Bidder will have the opportunity to assume the pension plan, and pursuant to the Puma Assumption Schedule, Puma has decided not to assume the pension plan. See Successful Bidder Notice, Exhibit 1. The Debtors intend to promptly convey this information to the employees and explain next steps regarding the pension plan and other employee benefits.

WHEREFORE, the Debtors respectfully request that the Court overrule the Responses to the Sale Motion and grant the Sale Motion and such other relief as is just and proper.

Dated: December 22, 2010
Wilmington, Delaware

/s/ *[signature]*
Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
Travis A. McRoberts (No. 5274)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 498-7531

-and-

John J. Rapisardi
George A. Davis
Peter Friedman
Zachary H. Smith
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Co-Attorneys for Debtors
and Debtors in Possession