**EXHIBIT 1**

**Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

BY AND AMONG

CARIBBEAN PETROLEUM CORPORATION,

CARIBBEAN PETROLEUM REFINING L.P.,

GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION,

(SELLERS)

AND

PUMA ENERGY INTERNATIONAL B.V.,

(BUYER)

DECEMBER 17, 2010

## TABLE OF CONTENTS

**Page**

1.    Definitions ............................................................................................................ 1

2.    Purchase and Sale. ............................................................................................. 15
    (a)    Purchase and Sale of Acquired Assets; Retention of Excluded Assets ............. 15
    (b)    Assumption of Assumed Liabilities; Retention of Excluded Liabilities ............ 15
    (c)    Assumption and Rejection of Contracts ......................................................... 15
    (d)    Consideration. ............................................................................................... 16
    (e)    Closing ......................................................................................................... 17
    (f)    Deliveries at Closing. .................................................................................... 17
    (g)    Non-Assignment of Assumed Contracts ......................................................... 18

3.    Sellers' Representations and Warranties ............................................................. 19
    (a)    Organization of Sellers; Good Standing ......................................................... 19
    (b)    Authorization of Transaction ......................................................................... 19
    (c)    Noncontravention ......................................................................................... 19
    (d)    Title to Acquired Assets. ............................................................................... 20
    (e)    Litigation. ..................................................................................................... 20
    (f)    Absence of Certain Changes .......................................................................... 20
    (g)    Environmental Matters .................................................................................. 21
    (h)    Board Approval and Recommendation. .......................................................... 21
    (i)    Brokers' Fees. ............................................................................................... 21
    (j)    Disclosure. ................................................................................................... 21

4.    Buyer's Representations and Warranties ............................................................. 22
    (a)    Organization of Buyer ................................................................................... 22
    (b)    Authorization of Transaction ......................................................................... 22
    (c)    Noncontravention ......................................................................................... 22
    (d)    Litigation. ..................................................................................................... 23
    (e)    Brokers' Fees ................................................................................................ 23
    (f)    Financial Capacity ........................................................................................ 23
    (g)    Adequate Assurances Regarding Executory Contracts ..................................... 23

5.    Pre-Closing Covenants. ...................................................................................... 23
    (a)    Commercially Reasonable Efforts; Cooperation ............................................. 23
    (b)    Notices and Consents .................................................................................... 23
    (c)    Conduct of the Business Pending the Closing ................................................. 24
    (d)    Notice of Developments ................................................................................ 25
    (e)    Access .......................................................................................................... 25
    (f)    Press Releases and Public Announcements ..................................................... 26
    (g)    Bankruptcy Court Matters ............................................................................. 26
    (h)    Bulk Transfer Laws ...................................................................................... 27
    (i)    Cure Amounts ............................................................................................... 27
    (j)    Supplementation and Amendment of Disclosure Schedule ............................... 27
    (k)    Regulatory Filings ........................................................................................ 27

|  | (l) | Allocation of the Purchase Price | 28 |
|  | (m) | Schedules and Exhibits | 28 |
|  | (n) | Certain Filings | 28 |
| 6. |  | Other Covenants | 28 |
|  | (a) | Cooperation; Further Assurances | 28 |
|  | (b) | Litigation Support | 29 |
|  | (c) | Availability of Records | 29 |
|  | (d) | Satisfaction of Excluded and Assumed Liabilities | 30 |
|  | (e) | Employee Matters | 30 |
|  | (f) | Transfer Taxes | 31 |
|  | (g) | Recording of Intellectual Property Assignments | 31 |
|  | (h) | Property and Other Taxes | 31 |
|  | (i) | Wage Reporting | 32 |
|  | (j) | Use of Name | 32 |
| 7. |  | Conditions to Obligation to Close | 33 |
|  | (a) | Conditions to Buyer's Obligations | 33 |
|  | (b) | Conditions to Sellers' Obligations | 34 |
|  | (c) | No Frustration of Closing Conditions | 35 |
| 8. |  | Termination | 35 |
|  | (a) | Termination of Agreement | 35 |
|  | (b) | Procedure Upon Termination | 36 |
|  | (c) | Effect of Termination | 36 |
| 9. |  | Miscellaneous | 37 |
|  | (a) | Expenses | 37 |
|  | (b) | Entire Agreement | 37 |
|  | (c) | Incorporation of Schedules and Exhibits | 37 |
|  | (d) | Amendments and Waivers | 37 |
|  | (e) | Succession and Assignment | 38 |
|  | (f) | Notices | 38 |
|  | (g) | Governing Law; Jurisdiction | 39 |
|  | (h) | Consent to Service of Process | 40 |
|  | (i) | WAIVERS OF JURY TRIAL | 40 |
|  | (j) | Specific Performance | 40 |
|  | (k) | Severability | 40 |
|  | (l) | No Survival of Representations and Warranties | 40 |
|  | (m) | Survival of Covenants and Agreements | 41 |
|  | (n) | No Third Party Beneficiaries | 41 |
|  | (o) | Construction | 41 |
|  | (p) | Computation of Time | 41 |
|  | (q) | Mutual Drafting | 41 |
|  | (r) | Headings; Table of Contents | 42 |
|  | (s) | Counterparts; Facsimile or Email Signatures | 42 |
|  | (t) | Time of Essence | 42 |

Exhibit A    -    Bidding Procedures Order
Exhibit B    -    Form of Sale Order
Exhibit C    -    Form of Escrow Agreement
Exhibit D    -    Form of Bill of Sale
Exhibit E    -    Form of Deed
Exhibit F    -    Form of Assignment and Assumption Agreement
Exhibit G    -    Form of Trademark Assignment
Exhibit H         Form of Intellectual Property Assignment


Annex A    -    Assumed Contracts
Annex B         Owned Real Property

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is entered into as of December 17, 2010, by and among Caribbean Petroleum Corporation, a corporation formed under the laws of the State of Delaware ("CPC"), Caribbean Petroleum Refining L.P., a limited partnership formed under the laws of the State of Delaware ("CPRLP") and Gulf Petroleum Refining (Puerto Rico) Corporation, a corporation formed under the laws of the State of Delaware ("Gulf", together with CPC and CPRLP, the "Sellers" and each, individually, a "Seller") and Puma Energy International B.V., a corporation formed under the laws of the Netherlands (the "Buyer"). Sellers and Buyer are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Section 1.

**WHEREAS**, Sellers have historically engaged in the business of refining, importing, offloading, storing and distributing gasoline and other petroleum-based products in the Commonwealth of Puerto Rico (the "Business");

**WHEREAS**, on August 12, 2010 (the "Commencement Date"), Sellers commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are currently pending before the Honorable Kevin Gross and jointly administered under Case No. 10-12553 (KG) (collectively, the "Chapter 11 Cases"); and

**WHEREAS**, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Business and certain other assets, as of the Closing, on the terms and subject to the conditions set forth herein, and, in furtherance of the foregoing, (i) Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Acquired Assets, and (ii) Buyer wishes to assume from Sellers the Assumed Liabilities, in the case of clause (i) and (ii) above, on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter contained, the receipt and sufficiency of which are acknowledged, and intending to be bound hereby, the parties hereto hereby agree as follows:

1.    Definitions.

"Acquired Assets" means all of Sellers' right, title and interest in and to all of Sellers' properties, assets and rights of every nature, kind and description, tangible and intangible (including goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, existing as of the Closing Date, other than the Excluded Assets, in each case that are used in or related to the Business, including, but not limited to, the following: (a) all Inventory; (b) all Furnishings and Equipment, refinery equipment, petroleum terminaling, pipeline and storage facilities, ship dock facilities in San Juan Harbor, and physical facilities of every type used in or related to the Business; (c) all Records used in or related to the Business or used in connection with the Acquired Assets, including all Tax Returns and Records relating to Taxes imposed on the Acquired Assets or with respect to the Business, other than Tax Returns and Records relating

to income or similar Taxes; _provided_ that Sellers shall have access to and the right to make copies of any such Tax Returns and Records in accordance with Section 6(c) hereof; (d) all Intellectual Property used in or related to the Business (collectively, "Acquired Intellectual Property"); (e) all Contracts used in or related to the Business as set forth on Annex A and designated by Buyer pursuant to Section 2(c) hereof, which will be assigned to Buyer pursuant to Section 365 of the Bankruptcy Code in connection with the transactions contemplated in this Agreement (all Contracts contemplated by this clause (e), collectively, the "Assumed Contracts") and any and all deposits, claims, causes of action, settlements, retroactive adjustments, setoff rights, recoupment rights and rights of refund in respect of any Assumed Contract (other than the Excluded Litigation Claims and Excluded Insurance Policies, each of which, for the avoidance of doubt, shall be Excluded Assets), whether related to periods ending before, on, or after the Closing Date; (f) all of the Owned Real Property together with all interests of Sellers in and to any subsurface rights, mineral rights, hereditaments, water rights, water courses, alleys, passages, privileges, covenants and reciprocal easement agreements relating to any such Owned Real Property; (g) all claims of Sellers against third parties relating to the Acquired Assets (other than the Excluded Litigation Claims and Excluded Insurance Policies, each of which, for the avoidance of doubt, shall be Excluded Assets) or the Assumed Liabilities, whether choate or inchoate, known or unknown, contingent or noncontingent, together with all rights, title and interest in and to any award made or to be made in relation thereto; (h) all Permits relating to the Business (the Permits contemplated by this clause (h), collectively, the "Assumed Permits") in each case, only to the extent such Assumed Permits are assignable; (i) all insurance policies and binders set forth on Schedule 1.1 of the Disclosure Schedule and all claims, refunds and credits from such policies or binders due or to become due with respect to such policies; (j) all credits, warranties, representations and guarantees provided to or otherwise received by Sellers from any suppliers, manufacturers, contractors or sellers that relate or pertain to any Acquired Asset, only to the extent such are assignable; (k) all telephone and facsimile numbers, domain names and e-mail addresses used in or related to the Business, only to the extent such are transferrable; (l) all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with current or former employees and/or agents of Sellers or with third parties, to the extent relating to the Business (or any portion thereof), only to the extent such are transferable; and (m) all goodwill associated with the Business, including customer and supplier lists, and all goodwill associated with all Intellectual Property.

"Acquired Intellectual Property" has the meaning set forth in the definition of Acquired Assets.

"Administrative Expenses" means "administrative expenses" as defined in Section 503(b) of the Bankruptcy Code.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"Agreement" has the meaning set forth in the preamble.

"Antitrust Division" has the meaning set forth in Section 5(k).

"Antitrust Laws" means, collectively, the HSR Act, the Sherman Antitrust Act of 1890, as amended, the Clayton Antitrust Act of 1914, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2(f)(i)(C).

"Assisting Party" has the meaning set forth in Section 6(b).

"Assumed Contracts" has the meaning set forth in the definition of Acquired Assets.

