**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

In re                                                    :      Chapter 11
                                                         :
CARIBBEAN PETROLEUM CORP., et al.,[1]                    :      Case No. 10-12553 (KG)
                                                         :
                                    Debtors.             :      Jointly Administered
                                                         :
---------------------------------------------------------- x

**DISCLOSURE STATEMENT WITH RESPECT TO THE JOINT PLAN OF
LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
PROPOSED BY THE DEBTORS, THE STATUTORY COMMITTEE OF
UNSECURED CREDITORS, AND BANCO POPULAR DE PUERTO RICO**

<div style="border:1px solid black">

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS
OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE
SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED
BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING
SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT BUT HAS
NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

</div>

Dated:      March [__], 2011

CADWALADER, WICKERSHAM & TAFT LLP        RICHARDS, LAYTON & FINGER, P.A.
*Co-Counsel for Debtors and Debtors in Possession*    *Co-Counsel for Debtors and Debtors in Possession*
One World Financial Center                One Rodney Square
New York, New York 10281                  P.O. Box 551
Telephone:  (212) 504-6000                Wilmington, Delaware 19899
                                          Telephone:  (302) 651-7700

---

[1] The Debtors in these chapter 11 cases (along with the last four digits of each Debtor's federal tax identification number) are: Caribbean Petroleum Corporation (7836), Caribbean Petroleum Refining L.P. (1421), and Gulf Petroleum Refining (Puerto Rico) Corporation (1417).  The service address for all Debtors is: PO Box 361988, San Juan, Puerto Rico 00936.

DISCLOSURE STATEMENT WITH RESPECT TO THE JOINT PLAN
OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY
CODE PROPOSED BY THE DEBTORS, THE STATUTORY COMMITTEE
OF UNSECURED CREDITORS, AND BANCO POPULAR DE PUERTO RICO

## TABLE OF CONTENTS

Page

I. DISCLAIMER ........................................................................................................... 1

II. INTRODUCTION .................................................................................................... 3
    A. Purpose, Limitations, and Structure of this Disclosure Statement ..................... 3
    B. Summary of the Plan ........................................................................................... 4
    C. Voting on the Plan .............................................................................................. 9
        1. Classes Entitled to Vote ........................................................................... 9
        2. Votes Required for Acceptance of the Plan by a Class ........................... 10
        3. Voting Instructions .................................................................................. 10
        4. Tabulation of Votes ................................................................................. 11
        5. Inquiries .................................................................................................. 11
    D. Confirmation Hearing ....................................................................................... 12

III. GENERAL INFORMATION ABOUT THE DEBTORS ...................................... 12
    A. Description and History of the Debtors' Businesses ......................................... 12
        1. Scale and Scope of Business ................................................................... 12
        2. Corporate History and Governance ........................................................ 13
        3. 2001 Chapter 11 Cases ........................................................................... 13
        4. Employees ............................................................................................... 13
    B. The Debtors' Prepetition Financing Arrangements .......................................... 14
        1. BPPR Financing ..................................................................................... 14
            a. BPPR Credit Facility ................................................................... 14
            b. BPPR Funding Agreement ........................................................... 14
        2. FirstBank Credit Facility ........................................................................ 15
        3. Lexel Loan Agreement and Funding Agreement .................................... 15
    C. Other Significant Prepetition Debt .................................................................... 16
        1. Hacienda ................................................................................................. 16
        2. Inpecos .................................................................................................... 16
    D. The Explosions .................................................................................................. 16
    E. Insurance ........................................................................................................... 17
        1. Chartis Primary General Liability .......................................................... 17
        2. Chartis Umbrella Liability ...................................................................... 18
        3. Chartis Property All Risk ........................................................................ 18
        4. ACE Premises Pollution Liability .......................................................... 18
        5. Navigators Marine Terminal Operations Liability ................................. 18
        6. Liberty Storage Tank Third Party Liability Corrective Action and Clean-Up Policy ................................................................................................ 19
    F. Pending Litigation and Other Legal Matters ..................................................... 19
        1. Litigation Related to the Explosions ...................................................... 19
            a. Federal Court Cases ..................................................................... 19
            b. State Court Cases .......................................................................... 20
        2. Santa Paula Litigation ............................................................................ 20
        3. AOT Arbitration ..................................................................................... 21
        4. Environmental ......................................................................................... 21
            a. Pre-Explosion Environmental Issues ........................................... 21
            b. Post-Explosion Environmental Issues .......................................... 22

| | | | |
|---|---|---|---|
| **IV.** | **EVENTS DURING THE CHAPTER 11 CASES** | | **23** |
| | A. | Commencement of the Chapter 11 Cases | 23 |
| | B. | First Day Orders | 23 |
| | C. | The Debtors' Professionals and Restructuring Officers | 23 |
| | D. | The Creditors Committee | 23 |
| | | 1. Appointment of the Creditors Committee | 23 |
| | | 2. Creditors Committee's Professionals | 24 |
| | E. | Motion to Transfer Venue | 24 |
| | F. | Postpetition Financing and Use of Cash Collateral | 24 |
| | G. | Extension Motions | 25 |
| | H. | Challenge Period | 25 |
| | I. | General Bar Date and Summary of Claims | 26 |
| | | 1. Schedules and Statements | 26 |
| | | 2. General Bar Date | 26 |
| | | 3. Summary of Claims | 26 |
| | J. | Administrative Expense Bar Dates | 26 |
| | K. | Rejection of Franchise Agreements | 27 |
| | | 1. Conditional Rejection Motion | 27 |
| | | 2. Withdrawal Motion | 28 |
| | | 3. Motion to Reconsider | 28 |
| | | 4. Appeal of the Rejection Order | 28 |
| | L. | Puerto Rico Government Resolutions | 28 |
| | | 1. Hacienda | 28 |
| | | 2. Rejection of Franchise Agreements | 29 |
| | M. | Sale of Certain Petroleum Products | 29 |
| | N. | 363 Sale | 29 |
| | O. | The BPPR Settlement | 30 |
| | P. | Plan Support Agreement | 32 |
| | Q. | FirstBank Settlement | 32 |
| | R. | EPA/USCG Settlement | 33 |
| | S. | Negotiations with Chartis | 33 |
| | T. | Employee Benefits | 33 |
| **V.** | **THE PLAN** | | **33** |
| | A. | Classification and Treatment of Holders of Claims and Equity Interests | 34 |
| | | 1. Administrative Expense Claims | 35 |
| | | 2. Professional Compensation and Reimbursement Claims | 35 |
| | | 3. DIP Financing Claims | 36 |
| | | 4. Priority Tax Claims | 36 |
| | | 5. Class 1 – Priority Non-Tax Claims | 36 |
| | | 6. Class 2 – FirstBank Secured Claim | 37 |
| | | 7. Class 3 – BPPR Secured Claims | 37 |
| | | 8. Class 4 – Other Secured Claims | 37 |
| | | 9. Class 5 – General Unsecured Claims | 38 |
| | | 10. Class 6 – Intercompany Claims | 38 |
| | | 11. Class 7 – Subordinated Claims | 39 |
| | | 12. Class 8 – Equity Interests | 39 |
| | B. | Means for Implementing the Plan | 39 |
| | | 1. Settlements | 39 |
| | | 2. Corporate Action | 40 |
| | |    a. Transfer of Assets and Assumption of Liabilities | 40 |
| | |    b. Dissolution of the Debtors | 40 |
| | |    c. Cancelation of Existing Securities and Agreements | 40 |
| | | 3. Liquidation Trust | 40 |
| | |    a. Establishment of the Liquidation Trust | 40 |
| | |    b. Powers and Duties of the Liquidation Trustee | 40 |

   c.  Collection of Insurance Proceeds................................................................41
   d.  Collection of BPPR Accounts Receivable Proceeds................................42
   e.  Liquidation Trust Oversight Board..........................................................42
   f.  Accounting and Reporting.........................................................................43
   g.  Plan Expenses.............................................................................................43
   h.  Retention of Professionals.........................................................................43
   i.  Resignation/Removal of Liquidation Trustee.........................................44
   j.  Termination of the Liquidation Trust......................................................44
   k.  Reservation of Rights for Additional Trust(s)........................................44
   l.  Limitation on Liability...............................................................................44
  4.  Reliance on Documents....................................................................................45
  5.  Requirement of Undertaking...........................................................................45
  6.  Tort Claims.......................................................................................................45
  7.  Administrative and Priority Claims Reserve .................................................45
  8.  General Unsecured Claims Reserve.................................................................45
  9.  Causes of Action...............................................................................................46
   a.  Preservation of Causes of Action.............................................................46
   b.  No Waiver....................................................................................................46
  10.  Effectuating Documents and Further Transactions.......................................46
  11.  Authority to Act...............................................................................................46
C.  Provisions Governing Distributions.........................................................................47
  1.  Distribution Record Date................................................................................47
  2.  Date of Distributions Under the Plan.............................................................47
   a.  Distributions on the Effective Date..........................................................47
   b.  Distributions After the Effective Date.....................................................47
  3.  Sources for Distributions.................................................................................47
  4.  Manner of Payment.........................................................................................47
  5.  Disbursement Agent.........................................................................................47
  6.  Delivery of Distributions.................................................................................47
  7.  Allocation of Distributions Between Principal and Interest.........................48
  8.  No Postpetition Interest on Claims.................................................................48
  9.  No Distribution in Excess of Allowed Amount of Claim ..............................48
  10.  Distributions with Respect to Disputed Claims.............................................48
  11.  Distributions with Respect to Defendants .....................................................48
  12.  Disputed Payments ..........................................................................................48
  13.  Setoffs...............................................................................................................48
  14.  Unclaimed Property.........................................................................................49
   a.  Escrow of Unclaimed Property.................................................................49
   b.  Distribution of Unclaimed Property ........................................................49
  15.  Claims Paid by Third Parties .........................................................................49
  16.  Distributions Free and Clear..........................................................................50
  17.  Time Bar to Cash Payments ...........................................................................50
  18.  De Minimis Distributions................................................................................50
  19.  Transfer of Property Under Plan....................................................................50
D.  Provisions for Resolving and Treating Disputed Claims .......................................50
  1.  Objections to Claims........................................................................................50
  2.  Estimation of Claims Post-Effective Date......................................................50
  3.  Late-Filed Claims and Amendments to Claims..............................................51
  4.  Settlement of Disputed Claims........................................................................51
E.  Treatment of Executory Contracts and Unexpired Leases....................................51
  1.  Rejection of Remaining Executory Contracts and Unexpired Leases ..........51
  2.  Objections to Rejection....................................................................................51
  3.  Rejection Damage Claims................................................................................52
  4.  Modifications....................................................................................................52
F.  Effect of Confirmation of the Plan on the Debtors ................................................52
  1.  Vesting of Assets ..............................................................................................52

|   |   |   |   |
|---|---|---|---|
| 2. | Binding Effect | | 52 |
| 3. | Injunction Against Interference with the Plan | | 52 |
| 4. | Term of Injunctions or Stays Arising Under or Entered During the Chapter 11 Cases | | 53 |
| 5. | Exculpation | | 53 |
| 6. | Releases | | 53 |
| | a. | Release by Debtors | 53 |
| | b. | Release by Holders of Claims and Equity Interests, and Released Parties | 53 |
| 7. | Injunction | | 54 |
| 8. | Exclusions and Limitations on Exculpation, Indemnification, and Releases | | 54 |
| 9. | Dissolution of Creditors Committee | | 54 |
| 10. | Insurance | | 55 |

G. Summary of Other Provisions of the Plan ........................................................................ 55
     1. Payment of Statutory Fees .................................................................................... 55
     2. Substantial Consummation ................................................................................... 55
     3. Plan Supplement .................................................................................................... 55
     4. Operations Between the Confirmation Date and the Effective Date ...................... 55
     5. Exemption from Transfer Taxes ........................................................................... 56
     6. Tax Treatment of the Liquidation Trust ............................................................... 56
     7. Determination of Tax Liabilities ........................................................................... 56
     8. Withholding and Reporting Requirements ........................................................... 56
     9. Fifty Percent Shareholder ..................................................................................... 56
     10. Modification and Amendment ............................................................................. 57
     11. Revocation or Withdrawal of the Plan. ............................................................... 57

VI. CONFIRMATION AND CONSUMMATION PROCEDURE ............................................ 57
     A. Voting Procedures and Solicitation of Votes ........................................................ 57
     B. Confirmation Hearing ........................................................................................... 57
     C. Confirmation of the Plan ....................................................................................... 58
         1. Acceptance ...................................................................................................... 59
         2. Best Interests Test/Liquidation Analysis ......................................................... 59
         3. Feasibility ....................................................................................................... 60
         4. "Cramdown" ................................................................................................... 60
             a. Fair and Equitable Test ............................................................................ 60
             b. No Unfair Discrimination ......................................................................... 61
     D. Consummation ...................................................................................................... 61
         1. Conditions Precedent ...................................................................................... 61
         2. Waiver of Conditions Precedent ...................................................................... 62
         3. Effect of Failure of Conditions ........................................................................ 62

VII. RISK FACTORS ............................................................................................................... 62
     A. Certain Bankruptcy Considerations ...................................................................... 62
         1. Parties-in-Interest May Object to the Debtors' Classification of Claims and Equity Interests ............................................................................................. 62
         2. Failure to Satisfy Vote Requirement ............................................................... 63
         3. Debtors May Not Be Able to Secure Confirmation of the Plan ........................ 63
         4. Nonconsensual Confirmation .......................................................................... 63
         5. Debtors May Object to the Amount or Classification of a Claim ..................... 64
         6. Risk of Non-Occurrence of the Effective Date ................................................ 64
         7. Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan ............................................................................................. 64
     B. Risk Factors That May Affect Distributions Under The Plan ................................ 64
         1. Debtors Cannot State with Certainty the Amount of Administrative Expense Claims .............................................................................................. 64

          2.         **Debtors Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes** ....................................... 64

          3.         **Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on General Unsecured Claims** .................................................................................................................... 64

    **C.**    **Certain Tax Risk Factors** ............................................................................................ 65

          1.         **U.S. Federal Income Tax Risk Factors** ................................................................. 65

          2.         **Puerto Rico Income Tax Risk Factors** ................................................................. 65

**VIII.**    **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .................... 65

**IX.**    **CERTAIN TAX CONSEQUENCES OF THE PLAN** ............................................................ 65

    **A.**    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ............... 66

          1.         **Tax Consequences to Debtors** .................................................................................. 67

                   a.      **COD Income and Attribute Reduction** .................................................... 67

                   b.      **Alternative Minimum Tax** .......................................................................... 68

          2.         **Tax Consequences to Holders of Allowed Claims** ............................................... 68

                   a.      **Consequences to U.S. Holders of Allowed Claims** ............................... 68

                   b.      **Consequences to Non-U.S. Holders of Allowed Claims** ....................... 70

          3.         **Tax Treatment of the Liquidation Trust** ............................................................... 72

                   a.      **Receipt of Liquidation Trust Interests** .................................................... 72

                   b.      **Classification of the Liquidation Trust as Liquidating Trust** ............. 72

                   c.      **General Tax Reporting by the Liquidation Trust and the Beneficiaries** .......... 72

    **B.**    **CERTAIN PUERTO RICO INCOME TAX CONSEQUENCES OF THE PLAN** ............... 73

          1.         **Debtors** ....................................................................................................................... 74

                   a.      **In General** ...................................................................................................... 74

                   b.      **Sale of Assets** ................................................................................................. 75

                   c.      **P.R. COD Income** ......................................................................................... 75

          2.         **Liquidation Trust and Beneficiaries** ..................................................................... 75

          3.         **Holders of Allowed Claims** ...................................................................................... 76

                   a.      **Receipt of Cash and/or Liquidation Trust Interests in Exchange for Allowed Claim** .......................................................................................... 76

                   b.      **Potential Distributions** ................................................................................ 78

**X.**    **CONCLUSION AND RECOMMENDATION** ...................................................................... 79

<u>**EXHIBITS**</u>

**The Plan** ............................................................................................................................. Exhibit A

**BPPR Settlement Term Sheet** ............................................................................................ Exhibit B

**Liquidation Analysis** ......................................................................................................... Exhibit C

**Disclosure Statement Order (excluding exhibits)** .......................................................... Exhibit D

# I.    DISCLAIMER

THIS DISCLOSURE STATEMENT (THE "<u>DISCLOSURE STATEMENT</u>") IS BEING DISTRIBUTED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE "JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS, THE STATUTORY COMMITTEE OF UNSECURED CREDITORS AND BANCO POPULAR DE PUERTO RICO" (THE "<u>PLAN</u>").  THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "<u>BANKRUPTCY CODE</u>").  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

A COPY OF THE PLAN IS ATTACHED AS <u>EXHIBIT A</u> HERETO.  ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  SUMMARIES OF THE PLAN AND OTHER STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  UNLESS OTHERWISE SPECIFIED HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.  THE DEBTORS URGE EACH HOLDER OF A CLAIM AGAINST OR EQUITY INTEREST IN THE DEBTORS TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TREATMENTS CONTEMPLATED THEREIN.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT.  THE LIQUIDATION TRUSTEE MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.  THE PLAN RESERVES FOR THE

**LIQUIDATION TRUSTEE THE RIGHT TO PROSECUTE CAUSES OF ACTION (AS DEFINED IN THE PLAN) AGAINST ANY ENTITY, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN.**

**NOTE:  THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN DESCRIBED IN THIS DOCUMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, THEIR CREDITORS AND ALL OTHER PARTIES IN INTEREST.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT YOU <u>VOTE</u> <u>IN</u> <u>FAVOR</u> OF THE PLAN.**

## II.    INTRODUCTION

Caribbean Petroleum Corporation ("**CPC**"), Caribbean Petroleum Refining L.P. ("**CPR**") and Gulf Petroleum Refining (Puerto Rico) Corporation ("**GPC**"), as debtors and debtors in possession (each, a "**Debtor**," and collectively, the "**Debtors**"), submit this disclosure statement (the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**") in connection with (i) the solicitation of acceptances of the "Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors, the Statutory Committee of Unsecured Creditors, and Banco Popular de Puerto Rico," dated February 4, 2011, as the same may be amended (the "**Plan**"),[2] filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"); and (ii) the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), scheduled for [__], 2011 at [____] [a.m./p.m.] (prevailing Eastern time).  As set forth below, on December 22, 2010, the Bankruptcy Court approved the sale of substantially all of the Debtors' assets (the "**363 Sale**") to Puma Energy International, B.V. ("**Puma**").  The Debtors anticipate that the sale of these assets will close during the first quarter of 2011.

**Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement will have the meanings ascribed to them in the Plan.  Headings are for convenience of reference and will not affect the meaning or interpretation of the Disclosure Statement.**

Solicitation is being conducted at this time in order to obtain sufficient acceptances to enable the Plan to be confirmed by the Bankruptcy Court.  The Plan sets forth, among other things, how Administrative Expense Claims, Claims against and Equity Interests in the Debtors will be treated upon consummation of the 363 Sale and the wind-down of the Estates.  This Disclosure Statement describes certain aspects of the Plan, the Debtors' business operations, significant events leading to their chapter 11 cases (the "**Chapter 11 Cases**"), and related matters.  **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OF THEIR RELATED EXHIBITS AND SCHEDULES IN THEIR ENTIRETY.**

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

| | |
|---|---|
| Exhibit A | The Plan |
| Exhibit B | BPPR Settlement Term Sheet |
| Exhibit C | Liquidation Analysis |
| Exhibit D | Disclosure Statement Order (excluding exhibits) |

### A.    Purpose, Limitations, and Structure of this Disclosure Statement

The purpose of this Disclosure Statement is to provide the holders of Claims against and Equity Interest in the Debtors who are entitled to vote on the Plan with adequate information to make an informed decision as to whether to accept or reject the Plan.  The information in this Disclosure Statement may not be relied upon for any other purpose, and nothing contained in this Disclosure Statement will constitute an admission of any fact or liability or as a stipulation or waiver by any party, or be deemed conclusive advice on the tax or other legal effects of the Plan.

On [__], 2011, after notice and a hearing, the Bankruptcy Court issued an order (the "**Disclosure Statement Order**") approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical in each Class of Claims being solicited to make

---

[2] Notwithstanding the convention of filing one plan document for all Debtors, the Plan is, and is treated as, separate chapter 11 plans, one for each of the three Debtors.

an informed judgment whether to accept or reject the Plan. The Disclosure Statement Order, excluding exhibits, is attached as Exhibit D hereto and should be referred to for details regarding the procedures for the solicitation of votes on the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

Unless otherwise specified herein, the statements contained in this Disclosure Statement are made only as of March [__], 2011. Delivery of this Disclosure Statement after March [__], 2011 does not mean that the information set forth in this Disclosure Statement remains unchanged since such date or the date of the materials relied upon in preparing this Disclosure Statement, and, except to the extent required by the Bankruptcy Code or Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors have no duty to update any information contained herein. The Debtors have prepared the information contained in this Disclosure Statement in good faith, based upon the information then available to them. Moreover, certain of the statements contained in this Disclosure Statement, by their nature, contain estimates and assumptions, and there can be no assurance that these estimates and assumptions will be correct at any later date. Except as otherwise expressly stated, no audit of the financial information contained in this Disclosure Statement has been conducted. Except as otherwise expressly provided herein, all references to "$" or "dollars" are deemed references to the lawful money of the United States of America.

The description of the Plan contained in this Disclosure Statement is intended only as a summary, and is qualified in its entirety by reference to the Plan itself. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan will govern. The Plan is a legally binding agreement and should be read in its entirety. Each holder of a Claim or Equity Interest that is classified in an impaired class should read, consider and carefully analyze the terms and provisions of the Plan as well as the information contained in this Disclosure Statement and the other documents provided herewith.

If you are eligible to vote on the Plan, this Disclosure Statement and all of its schedules and exhibits should have been delivered to you. There are certain documents and other materials identified in this Disclosure Statement and the Plan that are not attached to this Disclosure Statement or the Plan (such documents and materials, the "**Plan Supplement**"). The Plan Supplement will be filed with the Bankruptcy Court on or before the date that is at least seven (7) calendar days prior to the deadline to vote to accept or reject the Plan. Once it is filed, the Plan Supplement may be accessed on the docket electronically maintained by the Clerk of the Bankruptcy Court or inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. You may obtain a copy of the Plan Supplement once it is filed, or any of the schedules and exhibits to this Disclosure Statement, by accessing the website of the claims agent appointed in the Chapter 11 Cases, at www.kccllc.net/caribbean, or by sending a written request to the Debtors' counsel, Cadwalader, Wickersham & Taft LLP, at One World Financial Center, New York, New York 10281, Attn: George A. Davis, Esq. and Zachary H. Smith, Esq.

If you have any questions about the packet of materials you have received, you may contact the Debtors' counsel by mail at the address listed above, or by phone at (212) 504-6000.

**B.      Summary of the Plan**

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not proposing the substantive consolidation of their respective bankruptcy estates. Thus, although the Plan generally applies to all the Debtors, except where otherwise indicated, (i) the Plan constitutes three distinct chapter 11 plans, one for each Debtor; (ii) for voting purposes, each holder of a Claim in a Class will vote its Claims in such Class by individual Debtor; and (iii) the classification scheme set forth in Article V hereof applies to each Debtor, but to the extent there are no Claims in a certain Class against a particular Debtor, that Class will be deemed not to exist for any purpose whatsoever in respect of that Debtor. The Debtors are submitting a joint Plan, covered by a single Disclosure Statement, to simplify drafting and to avoid duplicative costs relating to the preparation and distribution of multiple plans and disclosure statements. Accordingly, Classes 1, 3, 4, 5, 6, 7, and 8 consist of sub-Classes for each Debtor, and each sub-Class will be deemed to be a separate Class for all purposes under the Bankruptcy Code. A schedule of the sub-Classes for Classes 1, 3, 4, 5, 6, 7, and 8 is set forth in Exhibit A to the Plan.

A Claim or Equity Interest will be placed in a particular Class only to the extent that such Claim or Equity Interest falls within the description of such Class, and will be classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. For the avoidance of doubt, a Claim will be placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that the Claim is an Allowed Claim in such Class and the Claim has not been paid, released, or otherwise settled or compromised prior to the Effective Date.

The following tables summarize the treatment of Administrative Expense Claims and Priority Tax Claims, and the classification and treatment of other Claims and Equity Interests under the Plan. These tables provide only a summary of the classification, impairment and entitlement to vote of Claims and Equity Interests under the Plan. For a complete description of the classification and/or treatment of Administrative Expense Claims, Priority Tax Claims, other Claims, and Equity Interests, reference should be made to the entire Disclosure Statement and the Plan and all exhibits thereto, to which this summary is qualified in its entirety by reference. All figures are approximate and aggregated for all Debtors.

| Class | Description | Treatment Under The Plan | Estimated Recovery | Voting Status |
|-------|-------------|--------------------------|--------------------|---------------|
| -- | Administrative Expense Claims (estimated $[____]) | Each holder of an Allowed Administrative Expense Claim will receive in full settlement, satisfaction, and release of such Claim, Cash in an amount equal to the Allowed but unpaid portion of such Claim, on or as soon as practicable after, the later of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the Debtors or the Liquidation Trustee and the holder of such Claim. | 100% | N/A |
| -- | DIP Financing Claims ($[___]) | Pursuant to the BPPR Settlement Order and Section 2.1 of the Plan, on the Effective Date, BPPR will receive in full settlement, satisfaction, and release of the DIP Financing Claims, Cash in an amount equal to the DIP Financing Claims Amount. Upon receipt by BPPR of all of the consideration provided in Section 3.1(c) of the Plan, all liens and security interests granted to secure the DIP Financing Claims will be satisfied, discharged, and terminated in full and of no further force or effect. | 100% | N/A |
| -- | Priority Tax Claims (estimated $[___]) | The holder of an Allowed Priority Tax Claim will receive in full settlement, satisfaction, and release of such Claim, Cash in an amount equal to the Allowed but unpaid portion of such Claim, on or as soon as practicable after, the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed. | 100% | N/A |
| 1 | Priority Non-Tax Claims (estimated $[___] million) | Class 1 consists of separate sub-Classes for all Priority Non-Tax Claims against each of the Debtors. Each holder of an Allowed Priority Non-Tax Claim will receive in full settlement, satisfaction, and release of such Claim, Cash in an amount equal to the Allowed but unpaid portion of such Claim, on or as soon as practicable after, the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed. | 100% | Unimpaired; Not entitled to vote (presumed to accept) |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Voting Status |
|-------|-------------|--------------------------|--------------------|--------------|
| 2 | FirstBank Secured Claim ($12.2 million) | Pursuant to the FirstBank Settlement Order and Section 2.2 of the Plan, on the Effective Date, FirstBank will receive in full settlement, satisfaction, and release of the FirstBank Secured Claims, Cash in an amount equal to $11,500,000 (the "**FirstBank Secured Claims Settled Amount**"). | [__]% | Impaired; Entitled to vote |
| 3 | BPPR Secured Claims ($[__] million) | Class 3 consists of separate sub-Classes for all BPPR Secured Claims against each of the Debtors.  Pursuant to the BPPR Settlement Order and Section 2.1 of the Plan, Banco Popular de Puerto Rico ("**BPPR**") will receive in full settlement, satisfaction, and release of the BPPR Secured Claims, (i) on the Effective Date, Cash in an amount equal to (A) the gross Cash proceeds generated by the 363 Sale and actually received by the Debtors (the "**Sale Proceeds**") less (1) the FirstBank Secured Claims Settled Amount, less (2) $33,200,000, less (3) the General Unsecured Claims Reserve Amount, less (4) the Plan Expenses Reserve Amount, plus (B) the BPPR Cash, plus (C) the BPPR Accounts Receivable Proceeds (to the extent reduced to Cash on the Effective Date), plus (D) the BPPR Insurance Proceeds (to the extent reduced to Cash on the Effective Date) and (ii) as soon as practicable after the Effective Date, (A) the product of (1) 66.67% and (2) the Excess Administrative and Priority Claims Reserve, as and when determined in accordance with Section 6.8 of the Plan, (B) the BPPR Accounts Receivable Proceeds, as and when reduced to Cash, and (C) the BPPR Insurance Proceeds, as and when reduced to Cash. | [___]% | Impaired; Entitled to vote |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Voting Status |
|---|---|---|---|---|
| 4 | Other Secured Claims ($[___]) | Class 4 consists of separate sub-Classes for all Other Secured Claims against each of the Debtors.  Each holder of an Allowed Other Secured Claim will receive in full settlement, satisfaction, and release of such Claim, either (i) retention of the liens securing such Claim, whether the Collateral subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claim, and deferred Cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the applicable Estate's interest in such Collateral, (ii) to the extent that the Debtors have sold, or the Liquidation Trustee sells, any Collateral that is subject to the liens securing such Claim, free and clear of such liens, liens on the proceeds of such Collateral, and the treatment of such liens under clause (i) or (iii) herein, and (iii) the realization by such holder of the indubitable equivalent of such Claim.  For the avoidance of doubt, the determination of which treatment to provide a holder of an Allowed Other Secured Claim will be within the sole and absolute discretion of the Debtors or the Liquidation Trustee, as applicable.  For the avoidance of doubt, (a) in the event that an Allowed Other Secured Claim exceeds the value of such holder's interest in the Collateral that secures it, the holder of such Claim will have an Allowed Other Secured Claim equal to the value of its interest in such Collateral, if any, and an Allowed General Unsecured Claim for the deficiency and (b) except as otherwise provided in the Plan or the Plan Support Agreement, any Inpecos Claim and any Lexel Claim, will be deemed to be, and will be treated as, a Class 7 Subordinated Claim. | [___]% | Impaired; Entitled to vote |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Voting Status |
|-------|-------------|--------------------------|--------------------|----------------|
| 5 | General Unsecured Claims ($[__] million) | Class 5 consists of separate sub-Classes for all General Unsecured Claims against each of the Debtors. Pursuant to the BPPR Settlement, each holder of an Allowed General Unsecured Claim will receive in full settlement, satisfaction, and release of such Claim (except that the BPPR Deficiency Claim will not be released or deemed to be released until paid in full with interest in accordance with the distribution priority terms of the Plan), its Pro Rata share of (i) Cash in an amount equal to the product of (a) 10% and (b) the Sale Proceeds (the "**General Unsecured Claims Reserve Amount**"), (ii) the product of (x) 33.33% and (y) the Excess Administrative and Priority Claims Reserve, as and when determined in accordance with Section 6.8 of the Plan, (iii) the Cash proceeds of all Causes of Action, and (iv) to the extent that proceeds of the Liability Insurance Policies are received by the Debtors or the Liquidation Trust, as applicable, pursuant to a settlement approved by the Bankruptcy Court with any of the insurers under any of the Liability Insurance Policies, and subject in all respects to Section 6.2(c)(iv) of the Plan with respect to the Chartis Liability Proceeds, the proceeds of the Liability Insurance Policies received by the Debtors and the Liquidation Trustee, as applicable, pursuant to such settlement, in each case less all costs and expenses incurred by the Debtors and the Liquidation Trustee, as applicable, in connection with the administration of distributions to the holders of Allowed General Unsecured Claims, including, without limitation the collection and monetization of assets, the prosecution of the Causes of Action, and the allowance and administration of the General Unsecured Claims (including Tort Claims), after the use of the Plan Expense Reserve, on or as soon as practicable after (A) the Effective Date, to the extent that such Cash proceeds are generated prior to the Effective Date and (B) the next Periodic Distribution Date, to the extent that such Cash proceeds are generated after the Effective Date, in each case to the extent that such Claim is Allowed. For the avoidance of doubt, (x) notwithstanding any other provision of the Plan, BPPR, on account of the BPPR Deficiency Claim or otherwise, will not be entitled to receive any recovery as a holder of a General Unsecured Claim pursuant to Section 5.5 of the Plan unless and until all other holders of Allowed General Unsecured Claims have been paid in full (including postpetition interest to the extent allowed under applicable bankruptcy law) on account of such holders' respective Allowed General Unsecured Claims, and (y) the holders of Allowed General Unsecured Claims will not be entitled to receive any portion of any increase in the Excess Administrative and Priority Claims Reserve Amount attributable to the payment of any Administrative Expense Claims from the proceeds of the Umbrella Insurance Policy in accordance Section 6.2(c)(iv) of the Plan. | [___]% | Impaired; Entitled to vote |

| Class | Description | Treatment Under The Plan | Estimated Recovery | Voting Status |
|-------|-------------|--------------------------|--------------------|--------------|
| 6 | Intercompany Claims ($[__]) | Class 6 consists of separate sub-Classes for all Intercompany Claims against each of the Debtors. All Intercompany Claims will be deemed canceled and released as of the Effective Date, and the holders of such Claims will not receive or retain any property or interest in property on account of such Claims. | N/A | Impaired; Not entitled to vote (deemed to reject) |
| 7 | Subordinated Claims ($[__]) | Class 7 consists of separate sub-Classes for all Subordinated Claims against each of the Debtors. All Subordinated Claims will be deemed canceled and released as of the Effective Date, and the holders of such Claims will not receive or retain any property or interest in property on account of such Claims. Notwithstanding any other provision of the Plan, no Inpecos Claim or Lexel Claim will be deemed to be, or will be treated as, a Class 7 Subordinated Claim unless the Plan as confirmed by the Bankruptcy Court includes the insurance provisions and the release provisions with respect to the Guarantors and Guarantor Affiliates as set forth in Sections 6.2, 11.5, 11.6, and 11.7 of the Plan; provided, however, that in the event that the Lexel Claims are not deemed to be, and/or not treated as, Class 7 Subordinated Claims, any Secured Claim of Lexel Establishment and/or Lexel Ltd. will be deemed to be, and will be treated as a Class 5 General Unsecured Claim, and any distributions made on account of any Claim of Lexel Establishment will be paid to BPPR (instead of Lexel Establishment) pursuant to the BPPR/Lexel Intercreditor Agreement. | N/A | Impaired; Not entitled to vote (deemed to reject) |
| 8 | Equity Interests | Class 8 consists of separate sub-Classes for all Equity Interests in each of the Debtors. All Equity Interests in any of the Debtors will be deemed canceled and terminated as of the Effective Date, and the holders of an Equity Interest in any of the Debtors will not receive or retain any property or interest in property on account of such Equity Interest. | N/A | Impaired; Not entitled to vote (deemed to reject) |

C.    **Voting on the Plan**

The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from holders of Claims against and Equity Interests in the Debtors, which procedures are described below.

