# EXHIBIT A

## Confirmed Plan

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------- x

In re                                           :       Chapter 11
                                                :
CARIBBEAN PETROLEUM CORP., et al.,              :       Case No. 10-12553 (KG)
                                                :
                               Debtors.         :       Jointly Administered

-------------------------------------------------- x

**FOURTH AMENDED JOINT PLAN OF LIQUIDATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
PROPOSED BY THE DEBTORS, THE STATUTORY COMMITTEE
OF UNSECURED CREDITORS, AND BANCO POPULAR DE PUERTO RICO**

CADWALADER, WICKERSHAM & TAFT LLP
*Co-Counsel for Debtors and Debtors in Possession*
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000

RICHARDS, LAYTON & FINGER, P.A.
*Co-Counsel for Debtors and Debtors in Possession*
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700

MORRISON & FOERSTER LLP
*Co-Counsel for Creditors Committee*
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000

PEPPER HAMILTON LLP
*Co-Counsel for Creditors Committee*
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899
Telephone: (302) 777-6500

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Counsel for Banco Popular de Puerto Rico*
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
Telephone: (302) 651-3000

Dated: May 6, 2011

**TABLE OF CONTENTS**

Page

ARTICLE I

DEFINITIONS

Section 1.1    Definitions.................................................................................................1
Section 1.2    Interpretation, Application of Definitions, and Rules of Construction..................14

ARTICLE II

COMPROMISES AND SETTLEMENTS OF CLAIMS

Section 2.1    BPPR Settlement........................................................................................16
Section 2.2    FirstBank Settlement..................................................................................18

ARTICLE III

ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS

Section 3.1    Administrative Expenses ..............................................................................19
Section 3.2    Priority Tax Claims.....................................................................................21

ARTICLE IV

CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Section 4.1    Classification.............................................................................................21

ARTICLE V

TREATMENT OF CLAIMS AND EQUITY INTERESTS

Section 5.1    Class 1 – Priority Non-Tax Claims................................................................22
Section 5.2    Class 2 – FirstBank Secured Claims..............................................................22
Section 5.3    Class 3 – BPPR Secured Claims....................................................................22
Section 5.4    Class 4 – Other Secured Claims....................................................................23
Section 5.5    Class 5 – General Unsecured Claims..............................................................23
Section 5.6    Class 6 – Intercompany Claims .....................................................................24
Section 5.7    Class 7 – Subordinated Claims .....................................................................24
Section 5.8    Class 8 – Equity Interests............................................................................25
Section 5.9    Nonconsensual Confirmation........................................................................25
Section 5.10   Elimination of Vacant Classes......................................................................25

## ARTICLE VI

### MEANS FOR IMPLEMENTATION

Section 6.1    Corporate Action.................................................................................25
Section 6.2    Liquidation Trust ...............................................................................26
Section 6.3    Reservation of Rights for Additional Trust(s) ......................................31
Section 6.4    Limitation on Liability .........................................................................31
Section 6.5    Reliance on Documents .......................................................................32
Section 6.6    Requirement of Undertaking.................................................................32
Section 6.7    Tort Claims ........................................................................................32
Section 6.8    Administrative and Priority Claims Reserve ..........................................32
Section 6.9    General Unsecured Claims Reserve.......................................................33
Section 6.10   Causes of Action and Accounts Receivable ..........................................33
Section 6.11   Effectuating Documents and Further Transactions.................................34
Section 6.12   Authority to Act .................................................................................34

## ARTICLE VII

### DISTRIBUTIONS

Section 7.1    Distribution Record Date .....................................................................34
Section 7.2    Date of Distributions Under the Plan.....................................................34
Section 7.3    Sources for Distributions .....................................................................35
Section 7.4    Manner of Payment.............................................................................35
Section 7.5    Disbursement Agent............................................................................35
Section 7.6    Delivery of Distributions .....................................................................35
Section 7.7    Allocation of Distributions Between Principal and Interest ......................35
Section 7.8    No Postpetition Interest on Claims .......................................................35
Section 7.9    No Distribution in Excess of Allowed Amount of Claim...........................36
Section 7.10   Distributions with Respect to Disputed Claims ......................................36
Section 7.11   Distributions with Respect to Defendants..............................................36
Section 7.12   Disputed Payments.............................................................................36
Section 7.13   Setoffs ..............................................................................................36
Section 7.14   Unclaimed Property ............................................................................37
Section 7.15   Claims Paid by Third Parties ...............................................................37
Section 7.16   Distributions Free and Clear ...............................................................38
Section 7.17   Time Bar to Cash Payments.................................................................38
Section 7.18   De Minimis Distributions ....................................................................38
Section 7.19   Transfer of Property Under Plan...........................................................38

## ARTICLE VIII
### PROCEDURES FOR DISPUTED CLAIMS

Section 8.1    Objections to Claims...........................................................................38
Section 8.2    Estimation of Claims Post-Effective Date ..............................................39
Section 8.3    Late-Filed Claims and Amendments to Claims.......................................39

Section 8.4     Settlement of Disputed Claims ....................................................................39

## ARTICLE IX
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 9.1     Rejection of Remaining Executory Contracts and Unexpired Leases ..................40
Section 9.2     Objections to Rejection...........................................................................40
Section 9.3     Rejection Damage Claims.........................................................................40
Section 9.4     Modifications .......................................................................................41

## ARTICLE X

### CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Section 10.1    Conditions Precedent to the Effective Date ................................................41
Section 10.2    Waiver of Conditions Precedent ..............................................................42
Section 10.3    Effect of Failure of Conditions ...............................................................42

## ARTICLE XI

### EFFECT OF CONFIRMATION

Section 11.1    Vesting of Assets ................................................................................42
Section 11.2    Binding Effect....................................................................................42
Section 11.3    Injunction Against Interference with the Plan .............................................43
Section 11.4    Term of Injunctions or Stays Arising Under or Entered During the
                Chapter 11 Cases.................................................................................43
Section 11.5    Exculpation .......................................................................................43
Section 11.6    Releases............................................................................................43
Section 11.7    Injunction .........................................................................................45
Section 11.8    Exclusions and Limitations on Exculpation, Indemnification, and Releases ........45
Section 11.9    Pension Plan......................................................................................45
Section 11.10   Dissolution of Creditors Committee .........................................................46
Section 11.11   Insurance..........................................................................................46

## ARTICLE XII

### RETENTION OF JURISDICTION

Section 12.1    Retention of Jurisdiction......................................................................46

## ARTICLE XIII

### MISCELLANEOUS PROVISIONS

Section 13.1    Payment of Statutory Fees ....................................................................48
Section 13.2    Substantial Consummation ....................................................................48
Section 13.3    Plan Supplement ................................................................................48

Section 13.4    Operations Between the Confirmation Date and the Effective Date ...................49
Section 13.5    Exemption from Transfer Taxes ...........................................................................49
Section 13.6    Tax Treatment of the Liquidation Trust................................................................49
Section 13.7    Determination of Tax Liabilities...........................................................................49
Section 13.8    Withholding and Reporting Requirements ...........................................................50
Section 13.9    Fifty Percent Shareholder ...................................................................................50
Section 13.10   Modification and Amendment ..............................................................................50
Section 13.11   Revocation or Withdrawal of the Plan..................................................................51
Section 13.12   Reservation of Rights..........................................................................................51
Section 13.13   Severability ........................................................................................................51
Section 13.14   Notice of Entry of Confirmation Order and Relevant Dates ..................................51
Section 13.15   Courts of Competent Jurisdiction ........................................................................52
Section 13.16   No Admissions....................................................................................................52
Section 13.17   Closing of the Chapter 11 Cases .........................................................................52
Section 13.18   Rates..................................................................................................................52
Section 13.19   Governing Law ...................................................................................................52
Section 13.20   Schedules, Exhibits and Supplements..................................................................52
Section 13.21   Compliance with Requirements of Department of Health and Human
                Services...............................................................................................................52
Section 13.22   Notices ...............................................................................................................53

Caribbean Petroleum Corporation, Caribbean Petroleum Refining L.P., and Gulf Petroleum Refining (Puerto Rico) Corporation, as debtors and debtors in possession in the above-captioned chapter 11 cases, together with the statutory committee of unsecured creditors appointed in the above-captioned chapter 11 cases and Banco Popular de Puerto Rico, propose the following joint chapter 11 plans of liquidation pursuant to section 1121(a) of title 11 of the United States Code.

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not proposing substantive consolidation of their respective Estates. Thus, although the Plan generally applies to all of the Debtors, except as otherwise provided in the Plan, (a) the Plan constitutes three distinct chapter 11 plans, one for each Debtor, (b) for voting purposes, each holder of a Claim in a Class shall vote its Claim in such Class by individual Debtor, and (c) the classification scheme set forth in Article IV of the Plan applies to each Debtor, but to the extent that there are no Claims in a certain Class against a particular Debtor, pursuant to Section 5.10 of the Plan, that Class shall be deemed not to exist for any purpose whatsoever with respect to that Debtor. All capitalized terms used in this paragraph shall have the meaning set forth in Article I of the Plan.

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  As used in the Plan, the following terms shall have the respective meanings defined below:

"Accounts Receivable" means any accounts receivable held by the Debtors on the Effective Date identified in the Plan Supplement.

"Administrative and Priority Claims Reserve" means the account to be established by the Liquidation Trustee and funded with the Administrative and Priority Claims Reserve Amount pursuant to Section 6.8 of the Plan.

"Administrative and Priority Claims Reserve Amount" means Cash in an amount equal to $33,200,000 less (a) the DIP Financing Claims Amount, less (b) to the extent Allowed on the Effective Date, the Completion Fees, less (c) the aggregate amount of all Other Secured Claims that are Allowed on the Effective Date, less (d) the aggregate amount of all Administrative Expense Claims that are Allowed on the Effective Date, less (e) the aggregate amount of all Priority Tax Claims and Priority Non-Tax Claims that are Allowed on the Effective Date.

"Administrative Bar Date Order" means the Order Establishing a Deadline for Filing Administrative Expense Requests and Approving the Form and Manner of Notice Thereof, entered by the Bankruptcy Court on November 24, 2010 (D.I. 356).

"Administrative Expense Claim" means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases Allowed under and in accordance

with, as applicable, sections 330, 364, 365, 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' Estates, any Professional Claims, and the DIP Financing Claims. For the avoidance of doubt, the BPPR Adequate Protection Claims shall not constitute Administrative Expense Claims for purposes of the BPPR Settlement Order and the Plan.

"Administrative Expense Claim Bar Date" means that date that is the first Business Day that is thirty (30) days after the Effective Date, or such other date as may be fixed by the Bankruptcy Court.

"Allowed" means, with respect to a Claim, (a) any Claim that has been listed by a Debtor in the Schedules as liquidated in amount and not disputed or contingent and for which no contrary proof of claim or interest has been filed, (b) any properly and timely filed, liquidated, noncontingent Claim with respect to which no objection to the allowance thereof has been filed within the applicable period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, or (c) any Claim allowed pursuant to the Plan, the Confirmation Order, the BPPR Settlement Order, or a Final Order of the Bankruptcy Court.

"Assets" means all tangible and intangible assets of every kind and nature of the Debtors and the Estates, including, without limitation, the Causes of Action, and all proceeds thereof, existing as of the Effective Date.

"Asset Purchase Agreement" means that certain asset purchase agreement by and between the Debtors and the Purchaser memorializing the terms and conditions of the Sale, as may be amended and/or supplemented in accordance with the term thereof.

"Ballot" means the form or forms distributed to holders of impaired Claims on which is to be indicated such holder's acceptance or rejection of the Plan.

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, and to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

"BPPR" means Banco Popular de Puerto Rico.

"BPPR Accounts Receivable Proceeds" means all Cash proceeds of the Accounts Receivable and/or assets received, collected, otherwise obtained by the Debtors, the Estates, or the Liquidation Trustee on and after the Effective Date as proceeds of the Accounts Receivable.

"BPPR Adequate Protection Claims" means those Secured Claims granted to BPPR under the Final DIP Order as adequate protection pursuant to sections 361, 363(c)(2), 363(e), and 364(d)(1) of the Bankruptcy Code.

"BPPR Adequate Protection Payments" means the budgeted adequate protection payments paid by the Debtors and actually received by BPPR during the Chapter 11 Cases pursuant to the Final DIP Order.

"BPPR Cash" means all Cash and Cash equivalents held by the Debtors on the Effective Date, other than the BPPR Insurance Proceeds, the BPPR Accounts Receivable Proceeds, and the Sale Proceeds.

"BPPR Claims" means, collectively, the BPPR Adequate Protection Claims, the BPPR Credit Facility Claims, the BPPR Deficiency Claim, and the DIP Financing Claims.

"BPPR Credit Facility" means that certain Loan and Security Agreement, dated as of March 22, 2003, as amended from time to time, by and between Caribbean Petroleum Corporation and Caribbean Petroleum Refining L.P., as borrowers, Gulf Petroleum Refining (Puerto Rico) Corporation and Oil Resources International, Limited, as guarantors, Gad Zeevi and Talia Zeevi, as personal guarantors, and BPPR (as successor to Westernbank Puerto Rico), as lender, and the other Prepetition Loan Documents (as defined in the Final DIP Order).

"BPPR Credit Facility Claims" means the Secured Claims of BPPR arising under or in connection with the BPPR Credit Facility, including Claims for interest as provided for in the BPPR Credit Facility, but excluding the BPPR Fees Claims.

"BPPR Deficiency Claim" means that portion of the BPPR Secured Claims that remain unpaid after BPPR has received all of the consideration provided in Section 5.3 of the Plan.

"BPPR Fees Claims" means the Claims of BPPR on account of professional fees and expenses incurred by BPPR in connection with the Chapter 11 Cases (as provided in paragraph 42 of the Final DIP Order) less the BPPR Adequate Protection Payments.

"BPPR/Guarantors Settlement Agreement" means that certain Settlement Agreement, dated as of February 4, 2011, by and between BPPR, the Guarantors, and First Oil International, Ltd.

"BPPR Initial Distribution" means Cash in an amount equal to the sum of (a) the Sale Proceeds less (i) the FirstBank Secured Claims Settled Amount, less (ii) $33,200,000, less (iii) the General Unsecured Claims Reserve Amount, less (iv) the Plan Expenses Reserve Amount, plus (b) the BPPR Cash, plus (c) the BPPR Accounts Receivable Proceeds (to the extent reduced to Cash on the Effective Date), plus (d) the BPPR Insurance Proceeds (to the extent reduced to Cash on the Effective Date), plus (e) the DIP Financing Claims Amount.

"BPPR Insurance Proceeds" means all Cash proceeds of the Property and Casualty Insurance Policies and/or assets received, collected, otherwise obtained by the Debtors, the Estates, or the Liquidation Trustee on and after the Effective Date as proceeds of the Property

3

and Casualty Insurance Policies, including but not limited to any premium credits and/or reimbursements payable or paid under (a) the Property and Casualty Policies and/or (b) the Liability Insurance Policies.

"BPPR/Lexel Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of March 13, 2007, by and between Westernbank Puerto Rico and Lexel Establishment.

