## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------

In re

CARIBBEAN PETROLEUM CORP., *et al.*,

Debtors.

-------------------------------------------------------------

:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 10-12553 (KG)
Jointly Administered

## MEMORANDUM OF LAW IN SUPPORT OF GAD AND RAM ZEEVI'S
## MOTION TO ENFORCE PLAN RELEASE AND THE SETTLEMENT AGREEMENT

L. John Bird (No. 5310)
FOX ROTHSCHILD LLP
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, Delaware 19801-2323
Telephone:     (302) 654-7444
Facsimile:     (302) 656-8920
– and –

Yann Geron
Oksana G. Wright
100 Park Avenue, Suite 1500
New York, New York 10017
Tel:     (212) 878-7930
Fax:     (212) 692-0940

ACTIVE 25486758v1

## Table of Contents

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF MATERIAL FACTS ................................................................................... 2

    A.    The Debtors, Gad Zeevi and Ram Zeevi and the Debtors' Affiliates................2

    B.    Bankruptcy Filings Precipitated by the Explosions and the Puerto Rico Action...4

    C.    The Allegations Against Gad Zeevi and Ram Zeevi in The Puerto Rico Action...5

    D.    The Debtors Released the Zeevis in Their Confirmed Plan of Reorganization.....6

        1.    The Plan Process and the Zeevi's Valuable Consideration ........................ 6

        2.    The Plan Releases ..................................................................................... 8

    E.    The Tort Plaintiffs' Also Directly Released the Zeevis in the Settlement Agreement.....................................................................................................11

    F.    The Pendency of the Puerto Rico Action and the Refusal of the Tort Plaintiffs to Honor the Releases.............................................................................12

ARGUMENT.............................................................................................................................. 13

    I.    The Alter Ego Claims Asserted Against The Zeevis In The Puerto Rico Action Were Property Of The Debtors' Estates And The Debtors Released Such Claims Under The Confirmed Plan............................................................. 13

        A.    Alter Ego Claims Asserted Against the Zeevis were  Property of the Estate.................................................................................................... 13

        B.    Any Alleged Alter Ego Claims Against the Zeevis Were  Released By the Debtors............................................................................................. 17

    II.    The Tort Plaintiffs Expressly Released the Zeevis in the Settlement Agreement.......................................................................................................... 19

CONCLUSION........................................................................................................................... 21

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bernberg v. Health Management Systems, Inc.* (*In re HHL Financial Services, Inc.*),
No. 97-398 (SLR), 2001 WL 34367298 (Bankr. D. Del. June 5, 2001)..................................16

*Consorcio Prodipe, S.A. de C.V. v. Vinci S.A.*,
544 F. Supp. 2d 178 (S.D.N.Y. 2008)......................................................................................20

*In re Buildings by Jamie, Inc.*,
230 B.R. 36 (Bankr. D.N.J. 1998) ...................................................................................15, 16

*In re Continental Airlines, Inc.*,
236 B.R. 318 (Bankr. D. Del. 1999), aff'd, 279 F.3d 226 (3d Cir. 2002) ..............................19

*In re Emoral, Inc.*,
740 F.3d 875 (3d Cir. 2014)........................................................................14, 15, 16, 17, 18

*In re Enron Corp.*,
No. 01 B 16034(AJG), 2003 WL 1889040 (Bankr. S.D.N.Y. Apr. 17, 2003) .......................15

*In re Keene Corp.*,
164 B.R. 844 (Bankr. S.D.N.Y. 1994)..............................................................................15, 16

*In re Marcus Hook Dev. Park, Inc.*,
943 F.2d 261 (3d Cir. 1991)....................................................................................................19

*In re OODC, LLC*,
321 B.R. 128 (Bankr. D. Del. 2005) .......................................................................................14

*In re PHP Healthcare Corp.* ("*PHP*"),
128 Fed. Appx. 839 (3d Cir. 2005)..........................................................................................14

*Koch Ref. v. Farmers Union Cent. Exch., Inc.*,
831 F.2d 1339 (7th Cir. 1987) .................................................................................................15

*Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*,
2004 WL 415251 (Del. Ch. Mar. 4, 2004)..............................................................................17

*Murray v. Miner*,
876 F. Supp. 512 (S.D.N.Y. 1995) ..........................................................................................15

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
884 F.2d 688 (2d Cir. 1989).....................................................................................................15

ii

**STATUTES**

11 U.S.C. § 541(a)(1) ...............................................................................................14

11 U.S.C. § 105 ..............................................................................................8, 10, 19

11 U.S.C. § 363 ..................................................................................................8

11 U.S.C. § 541 ................................................................................................19

Rules 6004 and 9019 of the Federal Rules of Bankruptcy ...............................................8

Rule 7001(7) of the Federal Rules of Bankruptcy .......................................................11

iii

Gad Zeevi and Ram Zeevi (the "Zeevis"), directors and/or officers of the above-captioned debtors (collectively, the "Debtors"), by their attorneys, Fox Rothschild LLP, submit this memorandum of law in support of their motion to enforce:

(1) this Court's Order confirming the Fourth Amended Joint Plan of Liquidation (the "Plan") pursuant to which the Debtors released the Zeevis from claims and causes of action, including any "alter ego" claims that constituted property of the Debtors' Estates; and

(2) the Settlement Agreement, dated September 30, 2013, entered between the Liquidation Trustee and the plaintiffs (the "Tort Plaintiffs") in the consolidated actions pending in the United States District Court for the District of Puerto Rico, Civil No. 09-2092(FAB) (Lead Case) (the "Puerto Rico Action"), in which the Tort Plaintiffs released the Zeevis from "any and all claims."

