IN THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>CARIBBEAN PETROLEUM CORP., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case Nos. 10-12553 (KG), *et seq.*<br><br>(Jointly Administered)<br><br>**Hearing Date:  June 9, 2014 at 9:00 a.m.**<br>**Objection Deadline: May 30, 2014 at 4:00 p.m.** |

## TORT PLAINTIFFS' OPPOSITION TO MOTION TO ENFORCE PLAN RELEASE AND THE SETTLEMENT AGREEMENT FILED BYGAD ZEEVI AND RAM ZEEVI

NOW COME all the plaintiffs ("Tort Plaintiffs") in Civil Actions Nos. 09-2092, 09-2095, 09-2096, 09-2215 and 10-1030 pending in the United States District Court for the District of Puerto Rico  (the "Puerto Rico Actions") and submit their opposition to the Motion to Enforce Plan Release and the Settlement Agreement (the "Zeevis' Motion to Enforce") filed by Gad Zeevi and Ram Zeevi (collectively the "Zeevis") (Docket No. 2057).

PRELIMINARY STATEMENT

As will be shown below, the Tort Plaintiffs' claims against the Zeevis are individualized claims that belong to them and not to the Debtors' estates.  As such, the Debtors could not have released the Zeevis from the Tort Plaintiffs' claims. Furthermore, in their Settlement Agreement with the Liquidation Trustee, the Tort Plaintiffs did not release the Zeevis in their individual capacities or for their various capacities related to the other companies they control. To the extent that this Honorable Court intended to release the Tort Plaintiffs' personal injury claims against the Zeevis, this was beyond the Court's jurisdiction.

## I. FACTS.

1.   **The accident and the claims made by the Tort Plaintiffs in the Puerto Rico Actions.**

The Puerto Rico Actions were brought by the Tort Plaintiffs to recover damages they suffered as a result of the explosion and fire of approximately twenty-one fuel storage tanks that occurred on October 23, 2009, at about 12:30 a.m., at the Gulf Oil Facility (the "Gulf Oil Facility"),[1] which was owned and/or operated by Caribbean Petroleum Corporation ("CPC"), Caribbean Petroleum Refining L.P. ("CPR") and Gulf Petroleum Refining (Puerto Rico) Corporation ("GPC") (collectively, the "Debtors").

According to the Complaints filed in the Puerto Rico Actions, the Tort Plaintiffs suffered damages because they were exposed to toxic releases, and they fear that they will suffer continuing health consequences and/or disabling diseases in the future.  The Tort Plaintiffs also allege that they have suffered fear, anguish, discomfort and inconvenience, pain and suffering, mental anguish, emotional distress and psychiatric and psychological damages.  The Tort Plaintiffs also allege they suffered losses from damage to their property and their inability to use and enjoy their homes, buildings, property and businesses, and because the contamination of their property reduced their value.  *See* Docket Nos. 853, 854, 855, 856 and 857 in the Puerto Rico Actions.

2.   **The first bankruptcy of the Debtors.**

The Debtors have been in bankruptcy twice.  The first time was in the year 2001, when the Debtors commenced voluntary cases under Chapter 11of Title 11 of the United States Code, 11 U.S.C., *et. seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which were jointly administered under Cases

---

[1] The "Gulf Oil Facility" "consists of a petroleum refinery, marine dock/terminal, pipelines and storage tanks." *See* ¶ 1 in Docket Nos. 853, 854, 855, 856 and 857 in the Puerto Rico Actions.

Nos. 01-11657 (PJW) through 01-11660 (PJW) (collectively the "2001 Bankruptcy Cases"). The 2001 Bankruptcy Cases were not closed until the end of year 2012.

In the 2001 Bankruptcy Cases, the Bankruptcy Court appointed an Examiner to "investigate [ ] the relationships among the Debtors and their related parties, including Inpecos, A.G. ("Inpecos"), First Oil International ("FOI"), and Gad Zeevi, and evaluate [ ] the rights of the Debtors in relation to these parties." *See*, Final Report of Benito Romano, the Court-Appointed Examiner in the Caribbean Petroleum LP, *et. al.* Bankruptcy Proceeding (the "Romano Report"), which is dated October 31, 2002 and is filed in the Bankruptcy Court. A copy of the Romano Report is attached hereto as Exhibit "1".

**3.      The second bankruptcy of the Debtors.**

On August 12, 2010, the Debtors again commenced Chapter 11 cases in the Bankruptcy Court, which are jointly being administered under Case No. 10-12553 (KG) (collectively, the "2010 Bankruptcy Cases"). The 2010 Bankruptcy Cases are still open.

In connection with the 2010 Bankruptcy Cases, the Debtors filed the Declaration of Nicolás López Peña in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (the " López Peña Declaration"), a copy of which is attached hereto as Exhibit "2".

Once the 2010 Bankruptcy Cases were filed, all claims against the Debtors were automatically stayed in the Puerto Rico Actions. (Docket Nos. 497, 533). The day after the bankruptcy petitions were filed, the Debtors filed in the Puerto Rico Court a Motion to Stay Consolidated Proceedings (Docket No. 494) requesting that the Court stay all proceedings against them. The Puerto Rico Court granted the stay on August 16, 2010. (Docket No. 499).

On October 25, 2010, the Puerto Rico Court entered another order (Docket No. 533) that, notwithstanding Plaintiffs' opposition (Docket No. 519), extended the stay to the Debtors' co-defendants "pending further orders from the bankruptcy court." (Docket No. 533).

On May 9, 2011, this Court entered an order in the 2010 Bankruptcy Cases confirming the Debtors' Joint Plan of Liquidation (the "Plan"), which became effective on June 3, 2011. Pursuant to the Plan, the Debtors were dissolved and this Court established a Claim Administration Procedure for the payment of claims.

The Puerto Rico Court recently allowed the Puerto Rico Actions to proceed after this Court lifted the stay to allow those actions to proceed.