"Assumed Liabilities" means only the following: Liabilities (a) with respect to the Acquired Assets that arise after the Closing; (b) to the extent incurred after the Closing with respect to the Assumed Contracts or the Assumed Permits and for the Cure Amounts (subject to the Buyer Cure Amounts Cap); (c) for Property Taxes to the extent that such Taxes relate to the ownership of the Acquired Assets after the Closing; (d) for Transfer Taxes as provided in Section 6(f); (e) for Taxes with respect to the Acquired Assets, only to the extent allocated to Buyer pursuant to Section 6(h) of this Agreement; (f) all Liabilities associated with the environmental condition of the Acquired Assets as of the Closing Date; provided, that the Assumed Liabilities shall not, with respect to (i) Governmental Entities, include Liabilities that have been or will be asserted (or, in the case of monetary claims for funds actually expended by any Governmental Entity, could have been lawfully asserted for such funds), and (ii) with respect to any Person other than a Governmental Entity, include Liabilities that have been, will be or could have been lawfully asserted, in case of sub-clause (i) or (ii), by such Person as Administrative Expenses, general unsecured claims or any other "claims" as defined in Section 101(5) of the Bankruptcy Code for purposes of the Chapter 11 Cases (such exception to the Assumed Liabilities set forth in this clause (f), which for the avoidance of doubt shall be Excluded Liabilities, the "Specified Environmental Claims")); and (g) related to the Acquired Assets required to be paid by Buyer under this Agreement or under any Related Agreement; provided, however, notwithstanding the above, Assumed Liabilities shall not include any Excluded Liabilities. Notwithstanding any language to the contrary set forth in clauses (a) through (g) above (except as expressly provided in clauses (b) and (f)), Buyer shall not assume any Liabilities of Sellers that arise from events, facts or circumstances that occur prior to the Closing. Furthermore, Sellers shall not have any obligation for any Liabilities related to the Acquired Assets for events, facts or circumstances that occur after the Closing.

"Assumed Permits" has the meaning set forth in the definition of Acquired Assets.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"<u>Bidding Procedures</u>" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"<u>Bidding Procedures Order</u>" means the Final Order entered by the Bankruptcy Court on September 10, 2010, attached hereto as <u>Exhibit A</u>, approving, among other things, the Bidding Procedures.

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 2(f)(i)(A)</u>.

"<u>Business</u>" has the meaning set forth in the recitals.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York or San Juan, Puerto Rico shall be authorized or required by Law to close.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Buyer Cure Amounts Cap</u>" means, subject to <u>Section 5(i)</u> and as adjusted in accordance with <u>Section 2(c)(i)</u>, the aggregate amount of Cure Amounts set forth on <u>Annex A</u> hereto.

"<u>Cash</u>" means all cash (including checks received prior to the close of business on the Closing Date, whether or not deposited or cleared prior to the close of business on the Closing Date), certificates of deposit and other bank deposits, treasury bills and other cash equivalents and marketable securities.

"<u>Chancery Court</u>" has the meaning set forth in <u>Section 9(g)</u>.

"<u>Chapter 11 Cases</u>" has the meaning set forth in the recitals.

"<u>Claim</u>" means any and all claims, demands, actions, choses in action, suits, complaints, causes of action, charges, suits, rights of recovery, rights of recoupment, proceedings and other litigation assets of the Sellers of any kind or nature, whether choate or inchoate, known or unknown, contingent or noncontingent, together with all rights, title and interest in and to any award made or to be made in relation thereto.

"<u>Closing</u>" has the meaning set forth in <u>Section 2(e)</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 2(e)</u>.

"<u>COBRA</u>" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state law.

"<u>COBRA Liabilities</u>" means all Liabilities arising on or prior to the Closing Date under COBRA with respect to any current or former employee of any Seller (including the Covered Employees) and/or any beneficiaries or dependents thereof.

"<u>Commencement Date</u>" has the meaning set forth in the recitals.

"Commercial Tort Claims" has the meaning set forth in Section 9-102 of the Uniform Commercial Code as in effect in the State of Delaware.

"Competing Transaction" means any direct or indirect acquisition or purchase, by a Person other than Buyer, of the Business or all or substantially all of the Acquired Assets, or any merger, consolidation, recapitalization or other business combination or other transaction (including a plan of reorganization or liquidation) affecting the Acquired Assets or the Business such that the Acquired Assets or the Business are no longer owned and controlled by Sellers (or a wholly-owned Subsidiary thereof) or any Affiliates thereof.

"Confidentiality Agreement" means the letter agreement, dated August 3, 2010, by and among Sellers and Buyer's Affiliate, Puma Energy Puerto Rico, Inc., regarding the terms and conditions on which Sellers would make available certain information to Buyer.

"Contract" means any written or oral agreement, commercial fuel agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, franchise, dealer and distributorship agreement, supply agreement, service agreement, software license agreement, software maintenance agreement, development agreement, joint venture agreement, promotion agreement, customer contract or purchase order, partnership agreement or other arrangement, understanding, permission or commitment, including any amendments, modifications or supplements to the foregoing.

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to, or in connection with, any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Covered Employee" means any officer or employee of any Seller or any of their respective Affiliates whose duties relate primarily to the operation of the Business and who is actively employed as of the date immediately prior to the Closing Date.

"Cure Amounts" has the meaning set forth in Section 5(i).

"D&O Insurance Policies" means all of Sellers' insurance policies providing coverage for current and former directors and officers of Sellers.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order or any other order of any Governmental Entity.

"Deed" has the meaning set forth in Section 2(f)(i)(B).

"Deposit" has the meaning set forth in Section 2(d)(ii).

"DIP Facility" means that certain $10,000,000 Debtor in Possession Senior Secured Superpriority Priming Financing Facility dated as of August 11, 2010, among Sellers and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced from time to time in accordance with its terms.

"DIP Lenders" means Banco Popular de Puerto Rico and the banks, financial institutions and other lender parties to the DIP Facility from time to time.

"Drop Dead Date" means April 14, 2011, or such later date as Buyer and Sellers may mutually agree in writing.

"Employee Benefit Plan" means each "employee benefit plan" as defined in Section 3(3) of ERISA, any "multi-employer plan" as defined in Section 3(37) of ERISA, each medical, surgical, hospitalization, life insurance and other "welfare" plan, fund, or program (within the meaning of Section 3(1) of ERISA), each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA), and each other plan, policy, program, agreement, understanding and arrangement (whether written or oral) providing compensation or other benefits to any current or former director, officer, employee or consultant (or to any dependent or beneficiary thereof) of any Seller or their Affiliates which is now or has been maintained, sponsored or contributed to by Sellers or their Affiliates or under the terms of which Sellers or their Affiliates have or are reasonably likely to have any obligation or liability, whether actual or contingent, including all employment, consulting, severance, termination, incentive, bonus, fund, deferred compensation, retirement, pension, savings, profit sharing, retention, change in control, vacation, holiday, cafeteria, medical, disability, life, accident, fringe benefit, health, welfare, stock-based and other compensation (including stock purchase and stock option plans) and benefit plans, policies, programs, agreements, understandings or arrangements.

"Environmental Claims" means a written notice, claim, demand, action, suit, complaint or proceeding by any Person alleging liability or potential liability with respect to the release, threatened release, discharge, emission, spill, leak, use, or the presence of or exposure to, any Hazardous Substances.

"Environmental Law" means each federal, state, or local Law (including those of the Commonwealth of Puerto Rico) relating to (a) the protection, preservation or restoration of the environment (including air, water, vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or to human health or safety, or (b) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Substances.  The term Environmental Law includes (a) the federal Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act, the federal Water Pollution Control Act of 1972, the federal Clean Air Act, the federal Clean Water Act, the federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the federal Solid Waste Disposal Act and the federal Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Atomic Energy Act, the Nuclear Waste Policy Act of 1982, the federal Occupational Safety and Health Act of 1970, the Puerto Rico Public Policy Environmental Act, and regulations promulgated thereunder, each as amended and as now in effect, and (b) any common law or equitable doctrine (including injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to, or threatened as a result of, the presence of or exposure to any Hazardous Substances.

"EPA" means the United States Environmental Protection Agency, and any successor thereto.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that with Sellers is: (a) a member of a controlled group of corporations within the meaning of Section 414(b) of the IRC; (b) a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the IRC; (c) a member of an affiliated service group within the meaning of Section 414(m) of the IRC; or (d) a member of a group of organizations required to be aggregated under Section 414(o) of the IRC.

"Escrow Agent" has the meaning set forth in Section 2(d)(ii).

"Escrow Agreement" has the meaning set forth in Section 2(d)(i).

"Excluded Assets" means any and all assets of Sellers that are not Acquired Assets. Without limiting the generality of the foregoing sentence, each of the following shall be Excluded Assets for purposes of this Agreement: (a) all of Sellers' or any of their respective Affiliates' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller or any of its Affiliates as a corporation, limited partnership or other entity; (b) all Tax Returns and Records related to Taxes paid or payable by any Seller or any of its Affiliates (other than Tax Returns and Records specifically included in clause (c) of the definition of Acquired Assets); (c) all Records that Sellers are not permitted under applicable Law to transfer; provided that Buyer shall have the right to make copies of any such Records to the extent such Records are exclusively related to the Business; (d) all assets with respect to any income Taxes of any Seller or any of its Affiliates for periods prior to the Closing, including any rights to income Tax refunds, overpayments or income Tax credits; (e) all equity securities of any Seller; (f) all Cash (including, for the avoidance of doubt, the Purchase Price) and accounts receivable, prepaid expenses, refunds, rights of setoff, notes receivable, trade accounts and other debts due or accruing to Sellers from (i) all of the Contracts other than the Assumed Contracts, (ii) the Assumed Contracts prior to the Closing, (iii) ownership of the Acquired Assets prior to the Closing and (iv) any other source; (g) all rights under any Contract that is not an Assumed Contract; (h) all of Sellers' or any of their respective Affiliates' current assets that are not related to or used in the Business; (i) all rights (including rights of set-off and rights of recoupment (including any such item relating to the payment of Taxes)), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of any Seller or any of its Affiliates against third parties with respect to Excluded Assets and Excluded Liabilities; (j) all avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law (including all rights and avoidance claims of Sellers arising under Chapter 5 of the Bankruptcy Code) except with respect to any of the Assumed Contracts; (k) any Records related to the Chapter 11 Cases other than the Records which are contained in clause (c) of the definition of Acquired Assets; (l) any (i) confidential personnel and medical records pertaining to any Covered

Employee and (ii) other Records that Sellers are required by law to retain; provided that Buyer shall have the right to make copies of any portions of such Records pursuant to sub-clause (ii) above to the extent that such portions relate either to the Business or any Acquired Asset and are necessary for Buyer to comply with applicable law; (m) all Employee Benefit Plans, including all assets maintained pursuant to, or in connection with, any Employee Benefit Plan, currently or previously sponsored or maintained by Sellers or any of Sellers' ERISA Affiliates or their respective predecessors or with respect to which such, or their respective predecessors, has made or is required to make payments, transfers or contributions in respect of any present or former employees, directors, officers, shareholders, consultants or independent contractors of Sellers or any of Sellers' ERISA Affiliates or their respective predecessors, and all insurance policies, fiduciary liability policies, benefit administration contracts, actuarial contracts, trusts, escrows, surety bonds, letters of credit and other contracts primarily relating thereto; (n) all of Sellers' rights under this Agreement and any Related Agreement; (o) all of Sellers' rights under or pursuant to all warranties (expressed or implied), representations and guarantees made by third parties to the extent relating to (i) any Excluded Assets or (ii) any Excluded Liabilities; (p) all of Sellers' rights to the Acquired Assets and Assumed Permits to the extent such rights are not assignable; (q) all Records relating to the Property and Casualty Insurance Policies and D&O Insurance Policies; (r) all Property and Casualty Insurance Policies and D&O Insurance Policies (including those set forth on Schedule 1.2 of the Disclosure Schedule) and all claims, refunds and credits from such policies due or to become due with respect to such policies (such policies referenced in this clause (r), the "Excluded Insurance Policies"); (s) all Excluded Litigation Claims; (t) all vehicles not used in the Business or related to the Acquired Assets; (u) all billboard signs and artwork not owned by Sellers; and (v) any other assets not owned by Sellers; and (w) each of those assets set forth on Schedule 1.3 of the Disclosure Schedule.