1.    *Classes Entitled to Vote*

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or interests that are members of a class that (a) is "impaired" within the meaning of section 1124 of the Bankruptcy Code (an "**Impaired Class**") and (b) is not deemed to have rejected a plan under section 1126(g) of the Bankruptcy Code, are entitled to vote to accept or reject a chapter 11 plan. Classes of claims or interests that are not impaired under section 1124 of the Bankruptcy Code are conclusively presumed to have accepted a plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the plan. Impaired classes of which the members will receive no recovery under a plan are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the plan.

Under the Plan, Classes 2, 3, 4, and 5 are each an Impaired Class and, to the extent Claims in those Classes are Allowed, the holders of those Claims may be entitled to receive distributions under the Plan. As a result, those holders of Claims are entitled to vote to accept or reject the Plan. In contrast, Class 1 is not an Impaired Class; consequently, holders of Claims in this Class are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Classes 6, 7 and 8 under the Plan are Impaired Classes, but the holders of Claims and Equity Interests in such Classes are <u>not</u> entitled to receive distributions under the Plan; consequently, these Classes are deemed to have rejected the Plan and the members of these Classes are not entitled to vote to accept or reject the Plan.

Only holders of record of Claims as of the date of the Disclosure Statement Order (*i.e.* [_____], 2011) that otherwise are entitled to vote to accept or reject the Plan have been sent a copy of this Disclosure Statement and an appropriately customized ballot (a "**Ballot**").

2.        *Votes Required for Acceptance of the Plan by a Class*

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class which cast ballots for acceptance or rejection of the plan. Thus, for each of Classes 2, 3, 4, and 5 under the Plan, the Class will have accepted the Plan if, of the total number of Class members that vote, more than one-half vote to accept the Plan, and such majority of voters holds at least two-thirds of the total dollar amount of the Claims in that Class.

3.        *Voting Instructions*

If you are entitled to vote on the Plan, a Ballot is enclosed with this Disclosure Statement. If you are entitled to vote in more than one Class, you will receive separate Ballots for each Claim entitled to vote, which must be used for each separate Claim. Please refer to the Disclosure Statement Order for more specific instructions on voting on the Plan.

The Debtors, with the approval of the Bankruptcy Court, have engaged Kurtzman Carson Consultants LLC as the noticing, claims and balloting agent (the "**Balloting/Claims Agent**") to assist in the solicitation process. The Balloting/Claims Agent will, among other things, answer questions, provide additional copies of all solicitation package materials, and generally oversee the solicitation process. The Balloting/Claims Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

The deadline to vote on the Plan is **4:00 p.m., prevailing Eastern time on [___], 2011** (the "**Voting Deadline**"). Ballots received after the Voting Deadline may not be counted. Except as otherwise provided in the solicitation procedures in the Disclosure Statement Order, a Ballot will be deemed delivered only when the Balloting/Claims Agent actually receives the original executed Ballot. Delivery of a Ballot to the Balloting/Claims Agent by facsimile, e-mail or any other electronic means will not be accepted. No Ballot should be sent to any of the Debtors, the Debtors' agents (other than the Balloting/Claims Agent), or the Debtors' financial or legal advisors. The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications). The Bankruptcy Code requires the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

Please vote and return your Ballot(s) in accordance with the instructions set forth herein and in the instructions accompanying your Ballot(s) to:

[Balloting/Claims Agent Information]

**TO BE COUNTED, YOUR ORIGINAL, EXECUTED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED AT THE ADDRESS ABOVE NO LATER THAN 4:00 P.M. PREVAILING EASTERN TIME ON THE VOTING DEADLINE. ANY BALLOT THAT IS EXECUTED AND RETURNED, BUT WHICH DOES NOT INDICATE EITHER AN**

ACCEPTANCE OR REJECTION OF THE PLAN, OR INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN, WILL BE NOT BE COUNTED EITHER AS A VOTE TO ACCEPT OR A VOTE TO REJECT THE PLAN. DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT. BALLOTS SENT BY FACSIMILE OR E-MAIL WILL NOT BE ACCEPTED.

4. *Tabulation of Votes*

To ensure that a vote is counted, the holder of a Claim should: (a) complete a Ballot; (b) indicate the holder's decision either to accept or reject the Plan in the boxes provided in the Ballot; and (c) sign and timely return the Ballot to the address set forth above by the Voting Deadline.

A vote to accept or reject the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not cast in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. A Ballot that is executed and received, but does not indicate the acceptance or rejection of the Plan, or that indicates both acceptance and rejection of the Plan, will not be counted either as a vote to accept or a vote to reject the Plan.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), and acceptance of Ballots will be determined by the Balloting/Claims Agent and the Debtors in their sole discretion, which determination will be final and binding, subject to approval by the Bankruptcy Court (if necessary). The Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not therefore been cured or waived) will be invalidated.

If one or more of the Classes of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code without providing further notice to the holders of any Claim. Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. Holders of Claims and Equity Interests should assume that, if one or more of the Classes of Claims entitled to vote on the Plan reject the Plan, the Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code at the Confirmation Hearing. *For a more detailed description of the requirements for confirmation of a plan that has been rejected by one or more classes, please see Section VI.C.4 of this Disclosure Statement.*

5. *Inquiries*

If you are a holder of a Claim entitled to vote on the Plan and either did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have questions about the procedures for voting your Claim, or about the packet of materials that you received, please contact [Balloting/Claims Agent Information].

If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by rule 3017(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), please contact Cadwalader, Wickersham & Taft LLP, at One World Financial Center, New York, New York 10281, Attn: George A. Davis, Esq. and Zachary H. Smith, Esq., by telephone at (212) 504-6000 or by electronic mail at george.davis@cwt.com and zachary.smith@cwt.com.

     **D.**     **Confirmation Hearing**

     Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will commence on [__], 2011, beginning at [__] [a.m./p.m.] (prevailing Eastern time), before the Honorable Kevin Gross, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 6th Floor, Courtroom #3, Wilmington, Delaware 19801. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served so that they are received on or before [__], 2011, at 4:00 p.m. (prevailing Eastern time). The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Subsequent to the Confirmation Hearing, the Bankruptcy Court may issue an order confirming the Plan (the "**Confirmation Order**").

## III.     GENERAL INFORMATION ABOUT THE DEBTORS

     **A.**     **Description and History of the Debtors' Businesses**

     1.     *Scale and Scope of Business*

     As set forth below in Section III.D, the commencement of these chapter 11 cases on August 12, 2010 (the "**Commencement Date**") was precipitated by catastrophic accidental explosions that occurred in October 2009 at the Debtors' facilities located in Bayamón, Puerto Rico (the "**Explosions**") that effectively halted the Debtors' operations. Prior to the Explosions, the Debtors' businesses were focused on the import, offloading, storage, and distribution of petroleum products in Puerto Rico. Although legally separate entities, the Debtors' operations were integrated and interdependent. Specifically, CPC purchased and imported petroleum products, CPR offloaded and stored CPC's and third party petroleum products, and CPC distributed such petroleum products to retailers located in Puerto Rico.

     CPC was a leading distributor of gasoline and other petroleum products through a network of retail service stations located throughout Puerto Rico (the "**Service Stations**"). CPC's network consisted of 116 Service Stations located on real property owned by CPC, and 68 Service Stations located on property that CPC leased from third parties. CPC entered into franchise arrangements (the "**Franchise Agreements**") with independent operators of each Service Station (collectively, the "**Dealers**"), pursuant to which the respective franchisee would operate the Service Station and purchase petroleum products from CPC. Prior to the Explosions, CPC's distribution operations accounted for approximately 13% of the retail gasoline and diesel market in Puerto Rico.

     As part of the integrated businesses, CPR owned certain facilities used in connection with the offloading and storage of petroleum products, including those products sold by CPC. Specifically, CPR owned the only privately-owned deepwater dock in San Juan Harbor (the "**Dock**"), and used the Dock to load and unload a variety of petroleum products. CPR also owned six carbon steel pipelines of various diameters each totaling approximately 13,000 feet in length (the "**Pipelines**"), directly connecting CPR's Dock to CPR's tank farm (the "**Tank Farm**"), the Cataño Oil Dock (a nearby 32 foot draft dock owned by the Puerto Rico Government, jointly leased by Total Gas and Power, Texaco, and Puma Energy), and to Puerto Rico Electric Power Authority's ("**PREPA**") San Juan and Palo Seco power generating plants. The Pipelines were also capable of servicing the San Juan airport. Prior to the Explosions, approximately 71% of the jet fuel consumed at the airport was stored in CPR's Tank Farm and supplied to the airport via CPR's Pipelines. Prior to the Explosions, the Tank Farm consisted of 48 multi-purpose tanks with a storage capacity of 2.8 million barrels, capable of storing an array of petroleum products such as fuel oil, crude oil, gasoline, jet fuel, and liquefied petroleum gas.

     CPR also owned a sour crude cracking refinery (the "**Refinery**", and together with the Tank Farm and surrounding property, the "**Terminal**") that when operational, was capable of producing gasoline, diesel, jet fuel, LPG, fuel oil and asphalt. The refinery was idled in 2000 and has not been restarted.

2. *Corporate History and Governance*

CPC was formed in 1987 through the merger of Caribbean Gulf Refining Corporation, Gulf Petroleum S.A., and Compania Petrolera Chevron, Inc. The Debtors are part of a privately-held corporate structure and are indirect subsidiaries of the GTRIMG Foundation Vaduz, a trust organized under the laws of Lichtenstein (the "**Trust**"), the beneficiaries of which are the wife and children of Mr. Gad Zeevi, the Debtors' President and Chairman of the Debtors' respective Boards of Directors. Three British Virgin Island entities reside between the Trust and the Debtors, including GTRIMG LTD, First Oil International, Ltd. ("**FOI**") and Oil Resources International ("**ORI**"). ORI owns direct 100% interests in CPC and GPC, respectively.

CPC is a Delaware corporation and the only limited partner of CPR, owning 99% of the partnership interests of CPR. GPC is a Delaware corporation and is the general partner of CPR, owning 1% of the partnership interests of CPR.[3] CPR is a general partnership formed under the laws of Delaware. CPC and GPC each have their own Board of Directors.[4]

3. *2001 Chapter 11 Cases*

On December 17, 2001, predecessors in interest to the Debtors, including CPC, CPR, Caribbean Petroleum L.P., Caribbean Oil L.P. and Gulf Petroleum Corporation, commenced voluntary chapter 11 cases before the Bankruptcy Court (the "**2001 Bankruptcy Cases**"). The 2001 Bankruptcy Cases were precipitated by a dispute among the company and its primary prepetition lender at the time, and declining margins in the petroleum industry due to various factors, including an increase in commodity petroleum prices. On March 13, 2003, the Bankruptcy Court confirmed a plan of reorganization in the 2001 Bankruptcy Cases proposed by the debtors therein (the "**2001 Plan**"). On March 24, 2003, the 2001 Plan became effective (the "**2001 Plan Effective Date**"). Pursuant to the 2001 Plan, on the 2001 Plan Effective Date, Caribbean Petroleum L.P., Caribbean Oil L.P. and Gulf Petroleum Corporation were merged with and into CPC, with CPC being the surviving corporate entity. As described below, the 2001 Plan also provided for court-approved settlement arrangements related to certain claims, which were still in effect as of the Commencement Date.

The 2001 Bankruptcy Cases have been substantially consummated, but remain open. See In re Caribbean Petroleum LP, et al., Case Nos. 01-11657 (KG) through 01-11661 (KG) (Bankr. D. Del. Dec. 17, 2001).

4. *Employees*

As of the Commencement Date, the Debtors employed approximately 46 employees in Puerto Rico. The workforce was composed of administrative and managerial staff, marketing and sales representatives, executives, shift managers and union workers. As of the Commencement Date, approximately 11 of the Debtors' hourly employees were members of the Union of Industrial Petroleum Workers (the "**Union Employees**"), which had a collective bargaining agreement with CPR through October 25, 2010 (the "**CBA**"). On October 25, 2010, pursuant to its terms, the CBA automatically renewed for another year. The Union Employees work at CPR's dock discharging vessels, and at CPR's water treatment plant and refinery conducting various clean-up and maintenance activities. Since the Commencement Date, two Union Employees have retired.

On and about January 14, 2011, the Debtors conducted a necessary workforce reduction and terminated the employment of 7 employees. In addition, in light of the ongoing wind-down of the Estates, effective as of February 1, 2011, the Debtors' Chief Executive Office resigned, and his responsibilities have been assumed by certain of the Debtors' officers.

---

[3] Aside from performing its duties as the general partner of CPR and its ownership of a 1% partnership interest in CPR, GPC has no other operations or assets.

[4] As of the Commencement Date, the members of CPC's Board of Directors included Gad Zeevi, Ram Zeevi, Eduardo del Valle, Haim Bergstein and Avi Finkelman. Avi Finkelman resigned from CPC's Board of Directors on November 1, 2010. As of the Commencement Date, the members of GPC's Board of Directors included Gad Zeevi, Ram Zeevi, Eduardo del Valle and Haim Bergstein.

**B.**     **The Debtors' Prepetition Financing Arrangements**

1.     *BPPR Financing*

a.     BPPR Credit Facility

As exit financing in connection with the 2001 Plan, CPC and CPR entered into that certain Loan and Security Agreement, dated as of March 22, 2003, as amended from time to time, by and between CPC and CPR, as borrowers, GPC and ORI, as guarantors, Gad Zeevi and Talia Zeevi, as personal guarantors, and BPPR (as successor to Westernbank Puerto Rico ("**Westernbank**")), as lender (the "**BPPR Credit Facility**").  The BPPR Credit Facility is comprised of (i) an $18 million revolving credit facility, of which approximately $1.74 million was outstanding as of July 30, 2010, and (ii) seven term loans with an aggregate outstanding principal balance of approximately $137 million as of the Commencement Date.

To secure their obligations under the BPPR Credit Facility, pursuant to certain collateral documents executed in connection therewith, CPC and CPR granted BPPR (i) second priority liens and mortgages on the Dock and the Pipelines, and (ii) first priority liens and mortgages on substantially all of CPC's and CPR's other real and personal property (collectively, the "**BPPR Collateral**").

On April 30, 2010, the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico closed Westernbank, and appointed the Federal Deposit Insurance Corporation ("**FDIC**") as receiver.  The FDIC subsequently entered into a Purchase and Assumption Agreement (the "**Purchase and Assumption Agreement**") with BPPR, dated as of April 30, 2010, pursuant to which BPPR assumed certain of Westernbank's deposits and liabilities and purchased certain of Westernbank's assets, including the BPPR Credit Facility.

Pursuant to the Purchase and Assumption Agreement, BPPR purchased certain Shared-Loss Assets (as defined in the Purchase and Assumption Agreement), and accordingly, the FDIC and BPPR also entered into that certain Commercial Shared Loss Agreement, attached as Exhibit 4.15B to the Purchase and Assumption Agreement (the "**Loss Sharing Agreement**").  Pursuant to the Loss Sharing Agreement, under certain circumstances and pursuant to certain conditions, the FDIC guarantees certain losses that may be incurred by BPPR in connection with its purchase and assumption of the BPPR Credit Facility.

b.     BPPR Funding Agreement

Pursuant to the BPPR Credit Facility, BPPR holds a first priority lien on certain of the Debtors' insurance policies.  Prior to the Commencement Date, the Debtors received $30 million from their Chartis Property Policy (the "**Chartis Property Proceeds**") and $4.75 million from their Navigators Marine Terminal Policy (the "**Navigators Proceeds**), as defined and set forth in more detail in Section III.E below, as a result of the damage caused by the Explosions.  These proceeds constituted collateral of BPPR, and therefore were deposited directly with BPPR.  The Chartis Property Proceeds were distributed in three installments, in late 2009 and early 2010.  Due to the Debtors' liquidity constraints at that time, BPPR agreed to allow the Debtors to access some of the Chartis Property Proceeds to continue limited operations and satisfy certain obligations.  In order for the Debtors to access the Chartis Property Proceeds, the Debtors were required to provide BPPR with individualized funding requests before BPPR would transfer any proceeds into the Debtors' operating accounts.  With the consent of BPPR, the Debtors used a majority of the Chartis Property Proceeds, for, among other things, debt service, operating expenses, vendor obligations, employee wages and benefits, taxes, tank rehabilitation, and professional fees.

On or about July 9, 2010, the Debtors received the Navigators Proceeds, and these proceeds were deposited directly with BPPR.  At that time, given their liquidity constraints, the Debtors lacked funds to make even basic payments such as payroll, and BPPR agreed to allow the Debtors to access the Navigators Proceeds.  In connection with the use of these proceeds, on July 27, 2010, the Debtors executed a funding letter (the "**BPPR Funding Letter**") regarding the use of any insurance proceeds received by BPPR.  The BPPR Funding Letter provided for, among other things, (i) the Debtors' acknowledgment of the validity of BPPR's liens and claims arising under the BPPR Credit Facility; (ii) the Debtors' acknowledgment that the Chartis Property Proceeds previously received in connection with the October 2009 explosions, and deposited with BPPR, constitute, from the

perspective of the Debtors, the sole property of BPPR pursuant to the BPPR Credit Facility; (iii) the Debtors' acknowledgment that they do not hold any claims against BPPR based upon BPPR's prior distribution of insurance proceeds to the Debtors, as well as any subsequent distributions, in accordance with the Debtors' instructions; and (iv) the Debtors' acknowledgment that they were executing the BPPR Funding Letter upon the Debtors' understanding that BPPR had agreed to fund the Debtors' essential operational needs, and professional fees, through July 30, 2010.

Pursuant to the BPPR Funding Agreement, the Debtors used the Navigators Proceeds to fund, among other things, insurance premium payments in the aggregate amount of $3.5 million, which payments were necessary to obtain insurance coverage for the Debtors' assets and preserve the value of the Estates, and to pay professional fees in connection with the preparation of the Chapter 11 Cases and certain wage obligations.

2.      *FirstBank Credit Facility*

CPR is party to a Loan Agreement, dated as of December 2, 1998 (as amended from time to time, the "**FirstBank Credit Facility**"), by and between CPR, as borrower, and FirstBank Puerto Rico ("**FirstBank**"), as lender. Pursuant to the 2001 Plan and on the 2001 Plan Effective Date, the FirstBank Credit Facility was amended, and the balance of the FirstBank Credit Facility was fixed at approximately $16.7 million. The FirstBank Credit Facility presently consists of a term loan that matures on February 1, 2013, and which had an aggregate outstanding principal balance of approximately $11.58 million as of the Commencement Date.

Pursuant to certain collateral documents executed in connection with the FirstBank Credit Facility, the FirstBank Credit Facility is secured by a security interest in, and a first priority mortgage on, the Dock and the Pipelines. On the 2001 Plan Effective Date, FirstBank and BPPR entered into an Intercreditor Agreement, dated as of March 24, 2003 (the "**Intercreditor Agreement**"), to confirm and acknowledge the relative priorities of such parties' respective interests in certain of the Debtors' assets. Pursuant to the terms of the Intercreditor Agreement, among other things, FirstBank's interest in the Dock and the Pipelines is senior to BPPR's interest in such assets, to the extent of the debt owed by CPR to FirstBank under the FirstBank Credit Facility.

3.      *Lexel Loan Agreement and Funding Agreement*

Prior to the Commencement Date, and with the consent of Westernbank, CPC and CPR entered into that certain Loan Agreement, dated as of March 13, 2007, as amended from time to time (the "**Lexel Loan Agreement**") with Lexel Establishment ("**Lexel**"), a Lichtenstein entity affiliated with the Debtors. Pursuant to the Lexel Loan Agreement, Lexel provided various secured and unsecured loans to CPC and CPR to finance the construction of a large tank capable of holding up to 500,000 barrels of gasoline, and another tank for diesel. As of the Commencement Date, CPC and CPR collectively owed approximately $11.2 million to Lexel on account of the Lexel Loan Agreement. Certain of the advances provided pursuant to the Lexel Loan Agreement are secured by subordinated mortgages on certain of CPR's property.

In addition to the foregoing, on March 21, 2008 and April 29, 2008, Lexel extended two loans to CPC in the amount of $1 million each (the "**Lexel Loans**"), and CPC issued Lexel two subordinated promissory notes in the sum of $1 million each. On June 12, 2008, CPC and Westernbank entered into a letter agreement whereby Westernbank agreed that the Lexel Loans would be paid with the sale proceeds from the sale of certain Service Stations. These Service Stations were never sold, and as of the Commencement Date, approximately $2.06 million, including principal and interest, remained outstanding pursuant to the Lexel Loans.

Further, pursuant to a Funding Agreement, dated as of June 6, 2008 (the "**Lexel Funding Agreement**"), by and between CPC and Lexel Ltd., and approved by Westernbank pursuant to a letter agreement with CPC, CPR and Lexel Ltd. dated June 6, 2008 (the "**Funding Intercreditor Agreement**"), Lexel Ltd. agreed to fund CPC's purchase of petroleum for resale to unbranded retailers (a new line of business for CPC). Lexel was to receive a percentage of the proceeds from the sale of such products. Pursuant to the Funding Intercreditor Agreement, CPC opened a stand-alone bank account at Westernbank into which Lexel Ltd. deposited approximately $2.75 million for use by the Debtors in accordance with the Lexel Funding Agreement, and upon which Lexel Ltd. had a first lien. As of the Commencement Date, approximately $6.25 million, including principal, interest and unpaid margins, remained outstanding pursuant to the Lexel Funding Agreement.

### C.    Other Significant Prepetition Debt

#### 1.    *Hacienda*

In the 2001 Bankruptcy Cases, the Debtors and the Department of Treasury for the Commonwealth of Puerto Rico ("**Hacienda**") entered into a Payment Compromise Agreement, dated as of March 10, 2003 (the "**Hacienda Settlement**"), to settle a contested proof of claim filed by Hacienda. Pursuant to the Hacienda Settlement, among other things, the Debtors agreed to remit certain periodic cash payments to Hacienda, in the aggregate amount of $32,000,000. To secure the Debtors' obligations under the Hacienda Settlement, Hacienda was entitled to record mortgages on the real property against which it had filed valid tax liens as of the commencement of the 2001 Bankruptcy Cases, subordinate to the security interests in such assets held by FirstBank and BPPR, respectively. The Debtors' obligations to Hacienda are partially guaranteed by certain non-Debtors. As of the Commencement Date, the Debtors owe Hacienda approximately $13.5 million pursuant to the Hacienda Settlement, excluding interest. The Debtors believe that since the 2001 Plan Effective Date in 2003, they have not accrued any other liability owed to Hacienda.

#### 2.    *Inpecos*

Prior to the commencement of the 2001 Bankruptcy Cases, Inpecos, A.G. ("**Inpecos**"), a Swiss company and affiliate of the Debtors, routinely procured letters of credit from certain banks, including Credit Suisse First Boston ("**Credit Suisse**"), to finance purchases of petroleum products by the Debtors' predecessors in interest. During the 2001 Bankruptcy Cases, Inpecos filed a proof of claim against then-CPC in the aggregate amount of $95.6 million, including a secured claim in the amount of $20 million. The 2001 Plan provided for the distribution to Inpecos of (i) 3,000 shares of convertible preferred stock in CPC, (ii) a 30% limited partnership interest in CPR, and (iii) on account of Inpecos' allowed secured claim against CPC, deferred cash payments in an amount equal to $15 million, payable directly to Credit Suisse, as secured creditor of Inpecos.

Pursuant to a subsequent agreement between CPC and Inpecos, dated March 24, 2003 (the "**Inpecos Agreement**"), in lieu of issuing (i) the 3,000 shares of convertible preferred stock in CPC and (ii) the 30% limited partnership interest in CPR, CPC agreed to provide Inpecos with 3% Subordinated Certificated Notes (the "**Notes**") in the aggregate amount of $80.6 million. Specifically, pursuant to the Inpecos Agreement, CPC issued Inpecos the Notes in three series: (a) $26,866,666.66 of Notes due 2018, (b) $26,866,666.66 of Notes due 2023, and (c) $26,866,666.66 of Notes due 2028. Since October 2006, CPC has not made any payment to Inpecos under the Notes.

### D.    The Explosions

On and about October 23, 2009, the Explosions and ensuing fires engulfed various of the Debtors' facilities, including significant portions of the Tank Farm. The concussive effect of the Explosions measured 2.8 on the Richter scale, and the resulting pressure wave rippled through San Juan and surrounding areas. The cause of the Explosions is still under investigation.

The Explosions damaged or destroyed a significant number of the Debtors' storage tanks located at the Tank Farm, surrounding infrastructure, and portions of the Pipelines. Due to the Explosions, approximately 20 out of 48 multipurpose tanks were destroyed, resulting in a reduction of approximately 50% of the Tank Farm storage capacity, as well as a considerable amount of the Debtors' petroleum products stored therein. This loss of product and Tank Farm storage capacity severely impacted both CPR's and CPC's operations.

Following the Explosions, the Debtors initially hired contractors and worked with the National Response Corporation (the "**NRC**") to conduct emergency response and clean-up at the impacted areas. However, the magnitude of the clean-up and repair, and the Debtors' lack of capital, made it difficult for the Debtors to complete these efforts. Accordingly, the United States Environmental Protection Agency (the "**EPA**") took over the clean-up efforts in February 2010. For more detail regarding the environmental impact of the Explosions and resulting clean-up, please see Section III.F.4 below.

In an effort to restore partial operations, shortly after the Explosions, the Debtors repaired certain pipeline systems within the Tank Farm on an emergency basis so that they could continue terminal services for PREPA. In late November 2009 and April 2010, CPR requested authorization from the EPA to resume partial operations of certain terminal services. In May 2010, the EPA denied CPR's request to resume partial terminal operations, pending a complete inspection of all surviving tanks. The EPA has ordered that all tanks be emptied so that the EPA may complete its inspections. However, as the Debtors have lacked the liquidity needed to repair the pipeline systems within the Tank Farm and remove remaining product from certain standing storage tanks, the timeframe for the completion of the EPA's inspections is unclear. Additionally, because the surviving storage tanks located at the Tank Farm could not be used for storage, CPR was unable to store new product from PREPA (or other sources) and realize the revenue streams associated therewith.

CPR's inability to store product in or remove product from its Tank Farm impacted CPC's ability to provide product to its Service Stations. Accordingly, shortly after the Explosions, CPC used its remaining working capital and $2 million of funding of the BPPR Credit Facility to purchase gasoline from four different suppliers in Puerto Rico to deliver to the Service Stations. However, the Debtors exhausted their working capital by early 2010, and since that time, CPC has lacked sufficient capital to purchase the gasoline necessary to supply its Dealer network and other customers. In an effort to begin to restore its supply relationships with the Dealers, on June 15, 2010, CPC entered into a short-term agreement with a competitor, Peerless Oil & Chemical ("**Peerless**"). Pursuant to this arrangement, Peerless supplied petroleum products to the Dealers and paid CPC a commission that equals the differential between the agreed purchase price between CPC and Peerless, and the price charged by CPC to the Dealers. To date, this arrangement has generated minimal revenue for the Debtors.

Immediately following the Explosions, CPR continued to use the Dock and the undamaged portion of the Pipelines to unload and store fuel oil delivered by PREPA vessels and deliver such products to PREPA upon request. However, in order to use the Dock, the Debtors are required by the United States Coast Guard ("**USCG**") to have an Oil Spill Removal Organization ("**OSRO**") onsite during the discharge of any vessel. On or about July 19, 2010, the Debtors' OSRO terminated its contract with the Debtors due to amounts allegedly due thereunder. Without the services of the OSRO, the Debtors stopped providing any discharge services to PREPA. In October 2010, the Debtors signed a contract for a new OSRO and had the ability to again discharge vessels at the Dock.

Despite the steps taken by the Debtors to restore operations, the devastating impact of the Explosions on the Debtors' property and the necessary clean-up and repair drained the Debtors' capital before they could become fully operational again, resulting in a liquidity crisis that precipitated the filing of these Chapter 11 Cases.

E.       **Insurance**

The Debtors are covered under six different insurance polices for damages and liabilities related to the Explosions: (i) Chartis Primary General Liability, (ii) Chartis Umbrella Liability, (iii) Chartis Property All Risk, (iv) ACE Premises Pollution Liability, (v) Navigators Marine Terminal Operations Liability, and (vi) Liberty Storage Tank Third Party Liability Corrective Action and Clean-Up Policy. The Debtors believe that they have submitted timely claims related to the Explosions under each of the aforementioned policies. A description of the nature and the amount of coverage that the Debtors understand remains available under each policy is provided below. While the below description is included to provide information regarding the Debtors' understanding of their insurance policies, the Debtors are not making any admissions or representations as to the actual claims or coverage available under such insurance policies.