"BPPR Liens" means all of the liens and security interests granted to BPPR pursuant to the BPPR Credit Facility and the other Prepetition Loan Documents (as defined in the Final DIP Order).

"BPPR Released Parties" has the meaning set forth in Section 2.1(d) of the Plan.

"BPPR Secured Claims" means, collectively, the BPPR Credit Facility Claims and the BPPR Adequate Protection Claims as Allowed pursuant to the BPPR Settlement Order and Section 2.1(a) of the Plan.  For the avoidance of doubt, the BPPR Secured Claims shall include all postpetition interest accrued on the BPPR Secured Claims through the Effective Date at the rate provided in the BPPR Credit Facility.

"BPPR Settlement" means that certain settlement of the BPPR Claims between and among the Debtors, the Creditors Committee, and BPPR authorized and approved by the BPPR Settlement Order and implemented and effectuated by the Plan.

"BPPR Settlement Order" means the *Order Granting Joint Motion for Order Pursuant to Bankruptcy Code Sections 105 and 363 and Fed. R. Bankr. P. 9019 Approving Settlement Between and Among Debtors, Official Committee of Unsecured Creditors, and Banco Popular de Puerto Rico*, entered by the Bankruptcy Court on March 21, 2011 (D.I. 786), authorizing and approving the BPPR Settlement and Allowing the BPPR Secured Claims.

"Business Day" means any day other than a Saturday, a Sunday, a "legal holiday" as such term is defined in Bankruptcy Rule 9006(a), or any other day on which banking institutions in New York, New York or San Juan, Puerto Rico are required or authorized to close by law or executive order.

"Cash" means legal tender of the United States of America.

"Causes of Action" means any and all actions, proceedings, causes of action, suits, demands, rights to legal remedies, rights to equitable remedies, rights to payment, and Claims, including, without limitation, those described in the Plan Supplement, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, noncontingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, of the Debtors or the Estates, existing as of the Effective Date, unless otherwise waived or released by the Debtors or the Liquidation Trustee, as applicable, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.  For the avoidance of doubt, Causes of Action shall (a) include all Litigation (as

defined in the Asset Purchase Agreement) set forth in Schedule 3(e) to the Asset Purchase Agreement and (b) not include the Accounts Receivable, the Liability Insurance Policies, or the Property and Casualty Insurance Policies.

"Chapter 11 Cases" means the cases commenced by the Debtors pursuant to chapter 11 of the Bankruptcy Code which are jointly administered under the caption In re Caribbean Petroleum Corp., et al., Case No. 10-12553 (KG).

"Chartis Liability Proceeds" has the meaning set forth in Section 6.2(c) of the Plan.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Claims Administration Procedure" means the procedures for liquidating, and determining the Allowed amount of, Tort Claims through direct negotiation or alternative dispute resolution, substantially in the form as filed with the Bankruptcy Court prior to the deadline to object to the Debtors' motion seeking entry of an order approving the Disclosure Statement and certain solicitation procedures related thereto.

"Claims Objection Deadline" means the date that is the first Business Day that is one hundred eighty (180) days after the Effective Date, subject to extension from time to time by order of the Bankruptcy Court.

"Class" means any group of substantially similar Claims or Equity Interests classified by Article IV of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

"Collateral" means any property or interest in property of the Estate of any Debtor subject to a lien, charge or other encumbrance to secure the payment or performance of a Claim, which lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable nonbankruptcy law.

"Collection Efforts" has the meaning set forth in Section 6.2(c) of the Plan.

"Commencement Date" means August 12, 2010.

"Completion Fees" means, collectively, the FTI Success Fee and the Jefferies Transaction Fee.

"Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

"Confirmation Hearing" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"Confirmation Objection Deadline" means the deadline to be established by the Bankruptcy Court pursuant to the Confirmation Scheduling Order for the filing and service by any and all parties in interest of objections to confirmation of the Plan.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance satisfactory to the Debtors and BPPR, including in its capacity as the DIP Lender.

"Confirmation Scheduling Order" means the order to be entered by the Bankruptcy Court (a) scheduling the Confirmation Hearing, (b) establishing the deadline to accept or reject the Plan, and (c) establishing the Confirmation Objection Deadline.

"Creditors Committee" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases by the United States Trustee on August 27, 2010, as amended from time to time by the United States Trustee.

"Debtors" means Caribbean Petroleum Corporation, Caribbean Petroleum Refining L.P., and Gulf Petroleum Refining (Puerto Rico) Corporation.

"Deficiency Claim" means that portion of a Claim secured by a lien on property in which the Estate has an interest that is determined, pursuant to section 506(a) of the Bankruptcy Code or through agreement, to exceed the value of the claimant's interest in such property.

"DIP Financing Agreement" means that certain Amendment and Supplement to Loan and Security Agreement, Security Agreements and Other Financing Agreements, dated as of September 10, 2010, as may be amended from time to time, by and between, Caribbean Petroleum Corporation, Caribbean Petroleum Refining L.P., and Gulf Petroleum Refining (Puerto Rico) Corporation, as borrowers, and BPPR, as lender.

"DIP Financing Claims" means the Secured, superpriority, and administrative Claims of BPPR arising under the DIP Financing Documents and the Final DIP Order. For the avoidance of doubt, the DIP Financing Claims shall include the BPPR Fees Claims but shall not include the BPPR Adequate Protection Claims.

"DIP Financing Claims Amount" means the aggregate amount of the DIP Financing Claims outstanding and unpaid as of the Effective Date, which amount shall be agreed to by the Proponents or determined by the Bankruptcy Court prior to the Effective Date.

"DIP Financing Documents" means, collectively, the DIP Financing Agreement, and all other related agreements, documents, security agreements, pledge agreements, notes, certificates, and instruments, in each case as authorized, and amended, modified, and/or supplemented, by the Final DIP Order.

"DIP Lender" means BPPR in its capacity as postpetition lender under the DIP Financing Agreement.

"Disallowed" means, with respect to a Claim, any Claim that has been disallowed by the Plan, the Confirmation Order, or Final Order of the Bankruptcy Court.

"Disbursement Agent" means any entity, including the Debtors and the Liquidation Trustee, that makes a transfer or distribution required under the Plan.

"Disclosure Statement" means the disclosure statement, dated February 4, 2011, relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented, or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126(b) of the Bankruptcy Code.

"Disputed" means, with respect to any Claim, any Claim that is not Allowed or Disallowed, or any Claim with respect to which an objection has been filed and is pending before the Bankruptcy Court.

"Disputed Claim Amount" means, with respect to a Disputed Claim, (a) if a liquidated amount is set forth in the proof of claim relating to such Claim, (i) the liquidated amount set forth in the proof of claim relating to such Claim, (ii) an amount agreed to by the Debtors or the Liquidation Trustee and the holder of such Claim, or (iii) if a request for estimation if filed by any party, the amount at which such Claim is estimated by the Bankruptcy Court, (b) if no liquidated amount is set forth in the proof of claim relating to such Claim, (i) an amount agreed to by the Debtors or the Liquidation Trustee and the holder of such Claim or (ii) the amount estimated by the Bankruptcy Court with respect to such Claim, or (c) if such Claim was listed on the Schedules as unliquidated, contingent, or disputed and no proof of claim was filed, or deemed to have been filed, by the applicable deadline to file such Claim and such Claim has not been resolved by written agreement of the Debtors or the Liquidation Trustee and the holder of such Claim or by an order of the Bankruptcy Court, zero.

"Distribution Date" means either the Effective Date or a Periodic Distribution Date.

"Distribution Record Date" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date designated in the Confirmation Order.

"Effective Date" means the first Business Day on which all conditions to the effectiveness of the Plan specified in Section 10.1 of the Plan have been satisfied or waived and the Plan becomes effective in accordance with its terms and the Confirmation Order.

"Effective Date Cash Requirement" means Cash in an amount equal to the sum of (a) the Effective Date Cash Payment, plus (b) the Administrative and Priority Claims Reserve Amount, plus (c) the General Unsecured Claims Reserve, plus (d) the Plan Expenses Reserve.

"Effective Date Cash Payment" means Cash in an amount equal to the sum of (a) the BPPR Initial Distribution, plus (b) the FirstBank Secured Claims Settled Amount, plus (c) to the extent Allowed on the Effective Date, the Completion Fees, plus (d) the aggregate amount of Other Secured Claims that are Allowed on the Effective Date plus (e) the aggregate amount of all Administrative Expense Claims that are Allowed on the Effective Date, plus (f) the aggregate

7

amount of all Priority Tax Claims and Priority Non-Tax Claims that are Allowed on the Effective Date.

"Effective Date Distributions" means all distributions required to be made on the Effective Date under the Plan to the holders of Claims that are Allowed as of the Effective Date.

"Equity Interest" means the legal, equitable, contractual and other rights of a holder of an ownership interest in any of the Debtors, including, without limitation, any interest evidenced by common or preferred stock, membership interests and options or other rights to purchase or otherwise receive any ownership in any of the Debtors.

"Estate" means, with respect to each Debtor, the estate created in its respective Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

"Excess Administrative and Priority Claims Reserve" means, as determined by Section 6.8 of the Plan, Cash in an amount equal to the remaining balance, if any, of the Administrative and Priority Claims Reserve after all Other Secured Claims, Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims have either been Allowed (and received a distribution in accordance with the Plan) or Disallowed by the Plan, the Confirmation Order, or Final Order of the Bankruptcy Court.

"Face Amount" means (a) with respect to an Allowed Claim, the Allowed amount of such Claim and (b) with respect to a Disputed Claim, the Disputed Claim Amount.

"FDIC" means the Federal Deposit Insurance Corporation.

"Final DIP Order" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing, (B) Use Cash Collateral, (C) Grant Liens and Superpriority Claims to the Postpetition Lender, and (D) Provide Adequate Protection to the Prepetition Lender and (II) Granting Related Relief,* entered by the Bankruptcy Court on September 10, 2010 (D.I. 148).

"Final Order" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

"FirstBank" means FirstBank Puerto Rico, as lender under the FirstBank Credit Facility.

"FirstBank Credit Facility" means that certain Loan Agreement, dated as of December 2, 1998, as amended from time to time, by and between Caribbean Petroleum Refining L.P., as borrower, and FirstBank, as lender.

"FirstBank Secured Claims" means the Secured Claims arising under the FirstBank Credit Facility as Allowed pursuant to the FirstBank Settlement Order and Section 2.2(a) of the Plan.

"FirstBank Secured Claims Settled Amount" means $11,500,000.

"FirstBank Settlement" means the settlement and compromise of the FirstBank Secured Claims authorized and approved by the FirstBank Settlement Order and implemented and effectuated by the Plan.

"FirstBank Settlement Order" means the *Order Under Fed. R. Bankr. P. 9019 Approving Settlement Between and Among the Debtors, the Statutory Committee of Unsecured Creditors, Banco Popular de Puerto Rico, and FirstBank Puerto Rico*, entered by the Bankruptcy Court on March 21, 2011 (D.I. 785), authorizing and approving the FirstBank Settlement and Allowing the FirstBank Secured Claims.

"FTI Engagement Letter" means that certain letter agreement, dated as of August 11, 2010, by and between Caribbean Petroleum Corporation, Caribbean Petroleum Refining L.P., Gulf Petroleum Refining (Puerto Rico) Corporation, and FTI Consulting, Inc.

"FTI Success Fee" means, collectively, the Completion Fee and the Success Fee (each as defined in the FTI Engagement Letter) in amount not to exceed $2,460,000 or such lesser amount as Allowed by the Bankruptcy Court.

"General Bar Date Order" means the *Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, entered by the Bankruptcy Court on October 6, 2010 (D.I. 197).

"General Unsecured Claim" means any Claim against any of the Debtors that (a) is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a FirstBank Secured Claim, a BPPR Secured Claim, an Other Secured Claim, an Intercompany Claim, or a Subordinated Claim or (b) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim. For the avoidance of doubt, any Guarantor Secured Claim, any Deficiency Claim, the BPPR Deficiency Claim, and any Rejection Damage Claim shall be a General Unsecured Claim.

"General Unsecured Claims Reserve" means the account to be established by the Liquidation Trustee and funded with the General Unsecured Claims Reserve Amount pursuant to Section 6.9 of the Plan.

"General Unsecured Claims Reserve Amount" means Cash in an amount equal to the product of (a) 10% and (b) the Sale Proceeds.

"Government Bar Date" means February 8, 2011 at 5:00 p.m. (prevailing Eastern time).

"Guarantor Affiliates" means, collectively, all entities (other than the Debtors) that are affiliated with a Guarantor, including all family members of the Guarantors.

"Guarantor Secured Claim" means any Secured Claim asserted by a Guarantor.

"Guarantors" means, collectively, Oil Resources International, Limited, as guarantor, and Gad Zeevi and Talia Zeevi, as personal guarantors of the BPPR Credit Facility.

"Impaired" has the meaning set forth in section 1124 of the Bankruptcy Code.

"Inpecos Claim" means any Claim against any Debtor arising prior to the Commencement Date held or previously held by Inpecos, A.G. or any such Claim held by any successors or assigns of Inpecos, A.G., including without limitation any Claims arising under any loans or other financial accommodations made to or for the benefit of any Debtor.

"Insurance Policies" means, collectively, the Liability Insurance Policies, and the Property and Casualty Insurance Policies.

"Insurance Proceeds" has the meaning set forth in Section 6.2(c) of the Plan.

"Intercompany Claim" means any Claim against a Debtor by another Debtor.

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of March 24, 2003, as amended from time to time, by and between BPPR (as successor to Westernbank Puerto Rico) and FirstBank.

"Jefferies Engagement Letter" means that certain letter agreement, dated as of September 28, 2010, by and between the Creditors Committee and Jefferies & Company, Inc.

"Jefferies Success Fee" means the Transaction Fee (as defined in the Jefferies Engagement Letter) in amount not to exceed $950,000 or such lesser amount as Allowed by the Bankruptcy Court.

"Lexel Claim" means any Claim against any Debtor arising prior to the Commencement Date held or previously held by any of Lexel Establishment or Lexel Ltd. or any such Claim held by any successors or assigns of Lexel Establishment or Lexel Ltd., including without limitation any Claims arising under the Lexel Loan Agreement or any other loans or other financial accommodations made to or for the benefit of any Debtor.

"Lexel Establishment Claim" means any Claim against any Debtor arising prior to the Commencement Date held or previously held by Lexel Establishment or any such Claim held by any successors or assigns of Lexel Establishment, including without limitation any Claims

arising under the Lexel Loan Agreement or any other loans or other financial accommodations made to or for the benefit of any Debtor by Lexel Establishment.

"Lexel Loan Agreement" means that certain Loan Agreement, dated as of March 13, 2007, as amended from time to time, by and between Caribbean Petroleum Corporation, Caribbean Petroleum Refining L.P., and Lexel Establishment.

"Liability Insurance Policies" means those liability insurance policies of the Debtors identified in the Plan Supplement.

"Liability Insurance Proceeds" has the meaning set forth in Section 6.2(c) of the Plan.

"Liquidation Trust" means the trust established on the Effective Date pursuant to Section 6.2 of the Plan.