## PRELIMINARY STATEMENT

In the Puerto Rico Action, which was filed as a result of the explosion at the Debtors' facilities (which effectively halted the Debtors' operations and led to the bankruptcy filings by the Debtors), the Tort Plaintiffs seek to recover against the Zeevis based on the alter ego theory of liability. Specifically, the Tort Plaintiffs allege in their Forth Amended Complaint[1] (Sections 3(e) and 3 (g)) that the Zeevis are liable to them because they, as directors and officers of the Debtors, controlled the Debtors "without adherence to normal corporate formalities, reasonable internal controls, or due consideration of the financial well-being [of the Debtors]" and "disregarded the corporate formalities in order to serve [their] own interests or those of [their] organization as a whole without regard to the individual corporate entities of the involved

---

[1]     A copy of the Fourth Amended Complaint is attached as **Exhibit 1** to Declaration of L. John Bird ("Bird Dec.").

1

entities." It is well established law in this Circuit that alter ego claims (such as the ones asserted by the Tort Plaintiffs) constitute property of the debtor's estate and could only be brought by the bankruptcy trustee or debtor-in-possession. Therefore, Tort Plaintiffs have no standing to assert such claims.

Moreover, to the extent any alter ego claims existed against the Zeevis, such claims were property of the Debtors' estates and were released under the confirmed Plan.

Alternatively, the Tort Plaintiffs themselves released the Zeevis in their recent Settlement Agreement with the Liquidation Trustee.

As a result, for the reasons stated below, this Court should grant the Zeevis' motion and enforce its Order confirming the Plan, as well as the Settlement Agreement, and compel the Tort Plaintiffs to dismiss the Puerto Rico Action against the Zeevis with prejudice.

## STATEMENT OF MATERIAL FACTS

### A. The Debtors, Gad Zeevi and Ram Zeevi and the Debtors' Affiliates

The three Debtors in the case at bar are Caribbean Petroleum Refining L.P. ("CPR"), a Delaware limited partnership, Caribbean Petroleum Corporation ("CPC"), a Delaware Corporation and Gulf Petroleum Refining (Puerto Rico) Corporation ("GPR"), a Delaware Corporation. *See* Declaration of Nicolás López Peña in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings[D.I. 3] (the "Peña Declaration"), ¶¶ 11, 16, 22.

Plaintiff Gad Zeevi was the President and Chairman of the Board of Directors of CPC and GPR. *See* Caribbean Petroleum Corporation Statement of Financial Affairs, Ex. 21B [D.I.

2

295]; Gulf Petroleum Refining (Puerto Rico) Corporation Statement of Financial Affairs, Ex. 21B [D.I. 299].[2]  Plaintiff Ram Zeevi was a Director of CPC and GPR. *See id.*[3]

The Debtors were part of a privately-held corporate structure.  Peña Decl., ¶ 10.  CPC held as a limited partner a 99% interest in CPR. *Id.* at ¶ 11.  GPR held as general partner a 1% interest in CPR. *Id.* at ¶ 22.  Both CPC and GPR were 100% owned by the British Virgin Islands entity Oil Resources International ("ORI"). *Id.* at ¶ 10.  ORI was 100% owned by the British Virgin Islands entity First Oil International ("FOI"), which was 100% owned by the British Virgin Islands entity GTRIMG LTD. *Id.*  GTRIMG LTD was owned by a Lichtenstein trust GTRIMG Foundation Vaduz (the "Trust"). *Id.*  Ram Zeevi is one of the five beneficiaries of the Trust. *Id.*

---

[2]     In the Fourth Amended Class Action Complaint (the "Fourth Amended Complaint") filed on October 22, 2010 and amended on February 28, 2014 in the consolidated actions in the Puerto Rico District Court, the Tort Plaintiffs assert that Gad Zeevi is the CEO and President of CPC and CPR and a director of CPC and CPR. *See* Bird Dec., Exhibit 1.

[3]     In the Fourth Amended Complaint, the Tort Plaintiffs incorrectly assert that Ram Zeevi is the Managing Director of CPC. Ram Zeevi resigned as Managing Director of CPC in July 2008 and at all relevant times was a director of CPC and GPR.

3

Below is an organizational chart of the Debtors and their affiliates as of the Petition Date:



*See* Peña Decl., ¶ 10; Discl. St. at §§ III(B), III(C).[4]

### B. Bankruptcy Filings Precipitated by the Explosions and the Puerto Rico Action

The Debtor's bankruptcy filings were triggered by a series of "catastrophic accidental explosions that occurred in October 2009 at the Debtors' facilities located in Bayamón, Puerto Rico that effectively halted the Debtors' operations". Peña Decl., ¶ 6; Discl. St., § III(A)(I).

---

[4]   A copy of the Disclosure Statement is attached as **Exhibit 2** to Bird Dec.

Following the explosion, in 2009 and 2010 the Tort Plaintiffs initiated the Puerto Rico Action by filing nine cases, five of which were filed as purported class actions, in the Puerto Rico District Court against thirty-seven defendants, including the Debtors and the Zeevis. Peña Decl., at ¶ 41. All nine cases were consolidated before the Honorable Francisco A. Besosa in the Puerto Rico Action. *Id.*

On August 12, 2010 (the "Petition Date"), the Debtors commenced their respective bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On August 16, 2010, the Court entered an Order jointly administering the Debtors' bankruptcy cases. After the Debtors filed for bankruptcy, the Puerto Rico Action was stayed.