### 4.    The Settlement between the Tort Plaintiffs and the Trustee.

On July 14, 2011, Chartis Insurance Company ("Chartis") filed in the Puerto Rico Court a Motion for Dismissal of Complaint as to Chartis Insurance Company – Puerto Rico Pursuant to Bankruptcy Court Order Permanently Barring Claims Against Chartis Insurance Company – Puerto Rico and Channeling Claims Against Policy Proceeds to Debtor or Successor. (Docket No. 592).[2]   In that motion Chartis explained that Chartis and the Debtors had entered into a Settlement, Release and Buyback Agreement (the "Chartis Buyback Agreement") whereby "all claims and interests that could have been asserted against the Chartis policies survive, but are channeled exclusively to the Debtors or their successors and all persons are forever enjoined, barred and estopped from asserting claims against the Chartis policies or against Chartis." (Docket No. 594).  The Puerto Rico Court granted the motion on July 14, 2011 (Docket No. 594).

One year later, Liberty Mutual Insurance Company ("Liberty Mutual") entered into a similar buyback agreement with the Debtors, and Liberty Mutual also filed in the Puerto Rico Court a motion for dismissal of all claims against it.  (Docket No. 676).  On September 10, 2012

---

[2] The Tort Plaintiffs had sued the Debtors' insurers pursuant to Puerto Rico's Direct Action Statute, which allows injured parties to sue the insurers directly.

the Puerto Rico Court entered an Order (Docket No. 686) and a Judgment (Docket No. 687) dismissing with prejudice all the Tort Plaintiffs' claims against Liberty Mutual.

As a result of the Debtors' bankruptcy filings, the stays issued by the Puerto Rico Court, and the Puerto Rico Court's dismissal of the claims against two of the Debtors' insurers (Chartis and Liberty Mutual), the Tort Plaintiffs had no choice but to assert their claims against Debtors and those two insurers in the Bankruptcy Court, rather than in the Puerto Rico Court.

Plaintiffs began to assert their claims in the Bankruptcy Court in January, 2012, when Plaintiffs received a Notice of Entry of Supplemental Order in Connection With Claims Administration Procedure (I) Deeming Certain Tort Claims Timely Filed in the Debtors' Chapter 11 Cases and (II) Fixing Deadline for Holders of Such Tort Claims to Serve Completed Questionnaires on Liquidation Trustee ("Notice").  The Notice had attached to it a Supplemental Order in Connection With Claims Administration Procedure (I) Deeming Certain Tort Claims Timely Filed in the Debtors' Chapter 11 Cases and (II) Fixing Deadline for Holders of Such Tort Claims to Serve Completed Questionnaires on Liquidation Trustee.  This Order provided that:

> ORDERED that CPLT [the Trustee] may amend or supplement Exhibit 1 without further order of the Court, and the affected claimants must submit a fully completed Questionnaire to the Liquidation Trustee in accordance with the procedures set forth in the Claims Administration Procedure on the later of (i) the Return Deadline or (ii) twenty-one (21) calendar days after the date on which CPLT provided notice of such amendment or supplement...

Because the Tort Plaintiffs had filed tort claims against Chartis (by way of the lawsuits filed in the Puerto Rico Court), upon request by the Tort Plaintiffs, the Trustee determined that the Tort Plaintiffs' claims (1) should be considered Channeled Claims within the meaning of the Order; and (2) should be deemed to be tort claims timely filed in the Debtors' Chapter 11 cases.

Each of the Tort Plaintiffs then proceeded to complete the Questionnaire For Eligible Claimants required for presenting claims in the Bankruptcy Court.[3]  After the forms were completed, the Trustee filed several motions and/or objections seeking to have most of the Tort Plaintiffs' claims disallowed for various reasons. For over a year and a half, the Tort Plaintiffs and the Trustee engaged in litigation before this Court, including appeals to the United States District Court of Delaware, and at the same time conducted extensive settlement negotiations, which culminated with a settlement (the "Settlement") between the Tort Plaintiffs and the Trustee on September 30, 2013.

The Tort Plaintiffs resolved their individual claims with the Trustee under a process established by this Court.  By the time of their Settlement, the Debtors had already been dissolved as part of their confirmed Plan.

As noted in the Response in Opposition to Motions for Reconsideration Concerning Order Granting Dismissal of Plaintiffs' Claims filed by the Caribbean Petroleum Liquidation Trust in the Puerto Rico Actions (Docket No. 792) (the "Trustee's Response"), Section 8.4 of the Plan gave the Trustee exclusive authority to settle claims and related causes of action against the Debtors without the necessity for notice to, or approval by, the Bankruptcy Court or any other party in interest.  The settlement was reached under the authority given to the Trustee by the Bankruptcy Court pursuant to the Plan and in accordance with the claims process establish by the Bankruptcy Court.  Trustee's Response at p. 2.

As part of the Settlement with the Trustee, the Tort Plaintiffs agreed to dismiss the Puerto Rico Actions against the Debtors, which amounted to nothing more than a formality because the Debtors had already been liquidated and presumably have no further assets upon which the Tort Claimants could execute.  In the Settlement, the Tort Plaintiffs reserved all rights against the

---

[3] All the claims of the Tort Plaintiffs were lumped together in Proof of Claim 2263.

other defendants in the Puerto Rico Actions.   The resolution of the Tort Plaintiffs' claims in the

bankruptcy proceedings was nothing out of the ordinary.   "After the reorganization plans have

been confirmed, individual tort claims generally [are] resolved according to the term of the plans.

Those terms typically include the establishment of trusts from which [ ] claims for payment are

paid, under so-called channeling injunctions."  Manual for Complex Litigation, Fourth, § 22.541.

That is precisely what the Tort Plaintiffs did when they reached settlement with the Trustee.