"Excluded Insurance Policies" has the meaning set forth in the definition of Excluded Assets.

"Excluded Liabilities" means any and all Liabilities of any of the Sellers that are not Assumed Liabilities. In furtherance, and not in any way a limitation of the foregoing, the Excluded Liabilities include the following Liabilities of any of the Sellers: (a) indebtedness for borrowed money, including, but not limited to, all amounts owed under the DIP Facility; (b) all Liabilities at any time relating to or arising under or in connection with any collective bargaining agreement, Employee Benefit Plan or any other severance, retention, employment, change-of-control, pension, incentive, retirement, equity or other compensation or benefit plan, program, policy, obligation or agreement of or with any Seller; (c) all Liabilities relating to wages, remuneration, compensation, benefits, severance, vacation or other paid-time-off for any Covered Employees or any former directors, officers, employees, contractors or other service providers engaged in connection with the Business; (d) all Liabilities arising out of the Excluded Assets, including Contracts that are not Assumed Contracts; (e) except for Taxes specifically allocated to Buyer pursuant to Section 6(h), any Liability of Sellers, or otherwise imposed on any of the Acquired Assets or with respect to the Business for any Pre-Closing Tax Period, in respect of any Tax, including any Liability of Sellers for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise; (f) Liabilities existing prior to the Closing Date that are subject to compromise under the Bankruptcy Code; (g) all Liabilities associated with brokers, finders or other consultants or advisors to Sellers entitled to a fee or reimbursement of

expenses with respect to this transaction; (h) any Liability relating to any Litigation arising out of or related to any occurrence or event that happened prior to the Closing, except to the extent expressly identified as an Assumed Liability; (i) any Liability for Cure Amounts in excess of the Buyer Cure Amounts Cap; (j) all Liabilities relating to long term deferred revenue of the Business as of the Closing; (k) all Liabilities with respect to the Specified Environmental Claims; (l) any Liability for product liabilities, employee liabilities, workers' compensation claims, personal injury or property damage claims arising prior to the Closing, except to the extent expressly identified as an Assumed Liability; (m) any liability, claim or obligation in connection with, or arising out of, any claim or dispute for services rendered or products, systems or goods manufactured, distributed, designed, configured, engineered, assembled, compiled or sold by Sellers prior to the Closing, including product liability claims; (n) all Liabilities arising from any claim relating exclusively to Sellers' conduct of the Business or ownership of the Acquired Assets prior to the Closing, except to the extent expressly identified as an Assumed Liability; and (o) all Liabilities and/or obligations of any Seller to Buyer under this Agreement, any Related Agreement or with respect to or arising out of the transactions contemplated hereby.

"Excluded Litigation Claims" means all Claims including, without limitation: (a) Commercial Tort Claims, (b) Claims set forth on the Schedules of Assets and Liabilities and Statements of Financial Affairs as filed by Sellers with the Bankruptcy Court, as supplemented, amended or modified from time to time, (c) Claims against or adverse to Sellers' current or former officers, directors, managers, employees, professionals, advisors, accountants, attorneys, lenders or agents and relate to acts, omissions, facts or events occurring on or prior to the Closing Date or (d) Claims against or adverse to other Persons and relate to acts, omissions, facts or events occurring on or prior to the Closing Date (other than Claims arising under any Assumed Contract, which shall constitute Acquired Assets).

"Final Order" means an Order of the Bankruptcy Court or other court of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect.

"Franchise Agreements" means those Contracts set forth in the Rejection Order.

"FTC" has the meaning set forth in Section 5(k).

"Fuel Inventory" means the fuel products, including gasoline, diesel, jet fuel, crude oil, kerosene and propane owned by Sellers as of the Closing Date.

"Furnishings and Equipment" means all tangible personal property (other than Inventory and Intellectual Property), wherever located, including machinery, equipment, computers, furniture, automobiles, trucks, railcars, tools, tractors and trailers, dock loaders, cranes, forklifts, spare parts, and leased personal property (to the extent assigned hereunder), in each case that is used in the Business.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

"Governmental Entity" means any United States federal, state, municipal or local or non-United States governmental or regulatory authority, agency, commission, court, body, board,

department or other governmental entity, including the Bankruptcy Court and the Commonwealth of Puerto Rico.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Hazardous Substances" means any substances, elements, mixtures, chemicals, constituents or materials, whether solid, liquid or gas, that are defined, listed or otherwise classified or regulated as pollutants, contaminants, hazardous wastes, hazardous substances, chemical substances, substances of very high concern, toxic substances, toxic materials, hazardous materials, extremely hazardous wastes under any present Environmental Laws (including petroleum and petroleum related substances, products, by products and wastes).

"Intellectual Property" means all (i) trademarks, copyrights, patents, service marks, trade names, logos and other designations used by Sellers in the Business and (ii) all computer programs and other computer software (other than off-the-shelf shrink wrapped software), software licenses, trade secrets, plans and specifications, inventions, know-how, technology, proprietary processes and formulae used by the Sellers, in each case, in the Business.

"Intellectual Property Assignment" has the meaning set forth in Section 2(f)(i)(E).

"Inventory" means the Fuel Inventory and all other goods held for sale or furnished under Contracts of service, and all raw materials and supplies, and all manufactured, spare and purchased parts, in each case that are used in the Business.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means all laws, statutes, rules, regulations, ordinances, codes, permits, consents, approvals, licenses, judgments, orders, writs, judicial decisions, decrees, policies, injunctions and other authorizations, requirements and pronouncements having the effect of law of any Governmental Entity.

"Leased Real Property" means the real property leased or subleased by the Sellers as tenant or subtenant, as applicable, together with, to the extent leased or subleased by the Sellers, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Sellers attached or appurtenant thereto and all easements, rights of way, servitudes, licenses, tenements, privileges and appurtenances relating to the foregoing.

"Liability" means any debt, liability, loss, penalty, adverse claim, recoupment, offset or obligation of whatever kind or nature (whether direct or indirect, known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due), including any liability for Taxes and any claim (as such term is defined in Section 101 of the Bankruptcy Code).

"Lien" means any mortgage, pledge, lien, encumbrance, charge, security interest, option, right of first refusal, easement, deed of trust, security agreement or other encumbrance or restriction on the use or transfer of any property.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity, by or before any Governmental Entity.

"Local Bankruptcy Rules" means the Local Bankruptcy Rules for the District of Delaware applicable to all cases in such district governed by the Bankruptcy Code.

"Material Adverse Effect" means, when used with respect to the Business, any effect or change that is materially adverse to the Business or the Acquired Assets; provided, however, that no effects or changes arising or related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) general business or economic conditions either in the United States of America or otherwise; (ii) conditions generally affecting the petroleum import, storage, and distribution industry; (iii) national or international political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iv) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) changes in Law or in GAAP; (vi) the taking of any action contemplated by this Agreement or any other Related Agreement; (vii) the announcement or pendency of this Agreement or the transactions contemplated hereby; or (viii) exigencies arising as a result of or in connection with Sellers' financial condition or status as a filer or filers under Chapter 11 of the Bankruptcy Code.

"Necessary Consent" has the meaning set forth in Section 2(g).

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice, subject, in the case of Sellers or the Business, to changes in the business or operations of any Seller resulting from business exigencies arising as a result of, or in connection with, Sellers' financial condition or status as a filer under Chapter 11 of the Bankruptcy Code.

"Owned Real Property" means the real property in which Sellers have fee title (or equivalent) interest including, but not limited to, the parcels of real property listed on Annex B, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of Sellers attached or appurtenant thereto and all easements, rights of way, servitudes, licenses, tenements, privileges and appurtenances relating to the foregoing.

"Party" or "Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, authorizations or similar right obtained from any Governmental Entity.

"Permitted Liens" means: (i) Liens relating to Taxes which are not due and payable as of the Closing Date; (ii) as to Owned Real Property, (a) leases and subleases to third party tenants, to the extent such leases or subleases are Assumed Contracts, (b) zoning requirements and other

governmental land use limitations arising under applicable Law with respect to the use, occupancy, subdivision or improvement of such real property, (c) all rights or easements, if any, of any Governmental Entity or any public or private utility company, to maintain telephone wires, pipes, conduits or other facilities which enter or cross such real property, (d) the state of facts that a current accurate survey would show as of the Closing, (e) variations between tax lot lines and the record lines and (f) utility easements, passages, easements (including reciprocal easement agreements, if any), rights of way, water liens, privileges, licenses, hereditaments, appurtenances, covenants and restrictions with respect to the Owned Real Property, in each case in this clause (ii), that do not prevent the operation of the Business as is presently conducted; and (iii) any Liens disclosed on <u>Schedule 1.4 of the Disclosure Schedule</u>.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group of any of the foregoing.

"<u>Post-Closing Tax Period</u>" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"<u>Property and Casualty Insurance Policies</u>" means all property, casualty and liability policies where a Seller is an insured.

"<u>Property Taxes</u>" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"<u>Purchase Price</u>" means, subject to <u>Section 5(i)</u>, an amount equal to Eighty-Two Million Dollars ($82,000,000).

"<u>Records</u>" means all of the books, files, documents and records owned by or in the control of Sellers (in whatever format they exist, whether in hard copy or electronic format), including all records, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists and supplier lists), plans, drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data, training materials, printed manuals, programmers' notes, engineering data, designs, maintenance records and procedures, operating manuals and procedures, safety manuals, current and historical operating information, production records, inventory records, safety and environmental reports, spill prevention and storm water runoff plans, if any, equipment manufacturer's warranties, if any, specifications of equipment, plans, blueprints, engineering studies, job descriptions, technical and shop drawings and other printed materials.

"<u>Rejection Order</u>" means the Order Authorizing Conditional Rejection of Certain Franchise Agreements entered by the Bankruptcy Court on December 2, 2010.

"<u>Related Agreements</u>" means this Agreement, the Bill of Sale, the Deeds, the Assignment and Assumption Agreement, the Trademark Assignment, the Escrow Agreement, and all other

Contracts, schedules, certificates or other documents being delivered pursuant to or in connection with this Agreement (other than the Assumed Contracts).

"Representative" of a Person means the Person's Controlled Affiliates and the officers, directors, managers, employees, advisors (including its financial advisors), representatives (including its legal counsel and its accountants) and agents of the Person and/or its Controlled Affiliates.

"Sale Motion" means the motion filed by Sellers on August 13, 2010, seeking entry of an order approving, among other things, this Agreement.