1.       *Chartis Primary General Liability*

Chartis Insurance Company ("**Chartis**") provides the Debtors' primary general liability insurance policy (the "**Chartis General Liability Policy**"). This policy may cover claims for property damage, bodily injury, marine liability and environmental pollution. The Chartis General Liability Policy has a $2 million general aggregate limit, a $1 million limit per occurrence for bodily injury, medical expenses, and property damage, and a $1 million limit for products-completed operations hazard. As of the Commencement Date, $1 million has been paid from the Chartis General Liability Policy to cover third party claims. The Debtors understand that it is

Chartis' position that there are no additional amounts available under the Chartis General Liability Policy, however, the Debtors contend that the Explosions constituted multiple occurrences and additional amounts may be recovered under the Chartis General Liability Policy.

2.      *Chartis Umbrella Liability*

Chartis provides the Debtors' umbrella liability policy (the "**Umbrella Insurance Policy**").  This policy may cover claims for property damage, bodily injury, marine liability and environmental pollution.  The Umbrella Insurance Policy has a $25 million limit per occurrence, and a $25 million aggregate limit for each annual period.  As of the Commencement Date, approximately $1 million has been paid from the Umbrella Insurance Policy to cover third party claims.  The Debtors believe that approximately $24 million remains available under this policy.

3.      *Chartis Property All Risk*

Chartis provides the Debtors' property all risk insurance (the "**Chartis Property Policy**").  This policy covers claims for property damage to the Terminal, the Pipelines, the Dock, loading racks, inventory, idled assets (including the Refinery), and business interruption, but excludes damage to the (i) Service Stations and (ii) PREPA's fuel.  The Chartis Property Policy has a $30 million maximum limit for indemnity for any one occurrence, and a $250,000 limit for each and every occurrence, in the aggregate in any one policy year, for pollutant clean-up and removal.  Prior to the Commencement Date, the Debtors received $30 million from this policy, which amount constitutes the coverage limit for one occurrence under this policy.

On July 7, 2010, CPC submitted an additional proof of loss claim under the Chartis Property Policy in connection with the Explosions.  Chartis subsequently filed a Complaint for Declaratory Judgment on July 8, 2010 in the Superior Court of the State of Delaware, New Castle County, alleging that the proof of loss includes claims that are not covered by the Chartis Property Policy.  The Debtors have not yet responded to this complaint, and as of the Commencement Date, this litigation has been stayed.  The Debtors contend that the Explosions constituted multiple occurrences and additional amounts may be recovered under the Chartis Property Policy.

4.      *ACE Premises Pollution Liability*

ACE provides the Debtors' premises pollution liability policy (the "**ACE Pollution Policy**").  This policy covers bodily injury, property damage, remediation costs and legal defense expenses arising out of a new or pre-existing pollution condition (*e.g.*, discharge of any contaminant or pollutant) at the Debtors' covered Pipelines.  The ACE Pollution Policy has a $3 million limit per pollution condition, and a $3 million general aggregate limit.  ACE denied the claim filed by the Debtors, and as of the Commencement Date, the Debtors have collected no proceeds from the ACE Pollution Policy, and $3 million remains available under this policy.

5.      *Navigators Marine Terminal Operations Liability*

Navigators provides the Debtors' marine terminal operations liability policy (the "**Navigators Marine Terminal Policy**").  This policy covers the Debtors' marine terminal operator, including loss, damage, injury or expense to any vessel, equipment or person while the vessel is docking, undocking or in the insured's custody, plus legal fees and expenses related to claims resolution.  This policy also covers marine products, including indemnification for bodily injury or property damage caused by the insured's marine products (*e.g.*, bunker fuel, lubricants, oils and other materials necessary to operate a ship or vessel), and charterer liability, including loss, damage or expense liability incurred while insured is acting as charterer to any vessel insured under the policy, plus legal fees and expenses related to claims resolution.  The Navigators Marine Terminal Policy has a $5 million limit for any one accident or occurrence, inclusive of legal fees, a $5 million aggregate limit for Products/Completed Operations (as defined in the Navigators Marine Terminal Policy), and $5 million for each vessel, subject to certain limitations and including legal expenses, arising out of any one loss, accident or occurrence.

Prior to the Commencement Date, the Debtors received $4.75 million from the Navigators Marine Terminal Policy, which amount constitutes the coverage limit for one occurrence under the policy.  On June 22, 2010, CPC, CPR and Navigators executed a Partial Settlement and Release Agreement whereby CPC and CPR

agreed, in consideration for the $4.75 million payment, to release Navigators from any and all claims that CPC and CPR may have against Navigators in connection with the one occurrence asserted on the Debtors' claim filed against Navigators. CPC and CPR, however, did not release Navigators from any claims for multiple occurrences or any other occurrence covered under the Navigators Marine Terminal Policy. The Debtors contend that the Explosions constituted multiple occurrences and additional amounts may be recovered under the Navigators Marine Terminal Policy.

> 6. *Liberty Storage Tank Third Party Liability Corrective Action and Clean-Up Policy*

Liberty Mutual Insurance Company ("**Liberty**") provides the Debtors' storage tank third party liability corrective action and clean-up insurance policy (the "**Liberty Storage Tank Policy**"). This policy covers bodily injury and property damage as a result of a spill or discharge of a pollutant from an aboveground or underground storage tank into the ground water, surface water or soil, plus reasonable and necessary costs arising under federal and state storage tank regulations as a result of the spill or discharge. The Liberty Storage Tank Policy has a $2 million limit per incident, a $4 million general aggregate limit, and a $1 million aggregate claims expense limit. As of the Commencement Date, the Debtors have collected no proceeds from the Liberty Storage Tank Policy, and $5 million remains available under this policy.

### F. Pending Litigation and Other Legal Matters

> 1. *Litigation Related to the Explosions*

The Debtors are facing significant tort litigation on account of alleged property damage and personal injuries purportedly arising from the Explosions. As of the Commencement Date, the aggregate amount of tort-related claims asserted against the Debtors, calculated based upon the damages sought by the plaintiffs in the tort litigation, exceeds $455 million.

> a. Federal Court Cases

As of the Commencement Date, nine cases[5] stemming from the Explosions were filed with the United States District Court for the District of Puerto Rico, five of which were filed as purported class actions. All nine of the federal cases were consolidated before the Honorable Francisco A. Besosa. Cruz-Aponte, et al. v. Caribbean Petroleum Corp., et al., Civil No. 09-2092 (FAB). In total, the consolidated cases have named thirty-two defendants, including CPC, CPR and five allegedly related persons and entities, the Debtors' insurance companies and companies who allegedly had fuel product stored at the Tank Farm. The first action was filed as a purported class action on the same day as the Explosions, October 23, 2009, and four other purported class actions were filed at later dates. No class of plaintiffs has been certified in any of the federal cases. Collectively, these lawsuits have 1,145 plaintiffs, all of whom reside near San Juan, Puerto Rico and allege that they have suffered damages and losses from the Explosions. The plaintiffs are claiming, among other things, the following damages: (i) pain and suffering, mental anguish, emotional distress and psychiatric and psychological damages and (ii) losses from their inability to use and enjoy their homes, buildings, property and businesses.

On March 30, 2010, CPC and CPR filed a motion to dismiss for lack of jurisdiction and for stay under the *Colorado River* abstention doctrine. The plaintiffs filed an objection to this motion, and CPC and CPR subsequently filed a reply to the objection. The court has yet to rule on this issue. The parties have also not yet conducted discovery in these cases, as they are awaiting a decision regarding the motion to dismiss before proceeding.

Upon the commencement of the Chapter 11 Cases, the federal cases were stayed pursuant to section 362 of the Bankruptcy Code as to the Debtors, and shortly thereafter, Judge Besosa issued an order

---

[5] On, January 14, 2010, Heriberto García Parra's pro se complaint was dismissed, and his appeal was also dismissed by the First Circuit. Accordingly, there are currently eight pending cases.

requesting that the parties inform the Court whether the proceedings should proceed against the other named defendants. Several plaintiffs and various defendants filed responsive pleadings in compliance with the Court's request. After reviewing these responsive papers, on October 25, 2010, Judge Besosa issued an order staying the consolidated cases against all defendants, including the Debtors' insurance companies.

<p style="text-align:center"><strong>b.    <u>State Court Cases</u></strong></p>

Starting on November 5, 2009, seventeen cases, including one purported class action, have been filed with the Court of First Instance, Superior Part of Bayamón. These lawsuits seek recovery of alleged damages arising from the Explosions, including (i) emotional damage and bodily injury due to the blasts and resulting vapor, fumes and smoke, and (ii) property damages, business interruption and loss of property as a result of the blast. These cases were at various stages when, on January 25, 2010, the Debtors filed a motion to consolidate these cases and to certify the cases under the Puerto Rico Rules of Complex Litigation, P.R. Laws Annot. Tit. 4 Appendix XXVII (the "**Rules of Complex Litigation**"). On March 17, 2010, the Chief Judge of the Superior Court of Bayamón granted this motion. Accordingly, under the Rules of Complex Litigation, the Chief Justice of the Puerto Rico Supreme Court will assign the consolidated cases to a special judge. As of the Commencement Date, a special judge had not yet been assigned, and these cases were stayed upon the filing of the Chapter 11 Cases pursuant to section 362 of the Bankruptcy Code. Accordingly, on August 20, 2010, the Chief Justice entered an order holding in abeyance the assignment of the special judge.

<p style="text-align:center"><strong>2.    <em><u>Santa Paula Litigation</u></em></strong></p>

Santa Paula Oil Corporation ("**SPOC**") operated eight Service Stations in Puerto Rico pursuant to seven Franchise Agreements with CPC, and one supply agreement with CPC. Pursuant to these agreements, SPOC operated seven Service Stations owned by CPC and one Service Station owned by SPOC, purchased petroleum product for each Service Station, and also purchased product for its owned service station. During confirmation of the 2001 Bankruptcy Cases, SPOC and CPC entered into a letter agreement whereby CPC allegedly agreed to assume the Franchise Agreements and the supply agreement with SPOC and SPOC allegedly agreed to amended terms of such agreements. After the 2001 Plan Effective Date, a dispute arose between SPOC and CPC as to the terms of the letter agreement. SPOC alleged that CPC agreed to assume the Franchise Agreements and the supply agreement and amend the terms of such agreements. Accordingly, SPOC paid for product at the rate allegedly set forth in the letter agreement. CPC argued that the letter agreement was not binding, but rather was an agreement to agree to amended terms of the Franchise Agreements and the supply agreement. Because the parties could not agree to amended terms of the agreements, CPC alleges that there was no agreement to assume the Franchise Agreements and the supply agreement, and no agreement to the modified terms of such agreements.

To that end, SPOC filed a civil case against CPC on November 17, 2004 in the Court of First Instance in Puerto Rico for breach of contract with respect to the terms of the letter agreement (the "**SPOC Complaint**"). <u>See</u> <u>Santa Paula Oil Corp. v. Caribbean Petroleum Corp.</u>, Civil No. D AC2004-3862 (703) (the "**SPOC Litigation**"). CPC filed a counterclaim (the "**CPC Counterclaim**") on April 11, 2005 and filed notices of eviction on April 15-19, 2005 demanding that SPOC abandon the seven Service Stations owned by CPC for failure to pay the appropriate rate for petroleum product delivered by CPC. A trial was held in the SPOC Litigation on April 26-27, 2010, and at the conclusion of the trial, the Court of First Instance entered a judgment dismissing the SPOC Complaint and granting the CPC Counterclaim and the eviction complaints. Further, the Court ordered CPC to submit a certification of SPOC's debt. On August 9, 2010, CPC certified that, as of August 2010, the amount owed by SPOC to CPC is $18,713,036.85.

On July 10, 2010, SPOC filed an appeal before the Puerto Rico Court of Appeals seeking to vacate the judgment entered in favor of CPC (the "**SPOC Appeal**"). On August 9, 2010, CPC filed its Appellate Brief in Opposition to the SPOC Appeal, and on August 30, 2010, the Puerto Rico Court of Appeals entered a judgment dismissing, without prejudice, the SPOC Appeal and staying the proceedings in the SPOC Appeal in light of the filing of the Chapter 11 Cases. On September 16, 2010, CPC filed a motion for reconsideration with the Puerto Rico Court of Appeals, arguing that the automatic stay pursuant to section 362 of the Bankruptcy Code did not apply to the SPOC Appeal, and that the proceedings should continue. On October 15, 2010, the Court of Appeals denied CPC's motion for reconsideration and, accordingly, all proceedings related to the SPOC Appeal are stayed.

3. *AOT Arbitration*

Prior to the Commencement Date, CPC frequently entered into contracts with AOT Limited ("**AOT**") pursuant to which AOT supplied petroleum products to CPC. Under the terms of a typical contract between AOT and CPC, AOT would deliver petroleum products by vessel to the Dock; CPC would then offload the products, and transport them through the Pipelines to the Tank Farm. However, pursuant to an arrangement between the parties, CPC would not pay AOT for the delivered product until such time as CPC withdrew the product from the applicable tank(s) for its own use. Thus, at any given time, by arrangement between the parties, CPR had AOT-delivered product in its storage tanks for which AOT had yet to be paid.

When the Explosions occurred, a vessel was discharging AOT petroleum products at the Dock, and certain of such products were being transferred through the Pipelines to tanks located at the Tank Farm. The Explosions destroyed the AOT product being discharged from the vessel, and further destroyed several storage tanks containing petroleum products previously delivered by AOT to CPC.

After making demand on CPC for payment with respect to the product destroyed in the Explosions, AOT instituted arbitration proceedings before the Society of Maritime Arbitrators, Inc. of New York City (the "**Arbitration Panel**") seeking to recover such payment from CPC. On July 20, 2010, the Arbitration Panel awarded AOT a final award of $63.6 million (the "**AOT Award**") for the destruction of the AOT product, demurrage, certain expenses and attorney fees. On August 10, 2010, AOT commenced an action in the United States District Court for the Southern District of New York, seeking a judgment confirming the AOT Award. As of the Commencement Date, this action has been stayed.

4. *Environmental*

a. Pre-Explosion Environmental Issues

Prior to the Explosions, the EPA and the Puerto Rico Environmental Quality Board (the "**EQB**") issued various orders to the Debtors with respect to environmental risks and alleged noncompliance at the Debtors' Terminal and Service Stations. The Debtors' Terminal is subject to an Administrative Order on Consent (Docket No. II RCRA-95-3008(h)-0303) ("**AOC**") issued by the EPA in 1995 under the Resource Conservation and Recovery Act ("**RCRA**"), which requires CPC, *inter alia*, to: (i) conduct investigations and develop remediation work plans for the Terminal site, (ii) submit reports to the EPA pursuant to RCRA, (iii) assess potential releases into waterways, (iv) remove contaminated soil, (v) continue operation of a subsurface well system to recover petroleum product contamination, and (vi) continue operation of the groundwater monitoring well system at the Terminal site. Prior to the Explosions, the Debtors had made significant progress on the investigation and remediation activities required by the AOC. The investigation and remediation required under the AOC, however, was significantly disrupted by the Explosions. In light of the Explosions, these efforts are anticipated to be reassessed by the EPA and Puma, which parties are negotiating an agreement addressing environmental investigation and remediation activities to be undertaken at the Terminal site and the Service Stations (the "**EPA-Puma Agreement**") after Puma assumes ownership of the Debtors' assets following the closing of the 363 Sale.

On March 3, 1999, the EQB issued an administrative order to CPC requiring compliance with the Underground Injection Control ("**UIC**") program for certain septic systems at rural Service Stations not connected to state and municipal sewer systems. Pursuant to the order, CPC was ordered to immediately apply for operation permits for the underground injection installations at 46 Service Stations or immediately discontinue use of such Service Stations, and the EQB also threatened to impose a fine for noncompliance with UIC regulations. In 2003, the EQB initiated an administrative proceeding against CPC to enforce the order, alleging that CPC had not complied with its requests. In May 2003, the EQB and CPC entered into a stipulation to resolve the administrative proceeding and establish a plan to bring the Service Stations into compliance with UIC regulations.

Further, in December 2008, based on an inspection of 60 Service Stations owned or leased by CPC, the EPA issued a Notice of Violation ("**NOV**") and information request to CPC regarding alleged violations of the Solid Waste Disposal Act related to the management of underground storage tanks ("**USTs**") at several Service Stations. The alleged violations cited included, among others: (i) failure to provide adequate spill and overflow protection, (ii) failure to notify EPA of regulatory compliance of certain USTs, (iii) improper performance of repairs

designed to prevent corrosion and leakage from USTs, and (iv) failure of certain facilities to report releases to EPA. CPC complied with the information request by submitting information about the Service Stations to EPA on March 13, 2009. In December 2009, the EPA issued another information request to CPC pursuant to RCRA related to 64 Service Stations, many of which were inspected and subject to the NOV and the first information request. The Debtors and Puma are in ongoing discussions with EPA regarding compliance issues at the Service Stations, and such issues are expected to be addressed in the EPA-Puma Agreement.

  b.  Post-Explosion Environmental Issues

    On the date of the Explosions, the EPA issued a Field Notice of Federal Intent ("**FNFI**") to CPR, informing CPR that it was a responsible party for discharge or threat of discharge of oil or petroleum products, that it must immediately address the discharge and that it is financially responsible for certain costs and damages.[6] Immediately following the Explosions, the Debtors hired contractors and worked with the EPA to conduct emergency response and clean-up at the impacted areas. In late November 2009, the Debtors began negotiations with the EPA in an effort to reach a consensual plan for the clean-up of CPR's facilities. However, the Debtors could not reach agreement with the EPA, and the EPA issued a Unilateral Administrative Order for Removal Activities, on February 19, 2010 (Docket No. CWA-02-2101-3801) (the "**UAO**"), that directed CPR to commence clean-up and removal actions necessitated by the Explosions with respect to CPR's facilities. CPR was unable to complete such efforts, and accordingly, the EPA assumed responsibility for the remediation of CPR's facilities. The USCG sought reimbursement from CPR for oversight and clean-up expenses prior to the Commencement Date, and approximately $2.1 million in invoices remain outstanding as of the Commencement Date.

    On June 30, 2010, the EQB issued an administrative order requesting information from the Debtors with respect to the Explosions. Specifically, the EQB requested information regarding the extent of the environmental damage caused by the Explosions, the Debtors' plan to mitigate this environmental damage and evidence of the financial wherewithal of the Debtors to complete the mitigation. On September 1, 2010, the Debtors provided a written response to the EQB's information request.

    On February 8, 2010, the Puerto Rico Department of Natural and Environmental Resources ("**DRNA**") issued an order alleging that the Explosions caused non-authorized modification of a natural habitat in violation of certain Puerto Rico laws and ordering CPC to mitigate the damage caused to these natural habitats, including the wetlands adjacent to CPC's property. The order required that CPC submit a work plan to perform the necessary work required pursuant to Puerto Rico law, and that DRNA must approve the work plan. CPC answered the order and requested that the order be dismissed because CPC was not the owner and operator of the Terminal. Since the Commencement Date, DRNA has not taken any further action in connection with the order.

    The EPA continues clean-up efforts at CPR's facility relating to the Explosions, and the Debtors assist in clean-up efforts where possible. Currently, the Debtors are focused on removing remaining petroleum product in certain tanks in the Tank Farm with the intent of mitigating any potential threat of product release. The Debtors are also working to remove remaining product from the Pipelines. The EPA's efforts are mainly focused on the demolition of affected tanks in the Tank Farm, soil testing within the footprint or in the immediate vicinity of the dismantled tanks after removal of such tanks and soil excavation, if necessitated by the results of soil testing. The EPA is also conducting limited work under the Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**") to remove product and certain exposed asbestos insulation from the Refinery.

    It is anticipated that the clean-up efforts related to the Explosions will not be completed by the Effective Date. Post-Effective Date clean-up efforts are expected to be undertaken by Puma and/or EPA and will or may include (i) investigation of subsurface soil, surface water and groundwater conditions, (ii) subsequent site remedial actions as necessary depending on the results of the site investigation, including (at a minimum) resumption of the product recovery well system required by the AOC, (iii) continuation of groundwater monitoring required by the AOC, (iv) asbestos removal or other abatement activities at the Refinery, (v) completion of tank

---

[6] FNFIs have also been issued to PREPA and Shell Oil.

clean-up and demolition activities (to the extent not previously completed by EPA), and (vi) potentially, wetlands restoration.

With respect to the Service Stations, it is anticipated that Post-Effective Date activities undertaken by Puma will or may include a comprehensive assessment and compliance program to ensure compliance with applicable RCRA UST regulations, as well as UIC requirements for septic systems.

## IV.    EVENTS DURING THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

On the Commencement Date, CPC, CPR and GPC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. These three Chapter 11 Cases are jointly administered in the Bankruptcy Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### B.    First Day Orders

On August 16, 2010, the Bankruptcy Court approved certain "first day" orders designed to minimize the disruption of the Debtors' businesses and to facilitate the Chapter 11 Cases (certain of the orders were entered on an interim basis at the time and entered as final relief on later dates, as provided below). Specifically, the Bankruptcy Court issued orders authorizing: (i) the joint administration of the Chapter 11 Cases; (ii) the filing of a consolidated list of creditors; (iii) an extension of time for the Debtors to file their schedules of assets and liabilities and statements of financial affairs (the "**First Extension Motion**"); (iv) postpetition financing (the "**Interim DIP Order**") (discussed more fully below) (final order entered September 10, 2010); (v) the continuation of the Debtors' existing bank accounts and operation of their cash management system substantially as they existed prior to the Commencement Date (final order entered September 8, 2010); (vi) the provision of adequate assurance to utility companies and establishment of procedures for determining requests for additional adequate assurance (order entered September 8, 2010); and (vii) payment of certain prepetition obligations related to wages, compensation and employee benefits (final order entered September 8, 2010).

Subsequently, the Bankruptcy Court entered orders that authorized the Debtors to (i) establish procedures for the interim compensation and reimbursement of professionals (order entered September 8, 2010); and (ii) retain certain professionals in the ordinary course of business (order entered October 13, 2010).

### C.    The Debtors' Professionals and Restructuring Officers

Shortly after the Commencement Date, the Debtors sought and obtained authority to retain and employ professionals to assist in the prosecution of the Chapter 11 Cases, including Cadwalader, Wickersham & Taft LLP ("**Cadwalader**") and Richards Layton & Finger, P.A. ("**RLF**") as co-bankruptcy counsel (orders entered September 8, 2010), and McConnell Valdés LLC as special counsel to the Debtors (order entered October 13, 2010). The Debtors also obtained authority to retain Kurtzman Carson Consultants, LLC as the Balloting/Claims Agent (order entered September 8, 2010).

On September 23, 2010, the Bankruptcy Court issued an order approving (i) the Debtors' retention of FTI Consulting, Inc. ("**FTI**"), as crisis managers to the Debtors, to provide certain interim management and restructuring services; and (ii) the designation of Kevin Lavin as Chief Restructuring Officer ("**CRO**"), and Roy Messing as Restructuring Officer, ("**RO**") of the Debtors.

### D.    The Creditors Committee

#### 1.    _Appointment of the Creditors Committee_

On August 26, 2010, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed a five-member statutory committee of unsecured creditors to represent the interests of unsecured creditors

of the Debtors pursuant to section 1102(a)(1) of the Bankruptcy Code (the "**Creditors Committee**").  The persons or entities initially appointed to the Creditors Committee were the following:

| | |
|---|---|
| PDCM Associates, S.E.<br>PO Box 190858<br>San Juan, PR 00919 | Jesus Trilla Case<br>206 Tetuan, Ste. 702<br>San Juan, PR 00901 |
| Anderson Muholland & Associates, Inc.<br>110 Corporate Park Dr., Ste. 202<br>White Plains, NY 10604 | Landron & Vera, LLP<br>Torre I, Ste. 203-204<br>Guaynabo, PR 00968 |
| National Response Corp.<br>3500 Sunrise Highway, Ste. 103<br>Great River, NY 11935 | |

On October 27, 2010, the U.S. Trustee filed a notice that PDCM Associates resigned from the Creditors Committee effective October 19, 2010, and Landron & Vera, LLP resigned from the Creditors Committee effective October 26, 2010.

Since formation of the Creditors Committee, the Debtors have kept the Creditors Committee informed with respect to their operations, the sale process and have consulted with the Creditors Committee concerning the administration of the Chapter 11 Cases.

2.  *Creditors Committee's Professionals*

In connection with the Chapter 11 Cases, the Creditors Committee sought and obtained authority to retain Morrison & Foerster LLP and Pepper Hamilton LLP as its co-legal counsel (orders entered October 13, 2010) and Jefferies & Company, Inc. as its financial advisors (order entered October 25, 2010).

E.  **Motion to Transfer Venue**

Shortly after the Commencement Date, on August 19, 2010, Hacienda filed a motion requesting a transfer of the venue of the Chapter 11 Cases to the United States Bankruptcy Court for the District of Puerto Rico (the "**Venue Motion**").  PREPA subsequently joined the Venue Motion.  The Debtors, joined by the Creditors Committee and FirstBank, filed an opposition to the Venue Motion, arguing, among other things, that (i) BPPR and the Creditors Committee support venue of the Chapter 11 Cases in Delaware, (ii) all of the professionals representing the significant constituents in the Chapter 11 cases are located in New York or Delaware and accordingly, transfer of venue to Puerto Rico would increase, rather than reduce, the costs of administering these cases, (iii) the Chapter 11 Cases are inextricably linked to the Debtors' previous chapter 11 filings in 2001, which were administered and confirmed by the Bankruptcy Court, and (iv) the Chapter 11 Cases are intended to enable the Debtors to pursue and consummate an expeditious and robust 363 Sale, and undue delay caused by a transfer of venue to Puerto Rico would prejudice the sale process and increase costs to the Debtors' Estates.  AOT and Chartis also filed objections to the Venue Motion.  After a lengthy hearing, the Bankruptcy Court found that the Chapter 11 Cases were properly venued in Delaware.  On September 16, 2010, the Bankruptcy Court entered an order denying the Venue Motion, maintaining the Chapter 11 Cases in the Bankruptcy Court.

F.  **Postpetition Financing and Use of Cash Collateral**

Pursuant to an order of the Bankruptcy Court dated September 10, 2010 (the "**Final DIP Order**"), the Bankruptcy Court granted approval for the Debtors to obtain postpetition, debtor in possession financing ("**DIP Financing**") on a final basis from their primary prepetition lender, BPPR, in an aggregate amount not to exceed $10 million.  The DIP Financing consists of a non-revolving, multi-draw credit sub-facility (the "**DIP Facility**") to be made available to the Debtors in accordance with and be governed by the terms of those certain documents comprising the DIP Financing, including the Final DIP Order.  In addition, the Final DIP Order authorized the

Debtors to use cash collateral, subject to the grant of adequate protection to BPPR. The Final DIP Order sets forth certain milestones for the sale of substantially all of the Debtors' assets and for plan confirmation, including (i) filing a proposed plan of liquidation and accompanying disclosure statement by November 19, 2010, (ii) obtaining approval of the disclosure statement by December 22, 2010, and (iii) confirming a plan of liquidation by January 28, 2011. The initial maturity date of the DIP Facility was February 8, 2011, however, BPPR has agreed to extend the maturity date of the DIP Facility, subject to the entry of the order approving the BPPR Settlement. On February 4, 2011 the Debtors filed the Plan, and together with BPPR and the Creditors Committee, intend to expeditiously seek confirmation of the Plan.

During the Chapter 11 Cases, the DIP Facility has been used to fund: (i) the marketing for and effectuation of the 363 Sale, as discussed in Section IV.N below, (ii) the rehabilitation of certain tanks in the Tank Farm and related infrastructure (subject to certain conditions as set forth in the DIP Financing documents), (iii) BPPR's monthly interest, out-of-pocket costs, fees, and expenses related to the DIP Facility, (iv) employee wages and general corporate purposes, (v) payment of professional fees of counsel and financial advisors to the Debtors and the Creditors Committee incurred in connection with the administration and prosecution of the Chapter 11 Cases, (vi) Adequate Protection Payments (as defined in the Final DIP Order), (vii) the adequate assurance deposit for the Debtors' utility providers, as ordered by the Bankruptcy Court; and (viii) payment of quarterly fees to the U.S. Trustee, in each case subject to certain limitations.

## G. Extension Motions

On November 22, 2010, the Bankruptcy Court entered an order extending the time provided by Bankruptcy Rule 2097 by which the Debtors must file notices of removal of civil actions and proceedings to which the Debtors are or may become parties until February 8, 2011.

On December 8, 2010, the Bankruptcy Court entered an order extending the deadline for the Debtors to assume or reject unexpired leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code to March 10, 2011.

On December 10, 2010, the Debtors filed a motion to extend the Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances with respect to the chapter 11 plan under section 1121 of the Bankruptcy Code to March 10, 2011 and May 9, 2011, respectively (the "**Extension Motion**"). On January 11, 2011 the Bankruptcy Court entered an order granting the Extension Motion.

## H. Challenge Period

Pursuant to the Final DIP Order, any party in interest had seventy-five (75) days from the date of the Interim DIP Order to file an adversary proceeding or contested matter (any such action, a "**Challenge**") against BPPR challenging the validity, enforceability, priority or extent of the BPPR Credit Facility and obligations related thereto, or the BPPR Collateral, or otherwise assert or prosecute any avoidance actions or any other claims, counterclaims or causes of action, objections, contests or defenses against BPPR or its respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with matters related to the BPPR Credit Facility and obligations related thereto or the BPPR Collateral. The period in which a party in interest could bring a Challenge expired on October 30, 2010, and no Challenges were filed or asserted against BPPR. However, on October 28, 2010, the Bankruptcy Court entered an order approving a stipulation among BPPR, ORI, FOI, Gad Zeevi and Talia Zeevi, extending these parties' deadline to file a Challenge against BPPR to December 15, 2010. Subsequently, the Bankruptcy Court entered several orders further extending the Challenge for ORI, FOI, Gad Zeevi and Talia Zeevi through and including February 9, 2011.

Pursuant to the Final DIP Order, the Creditors Committee had ninety (90) days after its appointment to file a Challenge against BPPR. The Creditors Committee's period to bring a Challenge was due to expire on November 24, 2010. However, on November 4, 2010, and on subsequent dates, the Bankruptcy Court entered orders approving stipulations between BPPR and the Creditors Committee extending the Creditors Committee's deadline. Pursuant to the order currently in effect, entered on January 21, 2010, the deadline for the Creditors Committee to file a Challenge is February 18, 2011, which date will be automatically extended through April 30, 2011, if on or before February 18, 2011 the Debtors have filed the Plan and Disclosure Statement and

motion to approve the BPPR Settlement. The Creditors Committee has reserved its Challenge right pursuant to the BPPR Settlement, as set forth in Section IV.O below.

### I.    General Bar Date and Summary of Claims

#### 1.    *Schedules and Statements*

Pursuant to the First Extension Motion, the Debtors received an extension until October 11, 2010 to file their schedules of assets and liabilities (the "**Schedules**") and statements of financial affairs (the "**Statements**"). On October 11, 2010, the Debtors filed with the Bankruptcy Court their respective Schedule D, Schedule E, Schedule F, Schedule G, and Schedule H. Simultaneously therewith, the Debtors filed a motion requesting a further extension of time to file their remaining Schedules and Statements. On October 25, 2010, the Bankruptcy Court entered an order further extending the deadline to file the remaining Schedules and Statements until November 10, 2010 (the "**Second Extension**"). Pursuant to the Second Extension, each Debtor filed its Schedule A, Schedule B, Schedule C and its respective Statements on November 10, 2010.