"Liquidation Trust Assets" means all Assets of the Debtors and the Estates other than the Purchased Assets and the Effective Date Cash Payment. For the avoidance of doubt, the Liquidation Trust Assets shall include the Liability Insurance Policies and the Property and Casualty Insurance Policies and any proceeds of the Liability Insurance Policies and the Property and Casualty Insurance Policies.

"Liquidation Trust Documents" means those documents establishing and governing the Liquidation Trust, substantially in the form set forth in the Plan Supplement.

"Liquidation Trust Interests" means the beneficial trust interests in the Liquidation Trust.

"Liquidation Trust Oversight Board" means the advisory board to the Liquidation Trust as set forth in Section 6.2(e) of the Plan.

"Liquidation Trustee" means FTI Consulting, Inc.

"Other Secured Claim" means any Secured Claim against a Debtor that is not a DIP Financing Claim, a FirstBank Secured Claim, a BPPR Secured Claim, or a Guarantor Secured Claim.

"PBGC" has the meaning set forth in Section 11.9 of the Plan.

"Pension Plan" has the meaning set forth in Section 11.9 of the Plan.

"Periodic Distribution Date" means a date after the Effective Date, which shall occur on a Business Day that is approximately ninety (90) days after the immediately preceding Distribution Date.

"Plan" means these joint plans of liquidation for the Debtors, including the exhibits and schedules hereto and the Plan Supplement, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code.

11

"Plan Expenses" means all actual and necessary fees, costs, expenses and obligations incurred by or owed to, the Liquidation Trustee, the Liquidation Trust Oversight Board, and each of the foregoing's respective agents, employees, attorneys, advisors and other professionals in administering the Plan and the Liquidation Trust, including, without limitation, (a) reasonable compensation for services rendered, and reimbursement for actual and necessary expenses incurred, by the Liquidation Trustee, the Liquidation Trust Oversight Board, and each of the foregoing's agents, employees and professionals after the Effective Date through and including the date upon which the Bankruptcy Court enters a final decree closing the Chapter 11 Cases and (b) all fees payable pursuant to Section 13.1 of the Plan.

"Plan Expenses Reserve" means the account to be established by the Liquidation Trustee and funded with the Plan Expenses Reserve Amount pursuant to Section 6.2(g) of the Plan.

"Plan Expenses Reserve Amount" means Cash in an amount equal to $1,000,000.

"Plan Supplement" means the supplemental appendix to the Plan, described in Section 13.3 of the Plan.

"Plan Support Agreement" means that certain Plan Support Agreement, dated as of February 4, 2011, as amended from time to time, by and between the Debtors, the Creditors Committee, BPPR, the Guarantors, and First Oil International, Ltd.

"Priority Non-Tax Claim" means any Claim against any of the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

"Priority Tax Claim" means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"Pro Rata" means, with respect to any distribution on account of any Allowed Claim, the ratio that the amount of such Allowed Claim bears to the aggregate Face Amount of all Claims in the same Class.

"Professional Claims" means Claims for compensation for services rendered and/or reimbursement of expenses incurred through and including the Effective Date under section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. For the avoidance of doubt, the Completion Fees shall constitute Professional Claims.

"Professional Claims Objection Deadline" means the date that is the first Business Day that is forty-five (45) days after the Effective Date, subject to extension from time to time by order of the Bankruptcy Court.

"Property and Casualty Insurance Policies" means those property and casualty insurance policies of the Debtors identified in the Plan Supplement.

"Proponents" means, collectively, the Debtors, the Creditors Committee and BPPR, as co-proponents of the Plan.

"Purchased Assets" means the Assets that were sold, transferred, assigned, conveyed, and delivered to the Purchaser pursuant to the Sale Order and in accordance with the terms and subject to the conditions of the Asset Purchase Agreement.

"Purchaser" means Puma Energy International B.V. or its designee.

"Rejection Damage Claim" means a Claim for damages arising from the rejection by any Debtor of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

"Released Parties" means, collectively, (a) the Debtors and the Estates, (b) the Guarantors, (c) the Guarantor Affiliates, (d) First Oil International, Ltd., (e) the Liquidation Trustee, (f) the Creditors Committee and its members, (g) the DIP Lender, (h) BPPR in its capacity as lender under the BPPR Credit Facility, (i) BPPR's predecessors in interest under the BPPR Credit Facility, including, without limitation, Westernbank Puerto Rico, (j) FirstBank, and (k) any of the representatives, agents, officers, directors, employees, professionals, advisors, attorneys, successors, or assigns of the foregoing (in their capacities as such).

"Releasing Parties" has the meaning set forth in Section 2.1(d) of the Plan.

"Sale" means the sale of the Purchased Assets to the Purchaser pursuant to the Sale Order and in accordance with the terms and subject to the conditions of the Asset Purchase Agreement.

"Sale Proceeds" means the gross Cash proceeds generated by the Sale and actually received by the Debtors.

"Sale Order" means the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (III) Granting Certain Related Relief,* entered December 22, 2010 (D.I. 511).

"Schedules" means, collectively, the schedules of the Debtors' assets and liabilities, the statement of the Debtors' financial affairs, and any other schedules and statements filed with the Bankruptcy Court pursuant to sections 521 or 1106 of the Bankruptcy Code or Bankruptcy Rule 1007, as such schedules and statements have been or may be amended and supplemented from time to time in accordance with Bankruptcy Rule 1009.

"Secured Claim" means a Claim to the extent (a) of the holder's interest in the value of the Collateral securing such Claim, (b) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code as secured, or (c) of any valid and enforceable rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

"Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

"Settled Creditors Committee Challenge Right" means the Creditors Committee's reserved conditional right, granted to it pursuant to the BPPR Settlement Order, to assert a Challenge and Claims and Defenses (each as defined in paragraph 34 of the Final DIP Order) only if (and only within forty-five (45) days after the earliest to occur of the following) (a) BPPR breaches its obligations under the BPPR Settlement and the Creditors Committee has not breached its obligations under the BPPR Settlement, (b) the Effective Date of the Plan does not occur on or before September 1, 2011, or (c) the Plan, as modified or amended, or another plan of liquidation that provides BPPR and the holders of General Unsecured Claims treatment substantially equivalent to the treatment provided in the Plan is not confirmed on or before September 1, 2011; provided, however, that the Creditors Committee (or any chapter 7 trustee for the Debtors) shall also be entitled to assert a Challenge and Claims and Defenses in the event that (and only within forty-five (45) days after the earliest to occur of the following): (x) BPPR begins foreclosure proceedings with respect to any of its Collateral, (y) BPPR files a motion to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (z) the Bankruptcy Court enters an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

"Subordinated Claim" means any Claim that is (a) subordinated pursuant to section 510 of the Bankruptcy Code, (b) an Inpecos Claim, or (c) a Lexel Claim.

"Tort Claim" means (a) any Claim asserted against any of the Debtors that is predicated upon alleged damages incurred on account of negligence or other equivalent tort legal theory in connection with the explosions that occurred at Caribbean Petroleum Refining L.P.'s facilities in October 2009 or (b) any Claim asserted against any of the Debtors for contribution or indemnity related to the explosions that occurred at Caribbean Petroleum Refining L.P.'s facilities in October 2009. For the avoidance of doubt, any Claim of the United States government arising under any environmental law shall not constitute a Tort Claim.

"Umbrella Insurance Policy" means that certain Commercial Umbrella Liability Policy issued by American International Insurance Company of Puerto Rico to Caribbean Petroleum Corporation.

"Unclaimed Property" means any Cash, checks and other property to be distributed in respect of an Allowed Claim pursuant to the Plan, which was deemed unclaimed (a) on the date such property would have been distributed by the Liquidation Trustee but such distribution did not occur because the current address of such holder could not be reasonably determined by the Liquidation Trustee or (b) on the date such property was returned to the Liquidation Trustee as undeliverable without a proper forwarding address after having been properly distributed by the Liquidation Trustee.

"United States Trustee" means the Office of the United States Trustee for the District of Delaware.

Section 1.2    Interpretation, Application of Definitions, and Rules of Construction. For purposes of the Plan, unless otherwise provided herein:

14

(a)      whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and the neuter gender;

(b)      any reference in the Plan to an existing document, schedule, or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented;

(c)      any reference to an entity as a holder of a Claim or Equity Interest includes that entity's permitted successors and assigns;

(d)      all references in the Plan to articles, sections, schedules, exhibits, and supplements are references to the respective articles, sections, schedules, exhibits, and supplements of or to the Plan, as the same may be amended, waived, or modified from time to time;

(e)      whenever the words "include", "includes", or "including" are used in the Plan, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of similar import;

(f)      the words "herein," "hereunder," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular provision of the Plan;

(g)      subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules;

(h)      captions and headings to sections of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

(i)      the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

(j)      any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

(k)      all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the CM/ECF system of the Bankruptcy Court;

(l)      all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases;

15

(m)      any immaterial effectuating provisions may be interpreted by the Liquidation Trustee after the Effective Date in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order;

(n)      in the event that a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan or any settlement or other agreement contemplated hereunder is inconsistent with a particular term of the Plan, the definitive documentation shall govern and shall be binding on the parties thereto;

(o)      to the extent that any schedule, exhibit, or supplement to the Plan is inconsistent with the terms of the Plan, and unless otherwise provided herein or in the Confirmation Order, the terms of the schedule, exhibit, or supplement shall govern;

(p)      to the extent that the Asset Purchase Agreement is inconsistent with the terms of the Plan or any schedule, exhibit, or supplement to the Plan, the terms of the Asset Purchase Agreement shall govern;

(q)      to the extent that the Confirmation Order or the Sale Order is inconsistent with the Plan or any schedule, exhibit, or supplement to the Plan, the provisions of the Confirmation Order or Sale Order (as applicable) shall govern;

(r)      to the extent that the Disclosure Statement is inconsistent with the terms of the Plan, the terms of the Plan shall govern;

(s)      in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply;

(t)      in the event that any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or have occurred as of the required date; and

(u)      all references in the Plan to monetary figures shall refer to currency of the United States of America.

## ARTICLE II

## COMPROMISES AND SETTLEMENTS OF CLAIMS

Section 2.1    BPPR Settlement.  Pursuant to Bankruptcy Rule 9019, section 1123(b)(3) of the Bankruptcy Code, and the BPPR Settlement Order, the Plan shall implement the BPPR Settlement, and shall constitute a motion for approval of, and the Confirmation Order shall constitute Bankruptcy Court approval of, the implementation of the BPPR Settlement.  On the Effective Date, the BPPR Settlement shall be effectuated as follows:

(a)    <u>Allowance and Settlement of BPPR Secured Claims</u>.    In accordance with the BPPR Settlement Order, on the Effective Date, (i) the BPPR Secured Claims are and shall be deemed forever Allowed as undisputed, noncontingent, and liquidated Secured Claims in the aggregate principal amount of $137,671,348.58 <u>plus</u> prepetition professional fees and out-of-pocket expenses, and interest accrued thereon through the Effective Date for all purposes under the Plan and in the Chapter 11 Cases, and not subject to objection or avoidance under the Bankruptcy Code or applicable nonbankruptcy law, Challenge, Claims and Defenses (each as defined in paragraph 34 of the Final DIP Order), or the Settled Creditors Committee Challenge Right, (ii) the BPPR Liens are and forever shall be deemed to be as of the Commencement Date valid, perfected, and enforceable first priority liens on and security interests in the Prepetition Collateral (as defined in the Final DIP Order) and (A) not subject to avoidance under the Bankruptcy Code, applicable nonbankruptcy law, any Challenge, or Claims and Defenses (each as defined in paragraph 34 of the Final DIP Order) and (B) subject only to the Permitted Prepetition Liens (as defined in paragraph 9(e) of the Final DIP Order, and (iii) the Settled Creditors Committee Challenge Right shall be deemed to be irrevocably waived and released.  On account of the BPPR Secured Claims, BPPR shall receive the treatment provided in Section 5.3 of the Plan.  BPPR shall retain the BPPR Liens on the Collateral securing the BPPR Secured Claims or, to the extent that the Debtors have sold, or the Liquidation Trustee sells, such Collateral free and clear of such BPPR Liens, the proceeds of such Collateral, to the same extent and with the same priority as of the Commencement Date, until such time as BPPR has received all of the consideration provided in Section 5.3 of the Plan.

(b)    <u>Allowance and Settlement of DIP Financing Claims; Settlement of Carve-Out</u>.  In accordance with the BPPR Settlement Order, on the Effective Date, (i) the DIP Financing Claims are and shall be deemed Allowed as undisputed, noncontingent, and liquidated superpriority administrative expense claims in the DIP Financing Claims Amount for all purposes under the Plan and in the Chapter 11 Cases without the need for BPPR to file a proof of claim evidencing the DIP Financing Claims, and not subject to any objection, avoidance, Challenge, or Claims and Defenses (each as defined in paragraph 34 of the Final DIP Order), (ii) the terms of the Carve-Out (as defined in paragraph 19 of the Final DIP Order) shall be deemed to be forever waived and released, and (iii) only upon receipt by BPPR of all consideration to be received by BPPR under the Plan on the Effective Date (including the Effective Date distributions on account of both its DIP Financing Claims and BPPR Secured Claims as provided in Sections 3.1 and 5.3 of the Plan) shall the liens and security interests granted to secure the DIP Financing Claims be satisfied, discharged, and terminated. On account of the DIP Financing Claims, BPPR shall receive the treatment provided in Section 3.1(c) of the Plan.

(c)    <u>Allowance of BPPR Deficiency Claim</u>.  In accordance with the BPPR Settlement Order, upon receipt by BPPR of all of the consideration provided in Section 5.3 of the Plan, on and after the Effective Date, (i) BPPR shall retain and be deemed to hold the BPPR Deficiency Claim and (ii) the BPPR Deficiency Claim shall be deemed to be an Allowed Claim; <u>provided</u>, <u>however</u>, that BPPR shall not be entitled to receive any recovery under the Plan on account of the Allowed BPPR Deficiency Claim unless and until all other holders of Allowed General Unsecured Claims have been paid in full (including postpetition interest to the extent allowed under applicable bankruptcy law) on account of such holders' respective Allowed General Unsecured Claims; <u>provided</u>, <u>further</u>, <u>however</u>, that the BPPR Deficiency Claim shall

not be released or deemed to be released until paid in full with interest in accordance with the distribution priority terms of the Plan.