### C.  The Allegations Against Gad Zeevi and Ram Zeevi in The Puerto Rico Action

The Tort Plaintiffs' claims against Gad Zeevi and Ram Zeevi in the Puerto Rico Action are based on the "alter ego" theory of liability.[5]  Specifically, in Paragraph 3(e) of the Fourth Amended Complaint Tort Plaintiffs allege:

> Gad Zeevi is the CEO and President of CPC and CPR. Gad Zeevi is also a director of CPC and CPR. Gad Zeevi, *through his control* of the GTRIMG Foundation and FOI, *controls and uses CPC and CPR for his own benefit and for the benefit of other entities he controls, without adherence to normal corporate formalities, reasonable internal controls, or due consideration of the financial well-being of CPC and CPR.*  Gad Zeevi has used the companies he controls, including CPC, CPR, FOI and Inpecos as a source of funding for one another and has otherwise disregarded the corporate formalities in order to serve his own interests or those of his organization as a whole without regard to the individual corporate entities of the involved entities. *As a result Mr. Zeevi is*

---

[5]      In the Fourth Amended Complaint, the Tort Plaintiffs assert several causes of action against the "Capeco Defendants," which is defined to include, among others, the Zeevis, CPC and CPR, including negligence, trespass, nuisance, failure to properly respond to emergency, and liability under Article 1802 of the Puerto Rico Civil Code. As to the Zeevis, all such causes of action relate to the Zeevis alleged control of the Debtors as asserted in ¶¶ 3(e) and (g) of the Fourth Amended Complaint.

5

> *personally liable for the debts and liabilities of CPC, CPR, FOI and Inpecos, including the damages suffered by Plaintiffs.*

Fourth Amended Complaint ¶ 3(e) (emphasis added).

Similarly, with respect to Ram Zeevi, Tort Plaintiffs claim:

> Ram Zeevi is the Managing Director of CPC and, along with his father, Gad Zeevi, exercises control over the operations of CPC and CPR.    Ram Zeevi, along with his father, Gad Zeevi, *has disregarded the corporate formalities of CPC and CPR for his own benefit, which makes him personally liable for their debts and liabilities, including the damages suffered by Plaintiffs.*

*Id.* at ¶ 3(g) (emphasis added).[6]

### D.  The Debtors Released the Zeevis in Their Confirmed Plan of Reorganization

#### 1.    The Plan Process and the Zeevi's Valuable Consideration to the Debtors and to Creditors

By a Guarantee dated March 22, 2003, Gad Zeevi guaranteed certain obligations under a certain Loan and Security Agreement of the same date by and between CPC and CPR, as borrowers and Banco Popular de Puerto Rico ("BPPR"), as lender (the "BPPR Credit Facility"). As of the Petition Date, the Debtors owed BPPR approximately $137 million on account of the BPPR Credit Facility.

As a part of the Plan process, the Debtors, the Creditors Committee, BPPR and Gad Zeevi, Talia Zeevi and ORI (the "Guarantor Parties") executed a Plan Support Agreement, dated February 4, 2011 (the "Plan Support Agreement").[7]  On May 18, 2011, the Creditors Committee and the Guarantor Parties signed a letter agreement (the "Letter Agreement") in support of the

---

[6]     The allegations against the Zeevis in all other actions, which were consolidated with the Puerto Rico Action, are identical to the allegations in the Fourth Amended Complaint.

[7]     A copy of the Plan Support Agreement is attached as **Exhibit 3** to Bird Dec.

6

plan pursuant to which the Debtor provided full releases to the Zeevis.[8]  In exchange for the
releases the Guarantor Parties, including the Zeevis, gave valuable consideration to the Debtors
and creditors, including the following.

1. <u>Subordination of Guarantor Parties' Claims and Agreement That Such Parties Are Not
Entitled to Distribution Under the Plan for Such Claims</u>:

    a. Any allegedly secured claims of any of the Guarantor Parties was deemed to
       be and treated as unsecured claims under the Plan.
    b. Approximately $90 million of debt owed to Debtor affiliate Inpecos, A.G.
       was treated as a Class 7 Subordinated Claim under the Plan and not entitled
       to receive any distribution under the Plan.[9]
    c. Approximately $13.26 million of debt owed to Debtor affiliate Lexel
       Establishment was treated as a Class 7 Subordinated Claim under the Plan
       and not entitled to receive any distribution under the Plan.[10]
    d. Approximately $6.25 million of debt owed to Debtor affiliate Lexel Ltd. was
       treated as a Class 7 Subordinated Claim under the Plan and not entitled to
       receive any distribution under the Plan.[11]

2. <u>Release of Insurance Coverage</u>: All insurance proceeds under the Chartis CGL and
Umbrella policies were contributed for the benefit of the Estate. At a minimum, this
included approximately $24 million of valuable insurance proceeds.[12] No proceeds of

---

[8]      The Letter Agreement affirms the agreed consideration to be provided by the Guarantor Parties in exchange
for the Plan releases as provided in the Plan Support Agreement.  Additionally, in the Letter Agreement, the
Creditors Committee agreed to "vigorously support and pursue confirmation of the Plan in good faith, including the
release provisions and the inclusion of the Guarantors and Guarantor Parties therein."  A copy of the Letter
Agreement is attached to Bird Dec. as **Exhibit 4**.

[9]      Inpecos, A.G. is an affiliate of the Debtors, also ultimately owned by the GTRIMG Foundation.

[10]      Lexel Establishment is an affiliate of the Debtors, also ultimately owned by the GTRIMG Foundation.

[11]      Lexel Ltd. is an affiliate of the Debtors, also ultimately owned by the GTRIMG Foundation.