On October 15, 2013, the Tort Plaintiffs filed in the Puerto Rico Actions a Motion for

Voluntary Partial Dismissal With Prejudice Due to Compromise (Docket No. 775) wherein they

requested the dismissal of "all the claims they have asserted in Civil Actions Nos. 09-2092, 09-

2095, 09-2096, 09-2215, 10-1030 and 10-1036 [the Puerto Rico Actions] against Caribbean

Petroleum Corporation, Caribbean Petroleum Refining L.P. and Gulf Petroleum refining (Puerto

Rico) Corporation, but reserving to Plaintiffs all rights and claims asserted against all other

parties in all consolidated actions." Motion to Dismiss at 1. This Motion was granted by the

Puerto Rico Court on October 28, 2013 (Docket No. 784).   Following a challenge to the

dismissal order mounted by several parties (Docket Nos. 785, 787, 788), which the Puerto Rico

Court ultimately denied, on January 17, 2014, the Puerto Rico Court entered partial final

judgment dismissing with prejudice the Tort Plaintiffs' claims in Civil Action Nos. 09-2092, 09-

2095, 09-2096, 09-2215, 10-1030 and 10-2036 against Caribbean Petroleum Corporation, CPR,

GPR, FTI Consulting and the Caribbean Petroleum Liquidation Trust (Docket No. 822).   On

January 22, 2014, the Puerto Rico Court entered an Amended Judgment in accordance with

Federal Rule of Civil Procedure 54(b).  (Docket No. 827).

5.     **The additional parties related to the Zeevis that are named as defendants in the Puerto Rico Actions.**

In the Puerto Rico Actions, the Tort Plaintiffs sued the Debtors and the following parties who have connections to the Zeevis:[4]

    a.     Inpecos A.G. ("Inpecos") is a Swiss limited company domiciled in Stenhausen, Switzerland. <u>Inpecos is owned by the GTRIMG Foundation and is controlled by Gad Zeevi.</u> Inpecos has entered into agreements with CPC obligating Inpecos to transport petroleum products and provide other services to CPC, including lending funds to CPC. <u>Inpecos' assets have been intermingled with, or Inpecos has improperly obtained the assets of CPC and CPR,</u> making Inpecos liable for the debts and liabilities of CPC and CPR, including the damages suffered by Plaintiffs.

    b.     First Oil International ("FOI"), a corporation organized under the laws of the British Virgin Islands for the special purpose of acquiring CPC and CPR. <u>FOI is an owner of CPC and CPR.</u> FOI is doing business in this district through CPC and CPR at their places of business. <u>FOI is owned by Gad Zeevi and/or the GTRIMG Foundation and is controlled by Gad Zeevi. FOI does not maintain corporate records and does not follow corporate formalities.</u> FOI's only reported address is c/o Services Resources (UK) Ltd., which is located in a four-apartment London, England townhouse owned by Ram Zeevi. <u>FOI is used by Gad Zeevi to exercise control over and to use CPC and CPR for his own benefit and for the benefit of other entities he controls, without adherence to normal corporate formalities, reasonable internal controls, or due consideration of the financial well–being of CPC and/or CPR.</u> **As a result, FOI is liable for the debts and liabilities of CPC and CPR, including the damages suffered by Plaintiffs.**

    c.     Gad Zeevi, whose domicile is unknown to Plaintiffs. <u>Gad Zeevi is the CEO and President of CPC and CPR. Gad Zeevi is also a director of CPC and CPR. Gad Zeevi, through his control of the GTRIMG Foundation and FOI, controls and uses CPC and CPR for his own benefit and for the benefit of other entities he controls, without adherence to normal corporate formalities, reasonable internal controls, or due consideration of the financial well-being of CPC and CPR. Gad Zeevi has used the companies he controls, including CPC, CPR, FOI and Inpecos as a source of funding for one another and has otherwise disregarded the corporate formalities in order to serve his own interests or those of his organization as a whole without regard to the individual corporate entities of the involved entities.</u> **As a result Mr. Zeevi is personally liable for the debts and liabilities of CPC, CPR, FOI and Inpecos, including the damages suffered by Plaintiffs.**

---

[4] *See* for example Document No. 854 in the Puerto Rico Actions filed in the Puerto Rico Actions. All other Amended Complaints have similar allegations. *See* Docket Nos. 853, 854, 855, 856 and 857.

d.    The GTRIMG Foundation ("GTRIMG"), a Liechtenstein Trust established in the early 1980s, the beneficiaries of which are Gad Zeevi's wife and children. <u>GTRIMG and the companies owned by it, are controlled by Gad Zeevi.</u> <u>GTRIMG has been used by Gad Zeevi to control the activities of CPC and CPR</u> <u>without regard to their corporate formalities.</u>  As a result, GTRIMG is liable for the debts and liabilities of CPC and CPR including the damages suffered by Plaintiffs.

e.    Ram Zeevi.  <u>Ram Zeevi is the Managing Director of CPC and, along with his</u> <u>father, Gad Zeevi, exercises control over the operations of CPC and CPR.</u>  <u>Ram</u> <u>Zeevi, along with his father, Gad Zeevi, has disregarded the corporate formalities</u> <u>of CPC and CPR for his own benefit,</u> which makes him personally liable for their debts and liabilities, including the damages suffered by Plaintiffs.

**6.    <u>Claims asserted against the Zeevis and their other entities.</u>**

The claims asserted by the Tort Plaintiffs against the Zeevis and their other entities are

not based solely on a pure alter ego liability.   Instead, the Tort Plaintiff have alleged that the

<u>Zeevis themselves committed tortious acts</u> which caused damage to them:

9.