"Sale Order" means an order or orders of the Bankruptcy Court, substantially in the form attached hereto as Exhibit B, which approves this Agreement and all of the terms and conditions hereof and authorizes Sellers to consummate the transactions contemplated hereby pursuant to Sections 105, 363, 365 and 1146(c) of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006. Without limiting the generality of the foregoing, such order shall find, hold and provide, among other things, that: (a) the Acquired Assets sold to Buyer pursuant to this Agreement (including the Owned Real Property as specifically described in the Sale Order) shall be transferred to Buyer free and clear of all Liabilities, Liens and interests (other than Permitted Liens and Liens created by Buyer); (b) Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (c) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions; (d) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the breach hereof as provided herein; (e) not selling the Acquired Assets free and clear of Liabilities, Liens and interests (other than Permitted Liens and Liens created by Buyer) would impact adversely on Sellers' efforts to maximize the value of their respective estates; (f) a sale of the Acquired Assets other than one free and clear of Liabilities, Liens and interests (other than Permitted Liens and Liens created by Buyer) would be of substantially less benefit to the estates of Sellers; (g) Buyer has provided adequate assurance of future performance with respect to the Assumed Contracts and that the Assumed Contracts may be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code; (h) the transactions contemplated by this Agreement are in the best interests of Sellers' estates, their creditors, and all other parties-in-interest; (i) due and adequate notice and an opportunity to be heard in accordance with all applicable laws were given to all necessary parties in the Chapter 11 Cases, including all Governmental Entities; (j) Buyer and Sellers are authorized to close the transactions immediately upon entry of the Sale Order; (k) the requirements of Bankruptcy Rule 6004(h) shall be waived; (l) Buyer is not a successor to any Sellers or any of their respective estates and the transactions contemplated by this Agreement shall not amount to a consolidation, merger or de facto merger of Buyer with or into any Seller; and (m) the sale of the Acquired Assets to Buyer is not being undertaken for the purpose of escaping liability for any of Sellers' debts or hindering, delaying or defrauding creditors under the Bankruptcy Code or under any applicable Laws.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Specified Environmental Claims" has the meaning set forth in the definition of Assumed Liabilities.

"Straddle Period" means any Tax period beginning before or on and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or Controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or Control any managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means any United States federal, state or local or non United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, asset, transfer, registration, value added, alternative or add on minimum, estimated or other tax of any kind whatsoever, or other governmental taxes, charges, fees, levies or other assessments imposed by and payable to the United States, or any state, county, local or foreign government or subdivision or agency thereof, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Records" has the meaning set forth in Section 6(c).

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Trademark Assignment" has the meaning set forth in Section 2(f)(i)(D).

"Transfer Tax" has the meaning set forth in Section 6(f).

2.    Purchase and Sale.

(a)    Purchase and Sale of Acquired Assets; Retention of Excluded Assets. On the terms and subject to the conditions of this Agreement, at the Closing, Buyer agrees to purchase, acquire and accept from Sellers, and Sellers agree to sell, transfer, assign, convey and deliver to Buyer, all of the Acquired Assets free and clear of any and all Liens (other than Liens created by Buyer and the Permitted Liens), claims and other interests as of the Closing for the consideration specified in Section 2(d)(i). Nothing contained herein shall be deemed to sell, transfer, assign or

convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in, and under the Excluded Assets.

(b)    Assumption of Assumed Liabilities: Retention of Excluded Liabilities.  On the terms and subject to the conditions of this Agreement at the Closing, Buyer agrees to assume and become responsible for only the Assumed Liabilities and to timely pay, honor and discharge, or cause to be timely paid, honored and discharged, all of the Assumed Liabilities in accordance with the terms thereof.  Notwithstanding anything in this Agreement to the contrary, Buyer will not assume, and shall be deemed not to have assumed, any of the Excluded Liabilities.  On the terms and subject to the conditions of this Agreement (including Section 7(a)(xii)), at the Closing, Buyer agrees to assume responsibility for the administrative orders described in paragraph 10 of the Sale Order and nothing in this Agreement shall release, nullify, or enjoin the enforcement of any Liability of Buyer to any Governmental Entity under any applicable Law that any Person would be subject to as the owner or operator of the Acquired Assets after the date of entry of the Sale Order.

(c)    Assumption and Rejection of Contracts.

(i)    Annex A sets forth a list of the Contracts that Buyer desires to be assumed by Sellers and assigned to Buyer at the Closing.  Notwithstanding the foregoing, at any time prior to the date that is ten (10) Business Days prior to the Closing Date (A) Buyer may, by written notice to Sellers, designate any Contract (other than any Contract related to the Foreign Trade Zone subgrant) that has not been (i) previously designated as an Assumed Contract or (ii) rejected, as an Assumed Contract, and upon receipt of any such notice Sellers shall use reasonable efforts to effect the assumption of such Contract by Sellers in accordance with the Bankruptcy Code, and, if such Contract is assumed prior to the Closing, such Contract shall become an Assumed Contract and (B) Buyer may, by written notice to Sellers, designate any Assumed Contract that has not been assumed by Sellers as one that Buyer no longer desires to have assumed and assigned and such Contract shall be deemed not to be an Assumed Contract and, in each case, the Buyer Cure Amounts Cap shall be adjusted accordingly by an amount equal to the Cure Amount, if any, associated with such Contract.  To the extent not already undertaken by Sellers, as promptly as reasonably practicable following the designation by Buyer of any additional Contract as an Assumed Contract in accordance with the foregoing sentence, Sellers shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all necessary actions in order to determine and fix the Cure Amounts with respect to such Contract and to effect the assumption of such Contract by Sellers in accordance with the Bankruptcy Code at the Closing, such assumption to be effective as of the Closing Date.  Buyer shall use its reasonable best efforts to cooperate in the foregoing.

(ii)    Buyer agrees that it will provide adequate assurance of future performance of all of the Assumed Contracts so that all Assumed Contracts can be assumed by Sellers at or prior to the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.  In furtherance of the foregoing, Buyer acknowledges and agrees that Buyer will provide all necessary information regarding Buyer, as well as a financial commitment of performance by Buyer with respect to the

Assumed Contracts from and after the Closing, to demonstrate adequate assurance of the performance of the Assumed Contracts.

(d)     Consideration.

(i)     The aggregate consideration for the sale and transfer of the Acquired Assets shall be (A) the Purchase Price payable in cash at the Closing pursuant to Section 2(f)(ii)(G) and (B) the assumption by Buyer of the Assumed Liabilities.

(ii)     On or before the date hereof, Buyer shall have deposited with JPMorgan Chase Bank, National Association, in its capacity as escrow agent (the "Escrow Agent"), pursuant to the terms of an escrow agreement, dated as of the date hereof, in the form of Exhibit C attached hereto (the "Escrow Agreement"), an amount in cash equal to Four Million, One Hundred Thousand Dollars ($4,100,000) (the "Deposit") by wire transfer of immediately available funds.  The Escrow Agent shall hold, invest and disburse the Deposit strictly in accordance with the terms and provisions of this Agreement, the Escrow Agreement and any Final Order of the Bankruptcy Court.  All interest and investment income earned on the Deposit shall be payable to Buyer and shall be reported to any taxing authority with jurisdiction (if any), as income of Buyer, except in the event that Sellers are entitled to the Deposit as set forth in this Agreement, in which case the interest and investment income earned thereon shall belong to Sellers and shall, to the extent applicable, be credited against the Purchase Price.  Sellers and Buyer, as appropriate, shall promptly execute all forms reasonably requested by any escrow agent, including IRS Form W-9, or any substitute form, and any necessary investment direction letters.  The Deposit (together with all accrued investment income or interest thereon) shall be held by the Escrow Agent in trust and distributed to Buyer or Sellers as follows:

(A)     if the Closing shall occur, then the Deposit, together with all accrued investment income or interest thereon, shall be applied towards the Purchase Price payable by Buyer to Sellers under Section 2(f)(ii)(G);

(B)     if Sellers terminate this Agreement pursuant to Section 8(a)(iii) (solely with respect to Sections 7(b)(i), (ii), (iv) and (vi)), Section 8(a)(v) or 8(a)(ix), or if Buyer terminates this Agreement pursuant to Section 8(a)(ii) (solely with respect to Section 7(a)(xi)), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Sellers; and

(C)     if this Agreement is terminated (1) by Buyer pursuant to Sections 8(a)(ii) (other than with respect to Section 7(a)(xi)), 8(a)(iv), 8(a)(vi), 8(a)(vii), 8(a)(viii) or 8(a)(ix), (2) by Sellers pursuant to Sections 8(a)(iii) (solely with respect to Sections 7(b)(iii) and 7(b)(v)), 8(a)(vi) or 8(a)(vii) or (3) by both Parties pursuant to Section 8(a)(i), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Buyer.

(e)     Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Cadwalader, Wickersham & Taft LLP, located at One World Financial Center, New York, New York 10281, (i) commencing at 11:00 a.m. local

time on the Business Day (the "Closing Date") immediately following the date on which all conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated in this Agreement, as set forth in Section 7 (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions), have been satisfied or waived, or (ii) such other Business Day that is otherwise mutually agreed to by Sellers and Buyer.

(f)     Deliveries at Closing.

(i)     At the Closing, Sellers will deliver to Buyer the following duly executed documents and other items:

(A)     Bill of Sale substantially in the form of Exhibit D attached hereto (the "Bill of Sale");

(B)     a deed for each of the Owned Real Properties included in the Acquired Assets substantially in the form of Exhibit E attached hereto (the "Deeds");

(C)     an Assignment and Assumption Agreement substantially in the form of Exhibit F attached hereto (the "Assignment and Assumption Agreement");

(D)     an instrument of assignment substantially in the form of Exhibit G (the "Trademark Assignment") attached hereto for each registered trademark (or pending application therefor) transferred or assigned hereby;

(E)     an instrument of assignment in the form of Exhibit H (the "Intellectual Property Assignment") attached hereto for any patent, copyright, or other Intellectual Property;

(F)     a certified copy of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement, including the Bidding Procedures Order and the Sale Order; and

(G)     a certificate to the effect that each of the conditions specified in Section 7(a)(iv) and Section 7(a)(v) is satisfied in all material respects.

(ii)     At the Closing, Buyer will deliver, and in the case of Section 2(f)(ii)(F) will cause the Escrow Agent to deliver, to Sellers the following duly executed documents, cash amounts and other items:

(A)     the Bill of Sale;

(B)     the Assignment and Assumption Agreement;

(C)     the Trademark Assignment;

(D)    the Intellectual Property Assignment;

(E)    a certificate to the effect that each of the conditions specified in Section 7(b)(i) and Section 7(b)(ii) is satisfied in all respects;

(F)    the Deposit, in accordance with the terms of the Escrow Agreement, by wire transfer of immediately available funds to one or more bank accounts designated in writing by Sellers to Buyer and the Escrow Agent prior to the Closing Date;

(G)    the Purchase Price, less an amount equal to the Deposit (together with all accrued investment income and interest thereon through the date immediately preceding the Closing Date), by wire transfer of immediately available funds to one or more bank accounts designated in writing by Sellers to Buyer prior to the Closing Date;

(H)    such other documents, instruments and certificates as Sellers may reasonably request; and

(I)    such additional documents as may be necessary or customary to consummate the Agreement, including any Transfer Tax or statement of value forms which may be required.

(g)    Non-Assignment of Assumed Contracts.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Acquired Asset if (i) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto would constitute a breach thereof or in any way adversely affect the rights of Buyer thereunder and (ii) the Bankruptcy Court shall not have entered a Final Order providing that such consent is not required (each such action, a "Necessary Consent").  In such event, Sellers and Buyer will use their commercially reasonable efforts to obtain, as promptly as reasonably practicable, any Necessary Consent with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that, notwithstanding anything to the contrary contained herein, Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Litigation or legal proceedings to obtain any such consent or approval or otherwise incur any expenses in connection with obtaining such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective, would adversely affect the rights of any Seller thereunder or Buyer would not in fact receive all such rights, such Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no expense to such Seller, under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Buyer, or under which such Seller would enforce for the benefit of Buyer with Buyer assuming such Seller's obligations and any and all rights of such Seller against a third party thereto.