On October 15, 2010, CPC and CPR each filed amended Schedules F and Schedules G. Further, on November 16, 2010, CPC filed a second amended Schedule F and a supplement to its amended Schedule G. On December 15, CPC and CPR each filed amended Statements.

#### 2.    *General Bar Date*

By order dated October 6, 2009 (the "**General Bar Date Order**"), pursuant to Bankruptcy Rule 3003(c)(3), the Bankruptcy Court established November 17, 2010 at 5:00 p.m. (prevailing Eastern time) (the "**General Bar Date**"), as the date and time by which general proofs of claim were required to be filed by substantially all claimants of the Debtors (other than Governmental Units (as defined in the General Bar Date Order) and BPPR per the Final DIP Order). The General Bar Date Order set the deadline for Governmental Units to file proofs of claim against the Debtors as February 8, 2011 at 5:00 p.m. (prevailing Eastern time). The EPA's deadline to file its proofs of claim has been extended pending ongoing settlement discussions regarding, among other things, the claims.

Notice of the General Bar Date and a proof of claim form were mailed to (i) all creditors and other known holders of claims, including all creditors listed in the Debtors' Schedules; (ii) all parties to executory contracts and unexpired leases of the Debtors; (iii) all parties to litigation with the Debtors; (iv) all members of the Creditors Committee; (v) all governmental units required to be notified; (vi) all persons and entities included in the Debtors' master service list; and (vii) all persons and entities requesting notice pursuant to Bankruptcy Rule 2002 as of the entry of the General Bar Date Order. The Bankruptcy Court-approved notice of the General Bar Date was published on October 11, 2010 in the *New York Times (National)* and on October 12, 2010 in the *Wall Street Journal (Europe),* the *Wall Street Journal (Asia),* the *Wall Street Journal (National)* and *El Nuevo Día* (in Spanish).

#### 3.    *Summary of Claims*

Approximately 1,540 proofs of claim asserting Claims against the Debtors were filed in the Chapter 11 Cases, exceeding a total of approximately $5.4 billion, including duplication, but excluding any estimated amounts for unliquidated Claims.

### J.    Administrative Expense Bar Dates

On November 24, 2010, the Bankruptcy Court entered an order (the "**Administrative Expense Bar Date Order**") establishing January 15, 2011 at 5:00 p.m. (prevailing Eastern time) as the date and time by which, except as otherwise provided in the Administrative Expense Bar Date Order, all Administrative Expense Claims that accrued from the Commencement Date through and including December 31, 2010 were required to be filed (the "**First Administrative Expense Bar Date**"). Except as otherwise provided in the Administrative Expense Bar Date Order, all requests for Administrative Expense Claims that accrued during this period were required to be filed by the First Administrative Expense Bar Date. Administrative Expense Claims that accrue from January 1,

2011 through and including the Effective Date are to be filed pursuant to the Plan, by the date that is thirty (30) days after the Effective Date, or such other date as may be ordered by the Bankruptcy Court (the "**Administrative Expense Claim Bar Date**"), as set forth in more detail in Section V.A.1 below.

Approximately 48 requests for Administrative Expense Claims were filed by the First Administrative Expense Bar Date, exceeding a total of approximately $36 million, including duplication, but excluding any estimated amounts for unliquidated Administrative Expense Claims. Based upon an initial review of the requests for Administrative Expense Claims, the Debtors believe that a substantial number of these Administrative Expense Claims are disputed and will be reclassified as General Unsecured Claims.

Notice of the First Administrative Expense Bar Date and a request form were mailed to (i) all creditors and other known holders of claims as of the date of entry of the Administrative Expense Bar Date Order; (ii) the U.S. Trustee; (iii) counsel to the Creditors Committee; (iv) counsel to BPPR; (v) all parties to executory contracts and unexpired leases of the Debtors; (vi) all parties to litigation with the Debtors (as of the date of entry of the Administrative Expense Bar Date Order); (vii) the Debtors' current officers, directors, and employees; (viii) the Internal Revenue Service; (ix) all applicable state and local taxing authorities; (x) the United States Securities and Exchange Commission; (xi) the EPA; (xii) any applicable state environmental agency; (xiii) the United States Department of Justice; (xiv) the United States Attorney for the District of Puerto Rico and the District of Delaware and relevant state attorneys general; and (xv) all parties who have requested notice pursuant to Bankruptcy Rule 2002. The Bankruptcy Court-approved notice of the First Administrative Expense Bar Date was published on December 1, 2010 in the *New York Times (National)* and *El Nuevo Día* (in Spanish).

## K.      Rejection of Franchise Agreements

As of the Commencement Date, CPC was party to approximately 170 Franchise Agreements with the Dealers of the Service Stations. Under the Franchise Agreements, CPC is the franchisor and the Dealer is the franchisee. Generally, each Franchise Agreement consists of an interrelated set of contracts, including (i) an agreement between CPC as fee owner (in the case of a station owned by CPC) or sub-lessor (in the case of a station leased by CPC), and the respective Dealer, to occupy the owned or leased Service Station; and (ii) a related petroleum product supply agreement. Generally, pursuant to the Franchise Agreements, the Dealer must purchase Gulf-branded petroleum products exclusively from the Debtors and sell those products at the applicable Service Station.

### 1.      *Conditional Rejection Motion*

In connection with the marketing of the Debtors' assets, the Debtors learned that certain potential bidders did not intend to purchase the Debtors' rights under the Franchise Agreements in connection with the 363 Sale. Ultimately, the Debtors believed that any successful bidder either would (i) require any Dealer to enter into a new franchise agreement on terms acceptable to such successful bidder, as a condition to closing of the 363 Sale; or (ii) determine not to enter into a new franchise agreement with certain Dealers, in which case the Debtors would reject the existing Franchise Agreements upon closing of the 363 Sale. Of concern to potential bidders was the potential applicability of a federal statute, the Petroleum Marketing Practices Act, 15 U.S.C. § 2108, *et seq.* (the "**PMPA**") and section 365(h) of the Bankruptcy Code, which may have frustrated the rejection of the Franchise Agreements. Accordingly, to provide certainty to potential bidders regarding the inapplicability of the PMPA and section 365(h) of the Bankruptcy Code, enhance the bidding process and ultimately facilitate the most productive and robust auction possible, the Debtors filed a motion with the Bankruptcy Court seeking entry of an order (i) authorizing the Debtors to reject the Franchise Agreements upon consummation of the 363 Sale, provided that such sale does not contemplate the assumption and assignment of the Franchise Agreements and (ii) finding that the PMPA and section 365(h) are not applicable to such rejection (the "**Rejection Motion**").

On November 17, 2010, a group of Dealers (the "**Dealer Objectors**") objected to the Rejection Motion. On November 26, the Debtors filed a reply to the objections filed by the Dealer Objectors. A hearing to consider the Rejection Motion was held before the Bankruptcy Court on December 1, 2010. On December 2, 2010,

the Bankruptcy Court entered an order granting the Rejection Motion (the "**Rejection Order**").[7] On December 8, 2010, the Bankruptcy Court entered a memorandum opinion with respect to the Rejection Order.

<div align="center">2. <em>Withdrawal Motion</em></div>

Certain of the Dealer Objectors also filed a motion to withdraw the reference to the District Court of Delaware (the "**District Court**") as it relates to the Rejection Motion (as amended on December 3, 2010, the "**Withdrawal Motion**") and a motion to stay the proceedings pending resolution of the Withdrawal Motion (the "**Stay Motion**"). The Debtors filed an objection to the Stay Motion, and on November 22, 2010, the Bankruptcy Court heard arguments on the Stay Motion. On November 26, 2010, the Bankruptcy Court entered an order denying the Stay Motion. On December 3, 2010, the Debtors filed their objection to the Withdrawal Motion. On December 16, 2010, the Withdrawal Motion was docketed with the District Court as Civil Action No. 10-cv-01104, and on December 22, Judge Leonard P. Stark was assigned to the case. A hearing to consider the Withdrawal Motion has not yet been scheduled.

<div align="center">3. <em>Motion to Reconsider</em></div>

On December 10, 2010, certain of the Dealer Objectors filed a motion seeking reconsideration of the Rejection Order pursuant to Bankruptcy Rule 9023 (the "**Motion to Reconsider**"). On December 19, the Debtors filed an objection to the Motion to Reconsider and several declarations in support of their objection. On December 20, the Bankruptcy Court held a telephonic hearing on shortened notice to determine the Motion to Reconsider. At the conclusion of the hearing, the Bankruptcy Court denied the Motion to Reconsider and accordingly, entered an order on December 28 denying the Motion to Reconsider.

<div align="center">4. <em>Appeal of the Rejection Order</em></div>

On December 16, certain of the Dealer Objectors appealed the Rejection Order, which appeal was docketed with the District Court on January 14, 2011 as Civil Action No. 11-cv-049. Briefing with respect to the appeal is currently being held in abeyance pending mandatory appellate mediation, which is scheduled to begin on February 15, 2011.

**L.     Puerto Rico Government Resolutions**

<div align="center">1. <em>Hacienda</em></div>

On October 26, 2010, the Senate of Puerto Rico passed Senate Resolution #755 ordering the Treasury Commission of the Senate of Puerto Rico (the "**Treasury Commission**") to investigate the Debtors' alleged outstanding tax liabilities owed to Hacienda. The Resolution requests that the Treasury Commission submit a detailed report regarding its investigation within ninety (90) days of the date of the Resolution. Subsequently, on October 28, 2010, the Treasury Commission initiated a proceeding in the Court of First Instance, Superior Court of Puerto Rico against Juan Carlos Puig, Secretary of Hacienda, and Gad Zeevi, ordering that they appear before the Treasury Commission and produce all documents and information related to any potential tax liabilities owed by the Debtors to Hacienda. On November 29, 2010, the Debtors sent a letter to the Treasury Commission noting, among other things, that (i) Gad Zeevi had not been properly served with the Senate Resolution or the order to produce documentation; (ii) the Debtors intend to cooperate with the Treasury Commission in supplying the requested information, to the extent available; and (iii) the Debtors do not owe Hacienda $100 million, as stated in the preamble to Senate Resolution #755, but rather the Debtors owe Hacienda $13.5 million, as indicated on CPC's

---

[7] The Rejection Order is not applicable to the Franchise Agreement with San German Gulf, Inc. or Mark Terzikhan (the "**San German Objectors**"), except with respect to the Bankruptcy Court's holding regarding the inapplicability of the PMPA to rejection of such Franchise Agreement, pending resolution of the objection to the Rejection Motion filed by the San German Objectors. The Debtors understand that the San German Objectors and Puma have reached an agreement in principle regarding the resolution of the objection.

Schedule F. Neither Gad Zeevi or Juan Carlos Puig has appeared before the Treasury Commission and no further action has been taken with respect to this Resolution.

2. _Rejection of Franchise Agreements_

On December 1, 2010, the House of Representatives in Puerto Rico passed House Resolution 1528 directing the Committee on Economic Development, Planning, Commerce, Industry and Telecommunications of the House of Representatives of Puerto Rico (the "**Development Committee**") to investigate the nature, scope, impact and status of the conditional rejection of the Franchise Agreements. The Resolution requires the Development Committee to submit a report with its findings within ninety (90) days of the date of the Resolution. Asserting that more than 1,000 direct and indirect jobs may be in jeopardy as a result of the potential rejection of the Franchise Agreements, the House of Representatives found that investigating the rejection of these Agreements is a matter of public interest as it may impact jobs and the unemployment rate in Puerto Rico. The Development Committee has not yet issued its report.

Currently, the Development Committee and the House of Representatives is considering Proyecto de la Camara 3080 (House Bill 3080), which would create a fund of not less than $3,000,000 to provide the Dealers with lines of credit to purchase their individual Service Stations. On January 11, 2011, the Debtors received a letter from the House of Representatives requesting information regarding House Bill 3080. The Debtors believe that House Bill 3080 is moot, as the Bankruptcy Court has already approved the sale of the Service Stations to Puma; see Section IV.N below.

**M.     Sale of Certain Petroleum Products**

Throughout the course of the Chapter 11 Cases, the Debtors have sold a portion of the petroleum product that remained in the Tank Farm after the Explosions in an effort to empty their tanks so that the EPA can complete clean-up and inspections of the Tank Farm. Specifically, as of December 31, 2010, the Debtors have sold $4.5 million (net of taxes) of diesel and fuel oil products. The Debtors have used the proceeds of these sales for ordinary course expenses and the administration of their Chapter 11 Cases.

**N.     363 Sale**

On August 13, 2010, the Debtors filed a motion (the "**Sale Motion**") with the Bankruptcy Court seeking entry of, among other things, (i) an order (the "**Bidding Procedures Order**") approving procedures for (a) submitting bids for the purchase of substantially all of the Debtors' assets (the "**Assets**"), (b) conducting an auction for the Assets (the "**Auction**"), (c) determining the successful bidder for the Assets (the "**Successful Bidder**"), and (d) assuming and assigning certain executory contracts (the "**Contracts**") and unexpired leases (the "**Leases**") to the Successful Bidder; and (ii) an order (the "**Sale Order**") approving the 363 Sale.

On September 10, 2010, the Bankruptcy Court entered the Bidding Procedures Order, and scheduled (i) December 10, 2010 as the deadline to submit bids for the Assets, (ii) December 13, 2010 as the date of the Auction, (iii) December 22, 2010 as the date of the hearing to consider approval of the 363 Sale (the "**Sale Approval Hearing**"), and (iv) February 8, 2011 as the deadline to consummate the 363 Sale. During the marketing process for the Assets, the EPA provided potential bidders with a letter regarding the EPA's expectations regarding remediation and clean-up efforts at the Debtors' property going forward.

The Debtors received 56 bids for the Assets: (i) three bids for substantially all of the Assets, (ii) one bid for the Tank Farm, Dock and Pipelines, (iii) two bids for the Debtors' scrap metal, including all of the scrap metal from the Debtors' dormant oil refinery, and (iv) 50 bids for one or more of the Debtors' owned Service Stations. Of the 56 bids received, 35 were deemed qualified bids by the Debtors (the "**Qualified Bids**"), in consultation with BPPR and the Creditors Committee. Pursuant to the Bidding Procedures, all parties who submitted Qualified Bids were invited to participate in the Auction for the Assets.

The Auction for the Assets commenced on December 16, 2010 and continued to December 17. Upon conclusion of the Auction, the Debtors, in consultation with BPPR, the Creditors Committee and the EPA,

determined that the $82 million all-cash bid submitted by Puma was the highest and best bid for the Assets and on December 19, filed with the Bankruptcy Court a notice of the selection of Puma as the Successful Bidder.

On December 22, the Bankruptcy Court held the Sale Approval Hearing and entered the Sale Order approving the sale of the Assets to Puma pursuant to the terms and conditions of that certain Asset Purchase Agreement, dated December 17, 2010 (the "**APA**").

Pursuant to the APA, the Assets to be acquired by Puma include all of the Debtors' properties (including real property such as the Refinery, the undeveloped property, and each of the owned Service Stations), assets and rights of every nature, kind and description, tangible and intangible (including goodwill), existing as of the closing date, other than certain excluded assets, to the extent such Assets are used in or related to the Debtors' business of refining, importing, offloading, storing and distributing gasoline and other petroleum-based products in the Commonwealth of Puerto Rico. Puma will receive the Assets free and clear of any and all liens, other than liens created by Puma and Permitted Liens (as defined in the APA).

Further, upon closing the 363 Sale, the Debtors will (i) assume the Contracts and Leases identified on Exhibit 3 to the Sale Order and assign such Contracts and Leases to Puma and (ii) reject the Franchise Agreements identified on Exhibit 2 of the Sale Order. Any cure amounts related to the assumption of the Contracts and Leases to be assigned to Puma will be paid by Puma subject to the Buyer Cure Amounts Cap (as defined in the APA). The Debtors and Puma anticipate closing the sale during the first quarter of 2011. As set forth above, the proceeds of the 363 Sale will be used to fund recoveries under the Plan.

O.      **The BPPR Settlement**

During the Auction, the Creditors Committee and BPPR engaged in negotiations concerning a settlement of the Creditors Committee's potential Challenges with respect to BPPR's Liens, and at the conclusion of the Auction, the Creditors Committee reached an agreement in principle with BPPR regarding the settlement of such Challenges, which agreement was memorialized in a term sheet (the "**BPPR Settlement Term Sheet**") that was filed with the Bankruptcy Court on December 21, 2010 with the Creditors Committee's Statement in Support of the Sale of Substantially all of the Debtors' Assets to Puma. A copy of the BPPR Settlement Term Sheet is attached as Exhibit B. The settlement agreement in principle was further finalized and documented by the parties for Bankruptcy Court approval (the "**BPPR Settlement**"), and substantially contemporaneous with the filing of the Plan and Disclosure Statement, the Debtors, with BPPR and the Creditors Committee, submitted a joint motion pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019, for Bankruptcy Court approval of the BPPR Settlement (the "**BPPR Settlement Motion**"). The Bankruptcy Court entered an order approving the BPPR Settlement Motion on [____], 2011. The terms of the BPPR Settlement have been incorporated into the Plan pursuant to the agreement of the Creditors Committee and BPPR. In brief, the key terms of the BPPR Settlement are as follows:

In return for receiving full releases from the Debtors, their Estates, and the Creditors Committee, as set forth in Section 2.1(d) of the Plan, BPPR (in its capacity as lender under the BPPR Credit Facility and as the DIP Lender) has agreed to support the Plan providing for the following:

Plan-based allocation of the Sale Proceeds: (i) up to $33.2 million of the Sale Proceeds to fund the Administrative and Priority Claims Reserve, which will be used to satisfy, among other things, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims; (ii) a distribution to holders of General Unsecured Claims consisting of, among other things, (a) 10% of the Sale Proceeds, (b) 33.33% of any excess amount of the Administrative and Priority Claims Reserve and (c) proceeds of the Liability Insurance Policies, if any; (iii) $11,500,000 to pay a settled and reduced amount of the FirstBank Secured Claims; and (iv) $1 million from Sale Proceeds to fund the Plan Expenses Reserve.

Plan-based allocation to the Liquidation Trust of substantially all of the remaining assets of the Estates to be liquidated for the benefit of creditors other than BPPR (except for specific assets and the proceeds thereof that will be liquidated by the Liquidation Trust for the benefit of BPPR), including: (i) substantially all Causes of Action and (ii) other remaining assets.

Plan-based allocation and distribution of proceeds of insurance assets and policies collected by the Debtors, the Estates, the Creditors Committee or the Liquidation Trustee as follows: (i) all future proceeds of the Liability Insurance Policies will be reserved or otherwise remain available for payment to third party creditors and payment of such proceeds will reduce the allowed claim of such third party creditors dollar-for-dollar, subject to certain conditions, and (ii) all proceeds of insurance policies (other than Liability Insurance Policies) will be paid to BPPR as a distribution on account of its claims under the BPPR Credit Facility.

BPPR will also receive the following: (i) the BPPR Secured Claims will be Allowed as undisputed, noncontingent, and liquidated in the aggregate principal amount of $137,671,348.58, plus prepetition professional fees and out-of-pocket expenses, and interest accrued thereon through the Effective Date; (ii) the DIP Financing Claims will be Allowed as undisputed, noncontingent, and liquidated in an amount to be agreed to by BPPR, the Debtors and the Creditors Committee or determined by the Bankruptcy Court prior to the Effective Date; and (iii) the BPPR Deficiency Claim will be deemed an Allowed Claim; provided, however, that BPPR will not be entitled to receive any recovery under the Plan on account of the Allowed BPPR Deficiency Claim unless and until all other holders of Allowed General Unsecured Claims have been paid in full (including postpetition interest to the extent allowed under applicable bankruptcy law) on account of such holders' respective Allowed General Unsecured Claims; provided, further, however, that the BPPR Deficiency Claim will not be released or deemed to be released until paid in full with interest in accordance with the distribution priority terms of the Plan.

Subject to approval of the proposed BPPR Settlement, the Creditors Committee has agreed that it will settle and condition its current right under the Final DIP Order to assert against BPPR any Challenge, Claims and Defenses (as defined in paragraph 34 of the Final DIP Order). Upon entry of the proposed order approving the BPPR Settlement, the Creditors Committee will retain only a conditional right to assert any Challenge, Claims and Defenses against BPPR. This conditional right will allow the Committee to assert a Challenge and Claims and Defenses only if (and only within forty-five (45) days after the earliest to occur of the following): (i) BPPR breaches its obligations under the BPPR Settlement and the Creditors Committee has not breached its obligations under the BPPR Settlement, (ii) the Effective Date of the Plan does not occur on or before September 1, 2011 or (iii) the Plan as modified or amended, or another plan of liquidation that provides BPPR and the holders of General Unsecured Claims treatment substantially equivalent to the treatment provided in the Plan, is not confirmed on or before September 1, 2011; provided, however, that the Creditors Committee or any successor in interest (including a chapter 7 trustee) will also be entitled to assert a Challenge and Claims and Defenses in the event that (and only within forty-five (45) days of the earliest to occur of the following): (a) BPPR begins foreclosure proceedings with respect to any of its Collateral, (b) BPPR files a motion to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (c) the Bankruptcy Court enters an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

### P. Plan Support Agreement

On February 4, 2011, ORI, Gad Zeevi and Talia Zeevi (collectively, the "**Guarantors**"), FOI, the Debtors, the Creditors Committee, and BPPR executed a plan support agreement (the "**Plan Support Agreement**") whereby the Guarantors agreed to support and not object to or otherwise contest the Plan, subject to express conditions in the Plan Support Agreement, and the Debtors, the Creditors Committee and BPPR agreed to support and pursue confirmation of the Plan in good faith. The Plan Support Agreement sets forth specific provisions to be included in the Plan, including (i) the collection of insurance proceeds, as described in more detail in Section V.B.3.c below, (ii) the treatment of Claims held by the Guarantors or its affiliates, including that the claims of Lexel, Lexel Ltd. and Inpecos will be treated as Subordinated Claims in Class 7; provided that specific terms of Plan Support Agreement are incorporated into the Plan, (iii) Plan releases for the Guarantors and their affiliates, and (iv) the first $4 million of Insurance Proceeds derived from the Umbrella Insurance Policy will be used on or after the Effective Date to satisfy Allowed Administrative Expense Claims.

In conjunction with the negotiation of the BPPR Settlement and Plan Support Agreement, the Guarantors and BPPR negotiated and entered into a separate settlement agreement, dated February 4, 2011 (the "**BPPR/Guarantors Settlement**") that resolves all the issues among BPPR and the Guarantors. Among other terms, the BPPR/Guarantors Settlement provides for: (i) releases including BPPR's release of the Guarantors' obligations under their guarantees of the BPPR Credit Facility, and the Guarantors' release of their rights to assert any Challenges, Claims and Defenses (as defined in the BPPR/Guarantors Settlement) against BPPR; (ii) new Guarantor payment obligations to make certain payments to BPPR; (iii) Gad Zeevi's exercise of commercially reasonable best efforts to collect proceeds of the Debtors' insurance policies for the benefit of BPPR and other creditors (in a manner consistent with the terms of the Plan and the Plan Support Agreement); (iv) the reduction of the Guarantors' payment obligations to the extent insurance proceeds are collected and used for the benefit of BPPR; and (v) a sharing between Gad Zeevi and BPPR of insurance proceeds that are collected for the benefit of BPPR in excess of an amount agreed upon by the Guarantors and BPPR.

### Q. FirstBank Settlement

Substantially contemporaneous with the filing of the Plan and Disclosure Statement, the Debtors, with BPPR, submitted a joint motion pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019, for Bankruptcy Court approval of the treatment of FirstBank Secured Claims (the "**FirstBank Settlement**"). The Bankruptcy Court entered an order approving the FirstBank Settlement on [__], 2011. The FirstBank Settlement provides for the full and final settlement and satisfaction of the FirstBank Secured Claims. In brief, the key terms of the FirstBank Settlement are as follows:

> The FirstBank Secured Claims will be deemed Allowed as undisputed, noncontingent, and liquidated in the aggregate principal amount of $11,584,809.57 plus prepetition out-of-pocket expenses, and interest accrued thereon through the Effective Date, and FirstBank will receive the treatment provided in Section 5.2 of the Plan. FirstBank's liens on the Dock and Pipelines, and upon all proceeds thereof, will be deemed to be valid, perfected, and not subject to avoidance.

> FirstBank will receive full releases from the Debtors, their Estates, the Creditors Committee, and each of the foregoing's respective current and former officers, directors, agents, employees, attorneys, advisors, and other professionals from all Claims and causes of action against FirstBank and its predecessors in interest under the FirstBank Credit Facility, as set forth in Section 11.6 of the Plan.

> FirstBank will provide a full release to the Debtors, their Estates, the Creditors Committee, BPPR (in its capacity as lender under the BPPR Credit Facility and as the DIP Lender), Westernbank and the FDIC and each of the foregoing's respective current and former officers, directors, agents, employees, attorneys, advisors, and other professionals from any and all Claims and causes of action, as set forth in Section 11.6 of the Plan.

R.   **EPA/USCG Settlement**

The EPA and USCG are currently in negotiations with the Debtors and BPPR regarding the settlement of the EPA's Claims. The Debtors anticipate that the settled amount of the EPA's Administrative Expense Claim will not exceed $7,850,000.

S.   **Negotiations with Chartis**

The Debtors, BPPR and the Creditors Committee are currently engaged in discussions with Chartis regarding the remaining coverage amounts available under the Umbrella Insurance Policy and other matters. These discussions are ongoing at this time as the parties are working toward a consensual process for recovering remaining insurance proceeds under the Umbrella Insurance Policy.

T.   **Employee Benefits**

The Debtors sponsor one tax-qualified defined benefit pension plan (the "**Pension Plan**") for their employees. The Debtors are required to make quarterly contributions to the Pension Plan. Employees are eligible to participate in the Pension Plan if they are (i) a full time employee of the Debtors, (ii) a temporary employee who works at least 20 hours per week during a consecutive twelve-month period, or (iii) a temporary employee who works at least 1,000 hours in a twelve-month period. Benefits under the Pension Plan vest after five years of service, and participants may begin collecting benefits upon reaching the age of 65, and in some circumstances, the age of 55. As of the Commencement Date, the Debtors believe that the Pension Plan was underfunded, *i.e.* the assets of the Pension Plan are insufficient to cover the benefit liabilities of the Plan. Further, due to their liquidity crisis after the Explosions, the Debtors were unable to make their premium payments to the Pension Benefit Guaranty Corporation (the "**PBCG**") due in 2010 or their minimum contribution payment to the Pension Plan due on August 13, 2010.

The Debtors also provide their employees with health benefits through Triple-S, a local Puerto Rican health care provider. A majority of the Debtors' salaried and hourly employees and their eligible dependents are participants in this health plan.

On November 1, 2010, certain employees of the Debtors filed a purported objection to the Sale, alleging that they were not provided with information regarding the impact of the bankruptcy and the 363 Sale on their employee benefits and other rights (the "**Employee Objection**"). The Employee Objection was overruled during the Sale hearing. The same group of employees filed a supplement to the Employee Objection on December 23, 2010. This supplemental objection is moot as it was filed after the Sale Order was entered.

Pursuant to the Final APA, Puma is not obligated to offer employment to any of the Debtors' business employees, and will not assume any accrued employee obligations or the Pension Plan. Accordingly, the Pension Plan will remain with the Debtors, and the Debtors understand that the PBGC is currently evaluating the Pension Plan and determining how it should be treated.

The PBGC filed 12 proofs of claim in the Chapter 11 Cases totaling approximately $9.5 million, plus unliquidated amounts. The PBGC filed these claims as alleged Administrative Expense Claims, Priority Non-Tax Claims or General Unsecured Claims, or a combination thereof. The Debtors are currently engaged in discussions with the PBGC regarding its filed proofs of claim.

V.   **THE PLAN**

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBITS ATTACHED THERETO, AND TO THE PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN IMPLEMENTS THE BPPR SETTLEMENT AND THE FIRSTBANK SETTLEMENT, WHICH ARE TO BE SUBMITTED FOR APPROVAL UNDER BANKRUPTCY RULE 9019.  THE BPPR SETTLEMENT PROVIDES, AMONG OTHER THINGS, FOR A DISTRIBUTION TO HOLDERS OF GENERAL UNSECURED CLAIMS AND RESOLVES ALL CHALLENGES AND CAUSES OF ACTION, WHETHER ASSERTED OR UNASSERTED, OF THE CREDITORS COMMITTEE AGAINST BPPR, AS DESCRIBED IN SECTION IV.O HEREOF.   THE FIRSTBANK SETTLEMENT PROVIDES FOR THE TREATMENT OF THE CLAIMS HELD BY FIRSTBANK.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST.

The Debtors believe that implementation of the Plan described in this Disclosure Statement will provide holders of Allowed Claims and Equity Interests a greater distribution than they would receive if these cases were converted to cases under chapter 7, which is the principal liquidation chapter of the Bankruptcy Code.  The Plan is attached as Exhibit A hereto and forms a part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not proposing the substantive consolidation of their respective bankruptcy estates.  However, because many of the procedural provisions of those separate plans are the same, and to save the Debtors' estates the cost of duplicative efforts to draft multiple disclosure statements and separately solicit approval of multiple plans, the Debtors are submitting a single Plan and this Disclosure Statement.  Thus, although the Plan generally applies to all of the Debtors, except as otherwise provided in the Plan, (i) the Plan constitutes three distinct chapter 11 plans, one for each Debtor, (ii) for voting purposes, each holder of a Claim in a Class will vote its Claim in such Class by individual Debtor, and (iii) the classification scheme set forth in Article IV of the Plan applies to each Debtor, but to the extent that there are no Claims in a certain Class against a particular Debtor, pursuant to Section 5.10 of the Plan, that Class will be deemed not to exist for any purpose whatsoever with respect to that Debtor.

A.      **Classification and Treatment of Holders of Claims and Equity Interests**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  In general, an "allowed" claim or an "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court or other court of appropriate jurisdiction determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.  If a class of claims or equity interests is "impaired," the Bankruptcy Code affords certain rights to holders of such claims or equity interests, including the right to vote on the plan.  Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, grants such holder a claim for damages incurred, and does not otherwise alter the holders' legal, equitable and contractual rights.

1. *Administrative Expense Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims are not classified. Administrative Expense Claims are the actual and necessary costs and expenses of the Chapter 11 Cases that are Allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses include, but are not limited to, the actual and necessary expenses of operating the Debtors' businesses and tax obligations incurred after the Commencement Date. Other Administrative Expenses include the DIP Financing Claims and actual, reasonable and necessary professional fees and expenses of the Debtors' advisors incurred during the pendency of the Chapter 11 Cases. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense and will be paid in accordance with Section 13.1 of the Plan.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, or as otherwise provided in the Plan, each holder of an Allowed Administrative Expense Claim will receive in full settlement, satisfaction, and release of such Claim, Cash in an amount equal to the Allowed but unpaid portion of such Claim, on or as soon as practicable after, the later of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the Debtors or the Liquidation Trustee and the holder of such Claim. The Debtors estimate that Allowed Administrative Expenses payable on the Effective Date will be approximately $[____].