(d)    Releases.  In accordance with the BPPR Settlement Order, on the Effective Date, the Settled Creditors Committee Challenge Right shall and shall be deemed to be forever waived and released, and the Debtors, the Estates, and the Creditors Committee (in such capacity and on behalf of the Debtors and the Estates) (individually and collectively, including the Estates, the "Releasing Parties") shall and shall be deemed to release and discharge each of BPPR (in its capacity as lender under the BPPR Credit Facility and as the DIP Lender), Westernbank Puerto Rico and the FDIC, and each of foregoing's respective current and former parents, subsidiaries, affiliates, current and former officers, directors, shareholders, agents, attorneys, financial advisors, employees, predecessors, successors, and assigns, each in their capacities as such, (collectively, the "BPPR Released Parties") from any and all Claims, demands, liabilities, damages, contracts, damages, Causes of Action, costs, choses in action, expenses, and compensation of any kind or nature whatsoever, whether or not now known or unknown, suspected or claimed, matured or unmatured, liquidated or unliquidated, fixed or contingent, which any Releasing Party now has or had, owns, or holds, or at any time heretofore had, owned, or held, or could have claimed, has claimed, or may claim to have or have had against the BPPR Released Parties in connection with the Debtors and/or the Chapter 11 Cases, based upon, related to or arising by reason of any act, omission, transaction, or occurrence taken or occurring at any time up to and including the Effective Date, and the foregoing releases shall include, without limitation, releases and waivers of any Challenge and Claims and Defenses (each as defined in paragraph 34 of the Final DIP Order) and any avoidance actions under chapter 5 of the Bankruptcy Code; provided, however, that the foregoing general release shall not release and/or discharge any Claims to enforce the terms and obligations of BPPR set forth in the BPPR Settlement and the Plan.

(e)    Creditors Committee's and Debtors' Stipulations.  In accordance with the BPPR Settlement Order, on the Effective Date, the stipulations, admissions, and agreements of the Creditors Committee and the Debtors set forth in the BPPR Settlement shall be deemed to be made as of the Commencement Date and shall remain in full force and effect on and after the Effective Date.

(f)    BPPR Plan Support.  In accordance with the BPPR Settlement Order and in consideration of the treatment of the BPPR Claims under the Plan, BPPR shall support consummation of the Plan, subject to Sections 10.1 and 10.2 of the Plan.

Section 2.2    FirstBank Settlement.  Pursuant to Bankruptcy Rule 9019, section 1123(b)(3) of the Bankruptcy Code, and the FirstBank Settlement Order, the Plan shall implement the FirstBank Settlement, and shall constitute a motion for approval of, and the Confirmation Order shall constitute Bankruptcy Court approval of, the implementation of the FirstBank Settlement.  On the Effective Date, the FirstBank Settlement shall be effectuated as follows:

(a)    Allowance and Settlement of FirstBank Secured Claims.  In accordance with the FirstBank Settlement Order, on the Effective Date, (i) the FirstBank Secured Claims are and shall be deemed Allowed as undisputed, noncontingent, and liquidated in the

aggregate principal amount of $11,584,809.57 plus prepetition out-of-pocket expenses, and interest accrued thereon through the Effective Date without the need for FirstBank to file a proof of claim evidencing the FirstBank Secured Claims, and not subject to objection or avoidance under the Bankruptcy Code or applicable nonbankruptcy law and (ii) the liens of FirstBank upon and in the dock property and pipelines of Caribbean Petroleum Refining L.P. as set forth in that certain mortgage recorded at page 165 of volume 191 of the Registry of the Property of Guaynabo, and upon all proceeds thereof, are and shall be deemed as of the Commencement Date to be valid, perfected, enforceable, and not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law. On account of the FirstBank Secured Claims, FirstBank shall receive the treatment provided in Section 5.2 of the Plan. FirstBank shall retain its lien on the proceeds of the Collateral securing the FirstBank Secured Claims, to the same extent and with the same priority as of the Commencement Date, until such time as FirstBank has received all of the consideration provided in Section 5.2 of the Plan.

(b)    Releases.  In accordance with the FirstBank Settlement Order, on the Effective Date, (i) the Debtors, the Estates, the Creditors Committee (in such capacity and on behalf of the Debtors and the Estates), and each of the foregoing's respective officers, directors, agents, employees, attorneys, advisors, and other professionals (in their capacities as such) shall and shall be deemed to fully and finally release and waive all Claims and causes of action against FirstBank and its predecessors in interest (and their respective current and former officers, directors, agents, employees, attorneys, advisors, and other professionals) under the FirstBank Credit Facility, including, without limitation, any and all Claims under section 506(c) of the Bankruptcy Code and (ii) FirstBank and its officers, directors, agents, employees, attorneys, advisors, and other professionals shall and shall be deemed to fully and finally release and waive all Claims and causes of action against the Debtors, the Estates, the Creditors Committee, BPPR (in its capacity as lender under the BPPR Credit Facility and as the DIP Lender), Westernbank Puerto Rico and the FDIC (each in its capacity as BPPR's predecessors in interest under the BPPR Credit Facility), and each of the foregoing's respective current and former officers, directors, agents, employees, attorneys, advisors, and other professionals from any and all Claims and causes of action, in each case as more fully set forth in Section 11.6 of the Plan.

(c)    Release of Intercreditor Agreement Obligations.  In accordance with the FirstBank Settlement Order, upon receipt by FirstBank of all of the consideration provided in Section 5.2 of the Plan, on and after the Effective Date, the respective rights and obligations of BPPR and FirstBank under the Intercreditor Agreement shall be deemed fully satisfied and released as between BPPR and FirstBank.

## ARTICLE III

## ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS

Section 3.1    Administrative Expenses.

(a)    Generally.  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, or as otherwise provided in the Plan, each holder of an Allowed Administrative Expense Claim shall receive in full settlement, satisfaction, and release of such Claim, Cash in an amount equal to the Allowed but unpaid

19

portion of such Claim, on or as soon as practicable after, the later of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the Debtors or the Liquidation Trustee and the holder of such Claim.

Except as otherwise provided in the Plan, the General Bar Date Order, the Administrative Bar Date Order, or any other order of the Bankruptcy Court (and excluding, for the avoidance of doubt, any Administrative Expense Claims that have been fully satisfied or Allowed on or before the Effective Date), all Administrative Expense Claims that accrue from January 1, 2011 through the Effective Date must be filed with Kurtzman Carson Consultants, the Debtors' claims agent, and served on counsel for the Debtors (if filed and served before the Effective Date) or the Liquidation Trustee (if filed and served on or after the Effective Date) by the Administrative Expense Claim Bar Date.    The failure to properly file and serve an Administrative Expense Claim on or before the Administrative Expense Claim Bar Date shall result in such Administrative Expense Claim being deemed forever barred and Disallowed as of the Effective Date automatically without the need for any objection from the Debtors, the Liquidation Trustee, or any other party in interest or any action by the Bankruptcy Court.

The Liquidation Trustee shall have the right to object to any Administrative Expense Claim (other than Administrative Expense Claims that are Allowed as of the Effective Date) on or before the Claims Objection Deadline, subject to extension from time to time by order of the Bankruptcy Court. Unless the Debtors or the Liquidation Trustee objects to a timely-filed and properly-served Administrative Expense Claim, such Claim shall be deemed Allowed in the amount requested. In the event that the Debtors or the Liquidation Trustee objects to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Claim should be Allowed and, if so, in what amount. The Liquidation Trustee, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business and without further Bankruptcy Court approval.

(b)    <u>Professional Compensation and Reimbursement Claims</u>.    Any holder of a Professional Claim shall (i) file its application for final allowance of such Claim on or before the Administrative Expense Claim Bar Date and (ii) unless such holder agrees to less favorable treatment, be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court, upon (x) the date of entry of an order granting such award, or as soon as practicable thereafter or (y) such other terms as may be mutually agreed upon by such holder and BPPR and the Debtors or the Liquidation Trustee, as applicable.

Objections to any applications for final allowance of a Professional Claim must be filed and served on the professional that filed such application on or before the Professional Claims Objection Deadline, subject to extension from time to time by order of the Bankruptcy Court.    As soon as practicable following the seventh Business Day after the occurrence of the Professional Claims Objection Deadline, a hearing will be held to consider all timely-filed and properly-served applications for final allowance of a Professional Claim.

(c)    <u>DIP Financing Claims</u>. Pursuant to the BPPR Settlement Order and Section 2.1 of the Plan, on the Effective Date, BPPR shall receive in full settlement, satisfaction, and release of the DIP Financing Claims, Cash in an amount equal to the DIP

Financing Claims Amount.  Upon receipt by BPPR of all of the consideration provided in this Section 3.1(c) of the Plan, and subject to BPPR's receipt of other Effective Date consideration as provided in Sections 2.1(b) and 5.3 of the Plan, all liens and security interests granted to secure the DIP Financing Claims shall be satisfied, discharged, and terminated in full and of no further force or effect.

Section 3.2    <u>Priority Tax Claims</u>.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive in full settlement, satisfaction, and release of such Claim, Cash in an amount equal to the Allowed but unpaid portion of such Claim, on or as soon as practicable after, the later of (a) the Effective Date and (b) the date such Claim becomes Allowed.

## ARTICLE IV

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Section 4.1    <u>Classification</u>.  The Plan shall be deemed to constitute three distinct chapter 11 plans for each of the Debtors.  Pursuant to section 1122 of the Bankruptcy Code, the following table designates the Classes of Claims again, and Equity Interests in, the Debtors, and specifies which of those Classes are (a) Impaired and entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, (b) not Impaired and presumed to accept the Plan, and therefore not entitled to vote to accept or reject the Plan, and (c) Impaired and deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified, and the respective treatment of such unclassified claims is provided in Article III of the Plan.

| Class | Designation | Impairment | Voting Rights |
|-------|-------------|------------|---------------|
| 1 | Priority Non-Tax Claims | Not Impaired | Presumed to Accept |
| 2 | FirstBank Secured Claims | Impaired | Entitled to Vote |
| 3 | BPPR Secured Claims | Impaired | Entitled to Vote |
| 4 | Other Secured Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests | Impaired | Deemed to Reject |

Classes 1, 3, 4, 5, 6, 7, and 8 consist of sub-Classes for each Debtor, and each sub-Class shall and shall be deemed to be a separate Class for all purposes under the Bankruptcy Code.  A schedule of the sub-Classes for Classes 1, 3, 4, 5, 6, 7, and 8 is set forth in <u>Exhibit A</u> to the Plan.

A Claim or Equity Interest shall be placed in a particular Class only to the extent that such Claim or Equity Interest falls within the description of such Class, and shall be classified in other Classes to the extent that any portion of the Claim or Equity Interest falls

within the description of such other Classes. For the avoidance of doubt, a Claim shall be placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that the Claim is an Allowed Claim in such Class and the Claim has not been paid, released, or otherwise settled or compromised prior to the Effective Date.

## ARTICLE V

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

Section 5.1    Class 1 – Priority Non-Tax Claims.

    (a)    Treatment. Class 1 consists of separate sub-Classes for all Priority Non-Tax Claims against each of the Debtors. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall receive in full settlement, satisfaction, and release of such Claim, Cash in an amount equal to the Allowed but unpaid portion of such Claim, on or as soon as practicable after, the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed.

    (b)    Impairment and Voting. Class 1 is not Impaired. The holders of Claims in Class 1 are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

Section 5.2    Class 2 – FirstBank Secured Claims.

    (a)    Treatment. Pursuant to the FirstBank Settlement Order and Section 2.2 of the Plan, on the Effective Date, FirstBank shall receive in full settlement, satisfaction, and release of the FirstBank Secured Claims, Cash in an amount equal to the FirstBank Secured Claims Settled Amount.

    (b)    Impairment and Voting. Class 2 is Impaired and, accordingly, the holder of a Claim in Class 2 is entitled to vote to accept or reject the Plan.

Section 5.3    Class 3 – BPPR Secured Claims.

    (a)    Treatment. Class 3 consists of separate sub-Classes for all BPPR Secured Claims against each of the Debtors. Pursuant to the BPPR Settlement Order and Section 2.1 of the Plan, BPPR shall receive in full settlement, satisfaction, and release of the BPPR Secured Claims, (i) on the Effective Date, Cash in an amount equal to (A) the Sale Proceeds less (1) the FirstBank Secured Claims Settled Amount, less (2) $33,200,000, less (3) the General Unsecured Claims Reserve Amount, less (4) the Plan Expenses Reserve Amount, plus (B) the BPPR Cash, plus (C) the BPPR Accounts Receivable Proceeds (to the extent reduced to Cash on the Effective Date), plus (D) the BPPR Insurance Proceeds (to the extent reduced to Cash on the Effective Date) and (ii) as soon as practicable after the Effective Date, (A) the product of (1) 66.67% and (2) the Excess Administrative and Priority Claims Reserve, as and when determined in accordance with Section 6.8 of the Plan, (B) the BPPR Accounts Receivable Proceeds, as and when reduced to Cash, and (C) the BPPR Insurance Proceeds, as and when reduced to Cash.

(b)    Impairment and Voting.  Class 3 is Impaired and, accordingly, the holder of a Claim in Class 3 is entitled to vote to accept or reject the Plan.

Section 5.4    Class 4 – Other Secured Claims.

(a)    Treatment.  Class 4 consists of separate sub-Classes for all Other Secured Claims against each of the Debtors.  Except to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, the holder of an Allowed Other Secured Claim shall receive in full settlement, satisfaction, and release of such Claim, either (i) retention of the liens securing such Claim, whether the Collateral subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claim, and deferred Cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the applicable Estate's interest in such Collateral, (ii) to the extent that the Debtors have sold, or the Liquidation Trustee sells, any Collateral that is subject to the liens securing such Claim, free and clear of such liens, liens on proceeds of such Collateral, and the treatment of such liens under clause (i) or (iii) of this Section 5.4(a) of the Plan, and (iii) the realization by such holder of the indubitable equivalent of such Claim.  For the avoidance of doubt, the determination of which treatment to provide a holder of an Allowed Other Secured Claim under this Section 5.4(a) shall be within the sole and absolute discretion of the Debtors or the Liquidation Trustee, as applicable.  For the avoidance of doubt, to the extent that a holder of an Other Secured Claim maintains a valid right of setoff against the Debtors or the Estates and such setoff is permitted pursuant to Section 7.13 of the Plan, such holder shall receive no Cash distribution on account of such Other Secured Claim.  For the avoidance of doubt, (x) in the event that an Allowed Other Secured Claim exceeds the value of such holder's interest in the Collateral that secures it, the holder of such Claim shall have an Allowed Other Secured Claim equal to the value of its interest in such Collateral, if any, and an Allowed General Unsecured Claim for the deficiency and (y) except as otherwise provided in the Plan, any Inpecos Claim and any Lexel Claim, shall be deemed to be, and shall be treated as, a Class 7 Subordinated Claim.

(b)    Impairment and Voting.  Class 4 is Impaired and, accordingly, the holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

Section 5.5    Class 5 – General Unsecured Claims.