[12]      As officers and/or directors of the Debtors, the Zeevis were additional insured parties under the Debtors'
policies with Chartis Insurance Company-Puerto Rico (the "<u>Chartis Policies</u>"), which covered claims for property
damage, bodily injury, marine liability and environmental pollution.  *See Declaration of Juan Segui on Behalf of
Chartis Insurance Company – Puerto Rico in Support of the Motion of Debtors Pursuant to Sections 105 and 363 of
the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 for an Order (A) Authorizing the Debtors to Enter Into a
Settlement, Release and Buyback Agreement With Chartis Insurance Company - Puerto Rico, (B) Authorizing the
Sale of Interests in Certain Insurance Policies Related Thereto, and (C) Permanently Barring All Claims Against*

7

the Debtors' insurance policies were carved out to be used to pay claims or expenses of the Zeevis, the Guarantors and the Guarantor Affiliates (defined below), including any expenses related to the Puerto Rico Action, in which the Zeevis were named defendants.

3.  Insurance Collection:  Gad Zeevi agreed to pursue the collection of insurance proceeds on behalf of the Debtors' estates and or the liquidating trust for the benefit of holders of allowed claims against the Debtors entitled to receive distributions under the Plan.

Thus, the Debtors and Creditors bargained for and received significant and valuable consideration from the Zeevis in return for the releases given to the Zeevis.

**2.    The Plan Releases**

Under the Plan Support Agreement and the Letter Agreement, the parties agreed that the release provisions in the Plan would expressly include the Guarantor Parties (including Gad Zeevi) and their affiliates, family members (which include Ram Zeevi), employees, officers,

---

*Chartis Under Such Insurance Policies, and Channeling Any Such Claims Exclusively to the Proceeds of the Sale of Such Insurance Policies*, Ex. A-B [D.I. 965].

Pursuant to a Settlement, Release and Buyback Agreement by and between the Debtors and Chartis (the "Chartis Agreement"), which was approved by this Court on May 9, 2011, the Debtors sold "all rights, title, and interests in and under the Chartis Policies, free and clear of all liens, encumbrances, claims, and/or interests of any Person of any kind or nature whatsoever" for an aggregate purchase price of $24,060,368.43.  The Chartis Agreement served to forever settle, resolve, and terminate any and all disputes and existing or alleged obligations between the parties and included a full release and discharge.   *See Order (A) Authorizing the Debtors to Enter Into a Settlement, Release and Buyback Agreement With Chartis Insurance Company - Puerto Rico, (B) Authorizing the Sale of Interests in Certain Insurance Policies Related Thereto, and (C) Permanently Barring All Claims Against Chartis Under Such Insurance Policies, and Channeling Any Such Claims Exclusively to the Proceeds of the Proceeds of the Sale of Such Insurance Policies* [D.I. 982].

Pursuant to the Plan Support Agreement and Sections 5.5 and 6.2(c)(iv) of the Plan, all proceeds received in connection with the Chartis Agreement were used to fund distributions to creditors of the Debtors, with the first $3.9 million used to satisfy allowed administrative expense claims and the remaining proceeds distributed to the holders of allowed general unsecured claims, including the Tort Plaintiffs, in accordance with the terms of the Plan.  *See* Plan Support Agreement, ¶¶ 2, 6; Plan, §§ 5.5, 6.2(c)(iv).

8

directors, agents, attorneys, successors and assigns. *See* Plan Support Agreement, ¶¶ 7-8; Letter Agreement, p. 1.

Accordingly, section 11.6(a) of the confirmed Plan[13] provides in pertinent part as follows:

> [T]he Debtors . . . shall completely, conclusively, absolutely, unconditionally, irrevocably, and forever release **the Released Parties** from any and all Claims . . . obligations, damages, demands . . . suits, Causes of Action . . . based in whole or in part on any act or omission . . ., whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or in part upon any act, omission, transaction, agreement, event, or occurrence taking place on or prior to the Effective Date **in any way relating to the Debtors** . . . .

Plan, § 11.6(a) (emphasis added).

Section 1.1 of the Plan defines "Released Parties" to include, among others, "(a) the Debtors and the Estates, (b) the Guarantors, (c) the Guarantor Affiliates, . . . [and] (k) any of the . . . officers, directors, . . .of the foregoing (in their capacity as such)."

Gad Zeevi is included among the Guarantors. Specifically, Section 1.1 of the Plan defines "Guarantors" to include "Oil Resources International, Limited, as guarantor, and Gad Zeevi and Talia Zeevi, as personal guarantors of the BPPR Credit Facility,"

Ram Zeevi is included among the Guarantor Affiliates. Section 1.1 of the Plan defines "Guarantor Affiliates" to mean "all entities (other than the Debtors) that are affiliated with a Guarantor, including all family members of the Guarantors." Ram Zeevi is Gad Zeevi's son and, hence, a Guarantor Affiliate under the Plan. In addition, both Gad Zeevi and Ram Zeevi are covered by the Debtor's release of the Debtors' directors.

---

[13]    A copy of the Order Confirming The Fourth Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors, the Statutory Committee of Unsecured Creditors, and Banco Popular De Puerto Rico and a copy of the Plan are attached as **Exhibit 5 and 6** to Bird Dec., respectively.

9

Therefore, pursuant to Section 11.6 of the Plan,[14] the Debtors fully and finally released the Zeevis from all asserted and unasserted Claims and Causes of Action against the Zeevis held or controlled by the Debtors.

Section 11.7 of the Plan enjoins "all holders of Claims against . . . the Debtors or the Estates" from asserting, among other things, any and all Causes of Action released pursuant to Section 11.6 of the Plan against the Released Parties.[15]

On May 9, 2011, the Bankruptcy Court entered the Confirmation Order confirming the Plan. The Confirmation Order is final and unappealable.