The explosion occurred while the M/T Cape Bruny was unloading its cargo of 278,658 G.S.V. barrels (11,703,636 gallons) of highly flammable fuel (regular unleaded gasoline) at the marine dock/terminal.  The M/T Cape Bruny pumped too much of its cargo (fuel) into the pipelines that connect the marine dock/terminal, thereby causing the recipient storage tanks (Nos. 107 and 409) to overflow without detection.  As the cargo (fuel) spilled, it vaporized and spread across the Gulf Oil Facility.  The vaporized fuel found a source of ignition, causing the explosion. The Gulf Oil Facility's computerized monitoring system was not operational and a mechanical gauge attached to the storage tank could not be monitored by the two available Gulf Oil Facility employees involved in the operation. At the time of the explosion and while the transfer of the M/T Cape Bruny's cargo was being carried out, there were only five employees at the Gulf Oil Terminal:  one security guard, two laboratory employees, and two more employees to perform all other required operations.

10.

The explosion and fire, which lasted four days, generated an enormous smoke plume full of hazardous contaminants to which thousands of residents, (including Plaintiffs), were exposed causing them serious bodily harm.

11.

The blast also caused severe property damage to the homes, buildings and businesses owned by Plaintiffs in the affected areas. The force of explosion broke their windows, knocked doors off their hinges and frames and caused other severe damage. While the fire was burning, the homes, buildings and businesses had to be evacuated. Plaintiffs could not use their homes and buildings, and could not operate their businesses, resulting in loss of business income and opportunity.

12.

As a result of the explosion and fire, toxic gases and particulate were released into the atmosphere and spread from the Gulf Oil Facility to several areas of San Juan and the adjacent communities and municipalities of Puente Blanco, Cucharillas, Villa Paraíso, Las Palmas, Las Vegas, Juana Matos, Cataño, Levittown, Toa Baja,  Bayamón and others. Plaintiffs were exposed to the toxic gases and particulate, suffering injuries.

13.

The toxic gases and particulate have also caused serious and dangerous environmental contamination of water, water supplies and the land where the homes, buildings and businesses owned by Plaintiffs are located. The contamination has depreciated the value of the homes, buildings and businesses owned by Plaintiffs and the Class Members, or has made them unmarketable, thereby causing losses to Plaintiffs.

14.

As a result of the explosion, fire, exposure to toxic gases and particulate, and the contamination of water, water supply, land, homes, buildings and businesses, Plaintiffs and the Class Members have suffered fear, stress and anxiety.

15.

There are many other potential effects from the explosion that have not yet become known, and Plaintiffs reserve the right to amend this Complaint once additional information becomes available.

16.

The fire and explosion, and the resulting damages suffered by the Plaintiffs and the Class Members were caused by the concurrent actions, inactions and negligence of all the Defendants.

* * * *

**FIRST CAUSE OF ACTION: NEGLIGENCE OF OWNERS, OPERATORS AND OTHERS RESPONSIBLE FOR THE OPERATIONS OF THE GULF OIL FACILITY.**

25.

Plaintiffs, on behalf of themselves and the Class Members, repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if copied herein.

26.

Although CPC and CPR are currently organized as two legally separate entities, they continue to operate as a single enterprise for all practical purposes. These two entities, <u>together with Inpecos, FOI, Gad Zeevi, GTRIMG and Ram Zeevi,</u> (<u>collectively the "Capeco Defendants"</u>) together with "Vessel Defendants" (as that term is defined below in the Third Cause of Action) <u>had full control of the operations carried out at the Gulf Oil Facility</u> and on the M/T Cape Bruny on October 23, 2009.

27.

<u>The explosion and resultant fire and toxic release was caused by the negligence and fault of the Capeco Defendants</u>, the Vessel Defendants, Intertek, Antares, Astra Oil and Astra Oil Limited <u>in the following non-exclusive particulars</u>:

a.  Transferring or allowing the transfer of fuel and/or other explosive materials from the M/T Cape Bruny into a storage tank that could not be properly monitored because the Gulf Oil Facility's computerized monitoring system was not fully operational;

b.  Transferring or allowing the transfer of fuel and/or other explosive materials from the M/T Cape Bruny into storage tanks that were equipped only with mechanical gauges, which could not be monitored.

c.  Transferring or allowing the transfer of fuel and/or other explosive materials from the M/T Cape Bruny while only two employees of the Gulf Oil Facility were available to perform the operation;

d.  Allowing overflow of the storage tanks (Nos. 107 and 409) that were receiving fuel and/or other explosive materials from the M/T Cape Bruny;

e.  Failing to coordinate with the crew of the M/T Cape Bruny the operation for the transfer of fuel and/or other explosive materials that was underway when the explosion occurred;

f.  Failing to properly operate the: Gulf Oil Facility and to monitor the fuel-transfer or fuel-discharge operations so as to prevent the explosion, fire and toxic release and failing to prevent actions that either caused or contributed to the explosion, fire and toxic release;

g.  Operating the Gulf Oil Facility in such a manner that allowed actions that caused the explosion, fire and toxic release, including failing to have a operational monitoring system in place and  not having enough personnel or equipment to close the valves of the recipient tanks so as to prevent the overflow of the fuel;

h.  Failing to properly inspect the Gulf Oil Facility to assure that the tanks, equipment and personnel were fit for their intended purpose;

i.  Acting in a careless and negligent manner without due regard for the safety of others;

j.  Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Gulf Oil Facility  at the time of the explosion, fire and toxic release, which, if they had been so promulgated, implemented and enforced, would have averted said explosion, fire and toxic release;

k.  Operating the Gulf Oil Facility with untrained and unlicensed personnel;

l.  Inadequate and negligent training and hiring;

m.  Failing to take appropriate action to avoid or mitigate the explosion, fire and toxic release;

n.  Negligent implementation of policies and procedures for the safe transfer and storage of fuel and/or other explosive materials and failing to follow standards and regulations for the safe transfer and storage of fuel and/or other explosive materials;

o.  Employing untrained or poorly trained employees and failing to properly train employees;

p.  Failing to ascertain that the tanks and equipment were free from defects and/or in proper working order;

q.  Failure to timely warn;

r.  Failure to timely bring the release of fuel and/or other explosive materials under control;

s.  Failure to provide appropriate accident prevention equipment;

t.  Failure to observe and read the gauges of the tank that was receiving fuel and/or other explosive materials;

u.  Failure to react properly to danger signs;

v.  Failure to have adequate water supply and other emergency systems to stop and/or control the explosion and fire;

w.  Failure to follow and comply with standards. rules, regulations and statutes, including those set out in and incorporated by reference into the Code of Federal Regulations, which are designed to prevent the type of explosion, fire and toxic release that occurred at the Gulf Oil Facility;

x.  Failing to take manual measurements or soundings to determine the amount of fuel that was inside the receiving tanks; and

y.  Failing to perform those acts listed in the e-mail dated October 20, 2009 from Elisa Fabian (on behalf of Astra Oil) to Intertek's and Antares' representatives.

z.  Such other acts of negligence and omissions as will be shown at the trial of this matter, all of which acts are in violation of the laws of Puerto Rico and the United States of America.