3.    <u>Sellers' Representations and Warranties</u>.  Subject to Bankruptcy Court approval of this Agreement, entry of the Sale Order and such Sale Order being a Final Order at the time of the Closing, obtaining any of the consents required by this Agreement or the Sale Order, each Seller represents and warrants, as of itself, to Buyer that, except as set forth in the Disclosure Schedule delivered by Sellers to Buyer on the date hereof (collectively, the "<u>Disclosure Schedule</u>"), the statements contained in this <u>Section 3</u> are true and correct as of the date of this Agreement, and shall be true and correct as of the Closing Date.

(a)    <u>Organization of Sellers; Good Standing</u>.  Each Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware and, pursuant to Sections 1107 and 1108 of the Bankruptcy Code and the orders of the Bankruptcy Court, each Seller has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on the Business as a debtor in possession.

(b)    <u>Authorization of Transaction</u>.  Subject to Bankruptcy Court approval pursuant to the Sale Order, such Sale Order being a Final Order and any other authorization as may be required by the Bankruptcy Court:

(i)    each Seller has full corporate or similar power and authority to execute and deliver this Agreement and the Related Agreements to which it is a party and to perform its obligations hereunder and thereunder;

(ii)    the execution, delivery, consummation and performance of this Agreement and the Related Agreements to which a Seller is a party have been duly authorized by such Seller;

(iii)    this Agreement has been, and each Related Agreement to which a Seller is a party will be, at the Closing, duly and validly executed and delivered by each Seller party thereto; and

(iv)    this Agreement, and the Related Agreements to which a Seller is a party will, when executed, assuming, in each case, the due authorization, execution, and delivery thereof by the other parties thereto, constitute the valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(c)    <u>Noncontravention</u>.  Subject to (i) Bankruptcy Court approval pursuant to the Sale Order and such Sale Order being a Final Order and (ii) receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, neither the execution and delivery of this Agreement or the Related Agreements, nor the consummation of the transactions contemplated in this Agreement or the Related Agreements, will (i) conflict with or result in a breach of the certificate of incorporation or bylaws or other organizational documents of any Seller, (ii) violate any Law or Decree that is material to the conduct of the Business and to which the Business or the Acquired Assets are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Assumed

Contract. Subject to (i) Bankruptcy Court approval pursuant to the Sale Order and such Sale Order being a Final Order and (ii) receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity or third party in order for the Parties to consummate the transactions contemplated by this Agreement, the failure of which to give, make or obtain would result in a Material Adverse Effect.

(d)    <u>Title to Acquired Assets</u>.

(i)    Sellers have (i) good and valid title to, or a valid leasehold interest in, all tangible assets that are included in the Acquired Assets and (ii) good and valid title to the Owned Real Property, in each case free of all Liens other than Permitted Liens or such other Liens which shall be discharged on or before the Closing Date in connection with the Sale Order or any other action of the Bankruptcy Court.

(ii)    <u>Annex B</u> hereto sets forth a true and complete list of all Owned Real Property.

(iii)    Subject to Bankruptcy Court approval of the Sale Order, Sellers have the power and the right to sell, assign and transfer and, at the Closing, Sellers shall sell and deliver to Buyer and Buyer will acquire from Sellers, (i) good title to, or an adequate leasehold interest in, all tangible assets that are included in the Acquired Assets and (ii) good and valid title to the Owned Real Property, free and clear of all Liens, other than Liens created by Buyer and Permitted Liens.

(e)    <u>Litigation</u>. As of the date hereof, there is no Litigation pending or, to the knowledge of Sellers, threatened against any Seller before any Governmental Entity, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business or would reasonably be expected to prevent, restrict or delay the consummation of the transactions contemplated in this Agreement or any Related Agreement.

(f)    <u>Absence of Certain Changes</u>. Except for the commencement of the Chapter 11 Cases, the orders, writs, injunctions, decrees, statutes, rules or regulations of general applicability to the Acquired Assets, since the Commencement Date, there have been no events or conditions that could constitute a Material Adverse Effect.

(g)    <u>Environmental Matters</u>. Sellers have delivered to Buyer a true and correct copy of the Evaluation of Environmental Liabilities Report prepared by SCS Engineers for Sellers dated December 6, 2010.

(h)    <u>Board Approval and Recommendation</u>. The board of directors of each Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court, a sale, assumption and assignment of the Acquired Assets and the Assumed Contracts pursuant to this Agreement under Sections 105, 363 and 365 of the Bankruptcy Code is in the best interests of each Seller.

(i)  Brokers' Fees. Sellers have no obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the transactions contemplated by this Agreement, except as set forth on Schedule 3(f) of the Disclosure Schedule. Buyer shall not have any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person hired or retained by Sellers in connection with this Agreement or the transactions contemplated by this Agreement.

(j)  Disclosure. Except for the representations and warranties contained in this Section 3, no Seller nor any other Person makes (and Buyer is not relying upon) any other express or implied representation or warranty with respect to Sellers, the Business, the Acquired Assets (including the value, condition or use of any Acquired Asset), the Assumed Liabilities or the transactions contemplated by this Agreement, in the Related Agreements or in any other agreement, document or instrument to be delivered in connection herewith or therewith, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of any Seller or any of their respective officers, directors, employees, agents or Representatives. Without in any way limiting the foregoing and except for the representations and warranties contained in this Section 3, each Seller (i) expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of title, merchantability or fitness for a particular purpose, the physical condition of any personal or real property comprising a part of the Acquired Assets or which is the subject of any Contract to be assigned to Buyer at the Closing, the environmental condition or any other matter relating to the physical condition of any real property or improvements, the zoning of any such real property or improvements, the value of the Acquired Assets (or any portion thereof), the transferability of the Acquired Assets, the terms, amount, validity or enforceability of any Assumed Liabilities, the title of the Acquired Assets (or any portion thereof), the probable success or profitability of the ownership, the use or operation of the Business and the Acquired Assets by Buyer after the Closing, or any other matter or thing relating to the Acquired Assets or any portion thereof), and (ii) expressly disclaims all liability and responsibility for any projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant or Representative of any Seller or any of their Affiliates). Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of the physical condition of the Acquired Assets and all such other matters relating to or affecting the Acquired Assets as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Acquired Assets, Buyer is doing so based solely upon such independent inspections and investigations. Accordingly, upon the Closing Date, Buyer will accept the Acquired Assets at the Closing "as is," "where is," and "with all faults."

4.    Buyer's Representations and Warranties.

Buyer represents and warrants to Sellers that the statements contained in this Section 4 are true and correct as of the date of this Agreement and will be true and correct on the Closing Date:

(a)    Organization of Buyer.  Buyer is a corporation duly incorporated or formed (as applicable), validly existing and in good standing under the laws of the Netherlands and has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

(b)    Authorization of Transaction.

(i)    Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement, the Related Agreements and all other agreements contemplated in this Agreement to which it is a party and to perform its obligations hereunder and thereunder;

(ii)    the execution, delivery, consummation and performance of this Agreement, the Related Agreements and all other agreements contemplated in this Agreement to which Buyer is a party have been duly authorized by Buyer;

(iii)    this Agreement has been, and each Related Agreement to which Buyer is a party will be, at the Closing, duly and validly executed and delivered by Buyer; and

(iv)    this Agreement, and the Related Agreements to which Buyer is a party will, when executed, assuming, in each case, the due authorization, execution, and delivery thereof by the other parties thereto, constitute the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

(c)    Noncontravention.  Subject to receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, neither the execution and delivery of this Agreement or the Related Agreements, nor the consummation of the transactions contemplated in this Agreement or the Related Agreements will (i) conflict with or result in a breach of the certificate of incorporation or bylaws or other organizational documents of Buyer, (ii) violate any Law or Decree to which Buyer is, or its respective assets or properties are, subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which Buyer is a party or by which it is bound. Subject to receipt of any consents required by the HSR Act and the expiration or earlier termination of all waiting periods thereunder, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity or third party in order for the Parties to consummate the transactions contemplated by this Agreement.

(d)    Litigation.  As of the date hereof, there is no Litigation pending or, to the knowledge of the Buyer, threatened against Buyer before any Governmental Entity, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a material adverse effect or would reasonably be expected to prevent, restrict or delay the consummation of the transactions contemplated in this Agreement or any Related Agreement.

(e)    Brokers' Fees.  Buyer does not have any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the transactions contemplated by this Agreement.

(f)    Financial Capacity.  Buyer (i) has, or at the Closing will have, sufficient funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price and any expenses incurred by Buyer and its Affiliates in connection with the transactions contemplated by the Related Agreements, including Cure Amounts; (ii) has, or at the Closing will have, the resources and capabilities (financial or otherwise) to perform their respective obligations hereunder; and (iii) has not, and at the Closing will not have, incurred any obligation, commitment, restriction or Liability of any kind, that would impair or adversely affect such resources and capabilities.

(g)    Adequate Assurances Regarding Executory Contracts.  Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

5.    Pre-Closing Covenants.  The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

(a)    Commercially Reasonable Efforts; Cooperation.  Except as otherwise set forth herein, each of the Parties will use its commercially reasonable efforts to take all action and to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement at the earliest practicable date (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the transactions contemplated in this Agreement set forth in Section 7).

(b)    Notices and Consents.

(i)    Sellers and Buyer shall use their commercially reasonable efforts to obtain all material authorizations, consents, orders and approvals of all Governmental Entities and officials that may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement (including obtaining any Permits) and will cooperate with each Party in seeking to obtain all such authorizations, consents, orders and approvals.

(ii)    Sellers shall give such notices to third parties and use their commercially reasonable efforts to obtain all Necessary Consents.

(iii)    Buyer shall cooperate and use all commercially reasonable efforts to assist Sellers in giving such notices and obtaining such consents.