All Administrative Expense Claims under section 503(b)(9) of the Bankruptcy Code were required to be filed by November 17, 2010 pursuant to the General Bar Date Order. Except as otherwise provided in the Administrative Expense Bar Date Order, all Administrative Expense Claims that accrued from the Commencement Date through and including December 31, 2010 were required to be filed by January 15, 2011 pursuant to the Administrative Expense Bar Date Order. Except as otherwise provided in the Plan, the General Bar Date Order, the Administrative Bar Date Order, or any other order of the Bankruptcy Court (and excluding, for the avoidance of doubt, any Administrative Expense Claims that have been fully satisfied or Allowed on or before the Effective Date), all Administrative Expense Claims that accrue from January 1, 2011 through the Effective Date must be received by the Debtors' Balloting/Claims Agent and served on counsel for the Debtors (if filed and served before the Effective Date) or the Liquidation Trustee (if filed and served on or after the Effective Date) by the Administrative Expense Claim Bar Date. Any requests for payment of Administrative Expense Claims that are not properly filed and served by the Administrative Expense Claim Bar Date will not appear on the register of claims maintained by the Balloting/Claims Agent and will be deemed forever barred and Disallowed as of the Effective Date automatically without the need for any objection from the Debtors, the Liquidation Trustee, or any other party in interest or any action by the Bankruptcy Court.

The Liquidation Trustee will have the right to object to any Administrative Expense Claim (other than Administrative Expense Claims that are Allowed as of the Effective Date) on or before the date that is one hundred eighty (180) days from the Effective Date, subject to extension from time to time by order of the Bankruptcy Court. Unless the Debtors or the Liquidation Trustee objects to a timely-filed and properly-served Administrative Expense Claim, such Claim will be deemed Allowed in the amount requested. In the event that the Debtors or the Liquidation Trustee objects to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Claim should be Allowed and, if so, in what amount. The Liquidation Trustee, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business and without further Bankruptcy Court approval.

2. *Professional Compensation and Reimbursement Claims*

Any entity seeking an award by the Bankruptcy Court of compensation for services rendered and reimbursement of expenses incurred through and including the Effective Date under sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code ("**Professional Claims**") will (i) file its final application for allowance of such compensation and/or reimbursement by no later than the date that is thirty (30) business days after the Effective Date or such other date as may be fixed by the Bankruptcy Court, and (ii) unless such holder agrees to less favorable treatment, be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court, upon (x) the date that the order granting such award becomes a Final Order, or as soon as practicable thereafter or (y) such

other terms as may be mutually agreed upon by such holder and the Debtors or the Liquidation Trustee, as applicable.

Objections to any applications for final allowance of a Professional Claim must be filed and served on the professional that filed such application on or before the date that is forty-five (45) business days from the Effective Date (the "**Professional Claims Objection Deadline**"), subject to extension from time to time by order of the Bankruptcy Court. As soon as practicable following the seventh Business Day after the occurrence of the Professional Claims Objection Deadline, a hearing will be held to consider all timely-filed and properly-served applications for final allowance of a Professional Claim.

As of March [__], 2011, the Debtors have paid the various retained professionals, including the Debtors' professionals and the Creditors Committee's professionals, an aggregate of approximately $[____] since the Commencement Date and certain lenders' professionals, pursuant to the Final DIP Financing Order and DIP Term Loan Agreement, an aggregate of approximately $[____].

3.      *DIP Financing Claims*

The DIP Financing Claims will be deemed Allowed in the DIP Financing Claims Amount for all purposes under the Plan and in the Chapter 11 Cases, without the need for the holder of a DIP Financing Claim to file a proof of claim. Pursuant to the BPPR Settlement Order and Section 2.1 of the Plan, on the Effective Date, BPPR will receive in full settlement, satisfaction, and release of the DIP Financing Claims, Cash in an amount equal to the DIP Financing Claims Amount. Upon receipt by BPPR of all of the consideration provided in Section 3.1(c) of the Plan, all liens and security interests granted to secure the DIP Financing Claims will be satisfied, discharged, and terminated in full and of no further force or effect.

4.      *Priority Tax Claims*

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim will receive in full settlement, satisfaction, and release of such Claim, Cash in an amount equal to the Allowed but unpaid portion of such Claim, on or as soon as practicable after, the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed. The Debtors estimate that the Allowed amount of such Claims will be approximately $[____].

5.      *Class 1 – Priority Non-Tax Claims*

Priority Non-Tax Claims in this Class include certain Claims that are granted priority in payment under section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code, including certain wage, salary and compensation obligations to employees of the Debtors up to a statutory cap of $11,725 per employee. Because the Debtors were authorized by the prepetition wage order to pay such priority amounts to their employees, the Debtors estimate that the Allowed amount of such claims will be approximately $[____].

Class 1 is unimpaired by the Plan and consists of separate sub-Classes for all Priority Non-Tax Claims against each of the Debtors. Each holder of an Allowed Priority Non-Tax Claim against any Debtor is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Non-Tax Claim will receive in full settlement, satisfaction, and release of such Claim, Cash in an amount equal to the Allowed but unpaid portion of such Claim, on or as soon as practicable after, the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed.

6. *Class 2 – FirstBank Secured Claim*

A FirstBank Secured Claim includes those Secured Claims that arise under the FirstBank Credit Facility. For purposes of the Plan, the FirstBank Secured Claim will be Allowed, pursuant to the FirstBank Settlement, in the amount of $11,584,809.57, plus prepetition out-of-pocket expenses, and interest accrued thereon through the Effective Date.

Class 2 is impaired by the Plan. Each holder of an Allowed FirstBank Secured Claim is entitled to vote to accept or reject the Plan.

Pursuant to the FirstBank Settlement Order and Section 2.2 of the Plan, on the Effective Date, FirstBank will receive in full settlement, satisfaction, and release of the FirstBank Secured Claims, Cash in an amount equal to the FirstBank Secured Claims Settled Amount.

7. *Class 3 – BPPR Secured Claims*

BPPR Secured Claims include those Secured Claims that (i) arise under the BPPR Credit Facility and (ii) granted to BPPR under the Final DIP Order as adequate protection pursuant to sections 363(c)(2), 363(e), and 364(d)(1) of the Bankruptcy Code. For purposes of the Plan and as Allowed pursuant to the BPPR Settlement, the BPPR Secured Claims will be Allowed in the amount of $137,671,348.58, plus prepetition professional frees and out-of-pocket expenses, and interest accrued thereon through the Effective Date.

Class 3 is impaired by the Plan and consists of separate sub-Classes for all BPPR Secured Claims against each of the Debtors. Each holder of an Allowed BPPR Secured Claim is entitled to vote to accept or reject the Plan.

Pursuant to the BPPR Settlement Order and Section 2.1 of the Plan, BPPR will receive in full settlement, satisfaction, and release of the BPPR Secured Claims, (i) on the Effective Date, Cash in an amount equal to (A) the Sale Proceeds less (1) the FirstBank Secured Claims Settled Amount, less (2) $33,200,000, less (3) the General Unsecured Claims Reserve Amount, less (4) the Plan Expenses Reserve Amount, plus (B) the BPPR Cash, plus (C) the BPPR Accounts Receivable Proceeds (to the extent reduced to Cash on the Effective Date), plus (D) the BPPR Insurance Proceeds (to the extent reduced to Cash on the Effective Date) and (ii) as soon as practicable after the Effective Date, (A) the product of (1) 66.67% and (2) the Excess Administrative and Priority Claims Reserve, as and when determined in accordance with Section 6.8 of the Plan, (B) the BPPR Accounts Receivable Proceeds, as and when reduced to Cash, and (C) the BPPR Insurance Proceeds, as and when reduced to Cash.

8. *Class 4 – Other Secured Claims*

Other Secured Claims in this Class include any means any Secured Claim against a Debtor that is not the DIP Financing Claim, the FirstBank Secured Claim, a BPPR Secured Claim or a Guarantor Secured Claim. The Debtors estimate that on the Effective Date, the Allowed Claims in this Class will be approximately $[_____].

Class 4 is impaired by the Plan and consists of separate sub-Classes for all Other Secured Claims against each of the Debtors. Each holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

Except to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, each holder of an Allowed Other Secured Claim will receive in full settlement, satisfaction, and release of such Claim, either (i) retention of the liens securing such Claim, whether the Collateral subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claim, and deferred Cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the applicable Estate's interest in such Collateral, (ii) to the extent that the Debtors have sold, or the Liquidation Trustee sells, any Collateral that is subject to the liens securing such Claim, free and clear of such liens, liens on the proceeds of such Collateral, and the treatment of such liens under clause (i) or (iii) of herein, and (iii) the realization by such holder of the indubitable equivalent of such Claim. For the avoidance of doubt, the determination of which treatment to provide a holder of an Allowed Other Secured

Claim will be within the sole and absolute discretion of the Debtors or the Liquidation Trustee, as applicable. For the avoidance of doubt, (a) in the event that an Allowed Other Secured Claim exceeds the value of such holder's interest in the Collateral that secures it, the holder of such Claim will have an Allowed Other Secured Claim equal to the value of its interest in such Collateral, if any, and an Allowed General Unsecured Claim for the deficiency and (b) except as otherwise provided in the Plan or the Plan Support Agreement, any Inpecos Claim and any Lexel Claim, will be deemed to be, and will be treated as, a Class 7 Subordinated Claim.

9.      *Class 5 – General Unsecured Claims*

General Unsecured Claims in this Class include any Claim against any of the Debtors that (a) is not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, FirstBank Secured Claim, a BPPR Secured Claim, an Other Secured Claim, an Intercompany Claim, or a Subordinated Claim or (b) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim. For the avoidance of doubt, any Guarantor Secured Claim, any Deficiency Claim, the BPPR Deficiency Claim, and any Rejection Damage Claim will be a General Unsecured Claim. The Debtors estimate that on the Effective Date, the Allowed Claims in this Class will be approximately $[_____].

Class 5 is impaired by the Plan and consists of separate sub-Classes for all General Unsecured Claims against each of the Debtors. Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

Pursuant to the BPPR Settlement, each holder of an Allowed General Unsecured Claim will receive in full settlement, satisfaction, and release of such Claim (except that the BPPR Deficiency Claim will not be released or deemed to be released until paid in full with interest in accordance with the distribution priority terms of the Plan), its Pro Rata share of (i) Cash in an amount equal to the General Unsecured Claims Reserve Amount, (ii) the product of (x) 33.33% and (y) the Excess Administrative and Priority Claims Reserve, as and when determined in accordance with Section 6.8 of the Plan, (iii) the Cash proceeds of all Causes of Action, and (iv) to the extent that proceeds of the Liability Insurance Policies are received by the Debtors or the Liquidation Trust, as applicable, pursuant to a settlement approved by the Bankruptcy Court with any of the insurers under any of the Liability Insurance Policies, and subject in all respects to Section 6.2(c)(iv) of the Plan with respect to the Chartis Liability Proceeds, the proceeds of the Liability Insurance Policies received by the Debtors and the Liquidation Trustee, as applicable, pursuant to such settlement, in each case less all costs and expenses incurred by the Debtors and the Liquidation Trustee, as applicable, in connection with the administration of distributions to the holders of Allowed General Unsecured Claims, including, without limitation the collection and monetization of assets, the prosecution of the Causes of Action, and the allowance and administration of the General Unsecured Claims (including Tort Claims), after the use of the Plan Expense Reserve, on or as soon as practicable after (A) the Effective Date, to the extent that such Cash proceeds are generated prior to the Effective Date and (B) the next Periodic Distribution Date, to the extent that such Cash proceeds are generated after the Effective Date, in each case to the extent that such Claim is Allowed. For the avoidance of doubt, (x) notwithstanding any other provision of the Plan, BPPR, on account of the BPPR Deficiency Claim or otherwise, will not be entitled to receive any recovery as a holder of a General Unsecured Claim pursuant to Section 5.5 of the Plan unless and until all other holders of Allowed General Unsecured Claims have been paid in full (including postpetition interest to the extent allowed under applicable bankruptcy law) on account of such holders' respective Allowed General Unsecured Claims. and (y) the holders of Allowed General Unsecured Claims will not be entitled to receive any portion of any increase in the Excess Administrative and Priority Claims Reserve Amount attributable to the payment of any Administrative Expense Claims from the proceeds of the Umbrella Insurance Policy in accordance Section 6.2(c)(iv) of the Plan.

10.      *Class 6 – Intercompany Claims*

Intercompany Claims include any Claim against a Debtor by another Debtor. The Debtors estimate that on the Effective Date, the Allowed amount of such Intercompany Claims will aggregate approximately $[__].

Class 6 is impaired by the Plan and consists of separate sub-Classes for all Intercompany Claims against each of the Debtors. Each holder of an Intercompany Claim against any Debtor is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

All Intercompany Claims will be deemed canceled and released as of the Effective Date, and the holders of such Claims will not receive or retain any property or interest in property on account of such Claims.

11.     *Class 7 – Subordinated Claims*

Subordinated Claims include any Claim that is (i) subordinated pursuant to section 510 of the Bankruptcy Code, (ii) an Inpecos Claim, or (c) a Lexel Claim.  The Debtors estimate that on the Effective Date, the Allowed amount of such Subordinated Claims will aggregate approximately $[__].

Class 7 is impaired by the Plan and consists of separate sub-Classes for all Subordinated Claims against each of the Debtors.  Each holder of a Subordinated Claim against any Debtor is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

All Subordinated Claims will be deemed canceled and released as of the Effective Date, and the holders of such Claims will not receive or retain any property or interest in property on account of such Claims. Notwithstanding any other provision of the Plan, no Inpecos Claim or Lexel Claim will be deemed to be, or will be treated as, a Class 7 Subordinated Claim unless the Plan as confirmed by the Bankruptcy Court includes the insurance provisions and the release provisions with respect to the Guarantors and Guarantor Affiliates as set forth in Sections 6.2, 11.5, 11.6, and 11.7 of the Plan; provided, however, that in the event that the Lexel Claims are not deemed to be, and/or not treated as, Class 7 Subordinated Claims, any Secured Claim of Lexel Establishment and/or Lexel Ltd. will be deemed to be, and will be treated as a Class 5 General Unsecured Claim, and any distributions made on account of any Claim of Lexel Establishment will be paid to BPPR (instead of Lexel Establishment) pursuant to the BPPR/Lexel Intercreditor Agreement.

12.     *Class 8 – Equity Interests*

Equity Interests include the legal, equitable, contractual and other rights of a holder of an ownership interest in any of the Debtors, including, without limitation, any interest evidenced by common or preferred stock, membership interests and options or other rights to purchase or otherwise receive any ownership in any of the Debtors.  The Debtors estimate that on the Effective Date, the Allowed amount of such Equity Interests will aggregate approximately $[__].

Class 8 is impaired by the Plan and consists of separate sub-Classes for all Equity Interests in each of the Debtors.  Each holder of an Equity Interest against any Debtor is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

All Equity Interests in any of the Debtors will be deemed canceled and terminated as of the Effective Date, and the holders of an Equity Interest in any of the Debtors will not receive or retain any property or interest in property on account of such Equity Interest.

B.     **Means for Implementing the Plan**

The Plan will be implemented, and the distributions thereunder funded, as described below.

1.     *Settlements*

On the Effective Date and subject to Bankruptcy Court approval, the terms of the BPPR Settlement and the FirstBank Settlement, as described in more detail in Sections IV.O and IV.Q hereof, will be implemented.

2. *Corporate Action*

a. Transfer of Assets and Assumption of Liabilities

On the Effective Date, (i) the Debtors will, in accordance with the Plan, cause the Liquidation Trust Assets to be transferred to the Liquidation Trust and (ii) the Liquidation Trust will assume all obligations of the Debtors under the Plan. For the avoidance of doubt, on the Effective Date, all Insurance Policies, and the Debtors' and the Estates' rights thereunder, including, without limitation, the Debtors' and the Estates' rights to enforce the Insurance Policies, and to collect the Insurance Proceeds from the respective insurers, will be assigned and transferred by the Debtors and the Estates to the Liquidation Trust. The foregoing assignment and transfer will not and will not be deemed to impair, prejudice, or diminish the Liquidation Trust's (or any assignee's) rights to enforce the Insurance Policies or to collect the Insurance Proceeds from the respective insurers.

b. Dissolution of the Debtors

On the Effective Date and upon (i) the Debtors, or such entity designated by the Debtors, making the Effective Date Distributions and (ii) the Debtors causing the Liquidation Trust Assets to be transferred to the Liquidation Trust in accordance with Section 6.1(a) of the Plan, the Debtors will have no further duties or responsibilities in connection with implementation of the Plan, the members of the board of directors or managers, as the case may be, of each of the Debtors will be deemed to have resigned, and each of the Debtors will be deemed dissolved for all purposes without the necessity for any other or further action to be taken by or on behalf the Debtors. The dissolution of the Debtors will not and will not be deemed to impair, prejudice, or diminish the Liquidation Trust's (or any assignee's) rights to enforce the Insurance Policies or to collect the Insurance Proceeds from the respective insurers.

c. Cancelation of Existing Securities and Agreements

On the Effective Date, all agreements and other documents evidencing (i) any Claim or rights of any holder of a Claim against the Debtors, including all indentures and notes evidencing such Claims or (ii) any Equity Interest in the Debtors, including any options or warrants to purchase Equity Interests or any other capital stock of the Debtors, will be canceled; provided, however, that the BPPR Credit Facility will not be canceled, extinguished, and/or terminated pursuant to this Section 6.1(c) of the Plan or any other provision of the Plan, and the BPPR Deficiency Claim will not be released or deemed to be released until paid in full with interest in accordance with the distribution priority terms of the Plan; provided, further, that the foregoing proviso will not and will not be deemed to (x) give rise to any Claims against the Debtors, the Estates, and/or the Liquidating Trust other than the BPPR Claims and/or (y) entitle BPPR to receive or retain any property of the Debtors and/or the Estates other than as provided in the Plan and/or the BPPR Settlement Order. The holders of, or parties to, such canceled agreements and documents will have no rights arising from or relating to such agreements and documents or the cancelation thereof, except the rights provided pursuant to the Plan.

3. *Liquidation Trust*

a. Establishment of the Liquidation Trust

On the Effective Date, (i) the Liquidation Trust will be established pursuant to the Liquidation Trust Documents, (ii) the Liquidation Trustee will be appointed as trustee of the Liquidation Trust, and (iii) the Debtors will transfer the Liquidation Trust Assets to the Liquidation Trust.

b. Powers and Duties of the Liquidation Trustee

The Liquidation Trustee will have the rights and powers set forth in the Liquidation Trust Documents, and will be governed in all things by the terms of the Liquidation Trust Documents and the Plan. Subject to the Liquidation Trust Documents and the limitations and/or obligations set forth in Section 6.2(c) of the Plan, and in consultation with the Liquidation Trust Oversight Board pursuant to Section 6.2(e) of the Plan and the Liquidation Trust Documents, the Liquidation Trustee will be authorized, empowered, and directed to take all

actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including without limitation, to (i) act as the trustee for the Liquidation Trust and administer the Liquidation Trust, (ii) take any action necessary to transfer the Liquidation Trust Assets to the Liquidation Trust and dissolve the Debtors in accordance with the Plan and applicable law, (iii) retain attorneys, advisors, and other professionals (including, without limitation, any professionals previously retained in the Chapter 11 Cases) as may be necessary and appropriate to perform the duties required of, and the obligations assumed by the Liquidation Trustee under the Plan and the Liquidation Trust Documents, (iv) execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Liquidation Trust, (v) open, maintain, and administer bank accounts as necessary to discharge the duties of the Liquidation Trustee under the Plan and the Liquidation Trust Documents, (vi) administer, sell, liquidate, or otherwise dispose of the Liquidation Trust Assets in accordance with the Plan, (vii) request and receive reports from any insurer under the Liability Insurance Policies and the Property and Casualty Insurance Policies regarding the payment of any proceeds of such Liability Insurance Policies and Property and Casualty Insurance Policies, (viii) investigate, commence, and prosecute all Causes of Action transferred to the Liquidation Trust under the Plan to judgment or settlement, and take all other necessary and appropriate steps to collect, recover, liquidate, or otherwise reduce such Causes of Action and Accounts Receivable to Cash, (ix) make, on behalf of the Debtors and their Estates, all transfers and distributions required to be made pursuant to the Plan on and after the Effective Date, including, without limitation, distributions from the proceeds of the Liquidation Trust Assets and the Avoidance Actions, (x) file and prosecute objections to, and negotiate, settle or otherwise resolve, any and all Disputed Claims, including, without limitation, the Tort Claims in accordance with the Claims Administration Procedure, (xi) assume the role of the Debtors to review all Professional Claims and, if warranted, object to any application for final allowance of a Professional Claim on or before the Professional Claims Objection Deadline pursuant to Section 3.1(b) of the Plan, (xii) represent the Debtors' Estates before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the Liquidation Trust, (xiii) prepare and file quarterly financial reports pursuant to Section 6.2(f) of the Plan, and (xix) comply with applicable orders of the Bankruptcy Court and any other court of competent jurisdiction over the matters set forth herein, and all applicable laws and regulations concerning the matters set forth herein.

<p style="text-align:center;">c. Collection of Insurance Proceeds</p>

<p style="text-align:center;">(i) Insurance Collection</p>

In consideration for his agreement to collect insurance proceeds on behalf of the Debtors, the Estates, and the Liquidation Trust, as applicable, as set forth in the Plan Support Agreement, Gad Zeevi, on behalf of himself, the Guarantors and the Guarantor Affiliates, will have the full power and authority, and will be duly appointed as the Debtors' representative, to pursue and collect from insurers the proceeds (the "**Insurance Proceeds**") of the Debtors' insurance policies (other than liability policies and insurance policies and/or assets transferred to the Purchaser) on behalf of the Debtors' estates, and/or the Liquidation Trust for the benefit of holders of Allowed Claims against the Debtors (including BPPR) entitled to receive distributions under the Plan, including, without limitation, the ability and authority to exercise all of the Debtors' rights under any insurance policies; provided, however, that with respect to the Liability Insurance Policies, the Debtors (and/or Liquidation Trustee) will have the power and authority to pursue and collect the Liability Insurance Policies and will consult and coordinate with Gad Zeevi in connection with any such collection efforts and subsequent distribution of proceeds of the Liability Insurance Policies (the "**Liability Insurance Proceeds**"); provided, further, that Gad Zeevi will consult and coordinate with BPPR in connection with the Collection Efforts (as defined in section 6.2(c)(ii) of the Plan) and any resolution with respect to the Property and Casualty Insurance Policies; provided, further, that nothing herein will prevent any insured or additional insured under such Liability Insurance Policies from asserting any right to challenge any future distribution of Liability Insurance Proceeds to third parties pursuant to the terms of the underlying insurance policies; provided, further, however that nothing in the Plan Support Agreement or the Plan will authorize or permit Gad Zeevi, the Debtors and/or the Liquidation Trustee or any other person to challenge or seek to recover any prior payment to BPPR or Westernbank of any proceeds of insurance. Unless both (i) BPPR and (ii) the Debtors and/or the Liquidation Trustee, as applicable, and the Creditors Committee agree in advance to an alternative disposition of particular Insurance Proceeds in payment of Allowed Claims or Allowed Administrative Expense Claims, all Insurance Proceeds collected by Gad Zeevi will be transferred to the Debtors (before the Effective Date) or the Liquidation Trust (following the Effective Date) for distribution in accordance with the Plan or applicable orders of the Bankruptcy Court. Insurance Proceeds will not be used to pay Claims or expenses asserted against the Debtors by any of Gad Zeevi, the Guarantors, and/or the Guarantor Affiliates.

(ii)     Commercially Reasonable Best Efforts

Gad Zeevi will use commercially reasonable best efforts (the "**Collection Efforts**") to collect from insurers any Insurance Proceeds on behalf of the Debtors, the Estates, and/or the Liquidation Trust and to cooperate with the Liquidation Trustee in connection with collection from insurers of any Insurance Proceeds, including Liability Insurance Proceeds.  Gad Zeevi will bear his own costs and expenses in connection with his efforts to collect from insurers any Insurance Proceeds; provided that, and for the avoidance of doubt, Gad Zeevi will have no obligation to incur costs and expenses in connection with his Collection Efforts, including any attorneys' and/or expert witness fees.  Gad Zeevi will provide the Debtors and/or the Liquidation Trustee, as applicable, and BPPR with monthly status updates (either in written or telephonic form) regarding the Collection Efforts and any distribution of Insurance Proceeds to the Estates, the Liquidation Trust, or any claimant.

(iii)     Agreement to Support Collection Efforts

The Debtors and/or the Liquidation Trustee, and BPPR will use commercially reasonable best efforts to cooperate with Gad Zeevi in his efforts to collect from insurers any Insurance Proceeds, including (A) executing any documents reasonably necessary to facilitate the Collection Efforts as and when requested; (C) filing any motions with the Court seeking approval of any insurance-related settlement; and (C) obtaining all necessary consents from any additional named insured parties under the Debtors' insurance policies, including FirstBank; provided, however, that any settlement or compromise with respect to the Debtors' insurance policies and/or Insurance Proceeds (other than the Liability Insurance Proceeds) will require the express prior written consent of BPPR (which consent will not be unreasonably withheld), or the Creditors Committee and Debtors (or Liquidation Trustee following the Effective Date of the Plan) with respect to the Liability Insurance Proceeds.  In connection with efforts to collect from insurers any Insurance Proceeds, the Debtors and/or the Liquidation Trustee, as applicable, and BPPR (but only to the extent it possesses such requested information) will be required to provide Gad Zeevi with, and authorize him to use and receive, any and all material accumulated and/or prepared by the Debtors and/or their experts in connection with the investigation of the October 2009 explosions and all insured occurrences related thereto.

(iv)     Chartis Liability Proceeds

The first $4 million of Insurance Proceeds (the "**Chartis Liability Proceeds**") derived from the Umbrella Insurance Policy, will be used on or after the Effective Date (whether or not such Chartis Liability Proceeds are received by the Estates before the Effective Date) to satisfy Allowed Administrative Expense Claims asserted against the Debtors and the Estates (as directed under the Plan or otherwise in accordance with applicable orders of the Bankruptcy Court and subject to the applicable provisions of the BPPR/Guarantors Settlement Agreement); provided, however, for the avoidance of doubt, the holders of Allowed General Unsecured Claims will not be entitled to receive any portion of any increase in the Excess Administrative and Priority Claims Reserve Amount attributable to the payment of any Administrative Expense Claims from the proceeds of the Umbrella Insurance Policy in accordance with Section 6.2(c)(iv) of the Plan.

d.     Collection of BPPR Accounts Receivable Proceeds

Following the Effective Date, the Liquidation Trustee will use commercially reasonable efforts to collect the Accounts Receivable and promptly distribute to BPPR the BPPR Accounts Receivable Proceeds in accordance with the Plan, less reasonable costs and expenses incurred by the Liquidation Trustee in connection with the liquidation of the Accounts Receivable.  The Liquidation Trustee will consult and coordinate with BPPR in connection with the liquidation of the Accounts Receivable and  any settlement, collection, and/or disposition of any Accounts Receivable.

e.     Liquidation Trust Oversight Board

The Liquidation Trust Oversight Board will be (i) comprised of three (3) members, one (1) of which is selected by the Debtors, and two (2) of which are selected by the Creditors Committee and (ii) approved by the Bankruptcy Court pursuant to the Confirmation Order.  In addition, BPPR will have observer rights with respect

to, and may attend, observe, and be heard at (to the extent BPPR elects to attend and observe), any Liquidation Trust Oversight Board meetings and conferences with or without the Liquidation Trustee. BPPR will receive advance notice of all Liquidation Trust Oversight Board meetings and conferences. The Liquidation Trust Oversight Board will serve as an advisory board to the Liquidation Trust, and the Liquidation Trustee will consult with the Liquidation Trust Oversight Board (and BPPR) with respect to all matters determined by the Liquidation Trustee to be material to the administration of the Liquidation Trust. In addition, as more fully set forth in the Liquidation Trust Documents, the Liquidation Trustee must obtain the consent of the Liquidation Trust Oversight Board with respect to matters concerning (i) the settlement, collection, and/or disposition of any Liability Insurance Policies and any Liability Insurance Proceeds, (ii) the resolution of any unsecured Claim that is asserted, settled, or Allowed in an amount in excess of $5 million, or any Administrative Expense Claim, Priority Tax Claim, or Priority Non-Tax Claim that is asserted, settled, or entitled to payment in an amount exceeding $50,000, and (iii) any other matters related to insider Claims or issues. The Liquidation Trustee also will obtain the consent of BPPR with respect to matters concerning (i) the settlement, collection, and/or disposition of any Accounts Receivable, any BPPR Accounts Receivable Proceeds, any Property and Casualty Insurance Policies, and any proceeds of any of the Property and Casualty Insurance Policies and (ii) the resolution of any Administrative Expense Claim, Priority Tax Claim, or Priority Non-Tax Claim that is asserted, settled, or entitled to payment in an amount exceeding $50,000. Notwithstanding the foregoing and the Liquidation Trustee's duty to consult with the Liquidation Trust Oversight Board and BPPR, except with respect to the above enumerated issues, the Liquidation Trustee will have final decision-making authority with respect to Liquidation Trust matters.

f.     Accounting and Reporting

The Liquidation Trustee will maintain an accounting of receipts and disbursements with respect to the Liquidation Trust, which will be open to inspection and review by the Bankruptcy Court and any holder of an Allowed Claim or their respective professionals, upon reasonable notice to the Liquidation Trustee. After the Effective Date, the Liquidation Trustee will serve the United States Trustee with, and will file with the Bankruptcy Court, a quarterly financial report for each quarter (or portion thereof) that the Chapter 11 Cases remain open, as well as a final financial report after the Bankruptcy Court enters a final decree closing each of the Chapter 11 Cases. The quarterly financial report with respect to the Liquidation Trust will include (i) a statement of all disbursements made during the course of the quarter, whether or not pursuant to the Plan, (ii) a summary, by Class, of distributions made or other property transferred to each recipient under the Plan, and an explanation of the failure to make any distributions or other transfers of property under the Plan, (iii) projections as to the continuing ability of the Liquidation Trust to comply with the terms of the Plan, (iv) a statement of the aggregate funds of the Administrative and Priority Claims Reserve, the General Unsecured Claims Reserve, and the Plan Expenses Reserve, (v) a description of any other factors that may materially affect the ability to consummate the Plan, and (vi) an estimated date when an application for a final decree closing any or all of the Chapter 11 Cases will be filed with the Bankruptcy Court (or, in the case of the final quarterly report, the date upon which the final decree was entered by the Bankruptcy Court).

g.     Plan Expenses

The Liquidation Trustee may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid Plan Expenses. All Plan Expenses will be charged against and paid from the Plan Expenses Reserve and, thereafter, paid from the Liquidation Trust. On the Effective Date, the Liquidation Trustee will establish the Plan Expenses Reserve with the Plan Expense Reserve Amount, to be funded from the Sale Proceeds in accordance with the BPPR Settlement, which Plan Expenses Reserve Amount will vest in the Liquidation Trust free and clear of all liens, Claims, encumbrances, charges and other interests. Upon satisfaction of all valid Plan Expenses and entry by the Bankruptcy Court of a final decree closing each of the Chapter 11 Cases, any remaining balance of the Plan Expenses Reserve will be distributed by the Disbursement Agent in accordance with the Plan, the Liquidation Trust Documents, and the BPPR Settlement Order as soon as practicable thereafter.

h.     Retention of Professionals

The past or current retention of any professional in the Chapter 11 Cases will not be asserted by any party in interest as a basis to disqualify such professional from being retained by the Liquidation Trust.