(a)    Treatment.  Class 5 consists of separate sub-Classes for all General Unsecured Claims against each of the Debtors.  Pursuant to the BPPR Settlement Order, each holder of an Allowed General Unsecured Claim shall receive in full settlement, satisfaction, and release of such Claim (except that the BPPR Deficiency Claim shall not be released or deemed to be released until paid in full with interest in accordance with the distribution priority terms of the Plan), its Pro Rata share of (i) the General Unsecured Claims Reserve Amount, (ii) the product of (A) 33.33% and (B) the Excess Administrative and Priority Claims Reserve, as and when determined in accordance with Section 6.8 of the Plan, (iii) the Cash proceeds of all Causes of Action, and (iv) to the extent that proceeds of the Liability Insurance Policies are received by the Debtors or the Liquidation Trust, as applicable, pursuant to a settlement with any of the insurers under any of the Liability Insurance Policies, and subject in all respects to Section 6.2(c)(iv) of the Plan with respect to the Chartis Liability Proceeds, the proceeds of the Liability Insurance

Policies received by the Debtors and the Liquidation Trustee, as applicable, pursuant to such settlement, in each case _less_ all costs and expenses incurred by the Debtors and the Liquidation Trustee, as applicable, in connection with the administration of distributions to the holders of Allowed General Unsecured Claims, including, without limitation, the collection and monetization of assets, the prosecution of the Causes of Action, and the allowance and administration of General Unsecured Claims (including Tort Claims), after the use of the Plan Expenses Reserve, on or as soon as practicable after (A) the Effective Date, to the extent that such Cash proceeds are generated prior to the Effective Date and (B) the next Periodic Distribution Date, to the extent that such Cash proceeds are generated after the Effective Date, in each case to the extent that such Claim is Allowed.    For the avoidance of doubt, (x) notwithstanding any other provision of the Plan, BPPR, on account of the BPPR Deficiency Claim or otherwise, shall not be entitled to receive any recovery as a holder of a General Unsecured Claim pursuant to this Section 5.5 of the Plan unless and until all other holders of Allowed General Unsecured Claims have been paid in full (including postpetition interest to the extent allowed under applicable bankruptcy law) on account of such holders' respective Allowed General Unsecured Claims and (y) the holders of Allowed General Unsecured Claims shall not be entitled to receive any portion of any increase in the Excess Administrative and Priority Claims Reserve Amount attributable to the payment of any Administrative Expense Claims from the proceeds of the Umbrella Insurance Policy in accordance with Section 6.2(c)(iv) of the Plan.

        **(b)**    <u>Impairment and Voting</u>.  Class 5 is Impaired and, accordingly, the holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

Section 5.6    <u>Class 6 – Intercompany Claims</u>.

        **(a)**    <u>Treatment</u>.    Class 6 consists of separate sub-Classes for all Intercompany Claims against each of the Debtors.  All Intercompany Claims shall be deemed canceled and released as of the Effective Date, and the holders of such Claims shall not receive or retain any property or interest in property on account of such Claims.

        **(b)**    <u>Impairment and Voting</u>.  Class 6 is Impaired.  The holders of Claims in Class 6 are deemed to have rejected the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

Section 5.7    <u>Class 7 – Subordinated Claims</u>.

        **(a)**    <u>Treatment</u>.    Class 7 consists of separate sub-Classes for all Subordinated Claims against each of the Debtors.  All Subordinated Claims shall be deemed canceled and released as of the Effective Date, and the holders of such Claims shall not receive or retain any property or interest in property on account of such Claims.  Notwithstanding any other provision of the Plan, no Inpecos Claim or Lexel Claim shall be deemed to be, or shall be treated as, a Class 7 Subordinated Claim unless the Plan as confirmed by the Bankruptcy Court includes the insurance provisions set forth in Section 6.2 of the Plan and treats the Guarantors and Guarantor Affiliates as Released Parties under Sections 11.5, 11.6 and 11.7 of the Plan to the fullest extent permitted by applicable law; <u>provided, however,</u> that in the event that any Lexel Claim or Inpecos Claim is not deemed to be, and/or not treated as, a Class 7 Subordinated Claim, any such Lexel Claim or Inpecos Claim shall be deemed to be, and shall be treated as a Class 5

General Unsecured Claim (subject to any objection that might be asserted to such Claims); and provided, further, in any event, any distributions (if any) made on account of any Allowed Lexel Establishment Claim shall be paid to BPPR instead of the holder of such Allowed Lexel Establishment Claim.

(b)    Impairment and Voting.    Class 7 is Impaired.    The holders of Claims in Class 7 are deemed to have rejected the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

Section 5.8    Class 8 – Equity Interests.

(a)    Treatment.    Class 8 consists of separate sub-Classes for all Equity Interests in each of the Debtors.   All Equity Interests in any of the Debtors shall be deemed canceled and terminated as of the Effective Date, and the holders of an Equity Interest in any of the Debtors shall not receive or retain any property or interest in property on account of such Equity Interest.

(b)    Impairment and Voting.    Class 8 is Impaired.    The holders of Equity Interests in Class 8 are deemed to have rejected the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

Section 5.9    Nonconsensual Confirmation.    In the event that any Impaired Class of Claims or Equity Interests has not accepted the Plan or is deemed to have rejected the Plan, the Proponents (a) request that the Bankruptcy Court confirm the Plan in accordance with 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief and (b) reserve the right to amend the Plan in accordance with Section 13.10 hereof.

Section 5.10    Elimination of Vacant Classes.    Any Class (including, for the avoidance of doubt, any sub-Class) of Claims against, or Equity Interests in, the Debtors that is not populated as of the commencement of the Confirmation Hearing by an Allowed Claim or Equity Interest or a Claim or Equity Interest temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, shall be deemed eliminated from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining the acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION

Section 6.1    Corporate Action.

(a)    Transfer of Assets and Assumption of Liabilities.    On the Effective Date, (i) the Debtors shall, in accordance with the Plan, cause the Liquidation Trust Assets to be transferred to the Liquidation Trust and (ii) the Liquidation Trust shall assume all obligations of the Debtors under the Plan.   For the avoidance of doubt, on the Effective Date, all Insurance Policies, and the Debtors' and the Estates' rights thereunder, including, without limitation, the

Debtors' and the Estates' rights to enforce the Insurance Policies, and to collect the Insurance Proceeds from the respective insurers, shall be assigned and transferred by the Debtors and the Estates to the Liquidation Trust. The foregoing assignment and transfer shall not and shall not be deemed to impair, prejudice, or diminish the Liquidation Trust's (or any assignee's) rights to enforce the Insurance Policies or to collect the Insurance Proceeds from the respective insurers.

(b)     <u>Dissolution of the Debtors</u>. On the Effective Date and upon (i) the Debtors, or such entity designated by the Debtors, making the Effective Date Distributions and (ii) the Debtors causing the Liquidation Trust Assets to be transferred to the Liquidation Trust in accordance with Section 6.1(a) of the Plan, the Debtors shall have no further duties or responsibilities in connection with implementation of the Plan, the members of the board of directors or managers, as the case may be, of each of the Debtors shall be deemed to have resigned, and each of the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further action to be taken by or on behalf the Debtors. The dissolution of the Debtors shall not and shall not be deemed to impair, prejudice, or diminish the Liquidation Trust's (or any assignee's) rights to enforce the Insurance Policies or to collect the Insurance Proceeds from the respective insurers.

(c)     <u>Cancelation of Existing Securities and Agreements</u>. On the Effective Date, all agreements and other documents evidencing (i) any Claim or rights of any holder of a Claim against the Debtors, including all indentures and notes evidencing such Claims or (ii) any Equity Interest in the Debtors, including any options or warrants to purchase Equity Interests or any other capital stock of the Debtors, shall be canceled; <u>provided</u>, <u>however</u>, that the BPPR Credit Facility shall not be canceled, extinguished, and/or terminated pursuant to this Section 6.1(c) of the Plan or any other provision of the Plan, and the BPPR Deficiency Claim shall not be released or deemed to be released until paid in full with interest in accordance with the distribution priority terms of the Plan; <u>provided</u>, <u>further</u>, that the foregoing proviso shall not and shall not be deemed to (x) give rise to any Claims against the Debtors, the Estates, and/or the Liquidating Trust other than the BPPR Claims and/or (y) entitle BPPR to receive or retain any property of the Debtors and/or the Estates other than as provided in the Plan and/or the BPPR Settlement Order. The holders of, or parties to, such canceled agreements and documents shall have no rights arising from or relating to such agreements and documents or the cancelation thereof, except the rights provided pursuant to the Plan.

Section 6.2     <u>Liquidation Trust</u>.

(a)     <u>Establishment of the Liquidation Trust</u>. On the Effective Date, (i) the Liquidation Trust shall be established pursuant to the Liquidation Trust Documents, (ii) the Liquidation Trustee shall be appointed as trustee of the Liquidation Trust, and (iii) the Debtors shall transfer the Liquidation Trust Assets to the Liquidation Trust.

(b)     <u>Powers and Duties of the Liquidation Trustee</u>. The Liquidation Trustee shall have the rights and powers set forth in the Liquidation Trust Documents, and shall be governed in all things by the terms of the Liquidation Trust Documents and the Plan. Subject to the terms of the Liquidation Trust Documents and the limitations and/or obligations set forth in Section 6.2(c) of the Plan, and in consultation with the Liquidation Trust Oversight Board pursuant to Section 6.2(e) of the Plan and the Liquidation Trust Documents, the Liquidation

Trustee shall be authorized, empowered, and directed to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation, to (i) act as the trustee for the Liquidation Trust and administer the Liquidation Trust, (ii) take any action necessary to transfer the Liquidation Trust Assets to the Liquidation Trust and dissolve the Debtors in accordance with the Plan and applicable law, (iii) retain attorneys, advisors, and other professionals (including, without limitation, any professionals previously retained in the Chapter 11 Cases) as may be necessary and appropriate to perform the duties required of, and the obligations assumed by the Liquidation Trustee under the Plan and the Liquidation Trust Documents, (iv) execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Liquidation Trust, (v) open, maintain, and administer bank accounts as necessary to discharge the duties of the Liquidation Trustee under the Plan and the Liquidation Trust Documents, (vi) administer, sell, liquidate, or otherwise dispose of the Liquidation Trust Assets in accordance with the Plan, (vii) request and receive reports from any insurer under the Liability Insurance Policies and the Property and Casualty Insurance Policies regarding the payment of any proceeds of such Liability Insurance Policies and Property and Casualty Insurance Policies, (viii) investigate, commence, and prosecute all Causes of Action transferred to the Liquidation Trust under the Plan to judgment or settlement, and take all other necessary and appropriate steps to collect, recover, liquidate, or otherwise reduce such Causes of Action and Accounts Receivable to Cash, (ix) make, on behalf of the Debtors and the Estates, all transfers and distributions required to be made pursuant to the Plan on and after the Effective Date, including, without limitation, distributions from the proceeds of the Liquidation Trust Assets, (x) file and prosecute objections to, and negotiate, settle, or otherwise resolve, any and all Disputed Claims, including, without limitation, the Tort Claims in accordance with the Claims Administration Procedure, (xi) assume the role of the Debtors to review all Professional Claims and, if warranted, object to any application for final allowance of a Professional Claim on or before the Professional Claims Objection Deadline pursuant to Section 3.1(b) of the Plan, (xii) represent the Debtors' Estates before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the Liquidation Trust, (xiii) prepare and file quarterly financial reports pursuant to Section 6.2(f) of the Plan, and (xix) comply with applicable orders of the Bankruptcy Court and any other court of competent jurisdiction over the matters set forth herein, and all applicable laws and regulations concerning the matters set forth herein.

(c)    Collection of Insurance Proceeds.

(i)    Insurance Collection. In consideration for his agreement to collect insurance proceeds on behalf of the Debtors, the Estates, and the Liquidation Trust, as applicable, as set forth in the Plan Support Agreement, Gad Zeevi, on behalf of himself, the Guarantors and the Guarantor Affiliates, shall have the full power and authority, and shall be duly appointed as the Debtors' representative, to pursue and collect from insurers the proceeds (the "Insurance Proceeds") of the Debtors' insurance policies (other than liability policies and insurance policies and/or assets transferred to the Purchaser) on behalf of the Debtors' estates, and/or the Liquidation Trust for the benefit of holders of Allowed Claims against the Debtors (including BPPR) entitled to receive distributions under the Plan, including, without limitation, the ability and authority to exercise all of the Debtors' rights under any insurance policies; provided, however, that with respect to the Liability Insurance Policies, the Debtors (and/or Liquidation Trustee) shall have the power and authority to pursue and collect the proceeds of the

27

Liability Insurance Policies and shall consult and coordinate with Gad Zeevi in connection with any such collection efforts and subsequent distribution of proceeds of the Liability Insurance Policies (the "Liability Insurance Proceeds"); provided, further, that Gad Zeevi shall consult and coordinate with BPPR in connection with the Collection Efforts (as defined in Section 6.2(c)(ii) of the Plan) and any resolution with respect to the Property and Casualty Insurance Policies; provided, further, that, except with respect to distributions made pursuant to the Plan, nothing herein shall prevent any insured or additional insured under such Liability Insurance Policies from asserting any right to challenge any future distribution of Liability Insurance Proceeds to third parties pursuant to the terms of the underlying insurance policies; provided, further, however, that nothing in the Plan Support Agreement or the Plan shall authorize or permit Gad Zeevi, the Debtors and/or the Liquidation Trustee or any other person to challenge or seek to recover any prior payment to BPPR or Westernbank Puerto Rico of any proceeds of insurance. Unless both (i) BPPR and (ii) the Debtors and/or the Liquidation Trustee, as applicable, and the Creditors Committee agree in advance to an alternative disposition of particular Insurance Proceeds in payment of Allowed Claims or Allowed Administrative Expense Claims, all Insurance Proceeds collected by Gad Zeevi shall be transferred to the Debtors (before the Effective Date) or the Liquidation Trust (following the Effective Date) for distribution in accordance with the Plan or applicable orders of the Bankruptcy Court. Insurance Proceeds shall not be used to pay Claims or expenses asserted against the Debtors by any of Gad Zeevi, the Guarantors and/or the Guarantor Affiliates.

(ii)    Commercially Reasonable Best Efforts.    Gad Zeevi shall use commercially reasonable best efforts (the "Collection Efforts") to collect from insurers any Insurance Proceeds on behalf of the Debtors, the Estates, and/or the Liquidation Trust and to cooperate with the Liquidation Trustee in connection with collection from insurers of any Insurance Proceeds, including Liability Insurance Proceeds. Gad Zeevi shall bear his own costs and expenses in connection with his efforts to collect from insurers any Insurance Proceeds; provided, that and for the avoidance of doubt, Gad Zeevi shall have no obligation to incur costs and expenses in connection with his Collection Efforts, including any attorneys' and/or expert witness fees. Gad Zeevi shall provide the Debtors and/or the Liquidation Trustee, as applicable, and BPPR with monthly status updates (either in written or telephonic form) regarding the Collection Efforts and any distribution of Insurance Proceeds to the Estates, the Liquidation Trust, or any claimant.

(iii)    Agreement to Support Collection Efforts.    The Debtors and/or the Liquidation Trustee, and BPPR shall use commercially reasonable best efforts to cooperate with Gad Zeevi in his efforts to collect from insurers any Insurance Proceeds, including (A) executing any documents reasonably necessary to facilitate the Collection Efforts as and when requested, (B) filing any motions with the Court seeking approval of any insurance-related settlement, and (C) obtaining all necessary consents from any additional named insured parties under the Debtors' insurance policies, including FirstBank; provided, however, that any settlement or compromise with respect to the Debtors' insurance policies and/or Insurance Proceeds (other than the Liability Insurance Proceeds) shall require the express prior written consent of BPPR (which consent shall not be unreasonably withheld), or the Creditors Committee and Debtors (or the Liquidation Trustee following the Effective Date of the Plan) with respect to the Liability Insurance Proceeds. In connection with efforts to collect from insurers any Insurance Proceeds, the Debtors and/or the Liquidation Trustee, as applicable, and

BPPR (but only to the extent it possesses such requested information) shall be required to provide Gad Zeevi with, and authorize him to use and receive, any and all material accumulated and/or prepared by the Debtors and/or their experts in connection with the investigation of the October 2009 explosions and all insured occurrences related thereto.