On June 3, 2011 (the "Effective Date"), the Plan became effective.[16]  The Notice of Effective Date, provides, in part that:

---

[14]      Section 1.1 of the Plan further defines "Causes of Action" to include:

any and all actions, proceedings, causes of action, suits, demands, rights to legal remedies, rights to equitable remedies, rights to payment, and Claims, . . . whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, noncontingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, of the Debtors or the Estates, existing as of the Effective Date . . .

Section 1.1 of the Plan provides that "Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code. The Bankruptcy Code provides:

The term "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

*See* 11 U.S.C. § 101(5).

[15]      Since the Plan provides for the injunctive relief, this motion is appropriately filed in the main bankruptcy proceeding. *See* Rule 7001(7) the Federal Rules of Bankruptcy.

[16]      Under Section 6.1(a) and (b) of the Plan, on the Effective Date the Debtors transferred all of their assets (including all insurance policies) to the Caribbean Petroleum Liquidation Trust ("CPLT" or the "Liquidation Trust") and the Debtors were dissolved.  FTI Consulting, Inc. was appointed as the Liquidation Trustee.

10

> [A]ll settlements, compromises, waivers, exculpations, releases, and injunctions set forth in the Plan shall be effective and binding on all entities who may have had standing to assert any settled, released, exculpated, or enjoined Claims or Causes of Action, and no other person or entity shall possess such standing to assert such Claims or Causes of Action after the Effective Date.

### E. The Tort Plaintiffs' Also Directly Released the Zeevis in the Settlement Agreement

Pursuant to the confirmed Plan, FTI Consulting, Inc. ("FTI") was appointed as post-confirmation liquidating trustee to administer general, unsecured claims, and distribute certain remaining funds to creditors on account of their allowed claims.  The Plan empowers FTI to enter into such agreements without further order of this Court.  On September 30, 2013, the Tort Plaintiffs entered into the Settlement Agreement with FTI, acting on behalf of the Debtors' estate.[17]  The Settlement Agreement fixes and allows the Tort Plainitiff's claims against the Debtors' estate and provides for a payment of more than $1.1 million to the Tort Plaintiffs from the post-confirmation Plan trust.

Paragraph 7 of the Settlement Agreement provides, in part, that:

> Upon the Effective Date, the Tort Plaintiffs hereby completely, conclusively, absolutely, unconditionally, irrevocably, and forever waive, and release CPLT, the Liquidation Trustee, the Debtors, the Debtors' estates, **and their respective officers, directors, employees agents, . . . [and] affiliates**. . . from, any and all claims, . . . damages, demands . . . suits, causes of action, judgments, liabilities, or rights whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, equity, or otherwise, arising on or

---

[17]    A copy of the Settlement Agreement is attached to Bird Dec. as **Exhibit 7**.  Paragraph 9 of the Settlement Agreement provides that "[a]ny dispute to this Settlement Agreement shall be resolved by the Bankruptcy Court or any other court having jurisdiction over the Bankruptcy Cases." Settlement Agreement, ¶9.  Bankruptcy Court is defined under the Settlement Agreement as "the United States Bankruptcy Court for the District of Delaware" and Bankruptcy Cases is defined collectively as "which cases are jointly administered under Case No. 10-12553 (KG). *See* Settlement Agreement, p. 2, ¶6.

ACTIVE 25486758v1

> prior to the effective date of this Settlement Agreement in any way relating to the Debtors . . . **including, but not limited to, any and all claims and causes of action arising from or related to the Explosions [and] the Puerto Rico Actions** . . . .

(emphasis added).

As already discussed above, at all relevant times, the Zeevis were directors of the Debtors. Thus, under the Settlement Agreement, the Tort Plaintiffs expressly and directly released the Zeevis from "any and all claims."

### F.    The Pendency of the Puerto Rico Action and the Refusal of the Tort Plaintiffs to Honor the Releases

By motion dated December 2, 2013 (the "<u>Stay Modification Motion</u>"), FTI, as post-confirmation liquidating Trustee under the Plan, moved this court for an order lifting the automatic stay to allow the continuation of the Puerto Rico Action. *See* [D.I. 1984-1]. The Stay Modification Motion appears to have been made pursuant to the Settlement Agreement in order to allow the Tort Plaintiffs to pursue their claims against numerous other third-party defendants in the Puerto Rico Action that (unlike the Zeevis) were not released by the confirmed Plan and the Settlement Agreement.[18]

On January 13, 2014, this Court entered the Order Granting Stay Relief for Consolidated Actions Pending in Puerto Rico [D.I. 2012]. On January 15, 2014, United States District Judge

---

[18]    In addition to the Debtors and their officers, directors and affiliates, the named defendants in the Puerto Rico Action include Chartis Insurance Company – Puerto Rico; Chartis II; UPT United Product Tankers GmbH & Co., KG; UPT United Product Tankers (Americas) LLC; Schoeller Holdings Ltd.; Columbia ShipManagement Ltd.; Columbia ShipManagement (Deutschland) GmBH; Cape Bruny Shipping Company, Ltd.; Cape Bruny Tankschiffahrts; Steamship Mutual Underwriting Association (Bermuda) Ltd.; Harbor Fuel Service, Inc. a/k/a Harbor Bunkering Corporation; Total Petroleum Puerto Rico Corporation; Total, S.A.; Royal Dutch Shell PLC; Shell Oil Company; BP North America, Inc.; BP Products North America, Inc.; The British-American Oil Producing Company; British-American Petroleum Corporation; British American Petroleum, Inc.; British American Petroleum International Corp.; Ace Limited; Liberty International Underwriters; Navigators Group Inc.; Antares Oil Services, LLC; Repsol Petroleo SA; MAPFRE Astra Oil Co.; Astra Oil Trading, NV; Vitol SA, Inc.; Intertek Oil Chemical & AGRI Division (Caleb Brett), a division of Intertek Group; RYTTSA, as agents of Repsol, S.A. and Repsol YPF Group Businesses.