\* \* \* \*

## SECOND CAUSE OF ACTION: LIABILITY FOR THINGS UNDER ONE'S CONTROL

28.

Plaintiffs, on behalf of themselves and the Class Members, repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if copied herein.

29.

The explosion, fire and resultant toxic release was caused by improper, unsafe and negligent acts or omissions in preparation and during the course of offloading said fuel, and  which was in the care, custody, and control of the Capeco Defendants, the Vessel Defendants, Astra Oil, Astra Oil Limited, Intertek and Antares  over which the Capeco Defendants, the

Vessel Defendants, Astra Oil, Astra Oil Limited, Intertek and Antares <u>had</u> <u>*garde*</u>.  <u>The Capeco Defendants</u>, the Vessel Defendants, Astra Oil, Astra Oil Limited, Intertek and Antares <u>knew or should have known that these</u> <u>acts and omissions were dangerous and posed an unreasonable risk of</u> <u>harm, including, but not limited to the risk of release of fuel and</u> <u>explosion</u>.

**7.      <u>The findings made by the Court-appointed Examiner</u>.**

The Examiner appointed in the 2001 Bankruptcy Cases deposed Gad Zeevi, Ram Zeevi and others (Romano Report at pp. 3-4).  However, Inpecos and Gad Zeevi did not cooperate with the investigation.  (Romano Report at p. 5).

The Examiner stated in his report, in no uncertain terms, the following:

> In the course of his investigation, the Examiner has become aware of certain facts that he believes should be brought to the Court's attention as bearing on the issue of whether a trustee should be appointed in this matter. These include, among other things, <u>the use of the Debtors by Mr.</u> <u>Zeevi for his benefit and the benefit of other entities he controls without</u> <u>adherence to normal corporate formalities, reasonable internal controls, or</u> <u>due consideration of the financial well-being of the Debtors</u>; the creation and use by the Debtors and Inpecos of <u>a false agreement for the purpose of</u> <u>obtaining a favorable tax opinion</u>; and the purposeful failure of the Debtors to pay excise taxes." (Romano Report at page 2).

According to the Romano Report, "[t]he Debtors are all owned directly or indirectly by ORI [Oil Resources International] which is itself owned by FOI [First Oil International].  FOI, in turn, is ultimately owned along with other entities by a trust called GTRIMG Foundation "GTRIMG"), discussed below."[5] (Romano Report at p. 7).

The Romano Report discusses Gad Zeevi at pp. 9-11:

> Gad Zeevi is the President, Chief Executive Officer, and a director of each of the Debtors. <u>The evidence uniformly shows that Mr. Zeevi controls the</u> <u>Debtors</u> with the assistants of Haim Bergstein, who is also a director of the Debtors and a long-rime business associate of Mr. Zeevi.

---

[5] This is the same ownership structure that currently exists.  *See* Zeevi's Motion to Enforce at p. 4. *See also,* López Peña Declaration at pp. 4-5 which sets out the Debtors' businesses and organizational structure "immediately prior to the October 2009 explosions."

The Debtors comprise only a part of Mr. Zeevi's worldwide holdings. In total, Mr. Zeevi owns some forty companies including the Debtors, though some of these are holding companies. (See G. Zeevi Dep. At 28). As noted, Mr. Zeevi's ownership of the Debtors — along with FOI, Inpecos, and all of his other holdings — is consolidated in GTRIMG, a Liechtenstein trust established in the early 1980's the beneficiaries of which are Mr. Zeevi's wife and children. (G. Zeevi Dep. At 27).

The evidence is clear that at least until November 2000 Mr. Zeevi controlled GTIMG. Mr. Zeevi testified that he exercised some control over GTRIMG prior to November 2000. (See G. Zeevi Dep. At 27). Separate evidence confirms that his control was absolute. According to a September 5, 1999 letter from a director of GTRIMG to a representative of Fleet, Mr. Zeevi could terminate the trust at any time, change beneficiaries and their rights, change the trustees and the terms of the trust, and contribute or exclude assets from the trust as he wished." (Romano's Report at pages 9-10).

* * * *

Nonetheless, the Examiner believes the evidence demonstrates that Mr. Zeevi, in fact, does control the trust and the companies owned by the trust as a practical matter even assuming he does not as a technical legal matter…

The Romano Report then discusses First Oil International at pp. 11-13:

FOI is the owner of the Debtors through ORI. FOI was organized in the British Virgin Islands in 1987 by or on behalf of Mr. Zeevi as a special purpose entity to acquire the Debtors. (G.Zeevi Dep. at 47-48). At that time, FOI was owned in part by Mr. Zeevi, in part by a trust controlled by the family PHIBRO oil trader Michael Florsheim, and in part by a California investment company. (Bergstein Dep. at 102). After Mr. Florsheim's death in the early 1990s, Mr. Zeevi (or the GTRIMG trust) purchased the shares of the Florsheim trust as well as those of the California investment company leaving FOI under Mr. Zeevi's sole control. (Bergstein Dep. at 103).
[INSERT p.11, p. 13 middle ¶]

The Romano Report goes on to discuss Inpecos A.G. at pp. 14-26:

Inpecos is a Swiss limited company domiciled in Steinhausen, Switzerland also owned by the GTRIMG Trust.