(c)    <u>Conduct of the Business Pending the Closing</u>.  From the date hereof until the Closing Date, except as otherwise expressly provided for in this Agreement, or with the prior written consent of Buyer (which consent shall not be unreasonably withheld, delayed or conditioned), and subject to any applicable orders of the Bankruptcy Court, Sellers shall:

(i)    use commercially reasonable efforts to maintain the Acquired Assets, pay expenses and payables, collect receivables, repair and continue normal maintenance (normal wear and tear excepted) to the extent payable pursuant to the budget approved by the Bankruptcy Court in connection with the approval of the DIP Facility;

(ii)    (A) comply in all material respects with all Laws and Assumed Contracts, (B) maintain all Assumed Permits, and (C) pay all applicable Taxes that Sellers are required to pay (taking into account any relief afforded pursuant to the Chapter 11 Cases) to the extent payable pursuant to the budget approved by the Bankruptcy Court in connection with the approval of the DIP Facility;

(iii)    use commercially reasonable efforts to pursue sale processes pursuant to Section 363 of the Bankruptcy Code and to comply at all times with the Bidding Procedures Order;

(iv)    not enter into or make any material amendment to any Contract or transaction relating to the purchase of assets for use in the Business in excess of one hundred thousand dollars ($100,000) that will constitute Acquired Assets or Assumed Liabilities;

(v)    not modify, extend, renew or cancel in writing (except as a result of a default by the other party thereunder) any Assumed Contracts or enter into any new Contract related to the Acquired Assets, except in the Ordinary Course of Business;

(vi)    not enter into any new employment agreements, collective bargaining agreements, union contracts or similar Contracts, written or oral;

(vii)    use commercially reasonable efforts to cooperate with the EPA on the remedial procedures currently being undertaken with respect to the Acquired Assets;

(viii)    not alter the Acquired Assets, or consent to such alteration, except to complete any improvements or non-structural changes or installations which may be required by Law or are undertaken in the Ordinary Course of Business;

(ix)    use commercially reasonable efforts to perform all material obligations that are required to be performed by Sellers under the DIP Facility, and promptly as reasonably practicable deliver to Buyer a copy of any notice of default received by Sellers under the DIP Facility or any other material agreement or instrument affecting the Acquired Assets;

(x)    not sell, lease, transfer, mortgage, encumber, alienate or dispose of any Acquired Asset except for Fuel Inventory in the Ordinary Course of Business;

(xi)    use commercially reasonable efforts to transfer, assign, record or perfect in its name good title to any Acquired Assets that is not presently held or recorded in its name;

(xii)    not merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence;

(xiii)    not subject any of the Acquired Assets to any Lien (other than Permitted Liens); and

(xiv)    not enter into a legally enforceable contract or agreement requiring it to do anything prohibited by this Section 5(c).

(d)    Notice of Developments.  From the date hereof until the Closing, each of Sellers and Buyer will give prompt written notice to the other Party of (i) the existence of any fact or circumstance, or the occurrence of any event, which could be reasonably likely to cause a condition to a Party's obligations to consummate the transactions contemplated in this Agreement as set forth in Section 7, not to be satisfied as promptly as practicable, and (ii) the receipt of any notice or other communication from any Governmental Entity in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5(d) shall not be deemed to amend or supplement this Agreement, and the failure to deliver any such notice shall not constitute a waiver by any Party of any right or condition to the consummation of the transactions contemplated in this Agreement.

(e)    Access.

(i)    Prior to the Closing, Sellers shall, upon reasonable advance written request by Buyer, permit Buyer and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere with normal business operations, to all premises, properties, personnel, Records, Tax Records, and Contracts of the Business for the purpose of evaluating and reviewing the Business, the Acquired Assets and Assumed Liabilities, and obtaining, at Buyer's election (and in any event, at Buyer's sole cost and expense), policies from a title company insuring Buyer's fee interest in the Owned Real Property (provided, that the Parties expressly acknowledge that obtaining such title insurance policy shall not be a condition to the Closing); provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the affect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable law.  Except in response to a request contemplated by the first sentence of this Section 5(e)(i), during the period from the date hereof and ending on the Closing Date, Buyer shall not, and shall cause its Representatives not to, contact any customers, suppliers or licensors of the Business in connection with, or pertaining to, the Business or any subject matter of this Agreement, except with the prior written consent of Sellers, which consent shall not be unreasonably withheld.

(ii)    All information obtained pursuant to this <u>Section 5(e)</u> shall be subject to the terms and conditions of the Confidentiality Agreement.

(f)    <u>Press Releases and Public Announcements</u>.  Prior to the Closing, no Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties; <u>provided, however,</u> that any Party may make any public disclosure it believes in good faith is required by applicable law (including the Bankruptcy Code) (<u>provided</u>, that the disclosing Party shall use all reasonable best efforts to consult with the non-disclosing Party with respect to the text thereto prior to making the disclosure).

(g)    <u>Bankruptcy Court Matters</u>.

(i)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing bids with respect to any transaction (or series of transactions) involving a Competing Transaction, prior to the entry of the Sale Order (but not thereafter).  Nothing contained herein shall be construed to prohibit Sellers and any of its representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Transaction, prior to the entry of the Sale Order (but not thereafter).

(ii)    Sellers shall use commercially reasonable efforts to pursue the entry of the Sale Order.  Sellers shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules in connection with obtaining approval of the Sale Order.

(iii)    Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; <u>provided, however,</u> in no event shall Buyer or any Seller be required to agree to any amendment of this Agreement.

(iv)    Sellers shall use their commercially reasonable best efforts to obtain entry by the Bankruptcy Court of the Sale Order no later than February 8, 2011.

(v)    Sellers further covenant and agree that, after the entry of the Sale Order, the terms of any liquidation plan it submits to the Bankruptcy Court, or any other court for confirmation or sanction, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

(h)    <u>Bulk Transfer Laws</u>.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions

contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith.

(i)    Cure Amounts.  As promptly as practicable following the date hereof, Buyer and Sellers shall use commercially reasonable efforts to cooperate and determine the amounts required to cure all defaults under each Assumed Contract so as to permit the assumption and assignment of each such Assumed Contract pursuant to Section 365 of the Bankruptcy Code in connection with the transactions contemplated by this Agreement (as ultimately determined by the Bankruptcy Court, the "Cure Amounts"). Buyer shall be responsible for paying all Cure Amounts subject to the Buyer Cure Amounts Cap.  Sellers shall be responsible for paying all Cure Amounts in excess of the Buyer Cure Amounts Cap.  Sellers hereby agree that Buyer, with the consent of Sellers, and as approved by the Bankruptcy Court, may pay any such Cure Amounts in excess of the Buyer Cure Amounts Cap and deduct such amount from the Purchase Price otherwise payable to Sellers at the Closing. Sellers will, pursuant to the Sale Motion, move to assume and assign to Buyer the Assumed Contracts and will provide notices thereof to the Assumed Contract counterparties and all other parties in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court.

(j)    Supplementation and Amendment of Disclosure Schedule.  Sellers may, at their option, include in the Disclosure Schedule items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information provided in one Disclosure Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Disclosure Schedule to which its relevance is reasonably apparent on its face.  At any time prior to the date that is five (5) Business Days prior to the Closing Date, Sellers shall have the right to supplement or amend the Disclosure Schedule with respect to any matter hereafter arising or discovered after the delivery of the Disclosure Schedule pursuant to this Agreement.  No such supplement or amendment shall have any effect on the satisfaction of the conditions to closing set forth in Section 7(a), unless the matter or issue so disclosed on the Disclosure Schedule is an event, occurrence, fact, condition, change, development or effect that, individually or in the aggregate, has had or resulted in or would reasonably be expected to have or result in a Material Adverse Effect on the Business or the Acquired Assets.

(k)    Regulatory Filings.

(i)    If necessary, Buyer and Sellers shall (i) use commercially reasonable efforts to make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated herein as promptly as practicable, (ii) comply, to the extent practicable, at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective subsidiaries from Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division") or any other Governmental Entity in respect of such filings, and (iii) cooperate with each other in connection with any such filing or request (including, to the extent

permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Entity under any Antitrust Laws with respect to any such filing. Each Party shall use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any Antitrust Law in connection with the transactions contemplated herein. Each Party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Entity regarding any such filings. Each of Buyer and Sellers shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to the transactions contemplated herein as promptly as possible after the execution of this Agreement.

(l) <u>Allocation of the Purchase Price</u>. Prior to the Closing, the Parties shall use their best efforts to agree to a written schedule allocating the Purchase Price and the Assumed Liabilities among the Acquired Assets. Each of the Parties hereto shall report the federal, state, local and other tax consequences of the purchase and sale contemplated hereby (including the filing of Internal Revenue Service Form 8594 or any supplements or amendments thereto) in a manner consistent with such Purchase Price allocation schedule. None of the Parties hereto shall, and shall not permit any of its Affiliates to, take a position (except as required by applicable Law) on any Tax Return, before any taxing authority, or in any judicial proceeding, that is inconsistent with such Purchase Price allocation schedule.

(m) <u>Schedules and Exhibits</u>. Sellers and Buyer shall cooperate and work in good faith to complete any Exhibits, Annexes and other documents to be attached to this Agreement.

(n) <u>Certain Filings</u>. Sellers and Buyer shall use commercially reasonable efforts to cooperate with one another to (i) determine whether any action by or in respect of, or filing with, any Governmental Entity is required in connection with the consummation of the transactions contemplated by this Agreement and (ii) take such actions or make any such filings, furnishing information as required by any Governmental Entity in order to consummate the transactions contemplated by this Agreement.

6. <u>Other Covenants</u>. The Parties agree as follows with respect to the period from and after the Closing:

(a) <u>Cooperation; Further Assurances</u>. The Parties shall cooperate with each other, and shall use commercially reasonable efforts to cause their respective Controlled Affiliates and Representatives to cooperate with each other, to provide an orderly transition of the Business and the Acquired Assets from Sellers to Buyer. On and after the Closing, Buyer will afford promptly to Sellers and its counsel, financial advisers and other agents reasonable access during normal business hours to its properties, books and records, employees, auditors and counsel to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax Returns, reports or forms, the defense of any Tax audit, claim or assessment, the reconciliation of Claims in the Chapter 11 Cases, the preparation and

confirmation of a plan in the Chapter 11 Cases, other matters relating to the winding-up of a Seller's estate and/or the closing of any of the Chapter 11 Cases, or to permit Sellers to determine any matter relating to its rights and obligations hereunder or any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities. Sellers will hold, and will use commercially reasonable efforts to cause their officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning Buyer or the Business provided to them pursuant to this Section 6(a). Without limiting the provisions of this Section 6(a), to the extent that Buyer or any Seller discovers any additional assets or properties which should have been transferred or assigned to Buyer as Acquired Assets but were not so transferred or assigned at Closing, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer without any adjustment to the Purchase Price and shall cooperate and execute and deliver all conveyances, assumptions, notices, releases, and other instruments as may be necessary to make effective the transactions contemplated by this Agreement. Without limiting the provisions of this Section 6(a), to the extent that Buyer or any Seller discovers any assets or properties which are an Excluded Asset that were inadvertently or otherwise mistakenly transferred or assigned to Buyer, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property back to Sellers.

(b)    Litigation Support. In the event and for so long as any Party actively is contesting or defending against any Litigation commenced with respect to (i) any transaction contemplated by this Agreement or any other Related Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act or transaction on or prior to the Closing Date involving the Business, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, make available its personnel and provide such testimony and access to its books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the affect of waiving, its attorney-client privilege with respect thereto.  As a condition to the cooperation required pursuant to this Section 6(b), the Party to provide such cooperation or assistance (the "Assisting Party") may require the Party receiving such cooperation or assistance to enter into a non-disclosure agreement reasonably satisfactory in form and substance to the Assisting Party.

(c)    Availability of Records.

(i)    After the Closing Date, Buyer shall provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Acquired Assets for periods prior to the Closing and shall preserve such Records until the later of (A) six (6) years after the Closing Date, (B) the required retention period required by any United States Law, (C) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (D) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have

the right to retain originals or copies of all Records included in the Acquired Assets for periods prior to the Closing. Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer will permit Sellers to retain such Records. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all commercially reasonable assistance that Sellers may request in connection with such Litigation or claim and shall make available to Sellers' personnel most knowledgeable about the matter in question.