Attorneys, advisors and any other professionals retained by the Liquidation Trustee will submit to the Liquidation Trustee periodic statements for all reasonable compensation for services rendered, and reimbursement for actual and necessary expenses incurred, by such professionals. The Liquidation Trustee will have twenty (20) days to object to any such statement. In the event that an objection is received by a professional and cannot be promptly resolved by such professional and the Liquidation Trustee, the dispute will be submitted by the Liquidation Trustee, to the Bankruptcy Court for adjudication. The Bankruptcy Court will retain jurisdiction to adjudicate any such objection. In the event that no objection is raised to a statement within the twenty (20) day period, such statement will be promptly paid by the Liquidation Trustee.

i.      Resignation/Removal of Liquidation Trustee

The Liquidation Trustee may resign or be removed in accordance with the Liquidation Trust Documents. Any successor Liquidation Trustee will be appointed by the Liquidation Trust Oversight Board in accordance with the Liquidation Trust Documents.

j.      Termination of the Liquidation Trust

The Liquidation Trust will terminate upon the earlier of (i) the five (5) year anniversary of the Effective Date or (ii) the entry by the Bankruptcy Court of a final decree closing each of the Chapter 11 Cases and submission by the Liquidation Trustee of the final financial report to the Bankruptcy Court pursuant to Section 6.2(f) of the Plan. On or prior to the date of termination of the Liquidation Trust, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidation Trust, for cause shown. Upon termination of the Liquidation Trust and as soon as reasonably practicable thereafter, the balance of any Cash and other property of the Liquidation Trust will be distributed in accordance with the Plan and the Liquidation Trust Documents.

k.      Reservation of Rights for Additional Trust(s)

The Debtors and the Liquidation Trustee, as applicable, reserve the right to establish an additional trust(s) on or after the Effective Date if the Debtors or the Liquidation Trustee, as applicable, determine that the establishment of such trust(s) is necessary to the administration of the Plan and fulfillment of the fiduciary duty to maximize the value of the Liquidation Trust Assets. Such additional trust(s) will be subject to the same governance as the Liquidation Trust and funded from the Plan Expense Reserve; provided, however, that the Debtors and the Liquidation Trustee, as applicable, reserve the right to change the governance of such additional trust(s) at any time and without the need for any action by the Bankruptcy Court. For the avoidance of doubt, no additional trust established pursuant to Section 6.3 of the Plan will be funded from any Sale Proceeds (other than the Plan Expenses Reserve).

l.      Limitation on Liability

No recourse will ever be had, directly or indirectly, against the Liquidation Trustee, or its officers, directors, agents, employees, attorneys, advisors or other professionals, or any member of the Liquidation Trust Oversight Board by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, or note, or upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidation Trustee under the Plan or by reason of the creation of any indebtedness by the Liquidation Trustee under the Plan for any purpose authorized by the Plan. All such liabilities, covenants, and agreements of the Liquidation Trustee, their respective officers, directors, agents, employees, attorneys, advisors or other professionals, whether in writing or otherwise, under the Plan will be enforceable, if at all, only against, and will be satisfied only out of, the Plan Expenses Reserve. Every undertaking, contract, covenant or agreement entered into in writing by the Liquidation Trustee will provide expressly against the personal liability of the Liquidation Trustee. The Liquidation Trustee and its officers, directors, agents, employees, attorneys, advisors and other professionals, and each of the members of the Liquidation Trust Oversight Board will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their respective best judgment, and the fact that such act or omission was advised, directed or approved by the Liquidation Trust Oversight Board or an attorney acting as counsel for the Liquidation Trustee, as applicable, will be conclusive evidence of such good faith and best judgment; provided, however, that Section 6.4 of the Plan will not apply to any

gross negligence or willful misconduct by the Liquidation Trustee or its officers, directors, agents, employees, attorneys, advisors or other professionals, or any member of the Liquidation Trust Oversight Board.

4.      *Reliance on Documents*

The Liquidation Trustee may rely, and will be protected in acting or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by it to be genuine and to have been signed or presented by the proper entity.

5.      *Requirement of Undertaking*

The Liquidation Trustee may request any court of competent jurisdiction to require, and any such court may in its discretion require, in any suit for the enforcement of any right or remedy under the Plan, or in any suit against the Liquidation Trustee for any act taken or omitted by the Liquidation Trustee that the filing party litigant in such suit undertake to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

6.      *Tort Claims*

All Tort Claims are Disputed Claims. Each of the Tort Claims as to which a proof of claim was timely filed in the Chapter 11 Cases by the time provided in the General Bar Date Order or by the Government Bar Date, as applicable, will be determined and liquidated in accordance with the Claims Administration Procedure. The Debtors and the Liquidation Trustee reserve the right to file an objection to any Tort Claim with the Bankruptcy Court to the extent that resolution of such objection would not impair any right of the holder of such Tort Claim to a jury trial.

7.      *Administrative and Priority Claims Reserve*

On the Effective Date, the Liquidation Trustee will establish the Administrative and Priority Claims Reserve with the Administrative and Priority Claims Reserve Amount, funded from the Sale Proceeds, which funds will vest in the Liquidation Trust free and clear of all liens, Claims, encumbrances, charges and other interests. As soon as practicable after all Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims have been either Allowed (and received a distribution in accordance with the Plan) or Disallowed by the Plan, the Confirmation Order, or Final Order of the Bankruptcy Court, the Liquidation Trustee, in consultation with BPPR and the Liquidation Trustee Oversight Board, will determine the amount of the Excess Administrative and Priority Claims Reserve and, subject to the Liquidation Trustee reaching an agreement with BPPR and the Liquidation Trust Oversight Board on such amount and the allocation thereof to be made in accordance with the Plan, the Disbursement Agent will distribute the Excess Administrative and Priority Claims Reserve in accordance with the Plan, the Liquidation Trust Documents, and the BPPR Settlement Order. For the avoidance of doubt, the holders of Allowed General Unsecured Claims will not be entitled to receive any portion of any increase in the Excess Administrative and Priority Claims Reserve Amount attributable to the payment of any Administrative Expense Claims from the proceeds of the Umbrella Insurance Policy in accordance Section 6.2(c)(iv) of the Plan.

8.      *General Unsecured Claims Reserve*

On the Effective Date, the Liquidation Trustee will establish the General Unsecured Claims Reserve with the General Unsecured Claims Reserve Amount, funded from the Sale Proceeds in accordance with the BPPR Settlement, which General Unsecured Claims Reserve Amount will vest in the Liquidation Trust free and clear of all liens, Claims, encumbrances, charges and other interests. In the event that all General Unsecured Claims have been either Allowed (and received a distribution in accordance with the Plan) or Disallowed by the Plan, the Confirmation Order, or Final Order of the Bankruptcy Court, any remaining balance of the General Unsecured Claims Reserve will be distributed by the Disbursement Agent in accordance with the Plan, the Liquidation Trust Documents, and the BPPR Settlement Order as soon as practicable thereafter.

9. *Causes of Action*

a. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code or any corresponding provision of federal or state laws, and except as otherwise provided in the Final DIP Order, the BPPR Settlement Order, the Plan, or the Confirmation Order, (i) on the Effective Date, all Causes of Actions that are not Purchased Assets will be transferred to and vested in the Liquidation Trust and (ii) on and after the Effective Date, all such Causes of Action will be retained by the Liquidation Trust, and the Liquidation Trust and/or the Liquidation Trustee may, in accordance with the Liquidation Trust Documents, enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action.

b. No Waiver

Except as otherwise provided in Section 11.6(a) of the Plan, nothing in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable right or defense that the Debtors (through the Liquidation Trustee) may have or choose to assert on behalf of the Debtors or their respective Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any entity, to the extent such entity asserts a cross-claim, counterclaim, and/or claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (ii) the turnover of any Asset, and (iii) the Debtors' right to object to any Claim or Equity Interest pursuant to section 502(d) of the Bankruptcy Code. No entity may rely on the absence of a specific reference in the Plan to any Cause of Action against them as an indication that the Liquidation Trustee or the Purchaser will not pursue any and all available Causes of Action against them. The Liquidation Trustee and the Purchaser expressly reserve all rights to prosecute any and all Causes of Action against any entity except as otherwise provided in the Plan. Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Confirmation Order, or other Final Order of the Bankruptcy Court, the Debtors expressly reserve all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, estoppel (judicial, equitable or otherwise) or laches, will apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

10. *Effectuating Documents and Further Transactions*

Upon entry of the Confirmation Order, the Debtors, and the Liquidation Trustee will be authorized and are instructed to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements and documents and take such actions as may be reasonably necessary or appropriate to effectuate, implement, consummate and further evidence the terms and conditions of the Plan, including, without limitation, implementing all settlements and compromises as set forth in or contemplated by the Plan, and performing all obligations under the Plan. As of the Effective Date, no member, partner or equity security holder of the Debtors will take any action that affects, alters or creates any additional or incremental liability for or imputed to the Debtors.

11. *Authority to Act*

Prior to, on, or after the Effective Date, as applicable, all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, equity security holders, officers, directors, partners, managers, members, or other owners of one or more of the Debtors will be deemed to have occurred and will be in effect prior to, on, or after the Effective Date, as applicable, pursuant to the applicable law of the states in which the Debtors are formed, without any requirement of further vote, consent, approval, authorization or other action by such stockholders, equity security holders, officers, directors, partners, managers, members or other owners of such entities or notice to, order of or hearing before the Bankruptcy Court.

C.    **Provisions Governing Distributions**

1.    *Distribution Record Date*

Except as otherwise provided in the Plan, as of 12:00 p.m. (prevailing Eastern time) on the Distribution Record Date, there will be no further changes in the recordholders of any Claim against, or Equity Interest in, the Debtors, and the Debtors and the Liquidation Trustee will have no obligation to recognize any transfer of any Claim against, or Equity Interest, in the Debtors occurring after the Distribution Record Date. The Debtors and the Liquidation Trustee will be entitled to recognize and deal for all purposes under the Plan only with those recordholders of Claims against and Equity Interests in the Debtors as of 12:00 p.m. (prevailing Eastern time) on the Distribution Record Date, to the extent applicable.

2.    *Date of Distributions Under the Plan*

a.    Distributions on the Effective Date

Except as otherwise provided herein or pursuant to an agreement or understanding between the Debtors or the Liquidation Trustee and the holder of a Claim that is Allowed as of the Effective Date, all transfers and distributions required to be made under the Plan with respect to Claims that are Allowed as of the Effective Date will be made by the Disbursement Agent on or as soon as practicable after the Effective Date.

b.    Distributions After the Effective Date

Except as otherwise provided in the Plan or pursuant to agreement or understanding between the Debtors or the Liquidation Trustee and the holder of a Disputed Claim, if a Disputed Claim becomes Allowed after the Effective Date, the Disbursement Agent will make all transfers and distributions with respect to such Claim on or as soon as practicable after the date on which such Claim becomes Allowed, pursuant to the terms and provisions of the Plan. Distributions made after the Effective Date to holders of Allowed Claims will be deemed to have been made on the Effective Date, and, except as otherwise provided in the Plan, no interest will accrue or be payable with respect to such claims or any distribution related thereto.

3.    *Sources for Distributions*

All Cash required for the payments to be made pursuant to the Plan will be obtained from the Cash held by the Debtors or the Liquidation Trust, as applicable.

4.    *Manner of Payment*

Any distributions to be made on behalf of the applicable Debtor pursuant to the Plan will be made by checks drawn on accounts maintained by the Debtors or the Liquidation Trustee, as applicable, or by wire transfer if circumstances justify, at the option of the Debtors or the Liquidation Trustee, as applicable.

5.    *Disbursement Agent*

All transfers and distributions required under the Plan will be made in accordance with the terms and provisions of the Plan and the Liquidation Trust Documents by the Debtors or the Liquidation Trustee, as applicable, as Disbursement Agent or such other entity designated by the Debtors or the Liquidation Trustee, as applicable, as Disbursement Agent. For the avoidance of doubt, the Debtors, or such other entity designated by the Debtors, will act as Disbursement Agent with respect to all Effective Date Distributions.

6.    *Delivery of Distributions*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim will be made to the address of such holder as set forth in the Schedules or the books and records of the Debtors or its agents, as applicable, unless the Debtors or the Liquidation Trustee has been notified in writing of a change of address,

including by the filing of a proof of claim by such holder that contains an address for such holder different from the address reflected in the Debtors' Schedules or books and records.

7. *Allocation of Distributions Between Principal and Interest*

The aggregate consideration to be distributed to the holders of Allowed Claims under the Plan will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claims of such holders, as determined for federal income tax purposes, and any remaining consideration as satisfying accrued but unpaid interest, if any.

8. *No Postpetition Interest on Claims*

Except as otherwise provided for in the Plan, the Confirmation Order, the Final DIP Order, or any other order entered by the Bankruptcy Court, or as required by applicable law, postpetition interest will not accrue on or after the Commencement Date on account of any Claim.

9. *No Distribution in Excess of Allowed Amount of Claim*

Notwithstanding any other provision of the Plan, no holder of an Allowed Claim will receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim.

10. *Distributions with Respect to Disputed Claims*

Notwithstanding any other provision of the Plan, if all or any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. Until such time as a Disputed Claim is determined by Final Order, or, with respect to any Tort Claim, pursuant to the Claims Administration Procedure, the Liquidation Trust will withhold on account of such Claim the distribution to which the holder of such Claim would be entitled under Article V of the Plan if such Claim were Allowed in full; provided, however, that the Liquidation Trust will not be required to withhold on account of any Tort Claim with respect to which the holder of such Tort Claim declined Arbitration (as defined in the Claims Administration Procedure) pursuant to the Claims Administration Procedure. At such time as a Disputed Claim becomes an Allowed Claim, the Disbursement Agent will distribute to the holder of such Claim the property distributable to such holder pursuant to the Plan. To the extent that all or a portion of a Disputed Claim is Disallowed or expunged, the holder of such Claim will not receive any distribution on account of the portion of such Claim that is Disallowed or expunged.

11. *Distributions with Respect to Defendants*

Notwithstanding any other provision of the Plan, the Liquidation Trustee may, in its exclusive discretion, withhold any and all distributions on account of any portion of a Claim held by an entity that (a) is a defendant in any pending contested matter or adversary proceeding being prosecuted by the Liquidation Trustee or (b) against whom the Liquidation Trustee may assert a Cause of Action.

12. *Disputed Payments*

If any dispute arises as to the identity of a holder of an Allowed Claim that is to receive any distribution under the Plan, the Disbursement Agent may, in lieu of making such distribution to such entity, make such distribution into an escrow account until such dispute is resolved by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

13. *Setoffs*

Except as otherwise provided in the Plan, the Confirmation Order, or in an agreement approved by a Final Order of the Bankruptcy Court, the Liquidation Trustee may, pursuant to applicable law (including section 553 of the Bankruptcy Code), set off against any distribution related to any Claim before such distribution is made

on account of such Claim, any and all of the Claims (other than Claims released pursuant to the Plan), rights and Causes of Action of any nature that the Debtors, the Estates, or the Liquidation Trust may hold against the holder of such Claim; provided, however, that none of the Debtors, the Liquidation Trust, or the Liquidation Trustee will, or will be entitled, to assert any right to setoff against (i) the DIP Lender or (ii) BPPR; provided, further, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, or any other act or omission of the Liquidation Trustee, nor any provision of the Plan, will constitute a waiver or release by the Liquidation Trustee of any such Claims, rights and Causes of Action that the Liquidation Trustee may possess against such holder. To the extent that the Liquidation Trustee sets off a Claim of the Debtors' Estates against a holder of a Claim against the Debtors before a distribution is made to the holder of such Claim against the Debtors pursuant to the Plan, the Liquidation Trustee will be entitled to full recovery on the Debtors' Claim against such holder. No provision in the Plan will be deemed to expand any right of setoff under applicable law. Notwithstanding the foregoing and any other provision of the Plan, the Liquidation Trustee will not set off any Claim of the Debtors or the Estates against a Claim against the Debtors or the Estates if such set off would reduce or have the effect of reducing any BPPR Accounts Receivable Proceeds, whether or not reduced to Cash; provided, however, that no provision in the Plan will prevent the holder of a Claim from asserting or, upon entry of a Final Order of the Bankruptcy Court, effectuating a valid right of setoff against the Debtors or the Estates. Notwithstanding the foregoing, no provision in the Plan, the Confirmation Order, or any other document that implements the Plan will affect any setoff or recoupment right of the United States government.

14.    *Unclaimed Property*

a.    Escrow of Unclaimed Property

The Liquidation Trustee will hold all Unclaimed Property for the benefit of the holders of Claims entitled thereto under the terms of the Plan. The Liquidation Trustee will use reasonable efforts to determine the current address of the holders of Claims entitled to Unclaimed Property, but no distribution to such holders will be made unless and until the Liquidation Trustee has determined the then current address of such holders, at which time such distribution will be made to such holders without any interest thereon whatsoever, except as otherwise provided in the Plan.

b.    Distribution of Unclaimed Property

Upon the conclusion of one hundred and twenty (120) calendar days following the date that any Cash or other property becomes Unclaimed Property, the holders of Allowed Claims theretofore entitled to such Unclaimed Property will be deemed to have forfeited such property, whereupon (i) all rights and title to and interest in such Unclaimed Property will immediately and irrevocably re-vest in the Liquidation Trust for the benefit of holders of Allowed, but as yet not fully paid, Claims in the Class in which the applicable Claim was classified, (ii) such holders will cease to be entitled to such Unclaimed Property or any further distributions on account of such Claims, (iii) such Claims will be deemed to be Disallowed and expunged to the extent of such forfeiture, and (iv) such Unclaimed Property will be redistributed Pro Rata by the Disbursement Agent to any Allowed Claims that remain unpaid, either in whole or in part, in the Class in which the applicable Claim was classified. If no Allowed Claims remain unpaid within the Class in which the applicable Claim was classified, the Unclaimed Property will be distributed by the Disbursement Agent in accordance with the Plan and the Liquidation Trust Documents.

15.    *Claims Paid by Third Parties*

To the extent that a holder of a Claim against the Debtors receives payment on account of such Claim from a party that is not the Disbursement Agent, such Claim will be reduced accordingly without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court; provided, however, that the foregoing will not apply to BPPR and the BPPR Claims. To the extent that a holder of a Claim against the Debtors receives a distribution on account of such Claim and also receives payment from a party that is not the Disbursement Agent on account of such Claim, such holder will, within thirty (30) calendar days of receipt thereof, repay and/or return the distribution to the Disbursement Agent, to the extent that the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim; provided, however, that the foregoing will not apply to BPPR and the BPPR Claims.

16.     *Distributions Free and Clear*

Except as otherwise provided in the Plan, any distribution or transfer made under the Plan, including, without limitation, distributions to any holder of an Allowed Claim, will be free and clear of any liens, Claims, encumbrances, charges and other interests, and no other entity will have any interest, whether legal, beneficial or otherwise, in property distributed or transferred pursuant to the Plan.

17.     *Time Bar to Cash Payments*

Checks issued by the Disbursement Agent, on behalf of the Debtors in respect of Allowed Claims will be null and void if not presented for payment within sixty (60) calendar days after the date of issuance thereof. Requests for reissuance of any check will be made to the Liquidation Trustee by the holder of the Allowed Claim to whom such check originally was issued on or before thirty (30) calendar days after the expiration of the sixty (60) calendar day period following the date of issuance of such check. After such date, all funds held on account of such voided check will be redistributed by the Disbursement Agent in accordance with the Plan and the Liquidation Trust Documents.

18.     *De Minimis Distributions*

Except as otherwise provided in the Plan, the Disbursement Agent will not have any obligation to make a distribution on account of an Allowed Claim if the amount to be distributed to the holder of such Claim on the particular Periodic Distribution Date is less than $10 and does constitute a final distribution to such holder. The Disbursement Agent will have no obligation to make any distribution on account of Claims Allowed in an amount less than $500.

19.     *Transfer of Property Under Plan*

All transfers of property under the Plan will be made in accordance with applicable nonbankruptcy law, including any laws governing the transfer of property by a corporation or a trust that is not a moneyed, business, or commercial corporation or trust.

**D.      Provisions for Resolving and Treating Disputed Claims**

1.      *Objections to Claims*

As of the Effective Date, the Liquidation Trustee, will have the exclusive right to file and prosecute objections to, and negotiate, settle or otherwise resolve, any and all Claims (except Professional Claims); provided, however, that in the event that any Proponent files an objection to, or motion to subordinate, a Claim prior to the Effective Date, such objection and/or motion will automatically be assigned to the Liquidation Trustee on the Effective Date. Except as otherwise provided herein, any objection to a Claim will be filed and served upon the holder of such Claim on or before the Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim will be deemed properly served on the holder of such Claim or if service is made in any of the following manners (i) in accordance with rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004, (ii) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the holder of such Claim in the Chapter 11 Cases and has not withdrawn such appearance, (iii) by first class mail, postage prepaid, on the signatory on the respective proof of claim or interest or other representative identified on the proof of claim or interest or any attachment thereto, or (iv) at the last known address of the holder of such Claim if no proof of claim is filed or if the Debtors or the Liquidation Trustee has been notified in writing of a change of address.

2.      *Estimation of Claims Post-Effective Date*

As of the Effective Date, the Liquidation Trustee will have the exclusive right to request at any time that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, for any reason or purpose, regardless of whether an objection has been previously filed with respect to such Claim or

whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim including, without limitation, during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism set forth in the Plan or approved by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event will any holder of a Claim that has been estimated be entitled to seek reconsideration of the estimation of such Claim unless the holder of such Claim has filed a motion requesting the right to seek such reconsideration on or before thirty (30) calendar days after the date such Claim is estimated by the Bankruptcy Court.

3.  *Late-Filed Claims and Amendments to Claims*

Pursuant to section 502(b)(9) of the Bankruptcy Code, any Claim that is not filed on or before the applicable deadline to file such Claim will be Disallowed and expunged in full as of the Effective Date without any action required of the Debtors, the Liquidation Trustee, or the Bankruptcy Court. On or after the applicable deadline to file a Claim, the holder of such Claim must obtain prior authorization from the Bankruptcy Court, or the Debtors or the Liquidation Trustee (as applicable), to file or amend such Claim. Any new or amended Claim filed after the applicable deadline to file such Claim without such prior authorization will not appear on the register of Claims and will be deemed Disallowed and expunged in full without any action required of the Debtors, the Liquidation Trustee, or the Bankruptcy Court.

4.  *Settlement of Disputed Claims*

Except as otherwise provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, as of the Effective Date, the Liquidation Trustee will have the exclusive authority to compromise, settle, or otherwise resolve all Claims, rights, Causes of Actions, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors' Estates may hold against any entity, without the necessity for notice to or approval by the Bankruptcy Court or any other party in interest.

E.  **Treatment of Executory Contracts and Unexpired Leases**

1.  *Rejection of Remaining Executory Contracts and Unexpired Leases*

All executory contracts and unexpired leases to which any of the Debtors is a party, will be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, except for those executory contracts or unexpired leases that (i) have already been rejected pursuant to a Final Order of the Bankruptcy Court, (ii) have previously expired or terminated pursuant to their own terms (and not otherwise extended), or (iii) were assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Order. Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such rejections and a finding that such rejected executory contracts or unexpired leases are burdensome and that the rejection thereof is in the best interests of the Debtors and the Estates. For the avoidance of doubt, the Liability Insurance Policies and the Property and Casualty Insurance Policies are not and will not be rejected by the Plan.

2.  *Objections to Rejection*

Any non-Debtor party to an executory contract or unexpired lease that wishes to object to the rejection of such executory contract or unexpired lease, must file an objection with the Bankruptcy Court by the Confirmation Objection Deadline and serve such objection on counsel to the Debtors. The failure to properly file and serve an objection to the Debtors' rejection on or before the Confirmation Objection Deadline will result in the non-Debtor party to the applicable executory contract or unexpired lease being (i) deemed to consent to such rejection and (ii) barred, estopped, and permanently enjoined from (a) objecting to such rejection and precluded from being heard at the Confirmation Hearing with respect to such objection and (b) asserting against the Debtors, the Estates, any of the Debtors' property, the Liquidation Trustee, or the Purchaser any default existing as of the Effective Date or any counterclaim, defense, setoff, or any other interest. With respect to any timely-filed and properly-served objection to the Debtors' proposed rejection, the Debtors may, in their sole discretion, settle or

otherwise resolve such objection, or respond to such objection (in which case the Bankruptcy Court will decide such objection at the Confirmation Hearing).

3.    *Rejection Damage Claims*

All Rejection Damage Claims will be treated as General Unsecured Claims and classified in Class 5, and may be objected to in accordance with the provisions of Article VIII of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.  All proofs of claim with respect to Rejection Damage Claims must be filed with the Bankruptcy Court and served on the Debtors on or before (i) the first Business Day that is thirty (30) calendar days after entry of an order authorizing the rejection of the respective executory contract or unexpired lease, including the Confirmation Order with respect to the executory contracts and unexpired leases rejected pursuant to the Plan and (ii) such other date as is ordered by the Bankruptcy Court.  The failure to property file and serve a proof of claim with respect to a Rejection Damage Claim by the applicable deadline set forth in Section 9.3 of the Plan will result in such Claim being deemed forever barred and Disallowed as of the Effective Date without the need for any objection by the Debtors or the Liquidation Trustee or any action by the Bankruptcy Court.

4.    *Modifications*

Modifications, amendments, supplements and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith, (i) do not alter in any way the prepetition nature of the executory contracts and unexpired leases, or the validity, priority or amount of any Claims against the Debtors that may arise under such executory contract or unexpired lease, (ii) are not and do not create postpetition contracts or leases, (iii) do not elevate to Administrative Expense Claims any Claims of the counterparties to the executory contracts and unexpired leases against any of the Debtors, and (iv) do not entitle any entity to a Claim under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition executory contracts or unexpired leases and subsequent modifications, amendments, supplements or restatements.

**F.    Effect of Confirmation of the Plan on the Debtors**

1.    *Vesting of Assets*

On the Effective Date, except as otherwise provided in the Plan, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, the Liquidation Trust Assets will vest in the Liquidation Trust, subject to the rights and interests of the beneficiaries of the Liquidation Trust.

2.    *Binding Effect*

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Equity Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

3.    *Injunction Against Interference with the Plan*

Except as otherwise provided in the Plan, upon entry of the Confirmation Order, all holders of Claims against, or Equity Interests in, any of the Debtors, and other parties in interest, along with any current or former officers, directors, employees, agents, representatives, partners, limited partners, members, trustees, managers, affiliates, parents, subsidiaries, attorneys, auditors, appraisers, accountants, financial advisors, investment bankers, consultants, or other professionals of any of the foregoing and any entity controlling or controlled by any of the foregoing and any predecessors, successors and assigns of any of the foregoing, will be enjoined from seeking to oppose, delay, interfere or otherwise frustrate implementation or consummation of the Plan.

4.  *Term of Injunctions or Stays Arising Under or Entered During the Chapter 11 Cases*

Except as otherwise provided in the Plan, (i) all injunctions with respect to or stays against an action against property of the Debtors' Estates arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, and in existence on the Confirmation Date, will remain in full force and effect until such property is no longer property of the Debtors' Estates and (ii) all other injunctions and stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code will remain in full force and effect until the earliest of (a) the date that the Chapter 11 Cases are closed pursuant to a Final Order of the Bankruptcy Court or (b) the date that the Chapter 11 Cases are dismissed pursuant to a Final Order of the Bankruptcy Court.

5.  *Exculpation*

*To the fullest extent permissible under applicable law, except as otherwise provided in the Plan, none of the (i) Debtors and the Estates, (ii) the Guarantors, (iii) the Guarantor Affiliates, (iv) FOI, (v) Liquidation Trustee, (vi) the Creditors Committee and its members, (vii) the DIP Lender, (viii) BPPR in its capacity as lender under the BPPR Credit Facility and Westernbank's predecessors in interest under the BPPR Credit Facility, including, without limitation, Westernbank, (ix) FirstBank, and (x) any of the representatives, agents, officers, directors, employees, professionals, advisors, attorneys, successors or assigns of the foregoing (in their capacities as such) (the "**Released Parties**"), or any of such parties' successors and assigns, will have or incur any liability to, or be subject to any right of action by, any holder of a Claim against, or Equity Interest in, any of the Debtors, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or any of their successors and assigns, for any act or omission in connection with, related to or arising out of, the Chapter 11 Cases, the operation of the Debtors' businesses during the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of the Plan, the Asset Purchase Agreement, or any other contract, instrument, release, agreement, settlement or document created, modified, amended, terminated or entered into in connection with the Plan, or any other act or omission in connection with the Debtors' bankruptcy; provided, however, that nothing in Section 11.5 of the Plan will impact the allowance or disallowance of any Claim not expressly released under the Plan.*

6.  *Releases*

a.  Release by Debtors

*On the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, the Debtors and any entity seeking to exercise the rights of the Debtors or the Estates, including, without limitation, any successor to the Debtors, will completely, conclusively, absolutely, unconditionally, irrevocably, and forever release the Released Parties from any and all Claims, Equity Interests, liens, encumbrances, obligations, damages, demands, debts, suits, Causes of Action, judgments, liabilities or rights whatsoever (other than the rights of the Debtors or their successors to enforce the Plan and contracts, instruments, releases, indentures, agreements and other documents delivered hereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act, omission, transaction, agreement, event or occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of the Plan, the Asset Purchase Agreement, the business or contractual arrangements between any Debtor and any Released Party, or any other act or omission in connection with the Debtors' bankruptcy, without further notice to or action by the Bankruptcy Court, or act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any entity.*

b.  Release by Holders of Claims and Equity Interests, and Released Parties

*On the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, the holders of Claims against, and Equity Interests in, the Debtors, and the Released Parties, will be deemed to completely, conclusively, absolutely, unconditionally, irrevocably, and forever release the Released*

*Parties from any and all Claims, Equity Interests, liens, encumbrances, obligations, damages, demands, debts, suits, Causes of Action, judgments, liabilities or rights whatsoever (other than the right to enforce the terms of the Plan, including, without limitation, the Debtors' and the Liquidation Trustee's, as applicable, obligations with respect to Allowed Claims of the Released Parties or otherwise, and the Debtors' and the Liquidation Trustee's, as applicable, obligations under the contracts, instruments, releases, indentures, agreements and other documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, based in whole or in part on any act, omission, transaction, event or occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the business arrangements with any Debtor, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation, or consummation of the Plan, the Asset Purchase Agreement, or any other release or settlement created, modified, amended, terminated or entered into in connection with the Plan, the restructuring of any Claims against, and Equity Interests in, the Debtors, the property to be distributed under the Plan, or any other act or omission in connection with the Debtors' bankruptcy, without further notice to or action by the Bankruptcy Court, or act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any entity; provided, however that the foregoing release will not apply as between BPPR, on the one hand, and the Guarantors, FOI and Lexel Establishment on the other hand, in respect of their respective rights and obligations arising under the BPPR/Guarantors Settlement Agreement and sections 2.10, 2.11, 2.12, 2.13, and 2.14 of the BPPR/Lexel Intercreditor Agreement solely to the extent Lexel Establishment seeks, receives, or is entitled to distributions on account of its Claims under the Plan or otherwise; provided, however, for the avoidance of doubt, Lexel Establishment's agreement to waive and/or subordinate its Claims against the Debtors (as contemplated in section 5 of the Plan Support Agreement, under the Plan or in any circumstances relating to the Debtors' bankruptcy proceedings) will not give rise to any cause of action by BPPR against Lexel Establishment; provided, further, however, that neither Section 11.6 of the Plan nor any other provision of the Plan or Confirmation Order will, or will be deemed to, release the BPPR Deficiency Claim until paid in full with interest in accordance with the distribution priority terms of the Plan.*

7.    <u>*Injunction*</u>

Except as otherwise provided in the Plan, on the Effective Date, all holders of Claims against, and Equity Interests in, the Debtors or the Estates, and the Released Parties will be precluded and enjoined from asserting against the Released Parties, their successors and assigns, or any of their assets or property, whether in the possession of the Debtors or a transferee of such property under the Plan, any and all Claims, Equity Interests, liens, encumbrances, obligations, damages, demands, debts, suits, Causes of Action, judgments, liabilities or rights whatsoever that are released pursuant to Section 11.6 of the Plan.