(iv)    Chartis Liability Proceeds. The first $3.9 million of Insurance Proceeds (the "Chartis Liability Proceeds") derived from the Umbrella Insurance Policy, shall be used on or after the Effective Date (whether or not such Chartis Liability Proceeds are received by the Estates before the Effective Date) to satisfy Allowed Administrative Expense Claims asserted against the Debtors and the Estates (as directed under the Plan or otherwise in accordance with applicable orders of the Bankruptcy Court and subject to the applicable provisions of the BPPR/Guarantors Settlement Agreement); provided, however, for the avoidance of doubt, the holders of Allowed General Unsecured Claims shall not be entitled to receive any portion of any increase in the Excess Administrative and Priority Claims Reserve Amount attributable to the payment of any Administrative Expense Claims from the proceeds of the Umbrella Insurance Policy in accordance with this Section 6.2(c)(iv) of the Plan.

(d)    Collection of BPPR Accounts Receivable Proceeds. Following the Effective Date, the Liquidation Trustee shall use commercially reasonable efforts to collect the Accounts Receivable and promptly distribute to BPPR the BPPR Accounts Receivable Proceeds in accordance with the Plan, less reasonable costs and expenses incurred by the Liquidation Trustee in connection with the liquidation of the Accounts Receivable. The Liquidation Trustee shall consult and coordinate with BPPR in connection with the liquidation of the Accounts Receivable and any settlement, collection, and/or disposition of any Accounts Receivable.

(e)    Liquidation Trust Oversight Board.    The Liquidation Trust Oversight Board shall be (i) comprised of three (3) members, one (1) of which is selected by the Debtors, and two (2) of which are selected by the Creditors Committee and (ii) approved by the Bankruptcy Court pursuant to the Confirmation Order. In addition, BPPR shall have observer rights with respect to, and may attend, observe, and be heard at (to the extent BPPR elects to attend and observe), any Liquidation Trust Oversight Board meetings and conferences with or without the Liquidation Trustee. BPPR shall receive advance notice of all Liquidation Trust Oversight Board meetings and conferences. The Liquidation Trust Oversight Board shall serve as an advisory board to the Liquidation Trust, and the Liquidation Trustee shall consult with the Liquidation Trust Oversight Board (and BPPR) with respect to all matters determined by the Liquidation Trustee to be material to the administration of the Liquidation Trust. In addition, as more fully set forth in the Liquidation Trust Documents, the Liquidation Trustee must obtain the consent of the Liquidation Trust Oversight Board with respect to matters concerning (i) the settlement, collection, and/or disposition of any Liability Insurance Policies and any Liability Insurance Proceeds, (ii) the resolution of any unsecured Claim that is asserted, settled, or Allowed in an amount in excess of $5 million, or any Administrative Expense Claim, Priority Tax Claim, or Priority Non-Tax Claim that is asserted, settled, or entitled to payment in an amount exceeding $50,000, and (iii) any other matters related to insider Claims or issues. The Liquidation Trustee also shall obtain the consent of BPPR with respect to matters concerning (i) the settlement, collection, and/or disposition of any Accounts Receivable, any BPPR Accounts Receivable Proceeds, any Property and Casualty Insurance Policies, and any proceeds of any of the Property and Casualty Insurance Policies and (ii) the resolution of any Administrative

29

Expense Claim, Priority Tax Claim, or Priority Non-Tax Claim that is asserted, settled, or entitled to payment in an amount exceeding $50,000. Notwithstanding the foregoing and the Liquidation Trustee's duty to consult with the Liquidation Trust Oversight Board and BPPR, except with respect to the above enumerated issues, the Liquidation Trustee shall have final decision-making authority with respect to Liquidation Trust matters.

       (f)    <u>Accounting and Reporting</u>. The Liquidation Trustee shall maintain an accounting of receipts and disbursements with respect to the Liquidation Trust, which shall be open to inspection and review by the Bankruptcy Court and any holder of an Allowed Claim or their respective professionals, upon reasonable notice to the Liquidation Trustee. After the Effective Date, the Liquidation Trustee shall serve the United States Trustee with, and shall file with the Bankruptcy Court, a quarterly financial report for each quarter (or portion thereof) that the Chapter 11 Cases remain open, as well as a final financial report after the Bankruptcy Court enters a final decree closing each of the Chapter 11 Cases. The quarterly financial report with respect to the Liquidation Trust shall include (i) a statement of all disbursements made during the course of the quarter, whether or not pursuant to the Plan, (ii) a summary, by Class, of distributions made or other property transferred to each recipient under the Plan, and an explanation of the failure to make any distributions or other transfers of property under the Plan, (iii) projections as to the continuing ability of the Liquidation Trust to comply with the terms of the Plan, (iv) a statement of the aggregate funds of the Administrative and Priority Claims Reserve, the General Unsecured Claims Reserve, and the Plan Expenses Reserve, (v) a description of any other factors that may materially affect the ability to consummate the Plan, and (vi) an estimated date when an application for a final decree closing any or all of the Chapter 11 Cases will be filed with the Bankruptcy Court (or, in the case of the final quarterly report, the date upon which the final decree was entered by the Bankruptcy Court).

       (g)    <u>Plan Expenses</u>. The Liquidation Trustee may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid Plan Expenses. All Plan Expenses shall be charged against and paid from the Plan Expenses Reserve and, thereafter, paid from the Liquidation Trust. On the Effective Date, the Liquidation Trustee shall establish the Plan Expenses Reserve with the Plan Expenses Reserve Amount, funded from the Sale Proceeds in accordance with the BPPR Settlement, which Plan Expenses Reserve Amount shall vest in the Liquidation Trust free and clear of all liens, Claims, encumbrances, charges and other interests. Upon satisfaction of all valid Plan Expenses and entry by the Bankruptcy Court of a final decree closing each of the Chapter 11 Cases, any remaining balance of the Plan Expenses Reserve shall be distributed by the Disbursement Agent in accordance with the Plan, the Liquidation Trust Documents, and the BPPR Settlement Order as soon as practicable thereafter.

       (h)    <u>Retention of Professionals</u>. The past or current retention of any professional in the Chapter 11 Cases shall not be asserted by any party in interest as a basis to disqualify such professional from being retained by the Liquidation Trust. Attorneys, advisors and any other professionals retained by the Liquidation Trustee shall submit to the Liquidation Trustee periodic statements for all reasonable compensation for services rendered, and reimbursement for actual and necessary expenses incurred, by such professionals. The Liquidation Trustee shall have twenty (20) days to object to any such statement. In the event that an objection is received by a professional and cannot be promptly resolved by such professional

and the Liquidation Trustee, the dispute shall be submitted by the Liquidation Trustee, to the Bankruptcy Court for adjudication. The Bankruptcy Court shall retain jurisdiction to adjudicate any such objection. In the event that no objection is raised to a statement within the twenty (20) day period, such statement shall be promptly paid by the Liquidation Trustee.

(i)     Resignation / Removal of Liquidation Trustee.    The Liquidation Trustee may resign or be removed in accordance with the Liquidation Trust Documents. Any successor Liquidation Trustee shall be appointed by the Liquidation Trust Oversight Board in accordance with the Liquidation Trust Documents.

(j)     Termination of the Liquidation Trust.    The Liquidation Trust shall terminate upon the earlier of (i) the five (5) year anniversary of the Effective Date or (ii) the entry by the Bankruptcy Court of a final decree closing each of the Chapter 11 Cases and submission by the Liquidation Trustee of the final financial report to the Bankruptcy Court pursuant to Section 6.2(f) of the Plan. On or prior to the date of termination of the Liquidation Trust, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidation Trust for cause shown. Upon termination of the Liquidation Trust and as soon as practicable thereafter, the balance of any Cash and other property of the Liquidation Trust shall be distributed in accordance with the Plan and the Liquidation Trust Documents.

Section 6.3     Reservation of Rights for Additional Trust(s).    The Debtors and the Liquidation Trustee, as applicable, reserve the right to establish (an) additional trust(s) on or after the Effective Date if the Debtors or the Liquidation Trustee, as applicable, determine that the establishment of such trust(s) is necessary to the administration of the Plan and fulfillment of the fiduciary duty to maximize the value of the Liquidation Trust Assets. Such additional trust(s) shall be subject to the same governance as the Liquidation Trust and funded from the Plan Expenses Reserve; provided, however, that the Debtors and the Liquidation Trustee as applicable, reserve the right to change the governance of such additional trust(s) at any time and without the need for any action by the Bankruptcy Court. For the avoidance of doubt, no additional trust established pursuant to this Section 6.3 of the Plan shall be funded from any Sale Proceeds (other than the Plan Expenses Reserve).

Section 6.4     Limitation on Liability.    No recourse shall ever be had, directly or indirectly, against the Liquidation Trustee or its officers, directors, agents, employees, attorneys, advisors or other professionals, or any member of the Liquidation Trust Oversight Board by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, or note, or upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidation Trustee under the Plan or by reason of the creation of any indebtedness by the Liquidation Trustee under the Plan for any purpose authorized by the Plan. All such liabilities, covenants, and agreements of the Liquidation Trustee, its respective officers, directors, agents, employees, attorneys, advisors, or other professionals, whether in writing or otherwise, under the Plan shall be enforceable, if at all, only against, and shall be satisfied only out of, the Plan Expenses Reserve. Every undertaking, contract, covenant or agreement entered into in writing by the Liquidation Trustee shall provide expressly against the personal liability of the Liquidation Trustee. The Liquidation Trustee and its officers, directors, agents, employees, attorneys, advisors and other professionals, and each of the members of the Liquidation Trust Oversight Board shall not be liable for any act they may

31

do, or omit to do hereunder in good faith and in the exercise of their respective best judgment, and the fact that such act or omission was advised, directed or approved by the Liquidation Trust Oversight Board or an attorney acting as counsel for the Liquidation Trustee, as applicable, shall be conclusive evidence of such good faith and best judgment; provided, however, that this Section 6.4 shall not apply to any gross negligence or willful misconduct by the Liquidation Trustee or its officers, directors, agents, employees, attorneys, advisors or other professionals, or any member of the Liquidation Trust Oversight Board.

    Section 6.5  Reliance on Documents. The Liquidation Trustee may rely, and shall be protected in acting or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by it to be genuine and to have been signed or presented by the proper entity.

    Section 6.6  Requirement of Undertaking. The Liquidation Trustee may request any court of competent jurisdiction to require, and any such court may in its discretion require, in any suit for the enforcement of any right or remedy under the Plan, or in any suit against the Liquidation Trustee for any act taken or omitted by the Liquidation Trustee that the filing party litigant in such suit undertake to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

    Section 6.7  Tort Claims. All Tort Claims are Disputed Claims. Each of the Tort Claims as to which a proof of claim was timely filed in the Chapter 11 Cases by the time provided in the General Bar Date Order or by the Government Bar Date, as applicable, shall be determined and liquidated in accordance with the Claims Administration Procedure. Pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rules 7016, 9014, and 9019, the Plan shall constitute a motion for approval of the Claims Administration Procedure. The Debtors and the Liquidation Trustee reserve the right to file an objection to any Tort Claim with the Bankruptcy Court to the extent that resolution of such objection would not impair any right of the holder of such Tort Claim to a jury trial.

    Section 6.8  Administrative and Priority Claims Reserve. On the Effective Date, the Liquidation Trustee shall establish the Administrative and Priority Claims Reserve with the Administrative and Priority Claims Reserve Amount, funded from the Sale Proceeds, which funds shall vest in the Liquidation Trust free and clear of all liens, Claims, encumbrances, charges and other interests. As soon as practicable after all Other Secured Claims, Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims have been either Allowed (and received a distribution in accordance with the Plan) or Disallowed by the Plan, the Confirmation Order, or Final Order of the Bankruptcy Court, the Liquidation Trustee, in consultation with BPPR and the Liquidation Trustee Oversight Board, shall determine the amount of the Excess Administrative and Priority Claims Reserve and, subject to the Liquidation Trustee reaching an agreement with BPPR and the Liquidation Trust Oversight Board on such amount and the allocation thereof to be made in accordance with the Plan, the Disbursement Agent shall distribute the Excess Administrative and Priority Claims Reserve in accordance with the Plan, the Liquidation Trust Documents, and the BPPR Settlement Order. For the avoidance of doubt, the holders of Allowed General Unsecured Claims shall not be entitled to receive any

32

portion of any increase in the Excess Administrative and Priority Claims Reserve Amount attributable to the payment of any Administrative Expense Claims from the proceeds of the Umbrella Insurance Policy in accordance with Section 6.2(c)(iv) of the Plan.

Section 6.9    General Unsecured Claims Reserve.    On the Effective Date, the Liquidation Trustee shall establish the General Unsecured Claims Reserve with the General Unsecured Claims Reserve Amount, funded from the Sale Proceeds in accordance with the BPPR Settlement, which General Unsecured Claims Reserve Amount shall vest in the Liquidation Trust free and clear of all liens, Claims, encumbrances, charges and other interests. In the event that all General Unsecured Claims have been either Allowed (and received a distribution in accordance with the Plan) or Disallowed by the Plan, the Confirmation Order, or Final Order of the Bankruptcy Court, any remaining balance of the General Unsecured Claims Reserve shall be distributed by the Disbursement Agent in accordance with the Plan, the Liquidation Trust Documents, and the BPPR Settlement Order as soon as practicable thereafter.

Section 6.10    Causes of Action and Accounts Receivable.

(a)    Preservation of Causes of Action and Accounts Receivable.    In accordance with section 1123(b) of the Bankruptcy Code or any corresponding provision of federal or state laws, and except as otherwise provided in the Final DIP Order, the BPPR Settlement Order, the Plan, or the Confirmation Order, (i) on the Effective Date, all Causes of Actions and Accounts Receivable that are not Purchased Assets shall be transferred to and vested in the Liquidation Trust and (ii) on and after the Effective Date, all such Causes of Action and Accounts Receivable shall be retained by the Liquidation Trust, and the Liquidation Trust and/or the Liquidation Trustee may, in accordance with the Liquidation Trust Documents, enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action and Accounts Receivable; provided, however, that the collection of BPPR Accounts Receivable Proceeds shall be governed by Section 6.2(d) of the Plan.