12

Besosa of the Puerto Rico District Court entered an order vacating the stay in effect in the consolidated Puerto Rico Actions.  Upon learning of this, counsel to Gad Zeevi and Ram Zeevi requested that the Tort Plaintiffs' counsel honor the clear and unambiguous releases under the Settlement Agreement and dismiss the Puerto Rico Actions as against the Zeevis.  However, the Tort Plaintiffs' counsel refused to dismiss the Puerto Rico Action against the Zeevis.

## ARGUMENT

**I.     The Alter Ego Claims Asserted Against The Zeevis In The Puerto Rico Action Were Property Of The Debtors' Estates And The Debtors Released Such Claims Under The Confirmed Plan**

The Tort Plaintiffs' claims asserted against the Zeevis in the Puerto Rico Action are alter ego claims.  Such claims were property of the Debtors' estate and were released by the Debtors under the confirmed Plan.  Hence, the Tort Plaintiffs have no standing to assert these claims, are enjoined from pursuing such claims and all such claims must be dismissed against the Zeevis in the Puerto Rico Action.

### A.     Alter Ego Claims Asserted Against the Zeevis were Property of the Estate

It is well established by the courts that "[a]fter a company files for bankruptcy, 'creditors lack standing to assert claims that are 'property of the estate.'" *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (citing *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002) ("[O]nce a company or individual files for bankruptcy, creditors lack standing to assert claims that are 'property of the estate.'")); *see also In re PHP Healthcare Corp. ("PHP")*, 128 Fed. Appx. 839, 845 (3d Cir. 2005).  Under Section 541 of the Bankruptcy Code, property of the estate is defined broadly and comprises "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The causes of action are considered to be property of the bankruptcy estate "if the claim existed

13

at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law." *In re Emoral, Inc.,* 740 F.3d at 879.

Most courts, including the Third Circuit, have held that "alter ego" allegations constitute "general claims" that could only be raised by the bankruptcy trustee on behalf of all creditors. *See id.* (agreeing with the Second Circuit that "when examining common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion," where a claim is "a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."); *see also In re OODC, LLC*, 321 B.R. 128, 136 (Bankr. D. Del. 2005) (noting that "most courts have found that the trustee in bankruptcy has standing to bring successor liability (or alter ego) suits on behalf of all creditors."); *see also St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 703–04 (2d Cir. 1989) (same); *Koch Ref. v. Farmers Union Cent. Exch., Inc.,* 831 F.2d 1339, 1350 (7th Cir. 1987) (same); *In re Enron Corp.*, No. 01 B 16034(AJG), 2003 WL 1889040, at *3 (Bankr. S.D.N.Y. Apr. 17, 2003) ("Based on the fact that Delaware law allows a subsidiary to maintain an action against a corporate parent, courts have found that a Delaware court would permit a debtor corporation to assert a claim to pierce its own corporate veil"); *Murray v. Miner*, 876 F. Supp. 512, 517 (S.D.N.Y. 1995) ("[F]or purposes of applying federal bankruptcy law, Delaware courts would permit a debtor corporation to 'assert[ ] an alter ego claim to pierce its own corporate veil.'")

Indeed, in tort cases like the one at issue here, courts have specifically held that the alter ego (or successor liability) claims against the third parties are of a general nature and constitute property of the debtor's estate. *See, e.g., In re Emoral, Inc.*, 740 F.3d at 880-81; *see also In re*

14

*Keene Corp.*, 164  B.R. 844, 849 (Bankr. S.D.N.Y. 1994); *In re Buildings by Jamie, Inc.*, 230

B.R. 36, 43 (Bankr. D.N.J. 1998).

The *Emoral* case, recently decided by the Third Circuit, is directly on point.  In *Emoral*,

the Third Circuit found that any claims against the third party based on the successor (or alter

ego) liability were property of the debtor's estate.  *In re Emoral, Inc.*, 740 F.3d at 876.  In that

case, the plaintiffs had filed complaints pre-bankruptcy against Emoral alleging personal injury

and product liability claims, and asserting that defendant Aaroma, which had purchased the

assets of Emoral, was a "mere continuation" of Emoral and, therefore, liable directly to the

Plaintiffs.  After Emoral filed for bankruptcy, the trustee of Emoral's bankruptcy estate and

Aaroma entered into a settlement under which Emoral gave Aaroma a general release from all

claims of the debtor.  Plaintiffs then sought to continue to pursue their tort claims against

Aaroma (the successor-in-interest), claiming that their claims were individualized to the

plaintiffs, and were not released by the debtor's settlement with Aaroma.  Aaroma filed a

"Motion to Enforce Court Order Approving Settlement with Bankruptcy Trustee and Compelling

Dismissal of State Court Actions."