* * * *

Additionally, because Inpecos – like the Debtors and FOI – is ultimately owned by the GTRIMG trust, the Examiner believes that an argument can

be made that Mr. Zeevi controls Inpecos, through Mr. Zeevi has disclaimed such control.  <u>As already noted, there is substantial evidence that Mr. Zeevi controls the GTRIMG trust</u>.  <u>Since the trust is Inpecos's parent, that amounts in substance to control over Inpecos</u>.  <u>Moreover, there is at least some evidence that Mr. Zeevi at times affirmatively asserted that he could exercise control over Inpecos</u>.  To take just one example, in a May 2000 memorandum, the auditors of the Debtors, BDO, stated that Mr. Zeevi "will represent to us that, if necessary, Inpecos [*sic*] will not require payments during 2000, in order to ensure that CPC meets its other current obligations."  (A copy of this memorandum is attached as Final Report Appendix Exh. 5.)  Mr. Bergstein could not verify whether Mr. Zeevi ultimately made this representation.  He did testify, however, that Mr. Zeevi had the ability to do so.  (Bergstein Dep. at 267).

The Romano Report states at pp. 26-27:

> All of the officers and directors of a debtors corporation are insiders of that corporation by definition. See 11 U.S.C. sec. 101(31)(B)(i),(ii) (1993). Similarly, "persons in control" of a debtor — whether it be a corporation or a partnership —also are insiders. See U.S.C. sec 101 (31)(C)(v). "Control" for these purposes turns upon whether "the relationship in question is fraught with the same potential for improper influence as the relationships specifically enumerated in the statute." <u>In re Greer West Inv. Ltd. P'ship,</u> No. 94-15670, 1996 U.S. App. LEXIS 8495, *7-8 (9th Cir. Mar. 25, 1996); <u>see also In re Krehl,</u> 86 F.3d 737, 741 (7th Cir. 1996) (the definition of "insider" is "intended to be illustrative rather than exhaustive").

> Under these definitions, both Gad Zeevi and Haim Bergstein are insiders of the Debtors. They are insiders of CPC (which is a corporation) by virtue of their status as directors. As for CPLP and CPR, Mr. Zeevi has admitted being "in control" of both partnerships and is a director of both in any event…. (Romano's Report at pp. 26-27).

The Romano Report states at pp. 55-56:

### 1. Disregard of Corporate Form

> The Examiner has become aware of numerous instances in which Mr. Zeevi has used the companies he controls, including Debtors, as a source of funding for one another <u>and otherwise disregarded the corporate form in order to serve his own interests or those of his organization as a whole without regard to the individual corporate interests of the involved entities</u>. Thus, in reviewing the books and records of the Debtors, the Examiner and his experts have noted many transfers among the Debtors and their related parties without proper documentation: journal entries made to increase or decrease the amounts owing by related entities without

support; and sales and purchases of property by one related entity to another at arbitrary prices unconnected to any independent appraisal.

The Debtors' relationship with FOI typifies this <u>disregard of the corporate form</u>. (Romano's Report at pages 55-56).

The Romano Report then goes on to describe the transactions that exemplify the disregard of corporate formality.

> The Romano Report then to states at pp. 56-57:
>
> So too the Debtors relationship with GCC. There, payments of almost $23 million were made by CPC on GCC's behalf with corporate formalities totally lacking as CPC was keeping GCC's books. Moreover, no consideration at an appears to have been given to whether these payments carried with them any benefit to CPC or furthered any CPC business purpose. Indeed, as noted above, Mr. Vataro told the Debtors' board in 2001 that CPC could not afford to continue to fund GCC's operations given by CPC's increasingly precarious financial condition; yet, the payments were made nonetheless because they benefited a Zeevi-controlled entity. This disregard of the corporate form and willingness to employ one entity to fund another plainly bears upon whether a trustee should be appointed. Indeed, even the failure of management properly to document transactions among related entities bears upon their competence, since a lack of proper controls creates the potential for loss due not only to fraud and misappropriation but due to simple errors as well. (Romano's Report at pages 56-57).

The Romano Report also provides evidence of Gad Zeevi's character:

> **Criminal Investigation of Mr. Zeevi**
>
> A final matter that may bear upon the appointment of a trustee is the status of certain criminal charges against Mr. Zeevi in Israel. On June 12, 2002, Mr. Zeevi was charged in an instrument denominated an "Indictment" by the state of Israel for fraudulently obtaining bank loans, lying to the government, money laundering, and conspiring to obtain control of state-owned telecommunications company named Bezeq using, among other entities, a Zeevi controlled company called Alpha Trade and Finance Corporation ("Alpha") (Mr. Zeevi also used Alpha to make certain payments to Debtors here)." (Romano's Report at page 62).

## II. <u>ARGUMENT</u>.

A.     <u>The claims asserted by the Tort Plaintiffs against the Zeevis in the Puerto Rico Actions to recover for the personal damages they suffered as a result of the explosions are individualized claims that are not property of the Debtors' Estates.</u>

      1.     <u>The case on which the Zeevis rely, which was decided pursuant to New Jersey and New York law, is not applicable to the Puerto Rico Actions.</u>

The Zeevis' Motion to Enforce is based on a case recently decided by the Third Circuit Court of Appeals, *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014). But that case is not applicable because (1) it was decided under New Jersey and New York law; and (2) the claim was based on a "continuation" of liability theory, which is not applicable to our case.

      a.     <u>The laws of New York and New Jersey do not apply.</u>

The issue presented in *In re Emoral, Inc.* was "whether personal injury causes of action arising from the alleged wrongful conduct of a debtor corporation, asserted against a third-party non-debtor corporation on a <u>'mere continuation'</u> theory of successor liability <u>under state law</u>, are properly characterized as 'generalized claims' constituting property of the bankruptcy estate." 740 F.3d at 876.