(ii)    After the Closing Date until the latest of (A) six (6) years after the Closing Date, (B) the required retention period required by any United States Law, (C) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (D) the expiration of the applicable statute of limitations, Sellers shall (x) provide to Buyer and its Representatives (after reasonable notice and during normal business hours and without charge to Buyer) access to all Records relating to Taxes incurred by Sellers in connection with the Business, or otherwise relating to or affecting the Business (collectively, "Tax Records"), and (y) prior to destroying any Tax Records, notify Buyer thirty (30) days in advance of any such proposed destruction of their intent to destroy such Records, and Sellers will permit Buyer to retain a copy of such Tax Records. Access contemplated in clause (x) in the immediately preceding sentence shall include access to any information in electronic form to the extent reasonably available. With respect to any claims that are Assumed Liabilities, Sellers shall render all commercially reasonable assistance that Buyer may request in defending such claims.

(d)    Satisfaction of Excluded and Assumed Liabilities.  Buyer agrees to pay, perform and discharge the Assumed Liabilities as they become due and shall indemnify and hold Sellers harmless with respect to the Assumed Liabilities. Sellers agree to satisfy and hold Buyer harmless with respect to the Excluded Liabilities as required by the Bankruptcy Code.

(e)    Employee Matters.

(i)    Covered Employees.  Sellers and Buyer acknowledge and agree that Buyer is not obligated to hire any of the Covered Employees. Nothing contained in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels, or prevent any change in the employee benefits provided to any individual employee of any Seller. No provision of this Agreement shall create any third-party beneficiary rights in any employee of any Seller or former employee of any Seller or any other persons or entities (including any beneficiary or dependent thereof), in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.

(ii)    COBRA Liabilities. Sellers agree and acknowledge that Sellers will retain and will be solely liable for, to the extent required under COBRA, and that Buyer will not assume, any of the COBRA Liabilities. Without limiting the foregoing, Sellers agree that Sellers will provide all benefits required under COBRA to any employees of any Seller, and that Sellers will continue after Closing to maintain a "group health plan" (within the meaning of Treasury Regulation 54.5980B-2) under which to provide such benefits.

(iii)   Limitations. Buyer shall not have any obligation to extend offers of employment to any Covered Employee, or other service provider or employee of any Seller or any of its Affiliates or to enter or continue any employment or other service relationship with any such Covered Employee, service provider or employee. Any employment opportunity offered by Buyer hereunder shall be subject to the terms so offered by Buyer in its sole discretion, and Buyer may reserve the right to terminate such employment in accordance with applicable Law.

(iv)   Seller Obligations.

(A)   Sellers shall be and remain solely liable for all wages, remuneration and other obligations and Liabilities, whether actual or contingent: (1) associated with any employee, officer or other service provider of any Seller or any Seller Affiliate (or any dependent thereof), including in connection with any termination of any such service relationship; and (2) that arise under or in connection with any Employee Benefit Plan at any time. Without limiting the generality of the foregoing, Buyer shall not, at any time, have any obligation or liability with regard to any severance, retention, employment, change-of-control, pension, retirement, equity or other plan, program, policy, obligation or agreement of or with any Seller or any of its Affiliates.

(B)   Sellers shall retain responsibility for and continue to pay all medical, life insurance, disability and other welfare plan expenses and benefits for each Covered Employee with respect to claims incurred by such Covered Employee or their covered dependents through the end of the month in which the Closing Date occurs.

(f)   Transfer Taxes. Buyer shall pay (and shall indemnify and hold harmless Sellers and their directors, officers, employees, Affiliates, agents, partners, successors and permitted assigns against) any stamp, documentary, registration, transfer, added-value or similar tax (each a "Transfer Tax") imposed under applicable Law in connection with the transactions contemplated by this Agreement and the Related Agreements that are not eliminated through the application of Section 1146(a) of the Bankruptcy Code. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence. Buyer shall be responsible for filing such Tax Returns and remitting the Tax to the applicable taxing authority, including bearing any costs associated with preparing said returns.

(g)   Recording of Intellectual Property Assignments. Buyer shall file and record all assignments of Acquired Intellectual Property with the appropriate Governmental Entities as promptly as practicable following the Closing.

(h)   Property and Other Taxes. Subject to Section 6(f) hereof, Sellers shall be responsible for and shall promptly pay, in accordance with the Bankruptcy Code, all Taxes due and payable with respect to the Business or the Acquired Assets, including all Property Taxes, attributable to any Pre-Closing Tax Period. Buyer shall be responsible for and shall promptly pay when due all such Taxes due and payable with respect to the Acquired Assets, including all

Property Taxes, attributable to any Post-Closing Tax Period. All such Taxes, imposed (i) in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), or (ii) measured by income or receipts, and due and payable with respect to the Business or the Acquired Assets, as applicable, for the Straddle Period shall be apportioned between Buyer and Sellers based on an interim closing of the books method on the Closing Date, to the extent permitted by applicable Law. All such Taxes, other than those described in the prior sentence, that are due and payable with respect to the Business or the Acquired Assets, as applicable, for the Straddle Period shall be apportioned between Buyer and Sellers based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. Sellers shall be liable for the proportionate amount of any applicable Taxes that are attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of any applicable Taxes that are attributable to the Post-Closing Tax Period. Upon receipt of any bill for such Taxes, Buyer or Sellers, as applicable, shall present a statement to the other Party setting forth the amount of reimbursement to which each is entitled under this Section 6(h) together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the Party owing it to the other Party within ten (10) days after delivery of such statement. In the event that Buyer or Sellers make any payment for which it is entitled to reimbursement under this Section 6(h), the applicable Party shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement to which the presenting Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. Buyer and Sellers shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of all Tax Returns pursuant to this Agreement and any action, audit or other proceeding with respect to Taxes relating to the Business or the Acquired Assets, as applicable. Such cooperation shall include the retention and provision of Records and information pursuant to Section 6(a) and Section 6(c) hereof and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Sellers shall use commercially reasonable efforts to cooperate with Buyer in connection with Buyer's efforts to obtain any Tax credits or Tax benefits that may be reasonably available to Buyer in connection with the transactions contemplated by this Agreement.

(i)     Wage Reporting. Sellers agree to utilize, or cause their respective Affiliates to utilize, the alternate procedure set forth in Internal Revenue Service Revenue Procedure 2004-53, or any comparable procedure applicable in the Commonwealth of Puerto Rico, with respect to Covered Employee wage reporting for the year in which the Closing Date occurs.

(j)     Use of Name. Sellers agree that, as of Closing, Sellers and their respective Affiliates shall cease any and all use, including in connection with the publication, copying, production, sale, distribution or other exploitation of any assets, of the "Caribbean Petroleum Corporation" name and any similar names which may give rise to a likelihood of confusion with "Caribbean Petroleum Corporation," together with the logo used by Sellers in connection therewith prior to Closing. Sellers further agree that CPC will, within ten (10) Business Days of Closing, legally change its name with the Secretary of State of the State of Delaware and cease to be named "Caribbean Petroleum Corporation." For the avoidance of doubt, nothing in this Section 6(j) shall be deemed to limit Sellers' and their respective Affiliates' right to use the name

"Caribbean Petroleum Corporation" in connection with filing Tax Returns or to describe the historical relationship between Sellers and CPC without suggesting a continuing affiliation with CPC.

7. <u>Conditions to Obligation to Close</u>.

(a) <u>Conditions to Buyer's Obligations</u>. Buyer's obligation to consummate the transactions contemplated in this Agreement in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i) no order staying, reversing, modifying or amending the Bidding Procedures Order shall be in effect on the Closing Date;

(ii) the Bankruptcy Court shall have entered the Sale Order, such order shall be a Final Order and reasonably satisfactory to Buyer and Sellers and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(iii) the Bankruptcy Court shall have entered the Rejection Order, such order shall be a Final Order, and no order staying, reversing, modifying or amending the Rejection Order shall be in effect on the Closing Date which has the effect of preventing Sellers from rejecting substantially all of the Franchise Agreements;

(iv) the representations and warranties set forth in <u>Section 3</u> shall be true and correct in all material respects (except where such representation or warranty is already qualified by materiality or similar standard, in which case such representation and warranty shall be true and correct in all respects) when made and at and as of the Closing Date as if made at and as of such time (in either case, except to the extent expressly made as of an earlier date, in which case as of such date as if made at, and as of, such date);

(v) Sellers shall have performed and complied with their covenants and agreements hereunder through the Closing in all material respects;

(vi) no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(vii) the Acquired Assets shall be transferred, assigned, conveyed and delivered to Buyer free and clear of any and all Liens (other than Liens created by Buyer and the Permitted Liens);

(viii) Sellers shall have obtained any consent, approval, waiver, or order of, and made each filing or registration with, any Governmental Entity required in connection with the consummation by Sellers of the transactions contemplated by this Agreement, other than those the failure to have been obtained or made would not cause a Material Adverse Effect;

(ix)    each delivery contemplated by Section 2(f)(i) to be delivered to Buyer shall have been delivered;

(x)    since the date hereof, no event, occurrence, fact, condition, change, development or effect shall have occurred that, individually or in the aggregate, has had or resulted in or would reasonably be expected to have or result in a Material Adverse Effect on the Business or the Acquired Assets;

(xi)    the waiting period applicable to the transactions contemplated hereby under the HSR Act, if any, shall have expired, or early termination of the waiting period shall have been granted;

(xii)    Buyer shall have entered into an agreement with the United States government, reasonably acceptable to Buyer, with respect to Buyer's obligations in connection with any Environmental Claims related to the Acquired Assets following the Closing.  As one of the factors in the determination of what is reasonably acceptable, Buyer acknowledges and agrees that it accepts, and that any such agreement shall conform with, the cooperative owner expectations outlined in the letter from the United States Department of Justice to All Potential Buyers, dated December 9, 2010, and that such agreement shall be subject to the approval of the appropriate officials of the United States government; and

(xiii)    no Governmental Entity shall have filed any objection with the Bankruptcy Court with respect to the consummation of the transactions on the terms set forth in this Agreement that has not been withdrawn, resolved or otherwise disposed of and which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business or would reasonably be expected to prevent, restrict or delay the consummation of the transactions contemplated in this Agreement.

(b)    Conditions to Sellers' Obligations.  Sellers' obligation to consummate the transactions contemplated in this Agreement in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(i)    the representations and warranties set forth in Section 4 shall be true and correct in all material respects (except where such representation or warranty is already qualified by materiality or similar standard, in which case such representation and warranty shall be true and correct in all respects) when made and at and as of the Closing Date as if made at and as of such time (in either case, except to the extent expressly made as of an earlier date, in which case as of such date as if made at, and as of, such date);

(ii)    Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(iii)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(iv)    each delivery contemplated by <u>Section 2(f)(ii)</u> to be delivered to Sellers shall have been delivered;

(v)    . the Bankruptcy Court shall have entered the Sale Order, such order shall be a Final Order and reasonably satisfactory to Buyer and Sellers and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date; and

(vi)    the waiting period applicable to the transactions contemplated hereby under the HSR Act, if any, shall have expired, or early termination of the waiting period shall have been granted.

(c)    <u>No Frustration of Closing Conditions</u>.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the transactions contemplated in this Agreement set forth in <u>Section 7(a)</u> or <u>Section 7(b)</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts (or, where applicable, commercially reasonable efforts) to satisfy the conditions to the consummation of the transactions contemplated in this Agreement or other breach of a representation, warranty or covenant hereunder.

8.    <u>Termination</u>.