8.    <u>*Exclusions and Limitations on Exculpation, Indemnification, and Releases*</u>

Except as otherwise provided in Section 11.3 of the Plan, nothing in the Confirmation Order or the Plan will effect a release of any Claim by the United States government or any of its agencies or any state and local authority whatsoever, including, without limitation, any Claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor will anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any Claim, suit, action or other proceedings against the Released Parties for any liability whatever, including, without limitation, any Claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor will anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties.

9.    <u>*Dissolution of Creditors Committee*</u>

On the Effective Date, the Creditors Committee will have no further powers or duties and will be dissolved for all purposes; <u>provided</u>, <u>however</u>, that the Creditors Committee and its professionals will be entitled to reasonable compensation and reimbursement of actual and necessary expenses for post-Effective Date activities,

including, without limitation, preparing and filing applications for Professional Claims or reimbursement of expenses incurred as a member of the Creditors' Committee, and any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order.

10.     *Insurance*

As provided in Section 6.1(a) of the Plan, on the Effective Date, all Insurance Policies, and the Debtors' and the Estates' rights thereunder, including, without limitation, the Debtors' and the Estates' rights to enforce the Insurance Policies, and to collect the Insurance Proceeds from the respective insurers, will be assigned and transferred by the Debtors and the Estates to the Liquidation Trust. Except for any insurance policy with respect to which the Debtors or the Liquidation Trustee, as applicable, and the respective insurer have entered into a settlement agreement approved by the Bankruptcy Court, no provision in the Plan or the Confirmation Order, including, without limitation, any exculpation or release provisions, will diminish or impair the ability of the Debtors, the Liquidation Trustee, or any other person (including, without limitation, the holders of General Unsecured Claims) to pursue any insurance policies that may cover Claims against the Debtors or any other person. All such insurance policies will remain in full force and effect. Notwithstanding anything in Section 11.10 of the Plan or any other provision of the Plan, no Entity (as defined in the Bankruptcy Code) will challenge or seek to recover any prior payment to BPPR or any of its predecessors in interest under the BPPR Credit Facility (including Westernbank) of any proceeds of the Liability Insurance Policies or the Property and Casualty Insurance Policies.

## G.     Summary of Other Provisions of the Plan

The following subsections summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions.

1.     *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code that are due and payable as of the Effective Date will be paid by the Liquidation Trustee on the Effective Date. All such fees that become due and payable after the Effective Date will be paid by the Liquidation Trustee with funds from the Plan Expenses Reserve when such fees become due and payable.

2.     *Substantial Consummation*

On the Effective Date, the Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

3.     *Plan Supplement*

The Plan Supplement will include certain documents relating to the Plan and its consummation and implementation, including, without limitation, the schedule of Accounts Receivable, the schedule of Liability Insurance Policies, the schedule of Property and Casualty Insurance Policies, the Liquidation Trust Documents, and the schedule of certain Causes of Action. The Plan Supplement will be filed with the Clerk of the Bankruptcy Court on or before the date that is seven (7) calendar days prior to the deadline to accept or reject the Plan fixed by the Bankruptcy Court pursuant to the Confirmation Scheduling Order, and may be amended, modified, or supplemented by the Debtors prior to the Confirmation Hearing. Upon its filing with the Bankruptcy Court, the Plan Supplement may be accessed on the docket electronically maintained by the Clerk of the Bankruptcy Court or inspected in the office of the Clerk of the Bankruptcy Court during normal business hours.

4.     *Operations Between the Confirmation Date and the Effective Date*

During the period from the Confirmation Date through and until the Effective Date, the Debtors will continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

5. *Exemption from Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any security under, in furtherance of, or in connection with, the Plan or (ii) the assignment or surrender of any lease or sublease, or the delivery of any instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any deed, asset purchase agreement, bill of sale, assignment, mortgage, deed of trust or similar document executed in connection with any disposition of assets contemplated by the Plan (including real and personal property), will not be subject to any stamp tax, real estate transfer tax, recording tax, sales tax, personal property tax, mortgage tax, use tax, or other similar tax, or any Uniform Commercial Code filing or recording fee or similar or other government assessment. The Confirmation Order will direct the appropriate state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

6. *Tax Treatment of the Liquidation Trust*

The Liquidation Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes that will be treated as a pass-through entity. All parties must treat the transfer of the Liquidation Trust Assets to the Liquidation Trust as a transfer of such assets directly to the beneficiaries of the Liquidation Trust, followed by the transfer of such assets by each beneficiary to the Liquidation Trust. Consistent therewith, all parties must treat the Liquidation Trust as a grantor trust of which the Liquidation Trust's beneficiaries are the owners and grantors. Assuming the Liquidation Trust is treated as a liquidating trust, the holders of Liquidation Trust Interests generally should be treated for U.S. federal income tax purposes as the direct owners of an undivided interest in the Liquidation Trust Assets. The Liquidation Trustee will determine the fair market value of the Liquidation Trust Assets as soon as possible after the Effective Date, and all parties must consistently use this valuation for all U.S. federal income tax purposes.

7. *Determination of Tax Liabilities*

The Debtors or the Liquidation Trustee (as applicable) will, pursuant to section 505(b) of the Bankruptcy Code, have the right to request an expedited determination of any unpaid liability of the Debtors' Estates and the Liquidation Trust for any tax incurred during the administration of the Chapter 11 Cases. As of the Effective Date, the Liquidation Trustee will be responsible for preparing and filing any tax forms or returns on behalf of the Debtors' Estates; provided, however, that the Liquidation Trustee will not be responsible for preparing or filing any tax forms for holders of Equity Interests in the Debtors (which Equity Interests will be canceled pursuant to the Plan), but will provide such holders with any information reasonably required to prepare such forms.

8. *Withholding and Reporting Requirements*

All distributions under the Plan will be subject to federal, state, local and foreign withholding taxes or other amounts required to be withheld under any applicable law and such amounts will be deducted and withheld from any distributions made pursuant to the Plan. Any amount so deducted and withheld will be deemed paid to the holders of Allowed Claims. All holders of Allowed Claims will be required to provide to the Liquidation Trustee any information necessary to effectuate the withholding of such taxes. Notwithstanding the foregoing, each holder of an Allowed Claim that is to receive a distribution will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution. The Liquidation Trustee will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, establishing any mechanisms the Liquidation Trustee believes is reasonable and appropriate, including, without limitation, requiring claimholders to submit appropriate tax withholding certifications.

9. *Fifty Percent Shareholder*

Unless otherwise ordered by the Bankruptcy Court, on and after the Confirmation Date, any "Fifty Percent Shareholder" within the meaning of section 382(g)(4)(D) of the Internal Revenue Code of 1986, as

amended, will be enjoined from claiming a worthless stock deduction with respect to any Equity Interest held by such shareholder for any taxable year of such shareholder ending prior to the Effective Date.

10.  *Modification and Amendment*

The Debtors, BPPR and the Creditors Committee, collectively, may, in consultation with the Guarantors, alter, amend, modify or supplement the Plan pursuant to section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date; provided, however, that the Debtors, BPPR and the Creditors Committee will consult with the Guarantors only in the event that a proposed alteration, amendment, modification, or supplement would affect any insurance provision and/or release provision with respect to the Guarantors and/or Guarantor Affiliates as set forth in Sections 6.2, 11.5, 11.6, and 11.7 of the Plan.  After the Confirmation Date and prior to substantial consummation of the Plan, the Debtors, BPPR or the Creditors Committee may, upon order of the Bankruptcy Court and in consultation with the Guarantors, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan as may be necessary to carry out the purpose and effects of the Plan; provided, however, that the Debtors, BPPR and the Creditors Committee will consult with the Guarantors only in the event that a proposed amendment or modification would affect any insurance provision and/or release provision with respect to the Guarantors and/or Guarantor Affiliates as set forth in Sections 6.2, 11.5, 11.6, and 11.7 of the Plan.  A holder of a Claim against the Debtors that has accepted the Plan will be deemed to have accepted the Plan as altered, amended or modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

11.  *Revocation or Withdrawal of the Plan.*

The Debtors, BPPR and the Creditors Committee, collectively, reserve the right to revoke or withdraw the Plan or the Confirmation Order prior to the Effective Date as to any or all of the Debtors.  If the Plan or the Confirmation Order is revoked or withdrawn, then (i) the Plan, (ii) all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order of the Bankruptcy Court, (iii) any rejection of an executory contract or unexpired lease effected by the Plan, and (iv) any document or agreement executed pursuant to the Plan, will be deemed null and void with respect to the applicable Debtors without further notice to or order by the Bankruptcy Court.  In the event that the Plan or the Confirmation Order is revoked or withdrawn, nothing in the Plan, and no actions taken in preparation for consummation of the Plan will (a) constitute a waiver or release of any Claim by or against or Equity Interest in the applicable Debtors or any other entity or party in interest, (b) prejudice in any manner the rights of the Debtors or any other entity or party in interest, (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other entity or party in interest, (d) constitute a waiver or release of the rights of the Debtors to move to dismiss any of the Chapter 11 Cases or convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (e) alter or otherwise affect the enforceability or effectiveness of the Sale Order.

## VI.  CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.  Voting Procedures and Solicitation of Votes

The voting procedures and the procedures governing the solicitation of votes are described above in Section II.C, and in the Disclosure Statement Order, which has been sent to you with this Disclosure Statement if you are entitled to vote on the Plan.

### B.  Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Confirmation Hearing has been scheduled for [__], 2011, commencing at [__] [a.m./p.m.] (prevailing Eastern time), before the Honorable Kevin Gross, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware,

824 Market Street, 6th Floor, Courtroom #3, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing and filed with the Bankruptcy Court.

Objections, if any, to confirmation of the Plan must be filed and served so that they are received on or before [__], 2011 at 4:00 p.m. (prevailing Eastern time). Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Equity Interest held by the objector. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. Objections must be timely served upon the following parties:

A) Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Phone: (212) 504-6000
Attn: George A. Davis, Esq.
Zachary H. Smith, Esq.

B) Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Phone: (302) 651-7700
Attn: Mark D. Collins, Esq.
Jason M. Madron , Esq.

C) Office of the United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035
Phone: (302) 573-6491
Attn: David M. Klauder, Esq.

D) Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104-0050
Phone: (212) 468-8000
Attn: Lorenzo Marinuzzi, Esq.
Todd M. Goren, Esq.

E) Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19801
Phone: (302) 777-6500
Attn: David B. Stratton, Esq.

F) Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
Phone: (302) 651-3000
Attn: Mark S. Chehi, Esq.
Sarah E. Pierce, Esq.

C. **Confirmation of the Plan**

In order to meet the requirements for confirmation, the Plan (among other things) must: (i) be accepted by all Impaired Classes of Claims and Equity Interests, or if rejected by an Impaired Class, not "discriminate unfairly" and be "fair and equitable" as to such class; (ii) be "feasible," and (iii) be in the "best interests" of holders of Claims and Equity Interests in Impaired Classes.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the following requirements of section 1129 of the Bankruptcy Code:

The Plan complies with the applicable provisions of the Bankruptcy Code.

The Debtors, as the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code.

The Plan has been proposed in good faith and not by any means forbidden by law.

Any payment made or promised by the Debtors or by a person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (i) made before the confirmation of the Plan is

reasonable; or (ii) is subject to the approval of the Bankruptcy Court as reasonable, if such payment is to be fixed after confirmation of the Plan.

Each holder of an impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value as of the Effective Date that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. _See_ discussion of _"Best Interests Test" below and the Debtors' liquidation analysis in Exhibit C._

Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests either has accepted the Plan or is not an Impaired Class under the Plan.

Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims will be paid in full as required by the Bankruptcy Code.

At least one Impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Impaired Class.

All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee will be paid as of the Effective Date.

1.    _Acceptance_

Classes 2, 3, 4, and 5 of the Plan are each an Impaired Class; holders of Claims in these Classes may receive or retain property under the Plan and are thus being treated as if they are entitled to vote to accept or reject the Plan.  Classes 6, 7, and 8 of the Plan are also Impaired Classes; however, because holders of Claims or Equity Interests in these Classes will not receive or retain property under the Plan, they are deemed to have voted to reject the Plan.  Class 1 of the Plan is not an Impaired Class and, therefore, is conclusively presumed to have voted to accept the Plan.

2.    _Best Interests Test/Liquidation Analysis_

Often referred to as the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation of the Plan, that each holder of a Claim or Equity Interest either: (i) has accepted the Plan; or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the Plan that such holder would receive if the Plan were confirmed.

In chapter 7 cases, creditors and equity interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (i) holders of secured claims (to the extent of the value of their respective collateral); (ii) holders of priority claims; (iii) holders of unsecured claims; (iv) holders of claims expressly subordinated by its terms or by order of the bankruptcy court; and (v) holders of equity interests.  Further, the costs of liquidating under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as compensation of counsel and other professionals retained by the trustee, asset disposition expenses, and all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases.

As described in more detail in the Liquidation Analysis, attached hereto as Exhibit C, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the

Bankruptcy Code would be less than the value of distributions under the Plan because, among other reasons, the proposed treatment of the Debtors' collective Assets under the Plan is more efficient, less expensive and more likely to result in maximum distributions than in separate chapter 7 cases for each of the Debtors. BPPR, as the prepetition senior secured creditor and DIP Lender, has agreed, in accordance with the BPPR Settlement, that the Sale Proceeds may be allocated to pay Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and General Unsecured Claims. These distributions may not otherwise be available in a chapter 7 case.

Further, the Plan provides specific procedures for efficient and expeditious allowance or disallowance of Claims and for prompt distributions to holders of certain Allowed Claims, which would likely not be available in separate chapter 7 cases for the Debtors. Distributions in chapter 7 cases may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors, and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. Thus, the substantial costs related to the appointment of the chapter 7 trustee and professionals to represent the trustee would diminish or negate any potential recoveries with respect to General Unsecured Claims, and holders of Allowed General Unsecured Claims are likely to receive distributions of equal or lesser value under a chapter 7 liquidation than under the Plan, with a significantly higher degree of uncertainty than that provided under the Plan.

3. _Feasibility_

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that the plan is "feasible." A feasible plan is one that will not lead to a need for further financial reorganization or liquidation of the debtors, unless such reorganization or liquidation is proposed in the plan.

In order to determine whether the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code, the Debtors have analyzed their ability to meet their obligations under the Plan. The Debtors believe that the Cash on hand and the proceeds from the 363 Sale will be sufficient to pay all Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims that become Allowed, based upon the Debtors' estimates. Accordingly, the Debtors believe the Plan is feasible.

4. _"Cramdown"_

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a chapter 11 plan of reorganization even if not all impaired classes have accepted the plan; _provided_ that such plan has been accepted by at least one impaired class. The Debtors will seek to confirm the Plan notwithstanding its rejection by any of the Impaired Classes. In order to obtain such nonconsensual confirmation (or "cramdown") of the Plan, the Debtors must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that voted to reject the Plan (each such Impaired Class, a "**Non-Accepting Class**").

a. Fair and Equitable Test

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable," and includes the general requirement that no class receive more than 100% of the amount of the allowed claims in such class. The "fair and equitable" test sets different standards for secured creditors, unsecured creditors, and equity holders, as follows:

(i) Secured Creditors

With respect to Non-Accepting Classes of Secured Claims, the "fair and equitable" test requires that (i) each impaired secured creditor retains the liens securing its allowed secured claim and receives on account of that claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (ii) the

property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) above; or (iii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim.

<div align="center">(ii)    <u>Unsecured Creditors</u></div>

With respect to Non-Accepting Classes of Unsecured Claims, the "fair and equitable" test requires that (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed claim; or (ii) the holders of any claims (or equity interests) that are junior to the Non-Accepting Class will not receive any property under the Plan. (This provision is often referred to as the "absolute priority" rule.)

<div align="center">(iii)    <u>Equity Interests</u></div>

With respect to Non-Accepting Classes of Equity Interests, the "fair and equitable" test requires that (i) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest; or (ii) the holder of an interest that is junior to the Non-Accepting Class will not receive or retain any property under the Plan.

<div align="center">b.    <u>No Unfair Discrimination</u></div>

A plan does not "discriminate unfairly" with respect to a Non-Accepting Class if the value of the cash and/or securities to be distributed to the Class is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the Non-Accepting Class. Exact parity is not required. The Debtors believe that any discrepancy in treatment or potential distributions to otherwise unsecured creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.

**D.    Consummation**

<div align="center">1.    *Conditions Precedent*</div>

The Plan will be consummated on the first Business Day on which all of the conditions precedent set forth below (collectively, the "**Conditions Precedent**") have been satisfied or waived by the applicable parties, (the "**Effective Date**").

a.    <u>Confirmation Order</u>  The Confirmation Order will have been entered by the Bankruptcy Court and will be in full force and effect, and there will not be a stay or injunction (or similar prohibition) in effect with respect thereto.

b.    <u>Sale Consummation</u>  The 363 Sale will have been consummated.

c.    <u>Debtor/United States Agreement</u>  The settlement agreement between and among the Debtors, the EPA, and the USCG will have been authorized and approved pursuant to a Final Order of the Bankruptcy Court.

d.    <u>Purchaser/United States Agreement</u>  The Purchaser and the United States government will have entered into the agreement referenced in section 7(a)(xii) of the Asset Purchase Agreement.

e.    <u>Other Acts; Execution and Delivery of Other Documents</u>  All other actions and all agreements, instruments, or other documents necessary to implement the Plan will have been (i) effected or (ii) duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness will have been satisfied or waived.

f.     <u>Consents</u>   The Debtors will have received all authorizations, consents, approvals, regulatory approvals, rulings, letters, opinions or documents necessary to implement the Plan.

g.     <u>Reserves Funded</u>  The Effective Date Cash Requirement will have been funded, or reserved for, as applicable.

h.     <u>Fixing of the DIP Financing Claims Amount</u>  The Debtors, BPPR and the Creditors Committee will have reached an agreement in writing that fixes the DIP Financing Claims Amount (including the BPPR Fees Claims) outstanding and unpaid as of the Effective Date, or the DIP Financing Claims Amount will have been determined by the Bankruptcy Court.

i.     <u>Administrative Expense Claims Cap</u>  The Bankruptcy Court will have determined and found that no more than $33,200,000 of the Sale Proceeds will be used to pay Allowed Administrative Expense Claims that must be paid under the Plan.

2.     *Waiver of Conditions Precedent.*

Each of the conditions precedent in Section 10.1(e) of the Plan may be waived, in whole or in part, by the Debtors in writing without notice to third parties or order of the Bankruptcy Court or any other formal action, subject to the consent of each of BPPR and the Creditors Committee. The condition precedent in Section 10.1(i) of the Plan may be waived by only BPPR in writing without notice to third parties or order of the Bankruptcy Court or any other formal action.

3.     *Effect of Failure of Conditions.*

If the conditions specified in Section 10.1 of the Plan have not been satisfied or waived in the manner provided in Section 10.2 of the Plan on or before the date that is the later of (i) May 31, 2011 and (ii) such later date as to which the Debtors and BPPR have agreed to in writing, then (a) the Confirmation Order will be of no further force or effect, (b) no distributions under the Plan will be made, (c) the Debtors and all holders of Claims against and Equity Interests in the Debtors will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, (d) all of the Debtors' obligations with respect to the Claims and Equity Interests will remain unaffected by the Plan and nothing contained herein will be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and (e) the Plan will be deemed withdrawn.

# VII.   RISK FACTORS

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT. THE RISK FACTORS SET FORTH BELOW SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

A.    **Certain Bankruptcy Considerations**

1.     *Parties-in-Interest May Object to the Debtors' Classification of Claims and Equity Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created eight Classes of Claims and

Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2. *Failure to Satisfy Vote Requirement*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

3. *Debtors May Not Be Able to Secure Confirmation of the Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, including, among other requirements, a finding by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the Disclosure Statement, the balloting procedures and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to Non-Accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in a less favorable treatment of any Non-Accepting Class, as well as of any Classes junior to such Non-Accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

4. *Nonconsensual Confirmation*

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

5.       *Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of certain Claims under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.       *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur. The Effective Date is subject to certain conditions as described in the Plan, including consummation of the 363 Sale, and if these conditions precedent are not satisfied, it is unclear if the Plan will become effective.

7.       *Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

**B.**       **Risk Factors That May Affect Distributions Under The Plan**

1.       *Debtors Cannot State with Certainty the Amount of Administrative Expense Claims*

As the number and amount of Administrative Expense Claims are presently unknown to the Debtors, it is possible that, if the actual number and amount of Administrative Expense Claims exceeds the Debtors' estimates, the Administrative and Priority Claims Reserve may not contain sufficient Cash to satisfy all Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims in full. Accordingly, should, collectively, Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims exceed the amount of the Administrative and Priority Claims Reserve and holders of such Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims refuse to consent to less than payment in full, the Effective Date may not occur.

2.       *Debtors Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes*

A number of unknown factors make certainty in creditor recoveries impossible. The Debtors cannot know with any certainty, at this time, the number or amount of Claims in Classes 5 that will ultimately be Allowed.

3.       *Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on General Unsecured Claims*

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect. Such differences may adversely affect the percentage recovery to holders of such Allowed Claims under the Plan.

C.     Certain Tax Risk Factors

        1.      *U.S. Federal Income Tax Risk Factors*

There are significant uncertainties with respect to the income tax consequences associated with the consummation of the Plan.  In particular, the tax posture of the Debtors is uncertain and therefore the amount of tax liability the Debtors may incur in connection with the consummation of the Plan cannot be quantified.  Any such tax liabilities would generally constitute administrative expenses of the Debtors and as such could reduce the amounts available for distribution with respect to the Allowed Claims.  For a more detailed discussion of the income tax consequences of the consummation of the Plan, see Article IX below.

        2.      *Puerto Rico Income Tax Risk Factors*

There are significant uncertainties with respect to the income tax consequences associated with the consummation of the Plan.  In particular, the tax posture of the Debtors is uncertain and therefore the amount of tax liability the Debtors may incur in connection with the consummation of the Plan cannot be quantified.  Any such tax liabilities would generally constitute administrative expenses of the Debtors and as such could reduce the amounts available for distribution with respect to the Allowed Claims.  For a more detailed discussion of the income tax consequences of the consummation of the Plan, see Article IX below.

## VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed with respect to any of the Debtors, the following alternatives are available: (i) confirmation of another chapter 11 plan; (ii) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (iii) dismissal of the Chapter 11 Cases leaving holders of Claims and Equity Interests to pursue available non-bankruptcy remedies.  These alternatives to the Plan are very limited and not likely to benefit holders of Claims or Equity Interests.

Although the Debtors could theoretically file a new plan, the most likely result if the Plan is not confirmed is that the Chapter 11 Cases will be converted to cases under chapter 7 of the Bankruptcy Code.  The Debtors believe that conversion of the Chapter 11 Cases to chapter 7 cases would result in (i) significant delay in distributions to all holders of Claims who would have received a distribution under the Plan and (ii) diminished recoveries for certain Classes of Claims.

If the Debtors were to formulate an alternative chapter 11 plan, this would necessarily delay creditors' receipt of distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions than are currently provided for under the Plan.

If the Chapter 11 Cases are dismissed, holders of Claims or Equity Interests would be free to pursue non-bankruptcy remedies in their attempts to satisfy Claims against or Equity Interests in the Debtors.  However, in that event, holders of Claims or Equity Interests would be faced with the costs and difficulties of attempting, each on its own, to recover from a non-operating entity.  Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

## IX.     CERTAIN TAX CONSEQUENCES OF THE PLAN

The following summary contains a description of certain U.S. federal income tax and Puerto Rico income tax consequences that may be relevant to the Debtors and holders of Allowed Claims.  This summary does not describe any tax consequences arising under the laws of any state, locality or taxing jurisdiction other than the United States or Puerto Rico.

This summary is based upon the tax laws of the United States and Puerto Rico as in effect on the date of this Disclosure Statement, which are subject to change (possibly with retroactive effect).  This summary is

also based on the assumption that the joint chapter 11 plans of the Debtors will be implemented as described in the Plan.

This description is not a comprehensive description of the tax considerations that may be relevant to the Debtors or holders of Allowed Claims, including tax considerations that arise from rules that are generally applicable to all taxpayers or to certain classes of holders of Allowed Claims or rules that holders of Allowed Claims are generally assumed to know.

Holders of Allowed Claims should consult their own tax advisors as to the tax consequences expected to result from the implementation of the Plan.

## A.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

This discussion is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), in effect on the date of this Disclosure Statement, U.S. Treasury regulations in effect (or, in certain cases, proposed) on such date, and judicial and administrative interpretations thereof available on or before such date.  All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the Internal Revenue Service (the "**IRS**") or any other taxing authority as to any of the U.S. federal income tax consequences expected to result from the implementation of the Plan discussed below.  There can be no assurance that the IRS or another taxing authority will not take a contrary view with respect to any issue discussed below.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder.  The U.S. federal income tax treatment of a holder of an Allowed Claim may vary depending upon such holder's particular situation.  The following discussion assumes that a holder holds an Allowed Claim as a capital asset.  The following discussion does not address U.S. state, local or foreign tax consequences to the Debtors and holders of an Allowed Claim.  The U.S. federal income tax summary does not address tax consequences to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest in, or a debt obligation of, a Debtor as a position in a straddle or as part of a hedging, conversion or integrated transaction for U.S. federal income tax purposes, controlled foreign corporations, passive foreign investment companies, persons that have a functional currency other than the U.S. dollar, or persons who acquired a debt obligation of a Debtor in connection with the performance of services.  In addition, this discussion does not address the U.S. federal income tax consequences to holders of Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims which are not entitled to vote regarding the acceptance or rejection of the Plan or are unimpaired or otherwise entitled to payment in full in Cash under the Plan, or to holders of Equity Interests that are not entitled to vote regarding the acceptance or rejection of the Plan.

For purposes of this summary, a "U.S. Holder" means a beneficial owner of Allowed Claims who or that is for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) a trust if (x) a court within the United States is able to exercise supervision over its administration and (y) one or more United States persons (as defined in the Tax Code) have the authority to control all of the substantial decisions of such trust.  A "Non-U.S. Holder" is a beneficial owner of Allowed Claims that is neither a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) nor a U.S. Holder.

If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds Allowed Claims, the U.S. federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners.  A partnership considering accepting the Plan should consult its own tax advisors about the tax consequences to its partners of the receipt of Cash and/or Liquidation Trust Interests in exchange for Allowed Claims.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM.  HOLDERS OF ALLOWED CLAIMS, INCLUDING HOLDERS OF ALLOWED CLAIMS IN MORE THAN ONE CLASS RELATING TO THE SAME UNDERLYING OBLIGATION, ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF ALLOWED CLAIMS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF ALLOWED CLAIMS FOR THE PURPOSE OF AVOIDING U.S. FEDERAL, STATE OR LOCAL TAX PENALTIES, (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (3) HOLDERS OF ALLOWED CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

1.  *Tax Consequences to Debtors*

Based on the limited information available, the tax posture of the Debtors is uncertain. Consummation of the Plan, including the disposition of the assets of the Debtors pursuant to the 363 Sale may result in recognition of income, deductions, gain or loss with respect to which the Debtors may incur regular tax and/or alternative minimum tax.  Any such tax would constitute an administrative expense of the Debtors.  There can be no assurance that the amounts available for distribution with respect to the Allowed Claims would not be reduced, perhaps substantially, by any such federal income tax payments required to be made by the Debtors.

a.  COD Income and Attribute Reduction

Generally, a taxpayer must recognize cancellation of indebtedness ("**COD**") income to the extent the taxpayer's indebtedness is discharged for less than the amount of such indebtedness.  For this purposes, COD income is the amount by which the discharged indebtedness exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the cancelled debt would have given rise to a tax deduction).  The amount of consideration paid to a creditor generally would equal the amount of Cash, the fair market value of property (including stock), and/or the issue price of any new debt instrument paid to such creditor.

A debtor will not be required to include any COD income in its gross income if the debtor is under the jurisdiction of a court in a Title 11 bankruptcy proceeding and the discharge of debt occurs pursuant to a plan approved by the bankruptcy court (the "**Title 11 exception**").  After calculating its tax for the taxable year in which the debt is discharged, the debtor is, however, generally required to reduce its tax attributes – such as NOL carryforwards, current year NOLs, tax credits, and tax basis in assets – by the amount of the excluded COD income. To the extent the amount of excluded COD income exceeds the tax attributes available for reduction, the remaining COD income continues to be excluded from gross income.

If a Debtor is a partnership (or an entity or arrangement treated as a partnership for U.S. federal income tax purposes), the COD income exclusion and attribute reduction rules apply at the partner, rather than the partnership, level.  Any COD income realized by a Debtor that is treated as a partnership for U.S. federal income tax purposes will be allocated to its partners, and each partner generally must include its share of the COD income in determining the partner's own taxable income, except to the extent that the partner can exclude the COD income under the Title 11 exception.

As a result of the discharge of Allowed Claims under the Plan, the Debtors expect to realize a substantial amount of COD income.  The COD income realized by CPR as a result of the discharge of its Allowed Claims will be allocated to CPC and GPC in accordance with their respective share of such Allowed Claims.  Under

the Title 11 exception, CPC and GPC will exclude from their gross income all COD income resulting from the discharge of Allowed Claims. CPC and GPC will, therefore, have to reduce their tax attributes with the amount of COD income realized as a result of the discharge of their respective Allowed Claims, and with the amount of COD income realized by CPR and allocated to CPC and GPC, as applicable. CPC and GPC do not anticipate retaining significant tax attributes, if any, following the attribute reduction.

<div align="center">b.      <u>Alternative Minimum Tax</u></div>

In general, an alternative minimum tax ("**<u>AMT</u>**") is imposed on a corporation's alternative minimum taxable income at a 20% tax rate if and to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. For example, a corporation generally cannot offset more than 90% of its taxable income for AMT purposes by available NOL carryforwards (as computed for AMT purposes). Any AMT paid by a corporation generally will be allowed as a nonrefundable credit against such corporation's regular federal income tax liability in any future taxable year when such corporation is not longer subject to AMT and otherwise becomes subject to regular tax. It is uncertain whether NOL carryforwards (as computed for AMT purposes) will be available to offset, partially or entirely, the alternative minimum taxable income and, thus, whether CPC or GPC will be subject to AMT as a result of the discharge of the Allowed Claims under the Plan.