(b)    No Waiver.    Except as otherwise provided in Section 11.6(a) of the Plan, nothing in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, Accounts Receivable, right of setoff, or other legal or equitable right or defense that the Debtors (through the Liquidation Trustee) may have or choose to assert on behalf of the Debtors or their respective Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any entity, to the extent such entity asserts a cross-claim, counterclaim, and/or claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (ii) the turnover of any Asset, and (iii) the Debtors' right to object to any Claim or Equity Interest pursuant to section 502(d) of the Bankruptcy Code. No entity may rely on the absence of a specific reference in the Plan to any Cause of Action and/or Accounts Receivable against them as an indication that the Liquidation Trustee or the Purchaser will not pursue any and all available Causes of Action and/or Accounts Receivable against them. The Liquidation Trustee and the Purchaser expressly reserve all rights to prosecute any and all Causes of Action and/or Accounts Receivable against any entity except as otherwise provided in the Plan. Unless any Causes of Action and/or Accounts Receivable against an entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Confirmation Order, or other Final Order of the Bankruptcy Court, the Debtors expressly reserve

all Causes of Action and/or Accounts Receivable for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action and/or Accounts Receivable upon or after the confirmation or consummation of the Plan.

Section 6.11   Effectuating Documents and Further Transactions.  Upon entry of the Confirmation Order, the Debtors, and the Liquidation Trustee shall be authorized and are instructed to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements and documents and take such actions as may be reasonably necessary or appropriate to effectuate, implement, consummate and further evidence the terms and conditions of the Plan, including, without limitation, implementing all settlements and compromises as set forth in or contemplated by the Plan, and performing all obligations under the Plan.  As of the Effective Date, no member, partner or equity security holder of the Debtors shall take any action that affects, alters or creates any additional or incremental liability for or imputed to the Debtors.

Section 6.12   Authority to Act.  Prior to, on, or after the Effective Date, as applicable, all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, equity security holders, officers, directors, partners, managers, members, or other owners of one or more of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date, as applicable, pursuant to the applicable law of the states in which the Debtors are formed, without any requirement of further vote, consent, approval, authorization or other action by such stockholders, equity security holders, officers, directors, partners, managers; members or other owners of such entities or notice to, order of or hearing before the Bankruptcy Court.

## ARTICLE VII

## DISTRIBUTIONS

Section 7.1   Distribution Record Date.  Except as otherwise provided in the Plan, as of 12:00 p.m. (prevailing Eastern time) on the Distribution Record Date, there shall be no further changes in the recordholders of any Claim against, or Equity Interest in, the Debtors, and the Debtors and the Liquidation Trustee shall have no obligation to recognize any transfer of any Claim against, or Equity Interest, in the Debtors occurring after the Distribution Record Date.  The Debtors and the Liquidation Trustee shall be entitled to recognize and deal for all purposes under the Plan only with those recordholders of Claims against, and Equity Interests in, the Debtors as of 12:00 p.m. (prevailing Eastern time) on the Distribution Record Date, to the extent applicable.

Section 7.2   Date of Distributions Under the Plan.

(a)   Distributions on the Effective Date.  Except as otherwise provided herein or pursuant to an agreement or understanding between the Debtors or the Liquidation Trustee and the holder of a Claim that is Allowed as of the Effective Date, all transfers and distributions required to be made under the Plan with respect to Claims that are Allowed as of

the Effective Date shall be made by the Disbursement Agent on or as soon as practicable after the Effective Date.

(b)    Distributions After the Effective Date.    Except as otherwise provided in the Plan or pursuant to agreement or understanding between the Debtors or the Liquidation Trustee and the holder of a Disputed Claim, if a Disputed Claim becomes Allowed after the Effective Date, the Disbursement Agent shall make all transfers and distributions with respect to such Claim on or as soon as practicable after the date on which such Claim becomes Allowed, pursuant to the terms and provisions of the Plan.  Distributions made after the Effective Date to holders of Allowed Claims shall be deemed to have been made on the Effective Date, and, except as otherwise provided in the Plan, no interest shall accrue or be payable with respect to such claims or any distribution related thereto.

Section 7.3    Sources for Distributions.    All Cash required for the payments to be made pursuant to the Plan shall be obtained from the Cash held by the Debtors or the Liquidation Trust, as applicable.

Section 7.4    Manner of Payment.    Any distributions to be made on behalf of the applicable Debtor pursuant to the Plan shall be made by checks drawn on accounts maintained by the Debtors or the Liquidation Trustee, as applicable, or by wire transfer if circumstances justify, at the option of the Debtors or the Liquidation Trustee, as applicable.

Section 7.5    Disbursement Agent.    All transfers and distributions required under the Plan shall be made in accordance with the terms and provisions of the Plan and the Liquidation Trust Documents by the Debtors or the Liquidation Trustee, as applicable, as Disbursement Agent or such other entity designated by the Debtors or the Liquidation Trustee, as applicable, as Disbursement Agent.  For the avoidance of doubt, the Debtors, or such other entity designated by the Debtors, shall act as Disbursement Agent with respect to all Effective Date Distributions.

Section 7.6    Delivery of Distributions.    Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to the address of such holder as set forth in the Schedules or the books and records of the Debtors or its agents, as applicable, unless the Debtors or the Liquidation Trustee has been notified in writing of a change of address, including by the filing of a proof of claim by such holder that contains an address for such holder different from the address reflected in the Debtors' Schedules or books and records.

Section 7.7    Allocation of Distributions Between Principal and Interest.    The aggregate consideration to be distributed to the holders of Allowed Claims under the Plan shall be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claims of such holders, as determined for federal income tax purposes, and any remaining consideration as satisfying accrued but unpaid interest, if any.

Section 7.8    No Postpetition Interest on Claims.    Except as otherwise provided for in the Plan, the Confirmation Order, the Final DIP Order, or any other order entered by the Bankruptcy Court, or as required by applicable law, postpetition interest shall not accrue on or after the Commencement Date on account of any Claim.

Section 7.9    No Distribution in Excess of Allowed Amount of Claim. Notwithstanding any other provision of the Plan, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim.

Section 7.10    Distributions with Respect to Disputed Claims.  Notwithstanding any other provision of the Plan, if all or any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.   Until such time as a Disputed Claim is determined by Final Order or, with respect to any Tort Claim, pursuant to the Claims Administration Procedure, the Liquidation Trust shall withhold on account of such Claim the distribution to which the holder of such Claim would be entitled under Article V of the Plan if such Claim were Allowed in full; provided, however, that the Liquidation Trust shall not be required to withhold on account of any Tort Claim with respect to which the holder of such Tort Claim declined Arbitration (as defined in the Claims Administration Procedure) pursuant to the Claims Administration Procedure.   At such time as a Disputed Claim becomes an Allowed Claim, the Disbursement Agent shall distribute to the holder of such Claim the property distributable to such holder pursuant to the Plan. To the extent that all or a portion of a Disputed Claim is Disallowed or expunged, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is Disallowed or expunged.

Section 7.11    Distributions with Respect to Defendants.  Notwithstanding any other provision of the Plan, the Liquidation Trustee may, in its exclusive discretion, withhold any and all distributions on account of any portion of a Claim held by an entity that (a) is a defendant in any pending contested matter or adversary proceeding being prosecuted by the Liquidation Trustee or (b) against whom the Liquidation Trustee may assert a Cause of Action.

Section 7.12    Disputed Payments.  If any dispute arises as to the identity of a holder of an Allowed Claim that is to receive any distribution under the Plan, the Disbursement Agent may, in lieu of making such distribution to such entity, make such distribution into an escrow account until such dispute is resolved by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

Section 7.13    Setoffs.    Except as otherwise provided in the Plan, the Confirmation Order, or in an agreement approved by a Final Order of the Bankruptcy Court, the Liquidation Trustee may, pursuant to applicable law (including section 553 of the Bankruptcy Code), set off against any distribution related to any Claim before such distribution is made on account of such Claim, any and all of the Claims (other than Claims released pursuant to the Plan), rights and Causes of Action of any nature that the Debtors, the Estates, or the Liquidation Trust may hold against the holder of such Claim; provided, however, that none of the Debtors, the Liquidation Trust, or the Liquidation Trustee shall, or shall be entitled, to assert any right to setoff against (a) the DIP Lender or (b) BPPR; provided, further, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, or any other act or omission of the Liquidation Trustee, nor any provision of the Plan, shall constitute a waiver or release by the Liquidation Trustee of any such Claims, rights and Causes of Action that the Liquidation Trustee may possess against such holder.  To the extent that the Liquidation Trustee sets off a Claim of the Debtors' Estates against a holder of a Claim against the Debtors before a distribution is made to the holder of such Claim against the Debtors pursuant to the Plan, the Liquidation Trustee

shall be entitled to full recovery on the Debtors' Claim against such holder. No provision in the Plan shall be deemed to expand any right of setoff under applicable law. Notwithstanding the foregoing and any other provision of the Plan, the Liquidation Trustee shall not set off any Claim of the Debtors or the Estates against a Claim against the Debtors or the Estates if such set off would reduce or have the effect of reducing any BPPR Accounts Receivable Proceeds, whether or not reduced to Cash; provided, however, that no provision in the Plan shall prevent a holder of a Claim from asserting or, upon entry of a Final Order of the Bankruptcy Court, effectuating a valid right of setoff against the Debtors or the Estates; provided, further, however, that in the event that a holder of a Claim asserts a right of setoff that would reduce or have the effect of reducing any BPPR Accounts Receivable Proceeds, the Liquidation Trustee may agree to setoff any Claims of the Debtors or the Estates against such Claim against the Debtors or the Estates only upon the written consent of BPPR, which such consent shall not be unreasonably withheld, or a further order of the Bankruptcy Court. Notwithstanding the foregoing, no provision in the Plan, the Confirmation Order, or any other document that implements the Plan shall affect any setoff or recoupment right of the United States government.

### Section 7.14    Unclaimed Property.

(a)    Escrow of Unclaimed Property.  The Liquidation Trustee shall hold all Unclaimed Property for the benefit of the holders of Claims entitled thereto under the terms of the Plan. The Liquidation Trustee shall use reasonable efforts to determine the current address of the holders of Claims entitled to Unclaimed Property, but no distribution to such holders shall be made unless and until the Liquidation Trustee has determined the then current address of such holders, at which time such distribution shall be made to such holders without any interest thereon whatsoever, except as otherwise provided in the Plan.

(b)    Distribution of Unclaimed Property.  Upon the conclusion of one hundred and twenty (120) calendar days following the date that any Cash or other property becomes Unclaimed Property, the holders of Allowed Claims theretofore entitled to such Unclaimed Property shall be deemed to have forfeited such property, whereupon (i) all rights and title to and interest in such Unclaimed Property shall immediately and irrevocably re-vest in the Liquidation Trust for the benefit of holders of Allowed, but as yet not fully paid, Claims in the Class in which the applicable Claim was classified, (ii) such holders shall cease to be entitled to such Unclaimed Property or any further distributions on account of such Claims, (iii) such Claims shall be deemed to be Disallowed and expunged to the extent of such forfeiture, and (iv) such Unclaimed Property shall be redistributed Pro Rata by the Disbursement Agent to any Allowed Claims that remain unpaid, either in whole or in part, in the Class in which the applicable Claim was classified. If no Allowed Claims remain unpaid within the Class in which the applicable Claim was classified, the Unclaimed Property shall be distributed by the Disbursement Agent in accordance with the Plan and the Liquidation Trust Documents.

### Section 7.15    Claims Paid by Third Parties.  To the extent that a holder of a Claim against the Debtors receives payment on account of such Claim from a party that is not the Disbursement Agent, such Claim shall be reduced accordingly without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court; provided, however, that the foregoing shall not apply to BPPR and the BPPR Claims. To the extent that a holder of a Claim against the Debtors receives a distribution on

account of such Claim and also receives payment from a party that is not the Disbursement Agent on account of such Claim, such holder shall, within thirty (30) calendar days of receipt thereof, repay and/or return the distribution to the Disbursement Agent, to the extent that the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim; provided, however, that the foregoing shall not apply to BPPR and the BPPR Claims.

Section 7.16    Distributions Free and Clear.  Except as otherwise provided in the Plan, any distribution or transfer made under the Plan, including, without limitation, distributions to any holder of an Allowed Claim, shall be free and clear of any liens, Claims, encumbrances, charges and other interests, and no other entity shall have any interest, whether legal, beneficial or otherwise, in property distributed or transferred pursuant to the Plan.

Section 7.17    Time Bar to Cash Payments.  Checks issued by the Disbursement Agent on behalf of the Debtors in respect of Allowed Claims shall be null and void if not presented for payment within sixty (60) calendar days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Liquidation Trustee by the holder of the Allowed Claim to whom such check originally was issued on or before thirty (30) calendar days after the expiration of the sixty (60) calendar day period following the date of issuance of such check.  After such date, all funds held on account of such voided check shall be redistributed by the Disbursement Agent in accordance with the Plan and the Liquidation Trust Documents.

Section 7.18    De Minimis Distributions.  Except as otherwise provided in the Plan, the Disbursement Agent shall not have any obligation to make a distribution on account of an Allowed Claim if the amount to be distributed to the holder of such Claim is less than $10 and does constitute a final distribution to such holder.  The Disbursement Agent shall have no obligation to make any distribution on account of Claims Allowed in an amount less than $500.

Section 7.19    Transfer of Property Under Plan.  All transfers of property under the Plan shall be made in accordance with applicable nonbankruptcy law, including any laws governing the transfer of property by a corporation or a trust that is not a moneyed, business, or commercial corporation or trust.

## ARTICLE VIII
## PROCEDURES FOR DISPUTED CLAIMS

Section 8.1    Objections to Claims.  As of the Effective Date, the Liquidation Trustee, shall have the exclusive right to file and prosecute objections to, and negotiate, settle or otherwise resolve, any and all Claims (except Professional Claims); provided, however, that in the event that any Proponent files an objection to, or motion to subordinate, a Claim prior to the Effective Date, such objection and/or motion shall automatically be assigned to the Liquidation Trustee on the Effective Date.  Except as otherwise provided herein, any objection to a Claim shall be filed and served upon the holder of such Claim on or before the Claims Objection Deadline.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the holder of such Claim or if service is made in any of the following manners  (a) in accordance with rule 4 of the Federal Rules of Civil Procedure, as modified and

made applicable by Bankruptcy Rule 7004, (b) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the holder of such Claim in the Chapter 11 Cases and has not withdrawn such appearance, (c) by first class mail, postage prepaid, on the signatory on the respective proof of claim or interest or other representative identified on the proof of claim or interest or any attachment thereto, or (d) at the last known address of the holder of such Claim if no proof of claim is filed or if the Debtors or the Liquidation Trustee has been notified in writing of a change of address.

Section 8.2    <u>Estimation of Claims Post-Effective Date</u>.   As of the Effective Date, the Liquidation Trustee shall have the exclusive right to request at any time that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, for any reason or purpose, regardless of whether an objection has been previously filed with respect to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim including, without limitation, during the pendency of any appeal relating to any such objection.   All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.   Claims may be estimated and subsequently compromised, settled, withdrawn, or otherwise resolved by any mechanism set forth in the Plan or approved by the Bankruptcy Court.   Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated be entitled to seek reconsideration of the estimation of such Claim unless the holder of such Claim has filed a motion requesting the right to seek such reconsideration on or before thirty (30) calendar days after the date such Claim is estimated by the Bankruptcy Court.