The Third Circuit affirmed the District Court's decision granting the motion.  The Court

agreed with the District Court's finding that "the cause of action for successor liability was a

'generalized' claim belonging to the estate because the facts giving rise to the cause of action

were not specific to [plaintiffs] but common to all creditors, and because, if [plaintiffs] were to

succeed in establishing that Aaroma constituted a 'mere continuation' of Emoral, this would

benefit the creditors of Emoral generally."  *Id.* at 878[19]; *see also In re Keene Corp.*, 164  B.R. at

---

[19]      "Put slightly differently, for purposes of determining whether the cause of action belongs to the Estate, the
critical distinction between the personal injury claim against Emoral and the successor liability claim against

15

849 ("[T]he remedy against a successor corporation for the tort liability of the predecessor is, like the piercing remedy, an equitable means of expanding the assets available to satisfy creditor claims. The class action plaintiffs that invoke it allege a general injury, their standing depends on their status as creditors of [the debtor], and their success would have the effect of increasing the assets available for distribution to all creditors."); *Buildings by Jamie,* 230 B.R. at 43 (holding that a debtor's individual creditors lacked standing to bring an alter ego veil-piercing cause of action seeking recovery from non-debtor third-party defendants, because that cause of action constituted property of the bankruptcy estate). In other words, in order to pursue an individual action, creditors must allege some wrong against them that is distinct from that suffered by the debtor. *See Bernberg v. Health Management Systems, Inc. (In re HHL Financial Services, Inc.),* No. 97-398 (SLR), 2001 WL 34367298, at *2 (Bankr. D. Del. June 5, 2001) ("[I]t would appear that the Third Circuit would find that plaintiffs at bar, although creditors, are required to allege some wrong distinct from that suffered by the corporation in order to pursue an individual action.").

Accordingly, in *Emoral,* the Third Circuit held that the successor liability causes of action constituted "general claims" that belonged exclusively to the debtor's estate and could have been asserted only by the trustee. Since the debtor released Aaroma from all liability, the Third Circuit further ruled that any claims by Plaintiffs against Aaroma were conclusively released and must be dismissed in the plaintiffs' state proceeding.

Similarly, here, Tort Plaintiffs' claims against the Zeevis in the Puerto Rico Action are indisputably based on the alter ego theory and are the classic 'generalized' claim belonging to

---

Aaroma is that establishing the former would benefit only the allegedly injured Diacetyl Plaintiffs whereas establishing the latter—that Aaroma is the "mere continuation" of Emoral and thus should be charged with all its liabilities—would benefit creditors of Emoral generally." *Id.*

16

the estate.  Tort Plaintiffs, in conclusory (and indeed false) fashion, claim that the Zeevis, as directors and officers of the Debtors, controlled the Debtors "without adherence to normal corporate formalities, reasonable internal controls, or due consideration of the financial well-being of [the debtors]" and "disregarded the corporate formalities in order to serve [their] own interests or those of [their] organization as a whole without regard to the individual corporate entities of the involved entities." *See* Fourth Amended Complaint (Exhibit 1), §3(e) and (g).  In other words, the Tort Plaintiffs claim that the Zeevis are liable for the Debtors' obligations to them for allegedly running the Debtors without adhering to the corporate form.  *See, e.g.,Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical,* 2004 WL 415251, at *7 (Del. Ch. Mar. 4, 2004) (holding that "[f]or this Court to pierce the corporate veil or hold that [a party] is the alter ego ... [the party seeking to pierce the corporate veil] must prove that some 'fraud or injustice' would be perpetrated through misuse of the corporate form").

As a matter of law, and pursuant to binding case law, such generalized alter ego claims constitute property of the debtors' estate which could only be alleged by the Debtors.  There is nothing "personal" about the Tort Plaintiffs' claims.

### B. Any Alleged Alter Ego Claims Against the Zeevis Were Released By the Debtors

Pursuant to section 11.6(a) of the Plan, the Debtors "completely, conclusively, absolutely, unconditionally, irrevocably, and forever release[d]" the Released Parties from any and all Causes of Action.  "Released Parties" under the Plan include, among others, the Guarantors (Gad Zeevi), the Guarantor Affiliates (Ram Zeevi), and the Debtors' officers and directors (Gad and Ram Zeevi).  Plan, § 1.1.

"Causes of Action" is defined in Section 101 of the Plan to include "any and all actions, proceedings, causes of action, suits, demands, rights to legal remedies, rights to equitable

17

remedies, rights to payment, and Claims . . . existing as of the Effective Date . . . ." *Id.* Clearly, given the breadth of this definition, it is indisputable that "Causes of Action" include any alter ego claims the Debtors could have asserted.

Thus, to the extent any alter ego claims existed against the Zeevis (which the Zeevis deny), such claims were property of the Debtors' estates and were released under the confirmed Plan.[20] As a result, the Court should follow the Third Circuit's decision in *Emoral* and grant the Zeevis' motion.

Furthermore, it is appropriate for this Court to interpret and enforce its own Confirmation Order and determine the scope and application of the releases under the confirmed Plan. "It is axiomatic that a court possesses the inherent authority to enforce its own orders . . . [and] [i]n the bankruptcy context, courts have specifically, and consistently, held that the bankruptcy court retains jurisdiction . . . to enforce its confirmation order." *In re Continental Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999), aff'd, 279 F.3d 226 (3d Cir. 2002) (internal citations omitted). Section 105(a) of the Bankruptcy Code provides that a bankruptcy court is authorized to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]" and "gives the bankruptcy court 'the power and the jurisdiction to enforce its valid orders.'" 11 U.S.C. § 105(a); *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 266 (3d Cir. 1991) (internal citation omitted).