Because state law governs the question whether a corporation can seek to hold another corporation or individual liable for all of its debts to all of its creditors, the answer to that question is not uniform across the country. Although some states allow corporations to pursue such generalized claims, some states do not. *See e.g., RDM Holdings. Ltd. v. Continental Plastics Co.*, 762 N.W. 2d 529, 545 (Mich. Ct. App. 2008) (Michigan law); *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1225 (8th Cir. 1987) (Arkansas law).

The Court in *In re Emoral, Inc.* applied on New Jersey and New York law without first conducting a choice-of-law analysis. This was possible because Emoral, Inc. is a New York corporation with its principal place of business in New Jersey. As a result, "either New Jersey or

New York law applies and [ ] the two states' relevant applicable legal standards are identical, rendering a choice-of-law analysis unnecessary." 740 F.3d at 880 n.2.

For New York law the Court relied on *In re Keane Corp.*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994), where the "court, applying New York law with respect to successor liability, held that plaintiffs' causes of action constituted property of the estate…" And for New Jersey law, the Court relied on *In re Buildings by Jamie, Inc.*, 230 B.R. 36, 43 (Bankr. D.N.J. 1998), where

> the court, applying New Jersey law, concluded that the debtor's individual creditors lacked standing to bring an alter ego veil-piercing cause of action seeking recovery from non-debtor third-party defendants, because that cause of action constituted property of the bankruptcy estate. It held that because New Jersey law permits a corporation to pierce its own veil and because recovery on the alter ego claim would benefit the estate as a whole, the cause of action was "properly characterized as a general claim as to which the trustee alone has standing as representative of the estate." 230 B.R. at 44.

The laws of New York and New Jersey, however, which drove the decision in *In re Emoral, Inc.*, have nothing to do with the instant case. The Debtors were incorporated in Delaware, their principal place of business is in Puerto Rico, and the Tort Plaintiffs' injuries occurred in Puerto Rico. So, either the law of Delaware or the law of Puerto Rico apply, but not the law of New York or New Jersey.

Since the choice is between the law of Delaware and Puerto Rico, a choice-of-law analysis would indicate that Puerto Rico has the most significant contacts and Puerto Rico law should apply. *See Wadsworth, Inc. v. Schwarz-Nin*, 951 F. Supp. 314, 32-22 (D.P.R. 1996). But here the Zeevis have not shown that Puerto Rico law is similar to New York or New Jersey, as should have been done in order for *In re Emoral, Inc.* to have even persuasive authority.

  **b.**  **The "Continuation" theory of liability is not the same as alter ego liability.**

The second problem the Zeevis face is that the "continuation" theory of liability has no application in this case.  The Zeevis seem to believe that the "continuation" theory of liability, which was at issue in *In re Emoral, Inc.*, and the alter-ego theory of liability, which is one theory asserted by the Tort Plaintiffs against the Zeevis in the Puerto Rico Actions, are one and the same.  *See*  Zeevis' Motion to Enforce at pp. 14-15 ("…the alter ego (or successor liability)…; the "Successor (or alter ego) liability…").  But this is not correct.

The "continuation" theory of liability is an exception to the rule against successor liability pursuant to which an acquiring company is generally not liable for the debtors and liabilities of the selling company.  The Court in *In re Emoral, Inc.* explained the "continuation" theory as follows:

> To establish liability based on a "mere continuation" theory, as the Diacetyl Plaintiffs seek to do against Aaroma, a plaintiff must "establish that there is continuity in management, shareholders, personnel, physical location, assets and general business operation between selling and purchasing corporations following the asset acquisition." *Ramirez v. Amsted Indus, Inc.*, 86 N.J. 332, 342, 431 A.2d 811 (1981).

740 F.3d at 880. On the other hand, the elements of an alter ego claim in Puerto Rico are different:

> Where the directors or officers use the corporation to commit fraud, courts will 'pierce the corporate veil' and hold those officers or directors personally liable." *Id.* at 322 (citing *South Porto Rico Sugar Corp. v. Junta Azucarera*, 88 D.P.R. 43 (1963)).

> This court has listed several factors in deciding whether to pierce the corporate veil.  Factors frequently considered "are undercapitalization, non-payment of dividends, nonfunctioning officers and directors, failure to observe corporate formalities, absence of corporate records, commingling of funds, and use of corporate funds for non-corporate purposes." *United States v. JG-24, Inc.,*, 331 F. Supp. 2d 14, 63 (D.P.R. 2004) (citing *Satellite Broad, Cable v. Telefónica de España*, 786 F. Supp. 1089, 1102 (D.P.R. 1992)).  The First Circuit has listed additional factors of corporate insolvency at the time of litigation, the use of the corporation in

> committing fraud, and the siphoning of corporate funds by the dominant
> shareholder.  *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d
> 10, 14-16 (1st Cir. 1985).

*Colón v. Blades*, 757 F. Supp. 2d 107, 109 (D.P.R. 2010).

Thus, *In re Emoral, Inc.* does not apply to a claim for piercing of the corporate veil in

Puerto Rico.