(a)    <u>Termination of Agreement</u>.    This Agreement may be terminated and the transactions contemplated in this Agreement abandoned at any time prior to the Closing:

(i)    by mutual written consent of Sellers and Buyer;

(ii)    by Buyer, if any of the conditions to the obligations of Buyer set forth in <u>Section 7(a)</u> shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(iii)    by Sellers, if any condition to the obligations of Sellers set forth in <u>Section 7(b)</u> shall have become incapable of fulfillment other than as a result of a breach by any Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(iv)    by Buyer, if there shall be a breach by any Seller of any representation, warranty, covenant or agreement of such Seller contained in this Agreement which would result in a failure of a condition set forth in <u>Section 7(a)</u>, and which breach has not been cured within seven (7) Business Days after the giving of written notice by Buyer to Sellers of such breach;

(v)    by Sellers, if there shall be a breach by Buyer of any representation, warranty, covenant or agreement of Buyer contained in this Agreement which would result in a failure of a condition set forth in <u>Section 7(b)</u>, and which breach has not been cured within seven (7) Business Days after the giving of written notice by Sellers to Buyer of such breach;

(vi)    by Buyer or Sellers, upon the entry by Sellers into a definitive agreement (prior to the entry of the Sale Order) with respect to a Competing Transaction;

(vii)    by Buyer or Sellers, if there shall be in effect a nonappealable Decree of a Governmental Entity of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, or the Bankruptcy Court or another court of competent jurisdiction shall stay the Sale Order;

(viii)    by Buyer, if the Sale Order is not entered by March 31, 2011; or

(ix)    by Buyer or Sellers, as applicable, on any date that is after the Drop Dead Date if the Closing shall not have occurred on or before such Drop Dead Date; provided, however, that Buyer or Sellers, as applicable, shall not have the right to terminate this Agreement under this Section 8(a)(ix) if the Closing has not occurred on or before the Drop Dead Date because of such Party's material failure to fulfill any of its obligations under this Agreement.

For the avoidance of doubt, any conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code and/or the appointment of a trustee under Chapter 11 or Chapter 7 of the Bankruptcy Code shall not effect a termination of this Agreement by Buyer, Sellers, or any such trustee so appointed or diminish Buyer's obligations hereunder, and this Agreement shall remain enforceable against Buyer by any such Chapter 11 or Chapter 7 trustee and binding upon any such Chapter 11 or Chapter 7 Trustee.

(b)    Procedure Upon Termination.  In the event of termination by Buyer or Sellers, or both, pursuant to Section 8(a), written notice thereof shall forthwith be given to the other Party, and this Agreement shall terminate and the purchase of the Acquired Assets hereunder shall be abandoned, without further action by Buyer or Sellers.  If this Agreement is terminated as provided herein, then each Party shall redeliver all documents, work papers and other material of any other Party relating to the transactions contemplated in this Agreement, whether so obtained before or after the execution hereof, to the Party furnishing the same.

(c)    Effect of Termination.

(i)    If any Party terminates this Agreement pursuant to Section 8(a), then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Section 1 (Definitions), Section 2(d)(ii) (Consideration), Section 9 (Miscellaneous), and this Section 8 (Termination) shall survive any such termination in accordance with their terms), and no Party shall have any liability to any other Party hereunder except as expressly set forth in this Section 8 or Section 2(d)(ii); provided, that no such termination shall relieve any of the Parties of any liability for an intentional breach of this Agreement or be deemed to constitute a waiver of any available remedy (including specific performance if available) for any such breach.

(ii)    If Sellers terminate this Agreement pursuant to Section 8(a)(iii) (solely with respect to Sections 7(b)(i), (ii), (iv) and (vi)) or Sections 8(a)(v) or 8(a)(ix), or if

Buyer terminates this Agreement pursuant to <u>Section 8(a)(ii)</u> (solely with respect to <u>Section 7(a)(xi)</u>), then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Sellers.

(iii)    If this Agreement is terminated (1) by Buyer pursuant to <u>Sections 8(a)(ii)</u> (other than with respect to <u>Section 7(a)(xi)</u>), <u>8(a)(iv)</u>, <u>8(a)(vi)</u>, <u>8(a)(vii)</u>, <u>8(a)(viii)</u> or <u>8(a)(ix)</u>, (2) by Sellers pursuant to <u>Sections 8(a)(iii)</u> (solely with respect to <u>Sections 7(b)(iii)</u> and <u>7(b)(v)</u>), <u>8(a)(vi)</u> or <u>8(a)(vii)</u> or (3) by both Parties pursuant to <u>Section 8(a)(i)</u>, then the Deposit, together with all accrued investment income or interest thereon, shall be delivered to Buyer.

(iv)    If this Agreement is terminated in accordance with <u>Section 8(a)</u>, (A) the Confidentiality Agreement shall survive such termination, and nothing in <u>Section 8(b)</u> or in this <u>Section 8(c)</u> shall relieve Buyer or Sellers of their respective obligations under the Confidentiality Agreement, and (B) Buyer agrees that all prohibitions in the Confidentiality Agreement shall be extended to a period of three (3) years from the date of such termination.

9.    <u>Miscellaneous</u>.

(a)    <u>Expenses</u>.  Except as otherwise provided in this Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.  Buyer shall be responsible for any HSR Act filing fees.

(b)    <u>Entire Agreement</u>.  This Agreement, the other Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(c)    <u>Incorporation of Schedules and Exhibits</u>.  The Schedules, Annexes and Exhibits to this Agreement are incorporated herein by reference and made a part hereof.

(d)    <u>Amendments and Waivers</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any

rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9(d). Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

(e)     Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns, including any trustee appointed in the Chapter 11 Cases or any subsequent Chapter 7 case. For the avoidance of doubt, Buyer is not a successor to any Seller or any of their respective bankruptcy estates and the sale of the Acquired Assets shall not amount to a consolidation, merger or de facto merger of Buyer with or into any Seller. The sale of the Acquired Assets to Buyer is not being undertaken for the purpose of escaping liability for any of Sellers' debts or hindering, delaying or defrauding creditors under the Bankruptcy Code or under any applicable Laws. No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other Parties, provided, however, that Sellers' consent shall not be unreasonably withheld in connection with any assignment by Buyer of all or any part of its rights, interests or obligations hereunder to one or more wholly owned Subsidiaries or Affiliates of Buyer, provided, that (i) Buyer shall remain fully liable for any and all for its obligations hereunder notwithstanding such assignment, and (ii) with respect to any assignments to any Affiliate of Buyer, such assignment would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by this Agreement or any Related Agreement.

(f)     Notices. All notices, requests, demands, claims and other communications hereunder will be in writing (including electronic and facsimile transmission) and shall be given,

If to Sellers:

Caribbean Petroleum Corporation
c/o FTI Consulting, Inc.
3 Times Square
11th Floor
New York, NY 10036
Attn: Roy Messing
Telephone:    212.499.3677
Facsimile:    212. 499.3636

with a copy (which shall not constitute notice) to:

Cadwalader, Wickersham & Taft LLP
One World Financial Center

New York, New York  10281
Attention:    George A. Davis / Zachary H. Smith
Telephone: 212.504.6000
Facsimile:    212.504.6666

If to Buyer:

Puma Energy Puerto Rico
P.O. Box 11929
San Juan, Puerto Rico  00922
Attention:  Victor M. Dominguez
Telephone:    787.679.7350
Facsimile:    787.679-7385

with a copy (which shall not constitute notice) to:

Fuentes Law Offices
P.O. Box 9022726
San Juan, Puerto Rico  00902-2726
Attention:  Alex Fuentes
Telephone:    787.919.7788
Facsimile:    787.722.5206

and

Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Attention:  Clifton R. Jessup, Jr.
Telephone:    214.665.3638
Facsimile:    214.665.5938

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m., local time, in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9(f).

(g)    Governing Law; Jurisdiction.  This Agreement shall in all aspects be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, the other Related Agreements or

the transactions contemplated hereby or thereby, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court or if the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Agreement, the other Related Agreements or the transactions contemplated hereby or thereby, such matter shall be brought in the courts in the Court of Chancery for the State of Delaware in and for New Castle County (the "Chancery Court"), and in the event that the Chancery Court does not have subject matter jurisdiction as to a matter arising out of or relating to this Agreement, in any state or federal court of the State of Delaware located in New Castle County. Each of the Parties hereto agrees that any action instituted by it arising out of or relating to this Agreement will be instituted exclusively in one of the above specified courts. Each Party waives any defense of inconvenient forum to the maintenance of any dispute or action so brought, consents to service of process by mail and waives any objection to venue in any such court. Each party agrees that a final judgment in any dispute or action so brought will be conclusive and may be enforced by dispute or action on the judgment or in any other manner provided at law (common, statutory or other) or in equity.

(h)     Consent to Service of Process. Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9(f).

(i)     WAIVERS OF JURY TRIAL.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.

(j)     Specific Performance. Each Party acknowledges that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party hereto shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 9(j) shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(k)     Severability.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

(l)     No Survival of Representations and Warranties.    None of Sellers' or Buyer's respective representations or warranties in this Agreement shall survive the Closing.

(m)     Survival of Covenants and Agreements. All covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided,

that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

(n)    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns. For avoidance of doubt, and without limitation, the Parties acknowledge and agree that all provisions contained in Section 6(e) of this Agreement with respect to employees are included for the sole benefit of the respective Parties and shall not create any right (i) in any other Person, including any employees, former employees, any participant in any Employee Benefit Plan or any beneficiary thereof or (ii) to continued employment with Sellers or Buyer.

(o)    Construction.

(i)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The words "including" and "include" and other words of similar import will be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby." and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. References to Articles, Sections, clauses, subclauses, subparagraphs, Annexes and Exhibits herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Annexes and Exhibits of this Agreement.  The word "if" and other words of similar import will be deemed to be followed by the phrase "and only if."  Any reference herein to law or to a law, statute, rule or regulation of any Governmental Entity (or any provision thereof) shall include all laws and such law, statute, rule or regulation promulgated thereunder (or provision thereof), including any successor thereto, as it may be amended from time to time.  Any reference herein to "dollars" or "$" shall mean United States dollars.

(ii)    The Disclosure Schedules are hereby incorporated by reference.

(p)    Computation of Time.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.  If the final date of any period which is set out in any provision of this Agreement or the Closing Date falls on a day which is not a Business Day, then the time of such period or the Closing Date, as the case may be, shall be extended to the next Business Day.

(q)    Mutual Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

(r)     <u>Headings: Table of Contents</u>.   The Section headings and the table of contents contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(s)     <u>Counterparts: Facsimile or Email Signatures</u>.  This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.   This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies or pdf, each of which shall be deemed an original.

(t)     <u>Time of Essence</u>.  Time is of the essence of this Agreement.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**CARIBBEAN PETROLEUM CORPORATION**

By: _____
Name: Roy Messing
Title: Restructuring Officer

*Signature page to Asset Purchase Agreement*

**CARIBBEAN PETROLEUM REFINING L.P.**

By: _____

Name: Roy Messing
Title: Restructuring Officer

*Signature page to Asset Purchase Agreement*

GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION

By: _____
Name: Roy Messing
Title: Restructuring Officer

*Signature page to Asset Purchase Agreement*

PUMA ENERGY INTERNATIONAL B.V.

By: _____
    Name: ROBERT JONES
    Title: HEAD OF STRATEGY & INVESTMENTS

*Signature page to Asset Purchase Agreement*