<div align="center">2.      <u>*Tax Consequences to Holders of Allowed Claims*</u></div>

The U.S. federal income tax consequences to holders of Allowed Claims arising from the distributions to be made under the Plan may vary depending upon, among other things, the U.S. federal income tax characterization of the transactions adopted to implement the Plan, the nature of the indebtedness owing to the holder, whether the holder has previously claimed a bad debt or worthless security deduction in respect of its Allowed Claim, whether the holder is a U.S. Holder for tax purposes, whether the holder reports income on the accrual or cash basis, and whether the holder receives distributions under the Plan in more than one taxable year.

<div align="center">a.      <u>Consequences to U.S. Holders of Allowed Claims</u></div>

<div align="center">(i)      <u>Receipt of Cash and/or Liquidation Trust Interests in Exchange for Allowed Claim</u></div>

For U.S. federal income tax purposes, the transfer of the portion of the Allowed Claims attributable to the beneficiaries of the Liquidation Trust is treated as a transfer of such assets directly to the beneficiaries of the Liquidation Trust, followed by the beneficiaries' transfer of such assets to the Liquidation Trust in exchange for Cash or beneficial trust interests in the Liquidation Trust ("**<u>Liquidation Trust Interests</u>**"). In general, the receipt of Cash and/or Liquidation Trust Interests in exchange for an Allowed Claim will result in the recognition of gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any Liquidation Trust Interests received (other than any Cash or Liquidation Trust Interests attributable to accrued but unpaid interest) and (ii) the U.S. Holder's adjusted tax basis in its Allowed Claim (other than any Claim for accrued but unpaid interest). If amounts are received by a U.S. Holder in more than one taxable year, a portion of such amounts may be characterized as interest. For a discussion of the U.S. federal income tax consequences of the receipt and ownership of the Liquidation Trust Interests, see "Tax Treatment of the Liquidation Trust."

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Allowed Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held or is treated as having been held, whether the Allowed Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt or worthless security deduction in respect of its Allowed Claim.

A U.S. Holder of any Allowed Claim who recognizes capital losses as a result of the distribution under the Plan generally will be subject to limits on its use of capital losses. A corporate U.S. Holder may only use

capital losses to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a taxable year generally may carry over unused capital losses for the five taxable years following the capital loss year, and carry back unused capital losses to the three taxable years preceding the capital loss year. U.S. Holders, other than corporations, generally may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the deductibility of capital losses.

In addition, a U.S. Holder that purchased its Allowed Claim from a prior holder at a "market discount" (relative to the principal amount of the Allowed Claim at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with original issue discount ("**OID**"), its adjusted issue price, in each case, by at least a *de minimis* amount. Under the market discount rules, any gain recognized on the exchange of an Allowed Claim (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary interest income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant interest basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include market discount in income as it accrued. If a U.S. Holder of an Allowed Claim did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Allowed Claim, such deferred amounts would become deductible at the time of the exchange, up to the amount of gain that the U.S. Holder recognizes in the exchange.

U.S. Holders of Allowed Claims are urged to consult their own tax advisors for a determination of the character of any gain or loss recognized by them upon the exchange of such holders' Allowed Claims for Cash and/or Liquidation Trust Interests.

(ii)     Accrued but Unpaid Interest

In general, to the extent a U.S. Holder of a debt instrument receives property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, such U.S. Holder may recognize a deductible loss to the extent that any accrued interest claimed or amortized OID was previously included in the U.S. Holder's gross income and is not paid in full. The extent to which property received by a U.S. Holder of a debt instrument will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization generally is binding for U.S. federal income tax purposes. However, there is not assurance that such allocation will be respected by the IRS. U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest and OID for U.S. federal income tax purposes.

(iii)     Bad Debt Deduction and Worthless Securities Deduction

A U.S. Holder of an Allowed Claim that is not a security for purposes of section 165(g) of the Tax Code who receives, pursuant to the Plan, an amount less than such holder's tax basis in that Allowed Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction under section 166(a) of the Tax Code or may be entitled to a loss under section 165(a) of the Tax Code in the year of receipt. A U.S. Holder of a security, the Allowed Claim with respect to which is wholly worthless, may be entitled to a worthless securities deduction under sections 165(g) and 165(a) of the Tax Code. The rules regarding the timing and amount of deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a loss or deduction is claimed. Such loss or deduction would be limited to the U.S. Holder's adjusted tax basis in the indebtedness underlying its Allowed Claim. U.S. Holders of Allowed Claims are urged to consult their own tax advisors with respect to their ability to take any loss or deduction described above.

(iv)     Market Discount

U.S. Holders of Allowed Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code.  Under these provisions, some or all of the gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain) to the extent of accrued "market discount" on such holder's Allowed Claims.  Any gain realized by a U.S. Holder on the exchange of its Allowed Claims on the Effective Date generally should be treated as ordinary income to the extent of any market discount accrued on the underlying debt obligation by the U.S. Holder on or prior to the date of the exchange.  In general, a debt obligation with a fixed maturity of more than one year that is acquired by a U.S. Holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that U.S. Holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with OID) exceeds the tax basis of the debt obligation in the U.S. Holder's hands immediately after its acquisition by more than a *de minimis* amount.  U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the application of the market discount rules upon the exchange of their Allowed Claims pursuant to the Plan.

(v)     Effect of Potential Future Distributions

Certain U.S. Holders of Allowed Claims may receive distributions after the Effective Date.  The imputed interest provisions of the Tax Code may apply to treat a portion of the distributions to such holders as imputed interest.  With respect to such holders, imputed interest may accrue over time using the constant interest method, in which case such holders may be required to include imputed interest in income prior to the actual distribution.  It is possible that recognition of any loss realized by a U.S. Holder of an Allowed Claim may be deferred until such holder can no longer receive future distributions under the Plan.  It is also possible that any gain realized by a U.S. Holder of an Allowed Claim in respect of distributions under the Plan may be deferred under the "installment method" of reporting.  Deferral of gain recognition may be advantageous to a particular U.S. Holder, and, accordingly, U.S. Holders of Allowed Claims should consider the desirability of making an election to forego application of the installment method.  U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the possibility for deferral of recognition of gains and losses and the possibility of electing out of the installment method of reporting any gain realized in respect of their Allowed Claims.

b.     Consequences to Non-U.S. Holders of Allowed Claims

(i)     Receipt of Cash and/or Liquidation Trust Interests in Exchange for Allowed Claim

Subject to the discussion below with respect to accrued but unpaid interest, a Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax on any gain realized on the receipt of Cash and/or Liquidation Trust Interests in exchange for an Allowed Claim pursuant to the Plan, unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year, such Non-U.S. Holder has a "tax home" in the United States, and certain other conditions are met; or (ii) such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business within the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).  If the first exception applies, a Non-U.S. Holder generally will be subject to the U.S. federal income tax rate at 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocation to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

*Accrued but Unpaid Interests.*  Payments pursuant to the Plan to a Non-U.S. Holder that are attributable to accrued but unpaid interest (including OID) generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate

documentation (generally, an IRS Form W-8BEN or a successor form) establishing that the Non-U.S. Holder is not a United States person, unless:

(i) the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of CPC's or GPC's stock that are entitled to vote;

(ii) the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to CPC or GPC; or

(iii) such interest or OID is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, the Non-U.S. Holder provides a properly-executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the interest or OID at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest or OID that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued interest (including OID). For purposes of providing a properly-executed IRS Form W-8BEN, special procedures are provided under applicable U.S. Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

*Treaty Benefits.* To claim the benefits of an income tax treaty, a Non-U.S. Holder must provide a properly-executed IRS Form W-8BEN (or a successor form prior to the payment).

*Foreign Government Exemption.* Foreign government-related entities should furnish an IRS Form W-8EXP (or successor form) in order to establish an exemption from withholding under section 892 of the Tax Code.

(ii)       Information Reporting and Backup Withholding

A Non-U.S. Holder generally will not be subject to backup withholding with respect to payments of interest (including OID) and any other reportable payments, including amounts received pursuant to the Plan as long as (i) the payor or broker does not have actual knowledge or reason to know that the holder is a United States person and (ii) the holder has furnished to the payor or broker a valid IRS Form W-8BEN or IRS Form W-8EXP (or, in either case, a successor form) certifying, under penalties of perjury, its status as a non-United States person or otherwise establishes an exemption.

Any amount withheld under the backup withholding rules from a payment to a Non-U.S. Holder will be allowed as a credit against such holder's U.S. federal income tax liability, if any, or will otherwise be refundable, provided that the requisite procedures are followed and the proper information is filed with the IRS on a timely basis. Non-U.S. Holders should consult their own tax advisors regarding their qualification for exemption from backup withholding and the procedure for obtaining such an exemption, if applicable.

In addition to the foregoing, CPC, GPC, and the Liquidation Trustee, as applicable, generally must report to a Non-U.S. Holder and to the IRS the amount of interest (including OID) paid to each Non-U.S. Holder during each calendar year and the amount of tax, if any, withheld from such payments. Copies of the information returns reporting such amounts and withholding may be made available by the IRS to the tax authorities in the country in which a Non-U.S. Holder is a resident under the provision of an applicable income tax treaty or other agreement.

### 3.    *Tax Treatment of the Liquidation Trust*

#### a.    Receipt of Liquidation Trust Interests

For U.S. federal income tax purposes, all parties (including the Debtors, the Liquidation Trustee and the beneficiaries of the Liquidation Trust) must treat the transfer of the portion of the Liquidation Trust Assets attributable to beneficiaries of the Liquidation Trust as a transfer of such assets directly to the beneficiaries of the Liquidation Trust, followed by the beneficiaries' transfer of such assets to the Liquidation Trust.

#### b.    Classification of the Liquidation Trust as Liquidating Trust

The Liquidation Trust is intended to qualify, and the discussion below assumes that the Liquidation Trust will be respected, as a liquidating trust for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a grantor trust, *i.e.*, a pass-through entity.  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as such for U.S. federal income tax purposes.  In general, the Liquidation Trust has been structured with the intention of complying with the criteria set forth in Revenue Procedure 94-45 for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Title 11 plan.  Pursuant to the Plan, and in conformity with these criteria, all parties (including the Debtors, the Liquidation Trustee, and the beneficiaries of the Liquidation Trust) are required to treat, for U.S. federal income tax purposes, the Liquidation Trust as a grantor trust of which the beneficiaries of the Liquidation Trust are the owners and grantors.

The following discussion assumes that the Liquidation Trust characterization will be respected for U.S. federal income tax purposes.  However, no ruling from the IRS or opinion of counsel has been requested concerning the tax status of the Liquidation Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  Were the IRS successfully to challenge such classification, the U.S. federal income tax consequences to the Liquidation Trust, the beneficiaries of the Liquidation Trust and the Debtors could vary significantly from those discussed herein, including with respect to the potential for an entity level tax on the Liquidation Trust's income.  The beneficiaries of the Liquidation Trust are urged to consult their own tax advisors regarding the U.S. federal income tax consequences applicable to them if the Liquidation Trust would not be treated as a liquidating trust for U.S. federal income tax purposes.

#### c.    General Tax Reporting by the Liquidation Trust and the Beneficiaries

Pursuant to the Plan, all parties must treat the Liquidation Trust as a grantor trust of which the beneficiaries of the Liquidation Trust are the owners and the grantors.  Subject to the terms of the Liquidation Trust Agreement, and the powers of any advisory board established thereunder, the Liquidation Trustee will determine the fair market value of the Liquidation Trust Assets as soon as possible after the Effective Date, and the beneficiaries of the Liquidation Trust and the Liquidation Trustee must consistently use this valuation for all U.S. federal income tax purposes, including for determining gain, loss or tax basis.  Accordingly, assuming the Liquidation Trust qualifies as a liquidating trust for U.S. federal income tax purposes, each beneficiary of the Liquidation Trust generally should be required to report on the beneficiary's U.S. federal income tax return its allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust, in accordance with such beneficiary's relative beneficial interest in the trust.  The character of items of income, gain, loss, deduction or credit to any beneficiary of the Liquidation Trust, and such beneficiary's ability to benefit from any deductions or losses, may depend on such beneficiary's particular situation.

The U.S. federal income tax obligations of a beneficiary of the Liquidation Trust are not dependent upon the Liquidation Trust distributing any Cash or other property.  Therefore, a beneficiary of the Liquidation Trust may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidation Trust's income even if the trust has not made a concurrent distribution to such beneficiary.  In general, a distribution of Cash or other property by the Liquidation Trust will not be taxable to the beneficiary of the Liquidation Trust as such beneficiary will already be regarded for U.S. federal income tax purposes as owning the underlying assets or realizing the income of the Liquidation Trust.

The Liquidation Trust will file with the IRS tax returns for the Liquidation Trust treating such trust as a grantor trust pursuant to U.S. Treasury regulation section 1.671-4(a). The Liquidation Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction or credit, and will instruct the holder to report such items on its U.S. federal income tax return or to forward the appropriate information to the beneficial owners with instructions to report such items on their U.S. federal income tax returns.

## B.    CERTAIN PUERTO RICO INCOME TAX CONSEQUENCES OF THE PLAN

This discussion is based on the provisions of the Internal Revenue Code for a New Puerto Rico (the "**New PR Tax Code**") as in effect on January 31, 2011, and judicial and administrative interpretations thereof available on or before such date on identical provisions of the Puerto Rico Internal Revenue Code of 1994, as amended (the "**1994 Code**"). All of the following is subject to change, which change could apply retroactively and could affect the accuracy of the statements set forth below as well as the tax considerations described below.

Due to the lack of definitive legal precedents and judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax considerations described below. No legal opinion of counsel has been requested or obtained, and the Debtors do not intend to seek a ruling from the Puerto Rico Treasury Department ("**Treasury**") or any other taxing authority as to any of the Puerto Rico ("**P.R.**") income tax consequences expected to result from the implementation of the Plan discussed below. There can be no assurance that Treasury or another taxing authority will not take a contrary view with respect to any issue discussed below.

The following summary is for general information only and does not purport to address all of the P.R. income tax considerations that may be applicable to the Debtors or to any particular holder of an Allowed Claim. The following discussion assumes that the grant of industrial tax exemption held by CPC and CPR (the "**Tax Grant**") will not have an impact on the implementation of the Plan and that no item of income or loss generated as a consequence of such Plan, by either the Debtors, the holders of Allowed Claims or the Liquidation Trust, will be considered industrial development income, as such term is defined under the Tax Grant or under the Puerto Rico Tax Incentives Act of 1998, as amended.

The P.R. income tax treatment of a holder of an Allowed Claim may vary depending upon such holder's particular situation. The following discussion assumes that a holder holds an Allowed Claim as a capital asset. The following discussion also assumes that the Liquidation Trust will be treated as a grantor trust for P.R. income tax purposes and that it will have a U.S. situs. The following discussion does not address P.R. municipal, property or sales and use tax consequences to the Debtors and holders of an Allowed Claim. The P.R. income tax summaries do not address tax considerations to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an Equity Interest in, or a debt obligation of, a Debtor as a position in a straddle or as part of a hedging, or persons who acquired a debt obligation of a Debtor in connection with the performance of services. In addition, this discussion does not address the P.R. income tax consequences to holders of Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims which are not entitled to vote regarding the acceptance or rejection of the Plan or are unimpaired or otherwise entitled to payment in full in Cash under the Plan, or to holders of Equity Interests that are not entitled to vote regarding the acceptance or rejection of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN PR INCOME TAX CONSIDERATIONS EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. HOLDERS OF ALLOWED CLAIMS, INCLUDING HOLDERS OF ALLOWED CLAIMS IN MORE THAN ONE CLASS RELATING TO THE SAME UNDERLYING OBLIGATION, ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE P.R. TAX CONSEQUENCES EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN.

1. *Debtors*

a. In General

Under the New PR Tax Code, a foreign partnership engaged in trade or business within Puerto Rico as of the date of the new code approval is deemed liquidated on December 31, 2010. Pursuant to such liquidation, all of the assets and liabilities of the partnership are deemed distributed to its partners and, immediately thereafter, the partners are treated as contributing the distributed assets and liabilities to a new partnership. The new partnership will be considered for P.R. income tax purposes as a pass-through entity under the New PR Tax Code, unless it elects to be treated as a separate taxing entity. If such election is timely made under the provisions of the New PR Tax Code, the foreign partnership will be taxed as a corporation under the provisions of the 1994 Code for the taxable year 2011 and the subsequent 4 taxable years. Since there is no certainty as to whether CPR will make an election to be treated as a corporation for the 2011 taxable year, the following discussion addresses, in general, the P.R. income tax consequences of the Debtors under different entity scenarios.

(i) Foreign Partnerships

The P.R. trade or business of a partnership engaged in trade or business within Puerto Rico ("**ETB-PR**") is imputed to its foreign partners, subjecting them to P.R. tax on their share of the effectively connected income of the partnership. Accordingly, to the extent that pursuant to the provisions of the New PR Tax Code, CPR does not elect to be treated as a corporation for P.R. income tax purposes, it will be treated as a conduit for tax purposes in connection with its P.R. effectively connected income ("**ECI-PR**") for the 2011 taxable year. That is, partners will include their allocable shares of partnership income in gross income, and may deduct their allocable share of partnership deductions and losses.

(ii) Foreign Partnerships Electing to be treated as Corporations under the 1994 Code

If CPR elects to be treated as a Corporation for the 2011 taxable year, it will be taxed in the same manner and at the same rates as Puerto Rico corporations, but only on its ECI-PR. Under the effectively connected income rules, foreign corporations and partnerships ETB-PR are subject to a Puerto Rico maximum income tax rate of 39% on their net ECI-PR, which includes Puerto Rico source income, as well as certain types of foreign source income attributable to a Puerto Rico office or other fixed place of business. For taxable years 2009, 2010 and 2011 a special surtax of 5% of the tax liability will be imposed if adjusted gross income exceeds $100,000.

In determining the tax liability of a foreign corporation ETB-PR for a taxable year, the 1994 Code also provides for an alternative tax of 15% for long term capital gains derived from Puerto Rico sources.

The alternative minimum tax rate on corporations is 22%, and is imposed on the net taxable income, adjusted for certain items such as flexible and accelerated depreciation, income from installment sales and an adjustment for 50% of the excess of the income reported in its financial statements over its taxable income.

(iii) Foreign Corporations under the New Tax Code

As to Debtors that are foreign corporations ETB-PR, they will be subject to taxation in Puerto Rico on their ECI-PR under the provisions of the New Tax Code at a maximum income tax rate of 30% for taxable years 2011, 2012 and 2012. The alternative minimum tax rate applicable to foreign corporations during those taxable years will be 20% subject to similar adjustments to those enunciated under the provisions of the 1994 Tax Code.

As provided under the 1994 Code, an alternative tax of 15% would apply on long term capital gains derived from Puerto Rico sources.

b.         <u>Sale of Assets</u>

Based on the information available, the tax consequences of the sale, transfer or conveyance of the assets by the Debtors to Puma Energy International B.V. are uncertain. Pursuant to the assumptions stated at the beginning of this summary, said sale, transfer or conveyance should be a taxable event that may result in recognition of income, deductions, gain or loss by the Debtors, which may or may not lead to taxation in Puerto Rico. For these purposes, the income generated on the sale of real property located in Puerto Rico will be considered Puerto Rico source income. Under the provisions of the New PR Tax Code, gain from the sale of personal property (excluding inventory) usually takes its source from the place of organization of the seller. In the particular case of the Debtors, any gain realized on the sale of the assets pursuant to the Plan will be subject to P.R. income taxation to the extent that such gain is sourced in Puerto Rico or is deemed effectively connected with a Puerto Rico trade or business.

If subject to taxation in P.R., any income and/or gain realized by the Debtors, deemed to be ETB-PR, on the sale of its assets may be subject to the regular tax rates or to the alternative tax of 15% applicable to long term capital gains depending, among other considerations, on the nature of the assets sold and their holding periods.

c.         <u>P.R. COD Income</u>

Under the general rules of the New PR Tax Code, the discharge of a debt obligation for an amount less than the adjusted issue price gives rise to cancellation of indebtedness income ("**COD Income**"), which must be included in the debtor's income. Nonetheless, Debtors will not be required to include COD Income as part of their gross income if the discharge of debt occurs pursuant to a plan approved by the Federal Bankruptcy Court under the provisions of a Title 11 bankruptcy proceeding. After calculating its tax liability for the taxable year in which the debt is discharged, Debtors are required to reduce tax attributes (such as current NOL and capital losses, NOL and capital losses carried over, and the tax basis of assets used as collateral for the debt discharged) by the amount of the excluded COD Income.

2.         *Liquidation Trust and Beneficiaries*

The New PR Tax Code does not provide for the tax treatment of a liquidation trust established pursuant to the terms of a plan of liquidation under the provisions of Chapter 11 of the Bankruptcy Act. Trusts, in general, are considered distinct taxable entities that compute their income tax liability in the same manner and on the same basis as in the case of an individual, with specified differences. For P.R. income tax purposes, however, the separate existence of a trust will be ignored when the trust is characterized as a "grantor trust."

Pursuant to the Plan, all parties must treat the Liquidation Trust as a grantor trust of which the beneficiaries of the Liquidation Trust are the owners and the grantors. This discussion assumes that the Liquidation Trust will be considered as a grantor trust for P.R. income tax purposes and that such characterization will be respected. However, no ruling from the Treasury or opinion of counsel has been requested concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that Treasury would not take a contrary position. Were the Treasury successful in challenging such characterization, the P.R. income tax consequences to the Liquidation Trust, the beneficiaries of the Liquidation Trust and the Debtors could vary significantly from those discussed herein, including an entity level tax on the Liquidation Trust's income. The beneficiaries of the Liquidation Trust are urged to consult their own tax advisors regarding the P.R. income tax consequences applicable to them if the Liquidation Trust would not be treated as a grantor trust for P.R. income tax purposes.

Assuming the Liquidation Trust qualifies as a grantor trust for P.R. income tax purposes, each beneficiary of the Liquidation Trust will be required to report on its P.R. income tax return its allocable share of any item of income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust. The character of such items to a beneficiary of the Liquidation Trust, and such beneficiary's ability to benefit from any deductions or losses, may depend on such beneficiary's particular situation, including whether it is a resident or non-resident, individual, or corporation or partnership.

To the extent that the Liquidation Trust is treated as a grantor trust, a distribution by such trust will not be taxable to the beneficiary of the Liquidation Trust as such beneficiary will already be regarded for P.R. income tax purposes as owning the underlying assets or realizing the income of the Liquidation Trust.

3.   *Holders of Allowed Claims*

The P.R. income tax consequences to holders of Allowed Claims will depend upon several factors, including but not limited to: (i) the origin and nature of the Allowed Claim; (ii) the P.R. income tax characterization of the transactions adopted to implement the Plan; (iii) whether the holder is an individual that is a resident or non resident of Puerto Rico, a citizen of the U.S. or an alien, or a domestic or foreign corporation or partnership; (iii) whether the holder reports income on the accrual or cash basis method; (iv) whether the holder has taken a bad debt deduction or worthless security deduction with respect to the Allowed Claim; and (v) whether the holder receives distributions under the Plan in more than one taxable year.

If a partnership (including any entity or arrangement treated as a partnership for P.R. income tax purposes) holds Allowed Claims, the P.R. income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners.  A partnership considering accepting the Plan should consult its own tax advisors about the tax consequences to its partners of the receipt of Cash and/or Liquidation Trust Interests in exchange for Allowed Claims.

Under the New PR Tax Code, individual taxpayers may elect to be subject to taxation under the provisions of the 1994 Code for the taxable year 2011 and the subsequent four (4) taxable years.  Such election is final and irrevocable.  Except as otherwise stated, the discussion assumes that such election has not been made.

HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE P.R. TAX CONSEQUENCES EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN.

a.   Receipt of Cash and/or Liquidation Trust Interests in Exchange for Allowed Claim

In general, the receipt of Cash and/or Liquidation Trust Interests in exchange for an Allowed Claim will result in the recognition of gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any Liquidation Trust Interests received (other than any Cash or Liquidation Trust Interests attributable to accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Allowed Claim (other than a claim for accrued but unpaid interest).  If amounts are received by a holder in more than one taxable year, a portion of such amounts may be characterized as interest.

Pursuant to the Plan, distributions received in respect of Allowed Claims that are treated as debt obligations for federal income tax purposes will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest.  However, there is no assurance that Treasury will respect such allocation for P.R. income tax purposes.  Except as herein provided, interest paid on an Allowed Claim will constitute income from sources within Puerto Rico for purposes of the New PR Tax Code.  In addition, any gain (other than interest) realized by a holder upon the exchange of Allowed Claims for Cash and/or Liquidation Trust Interests may be treated as income from sources within Puerto Rico for purposes of the New PR Tax Code.  Holders of Allowed Claims should consult their own tax advisors concerning the allocation of consideration received in satisfaction of their Allowed Claims and the P.R income tax treatment of accrued but unpaid interest.

The New PR Tax Code also provides that the recovery of a debt that has been previously claimed as a deduction may be excluded from gross income to the extent the deduction did not produce a tax benefit.  A holder of an Allowed Claim that was previously required to include in its taxable income any accrued but unpaid interest on an Allowed Claim, may be entitled to recognize a deductible loss to the extent that such accrued but unpaid interest is not satisfied under the Plan.

Individuals that are Residents of Puerto Rico, P.R Corporations and
           Partnerships Treated as Corporations and Nonresident Aliens or Foreign
           Corporations or Partnerships Treated as Corporations that are ETB-PR

Generally, the holder of an Allowed Claim that is (i) a Puerto Rico resident individual; (ii) a domestic corporation or partnership treated as a corporation for purposes of the New PR Tax Code; or (iii) an alien or foreign corporation or partnership treated as a corporation, for purposes of the New PR Tax Code that is ETB-PR (all such holders are referred to as "**P.R. Holder(s)**") should not recognize any income, gain or loss, if at all, until actual receipt of consideration under the Plan (in the case of a cash basis taxpayer) or at such time as the P.R. Holder's right to consideration under the Plan which has not been previously recognized as gross income becomes fixed and determinable (in the case of an accrual basis taxpayer).

Where gain or loss is recognized by a P.R. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the P.R. Holder, whether the Allowed Claim constitutes a capital asset in the hands of the P.R. Holder and how long it has been held or is treated as having been held, and whether and to what extent the P.R. Holder previously claimed a band debt or worthless security deduction in respect of its Allowed Claim. The payment of an Allowed Claim made to a P.R. Holder for services rendered to the Debtors will be generally subject to a 7% withholding tax, unless it elects either a 10% or 15% withholding rate.

(ii)        Nonresident Citizens of the United States, Nonresident Aliens, and Foreign
           Corporations or Partnerships Treated as a Corporation Not ETB-PR

Generally, the holder of an Allowed Claim that is a U.S. citizen that is not a resident of Puerto Rico, or a nonresident alien, or a foreign corporation or partnership treated as a corporation that is not ETB-PR during the taxable year (all such holders are referred to as "**Nonresident Holder(s)**") should not recognize income, gain or loss, if any, until actual receipt of a payment or distribution under the Plan, or at such time as the Nonresident Holder's right to consideration under the Plan, which has not been previously recognized as gross income, becomes fixed and determinable.

The payment of interest on an Allowed Claim under the Plan to a Nonresident Holder that is a citizen of the United States will not constitute income from sources within Puerto Rico and, therefore, not subject to Puerto Rico income and withholding tax. Nonetheless, the payment of interest on an Allowed Claim to a Nonresident Holder that is an alien, or a foreign corporation or partnership treated as a corporation that is not ETB-PR, will constitute income from sources within Puerto Rico subject to a 29% Puerto Rico withholding tax if such holder owns 50% or more of the value of the Equity Interests of the Debtors (80% if a controlled group), as determined for purposes of the New PR Tax Code.[8] The New PR Tax Code does not provide a specific provision on income tax withholding at source on payments made to foreign partnerships not ETB-PR, however, such payments could be subject to a withholding tax depending on the status of the ultimate taxable entity or person and on the nature and characterization of such payment.

Pursuant to the terms of the Plan, the Liquidation Trust will act as the withholding agent for purposes of withholding the 29% P.R. income tax on the interest income portion of the payments of Allowed Claims. The Liquidation Trust will not withhold such P.R. taxes if the holder of an Allowed Claim has completed a certification, in duplicate, in which the holder states its address, taxpayer identification number and the reason for claiming an exemption on the application of the withholding tax. For such purposes, the holder will be able to indicate that it is not subject to withholding because is (i) a citizen of the United States or an individual resident of Puerto Rico; (ii) a corporation or partnership created under the laws of the Commonwealth of Puerto Rico; (iii) a nonresident alien, or foreign corporation or partnership treated as a corporation that is ETB-PR (including a

---

[8]        A controlled group is defined as including one or more chains of corporations that are related to a common parent through stock ownership, if at least 80% of the combined total voting power or the total value of all kinds of stock, except for the common parent's stock, are owned by one or more of the other corporations and the common parent owns at least 80% of the combined total voting power or the total value of all kinds of stock of one of the corporations (parent-subsidiary controlled group).

description of the trade or business conducted in Puerto Rico) and that the payments will be subject to Puerto Rico taxation as ECI; or (iv) an alien or a foreign corporation or partnership treated as a corporation that does not own directly or indirectly 50% (80% if a controlled group) or more of the value of the Equity Interests of the Debtors.

The New PR Tax Code also imposes on a Nonresident Holder a (1) 29% tax on net capital gains derived from sources within Puerto Rico by a Nonresident Holder that is an alien, or foreign corporation or partnership treated as a corporation, and (2) 10% tax for long term capital gains derived from sources within Puerto Rico by a Nonresident Holder that is a citizen of the United States. In general, gain realized by a Nonresident Holder upon the exchange of such holder's Allowed Claims for Cash and/or Liquidation Trust Interests is not considered income subject to withholding under the New PR Tax Code and, therefore, Puerto Rico income tax may not be withheld from such amounts. The fact that these payments may not be subject to withholding tax does not exempt such payments from Puerto Rico income taxation to the extent that such gain is considered from sources within Puerto Rico. Nonresident Holders should consult their own tax advisors about the character and the source of gains or losses realized for consideration received in satisfaction of their Allowed Claims.

b.     Potential Distributions

Certain holders of Allowed Claims may receive distributions after the Effective Date. It is possible that recognition of any loss realized by a holder of an Allowed Claim attributable to Puerto Rico may be deferred for Puerto Rico income tax purposes until such holder can no longer receive future distributions under the Plan. It is also possible that any gain realized by a holder of an Allowed Claim in respect of distributions under the Plan may be deferred for Puerto Rico income tax purposes until actual receipt of a payment under the Plan (in the case of a cash basis taxpayer) or at such time as the holder's right to a payment or distribution under the Plan which has not been previously recognized as gross income becomes fixed and determinable (in the case of an accrual basis taxpayer).

# X. CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest and quickest recoveries to holders of Claims and Equity Interests. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. The Debtors urge holders of impaired Claims and Equity Interests entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than 4:00 p.m. (prevailing Eastern time) on [_____], 2011.

Dated:      Wilmington, Delaware
March [_], 2011

CARIBBEAN PETROLEUM CORPORATION
By:
Name:   Roy Messing
Title:    Restructuring Officer


GULF PETROLEUM REFINING (PUERTO RICO) CORPORATION
By:
Name:   Roy Messing
Title:    Restructuring Officer


CARIBBEAN PETROLEUM REFINING L.P.
By:
Name:   Roy Messing
Title:    Restructuring Officer