Section 8.3    <u>Late-Filed Claims and Amendments to Claims</u>.   Pursuant to section 502(b)(9) of the Bankruptcy Code, any Claim that is not filed on or before the applicable deadline to file such Claim shall be Disallowed and expunged in full as of the Effective Date without any action required of the Debtors, the Liquidation Trustee, or the Bankruptcy Court. On or after the applicable deadline to file a Claim, the holder of such Claim must obtain prior authorization from the Bankruptcy Court, or the Debtors or the Liquidation Trustee (as applicable), to file or amend such Claim.   Any new or amended Claim filed after the applicable deadline to file such Claim without such prior authorization shall not appear on the register of Claims and shall be deemed Disallowed and expunged in full without any action required of the Debtors, the Liquidation Trustee, or the Bankruptcy Court.

Section 8.4    <u>Settlement of Disputed Claims</u>.   Except as otherwise provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, as of the Effective Date, the Liquidation Trustee shall have the exclusive authority to compromise, settle, or otherwise resolve all Claims, rights, Causes of Actions, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors' Estates may hold against any entity, without the necessity for notice to or approval by the Bankruptcy Court or any other party in interest.

## ARTICLE IX
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

      Section 9.1    <u>Rejection of Remaining Executory Contracts and Unexpired Leases</u>. All executory contracts and unexpired leases to which any of the Debtors is a party, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, except for those executory contracts or unexpired leases that (a) have already been rejected pursuant to a Final Order of the Bankruptcy Court, (b) have previously expired or terminated pursuant to their own terms (and not otherwise extended), or (c) were assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Order. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections and a finding that such rejected executory contracts or unexpired leases are burdensome and that the rejection thereof is in the best interests of the Debtors and the Estates. For the avoidance of doubt, the Liability Insurance Policies and the Property and Casualty Insurance Policies are not and shall not be rejected by the Plan.

      Section 9.2    <u>Objections to Rejection</u>. Any non-Debtor party to an executory contract or unexpired lease that wishes to object to the rejection of such executory contract or unexpired lease, must file an objection with the Bankruptcy Court by the Confirmation Objection Deadline and serve such objection on counsel to the Debtors. The failure to properly file and serve an objection to the Debtors' rejection on or before the Confirmation Objection Deadline shall result in the non-Debtor party to the applicable executory contract or unexpired lease being (a) deemed to consent to such rejection and (b) barred, estopped, and permanently enjoined from (i) objecting to such rejection and precluded from being heard at the Confirmation Hearing with respect to such objection and (ii) asserting against the Debtors, the Estates, any of the Debtors' property, the Liquidation Trustee, or the Purchaser any default existing as of the Effective Date or any counterclaim, defense, setoff, or any other interest. With respect to any timely-filed and properly-served objection to the Debtors' proposed rejection, the Debtors may, in their sole discretion, settle or otherwise resolve such objection, or respond to such objection (in which case the Bankruptcy Court shall decide such objection at the Confirmation Hearing).

      Section 9.3    <u>Rejection Damage Claims</u>. All Rejection Damage Claims shall be treated as General Unsecured Claims and classified in Class 5, and may be objected to in accordance with the provisions of Article VIII of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. All proofs of claim with respect to Rejection Damage Claims must be filed with the Bankruptcy Court and served on the Liquidation Trustee on or before (a) the first Business Day that is thirty (30) calendar days after the Effective Date, with respect to the executory contracts and unexpired leases rejected pursuant to the Plan, (b) the first Business Day that is thirty (30) calendar days after entry of an order authorizing the rejection of the respective executory contract or unexpired lease, with respect to the executory contracts and unexpired leases rejected by the Debtors other than pursuant to the Plan, or (c) such other date as is ordered by the Bankruptcy Court. The failure to properly file and serve a proof of claim with respect to a Rejection Damage Claim by the applicable deadline set forth in this Section 9.3 shall result in such Claim being deemed forever barred and Disallowed as of the Effective Date without the need for any objection by the Debtors or the Liquidation Trustee or any action by the Bankruptcy Court.

Section 9.4    Modifications.    Modifications, amendments, supplements and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith, (a) do not alter in any way the prepetition nature of the executory contracts and unexpired leases, or the validity, priority or amount of any Claims against the Debtors that may arise under such executory contract or unexpired lease, (b) are not and do not create postpetition contracts or leases, (c) do not elevate to Administrative Expense Claims any Claims of the counterparties to the executory contracts and unexpired leases against any of the Debtors, and (d) do not entitle any entity to a Claim under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition executory contracts or unexpired leases and subsequent modifications, amendments, supplements or restatements.

## ARTICLE X

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Section 10.1    Conditions Precedent to the Effective Date.    The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions have been satisfied in full or waived in accordance Section 10.2 of the Plan:

(a)    Confirmation Order.    The Confirmation Order shall have been entered by the Bankruptcy Court and shall be in full force and effect, and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(b)    Sale Consummation.    The Sale shall have been consummated.

(c)    Debtor/United States Agreement.    The settlement agreement between and among the Debtors, the United States Environmental Protection Agency, and the United States Coast Guard shall have been authorized and approved pursuant to a Final Order of the Bankruptcy Court, and shall have become effective in accordance with its terms.

(d)    Purchaser/United States Agreement.    The Purchaser and the United States government shall have entered into the agreement referenced in section 7(a)(xii) of the Asset Purchase Agreement, and such agreement shall have become effective in accordance with its terms.

(e)    Other Acts; Execution and Delivery of Other Documents.    All other actions and all agreements, instruments, or other documents necessary to implement the Plan shall have been (i) effected or (ii) duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

(f)    Consents.    The Debtors shall have received all authorizations, consents, approvals, regulatory approvals, rulings, letters, opinions or documents, if any, necessary to implement the Plan.

(g)    Reserves Funded.    The Effective Date Cash Requirement shall have been funded, or reserved for, as applicable.

41

(h)    Fixing of the DIP Financing Claims Amount.  The Proponents shall have reached an agreement in writing that fixes the DIP Financing Claims Amount (including the BPPR Fees Claims) outstanding and unpaid as of the Effective Date, or the DIP Financing Claims Amount shall have been determined by the Bankruptcy Court.

(i)    Administrative Expense Claims Cap.  The Bankruptcy Court shall have determined and found that no more than $33,200,000 of the Sale Proceeds will be used to pay Allowed Other Secured Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims that must be paid under the Plan.

Section 10.2    Waiver of Conditions Precedent.  Each of the conditions precedent in Section 10.1(e) of the Plan may be waived, in whole or in part, by the Debtors in writing without notice to third parties or order of the Bankruptcy Court or any other formal action, subject to the consent of each of BPPR and the Creditors Committee.  The condition precedent in Section 10.1(i) of the Plan may be waived by only BPPR in writing without notice to third parties or order of the Bankruptcy Court or any other formal action.

Section 10.3    Effect of Failure of Conditions.  If the conditions specified in Section 10.1 of the Plan have not been satisfied or waived in the manner provided in Section 10.2 of the Plan on or before the date that is the later of (a) May 31, 2011 and (b) such later date as to which the Debtors and BPPR have agreed to in writing, then (v) the Confirmation Order shall be of no further force or effect, (w) no distributions under the Plan shall be made, (x) the Debtors and all holders of Claims against, and Equity Interests in, the Debtors shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, (y) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and (z) the Plan shall be deemed withdrawn.

## ARTICLE XI

## EFFECT OF CONFIRMATION

Section 11.1    Vesting of Assets.  On the Effective Date, except as otherwise provided in the Plan, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, the Liquidation Trust Assets shall vest in the Liquidation Trust, subject to the rights and interests of the beneficiaries of the Liquidation Trust.

Section 11.2    Binding Effect.  Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

Section 11.3    Injunction Against Interference with the Plan.  Except as otherwise provided in the Plan, to the extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under this Section 11.3 of the Plan, upon entry of the Confirmation Order, all holders of Claims against, or Equity Interests in, any of the Debtors, and other parties in interest, along with any current or former officers, directors, employees, agents, representatives, partners, limited partners, members, trustees, managers, affiliates, parents, subsidiaries, attorneys, auditors, appraisers, accountants, financial advisors, investment bankers, consultants, or other professionals of any of the foregoing and any entity controlling or controlled by any of the foregoing and any predecessors, successors and assigns of any of the foregoing, shall be enjoined from seeking to oppose, delay, interfere or otherwise frustrate implementation or consummation of the Plan.

Section 11.4    Term of Injunctions or Stays Arising Under or Entered During the Chapter 11 Cases.  Except as otherwise provided in the Plan, to the extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under this Section 11.4 of the Plan, (a) all injunctions with respect to or stays against an action against property of the Debtors' Estates arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, and in existence on the Confirmation Date, shall remain in full force and effect until such property is no longer property of the Debtors' Estates and (b) all other injunctions and stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the earliest of (i) the date that the Chapter 11 Cases are closed pursuant to a Final Order of the Bankruptcy Court or (ii) the date that the Chapter 11 Cases are dismissed pursuant to a Final Order of the Bankruptcy Court.

Section 11.5    Exculpation.  *To the fullest extent permissible under applicable law, except as otherwise provided in the Plan, none of the Released Parties, or any of such parties' successors and assigns, shall have or incur any liability to, or be subject to any right of action by, any holder of a Claim against, or Equity Interest in, any of the Debtors, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or any of their successors and assigns, for any act or omission in connection with, related to or arising out of, the Chapter 11 Cases, the operation of the Debtors' businesses during the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation, or consummation of the Plan, the Asset Purchase Agreement, or any other contract, instrument, release, agreement, settlement, or document created, modified, amended, terminated, or entered into in connection with the Plan, or any other act or omission in connection with the Debtors' bankruptcy; provided, however, that this Section 11.5 shall not apply to any fraud, gross negligence, or willful misconduct by the Released Parties; provided, further, however, that nothing in this Section 11.5 shall impact the allowance or disallowance of any Claim not expressly released under the Plan.*

Section 11.6    Releases.

(a)    Release by Debtors.  *On the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, the Debtors and any entity seeking to exercise the rights of the Debtors or the Estates, including, without limitation, any*

*successor to the Debtors, shall completely, conclusively, absolutely, unconditionally, irrevocably, and forever release the Released Parties from any and all Claims, Equity Interests, liens, encumbrances, obligations, damages, demands, debts, suits, Causes of Action, judgments, liabilities, or rights whatsoever (other than the rights of the Debtors or their successors to enforce the Plan and contracts, instruments, releases, indentures, agreements, and other documents delivered hereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or in part upon any act, omission, transaction, agreement, event, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation, or consummation of the Plan, the Asset Purchase Agreement, the business or contractual arrangements between any Debtor and any Released Party, or any other act or omission in connection with the Debtors' bankruptcy, without further notice to or action by the Bankruptcy Court, or act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any entity.*

> (b) <u>Release by Holders of Claims and Equity Interests, and Released Parties</u>. *On the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, (a) the holders of Claims against, and Equity Interests in, the Debtors who (i) vote to accept the Plan and (ii) do not elect to opt-out of the releases set forth in this Section 11.6(b) of the Plan by checking the appropriate box on their respective Ballot(s), and (b) the Released Parties, will be deemed to completely, conclusively, absolutely, unconditionally, irrevocably, and forever release the Released Parties from any and all Claims, Equity Interests, liens, encumbrances, obligations, damages, demands, debts, suits, Causes of Action, judgments, liabilities, or rights whatsoever (other than the right to enforce the terms of the Plan, including, without limitation, the Debtors' and the Liquidation Trustee's, as applicable, obligations with respect to Allowed Claims of the Released Parties or otherwise, and the Debtors' and the Liquidation Trustee's, as applicable, obligations under the contracts, instruments, releases, indentures, agreements, and other documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the business arrangements with any Debtor, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation, or consummation of the Plan, the Asset Purchase Agreement, or any other release or settlement created, modified, amended, terminated, or entered into in connection with the Plan, the restructuring of any Claims against, and Equity Interests in, the Debtors, the property to be distributed under the Plan, or any other act or omission in connection with the Debtors' bankruptcy, without further notice to or action by the Bankruptcy Court, or act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any entity; provided, however, that the foregoing release shall not apply as between BPPR, on the one hand, and the Guarantors, First Oil International, Ltd., and Lexel Establishment on the other hand, in respect of their respective rights and obligations arising under the BPPR/Guarantors Settlement Agreement, and sections 2.10, 2.11, 2.12, 2.13, and 2.14 of the BPPR/Lexel Intercreditor Agreement solely to the extent Lexel Establishment seeks, receives, or is entitled to distributions on account of its Claims under*

the Plan or otherwise; *provided, however,* for the avoidance of doubt, *Lexel Establishment's agreement to waive and/or subordinate its Claims against the Debtors (as contemplated in section 5 of the Plan Support Agreement, under the Plan or in any circumstances relating to the Debtors' bankruptcy proceedings) shall not give rise to any cause of action by BPPR against Lexel Establishment; provided, further, however, that neither this Section 11.6 nor any other provision of the Plan or Confirmation Order shall, or shall be deemed to, (x) release the BPPR Deficiency Claim until paid in full with interest in accordance with the distribution priority terms of the Plan, or (y) release any Claim or cause of action against any of the Released Parties that is held by any person or entity that is not a Released Party and (i) opts out of the release provided for herein in accordance with this Section 11.6(b) or (ii) does not submit a Ballot.*

Section 11.7  <u>Injunction.</u>  Except as otherwise provided in the Plan, on the Effective Date, all holders of Claims against, and Equity Interests in, the Debtors or the Estates, and the Released Parties shall be precluded and enjoined from asserting against the Released Parties, their successors and assigns, or any of their assets or property, whether in the possession of the Debtors or a transferee of such property under the Plan, any and all Claims, Equity Interests, liens, encumbrances, obligations, damages, demands, debts, suits, Causes of Action, judgments, liabilities or rights whatsoever that are released pursuant to Section 11.6 of the Plan.

Section 11.8  <u>Exclusions and Limitations on Exculpation, Indemnification, and Releases.</u>  Except as otherwise provided in Section 11.3 of the Plan, nothing in the Confirmation Order or the Plan shall effect a release of any Claim by the United States government or any of its agencies or any state and local authority whatsoever, including, without limitation, any Claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any Claim, suit, action or other proceedings against the Released Parties for any liability whatever, including, without limitation, any Claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties.

Section 11.9  <u>Pension Plan.</u>  Nothing in the Debtors' bankruptcy cases, the Plan, the Confirmation Order, the Bankruptcy Code (and section 1141 thereof), or any other document filed in the Debtors' bankruptcy cases shall in any way be construed to discharge, release, limit, or relieve the Debtors or any other party, in any capacity, from any liability or responsibility with respect to the CAPECO Puerto Rican Pension Plan (the "<u>Pension Plan</u>") or any other defined benefit pension plan under any law, governmental policy, or regulatory provision.  The Pension Benefit Guaranty Corporation ("<u>PBGC</u>") and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Confirmation Order, Bankruptcy Code, or any other document filed in any Debtors' bankruptcy case, except with respect to the Debtors, the Estates, and BPPR, in which case the sole recourse available to the PBGC and the Pension Plan shall be limited to the provisions of the Plan and Confirmation Order.