---

[20]    The Debtors released the Released Parties in exchange for valuable consideration including, among other things, the subordination of claims held by the Guarantor Parties and their affiliates, agreement to receive no recovery on account of such claims and the release of substantial rights to insurance proceeds. In fact, all insurance proceeds were contributed to the Estate under the Buyback Agreement. Each of these actions provided a significant benefit to the Debtors and the entire creditor body, including the Tort Plaintiffs. Gad Zeevi's continuing support of the Plan was an additional integral part to the implementation of certain Plan provisions, including provisions regarding the collection of insurance proceeds for the benefit of the Debtors' creditors. In fact, since the insurance proceeds were contributed to the estate, the Zeevis can no longer use the proceeds to defend Tort Plaintiffs' claims in the Puerto Rico Action.

18

## II.    The Tort Plaintiffs Expressly Released the Zeevis in the Settlement Agreement

The Tort Plaintiffs' release of the directors and officers of the Debtors as part of the

Settlement Agreement, is yet another reason for this Court to grant the Zeevis' motion.

Under New York law:[21]

> [A] release may not be treated lightly. It is a jural act of high significance without which the settlement of disputes would be rendered all but impossible. It should never be converted into a starting point for renewed litigation except under circumstances and under rules which would render any other result a grave injustice. New York law also recognizes that "a clear and unambiguous release . . . should be enforced according to its terms."

*Consorcio Prodipe, S.A. de C.V. v. Vinci S.A.,* 544 F. Supp. 2d 178, 189 (S.D.N.Y. 2008)

(internal citations omitted). In *Consorcio Prodipe,* the court also noted under New York law

"when general language is used in the releasing document, 'the release is to be construed most

strongly against the releasor . . . .' [and] . . . [t]he burden is on the releasor to establish that the

release should be limited." *Id.* at 189-90.

Under the clear and unambiguous text of paragraph 7 of the Settlement Agreement, the

Tort Plaintiffs released the officers and directors of the Debtors from any and all claims arising

from or related to the Explosions and the Puerto Rico Actions.    Specifically, the Settlement

Agreement    states    that    "the    Tort    Plaintiffs...completely,    conclusively,    absolutely,

unconditionally,    irrevocably,    and    forever    waive[d],    and    release[d]    CPLT,    the Liquidation

Trustee, the Debtors, the Debtors' estates, and their respective officers [and] directors" from

"any and all claims and causes of action arising from or related to the Explosions [and] the

---

[21]    *See* Section 9 of the Settlement Agreement, which provides, in relevant parts, that the "Settlement Agreement shall be construed and interpreted in accordance with the laws of the State of New York."

19

Puerto Rico Actions." Settlement Agreement, ¶ 7. The Zeevis, who were officers and/or directors of the Debtors, are clearly the intended beneficiaries of the Settlement Agreement. Gad Zeevi was the President and Chairman of the Board of Directors of CPC and GPR. *See* Caribbean Petroleum Corporation Statement of Financial Affairs, Ex. 21B [D.I. 295]; Gulf Petroleum Refining (Puerto Rico) Corporation Statement of Financial Affairs, Ex. 21B [D.I. 299]. Ram Zeevi was a Director of CPC and GPR. *See id.* The Tort Plaintiffs do not dispute these facts as the Fourth Amended Complaint alleges that the Zeevis were officers and/or directors of the Debtors.

Under the plain language of the Settlement Agreement, the Tort Plaintiffs have released "officers and directors" of the Debtors, thus including the Zeevis, from all claims relating to the Explosions. Section 7, of the Settlement Agreement further provides that "the Tort Plaintiffs reserve their rights against any and all *other* parties to the [Puerto Rico Action]." Bird Dec., Exhibit 7 (emphasis added). As a result, pursuant to unambiguous language of the Settlement Agreement, the Tort Plaintiffs released the Debtors and the Zeevis from, among other things, the Puerto Rico Action, while reserving their right to pursue the action against numerous other parties, which are not mentioned in Section 7 of the Settlement Agreement.

In any event, upon releasing all claims against the Debtors in the Puerto Rico Action, the Tort Plaintiffs can no longer pursue any claims against alleged "alter egos" of such entities, since under the Plaintiffs own theory – these are but one and the same.

Furthermore, the Tort Plaintiffs expressly and unequivocally agreed to this Court's jurisdiction to enforce the Settlement Agreement. *See* Settlement Agreement, ¶9 ("Any dispute to this Settlement Agreement shall be resolved by the Bankruptcy Court or any other court having jurisdiction over the Bankruptcy Cases.").

20

Therefore, the Zeevis' motion should be granted and the Tort Plaintiffs should be compelled to dismiss all their claims against the Zeevis.

## CONCLUSION

For all the foregoing reasons, movants Gad and Ram Zeevi respectfully request that this Court enter an Order:

(a) permanently enjoining the Tort Plaintiffs from litigating the Puerto Rico Action, as well as claims asserted thereunder, against the Zeevis;

(b) compelling the Zeevis' dismissal with prejudice from the Puerto Rico Action; and

(c)  for such other and further relief as this Court deems just and proper.


Dated: April 24, 2014
        Wilmington, Delaware                **FOX ROTHSCHILD LLP**

                                            L. John Bird (No. 5310)
                                            Citizens Bank Center
                                            919 North Market Street, Suite 300
                                            Wilmington, Delaware 19801
                                            Telephone:   (302) 654-7444
                                            Facsimile:   (302) 656-8920
                                            Email:  lbird@foxrothschild.com

                                            – and –

                                            Yann Geron
                                            Oksana G. Wright
                                            100 Park Avenue, Suite 1500
                                            New York, New York 10017
                                            Tel:    (212) 878-7930
                                            Fax:    (212) 692-0940
                                            Email: ygeron@foxrothschild.com
                                            owright@foxrothschild.com

                                            *Counsel to Gad Zeevi and Ram Zeevi*


21