**2.**    **Unlike *In re Emoral, Inc.*, here the injuries suffered by the Tort Plaintiffs are the result of the torts that were actually committed by the Zeevis and their other corporations against the Tort Plaintiffs.**

In *In re Emoral, Inc.*, the district court and the appellate court made it very clear that the

plaintiffs had not alleged the commission of any tort (or misfeasance) by the successor

corporation and that the plaintiffs' claims were only based on the "continuation" theory of

liability.  The Court stated:

> The District Court held that the cause of action for successor liability was
> a "generalized" claim belonging to the estate because the facts giving rise
> to the cause of action were not specific to the Diacetyl Plaintiffs but
> common to all creditors, and because, if the Diacetyl Plaintiffs were to
> succeed in establishing that Aaroma constituted a "mere continuation" of
> Emoral, this would benefit the creditors of Emoral generally.  (*Id.* at 7-9.)
> It stated:
>
>> [T]he potential liability of Aaroma to the Diacetyl Plaintiffs does
>> not arise out of the alleged misfeasance of Aaroma as to these
>> creditors individually but rather out of its alleged continuation of
>> the general business operation of the actual alleged wrongdoer,
>> Emoral.  Put slightly differently, for purposes of determining
>> whether the cause of action belongs to the Estate, the critical
>> distinction between the personal injury claim against Emoral and
>> the successor liability claim against Aaroma is that establishing the
>> former would benefit only the allegedly injured Diacetyl Plaintiffs
>> whereas establishing the latter – that Aaroma is the "mere
>> continuation: of Emoral and thus should be charged with all its
>> liabilities – would benefit creditors of Emoral generally.

Unlike *In re Emoral, Inc.*, here the Tort Plaintiffs have alleged that "[t]he fire and

explosion, and the resulting damages suffered by the Plaintiffs… were caused by the concurrent

actions inactions and negligence of all the Defendants."  Complaint ¶ 16. "Inpecos, FOI, Gad

Zeevi, GTRIMG and Ram Zeevi, (collectively the "Capeco Defendants") together with the "Vessel Defendants"... <u>had full control of the operations carried out at the Gulf Oil Facility</u> and on the M/T Cape Bruny on October 23, 2009." Complaint ¶ 26. The Tort Plaintiffs go on to allege that "<u>[t]he explosion and resultant fire and toxic release was caused by the negligence and fault of the Capeco Defendants</u> [which include Inpecos, FOI, Gad Zeevi, GTRIMG and Ram Zeevi], the Vessel Defendants...." Complaint ¶ 27.

Only the trustee may pursue a claim involving a generalized injury common to the estate's creditors–that is, one that could be brought by any creditor of the debtor–because that claim is for injury to the estate itself and stands to benefit all of its creditors. *Board of Trustees of Teamsters local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002) (hereinafter, "*Foodtown*"). On the other hand, a claim that seeks redress for an <u>injury</u> <u>that</u> <u>is</u> <u>unique</u> <u>to</u> <u>a</u> <u>creditor</u> is not property of the estate and may be pursued by that individual creditor. *Foodtown*, 296 F.3d at 170. "A claim for an injury is personal to the Debtor if other creditors generally have no interest in that claim." *Id. (citing Koch Refining v. Farmer Union Cert. Exchange, Inc.*, 831 F.2d 1339, 1348-49 (7th Cir. 1987)).

Thus, the claims asserted by the Tort Plaintiffs against the Zeevis are particular individualized injuries that only they can bring and thus are not property of the estate. The Debtor could not have settled with the Zeevis the Tort Plaintiffs' claims as part of the Zeevis' support for the plan.

### 3.     <u>The Tort Plaintiffs did not release their claims against the Zeevis in their individual capacity or in their capacities related to their other entities.</u>

It is true that the Tort Plaintiff released their claims against the Debtors and the Debtors' officers and directors. But the same paragraph 7 of the Settlement Agreement cited by the

Zeevis states: "For the avoidance of doubt, the Tort Plaintiffs reserve their rights against any and all other parties to the Consolidated Actions [filed in the Puerto Rico Court]."

Thus, it is very clear that while the Tort Plaintiffs released the Zeevis in their capacities as officers or directors of the Debtors, they did not release them in the capacity for which they had been sued in the Puerto Rico Actions: as individuals for their own individual torts committed against the Tort Plaintiffs, or for their capacities as individuals in control of Inpecos, FOI and GTRIMG. In fact, when the Tort Plaintiffs filed their motion to dismiss their claims against the Debtors in the Puerto Rico Court, they reserved "to Plaintiffs all rights and claims asserted against all other parties in all consolidated actions." (Docket No. 775). And the Puerto Rico Court entered Judgment dismissing the Tort Plaintiffs' claims only against the Debtors, FTI Consulting and the Caribbean Petroleum Liquidation Trust. (Docket Nos. 784, 822, 827). No one else was dismissed because all other claims were reserved and maintained.

### 4.    The Court does not have jurisdiction to dismiss any claims of the Tort Plaintiffs.

The Zeevis have asked this Court to dismiss the Tort Plaintiffs' claims against them. However, a bankruptcy court does not have jurisdiction to hear and determine personal injury and wrongful death claims. 28 U.S.C. § 157(b)(5); Manual of Complex Litigation § 22.541; *In re Best Mfg. Group LLC*, 2007 Bankr. LEXIS 32392746834 at *9 (Bankr. D.N.J. 2007).

### III.  <u>CONCLUSION</u>.

For the above mentioned reasons, the Tort Plaintiffs request that this Honorable Court

deny the Zeevis' Motion to Enforce.

Dated: May 30, 2014                              Respectfully submitted,
       Wilmington, Delaware

                                       HILLER & ARBAN, LLC


                                        **/s/ Adam Hiller**
                                       Adam Hiller (DE No. 4105)
                                       1500 North French Street, 2nd Floor
       Wilmington, Delaware 19801
       (302) 442-7676 telephone
       (302) 442-7045 facsimile
       ahiller@hillerarban.com

       -and-

       Camilo K. Salas III (LA Bar #11657)
       SALAS & Co., L.C.
       650 Poydras Street, Suite 2000
       New Orleans, LA 70130
       Telephone: 504-799-3080
       Facsimile: 504-799-3085
       E-mail: csalas@salaslaw.com

       -and-

       JOHN F. NEVARES USDC-PR 130502
       John F. Nevares & Associates, PSC
       P.O. Box 13667
       San Juan, Puerto Rico 00908-3667
       Telephone: (787) 722-9333
       Facsimile: (787) 721-8820
       Email: jfnevaresnevareslaw.com

       *Attorneys for the Tort Plaintiffs*